**Case No. 1:21-cv-02163-KPF**

---

In the
United States District Court
for the Southern District of New York

---

IN RE:

AMR CORPORATION

---

On Appeal from the United States Bankruptcy Court
for the Southern District of New York, Adv. No. 13-01392 (SHL)

---

**Corrected Excerpts of Record of Plaintiffs-Appellants**

---

Joseph M. Alioto (*pro hac vice*)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 434-8900
Email: jmalioto@aliotolaw.com

Christopher Nedeau
(CA SBN 81297)
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Phone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Theresa D. Moore (*pro hac vice*)
Law Offices of Theresa D. Moore
One Sansome Street, 35th Floor
San Francisco, CA 94104
Phone: (415) 613-1414
Email: tmoore@aliotolaw.com

Lawrence G. Papale
(CA SBN 67068)
LAW OFFICES OF LAWRENCE
G. PAPALE
1308 Main Street Suite 117
St. Helena, CA 94574
Phone: (707) 963-1704
Email: lgpapale@papalelaw.com

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Docket Entries ............................................................. 1

Memorandum of Decision (Adv. Dkt. 101) .............................. 48

Order Granting in Part and Denying in Part Plaintiffs'
Motion for Leave to File an Amended Complaint to Add
Damages Claim (Adv. Dkt. 102) ...................................... 75

First Amended Complaint (Adv. Dkt. 103) ............................ 77

Defendants' Joint Answer to First Amended Complaint
(Adv. Dkt. 104) ...................................................... 131

First Amended Complaint (Adv. Dkt. 103) ............................ 77

Memorandum of Decision (Adv. Dkt. 115) ............................ 154

Order Denying Plaintiffs' Motion for Leave to File a
Second Amended and Supplemental Complaint and
to Add a Damages Claim and Demand for Jury Trial
(Adv. Dkt. 117) ...................................................... 181

Order Granting in Part and Denying in Part Defendants'
Motion for Summary Judgment and Denying Plaintiffs'
Cross-Motion for Summary Judgment (Adv. Dkt. 176) ............... 183

Transcript of Hearing re Bench Decision (Adv. Dkt. 177) ........... 185

Order Denying Plaintiffs' Motion for Leave to File a
Second Amended and Supplemental Complaint
(Adv. Dkt. 206) ...................................................... 314

Memorandum of Decision (Adv. Dkt. 292) ........................... 326

Order Denying Plaintiffs' Requested Relief and
Granting Judgment to Defendants Merged Entity
American Airlines Group Inc. (Adv. Dkt. 294) ..................... 411

Notice of Appeal and Statement of Election (Adv. Dkt. 295) ........ 413

APPEAL, PENAP

# U.S. Bankruptcy Court
## Southern District of New York (Manhattan)
## Adversary Proceeding #: 13-01392-shl

*Assigned to:* Judge Sean H. Lane  
*Lead BK Case:* 11-15463  
*Lead BK Title:* AMR Corporation  
*Lead BK Chapter:* 11  
*Demand:*

*Date Filed:* 08/06/13

*Nature[s] of Suit:* 72 Injunctive relief - other

### Plaintiff
----------------------
**Carolyn Fjord**  
c/o David J. Cook, Esq.  
Cook Collection Attorneys, PLC  
P.O. Box 270  
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**  
Alioto Law Firm  
One Sansome Street  
35th Floor  
San Francisco, CA 94104  
415-434-8900  
Fax : 415-434-9200  
Email: jmalioto@aliotolaw.com

**David Julian Cook**  
Cook Collection Attorneys, PLC  
165 Fell Street  
San Francisco, CA 94102  
415-989-4730  
Fax : 415-989-0491  
Email: cook@cookcollectionattorneys.com  
*LEAD ATTORNEY*

**Gil D. Messina**  
Messina Law Firm, P.C.  
961 Holmdel Road  
Holmdel, NJ 07733  
732-332-9300  
Fax : 732-332-9301  
Email: gmessina@messinalawfirm.com

**Jamie Lynne Miller**  
Alioto Law Firm  
1 Sansone  
35th Floor  
San Francisco, CA 94104  
415-434-8900  
Email: jmiller@aliotolaw.com

### Plaintiff
----------------------
**Katherine R. Arcell**  
c/o David J. Cook, Esq.  
Cook Collection Attorneys, PLC  
P.O. Box 270  
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**  
(See above for address)

**David Julian Cook**  
(See above for address)  
*LEAD ATTORNEY*

**Gil D. Messina**

**1**

(See above for address)

*Plaintiff*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Keith Dean Bradt**                                        represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                             **David Julian Cook**
San Francisco, CA 94104-0270                                             (See above for address)
                                                                         *LEAD ATTORNEY*

                                                                         **Gil D. Messina**
                                                                         (See above for address)

*Plaintiff*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Judy Bray**                                              represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                             **David Julian Cook**
San Francisco, CA 94104-0270                                             (See above for address)
                                                                         *LEAD ATTORNEY*

                                                                         **Gil D. Messina**
                                                                         (See above for address)

*Plaintiff*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Jose M. Brito**                                          represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                             **David Julian Cook**
San Francisco, CA 94104-0270                                             (See above for address)
                                                                         *LEAD ATTORNEY*

                                                                         **Gil D. Messina**
                                                                         (See above for address)

*Plaintiff*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Jan Marie Brown**                                        represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                             **David Julian Cook**
San Francisco, CA 94104-0270                                             (See above for address)
                                                                         *LEAD ATTORNEY*

                                                                         **Gil D. Messina**
                                                                         (See above for address)

*Plaintiff*

\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-\-

**Robert D. Conway**                                       represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                             **David Julian Cook**
San Francisco, CA 94104-0270                                             (See above for address)
                                                                         *LEAD ATTORNEY*

**2**

Gil D. Messina
(See above for address)

*Plaintiff*
-----------------------
**Judy Crandall**                                    represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                          **David Julian Cook**
San Francisco, CA 94104-0270                          (See above for address)
                                                      *LEAD ATTORNEY*

                                                      **Gil D. Messina**
                                                      (See above for address)

*Plaintiff*
-----------------------
**Rosemary D'Augusta**                               represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                          **David Julian Cook**
San Francisco, CA 94104-0270                          (See above for address)
                                                      *LEAD ATTORNEY*

                                                      **Gil D. Messina**
                                                      (See above for address)

*Plaintiff*
-----------------------
**Brenda K. Davis**                                  represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                          **David Julian Cook**
San Francisco, CA 94104-0270                          (See above for address)
                                                      *LEAD ATTORNEY*

                                                      **Gil D. Messina**
                                                      (See above for address)

*Plaintiff*
-----------------------
**Pamela Faust**                                     represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                          **David Julian Cook**
San Francisco, CA 94104-0270                          (See above for address)
                                                      *LEAD ATTORNEY*

                                                      **Gil D. Messina**
                                                      (See above for address)

*Plaintiff*
-----------------------
**Don Freeland**                                     represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                          **David Julian Cook**
San Francisco, CA 94104-0270                          (See above for address)
                                                      *LEAD ATTORNEY*

**3**

Gil D. Messina
(See above for address)

*Plaintiff*

------------------------

**Donald V. Fry**                                    represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                         **David Julian Cook**
San Francisco, CA 94104-0270                         (See above for address)
                                                     *LEAD ATTORNEY*

                                                     **Gil D. Messina**
                                                     (See above for address)

*Plaintiff*

------------------------

**Gabriel Garavanian**                               represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                         **David Julian Cook**
San Francisco, CA 94104-0270                         (See above for address)
                                                     *LEAD ATTORNEY*

                                                     **Gil D. Messina**
                                                     (See above for address)

*Plaintiff*

------------------------

**Harry Garavanian**                                 represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                         **David Julian Cook**
San Francisco, CA 94104-0270                         (See above for address)
                                                     *LEAD ATTORNEY*

                                                     **Gil D. Messina**
                                                     (See above for address)

*Plaintiff*

------------------------

**Yvonne Jocelyn Gardner**                           represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                         **David Julian Cook**
San Francisco, CA 94104-0270                         (See above for address)
                                                     *LEAD ATTORNEY*

                                                     **Gil D. Messina**
                                                     (See above for address)

*Plaintiff*

------------------------

**Lee M. Gentry**                                    represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                            (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                         **David Julian Cook**
                                                     (See above for address)

San Francisco, CA 94104-0270

*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

---

*Plaintiff*
-----------------------
**Valarie Ann Jolly**                                    represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                              (See above for address)
                                                         *LEAD ATTORNEY*

                                                         **Gil D. Messina**
                                                         (See above for address)

---

*Plaintiff*
-----------------------
**Gail S. Kosach**                                       represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                              (See above for address)
                                                         *LEAD ATTORNEY*

                                                         **Gil D. Messina**
                                                         (See above for address)

---

*Plaintiff*
-----------------------
**Michael C. Malaney**                                   represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                              (See above for address)
                                                         *LEAD ATTORNEY*

                                                         **Gil D. Messina**
                                                         (See above for address)

---

*Plaintiff*
-----------------------
**Len Marazzo**                                          represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                              (See above for address)
                                                         *LEAD ATTORNEY*

                                                         **Gil D. Messina**
                                                         (See above for address)

---

*Plaintiff*
-----------------------
**Lisa McCarthy**                                        represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                   (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**

**5**

San Francisco, CA 94104-0270

*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
-----------------------

**Patricia Ann Meeuwsen**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

**David Julian Cook**
(See above for address)
*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
-----------------------

**L. West Oehmig, Jr.**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

**David Julian Cook**
(See above for address)
*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
-----------------------

**Cynthia Prosterman**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

**David Julian Cook**
(See above for address)
*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
-----------------------

**Deborah M. Pulfer**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

**David Julian Cook**
(See above for address)
*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
-----------------------

**Dana L. Robinson**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC

represented by **Joseph M Alioto**
(See above for address)

**6**

P.O. Box 270
San Francisco, CA 94104-0270

David Julian Cook
(See above for address)
*LEAD ATTORNEY*

Gil D. Messina
(See above for address)

*Plaintiff*
------------------------
**Robert A. Rosenthal**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

David Julian Cook
(See above for address)
*LEAD ATTORNEY*

Gil D. Messina
(See above for address)

*Plaintiff*
------------------------
**Bill Rubinsohn**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

David Julian Cook
(See above for address)
*LEAD ATTORNEY*

Gil D. Messina
(See above for address)

*Plaintiff*
------------------------
**Sondra K. Russell**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

David Julian Cook
(See above for address)
*LEAD ATTORNEY*

Gil D. Messina
(See above for address)

*Plaintiff*
------------------------
**Sylvia N. Sparks**
c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

represented by **Joseph M Alioto**
(See above for address)

David Julian Cook
(See above for address)
*LEAD ATTORNEY*

Gil D. Messina
(See above for address)

*Plaintiff*
------------------------
**June Stansbury**
c/o David J. Cook, Esq.

represented by **Joseph M Alioto**
(See above for address)

Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

**David Julian Cook**
(See above for address)
*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
------------------------

**Clyde D. Stensrud**                              represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                          (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                    **David Julian Cook**
San Francisco, CA 94104-0270                                    (See above for address)
                                                                *LEAD ATTORNEY*

                                                                **Gil D. Messina**
                                                                (See above for address)

*Plaintiff*
------------------------

**Wayne Taleff**                                   represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                          (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                    **David Julian Cook**
San Francisco, CA 94104-0270                                    (See above for address)
                                                                *LEAD ATTORNEY*

                                                                **Gil D. Messina**
                                                                (See above for address)

*Plaintiff*
------------------------

**Gary Talewsky**                                  represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                          (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                    **David Julian Cook**
San Francisco, CA 94104-0270                                    (See above for address)
                                                                *LEAD ATTORNEY*

                                                                **Gil D. Messina**
                                                                (See above for address)

*Plaintiff*
------------------------

**Annette M. Tippetts**                            represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                          (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                                    **David Julian Cook**
San Francisco, CA 94104-0270                                    (See above for address)
                                                                *LEAD ATTORNEY*

                                                                **Gil D. Messina**
                                                                (See above for address)

*Plaintiff*
------------------------

**Diana Lynn Ultican**                             represented by **Joseph M Alioto**

**8**

c/o David J. Cook, Esq.
Cook Collection Attorneys, PLC
P.O. Box 270
San Francisco, CA 94104-0270

**David Julian Cook**
(See above for address)
*LEAD ATTORNEY*

**Gil D. Messina**
(See above for address)

*Plaintiff*
------------------------
**J. Michael Walker**                                    represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                 (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                            (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **Gil D. Messina**
                                                        (See above for address)

*Plaintiff*
------------------------
**Pamela S. Ward**                                       represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                 (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                            (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **Gil D. Messina**
                                                        (See above for address)

*Plaintiff*
------------------------
**Christine O. Whalen**                                  represented by **Joseph M Alioto**
c/o David J. Cook, Esq.                                                 (See above for address)
Cook Collection Attorneys, PLC
P.O. Box 270                                             **David Julian Cook**
San Francisco, CA 94104-0270                            (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **Gil D. Messina**
                                                        (See above for address)

*Plaintiff*
------------------------
**Carolyn Fjord, et al.**                                represented by **Joseph M Alioto**
                                                                       (See above for address)

                                                        **David Julian Cook**
                                                        (See above for address)

                                                        **Gil D. Messina**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **Jamie Lynne Miller**
                                                        (See above for address)

**9**

Christopher Alan Nedeau
Nedeau Law Firm
154 Baker Street
San Francisco, CA 94117
415-516-4010
Email: cnedeau@nedeaulaw.net

V.

*Defendant*
----------------------
**AMR Corporation**                                      represented by **Stephen Karotkin**
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8350
Fax : (212) 310-8007
Email: stephen.karotkin@weil.com

*Defendant*
----------------------
**American Airlines**                                    represented by **Aaron Chiu**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Email: aaron.chiu@lw.com

**Robin Lorraine Gushman**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Fax : 415-395-8095
Email: robin.gushman@lw.com

**Sadik Harry Huseny**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Fax : 415-395-8095
Email: sadik.huseny@lw.com

**Brittany N. Lovejoy**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Fax : 415-395-8095
Email: brittany.lovejoy@lw.com

**Silvia Segade Sanz**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600

**10**

Fax : 415-395-8095
Email: silvia.segade@lw.com

**Daniel Murray Wall**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Fax : 415-395-8095
Email: dan.wall@lw.com

*Defendant*
-----------------------
**US Airways Group, Inc.**                          represented by **Sadik Harry Huseny**
                                                                   (See above for address)

**Alfred Carroll Pfeiffer, Jr.**
Latham & Watkins LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111
415-391-0600
Fax : 415-395-8095
Email: al.pfeiffer@lw.com

**Daniel Murray Wall**
(See above for address)

*Defendant*
-----------------------
**US Airways, Inc.**                                represented by **Sadik Harry Huseny**
Kobre & Kim LLP                                                    (See above for address)
800 Third Avenue
New York, NY 10022
                                                    **Alfred Carroll Pfeiffer, Jr.**
                                                    (See above for address)

**Daniel Murray Wall**
(See above for address)

*Claims and Noticing Agent*
-----------------------
**Garden City Group, Inc**                          represented by **Angela Ferrante**
1985 Marcus Ave                                                    Garden City Group, LLC
Suite 200                                                         1985 Marcus Avenue, Suite 200
Lake Success, NY 11042                                            Lake Success, NY 11042
631-470-5000                                                      631-470-5000
                                                                  Fax : 631-940-6544
                                                                  Email: PACERTeam@gardencitygroup.com

| Filing Date | # | Docket Text |
|---|---|---|
| 08/06/2013 | 1<br>(27 pgs) | Adversary case 13-01392. Complaint against AMR Corporation, American Airlines, US Airways Group, Inc., US Airways, Inc. . Nature(s) of Suit: (72 (Injunctive relief - other)) Filed by CAROLYN FJORD, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, |

| | | |
|---|---|---|
| | | Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 08/06/2013) |
| 08/06/2013 | | Receipt of Complaint(13-01392-shl) [cmp,cmp] ( 293.00) Filing Fee. Receipt number 9560441. Fee amount 293.00. (Re: Doc # 1) (U.S. Treasury) (Entered: 08/06/2013) |
| 08/07/2013 | 2 (2 pgs) | Summons with Notice of Pre-Trial Conference issued by Clerk's Office with Pre-Trial Conference set for 9/12/2013 at 11:00 AM at Courtroom 701 (SHL), Answer due by 9/6/2013, (Acosta, Annya) (Entered: 08/07/2013) |
| 08/08/2013 | 3 (5 pgs) | Certificate of Service *of Summons and Complaint* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 08/08/2013) |
| 08/08/2013 | 4 (14 pgs) | Motion for Temporary Restraining Order *; advancing status conference and setting trial and discovery schedule* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 08/08/2013) |
| 08/09/2013 | 5 (6 pgs; 2 docs) | Certificate of Service *on US Airways, Inc. and US Airways Group Inc.* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, |

**12**

| | | |
|---|---|---|
| | | Christine O. Whalen. (Attachments: # 1 Declaration of service) (Cook, David) (Entered: 08/09/2013) |
| 08/09/2013 | 6 (3 pgs) | Order Signed On 8/9/2013, Setting Time And Date For Response To Plaintiffs' Ex-Parte Motion And Setting A Hearing Date. With Hearing To Be Held On 8/15/2013 at 10:00 AM at Courtroom 701 (SHL) (Ebanks, Liza) (Entered: 08/09/2013) |
| 08/09/2013 | 7 (14 pgs; 4 docs) | Certificate of Service *American Airlines, Inc.;* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Certificate of service-American Airlines # 2 Certificate of service-AMR Corporation # 3 Certificate of service-US Airways, Inc.) (Cook, David) (Entered: 08/09/2013) |
| 08/12/2013 | 8 (92 pgs; 6 docs) | Supplemental Motion for Temporary Restraining Order *Memorandum of Points and Authorities in support of Ex Parte Application for Order Advancing Status Conference and Setting Trial and Discovery Schedule* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Exhibit A & B # 2 Exhibit C # 3 Exhibit D # 4 Exhibit E # 5 Exhibit F) (Cook, David) (Entered: 08/12/2013) |
| 08/13/2013 | 9 (59 pgs; 3 docs) | Notice of Appearance in Adversary Proceeding *Notice of Filing of Adversary Complaint* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Complaint # 2 Appendix A)(Cook, David) (Entered: 08/13/2013) |
| 08/13/2013 | 10 (4 pgs) | Notice of Appearance in Adversary Proceeding *of Additional Counsel* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith |

| | | |
|---|---|---|
| | | Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 08/13/2013) |
| 08/13/2013 | [11](#)<br>(8 pgs) | Notice of Appearance in Adversary Proceeding *Notice of Filing Document* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 08/13/2013) |
| 08/13/2013 | [12](#)<br>(3 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Daniel Murray Wall on behalf of US Airways Group, Inc., US Airways, Inc.. (Attachments: # [1](#) Proposed Order) (Wall, Daniel) (Entered: 08/13/2013) |
| 08/13/2013 | | Receipt of Application for Pro Hac Vice Admission(13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number 9574455. Fee amount 200.00. (Re: Doc # [12](#)) (U.S. Treasury) (Entered: 08/13/2013) |
| 08/13/2013 | [13](#)<br>(3 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Alfred Carroll Pfeiffer Jr. on behalf of US Airways Group, Inc., US Airways, Inc.. (Attachments: # [1](#) Proposed Order) (Pfeiffer, Alfred) (Entered: 08/13/2013) |
| 08/13/2013 | | Receipt of Application for Pro Hac Vice Admission(13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number 9574477. Fee amount 200.00. (Re: Doc # [13](#)) (U.S. Treasury) (Entered: 08/13/2013) |
| 08/13/2013 | [14](#)<br>(3 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Sadik Harry Huseny on behalf of US Airways Group, Inc., US Airways, Inc.. (Attachments: # [1](#) Proposed Order) (Huseny, Sadik) (Entered: 08/13/2013) |
| 08/13/2013 | | Receipt of Application for Pro Hac Vice Admission(13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number 9574498. Fee amount 200.00. (Re: Doc # [14](#)) (U.S. Treasury) (Entered: 08/13/2013) |
| 08/13/2013 | [15](#)<br>(3 pgs; 3 docs) | **(Please Disregard Entry, Incorrect Event Code)**Notice of Appearance in Adversary Proceeding *via Motion for Admission to Practice Pro Hac Vice* filed by Gil D. Messina on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn |

| | | |
|---|---|---|
| | | Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Exhibit Certificate of Good Standing # 2 Proposed Order)(Messina, Gil) **(Please See Document Number 25)** Modified on 8/15/2013 (Porter, Minnie). (Entered: 08/13/2013) |
| 08/13/2013 | 16 (4 pgs) | Amended Notice of Appearance in Adversary Proceeding *Notice of Appearance of Additional Counsel, with bar nos.* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 08/13/2013) |
| 08/13/2013 | 25 (2 pgs) | Application for Pro Hac Vice Admission filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. Filing fee collected, receipt #192387. (Porter, Minnie) (Entered: 08/15/2013) |
| 08/14/2013 | 17 (14 pgs) | Opposition Brief *to Plaintiffs' Motion for Temporary Restraining Order (Ex Parte Application for Order Advancing Status Conference and Setting Trial and Discovery Schedule)* (related document(s)8, 4) filed by Daniel Murray Wall on behalf of US Airways Group, Inc., US Airways, Inc.. (Wall, Daniel) (Entered: 08/14/2013) |
| 08/14/2013 | 18 (13 pgs) | Motion to Shorten Time *Ex Parte Motion To Shorten Time With Respect To Expedited Motion Of The Official Committee Of Unsecured Creditors To Intervene In The Adversary Proceeding And For Leave To File Response To Plaintiffs' Ex Parte Application For Order Advancing Status Conference And Setting Trial And Discovery Schedule* filed by John Wm. Butler Jr. on behalf of The Official Committee of Unsecured Creditors. (Butler, John) (Entered: 08/14/2013) |
| 08/14/2013 | 19 (15 pgs) | Motion to Intervene *Notice Of Expedited Motion Of The Official Committee Of Unsecured Creditors To Intervene In The Adversary Proceeding And For Leave To File Response To Plaintiffs' Ex Parte Application For Order Advancing Status Conference And Setting Trial and Discovery Schedule* filed by John Wm. Butler Jr. on behalf of The Official Committee of Unsecured Creditors. (Butler, John) (Entered: 08/14/2013) |
| 08/14/2013 | 20 (10 pgs) | Objection to Motion *Objection Of The Official Committee Of Unsecured Creditors To Plaintiffs' Ex Parte Application For Order Advancing Status Conference And Setting Trial And Discovery Schedule* filed by John Wm. Butler Jr. on behalf of The Official Committee of Unsecured Creditors. (Butler, John) (Entered: 08/14/2013) |

| 08/14/2013 | [21](#)<br>(1 pg) | Order Signed On 8/14/2013, Granting Application For Pro Hac Vice Re: Daniel M. Wall. (Related Doc # [12](#)) (Ebanks, Liza) (Entered: 08/14/2013) |
|---|---|---|
| 08/14/2013 | [22](#)<br>(1 pg) | Order Signed On 8/14/2013, Granting Application For Pro Hac Vice Re: Alfred C. Pfeiffer, Jr. (Related Doc # [13](#)) (Ebanks, Liza) (Entered: 08/14/2013) |
| 08/14/2013 | [23](#)<br>(1 pg) | Order Signed On 8/14/2013, Granting Application For Pro Hac Vice Re: Sadik Huseny. (Related Doc # [14](#)) (Ebanks, Liza) (Entered: 08/14/2013) |
| 08/14/2013 | [24](#)<br>(17 pgs) | **Notice of Filing Form 8-K-Current Report** filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) Modified on 8/15/2013 (Richards, Beverly). (Entered: 08/14/2013) |
| 08/15/2013 | [26](#)<br>(1 pg) | Order Signed On 8/15/2013, Granting Application For Pro Hac Vice Re: Gil D. Messina. (Related Doc # [25](#)) (Ebanks, Liza) (Entered: 08/15/2013) |
| 08/19/2013 | [27](#)<br>(16 pgs) | Certificate of Service (related document(s)[20](#), [18](#), [19](#)) filed by John K. Lyons on behalf of The Official Committee of Unsecured Creditors. (Lyons, John) (Entered: 08/19/2013) |
| 08/19/2013 | [28](#)<br>(182 pgs) | Transcript regarding Hearing Held on 8/15/13 RE: Ex Parte Application for Order Advancing Status Conference and Setting Trial and Schedule. Remote electronic access to the transcript is restricted until 11/18/2013. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Reporting Company.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) [4](#)). Notice of Intent to Request Redaction Deadline Due By 8/26/2013. Statement of Redaction Request Due By 9/9/2013. Redacted Transcript Submission Due By 9/19/2013. Transcript access will be restricted through 11/18/2013. (Peterson, Brent) (Entered: 08/21/2013) |
| 08/27/2013 | [29](#)<br>(17 pgs; 4 docs) | **(Motion Withdrawn. See Document #[33](#).)** Motion to Withdraw the Reference filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, |

| | | |
|---|---|---|
| | | Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Motion # 2 Memorandum # 3 Certificate of service) (Cook, David) Modified on 8/19/2016 (Rouzeau, Anatin). (Entered: 08/27/2013) |
| 08/27/2013 | | Receipt of Motion to Withdraw the Reference (fee)(13-01392-shl) [motion,205] ( 176.00) Filing Fee. Receipt number 9602353. Fee amount 176.00. (Re: Doc # 29) (U.S. Treasury) (Entered: 08/27/2013) |
| 08/28/2013 | 30 (6 pgs) | Civil Cover Sheet from U.S. District Court, Case Number: 1306059 Judge Richard J. Sullivan (related document(s)29) filed by Clerk's Office of the U.S. Bankruptcy Court, S.D.N.Y.. (Rouzeau, Anatin) (Entered: 08/28/2013) |
| 09/04/2013 | 31 (3 pgs) | Order Signed On 9/4/2013, Granting Expedited Motion Of The Official Committee Of Unsecured Creditors To Intervene In The Adversary Proceeding And For Ex-Leave To File Response To Plaintiffs' Ex-Parte Application For Order Advancing Status Conference And Setting Trial And Discovery Schedule. (Related Doc # 19). (Ebanks, Liza) (Entered: 09/04/2013) |
| 09/06/2013 | 32 (21 pgs) | Answer to Complaint (Related Doc # 1) filed by Daniel Murray Wall on behalf of US Airways Group, Inc., US Airways, Inc.. (Wall, Daniel) (Entered: 09/06/2013) |
| 09/12/2013 | 33 (6 pgs; 2 docs) | Notice of Withdrawal *of Motion to Withdraw Reference* (related document(s)29) filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Certificate of Service)(Alioto, Joseph) (Entered: 09/12/2013) |
| 09/13/2013 | 34 (5 pgs) | Motion to Expunge Document (related document(s)29) filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 09/13/2013) |
| 09/13/2013 | 35 (5 pgs) | Second Motion to Expunge Document (related document(s)29, 34) filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Cook, David) (Entered: 09/13/2013) |

| | | |
|---|---|---|
| 09/16/2013 | 36 | **(THIS TRANSCRIPT HAS BEEN AMENDED, SEE DOCUMENT #43)**Transcript regarding Hearing Held on 09/12/2013 11:43AM RE: Pre-trial Conference. Remote electronic access to the transcript is restricted until 12/16/2013. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Reporting Company.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 9/23/2013. Statement of Redaction Request Due By 10/7/2013. Redacted Transcript Submission Due By 10/17/2013. Transcript access will be restricted through 12/16/2013. (Ortiz, Carmen) Modified on 9/30/2013 (Richards, Beverly). (Entered: 09/17/2013) |
| 09/20/2013 | 37<br>(3 pgs) | Notice of Appearance *And Request For Service of Papers* filed by John Wm. Butler Jr. on behalf of The Official Committee of Unsecured Creditors. (Butler, John) (Entered: 09/20/2013) |
| 09/20/2013 | 38<br>(11 pgs) | Letter *Plaintiffs' Proposed Scheduling Order* filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 09/20/2013) |
| 09/20/2013 | 39<br>(11 pgs) | Statement */ Joint Statement of Debtors and Intervenor Regarding Case Management* filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 09/20/2013) |
| 09/20/2013 | 40<br>(19 pgs) | Answer to Complaint (Related Doc # 1) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 09/20/2013) |
| 09/23/2013 | 43<br>(116 pgs) | Transcript regarding Hearing Held on 09/12/2013 11:43 AM RE: (AMENDS DOC # 36) Pre-trial Conference. Remote electronic access to the transcript is restricted until 12/23/2013. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Reporting Company.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 9/30/2013. Statement of Redaction Request Due By 10/15/2013. Redacted Transcript Submission Due By 10/24/2013. Transcript access will be restricted through 12/23/2013. (Ortiz, Carmen) (Entered: 09/30/2013) |
| 09/25/2013 | 41<br>(6 pgs) | Affidavit of Service *of Kevin M. Doyle re: Joint Statement of Debtors and Intervenor Regarding Case Management, and Answer of Defendants AMR Corporation and American Airlines to Complaint for Injunctive Relief Against Violation of Section 7 of The Clayton Antitrust Act* (related document(s)39, 40) filed by Angela Ferrante on behalf of Garden City Group, Inc. (Ferrante, Angela) (Entered: 09/25/2013) |
| 09/25/2013 | 42<br>(3 pgs) | Certificate of Service (related document(s)37) filed by John K. Lyons on behalf of The Official Committee of Unsecured Creditors. (Lyons, John) (Entered: 09/25/2013) |
| 10/16/2013 | 44<br>(5 pgs) | Scheduling Order Signed On 10/15/2013, Re: Discovery And Certain Related Matters. (Ebanks, Liza) (Entered: 10/16/2013) |
| 10/24/2013 | 45<br>(12 pgs) | So Ordered Stipulation Signed On 10/24/2013, Re: Stipulated Protective Order. (Ebanks, Liza) (Entered: 10/24/2013) |
| 11/12/2013 | 46<br>(15 pgs) | Motion to Shorten Time */ Ex Parte Motion of Debtors Pursuant to Fed. R. Bankr. P. 2002(a) and 9006(c) to Shorten Notice Period, Schedule* |

| | | |
|---|---|---|
| | | *Hearing, and Approve Notice with Respect to (I) Motion of Debtors for Entry of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. and (II) Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 44)* filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/12/2013) |
| 11/12/2013 | 47<br>(15 pgs) | Motion to Approve / *Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 44)* (related document(s)46) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/12/2013) |
| 11/13/2013 | 48<br>(3 pgs) | Order Signed On 11/13/2013, Shortening Notice Period, Scheduling Hearing, and Approving Notice with Respect to (I) Motion of Debtors for Entry of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. and (II) Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 44) (Related Doc # 46) . (Ebanks, Liza) (Entered: 11/13/2013) |
| 11/13/2013 | 49<br>(9 pgs; 2 docs) | Motion to Shorten Time *and schedule pretrial conference* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Proposed order) (Cook, David) (Entered: 11/13/2013) |
| 11/14/2013 | 50<br>(8 pgs) | Affidavit of Service *of Edward J. Devane* (related document(s)47, 48) filed by Angela Ferrante on behalf of Garden City Group, Inc. (Ferrante, Angela) (Entered: 11/14/2013) |
| 11/14/2013 | 51<br>(11 pgs) | Opposition / *Defendants' and Intervenor's Opposition to Plaintiffs' Ex Parte Motion to Shorten Notice Period and Schedule a Pretrial Conference for November 18, 2013; Request for a Supplemental Scheduling Order* (related document(s)49) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/14/2013) |
| 11/15/2013 | 52<br>(37 pgs; 2 docs) | Motion to Shorten Time *Reply to Opposition to Plaintiffs' Ex Parte Motion to Shorten Notice Period* filed by David Julian Cook on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn |

| | | |
|---|---|---|
| | | Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Exhibit) (Cook, David) (Entered: 11/15/2013) |
| 11/18/2013 | 53 (4 pgs) | Affidavit of Service *of Edward J. Devane re: Defendants and Intervenors Opposition to Plaintiffs Ex Parte Motion to Shorten Notice Period and Schedule a Pretrial Conference for November 18, 2013; Request for a Supplemental Scheduling Order* (related document(s)51) filed by Angela Ferrante on behalf of Garden City Group, Inc. (Ferrante, Angela) (Entered: 11/18/2013) |
| 11/18/2013 | 54 (2 pgs) | Notice of Hearing / *Notice of Status Conference* filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/18/2013) |
| 11/19/2013 | 55 (17 pgs) | Response / *Defendants' and Intervenor's Sur-Reply Regarding Plaintiffs' Ex Parte Motion to Shorten Notice Period and Schedule Pretrial Conference (Adv. Pro. ECF Nos. 49, 52)* (related document(s)52, 49) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/19/2013) |
| 11/19/2013 | 56 (5 pgs) | Affidavit of Service *of Edward J. Devane Re Notice of Status Conference* (related document(s)54) filed by Angela Ferrante on behalf of Garden City Group, Inc. (Ferrante, Angela) (Entered: 11/19/2013) |
| 11/21/2013 | 57 (235 pgs; 10 docs) | Motion for Temporary Restraining Order (related document(s)47, 46) filed by David Julian Cook on behalf of Carolyn Fjord, et al.. with hearing to be held on 11/25/2013 at 10:00 AM at Courtroom 701 (SHL) Responses due by 11/23/2013, (Attachments: # 1 Motion to Shorten Time for TRO # 2 Brief in Opposition to Motions to Approve Settlement & Consummate Merger & in Support of Motion for TRO # 3 Affidavit of Darren Bush # 4 Exhibit 1 to Bush Affidavit # 5 Exhibit 2 to Bush Affidavit # 6 Exhibit 3 to Bush Affidavit # 7 Appendix A and B to Bush Affidavit # 8 Proposed Order Shortening Time # 9 Proposed Order Granting TRO) (Cook, David) (Entered: 11/21/2013) |
| 11/21/2013 | 58 (208 pgs; 4 docs) | Motion for Temporary Restraining Order *Declaration of Gil Messina in Opposition to Debtors Motions to Approve Settlement and Consummate Merger and in Support of TRO* (related document(s)57) filed by David Julian Cook on behalf of Carolyn Fjord, et al.. with hearing to be held on 11/25/2013 at 10:00 AM at Courtroom 701 (SHL) Responses due by 11/23/2013, (Attachments: # 1 Exhibit A to Messina Declaration # 2 Exhibit B to Messina Declaration # 3 Exhibit C to Messina Declaration) (Cook, David) (Entered: 11/21/2013) |
| 11/21/2013 | 59 (32 pgs) | Motion for Temporary Restraining Order *ERRATA EXHIBIT A TO DECLARATION OF GIL D. MESSINA (CORRECT COURTESY COPIES HAVE BEEN DELIVERED TO THE COURT)* filed by David Julian Cook on behalf of Carolyn Fjord. with hearing to be held on 11/25/2013 at 10:00 AM at Courtroom 701 (SHL) Responses due by 11/23/2013, (Cook, David) (Entered: 11/21/2013) |
| 11/22/2013 | 60 (5 pgs) | Affidavit of Service *of Edward J. Devane re Defendants and Intervenors Sur-Reply Regarding Plaintiffs Ex Parte Motion to Shorten Notice Period and Schedule Pretrial Conference* (related document(s)55) filed by Angela Ferrante on behalf of Garden City Group, Inc. (Ferrante, Angela) (Entered: 11/22/2013) |

| 11/23/2013 | 61<br>(6 pgs) | Declaration *of Beverly K. Goulet in Support of Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 62<br>(8 pgs) | Declaration *Of Gregg Polle In Support Of Defendants' And Intervenors (I) Joint Reply To The Clayton Plaintiffs' Objection To Debtors' Motion For Order Pursuant To Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., And United States Department Of Justice, Et Al. (ECF No. 10610) And Debtors' Motion For Order Regarding Consummation Of Merger Pursuant To Scheduling Order (Adv. Pro. ECF No. 47) And (II) Joint Opposition To The Clayton Plaintiffs' Cross-Motion For Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by John Wm. Butler Jr. on behalf of The Official Committee of Unsecured Creditors. (Butler, John) (Entered: 11/23/2013) |
| 11/23/2013 | 63<br>(9 pgs) | Declaration *of Stephen Johnson in Support of Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 64<br>(51 pgs) | Reply to Motion *Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 65<br>(1 pg) | Declaration *of Dennis W. Carlton in Support of Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 66<br>(1 pg) | Declaration *of Daniel M. Kasper in Support of Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving* |

21

| | | |
|---|---|---|
| | | *Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 67<br>(1 pg) | Declaration *of Janusz Ordover in Support of Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 68<br>(5 pgs) | Declaration *of Sadik Huseny in Support of Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)57, 47) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 69<br>(15 pgs) | Motion to File Under Seal */ Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. § 107(b) and Bankruptcy Rule 9018 Authorizing the Filing of Certain Information Under Seal in Connection with Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)65, 68, 66, 67) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/23/2013 | 70<br>(159 pgs) | Statement */ Supplement to Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Joint Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)* (related document(s)64) filed by Stephen Karotkin on behalf of AMR Corporation. (Karotkin, Stephen) (Entered: 11/23/2013) |
| 11/25/2013 | 71<br>(22 pgs) | Affidavit of Service *of Edward J. Devane* (related document(s)61, 69, 62, 63, 65, 70, 68, 66, 64, 67) filed by Angela Ferrante on behalf of Garden City Group, Inc. (Ferrante, Angela) (Entered: 11/25/2013) |

| 11/27/2013 | 72<br>(35 pgs) | Memorandum Of Decision Signed On 11/27/2013, (related document(s)57, 47) (Ebanks, Liza) (Entered: 11/27/2013) |
|---|---|---|
| 11/27/2013 | 73<br>(4 pgs) | Order Signed On 11/27/2013 Authorizing the Filing of Certain Information Under Seal in Connection with Defendants' and Intervenor's (I) Joint Reply to Clayton Plaintiffs' Objection to Debtors' Motion for Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. (ECF No. 10610) and Debtors' Motion for Order Regarding Consummation of Merger Pursuant to Scheduling Order (Adv. Pro. ECF No. 47) and (II) Opposition to Clayton Plaintiffs' Cross-Motion for Temporary Restraining Order (Adv. Pro. ECF No. 57)(Related Doc # 69) (Ebanks, Liza) (Entered: 11/27/2013) |
| 11/27/2013 | 74<br>(3 pgs) | Order Signed On 11/27/2013, Denying Plaintiffs Cross-Motion For Temporary Restraining Order. (Related Doc # 57) (Ebanks, Liza) (Entered: 11/27/2013) |
| 11/27/2013 | 75<br>(3 pgs) | Order Signed On 11/27/2013 Regarding Consummation Of Merger Pursuant To Scheduling Order. (Adv. Pro. ECF No. 44) (Related Doc # 47) (Ebanks, Liza) (Entered: 11/27/2013) |
| 11/27/2013 | 79<br>(98 pgs) | Transcript regarding Hearing Held on 11/25/2013 10:38AM RE: Motion for Temporary Restraining Order/Plaintiff's Cross-Motion for Temporary Restraining Order ; Motion to Approve/Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order. Remote electronic access to the transcript is restricted until 2/25/2014. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Reporting Company.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 57, 47). Notice of Intent to Request Redaction Deadline Due By 12/4/2013. Statement of Redaction Request Due By 12/18/2013. Redacted Transcript Submission Due By 12/30/2013. Transcript access will be restricted through 2/25/2014. (Ortiz, Carmen) (Entered: 12/05/2013) |
| 12/04/2013 | 76<br>(175 pgs; 15 docs) | Motion for Temporary Restraining Order *Motion for Stay of Court's Order Regarding Consummation of Merger Pursuant to Scheduling Order and for Stay of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Pending Appeal* filed by Joseph M Alioto on behalf of Carolyn Fjord. (Attachments: # 1 Pleading Memorandum in Support of Motion to Stay # 2 Declaration of Joseph M. Alioto # 3 Exhibit A # 4 Exhibit B # 5 Exhibit C # 6 Exhibit D # 7 Exhibit E # 8 Exhibit F # 9 Exhibit G # 10 Exhibit H # 11 Exhibit I # 12 Motion for Order Shortening Time # 13 Proposed Order on Motion to Shorten Time # 14 Proposed Order on Stay) (Alioto, Joseph) (Entered: 12/04/2013) |
| 12/04/2013 | 77<br>(2 pgs) | Order Signed On 12/4/2013, Denying Motion For Stay Pending Appeal. (Related Doc # 76) (Ebanks, Liza) (Entered: 12/04/2013) |
| 12/05/2013 | 78<br>(56 pgs; 6 docs) | **(Appeal Withdrawn. See Document 92.)** Notice of Appeal filed by Joseph M Alioto on behalf of Carolyn Fjord. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit D # 4 Exhibit D # 5 Statement of Election to United States District Court)(Alioto, Joseph) Modified on 3/4/2014 (Rouzeau, Anatin). (Entered: 12/05/2013) |

| | | |
|---|---|---|
| 12/05/2013 | | Receipt of Notice of Appeal(13-01392-shl) [appeal,97] ( 298.00) Filing Fee. Receipt number 9811961. Fee amount 298.00. (Re: Doc # 78) (U.S. Treasury) (Entered: 12/05/2013) |
| 12/06/2013 | 80 (1 pg) | **(Document Filed Under Seal)** Declaration *of Daniel M. Kasper* filed by Daniel M. Kasper. (Richards, Beverly) (Entered: 12/10/2013) |
| 12/06/2013 | 81 (1 pg) | Declaration *of Sadik Huseny* **(FILED UNDER SEAL)** filed by Sadik Huseny. (Richards, Beverly) (Entered: 12/10/2013) |
| 12/06/2013 | 82 (1 pg) | Declaration *of Janusz Ordover* **(Filed Under Seal)** filed by Janusz Ordover. (Richards, Beverly) (Entered: 12/10/2013) |
| 12/06/2013 | 83 (1 pg) | Declaration *of Dennis W. Carlton* **(Filed Under Seal)** filed by Dennis W. Carlton. (Richards, Beverly) (Entered: 12/10/2013) |
| 12/10/2013 | 84 (11 pgs; 3 docs) | **(Appeal Withdrawn. See Doc.#96.)** Notice of Appeal (related document(s)74) filed by David Julian Cook on behalf of David J. Cook. (Attachments: # 1 Exhibit A # 2 Appellants' Statement of Election to Have the United States District Court Hear Appeal from Order)(Cook, David) Modified on 2/10/2014 (Rouzeau, Anatin). (Entered: 12/10/2013) |
| 12/10/2013 | | Receipt of Notice of Appeal(13-01392-shl) [appeal,97] ( 298.00) Filing Fee. Receipt number 9821313. Fee amount 298.00. (Re: Doc # 84) (U.S. Treasury) (Entered: 12/10/2013) |
| 12/19/2013 | 85 (17 pgs) | Designation of Contents (appellant). (related document(s)78) filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 12/19/2013) |
| 12/23/2013 | 86 (13 pgs) | Designation of Contents (appellant). *Record* filed by David Julian Cook on behalf of Carolyn Fjord, et al.. (Cook, David) (Entered: 12/23/2013) |
| 12/26/2013 | 89 (21 pgs) | Transcript regarding Hearing Held on 11/27/2013 10:12AM RE: Motion for Temporary Restraining Order/Plaintiff's Cross-Motion For Temporary Restraining order; Motion to Approve/Motion Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order. Remote electronic access to the transcript is restricted until 3/26/2014. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Reporting Company.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 44, 46). Notice of Intent to Request Redaction Deadline Due By 1/2/2014. Statement of Redaction Request Due By 1/16/2014. Redacted Transcript Submission Due By 1/27/2014. Transcript access will be restricted through 3/26/2014. (Ortiz, Carmen) (Entered: 01/08/2014) |
| 01/02/2014 | 87 (30 pgs; 3 docs) | Counter Designation (appellee) filed by Daniel Murray Wall on behalf of US Airways Group, Inc., US Airways, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B)(Wall, Daniel) (Entered: 01/02/2014) |
| 01/02/2014 | 90 (32 pgs) | Transcript regarding Hearing Held on 11/20/2013 2:09PM RE: Status Conference. Remote electronic access to the transcript is restricted until 4/2/2014. The transcript may be viewed at the Bankruptcy Court Clerks |

|  |  | Office. [Transcription Service Agency: Veritext Reporting Company.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 1/9/2014. Statement of Redaction Request Due By 1/23/2014. Redacted Transcript Submission Due By 2/3/2014. Transcript access will be restricted through 4/2/2014. (Ortiz, Carmen) (Entered: 01/09/2014) |
|---|---|---|
| 01/06/2014 | 88<br>(30 pgs; 3 docs) | Counter Designation (appellee) (related document(s)86) filed by Daniel Murray Wall on behalf of US Airways Group, Inc., US Airways, Inc.. (Attachments: # 1 Exhibit A # 2 Exhibit B)(Wall, Daniel) (Entered: 01/06/2014) |
| 01/10/2014 | 91<br>(122 pgs; 7 docs) | Motion to Amend filed by Joseph M Alioto on behalf of Carolyn Fjord, et al. with hearing to be held on 2/13/2014 at 11:00 AM at Courtroom 701 (SHL). (Attachments: # 1 Pleading Memorandum in Support # 2 Exhibit A # 3 Exhibit B # 4 Exhibit C # 5 Pleading Declaration of Gil Messina # 6 Pleading Proposed Order) (Alioto, Joseph) (Entered: 01/10/2014) |
| 01/23/2014 | 92<br>(1 pg) | Notice of Withdrawal *of Appeal Without Prejudice* (related document(s)78) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 01/23/2014) |
| 01/29/2014 | 93<br>(33 pgs; 2 docs) | Opposition *to Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages Claim* (related document(s)91) filed by Daniel Murray Wall on behalf of US Airways Group, Inc., US Airways, Inc.. (Attachments: # 1 Declaration of Sadik Huseny In Support Thereof) (Wall, Daniel) (Entered: 01/29/2014) |
| 02/07/2014 | 94<br>(30 pgs; 2 docs) | Reply to Motion *in Further Support of Plaintiffs' Motion for Leave to File an Amended Complaint* (related document(s)91) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Declaration of Gil D. Messina in Support of Plaintiffs' Reply to Defendants' and Intervenor's Joint Opposition to, and in Further Support of, Plaintiffs' Motion for Leave to File an Amended Complaint) (Messina, Gil) (Entered: 02/07/2014) |
| 02/09/2014 | 95<br>(27 pgs) | Amended Reply to Motion *in Further Support of Motion to Amend Complaint* (related document(s)91) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 02/09/2014) |
| 02/10/2014 | 96<br>(1 pg) | Letter *Withdrawing Notice of Appeal* (related document(s)84) filed by David Julian Cook on behalf of Cook Collection Attorneys, PLC, David J. Cook. (Rouzeau, Anatin) (Entered: 02/10/2014) |
| 02/21/2014 | 100<br>(98 pgs) | Transcript regarding Hearing Held on 02/13/2014 11:27AM RE: Motion to Amend Complaint Filed by Joseph M. Alioto..et al.... Remote electronic access to the transcript is restricted until 5/22/2014. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: VERITEXT REPORTING COMPANY.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 2/28/2014. Statement of Redaction Request Due By 3/14/2014. Redacted Transcript Submission Due By 3/24/2014. Transcript access will be restricted through 5/22/2014. (Ortiz, Carmen) (Entered: 03/06/2014) |

| | | |
|---|---|---|
| 03/04/2014 | 97<br>(2 pgs) | Letter *Dated 2/18/2014, Regarding Relevant Authority* filed by Sadik Huseny. (Ebanks, Liza) (Entered: 03/04/2014) |
| 03/04/2014 | 98<br>(3 pgs) | Response *Dated 2/19/2014, To Letter Regarding Relevant Authority Filed By Sadik Huseny* (related document(s)97) filed by Gil D. Messina. (Ebanks, Liza) (Entered: 03/04/2014) |
| 03/04/2014 | 99<br>(2 pgs) | Letter *Dated 2/20/2014, In Response To Letter Filed By Gil D. Messina* (related document(s)98) filed by Sadik Huseny. (Ebanks, Liza) (Entered: 03/04/2014) |
| 03/14/2014 | 101<br>(27 pgs) | Memorandum Of Decision Signed On 3/14/2014, Re: Plaintiffs' Motion To Amend The Complaint. (related document(s)91) (Ebanks, Liza) (Entered: 03/14/2014) |
| 03/31/2014 | 102<br>(2 pgs) | Order Signed On 3/31/2014, Granting In Part And Denying In Part Plaintiffs' Motion For Leave To File An Amended Complaint To Add Damages Claim. (Related Doc # 91) (Ebanks, Liza) (Entered: 03/31/2014) |
| 04/04/2014 | 103<br>(54 pgs) | Amended Complaint against all defendants Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 04/04/2014) |
| 04/22/2014 | 104<br>(23 pgs) | Answer to Amended Complaint (Related Doc # 103) filed by Sadik Harry Huseny on behalf of US Airways Group, Inc., US Airways, Inc.. (Huseny, Sadik) (Entered: 04/22/2014) |
| 05/05/2014 | 105<br>(186 pgs; 5 docs) | Second Motion to Amend *and Supplement Complaint* filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Memorandum of Law # 2 Exhibit A - Proposed Second Amended and Supplemental Complaint # 3 Exhibit B-Red-line of Proposed Second Amended and Supplemental Complaint # 4 Proposed Order) (Messina, Gil) (Entered: 05/05/2014) |
| 05/21/2014 | 107<br>(27 pgs) | Transcript regarding Hearing Held on 5/16/2014 3:02PM RE: Telephonic Status Conference on The Record Re: Doc # 105 Second Motion to Amend and Supplement Complaint filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. Remote electronic access to the transcript is restricted until 8/19/2014. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: VERITEXT REPORTING COMPANY.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 5/28/2014. Statement of Redaction Request Due By 6/11/2014. Redacted Transcript Submission Due By 6/23/2014. Transcript access will be restricted through 8/19/2014. (Ortiz, Carmen) (Entered: 06/03/2014) |
| 06/02/2014 | 106<br>(206 pgs; 3 docs) | Amended Motion to Amend *and Supplement Complaint* filed by Gil D. Messina on behalf of Carolyn Fjord, et al. Responses due by 6/20/2014,. (Attachments: # 1 Memorandum of Law in Support of Amended Motion to Supplement and Amend Complaint and Demand for Jury Trial # 2 Proposed form of Order) (Messina, Gil) (Entered: 06/02/2014) |
| 06/26/2014 | 108<br>(39 pgs) | Opposition Brief *to Plaintiffs' Amended Motion for Leave to File a Second Amended and Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial* (related document(s)106) filed by |

| | | Daniel Murray Wall on behalf of American Airlines, US Airways Group, Inc., US Airways, Inc.. (Wall, Daniel) (Entered: 06/26/2014) |
|---|---|---|
| 06/26/2014 | 109 (21 pgs; 2 docs) | Declaration *of Sadik Huseny in Support of Defendants' Opposition to Plaintiffs' Amended Motion for Leave to File a Second Amended and Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial* (related document(s)106) filed by Daniel Murray Wall on behalf of American Airlines, US Airways Group, Inc., US Airways, Inc.. (Attachments: # 1 Exhibit 1) (Wall, Daniel) (Entered: 06/26/2014) |
| 06/30/2014 | 110 (2 pgs) | Certificate of Service *on Defendants' Opposition and Supporting Declaration to Plaintiffs' Amended Motion for Leave to File a Second Amended and Supplemental Complaint and to Add a Damage Claim and Demand for Jury Trial* (related document(s)108, 109) filed by Sadik Harry Huseny on behalf of US Airways Group, Inc., US Airways, Inc.. (Huseny, Sadik) (Entered: 06/30/2014) |
| 07/08/2014 | 111 (4 pgs) | Notice of Hearing (related document(s)106) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. with hearing to be held on 7/17/2014 at 02:00 PM at Courtroom 701 (SHL) (Messina, Gil) (Entered: 07/08/2014) |
| 07/10/2014 | 112 (27 pgs) | Reply to Motion *Reply Memorandum of Law in Further Support of Amended Motion to File Second Amended and Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial* (related document(s)106) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 07/10/2014) |
| 07/22/2014 | 113 (118 pgs) | Transcript regarding Hearing Held on 7/17/2014 2:14PM RE: Amended Motion to Amend and Supplement Complaint. Remote electronic access to the transcript is restricted until 10/20/2014. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: VERITEXT REPORTING COMPANY.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 106). Notice of Intent to Request Redaction Deadline Due By 7/29/2014. Statement of Redaction Request Due By 8/12/2014. Redacted Transcript Submission Due By 8/22/2014. Transcript access will be restricted through 10/20/2014. (Ortiz, Carmen) (Entered: 08/08/2014) |
| 03/16/2015 | 114 (3 pgs) | Letter *Dated August 4, 2014 Re: List Of Plaintiffs Who Have Purchased Tickets From American Or US Airways Since The Merger For Personal Or Family Use* (related document(s)106) Filed by Gil D. Messina. (Ebanks, Liza) (Entered: 03/16/2015) |
| 03/31/2015 | 115 (27 pgs) | Memorandum Of Decision Signed On 3/31/2015, Re: Amended Motion To Amend And Supplement Complaint. (related document(s)106) (Ebanks, Liza) (Entered: 03/31/2015) |
| 04/16/2015 | 116 (5 pgs; 2 docs) | Notice of Settlement of an Order *Denying Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial* (related document(s)115) filed by Sadik Harry Huseny on behalf of American Airlines, US Airways Group, Inc., US Airways, Inc.. Objections due by 4/20/2015, (Attachments: # 1 Proposed Order)(Huseny, Sadik) (Entered: 04/16/2015) |

| 04/28/2015 | 117<br>(2 pgs) | Order Signed On 4/28/2015, Denying Plaintiff's Motion For Leave To File A Second Amended And Supplemental Complaint And To Add Damages Claim And Demand For Jury Trial. (Related Doc # 106) (Ebanks, Liza) (Entered: 04/28/2015) |
|---|---|---|
| 08/19/2015 | 118<br>(175 pgs; 3 docs) | Notice of Hearing *on Motion to Amend and Supplement Complaint* filed by Gil D. Messina on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. with hearing to be held on 9/30/2015 at 11:00 AM at Courtroom 701 (SHL) (Attachments: # 1 Memorandum of Law in Support of Motion to Amend and Supplement # 2 Proposed Order)(Messina, Gil) (Entered: 08/19/2015) |
| 09/03/2015 | 119<br>(2 pgs) | Letter *Dated 8/28/2015, Requesting A Telephone Conference Re: Motion To Amend and Supplement Complaint* (related document(s)118) Filed by Sadik Huseny. (Ebanks, Liza) (Entered: 09/03/2015) |
| 09/03/2015 | 120<br>(2 pgs) | Letter *Dated 9/2/2015, Requesting A Telephone Conference Re: Motion to Amend and Supplement Complaint* (related document(s)119, 118) Filed by Gil D. Messina. (Ebanks, Liza) (Entered: 09/03/2015) |
| 09/25/2015 | 121<br>(22 pgs) | Transcript regarding Hearing Held on 9/9/2015 2:04PM RE: Telephone Conference Re: Letter Filed By Sadik Huseny Re: Motion for Leave To File A Second Amended And Supplemental Complaint, Add A Damage Claim And Demand For Jury Trial. Remote electronic access to the transcript is restricted until 12/24/2015. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 10/2/2015. Statement of Redaction Request Due By 10/16/2015. Redacted Transcript Submission Due By 10/26/2015. Transcript access will be restricted through 12/24/2015. (Ortiz, Carmen) (Entered: 10/15/2015) |
| 10/20/2015 | 122<br>(1 pg) | Notice of Adjournment of Hearing *on Motion to Amend and Supplement Complaint Requested* filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 10/20/2015) |
| 10/27/2015 | 123<br>(1 pg) | Memorandum Endorsed Order Signed On 10/27/2015. "SO ORDERED" Re: Letter Requesting Adjournment Of Plaintiffs Motion To Amend And Supplement Complaint. (related document(s)122) (Ebanks, Liza) (Entered: 10/27/2015) |
| 02/25/2016 | 124<br>(2 pgs) | Notice of Hearing *(Telephonic)* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 02/25/2016) |
| 02/25/2016 | 125<br>(3 pgs) | Affidavit of Service (related document(s)124) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 02/25/2016) |

| | | |
|---|---|---|
| 04/22/2016 | 126<br>(16 pgs) | Transcript regarding Hearing Held on 04/14/16 at 11:05 am RE: Status Conference.. Remote electronic access to the transcript is restricted until 7/21/2016. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 4/29/2016. Statement of Redaction Request Due By 5/13/2016. Redacted Transcript Submission Due By 5/23/2016. Transcript access will be restricted through 7/21/2016. (Brown, Tenille) (Entered: 04/29/2016) |
| 02/01/2017 | 127<br>(1 pg) | Memorandum Endorsed Order Signed On 2/1/2017. "SO ORDERED" Re: Letter Requesting A Telephonic Status Conference. (Braithwaite, Kenishia) (Entered: 02/01/2017) |
| 02/13/2017 | 130<br>(25 pgs) | Transcript regarding Hearing Held on 2/8/2017 2:10 PM RE: Status Conference (Court Call Approved). Remote electronic access to the transcript is restricted until 5/15/2017. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 2/21/2017. Statement of Redaction Request Due By 3/6/2017. Redacted Transcript Submission Due By 3/16/2017. Transcript access will be restricted through 5/15/2017. (Ortiz, Carmen) (Entered: 03/09/2017) |
| 02/22/2017 | 128<br>(2 pgs) | Interim Scheduling Order Signed On 2/22/2017. (Ebanks, Liza) (Entered: 02/22/2017) |
| 02/22/2017 | 129<br>(1 pg) | Stipulation *Notice, Consent and Reference of a Civil Action to Bankruptcy Court* Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 02/22/2017) |
| 03/21/2017 | 131<br>(2 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Christopher Alan Nedeau on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Proposed Order) (Nedeau, Christopher) (Entered: 03/21/2017) |
| 03/21/2017 | | Receipt of Application for Pro Hac Vice Admission(13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number 11767563. Fee amount 200.00. (Re: Doc # 131) (U.S. Treasury) (Entered: 03/21/2017) |
| 03/23/2017 | 132<br>(1 pg) | Order Signed On 3/23/2017, Granting Application For Pro Hac Vice Re: Christopher A. Nedeau (Related Doc # 131) (Ebanks, Liza) (Entered: 03/23/2017) |
| 04/28/2017 | 133<br>(2 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Proposed Order) (Miller, Jamie) (Entered: 04/28/2017) |
| 04/28/2017 | | Receipt of Application for Pro Hac Vice Admission(13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number 11836974. Fee amount 200.00. (Re: Doc # 133) (U.S. Treasury) (Entered: 04/28/2017) |
| 05/01/2017 | 134<br>(1 pg) | Memorandum Endorsed Order Signed On 5/1/2017. "SO ORDERED". Re: Joint Letter Scheduling Motions For Summary Judgment. (Ebanks, Liza) (Entered: 05/01/2017) |

| | | |
|---|---|---|
| 05/01/2017 | 135<br>(1 pg) | Order Signed On 5/1/2017, Granting Application For Pro Hac Vice Re: Jamie Lynne Miller. (Related Doc # 133) (Ebanks, Liza) (Entered: 05/01/2017) |
| 05/12/2017 | 136<br>(2 pgs) | Motion to Seal *Certain Information in Connection with Defendant American Airlines Group Inc.'s Motion for Summary Judgment* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/12/2017 | 137<br>(6 pgs) | Memorandum of Law *in Support of Motion to Seal Information in Connection with Defendant American Airlines Group Inc.'s Motion for Summary Judgment* (related document(s)136) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/12/2017 | 138<br>(16 pgs; 2 docs) | Declaration *in Support of Motion to Seal Information in Connection with Defendant American Airlines Group Inc.'s Motion for Summary Judgment* (related document(s)136) filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 - Stipulated Protective Order) (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/12/2017 | 139<br>(2 pgs) | Motion for Summary Judgment filed by Sadik Harry Huseny on behalf of American Airlines. Responses due by 6/9/2017, (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/12/2017 | 140<br>(48 pgs) | Memorandum of Law *in Support of Defendant American Airlines Group Inc.'s Motion for Summary Judgment* (related document(s)139) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/12/2017 | 141<br>(105 pgs; 19 docs) | Declaration *of Sadik Huseny in Support of Defendant American Airlines Group Inc.'s Motion for Summary Judgment [Public Version]* (related document(s)139) filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 - Lundgren Expert Report # 2 Exhibit 2 - Ordover Deposition Excerpts # 3 Exhibit 3 - Carlton Deposition Excerpts # 4 Exhibit 4 - Carlton Expert Report # 5 Exhibit 5 - Ordover Expert Report # 6 Exhibit 6 - Kasper Expert Report # 7 Exhibit 7 - Nocella Deposition Excerpts # 8 Exhibit 8 - Freeland Deposition Excerpts # 9 Exhibit 9 - Plaintiffs' Responses to Defendants' First Set of Interrogatories # 10 Exhibit 10 - Malaney Deposition Excerpts # 11 Exhibit 11 - D'Augusta Deposition Excerpts # 12 Exhibit 12 - Jolly Deposition Excerpts # 13 Exhibit 13 - Taleff Deposition Excerpts # 14 Exhibit 14 - Garavanian Deposition Excerpts # 15 Exhibit 15 - Brown Deposition Excerpts # 16 Exhibit 16 - McCarthy Deposition Excerpts # 17 Exhibit 17 - Horton Deposition Excerpts # 18 Exhibit 18 - Taleff Article (Exhibit D-17)) (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/12/2017 | 142<br>(16 pgs) | Statement of Undisputed Facts *in Support of Motion for Summary Judgment* Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/12/2017) |
| 05/13/2017 | 143<br>(20 pgs) | Certificate of Service (related document(s)136, 137, 138, 142, 139, 141, 140) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/13/2017) |
| 06/06/2017 | 144 | Letter *Request by Consent for Extension of Summary Judgment Briefing* |

| | | |
|---|---|---|
| | (1 pg) | *Schedule* (related document(s)[139] Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 06/06/2017) |
| 06/06/2017 | [145]<br>(1 pg) | Memorandum Endorsed Order Signed On 6/6/2017, "SO ORDERED" Re: Letter Request By Consent For Extension Of Summary Judgment Briefing Schedule. (related document(s)[144]) (Ebanks, Liza) (Entered: 06/06/2017) |
| 06/15/2017 | [146]<br>(1 pg) | Memorandum Endorsed Order Signed On 6/15/2017, "SO ORDERED" Re: Letter Requesting For Further Modification Of Briefing Schedule. (Ebanks, Liza) (Entered: 06/15/2017) |
| 06/19/2017 | [147]<br>(1 pg) | Memorandum Endorsed Order Signed On 6/19/2017, "SO ORDERED". Regarding Letter Requesting To Increase Page Limit. (Ebanks, Liza) (Entered: 06/19/2017) |
| 06/24/2017 | [148]<br>(17 pgs; 4 docs) | Motion to Seal *by Plaintiffs* (related document(s)[139]) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # [1] Memorandum in Support of Motion to Seal # [2] Declaration in Support of Motion to Seal # [3] Proposed Order) (Messina, Gil) (Entered: 06/24/2017) |
| 06/24/2017 | [149]<br>(236 pgs; 25 docs) | Motion for Summary Judgment *Plaintiffs' Cross-Motion for Summary and Opposition to Defendants' Motion for Summary Judgment* (related document(s)[139]) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # [1] Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Motion for Summary Judgment # [2] Plaintiffs' Statement of Undisputed Material Facts in Support of Cross-Motion for Summary Judgment (Redacted) # [3] Response to Defendants' Statement of Undisputed Facts # [4] Declaration of Carl Lundgren in Support of Plaintiffs' Cross-Motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment # [5] Declaration of Bill Rubinsohn # [6] Declaration of Brenda Davis # [7] Declaration of Carolyn Fjord # [8] Declaration of Christine Whalen # [9] Declaration of Deborah Pulfer # [10] Declaration of Don Freeland # [11] Declaration of Donald Fry # [12] Declaration of Gabe Garavanian # [13] Declaration of Gary Talewsky # [14] Declaration of Jan Marie Brown # [15] Declaration Jose Brito # [16] Declaration of June Stansbury # [17] Declaration of Katherine Arcell # [18] Declaration of Lisa McCarthy # [19] Declaration of Michael Malaney # [20] Declaration of Pamela Faust # [21] Declaration of Rosemary D'Augusta # [22] Declaration of Sondra Russell # [23] Declaration of Valarie Ann Jolly # [24] Declaration of Wayne Taleff # [25] Declaration of Valarie Ann Jolly) (Messina, Gil) **(Attachment #1 Memorandum in Support of Cross-Motion for Summary Judgement has been Refiled. See Document #[153] for the correct entry)** Modified on 6/28/2017 (Richards, Beverly). (Entered: 06/24/2017) |
| 06/24/2017 | [150]<br>(7 pgs) | Affidavit *Declaration of Gil D. Messina in Support of Cross-Motion for Summary Judgment and in Opposition to Motion for Summary Judgment* (related document(s)[149]) Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 06/24/2017) |
| 06/24/2017 | [151]<br>(721 pgs) | Motion for Summary Judgment *Exhibits A to ZZ to Declaration of Gil D. Messina (Under Seal)* filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 06/24/2017) |
| 06/24/2017 | [152] | Certificate of Service (related document(s)[149]) Filed by Gil D. Messina |

| | | |
|---|---|---|
| | (3 pgs) | on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 06/24/2017) |
| 06/27/2017 | 153 (118 pgs) | Corrected Memorandum of Law in Support of Plaintiffs' Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment (related document(s)149) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) Modified on 6/28/2017 (Richards, Beverly). (Entered: 06/27/2017) |
| 06/27/2017 | 154 | **(Document Filed Incorrectly)** Motion for Summary Judgment *Corrected Declaration of Gil D. Messina in Support of Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment* (related document(s)151) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Exhibit A-ZZ to Declaration of Gil D. Messina in Support of Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment) (Messina, Gil) Modified on 6/28/2017 (Richards, Beverly). (Entered: 06/27/2017) |
| 06/28/2017 | 155 (1 pg) | Certificate of Service *for Corrected Filings* (related document(s)153, 154) Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 06/28/2017) |
| 06/28/2017 | 156 (744 pgs; 2 docs) | Motion for Summary Judgment *Second Corrected Declaration of Gil D. Messina in Support of Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment and Redacted Exhibits a-ZZ* (related document(s)151, 154) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Exhibit A-ZZ to Declaration of Gil D. Messina in Support of Cross-motion for Summary Judgment and in Opposition to Defendants' Motion for Summary Judgment) (Messina, Gil) (Entered: 06/28/2017) |
| 07/28/2017 | 157 (2 pgs) | Motion to Seal *Certain Information in Connection with Defendant American Airlines Group Inc.'s Opposition to Plaintiffs' Cross-Motion for Summary Judgment & Reply in Support of Defendant's Motion for Summary Judgment* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 07/28/2017) |
| 07/28/2017 | 158 (7 pgs) | Memorandum of Law *in Support of Motion to Seal Information in Connection with Defendant American Airlines Group Inc.'s Opposition to Plaintiffs' Cross-Motion for Summary Judgment & Reply in Support of Defendant's Motion for Summary Judgment* (related document(s)157) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 07/28/2017) |
| 07/28/2017 | 159 (16 pgs; 2 docs) | Declaration *in Support of Motion to Seal Information in Connection with Defendant American Airlines Group Inc.'s Cross-Motion for Summary Judgment & Reply in Support of Defendant's Motion for Summary Judgment* (related document(s)157) filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 --Stipulated Protective Order) (Huseny, Sadik) (Entered: 07/28/2017) |
| 07/28/2017 | 160 (45 pgs) | Memorandum of Law --*Defendant American Airlines Group Inc.'s Opposition to Plaintiffs' Cross-Motion for Summary Judgment & Reply in Support of Defendant's Motion for Summary Judgment* (related document(s)139, 149) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 07/28/2017) |

| | | |
|---|---|---|
| 07/28/2017 | 161<br>(96 pgs; 8 docs) | Declaration *of Sadik Huseny in Support of Defendant American Airlines Group Inc.'s Opposition to Plaintiffs' Cross-Motion for Summary Judgment & Reply in Support of Defendant's Motion for Summary Judgment [Redacted Version]* (related document(s)139, 149) filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 --Plaintiffs' Specific Allegations of Injury # 2 Exhibit 2 --Redacted in its Entirety # 3 Exhibit 3 --Redacted in its Entirety # 4 Exhibit 4 --Apr. 4, 2016 Hearing Tr. Excerpts # 5 Exhibit 5 --May 29, 2017 D'Augusta Errata # 6 Exhibit 6 --Dec. 12, 2013 Horton Dep. Tr. Excerpts # 7 Exhibit 7 --Mar. 16, 2016 D'Augusta Dep. Tr. Excerpts) (Huseny, Sadik) (Entered: 07/28/2017) |
| 07/28/2017 | 162<br>(70 pgs) | Reply Statement of Undisputed Fact --*Defendant American Airlines Group Inc.'s Reply to Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts [Redacted Version]* (related document(s)139, 149) filed by Sadik Harry Huseny on behalf of American Airlines. (Entered: 07/28/2017) |
| 07/28/2017 | 163<br>(43 pgs) | Counterstatement of Undisputed Fact --*Defendant American Airlines Group Inc.'s Response to Plaintiffs' Statement of Undisputed Facts in Support of Cross-Motion for Summary Judgment [Redacted Version]* (related document(s)139, 149) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 07/28/2017) |
| 07/31/2017 | 164<br>(18 pgs) | Certificate of Service (related document(s)157, 160, 162, 163, 158, 161, 159) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 07/31/2017) |
| 08/16/2017 | 165<br>(1 pg) | Memorandum Endorsed Order Signed On 8/16/2017, "Approved" Re: Letter Requesting To Extend The Deadline To File Reply To September 1, 2017. (Ebanks, Liza) (Entered: 08/16/2017) |
| 08/31/2017 | 166<br>(1 pg) | Memorandum Endorsed Order Signed On 8/31/2017, "The plaintiff's request is granted in part..." Re: Letter Requesting To Extend Page Limit Of Plaintiff's Reply. (Ebanks, Liza) (Entered: 08/31/2017) |
| 09/01/2017 | 167<br>(288 pgs; 7 docs) | Reply to Motion *Plaintiffs' Memorandum of Law in Support of Cross-Motion for Summary Judgment* filed by Joseph M Alioto on behalf of Carolyn Fjord. (Attachments: # 1 Declaration of Joseph M. Alioto # 2 Exhibit # 3 Exhibit # 4 Exhibit # 5 Exhibit # 6 Reply to Objections) (Alioto, Joseph) (Entered: 09/01/2017) |
| 09/05/2017 | 168<br>(1 pg) | Certificate of Service filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 09/05/2017) |
| 03/01/2018 | 169<br>(2 pgs) | Notice of Hearing *on Motion for Summary Judgment* filed by Sadik Harry Huseny on behalf of American Airlines. with hearing to be held on 3/26/2018 at 01:30 PM at Courtroom 701 (SHL) (Huseny, Sadik) (Entered: 03/01/2018) |
| 03/01/2018 | 170<br>(4 pgs) | Certificate of Service (related document(s)169) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/01/2018) |
| 03/30/2018 | 171<br>(90 pgs) | Transcript regarding Hearing Held on 03/26/18 at 1:48 PM RE: Doc. #136 (Seal) Defendant's motion to seal certain information in connection with defendant American Airlines Group Inc.'s motion for |

| | | |
|---|---|---|
| | | summary judgment; Doc. #157 (Seal) Defendant's motion to seal certain information in connection with defendant American Airlines Group Inc.'s opposition to Plaintiffs' cross-motion for summary judgment & reply in support of defendant's motion for summary judgment; Doc. #139, #140, #141 Defendant's motion for summary judgment filed on behalf of American Airlines; etc. Remote electronic access to the transcript is restricted until 6/28/2018. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 157, 156, 160, 136, 151, 148, 153, 150, 167, 161, 139, 149, 141, 140) Notice of Intent to Request Redaction Deadline Due By 4/6/2018. Statement of Redaction Request Due By 4/20/2018. Redacted Transcript Submission Due By 4/30/2018. Transcript access will be restricted through 6/28/2018. (Cales, Humberto) (Entered: 04/11/2018) |
| 04/17/2018 | 172 (3 pgs) | Statement of Undisputed Fact *Notice of Motion Order Correcting the Record* filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 04/17/2018) |
| 04/17/2018 | 173 (5 pgs) | Statement of Undisputed Fact *Motion for an Order Correcting the Record and Memorandum in Support* filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 04/17/2018) |
| 04/17/2018 | 174 (23 pgs; 2 docs) | Statement of Undisputed Fact *Declaration of Joseph M. Alioto in Support of Motion for an Order Correcting the Record* filed by Joseph M Alioto on behalf of Carolyn Fjord. (Attachments: # 1 Exhibit Exhibit A) (Alioto, Joseph) (Entered: 04/17/2018) |
| 04/19/2018 | 175 (10 pgs) | Certificate of Service (related document(s)172, 174, 173) filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 04/19/2018) |
| 08/31/2018 | 177 (95 pgs) | Transcript regarding Hearing Held on 08/29/18 at 3:09 PM RE: BENCH DECISION. Remote electronic access to the transcript is restricted until 11/29/2018. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 9/7/2018. Statement of Redaction Request Due By 9/21/2018. Redacted Transcript Submission Due By 10/1/2018. Transcript access will be restricted through 11/29/2018. (Cales, Humberto) (Entered: 09/14/2018) |
| 09/14/2018 | 176 (2 pgs) | Order Signed On 9/14/2018, GRANTING IN PART AND DENYING IN PART: Defendants' Motion For Summary Judgment And DENYING Plaintiffs' Cross-Motion For Summary Judgment. (related document(s)156, 160, 151, 172, 174, 153, 150, 167, 162, 163, 142, 161, 139, 149, 173, 154, 141, 140) (Ebanks, Liza) (Entered: 09/14/2018) |
| 11/08/2018 | 178 (8 pgs) | Letter *And Proposed Agreed Pre-Trial Scheduling* Filed by Gil D. Messina. (Ebanks, Liza) (Entered: 12/10/2018) |
| 12/10/2018 | 179 (7 pgs) | Order Signed On 12/10/2018, Regarding Plaintiffs' Request To Supplement Dr. Lundgren's Expert Report. (related document(s)178) (Ebanks, Liza) (Entered: 12/10/2018) |

| | | |
|---|---|---|
| 12/26/2018 | 180<br>(4 pgs) | Motion to Join *Notice of Motion for Motion for Leave to Serve Supplemental Expert Report of Dr. Carl Lundgren and/or Motion for Reconsideration* filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Miller, Jamie) (Entered: 12/26/2018) |
| 12/26/2018 | 181<br>(27 pgs) | Motion to Join *Memorandum in Support of Motion for Leave to Serve Supplemental Expert Report of Dr. Carl Lundgren and/or Motion for Reconsideration* (related document(s)180) filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Miller, Jamie) (Entered: 12/26/2018) |
| 12/26/2018 | 182<br>(6 pgs) | Statement of Undisputed Fact *Declaration of Gil Messina in Support of Motion for Leave to Serve Supplemental Expert Report of Dr. Carl Lundgren and/or Motion for Reconsideration* (related document(s)181, 180) filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Miller, Jamie) (Entered: 12/26/2018) |
| 12/26/2018 | 183<br>(4 pgs) | Statement of Undisputed Fact *Declaration of Jamie L. Miller in Support of Motion for Leave to Serve Supplemental Expert Report and/or Motion for Reconsideration* (related document(s)181, 180, 182) filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Miller, Jamie) (Entered: 12/26/2018) |
| 12/26/2018 | 184<br>(190 pgs; 6 docs) | Statement of Undisputed Fact *Motion for Leave to Serve Supplemental Expert Report of Dr. Carl Lundgren and/or Motion for Reconsideration* (related document(s)181, 183, 180, 182) filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C # 4 Exhibit D # 5 Exhibit E) (Messina, Gil) (Entered: 12/26/2018) |
| 12/27/2018 | 185<br>(3 pgs) | Certificate of Service (related document(s)184, 181, 183, 180, 182) filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Miller, Jamie) (Entered: 12/27/2018) |
| 01/08/2019 | 186<br>(7 pgs) | Opposition *to Plaintiffs' Motion for Leave to Serve Supplemental Expert Report of Dr. Carl Lundgren and/or Motion for Reconsideration* (related document(s)180) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 01/08/2019) |
| 01/08/2019 | 187<br>(4 pgs) | Certificate of Service (related document(s)186) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 01/08/2019) |
| 01/09/2019 | 188<br>(3 pgs) | Scheduling Order Signed On 1/9/2019. With Trial To Be Held On 3/11/2019 Through 3/15/2019 At 10:00 AM At Courtroom 701 (SHL) (Ebanks, Liza) (Entered: 01/09/2019) |
| 01/13/2019 | 189<br>(3 pgs) | Amended Complaint against all defendants *Notice of Motion and Motion for Leave to File a Second Amended and Supplemental Complaint* (related document(s)103) Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 01/13/2019) |
| 01/13/2019 | 190<br>(20 pgs) | Amended Complaint against all defendants *Memorandum in Support of Motion for Leave to File a Second Amended and Supplemental Complaint* (related document(s)189) Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 01/13/2019) |
| 01/13/2019 | 191 | Amended Complaint against all defendants *Declaration of Joseph M.* |

| | | |
|---|---|---|
| | (174 pgs; 5 docs) | *Alioto in Support of Motion for Leave to File Second Amended and Supplemental Complaint* (related document(s)103) Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Exhibit A to Declaration of Joseph M. Alioto # 2 Exhibit B to Declaration of Joseph M. Alioto # 3 Exhibit C to Declaration of Joseph M. Alioto # 4 Exhibit D to Declaration of Joseph M. Alioto) (Alioto, Joseph) (Entered: 01/13/2019) |
| 01/14/2019 | 192 (3 pgs) | Certificate of Service (related document(s)190, 189, 191) Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 01/14/2019) |
| 01/16/2019 | 193 (8 pgs) | Reply to Motion *for Leave to Serve Supplemental Expert Report of Dr. Lundgren and/or Motion for Reconsideration* (related document(s)184, 181, 183, 180, 182) filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Miller, Jamie) (Entered: 01/16/2019) |
| 01/16/2019 | 200 (18 pgs) | Transcript regarding Hearing Held on 12/18/19 at 3:40 PM RE: Status Conference. Remote electronic access to the transcript is restricted until 4/16/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 1/23/2019. Statement of Redaction Request Due By 2/6/2019. Redacted Transcript Submission Due By 2/19/2019. Transcript access will be restricted through 4/16/2019. (Cales, Humberto) (Entered: 02/08/2019) |
| 01/17/2019 | 194 (3 pgs; 2 docs) | Letter *to the Honorable Sean H. Lane regarding [Proposed] Pretrial Deadlines* Filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 [Proposed] Scheduling Order on Pretrial Deadlines)(Huseny, Sadik) (Entered: 01/17/2019) |
| 01/17/2019 | 195 (5 pgs) | Certificate of Service (related document(s)194) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 01/17/2019) |
| 01/23/2019 | 196 (2 pgs) | Agreed Scheduling Order Of Pre-Trial Deadlines Signed On 1/23/2019, With Final Pre-Trial Conference to be held on 3/6/2019 at 11:00 AM at Courtroom 701 (SHL); With TRIAL to begin on 3/11/2019 at 10:00 a.m. at Courtroom 701 (SHL) (Ebanks, Liza) (Entered: 01/23/2019) |
| 01/23/2019 | 197 (3 pgs) | Amended Complaint against all defendants *Amended Notice of Motion and Motion for Leave to File Second Amended and Supplemental Complaint* (related document(s)103) Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 01/23/2019) |
| 01/25/2019 | 198 (3 pgs) | Certificate of Service (related document(s)197) Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 01/25/2019) |
| 01/30/2019 | 199 (8 pgs) | Order Signed On 1/30/2019, Regarding Plaintiff's Motion For Reconsideration. (Related Doc 180) (Ebanks, Liza) (Entered: 01/30/2019) |
| 02/13/2019 | 201 (18 pgs) | Opposition *to Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint to Allege Injury and Damages under* |

| | | |
|---|---|---|
| | | *Section 4 of the Clayton Act and Demand for Jury Trial* (related document(s)190, 189, 197, 191) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 02/13/2019) |
| 02/13/2019 | 202<br>(5 pgs; 2 docs) | Affidavit *of Robin L. Kuntz in Support of Defendant American Airlines Group, Inc.'s Opposition to Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint to Allege Injury and Damages under Section 4 of the Clayton Act and Demand for Jury Trial* (related document(s)201) Filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit A)(Huseny, Sadik) (Entered: 02/13/2019) |
| 02/13/2019 | 203<br>(7 pgs) | Certificate of Service (related document(s)201) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 02/13/2019) |
| 02/15/2019 | 204<br>(10 pgs) | Reply to Motion filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 02/15/2019) |
| 02/15/2019 | 205<br>(3 pgs) | Certificate of Service *of Reply Memorandum* filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 02/15/2019) |
| 02/25/2019 | 264<br>(56 pgs) | Transcript regarding Hearing Held on 02/20/19 2:16 PM RE: Doc. #197 Amended Motion For Leave To File Second Amended And Supplemental Complaint. Remote electronic access to the transcript is restricted until 5/28/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 197). Notice of Intent to Request Redaction Deadline Due By 3/4/2019. Statement of Redaction Request Due By 3/18/2019. Redacted Transcript Submission Due By 3/28/2019. Transcript access will be restricted through 5/28/2019. (Ramos, Jonathan) (Entered: 03/25/2019) |
| 02/26/2019 | 206<br>(12 pgs) | Order Signed On 2/26/2019, Denying Plaintiffs' Motion For Leave To File A Second Amended And Supplemental Complaint. (related document(s)190, 189) (Ebanks, Liza) (Entered: 02/26/2019) |
| 02/28/2019 | 207<br>(30 pgs) | Letter Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 02/28/2019) |
| 02/28/2019 | 208<br>(38 pgs) | Letter *regarding Plaintiffs' Submissions* Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 02/28/2019) |
| 03/01/2019 | 209<br>(1 pg) | Memorandum Endorsed Order Signed On 3/1/2019, "Granted nunc pro tunc" Re: Plaintiff's Letter Regarding Reply In Support Deadline. (Ebanks, Liza) (Entered: 03/01/2019) |
| 03/04/2019 | 210<br>(4 pgs; 2 docs) | Motion to Approve *Notice of Motion and Motion In Limine to Exclude Evidence and Argument Regarding Plaintiffs' Other Litigations Against American Airlines* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Huseny, Sadik) (Entered: 03/04/2019) |
| 03/04/2019 | 211 | Motion to Approve *Notice of Motion and Motion In Limine to Exclude* |

| | (4 pgs; 2 docs) | *News Articles and Third-Party Report* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Huseny, Sadik) (Entered: 03/04/2019) |
|---|---|---|
| 03/04/2019 | 212<br>(8 pgs) | Memorandum of Law *in Support of American Airlines Group Inc.'s Motions in Limine* (related document(s)211, 210) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/04/2019) |
| 03/04/2019 | 213<br>(195 pgs; 20 docs) | Declaration *of Sadik Huseny in Support of American Airlines Group Inc.'s Motions in Limine* (related document(s)211, 210) filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9 # 10 Exhibit 10 # 11 Exhibit 11 # 12 Exhibit 12 # 13 Exhibit 13 # 14 Exhibit 14 # 15 Exhibit 15 # 16 Exhibit 16 # 17 Exhibit 17 # 18 Exhibit 18 # 19 Exhibit 19) (Huseny, Sadik) (Entered: 03/04/2019) |
| 03/05/2019 | 214<br>(95 pgs; 8 docs) | Stipulation *Joint Pretrial Order* Filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7) (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 215<br>(3 pgs) | Opposition *to Plaintiffs' Motion In Limine No. 1 to Exclude Evidence Relating to Plaintiffs Prior Litigation* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 216<br>(7 pgs) | Opposition *to Plaintiffs Motion In Limine No. 2 to Exclude Deposition Testimony Designated by Defendants in U.S. v. US Airways, et al.* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 217<br>(7 pgs) | Opposition *to Plaintiffs Motion In Limine No. 3 to Exclude Evidence of Efficiencies and/or to Exclude Evidence of Efficiencies Unrelated to any City-Pair Relevant Market* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 218<br>(17 pgs; 4 docs) | Motion to Seal filed by Jamie Lynne Miller on behalf of Carolyn Fjord, et al.. (Attachments: # 1 Memorandum in Support # 2 Declaration # 3 Proposed Order) (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 219<br>(8 pgs) | Opposition *to Plaintiffs Motion In Limine No. 5 to Exclude Testimony of Heather Garboden* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 220<br>(10 pgs) | Opposition *to Defendants' Motions in Limine* (related document(s)211, 210) filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 221<br>(50 pgs; 10 docs) | Declaration *of Sadik Huseny in Support of American Airlines Group Inc.'s Oppositions to Plaintiffs' Motions in Limine* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 # 6 Exhibit 6 # 7 Exhibit 7 # 8 Exhibit 8 # 9 Exhibit 9) (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 222 | Motion to File Under Seal *Defendant American Airlines Group Inc.'s* |

| | | |
|---|---|---|
| | (5 pgs; 2 docs) | *Motions In Limine and Oppositions to Plaintiffs Motions In Limine* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 223 (11 pgs; 2 docs) | Motion to Intervene *Motion in Limine to Exclude Evidence of Plaintiffs' Prior Litigation* filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Attachments: # 1 Memorandum) (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 224 (7 pgs) | Memorandum of Law *in Support of its Motion for Entry of Order Pursuant to 11 U.S.C. § 107(B) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Under Seal in Connection with Defendant American Airlines Group Inc.'s Motions In Limine and Oppositions to Plaintiffs Motions In Limine* (related document(s)222) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 225 (3 pgs) | Declaration *of Sadik Huseny in Support of Motion to Seal Defendant American Airlines Group Inc.'s Motions In Limine and Oppositions to Plaintiffs Motions In Limine* (related document(s)222) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 226 (10 pgs; 2 docs) | Motion to Intervene *Plaintiffs' Motion in Limine No. 2 to Exclude Deposition Testimony Designated by Defendants in U.S. v. US Airways* filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Attachments: # 1 Memorandum in Support) (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 227 (15 pgs; 2 docs) | Motion to Intervene *Plaintiffs' Motion in Limine No. 3 to Exclude Evidence of Efficiencies and/or to Exclude Evidence of Efficiencies Unrelated to Any City Pair Relevant Market* filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Attachments: # 1 Memorandum in Support) (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 228 (11 pgs; 2 docs) | Motion to Intervene *Plaintiffs' Motion in Limine No. 5 to Exclude Testimony of Heather Garboden* filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Attachments: # 1 Memorandum) (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 229 (11 pgs) | Declaration *of Jamie L. Miller in Support of Plaintiffs' Motions in Limine and in Opposition to Defendants' Motions in Limine* (related document(s)226, 228, 227, 223) filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Miller, Jamie) (Entered: 03/05/2019) |
| 03/05/2019 | 230 (19 pgs) | Declaration *of Gil D. Messina in Support of Motion in Limine to Exclude Deposition Testimony Designated by Defendants in US v. US Airways* (related document(s)226) filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 231 (3 pgs) | Certificate of Service (related document(s)211, 210, 222) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/05/2019) |
| 03/05/2019 | 232 (2 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Aaron Chiu on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Chiu, Aaron) (Entered: 03/05/2019) |
| 03/05/2019 | | Receipt of Application for Pro Hac Vice Admission( 13-01392-shl) |

| | | |
|---|---|---|
| | | [motion,122] ( 200.00) Filing Fee. Receipt number A13068664. Fee amount 200.00. (Re: Doc # 232) (U.S. Treasury) (Entered: 03/05/2019) |
| 03/05/2019 | 233 (2 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Brittany N. Lovejoy on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Lovejoy, Brittany) (Entered: 03/05/2019) |
| 03/05/2019 | | Receipt of Application for Pro Hac Vice Admission( 13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number A13068688. Fee amount 200.00. (Re: Doc # 233) (U.S. Treasury) (Entered: 03/05/2019) |
| 03/05/2019 | 234 (2 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Robin Lorraine Kuntz on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Kuntz, Robin) (Entered: 03/05/2019) |
| 03/05/2019 | | Receipt of Application for Pro Hac Vice Admission( 13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number A13068696. Fee amount 200.00. (Re: Doc # 234) (U.S. Treasury) (Entered: 03/05/2019) |
| 03/05/2019 | 235 (2 pgs; 2 docs) | Application for Pro Hac Vice Admission filed by Silvia Segade Sanz on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Segade Sanz, Silvia) (Entered: 03/05/2019) |
| 03/05/2019 | | Receipt of Application for Pro Hac Vice Admission( 13-01392-shl) [motion,122] ( 200.00) Filing Fee. Receipt number A13068703. Fee amount 200.00. (Re: Doc # 235) (U.S. Treasury) (Entered: 03/05/2019) |
| 03/05/2019 | 236 (128 pgs) | Affidavit *Written Direct Examination of Dr. Carl Lundgren* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 237 (6 pgs) | Affidavit *Written Direct Examination of Jose Brito* Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 238 (7 pgs) | Affidavit *Written Direct Examination of Don Fry* Filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 239 (8 pgs) | Affidavit *Written Direct Examination of Gabe Garavanian* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 240 (8 pgs) | Affidavit *Written Direct Examination of Valarie Jolly* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 241 (12 pgs) | Affidavit *Written Direct Examination of Lisa McCarthy* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 242 (9 pgs) | Affidavit *Written Direct Examination of Bill Rubinsohn* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | 243 | Affidavit *Written Direct Examination of Sondra Russell* Filed by Joseph |

| | | |
|---|---|---|
| | (8 pgs) | M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | [244](#)<br>(8 pgs) | Affidavit *Written Direct Examination of June Stansbury* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | [245](#)<br>(10 pgs) | Affidavit *Written Direct Examination of Gary Talewsky* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/05/2019) |
| 03/05/2019 | [246](#)<br>(5 pgs; 2 docs) | Motion to File Under Seal *Notice of Defendant American Airlines Group Inc.'s Motion for Entry of Order Pursuant to 11 U.S.C. § 107(B) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Provisionally Under Seal In Connection with Defendant American Airlines Group Inc.s Witness Statements* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # [1](#) Proposed Order) (Huseny, Sadik) (Entered: 03/06/2019) |
| 03/06/2019 | [247](#)<br>(6 pgs) | Memorandum of Law *in Support of Defendant American Airlines Group Inc.'s Motion to File Under Seal its Witness Statements* (related document(s)[246](#)) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/06/2019) |
| 03/06/2019 | [248](#)<br>(2 pgs) | Declaration *of Sadik Huseny in Support of Defendant American Airlines Group Inc.'s Motion to File Under Seal its Witness Statements* (related document(s)[246](#)) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/06/2019) |
| 03/06/2019 | [249](#)<br>(7 pgs; 6 docs) | Statement *Defendant American Airlines Group Inc.'s Witness Statements* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # [1](#) Exhibit 1 # [2](#) Exhibit 2 # [3](#) Exhibit 3 # [4](#) Exhibit 4 # [5](#) Exhibit 5) (Huseny, Sadik) (Entered: 03/06/2019) |
| 03/06/2019 | [250](#)<br>(2 pgs) | Certificate of Service (related document(s)[249](#)) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/06/2019) |
| 03/06/2019 | [251](#)<br>(23 pgs) | Affidavit *Objections and Responses to Defendants' Witness Statements* (related document(s)[249](#)) Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/06/2019) |
| 03/06/2019 | [252](#)<br>(1 pg) | Order Signed On 3/6/2019, Granting Application For Pro Hac Vice Re: Aaron Chiu (Related Doc # [232](#)) (Ebanks, Liza) (Entered: 03/06/2019) |
| 03/06/2019 | [253](#)<br>(1 pg) | Order Signed On 3/6/2019, Granting Application For Pro Hac Vice Re: Brittany N. Lovejoy (Related Doc # [233](#)) (Ebanks, Liza) (Entered: 03/06/2019) |
| 03/06/2019 | [254](#)<br>(1 pg) | Order Signed On 3/6/2019, Granting Application For Pro Hac Vice Re: Robin L. Kuntz (Related Doc # [234](#)) (Ebanks, Liza) (Entered: 03/06/2019) |
| 03/06/2019 | [255](#)<br>(1 pg) | Order Signed On 3/6/2019, Granting Application For Pro Hac Vice Re: Silvia Segade Sanz (Related Doc # [235](#)) (Ebanks, Liza) (Entered: 03/06/2019) |

| 03/07/2019 | 256 (1 pg) | Order Signed On 3/5/2019, Granting Application For Pro Hac Vice Re: Theresa D. Moore. (Ebanks, Liza) (Entered: 03/07/2019) |
|---|---|---|
| 03/08/2019 | 257 (8 pgs) | Opposition Brief *Opposition to Motion to Seal* (related document(s)246, 222) filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: 03/08/2019) |
| 03/10/2019 | 258 (20 pgs) | Objection to Motion *Defendant American Airlines Group Inc.'s Objections to Plaintiffs' Witness Statements* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/10/2019) |
| 03/11/2019 | 259 (2 pgs) | Certificate of Service (related document(s)258) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/11/2019) |
| 03/12/2019 | 281 (41 pgs) | Transcript regarding Hearing Held on 03/06/19 At 11:58 AM RE: Final Pre-Trial Conference. Remote electronic access to the transcript is restricted until 6/10/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 3/19/2019. Statement of Redaction Request Due By 4/2/2019. Redacted Transcript Submission Due By 4/12/2019. Transcript access will be restricted through 6/10/2019. (Ramos, Jonathan) (Entered: 05/06/2019) |
| 03/18/2019 | 260 (2 pgs) | Stipulation *of Undisputed Facts* Filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Miller, Jamie) (Entered: 03/18/2019) |
| 03/22/2019 | 261 (9 pgs; 2 docs) | Motion to File Under Seal *Certain Portions of the Witness Statement of Janusz A. Ordover Pursuant to 11 U.S.C. Section 107(B) and Fed. R. Bankr. P. 9018* filed by Sadik Harry Huseny on behalf of American Airlines. (Attachments: # 1 Proposed Order) (Huseny, Sadik) (Entered: 03/22/2019) |
| 03/22/2019 | 262 (3 pgs) | Declaration *of James Kaleigh in Support of Defendant's Motion for Entry of Order to File Certain Portions of the Witness Statement of Janusz A. Ordover Under Seal* (related document(s)261) filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/22/2019) |
| 03/22/2019 | 263 (2 pgs) | Certificate of Service (related document(s)261) Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 03/22/2019) |
| 03/28/2019 | 267 (272 pgs) | Transcript regarding Hearing Held on 3/19/19 at 10:08 AM RE: Trial; Motions to Seal; Plaintiff's Motion to Seal Re: Plaintiff's Motions in Limine; etc. Remote electronic access to the transcript is restricted until 6/26/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) 226, 228, 211, 210, 218, 227, 246, 223, 222). Notice of Intent to Request Redaction Deadline Due By 4/4/2019. Statement of Redaction Request Due By 4/18/2019. Redacted Transcript Submission Due By 4/29/2019. |

| | | |
|---|---|---|
| | | Transcript access will be restricted through 6/26/2019. (Cales, Humberto) (Entered: 04/11/2019) |
| 03/28/2019 | 268<br>(283 pgs) | Transcript regarding Hearing Held on 3/12/19 at 9:35 AM RE: TRIAL. Remote electronic access to the transcript is restricted until 6/26/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 4/4/2019. Statement of Redaction Request Due By 4/18/2019. Redacted Transcript Submission Due By 4/29/2019. Transcript access will be restricted through 6/26/2019. (Cales, Humberto) (Entered: 04/11/2019) |
| 03/28/2019 | 269<br>(223 pgs) | Transcript regarding Hearing Held on 3/13/19 at 10:26 AM RE: TRIAL. Remote electronic access to the transcript is restricted until 6/26/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 4/4/2019. Statement of Redaction Request Due By 4/18/2019. Redacted Transcript Submission Due By 4/29/2019. Transcript access will be restricted through 6/26/2019. (Cales, Humberto) (Entered: 04/11/2019) |
| 03/28/2019 | 283<br>(148 pgs) | Transcript regarding Hearing Held on 03/15/19 At 10:09 AM RE: Trial. Remote electronic access to the transcript is restricted until 6/26/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 4/4/2019. Statement of Redaction Request Due By 4/18/2019. Redacted Transcript Submission Due By 4/29/2019. Transcript access will be restricted through 6/26/2019. (Ramos, Jonathan) (Entered: 05/08/2019) |
| 03/29/2019 | 265<br>(6 pgs) | Opposition *to Defendants' Motion to Seal* (related document(s)261) filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Miller, Jamie) (Entered: 03/29/2019) |
| 04/02/2019 | 266<br>(3 pgs) | Order Signed On 4/2/2019, Authorizing The Filing Of Certain Information Under Seal In Connection With The Witness Statement Of Janusz A. Ordover. (Related Doc # 261) (Ebanks, Liza) (Entered: 04/02/2019) |
| 04/11/2019 | 270<br>(159 pgs) | Statement *[Redacted] Witness Statement of Janusz A. Ordover* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 04/11/2019) |
| 04/15/2019 | 271<br>(28 pgs; 4 docs) | Motion to Seal *Plaintiffs' Proposed Findings of Fact and Conclusions of Law* filed by Jamie Lynne Miller on behalf of Carolyn Fjord. (Attachments: # 1 Pleading Memorandum # 2 Declaration # 3 Proposed Order) (Miller, Jamie) (Entered: 04/15/2019) |
| 04/15/2019 | 272<br>(99 pgs) | Findings of Fact and Conclusions of Law *[Proposed]* Filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 04/15/2019) |
| 04/16/2019 | 273<br>(145 pgs) | Findings of Fact and Conclusions of Law *Redacted* Filed by Joseph M Alioto on behalf of Carolyn Fjord. (Alioto, Joseph) (Entered: |

| | | 04/16/2019) |
|---|---|---|
| 04/22/2019 | [274](#)<br>(1 pg) | Letter *Correcting Trial Transcript Exhibit Designation* Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Messina, Gil) (Entered: 04/22/2019) |
| 04/24/2019 | [275](#)<br>(3 pgs; 2 docs) | Letter *to Hon. Sean H. Lane re: Errata* (related document(s)[273](#)) Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # [1](#) Errata correcting Exhibit references from PX-96 to DX-050 in paras. 436, 437, 444 on pp. 77, 78 of Plaintiffs' Proposed Findings of Fact and Conclusions of Law)(Messina, Gil) (Entered: 04/24/2019) |
| 05/03/2019 | [276](#)<br>(319 pgs) | Statement *Real-Time Trial Transcript of Proceedings on March 11, 2019* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/03/2019) |
| 05/03/2019 | [277](#)<br>(361 pgs) | Statement *Real-Time Trial Transcript of Proceedings on March 12, 2019* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/03/2019) |
| 05/03/2019 | [278](#)<br>(279 pgs) | Statement *Real-Time Trial Transcript of Proceedings on March 13, 2019* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/03/2019) |
| 05/03/2019 | [279](#)<br>(277 pgs) | Statement *Real-Time Trial Transcript of Proceedings on March 14, 2019* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/03/2019) |
| 05/03/2019 | [280](#)<br>(170 pgs) | Statement *Real-Time Trial Transcript of Proceedings on March 15, 2019* filed by Sadik Harry Huseny on behalf of American Airlines. (Huseny, Sadik) (Entered: 05/03/2019) |
| 05/07/2019 | [282](#)<br>(2 pgs) | Order Signed On 5/7/2019, Designating Official Real-Time Transcripts. (related document(s)[276](#), [277](#), [278](#), [279](#), [280](#)) (Ebanks, Liza) (Entered: 05/07/2019) |
| 05/14/2019 | [284](#)<br>(7 pgs; 2 docs) | Letter (related document(s)[273](#)) Filed by Gil D. Messina on behalf of Carolyn Fjord, et al.. (Attachments: # [1](#) Errata to Table B of Plaintiffs' Proposed Findings of Fact and Conclusions of Law)(Messina, Gil) (Entered: 05/14/2019) |
| 05/23/2019 | [285](#)<br>(32 pgs; 2 docs) | Statement *of Recent Decision* filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Attachments: # [1](#) Exhibit A) (Alioto, Joseph) (Entered: 05/23/2019) |
| 06/10/2019 | [286](#)<br>(149 pgs) | Transcript regarding Hearing Held on 04/26/19 At 10:15 AM RE: Conference Regarding Transcripts For Trial Held March 11, 2019 - March 15, 2019.; Closing Arguments Regarding Trial Held On March 11, 2019 - March 15, 2019.; Doc. #271 (Seal) Motion To Seal Plaintiffs' Proposed Findings Of Fact And Conclusions Of Law. Remote electronic access to the transcript is restricted until 9/9/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.) (RE: related document(s) [271](#)). Notice of Intent to Request Redaction Deadline Due By 6/17/2019. Statement of Redaction Request Due By 7/1/2019. Redacted Transcript Submission Due By 7/11/2019. Transcript access |

| | | |
|---|---|---|
| | | will be restricted through 9/9/2019. (Ramos, Jonathan) (Entered: 06/11/2019) |
| 07/24/2019 | 287<br>(49 pgs) | Transcript regarding Hearing Held on 02/28/19 At 1:40 PM RE: Trial. Remote electronic access to the transcript is restricted until 10/22/2019. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 7/31/2019. Statement of Redaction Request Due By 8/14/2019. Redacted Transcript Submission Due By 8/26/2019. Transcript access will be restricted through 10/22/2019. (Ramos, Jonathan) (Entered: 08/05/2019) |
| 03/04/2020 | 288<br>(275 pgs) | Transcript regarding Hearing Held on 03/14/2019 At 9:36 AM RE: Trial. Remote electronic access to the transcript is restricted until 6/2/2020. The transcript may be viewed at the Bankruptcy Court Clerks Office. [Transcription Service Agency: Veritext Legal Solutions.]. (See the Courts Website for contact information for the Transcription Service Agency.). Notice of Intent to Request Redaction Deadline Due By 3/11/2020. Statement of Redaction Request Due By 3/25/2020. Redacted Transcript Submission Due By 4/6/2020. Transcript access will be restricted through 6/2/2020. (Ramos, Jonathan) (Entered: 03/05/2020) |
| 12/17/2020 | 289<br>(2 pgs) | Notice of Withdrawal *of Jamie L. Miller* filed by Joseph M Alioto on behalf of Carolyn Fjord, et al.. (Alioto, Joseph) (Entered: 12/17/2020) |
| 12/31/2020 | 290<br>(5 pgs; 3 docs) | Motion to Sever *Motion to Withdraw Jamie L. Miller as Counsel of Record* filed by Joseph M Alioto on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Declaration of Jamie L. Miller # 2 Proposed Order) (Alioto, Joseph) (Entered: 12/31/2020) |
| 01/15/2021 | 291<br>(1 pg) | Order Signed On 1/15/2021, Withdrawing Jamie L. Miller As Counsel Of Record.(Related Doc # 290)(Ebanks, Liza) (Entered: 01/15/2021) |
| 01/29/2021 | 292<br>(85 pgs) | Memorandum Of Decision Signed On 1/29/2021, Denying Plaintiffs' First Amended Complaint. (related document(s)103) (Ebanks, Liza) (Entered: 01/29/2021) |
| 02/08/2021 | 293<br>(6 pgs; 3 docs) | Notice of Proposed Order *Denying Plaintiffs' Requested Relief and Granting Judgment to Defendants* (related document(s)292) filed by Sadik Harry Huseny on behalf of American Airlines. with presentment to be held on 2/18/2021 (check with court for location) Objections due by 2/17/2021, (Attachments: # 1 Proposed Order Denying Plaintiffs Requested Relief and Granting Judgment to Defendants # 2 Certificate |

| | | of Service for Notice of Settlement of Order)(Huseny, Sadik) (Entered: 02/08/2021) |
|---|---|---|
| 02/22/2021 | 294<br>(2 pgs) | Order Signed On 2/22/2021, Denying Plaintiffs' Requested Relief And Granting Judgment To Defendants Merged Entity American Airlines Group Inc. (related document(s)292) (Ebanks, Liza) (Entered: 02/22/2021) |
| 02/23/2021 | 295<br>(297 pgs; 11 docs) | Notice of Appeal filed by Joseph M Alioto on behalf of Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Carolyn Fjord, Carolyn Fjord, et al., Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen. (Attachments: # 1 Exhibit 1 - Order Denying Plaintiffs' Requested Relief and Granting Judgment to Defendants # 2 Exhibit 2 - Memorandum of Decision # 3 Exhibit 3 - Order Denying Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint # 4 Exhibit 4 - Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for Summary Judgment # 5 Exhibit 5 - Bench Decision # 6 Exhibit 6 - Order Denying Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial # 7 Exhibit 7 - Memorandum of Decision # 8 Exhibit 8 - Order Granting in Part and Denying in Part Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages Claim # 9 Exhibit 9 - Memorandum of Decision # 10 Exhibit Civil Cover Sheet)(Alioto, Joseph) (Entered: 02/23/2021) |
| 02/23/2021 | | Receipt of Notice of Appeal( 13-01392-shl ) [appeal,97] ( 298.00) Filing Fee. Receipt number A15089660. Fee amount 298.00. (Re: Doc # 295) (U.S. Treasury) (Entered: 02/23/2021) |
| 02/23/2021 | | Receipt of Notice of Appeal( 13-01392-shl ) [appeal,97] ( 298.00) Filing Fee. Receipt number A15089660. Fee amount 298.00. (Re: Doc # 295) (U.S. Treasury) (Entered: 02/23/2021) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/26/2021 07:24:33 | | |
| **PACER Login:** annastjohn | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 13-01392-shl Fil or Ent: filed From: 2/12/2000 To: 2/26/2021 Doc From: 0 Doc To: 99999999 Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** 30 | **Cost:** | 3.00 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| AMR CORPORATION, *et al.*, | Case No. 11-15463 (SHL) |
| Debtors. | (Jointly Administered) |

----------------------------------------------------------------x

| | |
|---|---|
| CAROLYN FJORD, *et al.*, | |
| Plaintiffs, | |
| v. | Adv. Pro. No. 13-01392 (SHL) |
| AMR CORPORATION, AMERICAN AIRLINES, US AIRWAYS GROUP INC. and US AIRWAYS, INC., | |
| Defendants, | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| As Intervenor. | |

----------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**LATHAM & WATKINS LLP**
*Counsel for Defendants US Airways/*
*American Airlines Group*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
By:     Daniel M. Wall, Esq.
        Alfred C. Pfeiffer, Jr., Esq.
        Sadik Huseny, Esq.

**WEIL, GOTSHAL & MANGES LLP**
*Counsel for Defendants and Reorganized Debtors*
*AMR Corporation and American Airlines*
767 Fifth Avenue
New York, NY 10153
By:  Stephen Karotkin, Esq.
     Alfredo R. Perez, Esq.
     Stephen A. Youngman, Esq.
     Richard Mullen, Esq.

**SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP**
*Counsel for Intervenor the Official Committee of Unsecured*
*Creditors*
Four Times Square
New York, New York 10036
By:  Jay M. Goffman, Esq.
     James A. Keyte, Esq.
     Kenneth B. Schwartz, Esq.

-and-

155 North Wacker Drive
Chicago, Illinois 60606
By:  John Wm. Butler, Jr., Esq.
     Albert L. Hogan III, Esq.
     John K. Lyons, Esq.

**ALIOTO LAW FIRM**
*Counsel for Clayton Plaintiffs*
One Sansome Street, 35th Floor
San Francisco, CA 94104
By:  Joseph M. Alioto, Esq.

**MESSINA LAW FIRM, P.C.**
*Counsel for Clayton Plaintiffs*
961 Holmdel Road
Holmdel, NJ 07733
By:  Gil D. Messina, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Plaintiffs' motion to amend the complaint in the above-captioned civil antitrust action that challenges the merger between American Airlines and US Airways. (the "Motion") (ECF No. 91).[1]

The Motion proposes a number of changes. First, the Plaintiffs seek to add factual allegations, some that relate to events before consummation of the merger in December 2013 while others involve subsequent events. *See generally* Proposed First Amended Complaint (the "PAC") (ECF No. 91 Ex. 4). Second, the Motion addresses the Plaintiffs' proposed relief by seeking to: a) add a new claim for treble money damages under Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15(a)) ( the "Clayton Act"); b) add a request for a preliminary injunction requiring the defendants to hold their assets separate during the pendency of the case; and c) modify the language regarding the divestiture and associated declaratory relief sought under Section 16 of the Clayton Act (15 U.S.C. § 26). *See* PAC at 41, Prayer for Relief A-D. Third and finally, the Plaintiffs seek to add a demand for a jury trial. PAC at 1, 43.

Defendants, AMR Corporation and US Airways, and the Official Committee of Unsecured Creditors as intervenors (jointly, the "Defendants") jointly oppose the Motion (the "Opp.") (ECF No. 93). While Defendants do not object to the proposed changes regarding new factual allegations and divestiture, they strenuously object to the remaining relief. *See* Feb. 13 Hr'g. Tr. at 44:19-23 (ECF No. 100). The Defendants protest that the Plaintiffs have already waived their right to a jury trial, have failed to state a claim for damages, and are not entitled to the requested "hold separate" injunction.

---

[1]     Record citations to the American Airlines main bankruptcy case (Case No. 11-15463) are identified as "Main ECF No." while citations to the Adversary Proceeding record (Case No. 13-01392) are reflected as "ECF No."

For the reasons stated below, the Court grants the Motion in part and denies it in part. More specifically, the Court permits the uncontested amendments that assert new factual allegations and revise the proposed divestiture relief. But the Court denies the rest of the Motion. While the Court concludes that Plaintiffs have not waived their right to demand a jury, the proposed amended complaint fails to assert a sufficient basis for treble damages suffered by these individual plaintiffs. As the Plaintiffs' jury demand rests upon their proposed new treble damages claim, the request to add a jury demand must be denied as well. Finally, the Court considers the request for a "hold separate" injunction to have been withdrawn based on the statements of Plaintiffs' counsel at the hearing.

## **BACKGROUND**

### I. **History of Debtors' Bankruptcy**

The Debtors commenced their Chapter 11 cases in late November 2011. More than a year later, the Debtors negotiated a merger agreement with US Airways to serve as the centerpiece of their reorganization. This Court approved the merger agreement between the Debtors and US Airways in early May 2013. *See* Order Approving Merger (Main ECF No. 8096). Despite this Court's blessing, it was understood that regulatory approval was necessary for the merger to go forward and such approval was not expected until after confirmation of a plan of reorganization in the late summer of 2013. The Debtors subsequently filed a Second Amended Joint Chapter 11 Plan (the "Plan) and accompanying disclosure statement (the "Disclosure Statement"), which relied on the merger between the Debtors and US Airways. (Main ECF Nos. 8590 and 8591). By order in early June 2013, the Court approved the Disclosure Statement, and scheduled a hearing on confirmation of the Plan for the middle of

2

August.  *See* Order Approving Disclosure Statement  (Main ECF No. 8614).  The deadline to file

objections to confirmation was the end of July.  *Id.* at 13.

In early July, the Plaintiffs sued US Airways in the Northern District of California to

enjoin the merger.  *See Fjord v. US Airways Group, Inc.*, 13-cv-03041-SBA (N.D. Cal. July 2,

2013).[2]  At the end of that month, the Plaintiffs objected to confirmation of the Plan.  *See*

Objection to Confirmation of Plan.   (Main ECF No. 9356).  Even though they did not object to

the Court's earlier approval of the merger, the Plaintiffs' objection argued that the proposed

merger violated antitrust laws.  *Id.*  In the objection, the Plaintiffs also contended that these

antitrust concerns should be addressed in an Article III court, rather than in bankruptcy court.  *Id*.

at 5, 9.

One week after their objection to confirmation, the Plaintiffs filed this adversary

proceeding against US Airways, AMR Corporation, and American Airlines.   *See* Compl. at 25

(ECF No. 1).  The Complaint sought to enjoin the proposed merger for violating Section 7 of the

Clayton Antitrust Act while also seeking costs including attorney's fees.  Compl. at 25, Prayer

for Relief C, D.  Lastly, the Complaint asked for "such other and further relief to which

[Plaintiffs] may be entitled and which the Court finds to be just and appropriate."  Compl. at 26,

Prayer for Relief E.

---

[2]    This Court subsequently found that filing the California action violated the automatic stay and was *void ab initio*:

> [T]he action filed by the Clayton Act plaintiffs in California . . . was filed in violation of the automatic stay imposed by this case, and the Clayton Act plaintiffs did not file a motion in advance seeking to lift the stay so as to permit that filing.  As a result, that action is void ab initio as to the debtors.  The Court rejects the notion that the filing of the California action was somehow inadvertent, as these same lawyers have engaged in similar conduct in the past as discussed by Judge Gerber in his decision in *Adelphia Comm'ns. Corp.* (345 B.R. 69 at 73, Bankr. S.D.N.Y. 2006).

*See* Sept. 12, 2013 Hr'g. Tr. at  42:12-19, 43:1-6 (ECF No. 43).

3

Two days before the August confirmation hearing, the United States Department of Justice (the "DOJ") filed an action in the United States District Court for the District of Columbia alleging that the planned merger would substantially lessen competition and thus would violate Section 7 of the Clayton Act (the "DOJ Action"). The DOJ Action was joined by several states and was scheduled for a trial in late November 2013. At the August confirmation hearing, this Court requested additional briefing from the parties regarding the impact of the DOJ Action on confirmation and the future of these Chapter 11 cases. *See* Aug. 15 Hr'g Tr. at 12:8-23 (ECF No. 28). At that hearing, the Plaintiffs' counsel also indicated their intent to proceed with their Clayton Act claims in this adversary proceeding, independent of the DOJ Action. *Id.* at 57:11-23. In late August, the Plaintiffs filed a motion to withdraw the reference to the Bankruptcy Court and transfer this case to the District Court. *See* Motion to Withdraw the Reference (ECF No. 29).

At a subsequent hearing on confirmation in September, the Court overruled the Plaintiffs' confirmation objection and confirmed the Plan. On that same date, the parties discussed the status of this adversary proceeding. *See generally* Sept. 12 Hr'g. Tr. at 80-106 (ECF No. 43). At that time, Plaintiffs' counsel represented to the Court that they preferred to try their antitrust case in the Bankruptcy Court, rather than to move forward with their pending motion to withdraw the reference in the District Court. *Id.* at 81:13-15 ("[C]ertainly it would be my preference to try the case before Your Honor"); *Id.* at 84:7 ("[W]e will withdraw [the motion to withdraw the reference]."). Plaintiffs in fact withdrew that motion.

Two months later, the Debtors and US Airways publicly announced a settlement of the DOJ Action. The Settlement generally calls for the divestiture of various slots and gates at several airports throughout the country. *See* Motion for Approval of Settlement ¶16 (Main ECF

4

No. 10610). The terms of the Settlement resolved "all claims asserted in the Complaint filed in

the DOJ Action." *Id.* The Debtors filed motions seeking the Court's approval of the settlement

and entry of an order permitting immediate consummation of the merger between AMR and US

Airways. *See* Motion for Entry of Order Approving Settlement (Main ECF No. 10610) (filed

Nov. 12, 2013); Motion for Entry of Order Regarding Consummation of Merger (ECF No. 47)

(filed Nov. 12, 2013). The sole objection to the Debtors' motions was filed by the Plaintiffs on

November 21, 2013, and it took the form of a motion for a temporary restraining order seeking to

block the merger (the "TRO Motion") (ECF No. 57). The Debtors and the Committee filed a

joint reply brief and opposition to the TRO Motion on Saturday, November 23, 2013. (ECF No.

64). The Court held a hearing on both the Debtors' motion to consummate the merger and the

Plaintiffs' TRO Motion on November 25, 2013. At that hearing, the Court asked Plaintiffs'

counsel to elaborate on the identities of the plaintiffs and how they would be harmed by the

merger. Nov. 25 Hr'g. Tr. at 35:21-22, 36:16-17 (ECF No. 79).

On November 27, 2013, the Court issued a memorandum of decision, denying the

Plaintiffs' request for a TRO, approving the settlement of the DOJ Action, and permitting

consummation of the merger (the "TRO Opinion"). *See Fjord v. AMR Corp. (In re AMR Corp.)*

502 B.R. 23 (Bankr. S.D.N.Y. 2013). The TRO Opinion articulated, among other things, the

Court's finding that the Plaintiffs did not demonstrate a substantial likelihood of success on the

merits of their underlying antitrust claims and highlighted examples of the deficiencies in the

Plaintiffs' pleadings. *Id.* at 33-38. These deficiencies included the lack of evidence pertaining to

the plaintiffs' relationship with the airline industry, (*id.* at 33), and the failure to articulate the

anticipated harm to these plaintiffs upon closure of the merger. *Id.* at 36.

## II.      The Current Motion

This Motion came before the Court for a hearing on February 13, 2014.  At the hearing, the dispute between the parties narrowed.  On the one hand, the Defendants stated that they did not oppose amending the complaint to add new factual allegations or to add additional language regarding divestiture relief.  *See* Feb. 13 Hr'g. Tr. at 44:16-23.  On the other hand, the Plaintiffs clarified that they were not seeking preliminary injunctive relief to require the Defendants to hold their assets separate before trial, notwithstanding the language of the proposed amended complaint.  *Id*. at 35:11-38:11, 45:7-13.  At the conclusion of the hearing, therefore, the only issues that remained were whether the Plaintiffs may properly add a jury demand and a claim for treble damages.  After the hearing, the Court directed the parties to submit additional authority regarding whether the plaintiffs could have brought a claim for damages prior to the merger, and whether failure to do so would impute a waiver of a jury demand.  *Id*. at 50:9-25, 51:1-13.

## <u>DISCUSSION</u>

## I.      The Right to a Jury Trial

The Seventh Amendment to the U.S. Constitution preserves the right to a jury trial for "suits at common law, where the value in controversy shall exceed twenty dollars . . . . "  U.S. Const. amend. VII.  The Supreme Court has interpreted the term "suits at common law" to mean "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera v. Nordberg* 492 U.S. 33 at 41 (1989); *Eberhard v. Marcu,* 530 F.3d 122, 135 (2d Cir. 2008); *see also Texas v. Penguin Group (USA) Inc.,* 2013 U.S. Dist. LEXIS 58925, at *17 (S.D.N.Y. Apr. 24, 2013).   "A jury right also attaches to actions enforcing statutory rights, 'if the statute creates legal rights and remedies, enforceable in an action for damages in the

6

ordinary courts of law.'" *Penguin Group,* 2013 U.S. Dist. LEXIS 58925, at *18 (quoting *Curtis v. Lother,* 415 U.S. 189, 184 (1974)). Thus, statutory relief that is equitable in nature is tried to the court, whereas a claim for recovery of money damages under a statute is tried to a jury. *See, e.g., Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1047-48 (2d Cir. 1992) (distinguishing a Title VII claim that provides equitable relief as appropriately tried to the court, versus a claim under Executive Law § 296 that provides for recovery of money damages should be made to the jury).

Applying these principles to antitrust laws, actions for injunctive relief under Section 16 of the Clayton Act are equitable in nature and create no right to a trial by jury. In relevant part, Section 16 provides: "any person shall be entitled to sue for and have injunctive relief . . . when and under the same principles for injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . and showing that the danger of irreparable loss or damage is immediate a preliminary injunction may issue." 15 U.S.C. §26. Such injunctive relief does not trigger a right to a jury. *In re Tech. Licensing Corp.,* 423 F.3d 1286, 1287 (Fed. Cir. 2005) (noting that "there is no right to a jury trial when the only remedy sought . . . is an injunction*"); see also Ross v. Bank of AM., N.A. (In re Currency Conversion Fee Antitrust Litigation),* 2009 U.S. Dist. LEXIS 6747, at *14 (S.D.N.Y. Jan. 21, 2009) ("if the only relief sought is equitable, such as an injunction or specific performance . . . neither the party seeking that relief nor the party opposing it is entitled to a jury trial.") (citations omitted).

But a claim for treble damages under Section 4 of the Clayton Act falls within the ambit of the Seventh Amendment's right to a jury trial. Section 4 of the Clayton Act provides: ". . . any person who shall be injured . . . by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by

7

him sustained, and the cost of suit, including a reasonable attorney's fee . . . " 15 U.S.C. §15.

Such a damages claim is triable to a jury, subject to the limitations and procedural requirements

of the Federal Rules of Civil Procedure. *Ring v. Spina*, 166 F.2d 546, 550 (2d Cir. 1948) ("such

a claim [for damages for violation of the Antitrust Act], it is well settled, is triable by jury on

timely demand of a party.")

Where a party has the right to a jury, a demand must be timely made. A demand for a

jury trial must be made "no later than 14 days after the last pleading directed to the issue is

served." Fed. R. Civ. P. 38(b). Failure to do so results in a waiver of a jury trial. Fed. R. Civ. P.

38(d). To identify which pleading is the "last pleading directed to the issue" for purposes of

Rule 38, courts will look at the most recent pleading that contests an issue, "generally an answer

to a complaint or a reply to a counterclaim." *Mt. Hawley Ins. Co. v. Van Cortlandt Village LLC*,

2010 U.S. Dist. LEXIS 54442, at *7 (S.D.N.Y. June 1, 2010) (citing *McCarthy v. Bronson,* 906

F.2d 835, 840 (2d Cir. 1990)). An amended complaint also may revive the right to timely

request a jury trial, "but only when new issues are presented." *Lastra v. Weil, Gotshal &*

*Manges LLP*, 2005 U.S. Dist. LEXIS 3630, at *4 (S.D.N.Y. Mar. 8, 2005). A court should

consider the evidence offered and the legal theories pursued as pertinent factors, to properly

conclude that the amendment changes the "character of the suit" or the "ultimate issue for

decision." *Rosen v. Dick*, 639 F.2d 82, 94, 96 (2d Cir. 1980).

It is well settled that an amendment does not revive a right to demand a jury trial if that

right existed—and was waived—based on issues framed by an original complaint. *American*

*Home Prods. Corp. v. Johnson & Johnson,* 111 F.R.D. 448, 450 (S.D.N.Y. 1986) (citing *State*

*Mut. Life Assur. Co. of Am. v. Arthur Anderson & Co.,* 581 F.2d 1045, 1049 (2d Cir. 1978)). In

*American Home Products*, the defendant's original counterclaim sought injunctive relief and

8

"such other and further relief as the Court may deem just and proper." *Id.* at 453. In finding

that defendants waived their right to demand a jury, the court reasoned that they could have

made a jury demand at the outset of the case, chose not to do so, and then attempted to revive

that right by adding a counterclaim for damages. *Id.*

When examining waiver under Rule 38, courts must be careful not to elevate form over

substance. As the Second Circuit has noted:

> In determining whether a party has waived his right to a jury trial,
> we have distinguished between acts—or failures to act—prior to
> the time set by Rule 38(b) for the making of a demand, and failures
> to make a timely demand in accordance with Rule 38. In effect we
> have applied a presumption against waiver in the former
> circumstances and a presumption in favor of waiver in the latter.
> Compare *National Equipment Rental, Ltd. v. Hendrix*, 565 F.2d
> 255, 258 (2d Cir. 1977) (no waiver by signing of a contract having
> a jury waiver clause buried in the fine print), *and Heyman v. Kline*,
> 456 F.2d 123 (2d Cir.) (no waiver of right to have counterclaim
> tried to a jury by mere failure to assert right at a pretrial conference
> that preceded service of counterclaim), *cert. denied*, 409 U.S. 847
> (1972), *with Galella v. Onassis*, 487 F.2d 986 (2d Cir. 1973)
> (waiver by failure to follow Rule 38 after removal of action from
> state court), *and Noonan v. Cunard Steamship Co.*, 375 F.2d 69
> (2d Cir. 1967) (waiver by inadvertent failure to follow Rule 38).

*Washington v. New York City Bd. of Estimate,* 709 F.2d 792, 797 n.4 (2d Cir. 1983).

Where a timely jury demand has been made, Rule 39(a)(1) provides that a party may

nonetheless waive that right in two circumstances: when the parties or their attorneys file a

stipulation to a nonjury trial or when they so stipulate on the record. Fed. R. Civ. P. 39(a). *See*

*Tray-Wrap, Inc. v. Six L.'s Packing Co.,* 984 F.2d 65, 68 (2d Cir. 1993). In applying Rule

39(a)(1), the Second Circuit has adhered to the principle "a waiver is not lightly to be inferred,"

and that "the conduct said to constitute a waiver must be clear and unequivocal." *Id. See also*

*Penguin Group*, 2013 U.S. Dist. LEXIS 58925, at *20. The burden of proof rests with the party

seeking to enforce the waiver. *Id.*. Oral and written consent to a non-jury trial has been found to

9

constitute a waiver under Rule 39(a), but only when the plaintiff "clearly sought to waive his

jury demand." *See, e.g., Kahn v. GMC,* 865 F. Supp. 210, 212 (S.D.N.Y. 1994).[3] *See also Tray-*

*Wrap, Inc.* at 68 (finding that the words "before your Honor" in a written stipulation" did not

constitute a waiver, nor did certain statements made during off-the-record conference calls); *but*

*see Pierce v. ABC Carpet Co.,* 2013 U.S. Dist. LEXIS 82077, at *7, 9, 11 (S.D.N.Y. June 11,

2013) (finding that plaintiff's submission of a written waiver of jury trial subsequent to his

timely demand under Rule 38 did constitute a waiver).

Where a jury trial has not been timely demanded, Rule 39(b) affords the court discretion

"on motion, [to] order a jury trial on any issue for which a jury might have been demanded." *See*

*Ptaszek v. YMCA Ret. Fund*, 2004 U.S. Dist. LEXIS 16880, at *4 (S.D.N.Y. Aug. 23, 2004). To

clear the hurdle of Rule 39(b)'s discretionary provision, a party will be excused from its failure

to comply with Rule 38 only upon a "showing of exceptional circumstances." *Janetos v. Home*

*Depot U.S.A., Inc.* 2012 U.S. Dist. LEXIS 137595, at *9 (E.D.N.Y. Sept. 25, 2012) (citing

*Noonan v. Cunard Steamship Co.*, 375 F.2d 69, 70-71 (2d Cir. 1997)). The party must

demonstrate that failure to make a proper jury demand was "beyond mere inadvertence." *See*

*Westchester Day Sch. v. Vill. Of Mamaroneck*, 504 F.3d 338, 356 (2d Cir. 2007); (citing *Noonan,*

375 F.2d at 70 (mere inadvertence in failing to make a timely jury demand is not sufficient for

the court to exercise its discretion under Rule 39(b), and thus the waiver was valid)).

---

[3] The facts in *Kahn* illustrate the kind of unusual circumstances where waiver under Rule 39 is found:

> The record shows that Kahn knew exactly what he was doing . . . Kahn's letters to Judge
> Leval, and the statements in deposition and during the pretrial conference permit no
> "reasonable presumption against waiver." Kahn clearly sought to waive his jury demand
> by requesting a bench trial before Judge Leval, GM agreed to the waiver, and the record
> contains ample evidence of the waiver. These facts, in my view, satisfy the requirement
> of Rule 39(a) that jury demand waivers be made by written or oral stipulation entered in
> the record. Kahn waived his jury demand both in writing and orally.

*Kahn* at 213.

In arguing for waiver, Defendants here rely upon language in the original complaint requesting "such other relief as the court may deem just and proper." Opp. ¶36. Defendants construe such language as seeking money damages and thus triggering Plaintiffs' obligation to request a jury at that time. *Id.* Additionally, Defendants point to certain allegations in the original complaint as giving rise to a claim for damages, such that the right to demand a jury vested as of the filing of that pleading. *Id.* at ¶¶ 9, 36; s*ee also* Feb. 13 Hr'g. Tr. at 47:7-8, 47:13-15, 48:18-24. Those allegations are:

> Shortly after the announcement of the US Air-American merger, prices were increased by $4 to $10 roundtrip on domestic flights throughout the United States by Delta, United, American, and US Airways. Southwest matched the increase on a limited scale.

Compl. ¶ 107; Prop. Am. Compl. ¶ 120.

But there is no waiver here under Rule 38. Defendants' position presupposes that Plaintiffs were permitted to bring a treble damages claim prior to consummation of the merger. Stated another way, could Plaintiffs have brought a claim for damages under Section 4 of the Clayton Act prior to the merger? In their letter to the Court, Defendants suggest that "there is very little authority, and no specific and clear controlling law, on this issue . . . ." Def.'s Letter Regarding Relevant Authority at 1 (ECF No. 97). But the language of the statute and existing case law very strongly suggest the answer is no. As always, the Court starts with the language of the statute, which provides in relevant part:

> (a) . . . any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

11

Thus, Section 4 of the Clayton Act provides damages to plaintiffs that have been "sustained," which by its own terms provides retrospective relief. But the original complaint invoked only Section 16, which seeks to enjoin behavior that "threaten[s] loss or damage." Where a group of plaintiffs seek an injunction arguing that a proposed merger will cause them harm, it strains logic to argue that they also must present a claim for damages sustained even before the merger has taken place.

The case law recognizes the difference between these kinds of relief. As the First Circuit has observed:

> Section 4 [of the Clayton Act] is retrospective in orientation; it seeks to remedy the past by penalizing wrongdoers with treble damages . . . . Accordingly, § 4 "makes awards available only to *injured parties* and measures the award by a multiple of the injury actually proved" . . . . By contrast, § 16 is prospective and prophylactic, allowing injunctive relief upon demonstration of "a significant threat of injury from an impending violation of the antitrust laws" . . . . As we emphasized in our earlier discussion of plaintiff's "standing," the district court cannot require plaintiff to show *fact* of injury . . . in an action under § 16.

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.,* 754 F.2d 404, 412 (1st Cir. 1985) (emphasis in original) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat,* 429 U.S. 477 (1979); *Zenith Radio Corp. v. Hazeltine*, 395 U.S. 100 (1969)). Indeed, the Second Circuit has recognized that a cause of action under the antitrust laws accrues when there is an injury to competition. *Higgins v. New York Stock Exchange*, 942 F.2d 829, 832 (2d Cir. 1991) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.* 401 U.S. 321 (1971)). Thus, it is hard to fathom how a Section 4 damages claim could accrue before the underlying conduct that allegedly violates Section 7 takes place. The alleged anti-competitive conduct here is the "[acquisition of] the whole or any part of any of the stock" under the proposed merger. *See* 15 U.S.C. § 18. Plaintiffs' damages claim under Section

12

4 thus could only have accrued upon the closing of the merger. *Id.*; *see also* Feb. 13, Hr'g. Tr. at 76:10-15.[4]  It must follow that the jury demand was created only when the treble damages claim came into being after the consummation of the merger.

None of the authority cited by Defendants compels a different result.  The only Second Circuit case cited by the Defendants was *GAF Corp. v. Circle Floor Co.,* 463  F.2d 752 (2d Cir. 1972), which was silent on the issue of whether a plaintiff is foreclosed from seeking damages for a violation of Section 7 of the Clayton Act before a merger is completed.  But the Ninth Circuit addressed this issue in *Helix Milling Co. v. Terminal Flour Mills Co.,* 523 F.2d 1317 (9th Cir. 1975).  In that case, the acquisition never took place.  The defendants argued that a claim for damages pursuant to Section 7 of the Clayton Act could not be brought in the fact of an uncompleted acquisition.  *Id.* at 1323.  Affirming the grant of defendants' summary judgment motion, the court reasoned that "[t]he language of Section 7 speaks in terms of a completed acquisition rather than an attempted merger.  We can find no compelling reason for extending the reach of Section 7 to an uncompleted merger."  *Id.*[5]

While the Defendants rely on the catch-all language in the prayer for relief, it does not change the result here.  As a threshold matter, the catch-all language must be understood in the context of the original complaint.  That pleading is styled as a "Complaint For Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act."  Orig. Compl. at 1.  The prayer for

---

[4]    Defendants' reliance on the original complaint's passing reference to increased prices is unavailing.  It is best understood as background to the original complaint's contention that the merger should be enjoined because of the threat of injury.  *See* Feb. 13, Hr'g. Tr. at 76:10-15 (Plaintiffs' counsel stating that "[Defendant's counsel] mentioned that there were acts that took place prior to the merger, in which damages could have been claimed . . . The announcement that these companies acted in lock step is evidence that this is what can be anticipated in a completed merger, subsequently . . . It is not a claim in and of itself.")

[5]    The other cases cited by Defendants similarly do not squarely address whether a plaintiff is foreclosed from bringing a Section 4 damages claim prior to the consummation of a merger or any other allegedly illegal anti-competitive transaction.  *See generally Nelson v. Pacific Southwest Airlines*, 399 F. Supp. 1025, 1027-29 (S.D. Cal. 1975); *McTamney v. Stolt Tankers & Terminals (Holdings), S.A.* 678 F. Supp. 118, 119-21 (E.D. Pa. 1987); *Mr. Frank, Inc. v. Waste Management, Inc.*, 591 F. Supp. 859, 865, 867 (N.D. Ill. 1984).

relief clearly lays out a variety of equitable remedies sought, as well as attorney's fees. *See id.* Prayer for Relief, 25, 26. But despite its extensive scope, it notably does not seek damages. In fact, it does not even mention Section 4 of the Clayton Act.[6]

Defendants cite to similar catch-all language in the Second Circuit's decision in *Gulbenkian v. Gulbenkian*, 147 F.2d 173 (2d Cir. 1945). But that case does not support their argument. In *Gulbenkian*, the complaint sought specific performance of a contract and "such other relief as the court may deem proper." *Id*. at 176. The Second Circuit affirmed the district court's denial of specific performance but overturned its dismissal of the case, concluding that there was enough evidence presented at trial to sustain a damages award. The heart of the Circuit's ruling rested upon the notion that the complaint was equitable in nature and that any damages were incident to the equitable relief, rather than a separate claim per se. *Id. See also U.S. v. Stein*, 452 F. Supp. 2d 276, 280 (S.D.N.Y. 2006) (finding that the fact that the court could award money damages did not change the equitable nature of the action). But there is a key distinction between *Gulbenkian* and this case. In *Gulbenkian*, the right to seek specific performance and the right to damages both accrued at the same time, the event of the alleged breach. That is not true here. As explained above, the Clayton Act carefully sets out the applicable causes of action, including when each cause of action arises. So for the reasons stated

---

[6]     The prayer for relief states:

A.  Declaring, finding, adjudging, and decreeing that the agreement of the defendants and American to merge violates Section 7 of the Clayton Antitrust Act.  15 U.S.C. § 18.
B.  Preliminarily enjoining the defendants from consummating their merger during the pendency of this action
C.  Permanently enjoining the defendants from consummating their merger or requiring divestiture.
D.  Awarding to plaintiffs their cost of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act. 15 U.S.C. § 26
E.  Granting to plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and appropriate.

*See,* Orig. Compl. at 25-26.

14

above, it is difficult to construe this catch-all language as waiving a right to damages that had not yet accrued under the substantive antitrust law.

Having rejected Defendants' arguments on Rule 38, the Court turns to those under Rule 39.[7] *See* Fed. R. Civ. Pr. 39(a) (where jury has been demanded, it can nonetheless be waived). Defendants argue that certain statements by Plaintiffs' counsel at prior hearings constitute an oral waiver because they are "clear and unequivocal."[8] Opp. ¶¶ 3, 15, 38, 39. *See Royal American Managers, Inc. v. IRC Holding Corp.* 885 F.2d 1011, 1018 (2d Cir. 1989). But such statements were made in the context of the pre-merger rights of the Plaintiffs. Indeed, Plaintiffs at that time were seeking a trial before consummation of the merger. Thus, Plaintiffs did not have a jury right to either demand or waive, and Rule 39(a) could not apply in these circumstances. Accordingly, the Court rejects Defendants' argument that these statements constitute a waiver under Rule 39, given the posture of the case at that time.

## II.     The Request to Amend The Complaint

Having concluded that Plaintiffs have not waived their right to assert a damages claim and the related jury demand, the Court now turns to whether the PAC satisfies the applicable legal standards for amendment. A party may amend its pleading as a matter of course within the time limits imposed by Rule 15(a)(1). When a party seeks to amend its pleadings outside of the prescribed time frames, the opposing party must consent or the party must obtain leave of the

---

[7]     While Defendants do not cite to Rule 39 itself, the cases they cite regarding the purported oral waiver are all cases applying Rule 39(a).

[8]     *See, e.g.,* Sept. 12 Hr'g. Tr. at 88:25, 89:1-3

THE COURT: "[T]he case will be here for all purposes, and so you consent to this court resolving the matter on the merits for purposes of any objections you could have as to that?
MR. ALIOTO: "Yes, Your Honor."

MR. ALIOTO: "It is, in fact, your Honor, a bench trial." *Id.* at 105:9-10.

court.  Fed. R. Civ. P. 15(a)(2).  The decision to grant or deny a motion to amend rests within the "sound discretion of the trial court."  *Adelphia Recovery Trust v. FPL Group, Inc.* (*In re Adelphia Commc'ns Corp.*), 452 B.R. 484, 489 (Bankr. S.D.N.Y. 2011).  "The court should freely give leave when justice so requires."  *Id.*  The standard under Rule 15(a)(2) is generally lenient, and "this mandate is to be heeded."  *See Foman v. Davis,* 371 U.S. 178, 182 (1962).  But a court should not grant leave to amend the complaint if any one of the following four factors is present:  (1) the moving party acted in bad faith; (2) there would be prejudice to the opposing party; (3) there has been undue delay in bringing the motion; or (4) the proposed amendment would be futile.  *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.),* 503 B.R. 239, 340 (Bankr. S.D.N.Y. 2013) (citing *Foman*, 371 U.S. at 182).  Although the presence of any one of these factors can be sufficient to deny a motion to amend the complaint, the Defendants argue that all of them are present.

The Defendants' arguments regarding bad faith, prejudice, and undue delay can be easily rejected.  As to prejudice and bad faith, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  The Second Circuit in *AEP* explained that an amendment may be prejudicial when, among other things, it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial" or "significantly delay the resolution of the dispute."  *Id.*  "Undue prejudice arises when an 'amendment [comes] on the eve of trial and would result in new problems of proof.'"  *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (citing *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)).  In *Ruotolo*, the Second

16

Circuit found undue prejudice where the plaintiff sought leave to amend after judgment had already been entered against him. *Id.* In *Tronox*, the proposed amendment was deemed prejudicial where the parties had already expended millions of dollars preparing for trial, had conducted a 34-day trial already, and had not conducted any discovery on the proposed amended claim. *Tronox*, 503 B.R. at 288. By contrast, the Second Circuit found that delay was not unduly prejudicial in *Fluor* because the amended claim was "obviously one of the objects of discovery and related closely to the original claim . . . ." 654 F.2d at 856. In reaching its conclusion, the court also noted that no trial date had been set and no party had moved for summary judgment. *Id.*

The Defendants argue that the Plaintiffs' request for a jury trial is in bad faith and reflects a gamesmanship approach imposing prejudice upon the Defendants. Def. Opp. ¶¶ 1, 42-44.[9] But the Court has already found that Plaintiffs' damages claim—and resulting right to a jury— did not arise until after the merger was consummated. Indeed, the Defendants themselves recognized the existence of other relief once the merger closed. During litigation on the TRO Motion, for example, the Defendants explicitly conceded that a claim for money damages—the trigger for the jury demand here—was an alternative remedy for the antitrust violation alleged by Plaintiffs. TRO Reply ¶¶ 58-61 (ECF No. 64) (arguing that claimed harm of increased ticket prices was not irreparable for purposes of TRO because it is compensable under Section 4 of Clayton Act); *cf.* Nov. 25 Hr'g. Tr. at 69:6-20.[10] Having suggested the possible remedy of

---

[9]    The Defendants raise the bad faith and prejudice arguments specifically with respect to the Plaintiffs' jury demand amendment. Nonetheless, the Court will consider these arguments with regard to the addition of the damages claim because the jury demand only arises if the proposed treble damages amendment is permitted.

[10]    As Defendants' counsel stated: "What Mr. Alioto is really saying implicitly is that he doesn't accept that there is any remedy unless you can close a merger. And as we've discussed in our brief, Your Honor, we just fundamentally disagree with that. There's lots of other remedial powers that Courts have. Post-closing relief happens all the time…." Nov. 25 Hr'g. Tr. at 69:6-11.

Section 4 damages themselves, the Defendants are hard-pressed to argue that such an amendment, at this stage, would unduly prejudice them. Much like in *Fluor*, the amended claim for Section 4 damages is closely related to the original Section 7 claim. The amendment comes well before the "eve of trial." The parties have commenced discovery, but have not yet concluded it. In light of these circumstances, the Defendants have not shown that amendment would unduly prejudice them by requiring significant resources spent on additional discovery or by significantly delaying resolution of the dispute.

Absent a showing of bad faith or undue prejudice, mere delay does not provide a basis for a district court to deny the right to amend. *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir. 1981) (citing *Howey v. United States*, 481 F.2d 1187, 1190-91 (9th Cir. 1973)); *Middle Atlantic Utilities Co. v. S.M.W. Dev. Co.,* 392 F.2d 380, 384 (2d Cir. 1968). But after "a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." *McGee v. Dunn,* 940 F. Supp. 2d 93, 108 (S.D.N.Y. 2013) (citations omitted). In *McGee*, the plaintiff sought leave to amend the complaint, by adding allegations three years after the original complaint was filed. *Id.* at 109.[11] By contrast, the Plaintiffs filed this Motion approximately 45 days after the denial of the TRO Motion, and approximately five months after the filing of the initial complaint. The Motion was filed shortly after the consummation of the merger. The Defendants have not sufficiently shown that the Plaintiffs unduly delayed the filing of the Motion. As there is no showing of bad faith or prejudice here,

---

[11] The Court in *McGee* denied the plaintiff's motion to amend the complaint based not only on the three-year delay, but also the plaintiff's failure to file the proposed amended complaint with his motion. *See* 940 F. Supp. 2d at 109-10.

the mere delay in filing the Motion is not sufficient grounds to deny amendment to the
Complaint.

Having dispensed with the other factors, the Court turns to the Defendants' futility
argument. It is well established that leave to amend should be denied if the amendment would be
futile. *Houston Pipeline Co. LP v. Enron Corp.* (*In re Enron Corp.*) 367 B.R. 373, 382 (Bankr.
S.D.N.Y. 2007) (motion for leave to amend denied because defendants were able to establish that
plaintiffs' new claims were barred by contractual estoppel). "An amendment is futile when the
proposed changes would be subject to 'immediate dismissal' for failure to state a claim or on
some other ground." *Enron*, 367 B.R. 373, 382 (Bankr. S.D.N.Y. 2007); *see also Health-Chem
Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir. 1990). The party opposing an amendment has the
burden of establishing that a proposed amendment would be futile. *Velez v. Fogarty*, 2008 U.S.
Dist. LEXIS 96999, at *9 (S.D.N.Y. Nov. 20, 2008) (citations omitted).

When a defendant objects to a proposed amended complaint, the court may scrutinize that
complaint as if it were subject to a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *Id.* (citing
*Journal Publ'g Co. v. American Home Assur. Co.,* 771 F. Supp. 632, 635 (S.D.N.Y. 1991)). In
such a circumstance, the court must accept the facts alleged by the plaintiff as true and construe
them in the light most favorable to the defendants. *See Alexander Interactive, Inc. v. Adorama,
Inc.*, 2014 U.S. Dist. LEXIS 4931, at *10 (S.D.N.Y. Jan. 6, 2014). Conversely, if the
amendments are at least colorable "especially where they are based upon disputed facts, they
should be allowed, and a comprehensive legal analysis deferred to subsequent motions to dismiss
or for summary judgment." *Id.* (quoting *Cinelli v. Oppenheim-Ephratah Centr. Sch. Dist.,* 2008
U.S. Dist. LEXIS 1417, at *1 (N.D.N.Y. Jan. 7, 2008)). Under Rule 12(b)(6), a court looks to
whether a plaintiff has plead "enough facts to state a claim to relief that is plausible on its face."

19

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court must proceed "on the assumption

that all the allegations in the complaint are true." *Id.* at 555. Taken as true, these facts must

establish "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*,

556 U.S. 662, 677 (2009). The complaint must contain "more than an unadorned, the-defendant-

unlawfully-harmed-me-accusation." *Id.* at 678. "However, this does not mean that a claim must

contain 'detailed factual allegations' to survive a Rule 12(b)(6) motion to dismiss." *Eastman*

*Chem. Co. v. Nestlé Waters Mgmt. & Tech.,* 2012 U.S. Dist. LEXIS 141281, at *13-14 (S.D.N.Y.

Sept. 28, 2012) (citing *Talley v. Brentwood Union Free Sch. Dist.,* 2009 U.S. Dist. LEXIS 5357,

at *11-12 (E.D.N.Y. June 24, 2009)). The court must determine "whether the well-pleaded

factual allegations, assumed to be true, plausibly give rise to an entitlement to relief." *Hayden v.*

*Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 679).

       Section 4 of the Clayton Act provides for the recovery of treble damages as a remedy for

an antitrust violation. *See* 15 U.S.C. § 15. A private party may sue under Section 4 if he can

show: (1) a violation of the "antitrust laws"; (2) an injury to his business or property; and (3) a

causal relationship between the antitrust violation and his injury. *See, e.g., Balaklaw v. Lovell*,

14 F.3d 793, 797 (2d Cir. 1994). Section 4 requires a more rigorous standing requirement than

that of Section 16. *See Am. Med. Ass'n v. United Healthcare Corp*., 588 F.Supp. 2d 432, 448-49

(S.D.N.Y. 2008). Where Section 16 requires only alleged threatened loss or damage, Section 4

plaintiffs must plead actual antitrust injury. *Id.* As the Supreme Court explained in *Cargill, Inc.*

*v. Monfort of Colorado, Inc.*, 479 U.S. 104 (1986),

> The treble-damages remedy, if afforded to "every person
> tangentially affected by an antitrust violation or for all injuries that
> might conceivably be traced to an antitrust violation, would open
> the door to duplicative recoveries and multiple lawsuits. In order
> to protect against multiple lawsuits and duplicative recoveries,
> courts should examine other factors in addition to antitrust injury,

such as the potential for duplicative recovery, the complexity of apportioning damages, and the existence of other parties that have been more directly harmed, to determine whether a party is the proper plaintiff under [Section] 4.

*Id.* at 111 (quotations omitted). "[A] showing of antitrust injury is necessary, but not always sufficient, to establish standing under [Section] 4 [of the Clayton Act], because a party may have suffered antitrust injury but may not be a proper plaintiff under [Section] 4 for other reasons." *Am. Med. Ass'n*, 588 F.Supp. 2d at 448 (quoting *Cargill*, 479 U.S. at 110 n.5).[12]

"At the pleading stage, governed by Rule 12(b)(6), a plaintiff's demand for money damages must satisfy the *Twombly* and *Iqbal* requirement of factual, non-conclusory allegations stating a plausible claim that defendant's conduct caused specific economic harm in a quantifiable amount." *Kopperl v. Bain*, 2010 U.S. Dist. LEXIS 89195, at *10-11 (D. Conn. Aug. 30, 2010). The court in *Kopperl* dismissed the defendant's counterclaims for lack of "specific allegations, on any theory of recovery, with respect to the nature of those damages or their amount." *Id.*

The Plaintiffs here fail to allege an actual injury that they have suffered. For example, Plaintiffs claim that "public reports show that air service is being eliminated as a result of Defendants' merger, including to Reno-Tahoe, Seattle, Portland, Jackson, Branson, Key West, Louisville, Dayton, San Antonio, New Orleans, Orlando, Tampa Bay, Nashville, and Chicago Midway." Resp. at ¶ 31 (citing PAC ¶¶ 110-111). Paragraph 111, one of the proposed

---

[12] A party may suffer antitrust injury but still lack antitrust standing. *See Cargill*, 479 U.S. at 110 n.5. Antitrust standing is distinct from the constitutional standing requirement. *Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 n.31. While harm to the antitrust plaintiff is sufficient to satisfy constitutional standing, a court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action. *Id.* In considering whether a plaintiff is such a proper party, courts consider the directness of the injury, whether damages are speculative, and whether there is potential for duplicative recovery. *See Cargill*, 479 U.S. at 110 n.5; *AMA v. United Healthcare Corp.*, 588 F.Supp. 2d 432, 448 (S.D.N.Y. 2008). Because Plaintiffs have failed to show even antitrust injury, the Court need not address the issue of antitrust standing at this time.

21

amendments to the complaint, alleges reduction of flights at the Reno-Tahoe International

Airport and further alleges that other airlines have announced *future* reductions to be made at

other airports.  PAC ¶ 111.  But the Plaintiffs do not elaborate on any of these alleged harms.

Importantly, nowhere does the PAC connect the alleged harms to the Plaintiffs.  In fact, it

provides scant information about the named plaintiffs.  The PAC sets forth the hometowns of

each plaintiff.  *See* PAC ¶ 9.  But the only other real description of the plaintiffs states that they

are

> individuals who are passengers and travel agents who have
> purchased airline tickets from defendants in the past and who are
> expected to do so in the future.  They are threatened with losses . . .
> in the form of significant and substantial threats of higher prices
> for fares, diminished service and loss of flights, curtailment of
> capacity of aircraft and available seats, deterioration of quality of
> service, and lessening of competition . . . .

PAC ¶ 5.  But this fails to allege *any* actual injury to the Plaintiffs for the purposes of treble

damages, which would be "sustained during the pendency of defendants' merger prior to an

order of divestiture."  PAC at 41.  At the February 13, 2014 hearing on this Motion, Plaintiffs'

counsel agreed that a pleading for injury requires allegations that *something* happened.  Feb. 13

Hr'g Tr. at 31:20-24 (ECF No. 100) ("Under Section 4, you establish it that you're the one that

either purchased tickets that were higher than they otherwise would've been  . . . or that you have

been denied availability . . . .").  Yet the PAC is devoid of any such allegations.  For example,

Plaintiffs have not alleged what types of flights are taken, which airports are utilized, or how

often flights are taken.  In fact, many allegations in the PAC refer to harm to the general public

or to "millions of consumers," *see, e.g.,* PAC ¶ 153, rather than any specific harm to these

individual plaintiffs.  Much like the defendant's counterclaims in *Kopperl*, the Plaintiffs here

have failed to make any specific allegations regarding any theory of recovery for Section 4

damages. For that reason, the amendment to the complaint would not survive a motion to dismiss pursuant to Rule 12(b)(6). In other words, the amendments would be futile and should therefore be denied.

It should come as no surprise to the Plaintiffs that the complaint, even as amended, lacks specificity regarding the injury to the named plaintiffs. The Court identified this concern months ago when considering the Plaintiffs' TRO Motion. At the November 25, 2013 hearing on the TRO Motion, for example, the Court inquired about the alleged anti-competitive effects on the Plaintiffs. The only responses offered by Plaintiffs' counsel was that the Plaintiffs' interrogatory responses, which were never filed with this Court, addressed the potential impact upon the Plaintiffs. Nov. 25 Hr'g Tr. at 36:16-25 (ECF No. 79). The Court also noted this problem in its written decision on the TRO Motion. *See* TRO Opinion at 12 ("The Court has no evidence whatsoever regarding who the Plaintiffs are, what the nature of their interest in the airline industry is, or how they will be individually harmed by the proposed merger."). Moreover, the Court's TRO decision quoted the *Malaney* decision, which stated, "the Court need only 'consider those injuries plaintiffs advance that are personal to them . . . and cannot consider any injuries that plaintiffs allege would be suffered by the general air carrier flying public as a whole.'" TRO Opinion at 12 (citing *Malaney v. UAL Corp.*, 2010 U.S. Dist. LEXIS 106049, at *46 (N.D. Cal. Sept. 27, 2010)).[13]

---

[13]    While not germane to the Court's ruling today on the Motion, the Court notes that the Plaintiffs have failed to amend the complaint to address other issues identified in the TRO Opinion. *See* TRO Opinion at 18-21 (noting, among other things, difficulties with Plaintiffs' discussion of market share, the Herfindahl-Hirschman Index, failure to address the merger in light of the DOJ Settlement, and neglecting to address specific city-pairs consistent with generally accepted airline antitrust analysis).

III.    **The Preliminary Injunction Request**

Finally, the Motion purports to seek to add a request for "a preliminary injunction requiring during the pendency of this action that the defendants hold separate and not commingle their two businesses that have been combined pursuant to their merger, so that divestiture may be expeditiously and effectively accomplished following trial on the merits and judgment in plaintiff's favor."  PAC at 41, Prayer for Relief B.  While Plaintiffs defended this proposed new language in their reply brief, *see* Pl.'s Resp. at ¶ 44, they clarified at the hearing on this Motion that they were not seeking at this time to add any request for injunctive relief pending trial.  *See* Feb. 13Hr'g. Tr. at 37:11-12, 38:10-11 (Plaintiffs' counsel stating that this new relief sought was really intended for the Court's convenience); *id.* at 37:9-10, 37:14-15 (Plaintiffs' counsel clarifying that the language "during the pendency of the case" is intended to mean "during the pendency of the trial,"  and that the relief sought is "damages and divestiture, that's what I am asking for . . . .); *see* Pl.'s Resp. ¶44 ("If, as discovery and litigation progresses, it should appear that the full integration of Defendants' businesses will prejudice the issuance of an ultimate order of divestiture, Plaintiffs have reserved their right to move for a preliminary injunction to continue to have the businesses' assets held separate."); *see also* Feb 13 Hr'g. Tr. 45:7-13 (Defendants' counsel stating that "the request for the preliminary injunctive relief . . . we think was already resolved . . ." and "it sounds like from what counsel stated earlier that in response to Your Honor's questions, that the preliminary injunctive relief may be off the table now that they're not seeking that as a separate matter through the pendency of the next few months, which is fine.")

Given the representations of Plaintiffs' counsel, the Court considers the Plaintiffs to have abandoned their request to add language seeking a preliminary injunction beyond the request for divestiture that is already part of the PAC.[14]

### **CONCLUSION**

For the reasons set forth above, the Motion to Amend is granted in part and denied in part. The Defendants are directed to settle an order on three days' notice.

Dated: New York, New York
        March 14, 2014

                    */s/ Sean H. Lane*
                    UNITED STATES BANKRUPTCY JUDGE

---

[14] Of course, the Court previously issued a detailed decision denying Plaintiff's motion for a temporary restraining order that sought to enjoin the consummation of the Merger. *See Fjord v. AMR Corp.*, 502 B.R. 23. The relief sought by the TRO Motion appears to be essentially the same as the relief sought by the "hold separate" injunction contained in the PAC. See Feb. 13 Hr'g. Tr. at 34:14-25, 35:1-2, 36:1-15.

25

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                               :
In re                                          :          Chapter 11 Case No.
                                               :
AMR CORPORATION, et al.,                       :          11-15463 (SHL)
                                               :
                    Debtors.                   :          (Jointly Administered)
                                               :
------------------------------------------------------------x
CAROLYN FJORD, et al.,                         :          Adversary Proceeding No.
                                               :
                    Plaintiffs,                :          13-01392 (SHL)
                                               :
        v.                                     :
                                               :
AMR CORPORATION, AMERICAN                      :
AIRLINES, INC., US AIRWAYS GROUP,              :
INC., US AIRWAYS, INC.                         :
                                               :
                    Defendants.                :
                                               :
OFFICIAL COMMITTEE OF                          :
UNSECURED CREDITORS,                           :
                                               :
                    As Intervenor.             :
------------------------------------------------------------x
```

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT TO ADD DAMAGES CLAIM

Upon Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages Claim, dated January 10, 2014 (Adv. Pro. ECF No. 91) (the **"Motion"**); Defendants' and Intervenor's Joint Opposition to the Motion (Adv. Pro. ECF No. 93); Plaintiffs' Reply to Defendants' and Intervenor's Opposition to, and in Further Support of, the Motion (Adv. Pro. ECF No. 95); the record of the Hearing before the Court on February 13, 2014; Defendants' letter to the Court on February 18, 2014 (Adv. Pro. ECF No. 97); Plaintiffs' letter to the Court on February 19, 2014 (Adv. Pro. ECF No. 98); Defendants' letter to the Court on February 20, 2014 (Adv. Pro. ECF No. 99); and upon the decision of the Court issued on March 14, 2014, the Court permits the uncontested amendments that assert new factual allegations and revise the proposed divestiture relief, but denies the rest of the Motion. While the Court concludes that Plaintiffs

have not waived their right to demand a jury, the proposed amended complaint fails to assert a sufficient basis for treble damages suffered by these individual plaintiffs. As the Plaintiffs' jury demand rests upon their proposed new treble damages claim, the request to add a jury demand must be denied as well. Finally, the Court considers the request for a "hold separate" injunction to have been withdrawn based on the statements of Plaintiffs' counsel at the hearing.

Accordingly, it is hereby ORDERED that Plaintiffs' Motion is:

1. GRANTED in part to allow Plaintiffs to amend their complaint with the new proposed factual allegations and revised divestiture relief;

2. DENIED in part as to Plaintiffs' request to add a treble damages claim under Section 4 of the Clayton Act and a corresponding demand for a jury trial; and

3. MOOT as to Plaintiffs' request for a "hold separate" injunction because that request has been withdrawn.

By April 4, 2014, Plaintiffs shall file an Amended Complaint ~~pursuant to this Court's order, and strike any references to~~ *that is consistent with the Court's ruling on the Motion and thus should not include* (i) a claim for treble damages and corresponding demand for jury trial; and (ii) a "hold separate" injunction.

IT IS SO ORDERED.

Dated: March 31, 2014

*/s/ Sean H. Lane*
Sean H. Lane
United States Bankruptcy Judge

Joseph M. Alioto
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street,  35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Facsimile:  (415) 434-9200
Email: jmalioto@aliotolaw.com
        jmiller@aliotolaw.com

*Attorney for the Clayton Plaintiffs*

(ADDITIONAL COUNSEL LISTED ON LAST PAGE)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No.: 11-15463-SHL |
| | |
| AMR CORPORATION, et al. | Chapter 11 |
| | |
| Debtors. | (Jointly Administered) |
| | |
| Carolyn Fjord, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose' M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen, | Adversary No.: 13-01392-SHL |
| | |
| | **FIRST AMENDED COMPLAINT** |
| Plaintiffs. | |

|  |  |
|---|---|
| v. | ) |
|  | ) |
| AMR CORPORATION, AMERICAN AIRLINES, | ) |
| US AIRWAYS GROUP, INC., US AIRWAYS, | ) |
| INC. and AMERICAN AIRLINES GROUP, INC., | ) |
|  | ) |
| Defendants. | ) |
| _____ | ) |
|  | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS, | ) |
|  | ) |
| Intervenors. | ) |
| _____ | ) |

Plaintiffs are and will be direct purchasers of airline tickets from defendants. The

plaintiffs bring this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for

divestiture and an injunction prohibiting further violations of Section 7 of the Clayton Act, 15

U.S.C. § 18, arising from and out of the anticompetitive combination of the defendants, and to

prevent a threatened violation of Section 2(c) of the Clayton Antitrust Act, 15 U.S.C. § 13(c).

Plaintiffs complain and allege as follows:

## **INTRODUCTION**

1.      On February 14, 2013, the defendants announced that they had unanimously

approved a definitive merger agreement, agreeing to combine, in an all stock transaction valued

at more than $11 billion, American Airlines ("American") and US Airways ("USAir"), thereby

eliminating the substantial competition between them, and merging to create the world's largest

airline. It was proposed that the unlawful combine would operate under the American name.

2.      The effect of the announced – and since closed – merger between American and

USAir may be to substantially lessen competition, or tend to create a monopoly, in the

2

transportation of airline passengers in the United States and certain sub-markets in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

3.      The probable and planned anticompetitive effects of this unlawful combination are increases in prices and fares, elimination and/or curtailment of services, elimination or curtailment of frequency of flights, curtailment of capacity of aircraft and available seats for passage, elimination of tens of thousands of jobs, the deterioration of quality of service, the addition of charges for amenities otherwise considered part and parcel of the service provided, the elimination or substantial cutback of traffic to hubs, the creation of monopolies for passenger air traffic from and to major cities, the reduction of service and increase in fares for flights to small and medium-sized cities, and the encouragement and trend to further concentrate the industry toward ultimate monopoly.

4.      These types of anticompetitive effects have already been realized by reason of the other mergers which have occurred in the airline industry since 2008, and they have intensified in the past 18 months.  For example, in the last year and a half, there have been more than 10 nationwide price increases successfully imposed by the major legacy airlines, Delta, United, American and USAir, and since the recent mergers, impositions and increases in baggage charges, smaller seats, smaller planes and less capacity.

5.      Plaintiffs are individuals who are passengers and travel agents who have purchased airline tickets from defendants in the past and who are expected to do so in the future. They are threatened with losses or damages by reason of the defendants' merger in violation of Section 7 of the Clayton Act in the form of significant and substantial threats of higher prices for fares, diminished service and loss of flights, curtailment of capacity of aircraft and available

3

seats, deterioration of quality of service, and lessening of competition, for which Plaintiffs cannot be adequately compensated by damages and, accordingly, they bring this action for preliminary and permanent injunctive relief against the merger pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## JURISDICTION

6.      This action is brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to unwind defendants' unlawful merger in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.  This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

7.      This Court has jurisdiction over this matter pursuant to 11 U.S.C. §§ 105 and 541, 28 U.S.C. §§ 157(b)(2).  The complaint concerns the administration of the estate and is therefore a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A)

8.      Venue is proper in this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## THE PLAINTIFFS

9.      Each plaintiff named herein below is an individual and a citizen of the state listed as the address for each such plaintiff, and in the four years next prior to the filing of this action, each plaintiff purchased airline tickets from the defendants and each plaintiff expects to continue to purchase airline tickets from the defendants or their merged entity in the future:

Carolyn Fjord, 4405 Putah Creek Road, Winters, CA 95694;

Katherine R. Arcell, 4427 S. Miro St., New Orleans, LA 70125;

Keith Dean Bradt, 690 W 2nd St, Suite 200, Reno, NV  89503;

4

Judy Bray, 5140 N Union Blvd., Ste 200, Colorado Springs, CO 80918;

José M. Brito, 2715 Sage Bluff Ct., Reno, NV 89523;

Jan Marie Brown, 975 Kennedy Dr., Carson City, NV, 89706;

Robert D. Conway, 6160 W Brooks Ave., Las Vegas, NV 89108;

Judy Crandall, 4085 Ramrod Circle, Reno, NV 89519

Rosemary D'Augusta, 347 Madrone St., Millbrae, CA 94030;

Brenda K. Davis, 11022 Old Military Trail, Forney, TX, 75126;

Pamela Faust, 6227 Whileaway Dr., Loveland, Ohio 45140;

Don Freeland, 73801 White Sands Dr., Thousand Palms, CA 92276;

Donald V. Fry, 6740 Northrim Ln., Colorado Springs, CO 80919;

Gabriel Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879;

Harry Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879;

Yvonne Jocelyn Gardner, 10-Gold Coin Ct., Colorado Springs, CO 80919;

Lee M. Gentry, 7021 Forestview Dr., West Chester, OH 45069-3616;

Valarie Ann Jolly, 2121 Dogwood Loop, Mabank, TX 75156;

Gail S. Kosach, 4085 Ramrod Cir., Reno, NV 89519;

Michael C. Malaney, 5395 Egypt Creek NE., Ada, MI 49301;

Len Marazzo, 1260 Springer Ct., Reno, NV 89511;

Lisa McCarthy, 35 Lancashire Place, Naples, FL 34104;

Patricia Ann Meeuwsen, 1062 Wedgewood, Plainwell, MI 49080;

L. West Oehmig, Jr., 1017 East Brow Road, Lookout Mountain, TN 37350;

Cynthia Prosterman, 527 20th Avenue, San Francisco, CA 94121;

5

Deborah M. Pulfer, 16264 E. Mason Rd., Sidney, OH 45365;

Dana L. Robinson, 127B Palm Bay Terrace, Palm Beach Gardens, FL 33418;

Robert A. Rosenthal, 4659 Bridle Pass Drive, Colorado Springs, CO 80923;

Bill Rubinsohn, 261 Old York Road, Jenkintown, PA 19046;

Sondra K. Russell, 1206 N. Loop 340, Waco, TX 76705;

Sylvia N. Sparks, 3320 Conte Drive, Carson City, NV 89701;

June Stansbury, 363 Smithridge Park, Reno, NV 89502;

Clyde D. Stensrud, 1529 10th St W., Kirkland, WA 98033;

Wayne Taleff, 768 Farmsworth Ct., Cincinnati, OH 45255;

Gary Talewsky, 12 Cortland Drive, Sharon, MA 02067;

Annette M. Tippetts, 2783 East Canyon Crest Dr., Spanish Fork, Utah 84660;

Diana Lynn Ultican, 9039 NE Juanita Dr, #102, Kirkland, WA 98034;

J. Michael Walker, 11865 Heather Ln., Grass Valley, CA 95949;

Pamela S. Ward, 1322 Creekwood Dr., Garland, TX 75044;

Christine O. Whalen, 1129 Pine St., New Orleans, LA 70118.

## THE DEFENDANTS

10.     US Airways Group, Inc. ("USAir") is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Tempe, Arizona.

11.     US Airways, Inc. is a Delaware corporation with its principal place of business in Tempe, Arizona.

12.     Until its merger with AMR Corporation, and while they continue to operate as separate airlines, USAir has operated the fifth largest domestic carrier, with more than 45 billion

6

domestic revenue passenger miles ("RPMs") from 2011-2012. One RPM equals one passenger flown one mile. RPMs are the commonly accepted measure of airline size in the industry.

13. USAir operates the US Airways Shuttle, a US Airways brand which provides hourly service between Boston, New York, and Washington, D.C. Regional airline service is branded US Airways Express, operated by contract and a subsidiary airline.

14. USAir has and operates hubs in Charlotte, Philadelphia, Phoenix, and Washington, D.C.'s Ronald Reagan National Airport.

15. With its regional partners, USAir carries approximately 62 million passengers per year.

16. USAir also provides scheduled transportation of cargo throughout the United States and around the world.

17. Before its merger with AMR, and while the two airlines continue to operate separately, USAir has had more than 31,000 full-time employees.

18. USAir regularly conducts business by operating commercial flights into and out of this judicial district.

19. AMR Corporation ("AMR") is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Fort Worth, Texas. AMR was in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-15463 (SHL). AMR emerged from bankruptcy proceedings on December 9, 2013, when it closed its merger with USAir, although the two airlines continue, at present, to operate separately.

20.     Before its merger with USAir, AMR was a holding company that owned and operated American Airlines, Inc.

21.     American Airlines, Inc. ("American") is a Delaware corporation that has its principal place of business in Fort Worth, Texas.  Before its merger with USAir, AMR owned 100% of the common stock of American Airlines, Inc. and AMR Eagle Holding Corporation ("American Eagle"), those two companies being wholly owned and controlled subsidiaries of AMR.  American is in the business of air transportation of passengers for hire throughout the United States and between cities in the United States and numerous international destinations. American and American Eagle were, as of the date of the filing of the original complaint in this action, in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-15463-SHL.

22.     American Airlines Group, Inc. (hereinafter "AAG") is a publicly traded airline holding company headquartered in Fort Worth, Texas.  AAG was formed on December 9, 2013, by the merger of AMR with USAir and is the surviving company following that merger and the successor to AMR and USAir and their susidiaries.

23.     Although the defendants AMR and USAir merged on December 9, 2013, the defendants have admitted that the two airlines will continue to operate separately "for quite some time."  Consequently, the defendants are referred to herein as "AMR" or "American" and "USAir" as the context warrants, or they are also collectively referred to as the "defendants," except where "AAG" is used to denote the post-merger, surviving entity.

24.     As of the date of the merger, American operated, and continues to operate, the fourth largest domestic carrier, with more than 73 billion RPMs from 2011-2012.

25. With its regional partners, American carries approximately 136 million passengers per year.

26. American is engaged in the business of transporting passengers and cargo and had, as of the date of the merger, approximately 76,200 full-time employees.

27. American operates domestic hubs at Dallas/Forth Worth, Chicago's O'Hare, Miami, Los Angeles, and New York's JFK.

28. American's subsidiary shares its name with American Eagle and operates many of the regional carrier's flights; since November 2012, the subsidiaries of SkyWest, Inc., SkyWest Airlines and ExpressJet Airlines, have also operated regional flights as American Eagle. In addition, AmericanConnection is the regional brand for codeshare flights currently operated by Chautauqua Airlines.

29. The American-USAir merger is the fourth merger of major U.S. airline companies since 2008, when Delta merged with Northwest Airlines. In 2010, United Airlines merged with Continental Airlines, and in 2011, Southwest merged with AirTran.

30. Post-merger, AAG is the largest airline in the world, with more than 6,700 daily flights to 336 locations in 56 countries worldwide, about $40 billion in operating revenue, over 100,000 employees, and plans to take delivery of 607 new aircraft, including 517 narrowbody aircraft and 90 widebody international aircraft. The integration of American Airlines and USAir under a single operating certificate is not expected to be completed until late 2015.

## NATURE OF TRADE AND COMMERCE

31. The relevant product and geographic markets for purposes of this action are the transportation of airline passengers in the United States.

9

32.     Within the relevant market, well-defined submarkets exist which, in themselves, constitute geographic and/or product markets for antitrust purposes and include what are known as "city pairs."

33.     Pre-merger, American and USAir were substantial rivals and competitors in the relevant market.

34.     Pre-merger, American and USAir were substantial potential rivals and potential competitors in the relevant market.

35.     Not only did American and USAir provide competing passenger service against each other on a number of passenger routes, but they also were potentially able to provide competing passenger service against each other on any route anywhere in the United States if they believed it would be profitable to do so.

36.     American's then CEO Thomas Horton admitted that, "Airlines are networks, even where no overlap, they are competing against each other because of these connecting flights."

37.     Former Continental CEO, and now United CEO, Jeff Smisek admitted that *existing* airlines can easily enter new markets: "I mean, there are – competitors can enter your market at 540 miles an hour, so it's very easy to enter a market when you are already an airline… If I decide I want to fly to Charlotte tomorrow, all I have to do – I would want to sell the seats of aircraft, but I could take a 737 and point it to Charlotte and there I'd be.  So it's actually fairly easy to enter markets."

38.     Pre-merger, American had the capability to serve every major market in the United States with a population above 5,000 people.

10

39.     Pre-merger, USAir had the capability to serve every major market in the United States with a population above 5,000 people.

40.     The behavior of American was constrained by the actual and potential competition from USAir throughout the entire relevant market and sub-markets.

41.     The behavior of USAir was constrained by the actual and potential competition from American throughout the entire relevant market and sub-markets.

42.     USAir publicly admitted in judicial proceedings that the national market for air transportation is the only relevant air transportation market for antitrust purposes.  *In re Air Passenger Computerized Reservations Systems*, 694 F. Supp. 1443, 1467 (C.D. Cal. 1988).

43.     American publicly acknowledged that the national market for air transportation is the only relevant market for antitrust purposes.

44.     In *Continental Airlines v. American Airlines* (S.D. Tex. 1993) Civ. Nos. G-92-259, G-92-266, 1993 WL 379396 *2, American's position on relevant market was as follows: "Defendants [American] claim that the national United States market is the only geographic relevant market to this case.  Defendants [American] claim that the national United States air passenger service market includes all air passenger service within the United States.  Defendants [American] also claim that, for purposes of analyzing their national pricing actions, hubs and regions are not relevant markets separate from the national market that contains them."

45.     The market for the transportation of airline passengers in the United States is in and part of interstate commerce, makes extensive use of the instrumentalities of interstate commerce, and substantially affects interstate commerce.  Airline passengers travel in a continuous and uninterrupted flow of interstate commerce.  Airline travel is a continuous and

11

uninterrupted flow of interstate commerce. Materials used in the construction of airplanes are purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

46.     Any restraint of trade in the transportation of airline passengers in the United States, including the restraints specifically alleged in this complaint, directly and substantially restrains and affects interstate commerce.

## **TREND TOWARDS CONCENTRATION**

47.     In enacting and amending § 7 of the Clayton Act, "Congress sought to preserve competition among many small businesses by arresting a trend towards concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966) (emphasis added). The line of Supreme Court cases relying upon this principle of law has never been overruled and remains controlling law.

48.     The Supreme Court has held that, "'The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy.' To arrest this 'rising tide' towards concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers…Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers." *United States v. Von's, supra,* 384 U.S. at 276-277.

49.     The Supreme Court has held that, "What we have … is simply the case of two already powerful companies merging in a way which makes them even more powerful than they

were before.  If ever such a merger would not violate § 7, certainly it does when it takes place in a market characterized by a long and continuous trend toward fewer and fewer owner-competitors which is exactly the sort of trend which Congress, with power to do so, declared must be arrested." *United States v. Von's, supra,* 384 U.S. at 278.

50.     The Supreme Court has held that, "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time." *Brown Shoe, Co. v. United States*, 370 U.S. 294 (1962).

51.     The Supreme Court has held that where market "concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great." *United States v. Philadelphia Nat'l Bank,* 372 U.S. 321, 362 n.42 (1963).

52.     The merger of defendants has resulted in the largest airline company in the United States and the world.

53.     The projected combined market shares of the merged USAir-American entity (AAG) (24%), and those of the next three largest competitors, Delta (22%), United (19%), and Southwest (18%), will be approximately 83%, a figure well in excess of the 77% of the combined market share of the four top firms that was condemned by the Supreme Court in *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. 321, where the defendants proposed to merge the 2nd and 3rd largest banks in a four-county area.  That merger, like the USAir-American merger would have resulted in intense concentration of the market.  The Supreme Court enjoined the merger, holding that the resultant market share of the combined firm, as well

13

as the significant intense concentration in the market, were both so high as to be presumptively illegal.

54. As stated, the merger of USAir and American will result in the largest airline in the United States with 24% of the U.S. air passenger market and a highly concentrated market share by the top four airlines of approximately 83%. Such concentrations of market share in four firms are unacceptably high according to the Supreme Court in *United States v. Alcoa,* 377 U.S. 271 (1964), which required divestiture where nine firms controlled 95% of all aluminum created in the United States. In the narrower submarket for insulated aluminum conductor, Alcoa was third with only 11.6% of the market and Rome Cable Corporation was eighth with 4.7%; however, five companies controlled 65% and four smaller companies added another 23%. Based on these figures the Supreme Court deemed both markets "highly concentrated."

55. Similarly, the market share that will result from defendants' merger will exceed that which was condemned in *United States v. Continental Can Co.*, 378 U.S. 441 (1964), where the second largest competitor, Continental Can, acquired the sixth largest competitor, Hazel-Atlas, with Continental Can's post-merger market share rising from 21.9% to 25%. There, the Supreme Court ordered divestiture.

56. The number of major airlines remaining after the defendants' merger with American will be four, reflecting a persistent pattern of concentration and reduction of competition in the U.S. airline industry over the past several years. The Supreme Court in *United States v. Von's, supra*, 384 U.S. 270, considered such factors alone to violate § 7 of the Clayton Act (the acquisition by Von's, which had a 4.7% share of the market, of Shopping Bag, with 4.2% of the market, together with the growing number of grocery market chains and the

14

shrinking number of independently-owned stores resulted in the Court holding "these facts alone are enough to cause us to conclude…that the Von's-Shopping Bag merger did violate § 7").

57.     The merger of defendants is a merger of far larger competitors, resulting in a far greater share of the market possessed by the merged entity than the Supreme Court prohibited in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), where the Court ordered divestiture of a merged entity which had combined the 10th and 18th largest brewers in the United States, but which, when combined, resulted in just the fifth largest brewer with only 4.49% of all domestic beer sales.

58.     These Supreme Court cases have not been overruled or even diminished by later opinions and they determine beyond peradventure that the proposed USAir-American merger is unlawful.

59.     In *Hospital Corp. of America v. Federal Trade Commission,* 807 F.2d 1381, 1385 (7th Cir. 1986), Judge Posner of the Seventh Circuit observed that the above line of Supreme Court precedent, taken together, prohibited "any nontrivial acquisition of a competitor."

**<u>CONDUCT GIVING RISE TO VIOLATIONS OF LAW</u>**

60.     On February 14, 2013, American and USAir announced an agreement in which the two carriers would combine to form a new company with a value of $11 billion.

61.     On December 9, 2013, American and USAir announced that they had closed their merger.

62.     The new airline will operate under the name American Airlines Group, Inc. and be known as American Airlines.

63.     The merger created the country's largest airline.

15

64. The merger created the world's largest airline.

65. The chief executive officer of the combined company is Douglas Parker, previously the chairman and CEO of USAir.

66. Tom Horton, previously CEO of American, will serve as non-executive chairman of the combined company's Board of Directors until after the combined company's first shareholder meeting in approximately mid-2014.

67. Mr. Parker will become executive chairman of the Board when Mr. Horton ceases to be non-executive chairman.

68. Prior to announcing the merger Mr. Parker said, "I find it noteworthy that the only opposition that seems to exist to this merger is the senior management at American. I don't want to guess why it is that they don't support it. But we are hopeful that we can get their support at some point in the future."

69. After the merger was completed, Mr. Horton personally received nearly $16.9 million – $11.9 million in cash, and the rest in shares of the new company and short-term incentives. Previously, Horton's payment was intended to be about $20 million dollars, $9.9 million in cash and about half in stock of the new company, but that arrangement was rejected by the Bankruptcy Court as part of the merger.

70. Prior to announcing the merger, Mr. Horton was anxious to have American compete against the other airlines. Mr. Parker believed that the only obstacle to the merger was Mr. Horton and senior management. In order to induce Mr. Horton to agree to the merger, it was agreed that Mr. Horton would personally receive $20 million. In response to the offer of $20 million, Mr. Horton, contrary to the interests of American Airlines, not only agreed to the

16

merger, but agreed to withdraw from the business. In the absence of the $20 million offer, Mr.

Horton (and American Airlines), would not have agreed to the merger, but rather would have

emerged from the restructuring in the Bankruptcy Court to compete vigorously with Delta,

United, Southwest, and USAir. American would have had the most modern fleet, a new logo,

and renewed interest in succeeding on a competitive level. American had achieved its best profit

years, as had USAir. The $20 million offer was the price of the difference between combination

and competition.

71.     Mr. Horton acted on behalf of American as a representative and intermediary in

the proposed merger transaction.

72.     Mr. Parker and Mr. Horton met on July 19, 2012, to discuss a potential merger

between American and USAir.

73.     Through secret and private meetings, Mr. Parker of USAir met on more than one

occasion with Mr. Horton of American.

74.     One or more of the secret and private meetings between Messrs. Parker and

Horton was carried on outside of their offices, including in hotel rooms.

75.     At one or more of the secret and private meetings, Messrs. Parker and Horton

discussed the purposes and probable effects of the merger.

76.     At one or more of the secret and private meetings, Messrs. Parker and Horton

discussed airline fares in general and specifically.

77.     At one or more of the secret and private meetings, Messrs. Parker and Horton

discussed the frequency of flights.

78.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the elimination or curtailment of the use of hubs.

79.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the curtailment of capacity.

80.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the firing of employees.

81.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the type of aircraft to be eliminated.

82.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed charges for services previously given to passengers for free.

83.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the possible combination of American and USAir.

84.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the potential fare increases in the monopoly sub-markets that will be created by the combination.

85.     At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the potential fare increases in the duopoly sub-markets created by the combination.

86.     In an extraordinary admission contained in a letter written to American's employees by Mr. Horton on July 10, 2012, American's then chairman and CEO admitted that he went to competing airlines to seek their permission and approval to enter a combination between American and the other companies:

In fact, last year, I approached my counterparts at other airlines about the merits of possible combinations. Since that time, as we embarked on the restructuring journey, I have held the view that it is best that first put our house in order before considering a complex and challenging airline acquisition.

87.     The combined company, AAG, and its regional partners will provide access to more than 6,700 daily flights to 336 destinations in 56 countries, have approximately $40 billion in annual aggregate revenues, operate a mainline fleet of nearly 1,000 aircraft, and employ approximately 113,000 people worldwide.

88.     Combined, American and USAir will have more than 119 billion RPMs domestically. Their combined RPMs comprise 21% of domestic capacity, which tops the current domestic leaders, United Air Lines and Delta Airlines.

89.     Since the merger closed, the United States is now left with just four major airlines, which will dominate the United States market. The three major legacy airlines will be the new combined American, United, and Delta. The fourth is a low-cost carrier and legacy look-alike, Southwest Airlines.

90.     Since the merger closed, as much as 83% of the United States domestic airline industry will be controlled by just four airlines.

91.     Since the merger closed, it will result in lower capacity; that is, fewer seats in the sky, which, in turn, will result in higher ticket fares for consumers.

92.     Since the merger has closed, defendants will reduce their overall capacity.

93.     Defendants' merger further concentrates an already highly concentrated market, characterized by mergers, including the most recent mergers of Southwest and AirTran in 2011,

19

United and Continental in 2010 (which made United the U.S.'s largest carrier), and Delta and Northwest Airlines in 2008.

94.     In addition, defendants American and USAir were themselves the products of mergers and acquisitions.

95.     In 2001, American Airlines merged with Trans World Airlines. TWA was one of the largest domestic airlines in the United States and following the merger, American shut it down, together with TWA's St. Louis hub, despite American's representations it would not do so.

96.     In May 2010, United Airlines and Continental Airlines announced their planned merger. The announcement caused speculation about the future of each airline's hubs, including Continental's Cleveland hub. In Congressional testimony, an industry analyst stated that he did not believe the merger would cause reductions in Cleveland. On June 18, 2010, upon seeing the testimony, USAir's CEO Parker wrote an email to other USAir executives stating, "[s]urely these guys [United/Continental] aren't really planning to keep Cleveland open. I'm hopeful they're just saying what they need to (including to [the analyst]) to get this approved." United and Continental closed their merger on October 1, 2010. The combined firm has reduced capacity at nearly all of its major hubs (including Cleveland) and at many other airports where the two airlines previously competed. Similarly, Southwest/AirTran has reduced service in a number of its focus cities and on many of AirTran's former routes following its 2011 merger.

97.     Defendants are fully aware of these earlier mergers' effects. A 2012 American analysis concluded that "following a merger, carriers tend to remove capacity or grow more slowly than the rest of the industry." USAir's management concluded that although industry

20

**96**

consolidation has been a success, as its CEO Parker stated publicly in 2010, the industry had yet to hit its "sweet spot," and additional consolidation was needed because the industry remained "overly fragmented."

98.     A merger with American, if allowed to be operationally consummated, will allow USAir to hit the "sweet spot."  For plaintiffs and other consumers, however, it will be anything but sweet.  USAir believes that merging with American "finishes industry evolution" by accomplishing USAir's goal of "reduc[ing] capacity more efficiently."  When first considering a combination with American, USAir projected that the merged firm could reduce capacity by as much as 10%.  Similarly American expects that the merger will lead to capacity reductions that will negatively impact "communities," "people," "customers," and "suppliers."  Higher fares will then follow.  These goals stand in stark contrast to American's original plan to emerge from bankruptcy as a healthy, stand alone company intent on a program of increasing capacity over a five year period.

99.     For its part, America West acquired and merged with USAir in 2005.  The new company adopted the name US Airways Group.

100.     Since these mega-mergers started in 2007-2008, capacity has been substantially reduced despite a strengthening economy and increased demand for aircraft.

101.     Delta cut 41% of its flight out of Memphis when it merged with Northwest.  Before that merger, Northwest had 300 flights out of Memphis.  After the merger, only 90 flights remained.

102.     Since 2007, in the 29 largest hubs, scheduled domestic capacity has been reduced by 9%.

21

103.    Since 2007, in the 35 medium hubs, scheduled domestic capacity has been reduced by 26%.

104.    Since 2007, in the 70 small hubs, scheduled domestic capacity has been reduced by 18%.

105.    Remaining flights have become more crowded.

106.    The merged entity will reduce service to smaller and mid-sized communities. USAir's then CEO Parker admitted that the less lucrative, smaller community routes are the first to go: "If it is a choice to ask us to divest slots and give them to another carrier, we by definition, with a scarce resource, will continue to (serve markets) that are most lucrative, will reduce service to small and mid-sized communities and the carriers that get those slots will fly to large communities."

107.    Capacity reduction has resulted in higher prices for fares and other services.  The top three airlines now control over 80% of the domestic airline market, and the top four airlines, including Southwest, control 96% of the market.

108.    From 2007 through 2012, when U.S. airlines cut 26% of their scheduled flights to the nation's mid-sized airports, they increased the average inflation-adjusted fares there by 12%.

109.    The defendants' merger will have additional, negative impacts on smaller and mid-sized destinations.  As a result of their settlement with the DOJ, defendants will eliminate about 15% of their combined flights from Reagan National and 7% from LaGuardia.  The airlines have said that most, if not all, of those cuts will be to routes that serve smaller East Coast and Midwestern cities by culling almost 40% of regional jet flights from Reagan National and 17% from LaGuardia.

22

110.     The service to smaller and mid-sized destinations will not be replaced by the low-cost carriers who are, according to the DOJ, intended to receive defendants' slots at Reagan National and LaGuardia because those carriers do not fly regional jets and they must serve markets big enough to fill their larger planes.

111.     For example, it has been reported that the defendants' merger has already caused airlines to reduce flights at Reno-Tahoe International Airport and many other airports across the country.  The divestiture of slots/gates at seven hub airports has resulted in other airlines, such as Southwest, announcing cancellations of service of less profitable routes and moving the flights to the new and more lucrative routes at the larger, busier airports.  Southwest has announced that on June 8, 2014, it will cancel its nonstop daily flight between Reno and Seattle and another nonstop daily flight between Reno and Portland.  In addition, Jackson, MS, Branson, MO, and Key West, FL will lose all Southwest Airlines service effective June 8, 2014.  It has also been reported that Louisville, KY, Dayton, OH, San Antonio, TX, New Orleans, LA, Orlando, FL, Tampa Bay, FL, Nashville, TN and Chicago Midway also lost flights as a result of new slot availability.

112.     The defendants' merger is the fourth mega-merger in five years in the airline industry.  The prior mergers resulted in fare increases and capacity decreases.  The defendants' merger will again drive up fares.

113.     Although it was formerly expected that low-cost airlines, especially Southwest, would constrain legacy airfare increases, that is no longer the case, especially since Southwest merged with AirTran, the major low-cost carrier competitor of Southwest.  So, AirTran no longer constrains Southwest from increasing prices, nor does Southwest constrain the legacy airlines from increasing their prices. Consequently, many – and significant – price increases have taken

place since 2008.

114.    During the late summer/early fall of 2012, Southwest launched two of the three fare increases that stuck during the quarter.  When an attempted increase by United faltered, Southwest revived it.  An expert said this was "the first time [he] remembers a low-cost airline reviving a failed domestic price increase in almost a decade of watching fares."

115.    Southwest raised fares in markets following the mergers of Delta, Northwest, US Airways and America West, more than average fare increases overall, unless another low-cost airline was already in the particular market.  The merger of Southwest with its principal low-cost rival lessened the potential that Southwest could counteract higher fares in markets following the defendants' merger.

116.    Because of the defendants' merger, USAir's Philadelphia operations, one of USAir's main operation centers, will be transferred to Dallas (American's operations hub), and the merged entity will cut jobs.

117.    By reason of defendants' merger, air fares will increase.

118.    Air fares have already increased nationwide as a result of the mega-mergers beginning in 2007-2008.

119.    In 2012 alone, there were seven successful price increases instituted by the major airlines.

120.    Shortly after the announcement of the USAir-American merger, prices were increased by $4 to $10 roundtrip on domestic flights throughout the United States by Delta, United, American, and US Airways.  Southwest matched the increase on a limited scale.

24

121.    Since the mega mergers began, the major airlines have increased their ancillary fees.  In 2012, Delta, United, American, and USAir made more than $1 billion in reservation change fees.  In 2012, U.S. domestic airlines collected more than $3.5 billion in baggage fees.  The four major carriers Delta, United, American and USAir in 2013, all raised their prices on ticket changes from $150 to $200.  Now that the defendants' merger has closed, these fees will increase.

122.    The American-USAir merger surpassed United's in terms of number of employees, seat capacity, and operating revenues to create the largest passenger airline in the United States and the world.

123.    The Department of Justice approved the mergers of Northwest and Delta in 2008, the merger of United and Continental in 2010, and the merger of Southwest and AirTran in 2011.  During Congressional hearings on the Delta-Northwest merger, then House Judiciary Committee Chairman John Conyers stated, "We have an antitrust division that approves mergers left and right."  He further observed that "The department has not attempted to block or modify any major merger over the last seven years, including some of the largest, most controversial mergers among direct competitors."  Though the Department of Justice filed suit in August 2013, in the United States District Court for the District of Columbia, alleging that defendants' merger would violate Section 7 of the Clayton Act, the Department of Justice announced that they had settled with the defendants on November 12, 2013.  Given these facts, this action is the only remaining avenue available to "arrest" the march to monopoly power in the airline industry.

124.    The new American will operate nine hubs, including hubs in five of the six largest cities in the United States.

25

125. Because American and USAir have several connecting hubs in the same region, AAG will cut flights to some of those hubs.

126. The merged airline will cut flights to the Phoenix, Arizona hub.

127. The merged airline will cut flights to the Charlotte, North Carolina hub.

128. The merged airline will cut flights to the Philadelphia, Pennsylvania hub.

129. Since American and USAir do not share any airport hubs, there is a substantial and probable likelihood that USAir's hubs in Philadelphia and Charlotte will be shutdown or substantially cut back in favor of American's better hubs in New York and Miami.

130. The defendants' merger will also eliminate the potential for future head-to-head competition between USAir and American on flights at Reagan National. In 2011, USAir planned to start service from Reagan National to Miami and St. Louis, which would directly compete with American's existing service. USAir argued to the Department of Transportation that this new competition would "substantial[ly] benefit[]" consumers, and so asked DOT to approve the purchase of slots from Delta that would make the service possible. DOT ultimately approved that purchase. When it developed its plan to merge with American, however, USAir abandoned its plans to enter those markets and deprived consumers of the "substantial benefits" it had promised.

131. In addition, 59 out of the 116 domestic airports served by USAir from Charlotte are also served by Miami.

132. In talking about New York and Miami, then American CEO Horton said, "These are the most important population centers and we are very strong in them. What the airline

26

**102**

(USAir) does is carry a lot of connecting traffic over Charlotte and does so in a way that I would suggest is somewhat unrewarding."

133.     Closing hubs is not unprecedented.  Following American Airlines' acquisition of TWA, St. Louis ceased to be an American hub, even though American had promised not to close it.  Following the Delta-Northwest merger, service at Delta's hub in Cincinnati and Northwest's hub in Memphis was greatly reduced.

134.     Defendants' merger will increase market concentration in some of the largest U.S. cities, namely, Los Angeles, Philadelphia, Chicago, Washington, D.C., Dallas, and Phoenix.

135.     In addition, at the airport level, the following domestic airports will experience undue increases in market concentration as a result of the defendants' merger:  Charlotte Douglas International Airport (AAG will control over 92.1% of daily departures), Dallas-Fort Worth International Airport (AAG will control over 86% of daily departures), Philadelphia International Airport (AAG will control over 78% of daily departures), Miami International Airport (AAG will control over 70% of daily departures), Ronald Reagan Washington National Airport (AAG will control over 54% of daily departures), Phoenix Sky Harbor International Airport (AAG will control over 50% of daily departures), LaGuardia Airport (AAG will control over 35% of daily departures), O'Hare International Airport (AAG will control over 38% of daily departures), and Los Angeles International Airport (AAG will control over 21% of daily departures).

136.     The new combined company's dominance at the airports listed in paragraph 135 will result in higher fares for flights to and from those airports.

137.     Non-stop service is typically preferred by some passengers.

138.    Defendants have overlapping non-stop flights on 12 routes, including, *inter alia*, Charlotte to Dallas-Fort Worth, Charlotte to Miami, Charlotte to Chicago, Charlotte to New York LaGuardia, Dallas-Fort Worth to Phoenix, Dallas-Fort Worth to Philadelphia, and Dallas-Fort Worth to Chicago.  Defendants' combination will result in higher fare prices on these routes.

139.    Pre-merger, American and USAir overlapped on 12 non-stop airport pair routes. In four markets involving hub-to-hub routes, the merger will result in a monopoly.  In seven additional airport pair markets, post-merger concentration is in excess of 9,000 on the Herfindahl-Hirschman Index ("HHI"), with large changes in HHI, many of which are greater than 4,000 points.

140.    The seven overlapping routes which will result in a monopoly are: Charlotte-Dallas-Fort Worth; Charlotte-Miami; Dallas-Fort Worth-Philadelphia; Miami-Philadelphia; Dallas-Fort-Worth-Phoenix; Washington D.C.-Raleigh; Nashville-Washington, D.C.

141.    By reason of defendants' merger, the number of competitors in airport-pair markets will drop from two competitors to just one in 24 airport-pair markets.  The merger will reduce the number of competitors from three to two in 475 markets.  The merger will reduce the number of competitors from four to three in 749 airport-pair markets.

142.    By reason of the unlawful merger, approximately 530 more airport-pairs will lose an effective competitor than occurred as a result of the merger between United and Continental in 2010.

143.    By reason of defendants' unlawful merger, on nearly 1,000 routes, changes in market concentration and post-merger concentration will exceed the thresholds specified in the

28

Horizontal Merger Guidelines by the Department of Justice and are presumed, therefore, to lead to adverse competitive effects, including increases in fares, reductions in service, and loss of choice. See Appendix A, attached hereto and incorporated herein. The defendants' settlement with the DOJ has not affected the presumptive illegality of the merger as represented by the vast majority of enormously high concentrations in the city pairs shown in Appendix A.

144. Defendants' settlement with the DOJ required divestitures of 52 slot pairs at Ronald Reagan Washington National Airport. These 52 slot pairs represent 15% of the merged entities' combined slots at that airport. AAG will still hold roughly 54% of the slot pairs at Reagan National. Prior to the merger, American and USAir operated roughly 294 flights from Reagan. After the required divestitures, the merged entity will continue to operate 250 flights from Reagan National. Overall, the defendants' settlement with the DOJ affects 112 of the merged carrier's 6,700 daily flights, meaning less than 2%.

145. If Southwest, JetBlue, or another low cost carrier succeeds in gaining additional slots at Reagan National or LaGuardia, it will not have a dominant position at either airport sufficient to cause average fares to fall.

146. After the defendants' settlement with the DOJ and their combination, AAG will control 35% of daily flights from LaGuardia. The divestitures agreed to between defendants and the DOJ, will result in only 12 fewer flights from the airport, which will not allow low cost carriers to affect overall average fares at the airport. The merged entity will operate 160 flights from LaGuardia.

147. Defendants' agreement with the DOJ allows AAG to keep commuter slot pairs at Reagan National for use to small and medium-sized markets operated by jets with 76 or fewer

29

seats. As is already becoming apparent, no low cost carrier will enter these markets (such as Fayetteville, Arkansas) since JetBlue and Southwest do not operate regional aircraft viable for service on such routes. The combined entity will maintain monopolies on these smaller markets at Reagan National, which will allow AAG to set its own prices on routes and increase fares without competitive restraints.

148. On routes where one legacy airline offers nonstop service, the other legacies "generally respect the pricing of the non-stop carrier," as American has put it. Thus, if American offers nonstop service from Washington to Dallas at $800 round-trip, United and Delta will, "[d]espite having a service disadvantage," price their connecting fares at the level of American's nonstop fares. The legacy carriers do this because if one airline, say Delta, were to undercut fares in markets where American offers nonstop service, American would likely do the same in Delta's nonstop markets. To Delta, the cost of being undercut in its nonstop markets exceeds the benefit it would receive from winning additional passengers in American's nonstop markets.

149. USAir alone among the legacy carriers, had a different cost-benefit analysis for pricing connecting routes. Although it, too, is a national network carrier, USAir has hubs in cities that generate less revenue from passengers flying nonstop than the other legacy airlines' hubs. Because USAir's hubs generate less revenue from passengers flying nonstop, USAir must gain more revenue from connecting passengers. It gets that revenue by offering connecting service that is up to 40% cheaper than other airlines' nonstop service. USAir calls this program "Advantage Fares."

150. Millions of consumers have benefitted. Advantage Fares offers consumers, especially those who purchase tickets at the last minute, meaningfully lower fares. The benefits

30

from Advantage Fares have extended to hundreds of other routes, including those where more than one carrier offers nonstop service. Other airlines had chosen to respond to Advantage Fares with their own low connecting fares in markets where USAir has nonstop service. There are over 100 routes where other carriers have offered nonstop service on which USAir does not offer Advantage Fares. Consumers in these markets have not been given the option of a low-cost connecting alternative and have been forced to pay significantly more for service.

151. Advantage Fares have proven highly disruptive to the industry's overall coordinated pricing dynamic. An American executive expressed her frustration in September 2011 with USAirs' Advantage Fares, noting that USAir was "still way undercutting us [on flights from Boston and New York to Dallas] and getting significant share." One response American considered was to lower its fares on the same route. Another option was "to take up this battle w/them again," in an attempt to force USAir to limit or abandon its strategy.

152. Pre-merger, USAir believed that it gained "most of its advantage fare value from AA," meaning that Advantage Fares provided substantial value for USAir on routes where American was the legacy airline offering nonstop service. Post-merger, continuing Advantage Fares will mean that USAir will take that value away from AAG by undercutting its own nonstop prices. Plainly, this will make no economic sense. Thus, for defendants, post-merger, the benefits of Advantage Fares will go down, and its costs will go up.

153. By ending Advantage Fares, the merger will eliminate lower fares for millions of consumers. In 2012, more than 2.5 million round-trip passengers, including more than 250,000 passengers from the greater Washington, D.C. area, another 250,000 passengers in the Dallas-Fort Worth area, half a million passengers in the greater New York City area, and 175,000

31

passengers from Detroit, bought an Advantage Fare ticket.  Hundreds of thousands of other passengers flying nonstop on USAir particularly from its hubs in Phoenix, Charlotte, and Philadelphia, benefitted from responsive fares offered by the legacy airlines.

154.    Following airline deregulation in 1978, many mergers and acquisitions occurred: Delta Air Lines merged with Western Airlines; United Airlines acquired Pan American Airlines' Pacific routes; Northwest acquired Republic Airlines; American Airlines and Air California merged; American acquired TWA; America West acquired US Airways; Delta acquired Northwest; and United acquired Continental.

155.    In addition, since deregulation, the legacy carriers bought or controlled the new and growing feeder airlines with the specific purpose and intent of preventing them from becoming major competitors.

156.    In addition, defendants now compete on hundreds of domestic connecting routes where competition will be reduced or eliminated as a result of defendants' merger.

157.    AAG will operate in a much more highly concentrated market.  As a result, the prospects for effective collusion among the airlines remaining after defendants' merger will substantially increase.

158.    The potential for increased collusion among the remaining airlines is significant because the domestic passenger airlines, including, *inter alia*, the defendants, have in the past colluded to fix prices with regard to airfares, surcharges, and cargo prices, and to fix other terms and conditions of air transportation and travel.

159.    In addition to the degree to which market concentration has increased, there are substantial and significant barriers to entry into the industry in the relevant markets, as well as a

history of a lack of successful new entry. There have been only two new major carriers in recent years: Southwest Airlines and Jet Blue, both of which took substantial time to develop. On the contrary, the relevant market has been characterized by the exit, rather than the entry, of firms. In addition, defendants' combination has created an airline with nine hubs, making entry into markets between such hubs particularly difficult for a non-hub carrier because the prospective entrant will not have access to feed traffic and because the combined AAG, as a hub carrier, will have significant marketing advantages. The prospect of new entry is, therefore, unlikely to eliminate any of the anticompetitive effects that will eventuate from the defendants' merger and the increasingly concentrated structure of the relevant market.

160. There have not been new, viable competitors in the national market since 2000.

161. Then USAir CEO Parker publicly admitted that, "You cannot cover your cost of capital by starting up a new airline."

162. Both of the then CEOs of American and USAir indicated publicly their approval of the elimination of capacity and their desire to further concentrate the industry and eliminate capacity further, with the obvious result of higher fares.

163. American and USAir agreed that any cost savings by reason of the merger's elimination of duplicative functions will not be passed on to consumers in forms of lower prices. To the contrary, every indication is that the merger will result in higher fares charged to passengers, notwithstanding any so-called cost savings AAG realizes.

164. The defendants' merger has caused and will continue to cause damage to consumers, including the plaintiffs, by generating higher airfares across the country, including through the elimination of USAir's Advantage Fares, higher ancillary services fees, reductions in

33

the number of flights on particular routes and elimination of air service to smaller communities. Consumers, including the plaintiffs, will thus pay more for less airline service nationwide and between city pairs than would be the case in the absence of the merger.

165.    Former Chairman of the House Committee on Transportation and Infrastructure, Representative James Oberstar (D-Minn.), stated that, "The real victim in this process is the traveling public…The reduction of choices, the increasing power of the fortress hub makes it unlikely that other carriers would enter those markets where both American and USAir serve, because they'll be competing with a much bigger presence, with more power to serve those markets."

166.    There are 29 major airports in the United States, located in the following cities: Atlanta, Baltimore, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Fort Lauderdale, Houston, Las Vegas, Los Angeles, Miami, Minneapolis, New York, Newark, Orlando, Philadelphia, Phoenix, Portland, Salt Lake City, San Diego, San Francisco, Seattle, Tampa, and Washington D.C.

167.    Every major U.S. passenger airline, including the pre-merger American and USAir, has the ability and financial capacity to offer competitive flights between any two major cities in the United States, whether or not they currently offer such flights.

168.    Each major U.S. passenger airline, including the pre-merger American and USAir, has the ability and financial capacity to establish a competitive presence in any of the major airports located throughout the United States by, *inter alia*, leasing or otherwise utilizing terminal slots, hiring employees, and directing more flights to and from the given airport.

169.    The merger has eliminated American's actual rival, USAir.

34

170.    The merger has eliminated American's potential rival, USAir.

171.    Neither company is a failing company.

172.    American's then CEO Mr. Horton publicly stated on numerous occasions that American would emerge from bankruptcy independently and strong enough to compete with United and Delta.

173.    Horton publicly stated that, "[American] is going to be very successful. I think we have a very powerful company coming out of restructuring. Our company is only going to get more volume."

174.    In a December 13, 2012, meeting with American Airlines' pilot union leaders, Mr. Horton outlined his plan for a stand-alone exit from bankruptcy.

175.    In January 2013, American revealed its new logo. It was the company's first external logo redo in more than 40 years.

176.    The largest aircraft order ever was placed by American, which purchased nearly 500 new aircraft for $40 billion to be delivered beginning in 2013.

177.    Then USAir CEO Mr. Parker stated that, "Either of our airlines could compete independently. No one is suggesting that we couldn't."

178.    American posted a record $530 million profit in the third quarter 2013, five times that of a year earlier.

179.    Then USAir President Scott Kirby publicly stated that, "We have a business model that works, that is profitable, and generates margins that are far superior to American's…Our results prove that."

180.    USAir reported a 2012 net income of $637 million, up 797% from a $71 million net profit in 2011, and is expected to report similarly high profits for 2013.

181.    House Representative John Conyers (D-MI), noted in a February 26, 2013 hearing before the House Judiciary Committee's Subcommittee on Regulatory Reform, Commercial and Antitrust Law discussing the American-USAir merger that, "While American is still in bankruptcy, it is poised to successfully reorganize in billions of dollars in cash and reduced costs as a result of reorganization.  Moreover, USAir posted record profits.  These facts suggest that both airlines are in fact perfectly capable of surviving, even thriving as standalone companies."

182.    Since the major airlines already offer flights to and from various major U.S. cities, each such airline, including each defendant pre-merger, necessarily has the managerial expertise to offer similar flights between any two major cities in the United States.

183.    The major U.S. passenger airlines, including defendants, frequently trade, sell, lease, or purchase slots from other airlines in each of the major 29 airports throughout the United States.

184.    The major U.S. passenger airlines with significant market share in specific regions or major airports, including defendants pre- and post-merger, endeavor to keep other major airlines from entering the market with competitive flights.

185.    On information and belief, each major U.S. passenger airline, including defendants, has created internal documents reflecting a financial and economic cost/benefit analysis of increasing its presence in each or many of the major U.S. airports.

186.    On information and belief, each major U.S. passenger airline, including defendants, has created internal documents reflecting its analysis of how the market for air

transportation would be impacted within each regional market or major U.S. airport by the entry of another major U.S. passenger airline into that region or major airport.

187.    The entry of American or USAir, pre-merger, into regions or major airports that are dominated, controlled, or serviced by other major passenger airlines would have resulted in lower prices, increased service levels, and/or other pro-competitive effects on flights within the region to or from the given major airport.

188.    As the foregoing paragraphs show, the effect of the defendants' merger "may" be to substantially lessen competition or tend to create a monopoly in the relevant markets.

189.    By reason of the defendants' unlawful merger, the plaintiffs are threatened with loss or damage in the form of higher ticket prices and diminished service.  By reason of defendants' unlawful merger, the plaintiffs will sustain irreparable harm for which damages will be unable to compensate them in that competition will be lessened.  Service once lost cannot easily be restored.  Accordingly, plaintiffs bring this action for both preliminary and permanent injunctive relief against defendants' merger.

## VIOLATION ALLEGED

### Clayton Act, Section 7

190.    The conduct of defendants described hereinabove, specifically their agreement to merge and the closing of their merger, constitutes a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, in that the effect of the merger may be substantially to lessen competition or tend to create a monopoly in the transportation of airline passengers in the United States; by reason of which violation the plaintiffs have incurred and are threatened with loss or damage in the form of higher ticket prices and diminished service, as well as irreparable harm for

37

which damages will be inadequate to compensate plaintiffs, such that plaintiffs are entitled to

bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary

and permanent injunctive relief against defendants' merger and recover their costs of suit,

including a reasonable attorney's fee.

### **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs demand the following relief from this Honorable Court:

A.      Declaring, finding, adjudging, and decreeing that the agreement of the defendants

to merge and their merger violate Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B.      A final judgment of divestiture requiring defendants to unwind their merger and

permanently enjoining them from merging in the future.

C.      Awarding plaintiffs their costs of suit, including a reasonable attorney's fee, as

provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

D.      Granting to plaintiffs such other and further relief to which they may be entitled

and which the Court finds to be just and appropriate.

E.      If and when one or more of the plaintiffs experiences damages by reasoning of the

lessening of competition, plaintiffs will move to amend or supplement this complaint to request

treble damages and a trial by jury.

Dated: April 4, 2014                    ALIOTO LAW FIRM

                                By:     /s/ Joseph M. Alioto
                                        Joseph M. Alioto
                                        *Admitted Pro Hac Vice*


                                        COUNSEL LISTED ON NEXT PAGE

ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
        jmiller@aliotolaw.com

Gil D. Messina
*Admitted Pro Hac Vice*
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (732) 332-9300
Facsimile: (732) 332-9301
Email: gmessina@messinalawfirm.com
        tmay@messinalawfirm.com

## APPENDIX A

### CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

- HHIs in this appendix are calculated based on publicly available non-stop and one-stop airline ticket revenue data for 2012 from Department of Transportation's Airline Origin and Destination Survey (DB1B) database, available at: http://www.transtats.bts.gov/DatabaseInfo.asp?DB_ID=125&Link=0

- Routes are listed only once but include flights at all airports within the metropolitan area and in both directions. For example, the entry

| CITY PAIR | Post-Merger HHI | HHI |
|---|---|---|
| Charlotte, NC (CLT) - Dallas, TX (DFW) | 9,324 | 4,653 |

includes flights from Charlotte, North Carolina, to airports in and around Dallas, Texas, including both Dallas-Fort Worth International Airport (DFW) and Love Field (DAL), and it includes flights from both airports to Charlotte.

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Charlotte, NC (CLT) - Durango, CO (DRO) | 10,000 | 4,742 |
| Charlotte, NC (CLT) - Dallas, TX (DFW) | 9,324 | 4,653 |
| Charlotte, NC (CLT) - St. Croix, VI (STX) | 10,000 | 4,647 |
| Dallas, TX (DFW) - Philadelphia, PA (PHL) | 9,083 | 4,497 |
| Kahului, HI (OGG) - Tampa, FL (TPA) | 9,040 | 4,478 |
| Kapaa, HI (LIH) - St. Louis, MO (STL) | 8,930 | 4,448 |
| Fresno, CA (FAT) - Tampa, FL (TPA) | 8,659 | 4,259 |
| Dallas, TX (DFW) - Phoenix, AZ (PHX) | 8,921 | 4,205 |
| Miami, FL (MIA) - Monterey, CA (MRY) | 9,540 | 4,079 |
| Indianapolis, IN (IND) - Kahului, HI (OGG) | 8,174 | 4,006 |
| El Paso, TX (ELP) - Fresno, CA (FAT) | 8,320 | 3,866 |
| Columbus, OH (CMH) - Palm Springs, CA (PSP) | 7,704 | 3,703 |
| Miami, FL (MIA) - Santa Barbara, CA (SBA) | 8,042 | 3,634 |
| Kapaa, HI (LIH) - Miami, FL (MIA) | 8,439 | 3,619 |
| El Paso, TX (ELP) - Monterey, CA (MRY) | 8,415 | 3,612 |
| Pittsburgh, PA (PIT) - St. Croix, VI (STX) | 10,000 | 3,600 |
| Dallas, TX (DFW) - Greensboro, NC (GSO) | 8,120 | 3,557 |
| Hilo, HI (KOA) - Miami, FL (MIA) | 7,329 | 3,528 |
| Hilo, HI (KOA) - St. Louis, MO (STL) | 7,785 | 3,418 |
| Kahului, HI (OGG) - St. Louis, MO (STL) | 8,888 | 3,331 |
| Dallas, TX (DFW) - Norfolk-Virginia Beach, VA (ORF) | 7,786 | 3,312 |
| Greensboro, NC (GSO) - St. Croix, VI (STX) | 10,000 | 3,299 |
| Monterey, CA (MRY) - St. Louis, MO (STL) | 6,982 | 3,277 |
| El Paso, TX (ELP) - Kapaa, HI (LIH) | 9,185 | 3,206 |
| Charlotte, NC (CLT) - Palm Springs, CA (PSP) | 8,016 | 3,185 |
| Charlotte, NC (CLT) - Fresno, CA (FAT) | 7,903 | 3,165 |
| Fresno, CA (FAT) - Milwaukee, WI (MKE) | 7,185 | 3,164 |
| Palm Springs, CA (PSP) - St. Louis, MO (STL) | 6,753 | 3,085 |
| Austin, TX (AUS) - Santa Barbara, CA (SBA) | 6,499 | 3,068 |
| Dallas, TX (DFW) - Richmond, VA (RIC) | 8,372 | 3,048 |
| Charleston, WV (CRW) - New York, NY (NYC) | 6,407 | 3,034 |
| Kahului, HI (OGG) - Omaha, NE (OMA) | 6,897 | 3,033 |
| Austin, TX (AUS) - Monterey, CA (MRY) | 6,547 | 3,027 |
| Charlotte, NC (CLT) - Kahului, HI (OGG) | 10,000 | 3,022 |
| Austin, TX (AUS) - Kapaa, HI (LIH) | 6,499 | 3,006 |
| Palm Springs, CA (PSP) - Tampa, FL (TPA) | 6,968 | 2,985 |
| Milwaukee, WI (MKE) - Palm Springs, CA (PSP) | 6,319 | 2,966 |
| Chicago, IL (CHI) - Charlottesville, VA (CHO) | 8,865 | 2,949 |
| Fresno, CA (FAT) - Miami, FL (MIA) | 9,061 | 2,948 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Dallas, TX (DFW) - Monterey, CA (MRY) | 7,448 | 2,938 |
| Pittsburgh, PA (PIT) - Palm Springs, CA (PSP) | 6,446 | 2,932 |
| El Paso, TX (ELP) - Honolulu, HI (HNL) | 8,116 | 2,923 |
| Fresno, CA (FAT) - Indianapolis, IN (IND) | 6,099 | 2,905 |
| Fresno, CA (FAT) - San Antonio, TX (SAT) | 6,197 | 2,895 |
| Dallas, TX (DFW) - Kapaa, HI (LIH) | 7,991 | 2,892 |
| Raleigh-Durham, NC (RDU) - St. Thomas, VI (STT) | 6,493 | 2,845 |
| Phoenix, AZ (PHX) - St. Thomas, VI (STT) | 6,178 | 2,843 |
| Austin, TX (AUS) - Palm Springs, CA (PSP) | 6,428 | 2,839 |
| El Paso, TX (ELP) - Kahului, HI (OGG) | 6,861 | 2,808 |
| Columbus, OH (CMH) - Fresno, CA (FAT) | 6,320 | 2,801 |
| Austin, TX (AUS) - Fresno, CA (FAT) | 7,074 | 2,795 |
| Dallas, TX (DFW) - Fresno, CA (FAT) | 8,423 | 2,774 |
| Kansas City, MO (MCI) - Kahului, HI (OGG) | 6,274 | 2,772 |
| Dallas, TX (DFW) - Ontario, CA (ONT) | 8,978 | 2,770 |
| Des Moines, IA (DSM) - Kahului, HI (OGG) | 6,793 | 2,753 |
| Milwaukee, WI (MKE) - Kahului, HI (OGG) | 6,867 | 2,717 |
| Kapaa, HI (LIH) - Tucson, AZ (TUS) | 6,680 | 2,700 |
| Charlotte, NC (CLT) - Reno, NV (RNO) | 6,887 | 2,672 |
| Dallas, TX (DFW) - Hilo, HI (KOA) | 6,671 | 2,664 |
| Detroit, MI (DTW) - Fresno, CA (FAT) | 6,057 | 2,662 |
| Santa Barbara, CA (SBA) - St. Louis, MO (STL) | 5,691 | 2,656 |
| Columbus, OH (CMH) - St. Croix, VI (STX) | 8,177 | 2,621 |
| Albuquerque, NM (ABQ) - Monterey, CA (MRY) | 6,759 | 2,575 |
| El Paso, TX (ELP) - Hilo, HI (KOA) | 9,515 | 2,574 |
| Atlanta, GA (ATL) - Fresno, CA (FAT) | 5,717 | 2,571 |
| Charlotte, NC (CLT) - Tucson, AZ (TUS) | 5,647 | 2,567 |
| Charlotte, NC (CLT) - Ontario, CA (ONT) | 5,750 | 2,503 |
| Fresno, CA (FAT) - Pittsburgh, PA (PIT) | 6,024 | 2,501 |
| Detroit, MI (DTW) - Palm Springs, CA (PSP) | 5,443 | 2,491 |
| Albuquerque, NM (ABQ) - Kapaa, HI (LIH) | 6,473 | 2,484 |
| Charlotte, NC (CLT) - Grand Junction, CO (GJT) | 6,077 | 2,475 |
| Kansas City, MO (MCI) - Palm Springs, CA (PSP) | 5,473 | 2,455 |
| Albuquerque, NM (ABQ) - Santa Barbara, CA (SBA) | 6,410 | 2,455 |
| Hilo, HI (KOA) - Orlando, FL (MCO) | 5,588 | 2,454 |
| Hartford, CT (BDL) - St. Thomas, VI (STT) | 5,373 | 2,444 |
| Charlottesville, VA (CHO) - St. Louis, MO (STL) | 6,691 | 2,438 |
| Dallas, TX (DFW) - Palm Springs, CA (PSP) | 8,959 | 2,428 |
| Miami, FL (MIA) - Palm Springs, CA (PSP) | 7,592 | 2,423 |

**117**

Appendix Page 1

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Denver, CO (DEN) - St. Thomas, VI (STT) | 5,838 | 2,407 |
| Minneapolis, MN (MSP) - St. Croix, VI (STX) | 5,878 | 2,402 |
| Miami, FL (MIA) - Kahului, HI (OGG) | 7,973 | 2,388 |
| Columbus, OH (CMH) - Kahului, HI (OGG) | 7,136 | 2,383 |
| Philadelphia, PA (PHL) - St. Thomas, VI (STT) | 9,203 | 2,362 |
| Indianapolis, IN (IND) - St. Croix, VI (STX) | 8,140 | 2,349 |
| Dallas, TX (DFW) - Raleigh-Durham, NC (RDU) | 7,889 | 2,341 |
| Palm Springs, CA (PSP) - San Antonio, TX (SAT) | 5,514 | 2,313 |
| Albuquerque, NM (ABQ) - Fresno, CA (FAT) | 5,708 | 2,305 |
| Greensboro, NC (GSO) - Miami, FL (MIA) | 5,699 | 2,278 |
| Charlotte, NC (CLT) - Key West, FL (EYW) | 5,573 | 2,268 |
| Charlotte, NC (CLT) - Orange County, CA (SNA) | 5,196 | 2,265 |
| Albuquerque, NM (ABQ) - Hilo, HI (KOA) | 7,026 | 2,237 |
| Albuquerque, NM (ABQ) - Honolulu, HI (HNL) | 5,692 | 2,227 |
| Monterey, CA (MRY) - Tucson, AZ (TUS) | 7,706 | 2,199 |
| Indianapolis, IN (IND) - Palm Springs, CA (PSP) | 5,055 | 2,198 |
| Dallas, TX (DFW) - Pittsburgh, PA (PIT) | 8,393 | 2,191 |
| Fresno, CA (FAT) - St. Louis, MO (STL) | 5,756 | 2,185 |
| Dallas, TX (DFW) - Westchester County, NY (HPN) | 5,037 | 2,168 |
| Philadelphia, PA (PHL) - Palm Springs, CA (PSP) | 6,764 | 2,137 |
| Atlanta, GA (ATL) - Palm Springs, CA (PSP) | 5,169 | 2,119 |
| Hartford, CT (BDL) - Dallas, TX (DFW) | 8,326 | 2,118 |
| Columbia, SC (CAE) - Dallas, TX (DFW) | 7,648 | 2,113 |
| Raleigh-Durham, NC (RDU) - San Juan, PR (SJU) | 4,765 | 2,109 |
| Philadelphia, PA (PHL) - Tucson, AZ (TUS) | 4,757 | 2,098 |
| Miami, FL (MIA) - Phoenix, AZ (PHX) | 4,928 | 2,090 |
| Phoenix, AZ (PHX) - San Juan, PR (SJU) | 4,755 | 2,075 |
| Chicago, IL (CHI) - Charlotte, NC (CLT) | 5,982 | 2,051 |
| Detroit, MI (DTW) - St. Croix, VI (STX) | 8,834 | 2,039 |
| Chattanooga, TN (CHA) - Chicago, IL (CHI) | 6,818 | 2,039 |
| Charleston, SC (CHS) - Miami, FL (MIA) | 5,380 | 2,037 |
| St. Thomas, VI (STT) - Washington, DC (WAS) | 4,617 | 2,022 |
| Austin, TX (AUS) - Hilo, HI (KOA) | 5,363 | 2,008 |
| Santa Barbara, CA (SBA) - Tucson, AZ (TUS) | 7,273 | 2,004 |
| Boston, MA (BOS) - Key West, FL (EYW) | 6,327 | 1,984 |
| Norfolk-Virginia Beach, VA (ORF) - St. Thomas, VI (STT) | 5,239 | 1,968 |
| Dallas, TX (DFW) - Reno, NV (RNO) | 8,668 | 1,953 |
| San Juan, PR (SJU) - Sacramento, CA (SMF) | 4,709 | 1,950 |
| Boston, MA (BOS) - Palm Springs, CA (PSP) | 4,922 | 1,947 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Kapaa, HI (LIH) - Orlando, FL (MCO) | 5,457 | 1,946 |
| Greensboro, NC (GSO) - St. Thomas, VI (STT) | 5,466 | 1,944 |
| Dallas, TX (DFW) - Savannah, GA (SAV) | 7,094 | 1,936 |
| Hartford, CT (BDL) - Key West, FL (EYW) | 4,983 | 1,931 |
| Dallas, TX (DFW) - Santa Barbara, CA (SBA) | 6,048 | 1,909 |
| Kahului, HI (OGG) - San Antonio, TX (SAT) | 5,275 | 1,901 |
| Las Vegas, NV (LAS) - San Juan, PR (SJU) | 4,883 | 1,885 |
| Nashville, TN (BNA) - St. Thomas, VI (STT) | 5,903 | 1,877 |
| Charlotte, NC (CLT) - Honolulu, HI (HNL) | 5,637 | 1,845 |
| Charleston, SC (CHS) - St. Thomas, VI (STT) | 5,230 | 1,844 |
| Orlando, FL (MCO) - Kahului, HI (OGG) | 4,514 | 1,834 |
| Dallas, TX (DFW) - Sacramento, CA (SMF) | 7,494 | 1,833 |
| Fresno, CA (FAT) - Philadelphia, PA (PHL) | 5,844 | 1,831 |
| Cincinnati, OH (CIN) - St. Croix, VI (STX) | 8,601 | 1,831 |
| Charlotte, NC (CLT) - San Jose, CA (SJC) | 5,038 | 1,815 |
| El Paso, TX (ELP) - Santa Barbara, CA (SBA) | 8,179 | 1,805 |
| Miami, FL (MIA) - Norfolk-Virginia Beach, VA (ORF) | 4,355 | 1,801 |
| Kahului, HI (OGG) - Pittsburgh, PA (PIT) | 5,506 | 1,800 |
| Omaha, NE (OMA) - Palm Springs, CA (PSP) | 4,635 | 1,799 |
| Austin, TX (AUS) - Kahului, HI (OGG) | 5,961 | 1,791 |
| Anchorage, AK (ANC) - El Paso, TX (ELP) | 7,220 | 1,789 |
| Boston, MA (BOS) - Tucson, AZ (TUS) | 5,168 | 1,780 |
| Houston, TX (HOU) - St. Thomas, VI (STT) | 7,185 | 1,771 |
| Dallas, TX (DFW) - Greenville, SC (GSP) | 6,372 | 1,759 |
| Fresno, CA (FAT) - Orlando, FL (MCO) | 5,123 | 1,750 |
| Kahului, HI (OGG) - Tucson, AZ (TUS) | 5,099 | 1,728 |
| Boston, MA (BOS) - Fresno, CA (FAT) | 5,173 | 1,713 |
| Fresno, CA (FAT) - Minneapolis, MN (MSP) | 4,959 | 1,705 |
| Charlottesville, VA (CHO) - Fayetteville, AR (XNA) | 5,258 | 1,702 |
| Key West, FL (EYW) - Philadelphia, PA (PHL) | 4,530 | 1,697 |
| Austin, TX (AUS) - Charlotte, NC (CLT) | 5,600 | 1,693 |
| Austin, TX (AUS) - Tucson, AZ (TUS) | 5,300 | 1,687 |
| San Diego, CA (SAN) - San Juan, PR (SJU) | 4,198 | 1,678 |
| Charlottesville, VA (CHO) - Minneapolis, MN (MSP) | 4,883 | 1,669 |
| Fresno, CA (FAT) - San Juan, PR (SJU) | 7,380 | 1,667 |
| Las Vegas, NV (LAS) - St. Thomas, VI (STT) | 7,530 | 1,665 |
| Charlotte, NC (CLT) - Miami, FL (MIA) | 7,087 | 1,646 |
| San Juan, PR (SJU) - St. Louis, MO (STL) | 4,512 | 1,599 |
| San Antonio, TX (SAT) - Tucson, AZ (TUS) | 4,923 | 1,597 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Dallas, TX (DFW) - Knoxville, TN (TYS) | 7,796 | 1,589 |
| Greensboro, NC (GSO) - San Juan, PR (SJU) | 4,835 | 1,574 |
| Orlando, FL (MCO) - Palm Springs, CA (PSP) | 4,336 | 1,571 |
| Buffalo, NY (BUF) - Fayetteville, AR (XNA) | 4,703 | 1,555 |
| Syracuse, NY (SYR) - Fayetteville, AR (XNA) | 4,609 | 1,545 |
| Miami, FL (MIA) - Philadelphia, PA (PHL) | 5,610 | 1,543 |
| Honolulu, HI (HNL) - San Antonio, TX (SAT) | 4,711 | 1,541 |
| St. Louis, MO (STL) - St. Thomas, VI (STT) | 6,580 | 1,541 |
| Albuquerque, NM (ABQ) - Charlotte, NC (CLT) | 4,986 | 1,540 |
| Honolulu, HI (HNL) - Omaha, NE (OMA) | 4,545 | 1,531 |
| Charlotte, NC (CLT) - San Antonio, TX (SAT) | 5,158 | 1,519 |
| Norfolk-Virginia Beach, VA (ORF) - San Juan, PR (SJU) | 5,474 | 1,517 |
| Miami, FL (MIA) - Reno, NV (RNO) | 4,566 | 1,502 |
| Orlando, FL (MCO) - Monterey, CA (MRY) | 5,045 | 1,492 |
| Dallas, TX (DFW) - San Jose, CA (SJC) | 9,421 | 1,489 |
| Chattanooga, TN (CHA) - Dallas, TX (DFW) | 6,641 | 1,489 |
| Westchester County, NY (HPN) - Phoenix, AZ (PHX) | 4,437 | 1,484 |
| Charlottesville, VA (CHO) - Dallas, TX (DFW) | 4,745 | 1,476 |
| Richmond, VA (RIC) - St. Thomas, VI (STT) | 5,002 | 1,466 |
| Little Rock, AR (LIT) - Syracuse, NY (SYR) | 4,209 | 1,462 |
| Savannah, GA (SAV) - St. Croix, VI (STX) | 5,215 | 1,462 |
| Seattle, WA (SEA) - San Juan, PR (SJU) | 3,824 | 1,462 |
| Charleston, SC (CHS) - Dallas, TX (DFW) | 5,316 | 1,457 |
| Cleveland, OH (CLE) - St. Croix, VI (STX) | 7,993 | 1,449 |
| Chicago, IL (CHI) - Huntsville, AL (HSV) | 4,974 | 1,446 |
| Cleveland, OH (CLE) - St. Thomas, VI (STT) | 4,286 | 1,431 |
| Minneapolis, MN (MSP) - Kahului, HI (OGG) | 4,426 | 1,430 |
| Chicago, IL (CHI) - St. Thomas, VI (STT) | 4,065 | 1,425 |
| Chicago, IL (CHI) - Palm Springs, CA (PSP) | 6,637 | 1,420 |
| New Orleans, LA (MSY) - St. Thomas, VI (STT) | 5,276 | 1,418 |
| Durango, CO (DRO) - Miami, FL (MIA) | 5,283 | 1,417 |
| Dallas, TX (DFW) - Syracuse, NY (SYR) | 4,010 | 1,409 |
| Charlottesville, VA (CHO) - Des Moines, IA (DSM) | 5,161 | 1,397 |
| Denver, CO (DEN) - San Juan, PR (SJU) | 3,816 | 1,381 |
| Honolulu, HI (HNL) - Tucson, AZ (TUS) | 4,340 | 1,380 |
| Philadelphia, PA (PHL) - Fayetteville, AR (XNA) | 4,537 | 1,377 |
| Des Moines, IA (DSM) - Honolulu, HI (HNL) | 4,983 | 1,371 |
| Minneapolis, MN (MSP) - St. Thomas, VI (STT) | 4,568 | 1,370 |
| Des Moines, IA (DSM) - Reno, NV (RNO) | 4,282 | 1,350 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Philadelphia, PA (PHL) - St. Croix, VI (STX) | 9,330 | 1,331 |
| Honolulu, HI (HNL) - Indianapolis, IN (IND) | 3,926 | 1,328 |
| Boston, MA (BOS) - Fayetteville, AR (XNA) | 4,474 | 1,327 |
| Albuquerque, NM (ABQ) - Kahului, HI (OGG) | 5,134 | 1,322 |
| Charlottesville, VA (CHO) - Phoenix, AZ (PHX) | 6,867 | 1,319 |
| Charlotte, NC (CLT) - El Paso, TX (ELP) | 5,268 | 1,317 |
| Des Moines, IA (DSM) - Fresno, CA (FAT) | 5,037 | 1,311 |
| Dallas, TX (DFW) - San Diego, CA (SAN) | 6,869 | 1,310 |
| Dallas, TX (DFW) - Jacksonville, FL (JAX) | 7,106 | 1,304 |
| Dallas, TX (DFW) - San Juan, PR (SJU) | 7,234 | 1,303 |
| Palm Springs, CA (PSP) - Washington, DC (WAS) | 4,360 | 1,300 |
| Des Moines, IA (DSM) - Tucson, AZ (TUS) | 4,786 | 1,292 |
| Fresno, CA (FAT) - Omaha, NE (OMA) | 3,874 | 1,292 |
| St. Louis, MO (STL) - Tucson, AZ (TUS) | 4,306 | 1,273 |
| Nashville, TN (BNA) - San Juan, PR (SJU) | 4,957 | 1,262 |
| Austin, TX (AUS) - Honolulu, HI (HNL) | 4,531 | 1,259 |
| Key West, FL (EYW) - Raleigh-Durham, NC (RDU) | 4,746 | 1,247 |
| Charlottesville, VA (CHO) - Omaha, NE (OMA) | 5,087 | 1,237 |
| Chattanooga, TN (CHA) - San Francisco, CA (SFO) | 5,000 | 1,225 |
| Columbus, OH (CMH) - Honolulu, HI (HNL) | 3,984 | 1,225 |
| Des Moines, IA (DSM) - Palm Springs, CA (PSP) | 4,797 | 1,223 |
| Washington, DC (WAS) - Fayetteville, AR (XNA) | 4,214 | 1,221 |
| Dallas, TX (DFW) - Huntsville, AL (HSV) | 8,135 | 1,218 |
| Miami, FL (MIA) - Louisville, KY (SDF) | 3,843 | 1,217 |
| Philadelphia, PA (PHL) - San Jose, CA (SJC) | 3,728 | 1,215 |
| Boston, MA (BOS) - Kapaa, HI (LIH) | 5,009 | 1,210 |
| Kahului, HI (OGG) - Philadelphia, PA (PHL) | 5,157 | 1,199 |
| St. Thomas, VI (STT) - Tallahassee, FL (TLH) | 5,006 | 1,192 |
| Raleigh-Durham, NC (RDU) - Fayetteville, AR (XNA) | 4,878 | 1,190 |
| Honolulu, HI (HNL) - Milwaukee, WI (MKE) | 4,656 | 1,187 |
| Fresno, CA (FAT) - Kansas City, MO (MCI) | 3,980 | 1,184 |
| Des Moines, IA (DSM) - Ontario, CA (ONT) | 4,661 | 1,179 |
| Indianapolis, IN (IND) - St. Thomas, VI (STT) | 4,761 | 1,179 |
| Boston, MA (BOS) - Santa Barbara, CA (SBA) | 5,013 | 1,174 |
| New York, NY (NYC) - Palm Springs, CA (PSP) | 3,955 | 1,174 |
| Dallas, TX (DFW) - Washington, DC (WAS) | 7,095 | 1,163 |
| Dallas, TX (DFW) - Tallahassee, FL (TLH) | 5,582 | 1,152 |
| Columbus, OH (CMH) - St. Thomas, VI (STT) | 4,530 | 1,146 |
| Westchester County, NY (HPN) - Louisville, KY (SDF) | 4,898 | 1,145 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Cincinnati, OH (CIN) - Dallas, TX (DFW) | 6,098 | 1,143 |
| Charlotte, NC (CLT) - New York, NY (NYC) | 5,427 | 1,141 |
| Hilo, HI (KOA) - Tucson, AZ (TUS) | 4,981 | 1,138 |
| Los Angeles, CA (LAX) - St. Thomas, VI (STT) | 7,828 | 1,136 |
| Dallas, TX (DFW) - Fort Myers, FL (RSW) | 7,652 | 1,136 |
| Dallas, TX (DFW) - Harrisburg, PA (MDT) | 3,722 | 1,134 |
| Tampa, FL (TPA) - Tucson, AZ (TUS) | 3,663 | 1,128 |
| Dallas, TX (DFW) - Lexington, KY (LEX) | 7,647 | 1,128 |
| El Paso, TX (ELP) - Minneapolis, MN (MSP) | 5,393 | 1,121 |
| Detroit, MI (DTW) - Kahului, HI (OGG) | 4,623 | 1,115 |
| Dallas, TX (DFW) - Tucson, AZ (TUS) | 8,370 | 1,111 |
| Orlando, FL (MCO) - Santa Barbara, CA (SBA) | 4,729 | 1,110 |
| Chicago, IL (CHI) - Philadelphia, PA (PHL) | 3,773 | 1,110 |
| Pittsburgh, PA (PIT) - St. Thomas, VI (STT) | 6,199 | 1,105 |
| Chicago, IL (CHI) - Phoenix, AZ (PHX) | 3,835 | 1,105 |
| Boston, MA (BOS) - Reno, NV (RNO) | 3,228 | 1,097 |
| Miami, FL (MIA) - Washington, DC (WAS) | 3,354 | 1,097 |
| Miami, FL (MIA) - Fayetteville, AR (XNA) | 5,213 | 1,089 |
| Tampa, FL (TPA) - Fayetteville, AR (XNA) | 4,809 | 1,089 |
| Chicago, IL (CHI) - Kapaa, HI (LIH) | 4,812 | 1,089 |
| Charlottesville, VA (CHO) - Seattle, WA (SEA) | 3,998 | 1,073 |
| Fort Myers, FL (RSW) - Fayetteville, AR (XNA) | 4,835 | 1,066 |
| Orlando, FL (MCO) - Tucson, AZ (TUS) | 3,508 | 1,059 |
| Dallas, TX (DFW) - Orange County, CA (SNA) | 9,283 | 1,057 |
| Charlottesville, VA (CHO) - San Diego, CA (SAN) | 3,640 | 1,055 |
| New York, NY (NYC) - Fayetteville, AR (XNA) | 4,353 | 1,054 |
| Dallas, TX (DFW) - St. Thomas, VI (STT) | 6,531 | 1,050 |
| Norfolk-Virginia Beach, VA (ORF) - Fayetteville, AR (XNA) | 4,322 | 1,049 |
| Dallas, TX (DFW) - Honolulu, HI (HNL) | 6,579 | 1,049 |
| Orlando, FL (MCO) - Fayetteville, AR (XNA) | 4,751 | 1,047 |
| Fresno, CA (FAT) - New York, NY (NYC) | 4,255 | 1,046 |
| Santa Barbara, CA (SBA) - Salt Lake City, UT (SLC) | 4,720 | 1,043 |
| Austin, TX (AUS) - Columbia, SC (CAE) | 4,351 | 1,043 |
| Fresno, CA (FAT) - Washington, DC (WAS) | 4,112 | 1,038 |
| Fresno, CA (FAT) - Houston, TX (HOU) | 4,575 | 1,036 |
| Detroit, MI (DTW) - Tucson, AZ (TUS) | 3,293 | 1,027 |
| Chicago, IL (CHI) - San Juan, PR (SJU) | 4,623 | 1,023 |
| Philadelphia, PA (PHL) - Orange County, CA (SNA) | 3,113 | 1,021 |
| Phoenix, AZ (PHX) - Richmond, VA (RIC) | 3,462 | 1,018 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Cleveland, OH (CLE) - Dallas, TX (DFW) | 4,486 | 1,013 |
| Indianapolis, IN (IND) - Tucson, AZ (TUS) | 3,763 | 1,013 |
| Los Angeles, CA (LAX) - San Juan, PR (SJU) | 4,164 | 1,012 |
| Dallas, TX (DFW) - West Palm Beach (PBI) | 8,081 | 1,010 |
| San Francisco, CA (SFO) - San Juan, PR (SJU) | 3,252 | 1,009 |
| Durango, CO (DRO) - San Antonio, TX (SAT) | 5,052 | 1,007 |
| San Juan, PR (SJU) - Fayetteville, AR (XNA) | 4,985 | 1,000 |
| San Francisco, CA (SFO) - St. Thomas, VI (STT) | 4,846 | 995 |
| Ontario, CA (ONT) - Tampa, FL (TPA) | 3,341 | 992 |
| Charlotte, NC (CLT) - Los Angeles, CA (LAX) | 5,485 | 989 |
| Boston, MA (BOS) - St. Thomas, VI (STT) | 4,575 | 979 |
| Boston, MA (BOS) - Little Rock, AR (LIT) | 3,387 | 969 |
| Key West, FL (EYW) - Phoenix, AZ (PHX) | 5,114 | 968 |
| Westchester County, NY (HPN) - San Diego, CA (SAN) | 3,559 | 965 |
| New York, NY (NYC) - Tucson, AZ (TUS) | 3,967 | 963 |
| Knoxville, TN (TYS) - Fayetteville, AR (XNA) | 4,759 | 958 |
| Harrisburg, PA (MDT) - St. Louis, MO (STL) | 3,526 | 954 |
| Louisville, KY (SDF) - San Juan, PR (SJU) | 4,899 | 951 |
| New York, NY (NYC) - Ontario, CA (ONT) | 3,084 | 950 |
| Boston, MA (BOS) - Ontario, CA (ONT) | 3,066 | 928 |
| Charlotte, NC (CLT) - San Diego, CA (SAN) | 5,734 | 926 |
| Honolulu, HI (HNL) - Philadelphia, PA (PHL) | 3,978 | 925 |
| Pittsburgh, PA (PIT) - Fayetteville, AR (XNA) | 4,235 | 917 |
| Ontario, CA (ONT) - San Antonio, TX (SAT) | 4,014 | 914 |
| Charleston, SC (CHS) - San Juan, PR (SJU) | 5,048 | 912 |
| Dallas, TX (DFW) - Rochester, NY (ROC) | 3,776 | 910 |
| Chicago, IL (CHI) - Fresno, CA (FAT) | 4,549 | 908 |
| Honolulu, HI (HNL) - St. Louis, MO (STL) | 4,515 | 907 |
| Atlanta, GA (ATL) - Grand Junction, CO (GJT) | 3,588 | 893 |
| Nashville, TN (BNA) - New York, NY (NYC) | 3,481 | 892 |
| Kansas City, MO (MCI) - Tucson, AZ (TUS) | 3,780 | 890 |
| St. Louis, MO (STL) - Syracuse, NY (SYR) | 3,539 | 890 |
| Birmingham, AL (BHM) - St. Thomas, VI (STT) | 5,001 | 889 |
| Huntsville, AL (HSV) - Phoenix, AZ (PHX) | 3,944 | 885 |
| Charlottesville, VA (CHO) - Kansas City, MO (MCI) | 5,451 | 883 |
| Dallas, TX (DFW) - Kahului, HI (OGG) | 8,258 | 882 |
| Detroit, MI (DTW) - St. Thomas, VI (STT) | 3,512 | 879 |
| Grand Junction, CO (GJT) - Philadelphia, PA (PHL) | 4,499 | 878 |
| Austin, TX (AUS) - Philadelphia, PA (PHL) | 2,915 | 878 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Chicago, IL (CHI) - Santa Barbara, CA (SBA) | 4,819 | 878 |
| Boston, MA (BOS) - Dallas, TX (DFW) | 5,606 | 877 |
| Charlotte, NC (CLT) - San Juan, PR (SJU) | 7,386 | 875 |
| Philadelphia, PA (PHL) - San Antonio, TX (SAT) | 2,927 | 874 |
| Richmond, VA (RIC) - Fayetteville, AR (XNA) | 4,157 | 873 |
| Honolulu, HI (HNL) - Kansas City, MO (MCI) | 3,287 | 869 |
| Detroit, MI (DTW) - El Paso, TX (ELP) | 4,561 | 864 |
| New York, NY (NYC) - Santa Barbara, CA (SBA) | 4,872 | 863 |
| Westchester County, NY (HPN) - Fayetteville, AR (XNA) | 4,657 | 863 |
| Chicago, IL (CHI) - West Palm Beach (PBI) | 6,093 | 860 |
| Harrisburg, PA (MDT) - Fayetteville, AR (XNA) | 4,567 | 860 |
| Columbus, OH (CMH) - Orange County, CA (SNA) | 3,066 | 855 |
| Chicago, IL (CHI) - El Paso, TX (ELP) | 5,120 | 853 |
| Austin, TX (AUS) - Greensboro, NC (GSO) | 4,490 | 852 |
| Montgomery, AL (MGM) - Fayetteville, AR (XNA) | 5,064 | 848 |
| Montgomery, AL (MGM) - Phoenix, AZ (PHX) | 5,152 | 846 |
| El Paso, TX (ELP) - Philadelphia, PA (PHL) | 3,902 | 843 |
| Austin, TX (AUS) - Orange County, CA (SNA) | 3,439 | 843 |
| Phoenix, AZ (PHX) - Knoxville, TN (TYS) | 3,700 | 838 |
| Westchester County, NY (HPN) - St. Louis, MO (STL) | 3,322 | 838 |
| Miami, FL (MIA) - Ontario, CA (ONT) | 3,305 | 837 |
| Little Rock, AR (LIT) - Philadelphia, PA (PHL) | 3,482 | 832 |
| Dallas, TX (DFW) - Grand Junction, CO (GJT) | 7,233 | 823 |
| Birmingham, AL (BHM) - St. Croix, VI (STX) | 10,000 | 821 |
| Lexington, KY (LEX) - Phoenix, AZ (PHX) | 4,181 | 819 |
| Houston, TX (HOU) - Palm Springs, CA (PSP) | 4,929 | 817 |
| Charlotte, NC (CLT) - Fayetteville, AR (XNA) | 5,930 | 816 |
| Las Vegas, NV (LAS) - Santa Barbara, CA (SBA) | 5,004 | 814 |
| Little Rock, AR (LIT) - Miami, FL (MIA) | 3,847 | 807 |
| Orlando, FL (MCO) - Ontario, CA (ONT) | 2,953 | 805 |
| Fort Myers, FL (RSW) - St. Thomas, VI (STT) | 5,127 | 801 |
| New Orleans, LA (MSY) - San Juan, PR (SJU) | 5,674 | 799 |
| Little Rock, AR (LIT) - Rochester, NY (ROC) | 3,500 | 799 |
| Kapaa, HI (LIH) - Washington, DC (WAS) | 4,887 | 796 |
| Louisville, KY (SDF) - St. Thomas, VI (STT) | 4,886 | 795 |
| Columbus, OH (CMH) - Tucson, AZ (TUS) | 3,397 | 785 |
| Des Moines, IA (DSM) - Phoenix, AZ (PHX) | 5,219 | 784 |
| Charlottesville, VA (CHO) - Denver, CO (DEN) | 4,302 | 784 |
| Boston, MA (BOS) - Gainesville, FL (GNV) | 5,346 | 783 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Charlottesville, VA (CHO) - Los Angeles, CA (LAX) | 3,900 | 782 |
| Charlotte, NC (CLT) - Sacramento, CA (SMF) | 3,986 | 777 |
| Austin, TX (AUS) - Richmond, VA (RIC) | 3,835 | 776 |
| Pittsburgh, PA (PIT) - Tucson, AZ (TUS) | 3,255 | 773 |
| Key West, FL (EYW) - Washington, DC (WAS) | 3,876 | 772 |
| Hartford, CT (BDL) - Fayetteville, AR (XNA) | 4,199 | 772 |
| Tucson, AZ (TUS) - Washington, DC (WAS) | 3,981 | 767 |
| Charlottesville, VA (CHO) - Milwaukee, WI (MKE) | 5,375 | 764 |
| Kahului, HI (OGG) - Washington, DC (WAS) | 4,700 | 761 |
| Dallas, TX (DFW) - Portland, OR (PDX) | 4,765 | 756 |
| Greensboro, NC (GSO) - San Antonio, TX (SAT) | 4,719 | 751 |
| Little Rock, AR (LIT) - Harrisburg, PA (MDT) | 4,050 | 750 |
| Seattle, WA (SEA) - St. Thomas, VI (STT) | 4,204 | 748 |
| San Antonio, TX (SAT) - Orange County, CA (SNA) | 3,570 | 748 |
| Dallas, TX (DFW) - Montgomery, AL (MGM) | 8,376 | 746 |
| Los Angeles, CA (LAX) - St. Louis, MO (STL) | 4,736 | 744 |
| Omaha, NE (OMA) - Tucson, AZ (TUS) | 3,272 | 736 |
| Birmingham, AL (BHM) - Miami, FL (MIA) | 3,586 | 733 |
| Honolulu, HI (HNL) - Pittsburgh, PA (PIT) | 4,474 | 729 |
| El Paso, TX (ELP) - Seattle, WA (SEA) | 4,387 | 728 |
| Honolulu, HI (HNL) - Miami, FL (MIA) | 4,481 | 726 |
| Honolulu, HI (HNL) - Tampa, FL (TPA) | 3,403 | 725 |
| Miami, FL (MIA) - Raleigh-Durham, NC (RDU) | 3,319 | 724 |
| Gainesville, FL (GNV) - San Juan, PR (SJU) | 6,576 | 724 |
| Dallas, TX (DFW) - New York, NY (NYC) | 5,162 | 723 |
| Westchester County, NY (HPN) - Indianapolis, IN (IND) | 3,744 | 723 |
| Des Moines, IA (DSM) - San Jose, CA (SJC) | 3,651 | 718 |
| Chattanooga, TN (CHA) - Phoenix, AZ (PHX) | 5,224 | 718 |
| Columbia, SC (CAE) - Fayetteville, AR (XNA) | 5,277 | 716 |
| Detroit, MI (DTW) - Grand Junction, CO (GJT) | 3,495 | 714 |
| Little Rock, AR (LIT) - New York, NY (NYC) | 2,997 | 712 |
| Chattanooga, TN (CHA) - Los Angeles, CA (LAX) | 5,159 | 711 |
| Buffalo, NY (BUF) - Dallas, TX (DFW) | 3,590 | 708 |
| Chicago, IL (CHI) - Hilo, HI (KOA) | 4,809 | 708 |
| Rochester, NY (ROC) - Fayetteville, AR (XNA) | 4,513 | 705 |
| Detroit, MI (DTW) - Ontario, CA (ONT) | 2,905 | 699 |
| Miami, FL (MIA) - Tucson, AZ (TUS) | 4,278 | 696 |
| Little Rock, AR (LIT) - Raleigh-Durham, NC (RDU) | 3,707 | 693 |
| Raleigh-Durham, NC (RDU) - Washington, DC (WAS) | 3,411 | 692 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| San Jose, CA (SJC) - St. Louis, MO (STL) | 3,553 | 689 |
| Pittsburgh, PA (PIT) - Orange County, CA (SNA) | 2,862 | 687 |
| Hartford, CT (BDL) - Phoenix, AZ (PHX) | 3,045 | 687 |
| Chicago, IL (CHI) - Tucson, AZ (TUS) | 4,811 | 686 |
| West Palm Beach (PBI) - San Francisco, CA (SFO) | 3,238 | 684 |
| Durango, CO (DRO) - Tampa, FL (TPA) | 5,017 | 682 |
| Boston, MA (BOS) - Kahului, HI (OGG) | 4,044 | 682 |
| Miami, FL (MIA) - San Diego, CA (SAN) | 2,993 | 682 |
| Richmond, VA (RIC) - St. Louis, MO (STL) | 2,976 | 681 |
| Chicago, IL (CHI) - Syracuse, NY (SYR) | 4,598 | 678 |
| Philadelphia, PA (PHL) - San Diego, CA (SAN) | 4,906 | 676 |
| Columbus, OH (CMH) - New York, NY (NYC) | 3,140 | 674 |
| Nashville, TN (BNA) - St. Croix, VI (STX) | 9,444 | 671 |
| Phoenix, AZ (PHX) - Fort Myers, FL (RSW) | 2,711 | 670 |
| Westchester County, NY (HPN) - Seattle, WA (SEA) | 3,511 | 668 |
| Reno, NV (RNO) - Tampa, FL (TPA) | 3,854 | 663 |
| Columbus, OH (CMH) - Dallas, TX (DFW) | 7,592 | 662 |
| Savannah, GA (SAV) - Fayetteville, AR (XNA) | 4,952 | 659 |
| Little Rock, AR (LIT) - Pittsburgh, PA (PIT) | 3,419 | 659 |
| Columbia, SC (CAE) - Los Angeles, CA (LAX) | 3,605 | 657 |
| New York, NY (NYC) - Reno, NV (RNO) | 2,886 | 656 |
| Orange County, CA (SNA) - Tampa, FL (TPA) | 2,872 | 655 |
| Albuquerque, NM (ABQ) - Philadelphia, PA (PHL) | 3,204 | 655 |
| Westchester County, NY (HPN) - Las Vegas, NV (LAS) | 2,975 | 655 |
| Cleveland, OH (CLE) - San Juan, PR (SJU) | 3,338 | 653 |
| San Juan, PR (SJU) - Tallahassee, FL (TLH) | 5,177 | 651 |
| Cincinnati, OH (CIN) - St. Thomas, VI (STT) | 4,816 | 649 |
| Des Moines, IA (DSM) - Philadelphia, PA (PHL) | 3,270 | 645 |
| Houston, TX (HOU) - Kahului, HI (OGG) | 5,285 | 645 |
| Richmond, VA (RIC) - San Francisco, CA (SFO) | 3,125 | 645 |
| Boston, MA (BOS) - Monterey, CA (MRY) | 5,303 | 644 |
| Atlanta, GA (ATL) - Kahului, HI (OGG) | 4,665 | 643 |
| Dallas, TX (DFW) - Indianapolis, IN (IND) | 7,197 | 643 |
| Detroit, MI (DTW) - Key West, FL (EYW) | 5,219 | 641 |
| Orlando, FL (MCO) - San Jose, CA (SJC) | 2,754 | 640 |
| Gainesville, FL (GNV) - Los Angeles, CA (LAX) | 5,109 | 639 |
| Huntsville, AL (HSV) - Syracuse, NY (SYR) | 4,545 | 636 |
| Columbus, OH (CMH) - San Jose, CA (SJC) | 3,066 | 635 |
| Cincinnati, OH (CIN) - Westchester County, NY (HPN) | 4,686 | 634 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| West Palm Beach (PBI) - Phoenix, AZ (PHX) | 3,204 | 633 |
| Boston, MA (BOS) - Lexington, KY (LEX) | 4,454 | 630 |
| Chicago, IL (CHI) - Richmond, VA (RIC) | 4,250 | 628 |
| San Juan, PR (SJU) - Knoxville, TN (TYS) | 4,579 | 628 |
| Jacksonville, FL (JAX) - Fayetteville, AR (XNA) | 5,211 | 624 |
| Pensacola, FL (PNS) - Fayetteville, AR (XNA) | 4,492 | 622 |
| Ontario, CA (ONT) - Philadelphia, PA (PHL) | 3,569 | 620 |
| Chattanooga, TN (CHA) - Denver, CO (DEN) | 5,343 | 614 |
| Kansas City, MO (MCI) - San Juan, PR (SJU) | 3,085 | 612 |
| Orange County, CA (SNA) - St. Louis, MO (STL) | 3,356 | 609 |
| Columbia, SC (CAE) - San Antonio, TX (SAT) | 4,511 | 606 |
| Boston, MA (BOS) - Orange County, CA (SNA) | 3,047 | 606 |
| Indianapolis, IN (IND) - San Juan, PR (SJU) | 3,250 | 605 |
| Charlottesville, VA (CHO) - San Francisco, CA (SF | 4,599 | 605 |
| Ontario, CA (ONT) - Washington, DC (WAS) | 2,910 | 604 |
| Milwaukee, WI (MKE) - Tucson, AZ (TUS) | 2,533 | 602 |
| Westchester County, NY (HPN) - Little Rock, AR (LIT) | 4,494 | 601 |
| Detroit, MI (DTW) - Orange County, CA (SNA) | 2,798 | 601 |
| Hartford, CT (BDL) - Little Rock, AR (LIT) | 3,258 | 599 |
| Westchester County, NY (HPN) - Minneapolis, MN (MSP) | 3,448 | 596 |
| Columbus, OH (CMH) - San Juan, PR (SJU) | 3,131 | 594 |
| Chicago, IL (CHI) - Monterey, CA (MRY) | 5,356 | 591 |
| Key West, FL (EYW) - San Francisco, CA (SFO) | 6,164 | 591 |
| Westchester County, NY (HPN) - Knoxville, TN (TYS) | 4,688 | 589 |
| Chattanooga, TN (CHA) - St. Louis, MO (STL) | 5,385 | 587 |
| Philadelphia, PA (PHL) - Reno, NV (RNO) | 3,257 | 586 |
| Detroit, MI (DTW) - San Juan, PR (SJU) | 3,339 | 583 |
| Chicago, IL (CHI) - Harrisburg, PA (MDT) | 4,947 | 583 |
| Kansas City, MO (MCI) - Knoxville, TN (TYS) | 4,543 | 580 |
| Des Moines, IA (DSM) - West Palm Beach (PBI) | 5,020 | 580 |
| Charlotte, NC (CLT) - St. Thomas, VI (STT) | 9,177 | 579 |
| Boston, MA (BOS) - Louisville, KY (SDF) | 3,335 | 577 |
| Charlotte, NC (CLT) - San Francisco, CA (SFO) | 6,566 | 577 |
| Miami, FL (MIA) - San Jose, CA (SJC) | 3,313 | 577 |
| Chicago, IL (CHI) - Knoxville, TN (TYS) | 4,427 | 575 |
| Lexington, KY (LEX) - Kansas City, MO (MCI) | 3,795 | 570 |
| Nashville, TN (BNA) - Rochester, NY (ROC) | 3,840 | 567 |
| West Palm Beach (PBI) - Fayetteville, AR (XNA) | 5,232 | 566 |
| Hilo, HI (KOA) - New York, NY (NYC) | 2,683 | 565 |

**122**

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Nashville, TN (BNA) - Westchester County, NY (HPN) | 4,351 | 565 |
| St. Thomas, VI (STT) - Knoxville, TN (TYS) | 5,261 | 564 |
| Minneapolis, MN (MSP) - San Juan, PR (SJU) | 3,176 | 564 |
| Jacksonville, FL (JAX) - Phoenix, AZ (PHX) | 3,050 | 564 |
| Minneapolis, MN (MSP) - Ontario, CA (ONT) | 2,857 | 563 |
| Fort Myers, FL (RSW) - San Francisco, CA (SFO) | 2,681 | 563 |
| Pittsburgh, PA (PIT) - San Jose, CA (SJC) | 2,903 | 560 |
| Columbus, OH (CMH) - Westchester County, NY (HPN) | 6,310 | 560 |
| Detroit, MI (DTW) - Reno, NV (RNO) | 3,275 | 558 |
| Charleston, SC (CHS) - Key West, FL (EYW) | 5,545 | 557 |
| San Antonio, TX (SAT) - Savannah, GA (SAV) | 4,287 | 555 |
| Chattanooga, TN (CHA) - Seattle, WA (SEA) | 5,320 | 555 |
| Austin, TX (AUS) - Ontario, CA (ONT) | 4,018 | 552 |
| Los Angeles, CA (LAX) - Richmond, VA (RIC) | 2,905 | 552 |
| Monterey, CA (MRY) - New York, NY (NYC) | 5,542 | 551 |
| San Antonio, TX (SAT) - Knoxville, TN (TYS) | 4,405 | 551 |
| San Antonio, TX (SAT) - San Jose, CA (SJC) | 4,077 | 548 |
| Des Moines, IA (DSM) - Knoxville, TN (TYS) | 4,300 | 548 |
| Westchester County, NY (HPN) - Los Angeles, CA (LAX) | 3,258 | 548 |
| Charlotte, NC (CLT) - Denver, CO (DEN) | 5,189 | 546 |
| Phoenix, AZ (PHX) - Syracuse, NY (SYR) | 3,298 | 544 |
| Richmond, VA (RIC) - Seattle, WA (SEA) | 3,084 | 544 |
| Birmingham, AL (BHM) - San Juan, PR (SJU) | 5,331 | 543 |
| New York, NY (NYC) - Kahului, HI (OGG) | 2,993 | 543 |
| Norfolk-Virginia Beach, VA (ORF) - Phoenix, AZ (PHX) | 3,132 | 541 |
| Chicago, IL (CHI) - San Jose, CA (SJC) | 4,802 | 539 |
| Orlando, FL (MCO) - Orange County, CA (SNA) | 2,750 | 537 |
| Baton Rouge, LA (BTR) - Lexington, KY (LEX) | 4,938 | 535 |
| Dallas, TX (DFW) - Tampa, FL (TPA) | 6,378 | 535 |
| Austin, TX (AUS) - Reno, NV (RNO) | 4,193 | 534 |
| Santa Barbara, CA (SBA) - Washington, DC (WAS) | 5,304 | 533 |
| Gainesville, FL (GNV) - New York, NY (NYC) | 4,830 | 533 |
| Charlotte, NC (CLT) - Kansas City, MO (MCI) | 5,296 | 533 |
| Charlotte, NC (CLT) - Phoenix, AZ (PHX) | 6,243 | 530 |
| Montgomery, AL (MGM) - San Francisco, CA (SFO) | 5,057 | 529 |
| Hilo, HI (KOA) - Washington, DC (WAS) | 4,514 | 529 |
| San Diego, CA (SAN) - Tampa, FL (TPA) | 2,600 | 528 |
| Chicago, IL (CHI) - St. Croix, VI (STX) | 9,841 | 528 |
| Charlottesville, VA (CHO) - Little Rock, AR (LIT) | 5,886 | 527 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Denver, CO (DEN) - Lexington, KY (LEX) | 3,415 | 526 |
| Kapaa, HI (LIH) - Phoenix, AZ (PHX) | 4,543 | 526 |
| San Antonio, TX (SAT) - Sacramento, CA (SMF) | 3,274 | 524 |
| Phoenix, AZ (PHX) - Tallahassee, FL (TLH) | 5,470 | 523 |
| Key West, FL (EYW) - Greensboro, NC (GSO) | 5,612 | 523 |
| Chicago, IL (CHI) - Jacksonville, FL (JAX) | 2,959 | 520 |
| Pittsburgh, PA (PIT) - San Juan, PR (SJU) | 4,171 | 520 |
| Greensboro, NC (GSO) - Fayetteville, AR (XNA) | 4,916 | 519 |
| Boston, MA (BOS) - Des Moines, IA (DSM) | 2,605 | 518 |
| Columbus, OH (CMH) - Fayetteville, AR (XNA) | 4,343 | 517 |
| Charlotte, NC (CLT) - Seattle, WA (SEA) | 4,926 | 517 |
| Dallas, TX (DFW) - Los Angeles, CA (LAX) | 5,187 | 516 |
| Denver, CO (DEN) - Richmond, VA (RIC) | 2,855 | 516 |
| Kapaa, HI (LIH) - New York, NY (NYC) | 2,752 | 514 |
| Phoenix, AZ (PHX) - Fort Walton Beach, FL (VPS) | 3,529 | 512 |
| Omaha, NE (OMA) - San Juan, PR (SJU) | 3,521 | 508 |
| Los Angeles, CA (LAX) - Tallahassee, FL (TLH) | 5,315 | 504 |
| Kansas City, MO (MCI) - Syracuse, NY (SYR) | 3,349 | 504 |
| Miami, FL (MIA) - Sacramento, CA (SMF) | 2,774 | 503 |
| Cincinnati, OH (CIN) - San Juan, PR (SJU) | 3,442 | 502 |
| Greenville, SC (GSP) - Fayetteville, AR (XNA) | 5,272 | 501 |
| Nashville, TN (BNA) - Washington, DC (WAS) | 4,076 | 499 |
| Dallas, TX (DFW) - Salt Lake City, UT (SLC) | 4,506 | 499 |
| Boston, MA (BOS) - Hilo, HI (KOA) | 4,509 | 498 |
| Dallas, TX (DFW) - Las Vegas, NV (LAS) | 6,373 | 498 |
| Des Moines, IA (DSM) - Raleigh-Durham, NC (RDU) | 3,832 | 498 |
| Dallas, TX (DFW) - Fort Walton Beach, FL (VPS) | 9,022 | 496 |
| Charlottesville, VA (CHO) - Las Vegas, NV (LAS) | 5,346 | 495 |
| Des Moines, IA (DSM) - Jacksonville, FL (JAX) | 4,522 | 495 |
| Ontario, CA (ONT) - St. Louis, MO (STL) | 3,842 | 493 |
| Omaha, NE (OMA) - Syracuse, NY (SYR) | 3,346 | 491 |
| San Jose, CA (SJC) - Tampa, FL (TPA) | 3,037 | 490 |
| Orlando, FL (MCO) - Reno, NV (RNO) | 3,072 | 488 |
| Charleston, SC (CHS) - St. Croix, VI (STX) | 9,341 | 488 |
| Raleigh-Durham, NC (RDU) - Seattle, WA (SEA) | 2,590 | 487 |
| Greensboro, NC (GSO) - Los Angeles, CA (LAX) | 3,342 | 484 |
| Los Angeles, CA (LAX) - Raleigh-Durham, NC (RDU) | 2,869 | 481 |
| Denver, CO (DEN) - Montgomery, AL (MGM) | 5,661 | 476 |
| Nashville, TN (BNA) - Charlottesville, VA (CHO) | 6,270 | 476 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Columbus, OH (CMH) - Reno, NV (RNO) | 4,533 | 476 |
| Kahului, HI (OGG) - Phoenix, AZ (PHX) | 4,623 | 475 |
| El Paso, TX (ELP) - Milwaukee, WI (MKE) | 3,620 | 474 |
| Kansas City, MO (MCI) - Philadelphia, PA (PHL) | 4,543 | 474 |
| Harrisburg, PA (MDT) - Phoenix, AZ (PHX) | 3,941 | 474 |
| Cincinnati, OH (CIN) - Rochester, NY (ROC) | 3,105 | 473 |
| Kansas City, MO (MCI) - Orange County, CA (SNA) | 2,507 | 472 |
| Boston, MA (BOS) - Honolulu, HI (HNL) | 4,142 | 472 |
| Little Rock, AR (LIT) - Richmond, VA (RIC) | 4,152 | 471 |
| Chicago, IL (CHI) - Kahului, HI (OGG) | 4,738 | 467 |
| Richmond, VA (RIC) - San Diego, CA (SAN) | 3,411 | 466 |
| Durango, CO (DRO) - Philadelphia, PA (PHL) | 5,257 | 466 |
| Detroit, MI (DTW) - Gulfport, MS (GPT) | 4,883 | 465 |
| Cincinnati, OH (CIN) - Little Rock, AR (LIT) | 4,541 | 461 |
| Key West, FL (EYW) - St. Louis, MO (STL) | 4,897 | 460 |
| Atlanta, GA (ATL) - San Jose, CA (SJC) | 3,691 | 458 |
| Des Moines, IA (DSM) - Montgomery, AL (MGM) | 5,393 | 456 |
| Los Angeles, CA (LAX) - Montgomery, AL (MGM) | 5,000 | 456 |
| San Francisco, CA (SFO) - Tallahassee, FL (TLH) | 5,781 | 455 |
| Detroit, MI (DTW) - San Jose, CA (SJC) | 2,931 | 454 |
| Hartford, CT (BDL) - Los Angeles, CA (LAX) | 2,629 | 451 |
| Little Rock, AR (LIT) - Fort Myers, FL (RSW) | 4,582 | 451 |
| El Paso, TX (ELP) - New York, NY (NYC) | 4,710 | 450 |
| Chattanooga, TN (CHA) - Syracuse, NY (SYR) | 5,225 | 450 |
| Columbus, OH (CMH) - Los Angeles, CA (LAX) | 2,829 | 450 |
| Raleigh-Durham, NC (RDU) - San Francisco, CA (SFO) | 2,659 | 447 |
| Charlotte, NC (CLT) - St. Louis, MO (STL) | 6,103 | 447 |
| Denver, CO (DEN) - Fort Walton Beach, FL (VPS) | 3,761 | 446 |
| Los Angeles, CA (LAX) - West Palm Beach (PBI) | 3,421 | 445 |
| Miami, FL (MIA) - Orange County, CA (SNA) | 3,141 | 442 |
| Rochester, NY (ROC) - Louisville, KY (SDF) | 3,431 | 441 |
| Nashville, TN (BNA) - Syracuse, NY (SYR) | 4,010 | 440 |
| Houston, TX (HOU) - Lexington, KY (LEX) | 3,989 | 440 |
| Westchester County, NY (HPN) - Kansas City, MO (MCI) | 3,029 | 439 |
| New York, NY (NYC) - Raleigh-Durham, NC (RDU) | 2,628 | 439 |
| Indianapolis, IN (IND) - San Jose, CA (SJC) | 3,193 | 437 |
| Omaha, NE (OMA) - West Palm Beach (PBI) | 4,576 | 436 |
| Anchorage, AK (ANC) - Columbus, OH (CMH) | 3,993 | 435 |
| Key West, FL (EYW) - New York, NY (NYC) | 3,735 | 434 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Pittsburgh, PA (PIT) - San Diego, CA (SAN) | 2,625 | 431 |
| El Paso, TX (ELP) - Portland, OR (PDX) | 4,077 | 431 |
| Chicago, IL (CHI) - Mobile, AL (MOB) | 4,718 | 431 |
| Los Angeles, CA (LAX) - Lexington, KY (LEX) | 3,480 | 431 |
| Chattanooga, TN (CHA) - Las Vegas, NV (LAS) | 5,739 | 431 |
| Chicago, IL (CHI) - Reno, NV (RNO) | 4,145 | 430 |
| New York, NY (NYC) - St. Thomas, VI (STT) | 4,727 | 430 |
| Des Moines, IA (DSM) - Syracuse, NY (SYR) | 3,540 | 430 |
| Raleigh-Durham, NC (RDU) - San Antonio, TX (SAT) | 2,819 | 429 |
| Gainesville, FL (GNV) - Philadelphia, PA (PHL) | 5,296 | 428 |
| Norfolk-Virginia Beach, VA (ORF) - San Francisco, CA (SFO) | 2,619 | 427 |
| San Francisco, CA (SFO) - Tampa, FL (TPA) | 2,503 | 427 |
| Raleigh-Durham, NC (RDU) - San Diego, CA (SAN) | 2,545 | 426 |
| Indianapolis, IN (IND) - Miami, FL (MIA) | 3,367 | 426 |
| Las Vegas, NV (LAS) - Miami, FL (MIA) | 3,416 | 424 |
| Pittsburgh, PA (PIT) - Reno, NV (RNO) | 3,770 | 423 |
| Indianapolis, IN (IND) - Ontario, CA (ONT) | 4,118 | 421 |
| Dallas, TX (DFW) - Orlando, FL (MCO) | 6,437 | 419 |
| Las Vegas, NV (LAS) - Richmond, VA (RIC) | 2,632 | 418 |
| Mobile, AL (MOB) - Phoenix, AZ (PHX) | 3,393 | 415 |
| Tallahassee, FL (TLH) - Fayetteville, AR (XNA) | 5,582 | 415 |
| Key West, FL (EYW) - Las Vegas, NV (LAS) | 5,533 | 415 |
| Mobile, AL (MOB) - St. Louis, MO (STL) | 4,683 | 415 |
| Ontario, CA (ONT) - Pittsburgh, PA (PIT) | 3,463 | 414 |
| Chattanooga, TN (CHA) - San Diego, CA (SAN) | 5,736 | 413 |
| Des Moines, IA (DSM) - San Diego, CA (SAN) | 2,991 | 413 |
| Montgomery, AL (MGM) - Seattle, WA (SEA) | 5,549 | 412 |
| Houston, TX (HOU) - Hilo, HI (KOA) | 5,437 | 411 |
| Nashville, TN (BNA) - Key West, FL (EYW) | 4,663 | 404 |
| Jacksonville, FL (JAX) - St. Thomas, VI (STT) | 3,969 | 404 |
| Charlotte, NC (CLT) - Omaha, NE (OMA) | 4,495 | 404 |
| Richmond, VA (RIC) - San Antonio, TX (SAT) | 3,512 | 403 |
| West Palm Beach (PBI) - St. Louis, MO (STL) | 3,500 | 403 |
| Boston, MA (BOS) - Huntsville, AL (HSV) | 3,855 | 402 |
| Philadelphia, PA (PHL) - San Juan, PR (SJU) | 8,844 | 400 |
| Columbus, OH (CMH) - Miami, FL (MIA) | 3,540 | 399 |
| Hartford, CT (BDL) - Baton Rouge, LA (BTR) | 5,950 | 398 |
| San Jose, CA (SJC) - Washington, DC (WAS) | 2,594 | 397 |
| Jackson, MS (JAN) - Phoenix, AZ (PHX) | 2,850 | 397 |

Appendix Page 8

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Las Vegas, NV (LAS) - Harrisburg, PA (MDT) | 3,460 | 396 |
| Austin, TX (AUS) - San Juan, PR (SJU) | 2,692 | 396 |
| Reno, NV (RNO) - Washington, DC (WAS) | 2,700 | 395 |
| Austin, TX (AUS) - Harrisburg, PA (MDT) | 3,369 | 394 |
| Monterey, CA (MRY) - Phoenix, AZ (PHX) | 9,083 | 393 |
| Boston, MA (BOS) - San Antonio, TX (SAT) | 3,126 | 393 |
| Phoenix, AZ (PHX) - Pensacola, FL (PNS) | 3,086 | 392 |
| Columbus, OH (CMH) - Ontario, CA (ONT) | 3,863 | 390 |
| Denver, CO (DEN) - West Palm Beach (PBI) | 3,280 | 390 |
| Baton Rouge, LA (BTR) - San Juan, PR (SJU) | 5,023 | 390 |
| Austin, TX (AUS) - Durango, CO (DRO) | 3,946 | 389 |
| Miami, FL (MIA) - Pittsburgh, PA (PIT) | 4,372 | 389 |
| Austin, TX (AUS) - Charlottesville, VA (CHO) | 4,508 | 386 |
| Baton Rouge, LA (BTR) - Columbus, OH (CMH) | 4,922 | 386 |
| Phoenix, AZ (PHX) - Tampa, FL (TPA) | 4,075 | 385 |
| Cleveland, OH (CLE) - Fayetteville, AR (XNA) | 3,346 | 385 |
| Chattanooga, TN (CHA) - Houston, TX (HOU) | 5,565 | 384 |
| Charlotte, NC (CLT) - Portland, OR (PDX) | 3,828 | 381 |
| Chicago, IL (CHI) - Fort Walton Beach, FL (VPS) | 5,381 | 381 |
| Atlanta, GA (ATL) - Reno, NV (RNO) | 3,073 | 380 |
| Austin, TX (AUS) - Raleigh-Durham, NC (RDU) | 2,774 | 379 |
| Miami, FL (MIA) - Richmond, VA (RIC) | 3,155 | 378 |
| Charlotte, NC (CLT) - Las Vegas, NV (LAS) | 5,711 | 377 |
| El Paso, TX (ELP) - Los Angeles, CA (LAX) | 5,469 | 377 |
| Lexington, KY (LEX) - Syracuse, NY (SYR) | 4,516 | 377 |
| Miami, FL (MIA) - Salt Lake City, UT (SLC) | 3,320 | 375 |
| Memphis, TN (MEM) - San Juan, PR (SJU) | 4,175 | 372 |
| New York, NY (NYC) - Washington, DC (WAS) | 3,200 | 372 |
| Minneapolis, MN (MSP) - Tucson, AZ (TUS) | 4,208 | 372 |
| Detroit, MI (DTW) - Fayetteville, AR (XNA) | 5,675 | 371 |
| Baton Rouge, LA (BTR) - Richmond, VA (RIC) | 5,129 | 371 |
| Des Moines, IA (DSM) - Orange County, CA (SNA) | 3,145 | 371 |
| Dallas, TX (DFW) - Louisville, KY (SDF) | 6,997 | 370 |
| Kahului, HI (OGG) - Salt Lake City, UT (SLC) | 3,497 | 370 |
| Boston, MA (BOS) - Phoenix, AZ (PHX) | 3,563 | 369 |
| Fort Myers, FL (RSW) - San Juan, PR (SJU) | 4,369 | 368 |
| Columbus, OH (CMH) - San Diego, CA (SAN) | 2,702 | 366 |
| Anchorage, AK (ANC) - Tampa, FL (TPA) | 3,503 | 365 |
| Buffalo, NY (BUF) - Little Rock, AR (LIT) | 2,779 | 365 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Reno, NV (RNO) - San Antonio, TX (SAT) | 4,524 | 361 |
| Chattanooga, TN (CHA) - Fayetteville, AR (XNA) | 6,035 | 360 |
| Chicago, IL (CHI) - Tallahassee, FL (TLH) | 5,407 | 358 |
| Austin, TX (AUS) - Los Angeles, CA (LAX) | 3,130 | 357 |
| Austin, TX (AUS) - Sacramento, CA (SMF) | 3,323 | 357 |
| Chattanooga, TN (CHA) - Kansas City, MO (MCI) | 5,869 | 356 |
| Gulfport, MS (GPT) - Minneapolis, MN (MSP) | 5,688 | 353 |
| Houston, TX (HOU) - Kapaa, HI (LIH) | 5,668 | 353 |
| Boston, MA (BOS) - El Paso, TX (ELP) | 5,456 | 352 |
| Atlanta, GA (ATL) - Ontario, CA (ONT) | 3,281 | 352 |
| Columbus, OH (CMH) - Syracuse, NY (SYR) | 3,973 | 352 |
| Kansas City, MO (MCI) - Raleigh-Durham, NC (RDU) | 3,046 | 351 |
| Little Rock, AR (LIT) - West Palm Beach (PBI) | 5,040 | 350 |
| Des Moines, IA (DSM) - Sacramento, CA (SMF) | 2,629 | 350 |
| Seattle, WA (SEA) - Fort Walton Beach, FL (VPS) | 3,723 | 349 |
| Austin, TX (AUS) - Huntsville, AL (HSV) | 3,718 | 349 |
| Des Moines, IA (DSM) - Greenville, SC (GSP) | 4,251 | 348 |
| New York, NY (NYC) - Norfolk-Virginia Beach, VA (ORF) | 3,091 | 346 |
| Gainesville, FL (GNV) - Louisville, KY (SDF) | 5,418 | 346 |
| Chicago, IL (CHI) - Raleigh-Durham, NC (RDU) | 3,326 | 346 |
| Denver, CO (DEN) - Kapaa, HI (LIH) | 5,728 | 345 |
| St. Louis, MO (STL) - Knoxville, TN (TYS) | 5,379 | 345 |
| Rochester, NY (ROC) - St. Louis, MO (STL) | 3,063 | 343 |
| Harrisburg, PA (MDT) - Seattle, WA (SEA) | 3,640 | 342 |
| Charlotte, NC (CLT) - Des Moines, IA (DSM) | 4,500 | 342 |
| Fort Myers, FL (RSW) - San Diego, CA (SAN) | 2,930 | 342 |
| Jacksonville, FL (JAX) - San Francisco, CA (SFO) | 2,638 | 342 |
| Orange County, CA (SNA) - Washington, DC (WAS) | 2,798 | 341 |
| Reno, NV (RNO) - St. Louis, MO (STL) | 3,938 | 340 |
| West Palm Beach (PBI) - Seattle, WA (SEA) | 3,470 | 339 |
| Los Angeles, CA (LAX) - Fort Myers, FL (RSW) | 2,683 | 339 |
| Charlotte, NC (CLT) - Salt Lake City, UT (SLC) | 5,011 | 338 |
| Lexington, KY (LEX) - San Francisco, CA (SFO) | 3,416 | 338 |
| Austin, TX (AUS) - Lexington, KY (LEX) | 4,331 | 337 |
| Des Moines, IA (DSM) - Mobile, AL (MOB) | 4,564 | 336 |
| El Paso, TX (ELP) - Salt Lake City, UT (SLC) | 4,641 | 336 |
| Austin, TX (AUS) - Savannah, GA (SAV) | 4,641 | 334 |
| Houston, TX (HOU) - Norfolk-Virginia Beach, VA (ORF) | 2,739 | 334 |
| Baton Rouge, LA (BTR) - Cincinnati, OH (CIN) | 4,797 | 333 |

Appendix Page 9

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Key West, FL (EYW) - Richmond, VA (RIC) | 5,833 | 332 |
| San Jose, CA (SJC) - Tucson, AZ (TUS) | 5,027 | 331 |
| Dallas, TX (DFW) - Detroit, MI (DTW) | 4,001 | 330 |
| Little Rock, AR (LIT) - Washington, DC (WAS) | 3,013 | 329 |
| Kansas City, MO (MCI) - Ontario, CA (ONT) | 3,922 | 328 |
| Huntsville, AL (HSV) - Kansas City, MO (MCI) | 5,947 | 328 |
| Boston, MA (BOS) - Grand Junction, CO (GJT) | 5,419 | 328 |
| Omaha, NE (OMA) - Orange County, CA (SNA) | 2,541 | 327 |
| Pensacola, FL (PNS) - San Juan, PR (SJU) | 4,740 | 327 |
| El Paso, TX (ELP) - San Jose, CA (SJC) | 5,326 | 327 |
| Durango, CO (DRO) - Pittsburgh, PA (PIT) | 6,192 | 326 |
| Chicago, IL (CHI) - Rochester, NY (ROC) | 5,020 | 326 |
| Memphis, TN (MEM) - Miami, FL (MIA) | 4,462 | 325 |
| Des Moines, IA (DSM) - Miami, FL (MIA) | 3,715 | 324 |
| Kansas City, MO (MCI) - Mobile, AL (MOB) | 3,917 | 323 |
| Des Moines, IA (DSM) - Gulfport, MS (GPT) | 4,617 | 323 |
| Cleveland, OH (CLE) - Miami, FL (MIA) | 3,748 | 321 |
| Dallas, TX (DFW) - Miami, FL (MIA) | 6,662 | 321 |
| Kansas City, MO (MCI) - Fort Walton Beach, FL (VP | 4,599 | 321 |
| Anchorage, AK (ANC) - Charlotte, NC (CLT) | 4,572 | 321 |
| Pittsburgh, PA (PIT) - San Antonio, TX (SAT) | 2,599 | 321 |
| Los Angeles, CA (LAX) - Knoxville, TN (TYS) | 3,201 | 320 |
| Des Moines, IA (DSM) - Washington, DC (WAS) | 3,420 | 320 |
| Kansas City, MO (MCI) - Harrisburg, PA (MDT) | 3,532 | 319 |
| Baton Rouge, LA (BTR) - Raleigh-Durham, NC (RDU) | 4,815 | 318 |
| Columbus, OH (CMH) - San Francisco, CA (SFO) | 2,615 | 317 |
| Grand Junction, CO (GJT) - Tampa, FL (TPA) | 5,003 | 317 |
| Jacksonville, FL (JAX) - Omaha, NE (OMA) | 5,067 | 317 |
| St. Louis, MO (STL) - Tallahassee, FL (TLH) | 5,690 | 316 |
| Indianapolis, IN (IND) - Los Angeles, CA (LAX) | 2,535 | 316 |
| Greenville, SC (GSP) - Los Angeles, CA (LAX) | 3,094 | 316 |
| Greensboro, NC (GSO) - Phoenix, AZ (PHX) | 4,397 | 315 |
| Hartford, CT (BDL) - New Orleans, LA (MSY) | 2,920 | 315 |
| Los Angeles, CA (LAX) - Norfolk-Virginia Beach, VA (ORF | 2,594 | 314 |
| Chattanooga, TN (CHA) - San Antonio, TX (SAT) | 5,910 | 313 |
| Jacksonville, FL (JAX) - Seattle, WA (SEA) | 2,844 | 313 |
| Hartford, CT (BDL) - San Diego, CA (SAN) | 2,509 | 312 |
| San Antonio, TX (SAT) - San Juan, PR (SJU) | 2,667 | 311 |
| Baton Rouge, LA (BTR) - Washington, DC (WAS) | 3,742 | 311 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Harrisburg, PA (MDT) - San Antonio, TX (SAT) | 3,358 | 311 |
| Nashville, TN (BNA) - Harrisburg, PA (MDT) | 3,909 | 310 |
| Cleveland, OH (CLE) - Westchester County, NY (HPN) | 4,704 | 310 |
| Harrisburg, PA (MDT) - Miami, FL (MIA) | 5,288 | 310 |
| Boston, MA (BOS) - Fort Walton Beach, FL (VPS) | 4,955 | 309 |
| San Juan, PR (SJU) - Salt Lake City, UT (SLC) | 4,901 | 309 |
| Austin, TX (AUS) - Hartford, CT (BDL) | 2,809 | 309 |
| Des Moines, IA (DSM) - Pittsburgh, PA (PIT) | 3,185 | 308 |
| Des Moines, IA (DSM) - Los Angeles, CA (LAX) | 2,525 | 308 |
| Chattanooga, TN (CHA) - Minneapolis, MN (MSP) | 6,035 | 307 |
| Des Moines, IA (DSM) - Richmond, VA (RIC) | 3,387 | 307 |
| Milwaukee, WI (MKE) - San Jose, CA (SJC) | 3,322 | 307 |
| Omaha, NE (OMA) - Tallahassee, FL (TLH) | 6,189 | 307 |
| Columbia, SC (CAE) - Kansas City, MO (MCI) | 4,527 | 306 |
| San Diego, CA (SAN) - Syracuse, NY (SYR) | 2,797 | 306 |
| Los Angeles, CA (LAX) - Pittsburgh, PA (PIT) | 2,933 | 306 |
| Westchester County, NY (HPN) - San Francisco, CA (SFO) | 4,195 | 305 |
| Boston, MA (BOS) - Tallahassee, FL (TLH) | 5,024 | 304 |
| Dallas, TX (DFW) - St. Croix, VI (STX) | 10,000 | 303 |
| Little Rock, AR (LIT) - Orlando, FL (MCO) | 4,050 | 303 |
| Seattle, WA (SEA) - Syracuse, NY (SYR) | 2,852 | 301 |
| Chicago, IL (CHI) - Key West, FL (EYW) | 3,494 | 300 |
| Sacramento, CA (SMF) - St. Louis, MO (STL) | 2,582 | 299 |
| Cincinnati, OH (CIN) - Miami, FL (MIA) | 4,935 | 299 |
| Austin, TX (AUS) - Norfolk-Virginia Beach, VA (ORF) | 2,846 | 299 |
| Seattle, WA (SEA) - Tallahassee, FL (TLH) | 6,209 | 298 |
| Gainesville, FL (GNV) - New Orleans, LA (MSY) | 6,300 | 298 |
| Phoenix, AZ (PHX) - Savannah, GA (SAV) | 4,230 | 297 |
| Huntsville, AL (HSV) - Las Vegas, NV (LAS) | 3,885 | 297 |
| Omaha, NE (OMA) - Raleigh-Durham, NC (RDU) | 2,818 | 297 |
| Miami, FL (MIA) - St. Louis, MO (STL) | 3,803 | 297 |
| Huntsville, AL (HSV) - Seattle, WA (SEA) | 3,345 | 296 |
| Westchester County, NY (HPN) - Memphis, TN (MEM) | 4,067 | 295 |
| Hilo, HI (KOA) - Phoenix, AZ (PHX) | 4,454 | 295 |
| Monterey, CA (MRY) - Washington, DC (WAS) | 5,619 | 295 |
| Austin, TX (AUS) - Pittsburgh, PA (PIT) | 2,609 | 295 |
| Gulfport, MS (GPT) - New York, NY (NYC) | 4,484 | 295 |
| Boston, MA (BOS) - Baton Rouge, LA (BTR) | 4,280 | 293 |
| El Paso, TX (ELP) - Pittsburgh, PA (PIT) | 3,986 | 293 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Little Rock, AR (LIT) - Tampa, FL (TPA) | 3,930 | 293 |
| Key West, FL (EYW) - Louisville, KY (SDF) | 6,170 | 293 |
| Greensboro, NC (GSO) - San Diego, CA (SAN) | 4,099 | 293 |
| San Francisco, CA (SFO) - St. Louis, MO (STL) | 2,810 | 293 |
| San Francisco, CA (SFO) - Fort Walton Beach, FL ( | 3,454 | 293 |
| Hartford, CT (BDL) - San Juan, PR (SJU) | 5,673 | 292 |
| Fort Myers, FL (RSW) - San Antonio, TX (SAT) | 2,676 | 291 |
| Fresno, CA (FAT) - Phoenix, AZ (PHX) | 9,574 | 290 |
| Philadelphia, PA (PHL) - Sacramento, CA (SMF) | 2,877 | 290 |
| Chicago, IL (CHI) - Gulfport, MS (GPT) | 4,618 | 289 |
| Memphis, TN (MEM) - Phoenix, AZ (PHX) | 4,808 | 289 |
| Charleston, SC (CHS) - Los Angeles, CA (LAX) | 3,071 | 289 |
| Los Angeles, CA (LAX) - Harrisburg, PA (MDT) | 3,884 | 288 |
| Honolulu, HI (HNL) - Orlando, FL (MCO) | 2,888 | 288 |
| Denver, CO (DEN) - Greensboro, NC (GSO) | 3,382 | 287 |
| St. Louis, MO (STL) - St. Croix, VI (STX) | 9,073 | 287 |
| Harrisburg, PA (MDT) - Louisville, KY (SDF) | 3,581 | 287 |
| Lexington, KY (LEX) - Fayetteville, AR (XNA) | 4,320 | 287 |
| Jackson, MS (JAN) - Minneapolis, MN (MSP) | 4,719 | 287 |
| Hartford, CT (BDL) - Fort Walton Beach, FL (VPS) | 5,478 | 287 |
| Gulfport, MS (GPT) - Phoenix, AZ (PHX) | 4,028 | 286 |
| Montgomery, AL (MGM) - Minneapolis, MN (MSP) | 6,343 | 286 |
| Syracuse, NY (SYR) - Knoxville, TN (TYS) | 4,611 | 286 |
| West Palm Beach (PBI) - San Diego, CA (SAN) | 3,433 | 286 |
| Sacramento, CA (SMF) - Tampa, FL (TPA) | 2,501 | 285 |
| Little Rock, AR (LIT) - Norfolk-Virginia Beach, VA (ORF) | 3,660 | 285 |
| Omaha, NE (OMA) - Pensacola, FL (PNS) | 4,733 | 285 |
| Orlando, FL (MCO) - Phoenix, AZ (PHX) | 4,009 | 283 |
| Dallas, TX (DFW) - Gainesville, FL (GNV) | 6,248 | 283 |
| Indianapolis, IN (IND) - Syracuse, NY (SYR) | 3,346 | 283 |
| New York, NY (NYC) - Tallahassee, FL (TLH) | 4,681 | 282 |
| Jackson, MS (JAN) - New York, NY (NYC) | 3,886 | 282 |
| St. Louis, MO (STL) - Washington, DC (WAS) | 3,562 | 281 |
| Westchester County, NY (HPN) - Lexington, KY (LEX) | 4,864 | 280 |
| Denver, CO (DEN) - Mobile, AL (MOB) | 3,366 | 280 |
| Philadelphia, PA (PHL) - Seattle, WA (SEA) | 4,261 | 280 |
| San Antonio, TX (SAT) - San Francisco, CA (SFO) | 3,404 | 279 |
| Jacksonville, FL (JAX) - Little Rock, AR (LIT) | 5,509 | 278 |
| Des Moines, IA (DSM) - Huntsville, AL (HSV) | 5,237 | 278 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Key West, FL (EYW) - Pittsburgh, PA (PIT) | 3,483 | 277 |
| Houston, TX (HOU) - San Juan, PR (SJU) | 4,844 | 277 |
| Columbus, OH (CMH) - El Paso, TX (ELP) | 4,590 | 276 |
| Louisville, KY (SDF) - Syracuse, NY (SYR) | 3,612 | 275 |
| Greenville, SC (GSP) - Phoenix, AZ (PHX) | 2,929 | 274 |
| Harrisburg, PA (MDT) - San Diego, CA (SAN) | 4,131 | 272 |
| Phoenix, AZ (PHX) - Rochester, NY (ROC) | 2,756 | 272 |
| Kansas City, MO (MCI) - Rochester, NY (ROC) | 2,970 | 271 |
| Baton Rouge, LA (BTR) - Philadelphia, PA (PHL) | 3,775 | 271 |
| El Paso, TX (ELP) - Indianapolis, IN (IND) | 4,014 | 270 |
| Columbus, OH (CMH) - Little Rock, AR (LIT) | 3,273 | 270 |
| Hartford, CT (BDL) - San Francisco, CA (SFO) | 2,657 | 269 |
| St. Thomas, VI (STT) - Tampa, FL (TPA) | 4,436 | 269 |
| Kansas City, MO (MCI) - West Palm Beach (PBI) | 3,537 | 269 |
| Huntsville, AL (HSV) - Minneapolis, MN (MSP) | 5,458 | 268 |
| El Paso, TX (ELP) - Palm Springs, CA (PSP) | 6,530 | 268 |
| Columbus, OH (CMH) - Seattle, WA (SEA) | 2,515 | 267 |
| Lexington, KY (LEX) - New York, NY (NYC) | 4,373 | 267 |
| Houston, TX (HOU) - Tucson, AZ (TUS) | 4,456 | 267 |
| Charlottesville, VA (CHO) - Indianapolis, IN (IND | 4,591 | 266 |
| Nashville, TN (BNA) - Miami, FL (MIA) | 4,483 | 266 |
| Anchorage, AK (ANC) - Indianapolis, IN (IND) | 5,094 | 266 |
| Milwaukee, WI (MKE) - Knoxville, TN (TYS) | 4,213 | 265 |
| Minneapolis, MN (MSP) - West Palm Beach (PBI) | 4,823 | 264 |
| Philadelphia, PA (PHL) - St. Louis, MO (STL) | 4,659 | 264 |
| Gainesville, FL (GNV) - Washington, DC (WAS) | 4,883 | 263 |
| Gulfport, MS (GPT) - Los Angeles, CA (LAX) | 3,661 | 262 |
| Fort Myers, FL (RSW) - Seattle, WA (SEA) | 2,839 | 262 |
| Charlottesville, VA (CHO) - Louisville, KY (SDF) | 7,869 | 261 |
| Cincinnati, OH (CIN) - Phoenix, AZ (PHX) | 4,029 | 261 |
| Dallas, TX (DFW) - San Francisco, CA (SFO) | 4,011 | 261 |
| Austin, TX (AUS) - Fort Myers, FL (RSW) | 2,913 | 261 |
| Phoenix, AZ (PHX) - Pittsburgh, PA (PIT) | 4,126 | 261 |
| Richmond, VA (RIC) - San Juan, PR (SJU) | 2,720 | 261 |
| Mobile, AL (MOB) - San Francisco, CA (SFO) | 3,410 | 261 |
| New Orleans, LA (MSY) - Philadelphia, PA (PHL) | 4,232 | 260 |
| Salt Lake City, UT (SLC) - Tampa, FL (TPA) | 2,876 | 260 |
| Omaha, NE (OMA) - San Diego, CA (SAN) | 2,766 | 260 |
| Columbia, SC (CAE) - Seattle, WA (SEA) | 3,457 | 259 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Austin, TX (AUS) - Chattanooga, TN (CHA) | 5,587 | 258 |
| Kansas City, MO (MCI) - Fort Myers, FL (RSW) | 2,777 | 258 |
| Harrisburg, PA (MDT) - Omaha, NE (OMA) | 3,604 | 257 |
| Fort Walton Beach, FL (VPS) - Fayetteville, AR (X | 4,338 | 257 |
| Boston, MA (BOS) - Pensacola, FL (PNS) | 3,307 | 257 |
| Minneapolis, MN (MSP) - Fort Walton Beach, FL (VP | 6,289 | 256 |
| Omaha, NE (OMA) - Richmond, VA (RIC) | 3,508 | 256 |
| El Paso, TX (ELP) - Tampa, FL (TPA) | 3,311 | 255 |
| Des Moines, IA (DSM) - Rochester, NY (ROC) | 3,396 | 255 |
| Philadelphia, PA (PHL) - Tallahassee, FL (TLH) | 5,014 | 255 |
| Austin, TX (AUS) - Cincinnati, OH (CIN) | 3,879 | 254 |
| Omaha, NE (OMA) - Savannah, GA (SAV) | 5,733 | 254 |
| Cleveland, OH (CLE) - Little Rock, AR (LIT) | 2,934 | 254 |
| Greensboro, NC (GSO) - Omaha, NE (OMA) | 3,827 | 253 |
| Huntsville, AL (HSV) - Indianapolis, IN (IND) | 5,972 | 252 |
| Des Moines, IA (DSM) - El Paso, TX (ELP) | 5,590 | 252 |
| Raleigh-Durham, NC (RDU) - Tallahassee, FL (TLH) | 5,133 | 249 |
| Boston, MA (BOS) - Mobile, AL (MOB) | 4,940 | 249 |
| Grand Junction, CO (GJT) - Miami, FL (MIA) | 5,388 | 249 |
| Austin, TX (AUS) - Knoxville, TN (TYS) | 4,141 | 249 |
| Gainesville, FL (GNV) - Indianapolis, IN (IND) | 5,173 | 248 |
| El Paso, TX (ELP) - San Francisco, CA (SFO) | 5,400 | 248 |
| Jacksonville, FL (JAX) - Los Angeles, CA (LAX) | 2,916 | 248 |
| Greensboro, NC (GSO) - Houston, TX (HOU) | 4,051 | 248 |
| Miami, FL (MIA) - New Orleans, LA (MSY) | 4,060 | 247 |
| Birmingham, AL (BHM) - Key West, FL (EYW) | 4,205 | 247 |
| Hartford, CT (BDL) - Jackson, MS (JAN) | 3,698 | 247 |
| Detroit, MI (DTW) - Jackson, MS (JAN) | 4,440 | 247 |
| Philadelphia, PA (PHL) - Phoenix, AZ (PHX) | 5,660 | 247 |
| Indianapolis, IN (IND) - Reno, NV (RNO) | 3,892 | 246 |
| Charleston, SC (CHS) - Fayetteville, AR (XNA) | 5,979 | 246 |
| Columbia, SC (CAE) - San Francisco, CA (SFO) | 3,428 | 245 |
| Nashville, TN (BNA) - Boston, MA (BOS) | 3,105 | 245 |
| Los Angeles, CA (LAX) - Tampa, FL (TPA) | 3,488 | 245 |
| St. Louis, MO (STL) - Fort Walton Beach, FL (VPS) | 5,733 | 245 |
| El Paso, TX (ELP) - Orlando, FL (MCO) | 3,146 | 244 |
| Atlanta, GA (ATL) - El Paso, TX (ELP) | 4,450 | 244 |
| Minneapolis, MN (MSP) - Knoxville, TN (TYS) | 4,920 | 243 |
| Las Vegas, NV (LAS) - Lexington, KY (LEX) | 3,493 | 243 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Boston, MA (BOS) - Jackson, MS (JAN) | 3,999 | 243 |
| Houston, TX (HOU) - Knoxville, TN (TYS) | 4,051 | 243 |
| Milwaukee, WI (MKE) - Reno, NV (RNO) | 3,832 | 243 |
| Gulfport, MS (GPT) - Kansas City, MO (MCI) | 3,887 | 242 |
| Huntsville, AL (HSV) - New York, NY (NYC) | 4,033 | 242 |
| San Francisco, CA (SFO) - Knoxville, TN (TYS) | 3,400 | 242 |
| Miami, FL (MIA) - Omaha, NE (OMA) | 2,831 | 240 |
| Lexington, KY (LEX) - Rochester, NY (ROC) | 4,466 | 240 |
| Montgomery, AL (MGM) - San Diego, CA (SAN) | 5,257 | 239 |
| Huntsville, AL (HSV) - San Francisco, CA (SFO) | 3,449 | 239 |
| Savannah, GA (SAV) - San Francisco, CA (SFO) | 3,791 | 239 |
| Los Angeles, CA (LAX) - Philadelphia, PA (PHL) | 4,082 | 239 |
| Gainesville, FL (GNV) - Raleigh-Durham, NC (RDU) | 5,092 | 239 |
| Detroit, MI (DTW) - Honolulu, HI (HNL) | 4,822 | 238 |
| Dallas, TX (DFW) - Seattle, WA (SEA) | 4,298 | 237 |
| Boston, MA (BOS) - Miami, FL (MIA) | 3,909 | 237 |
| Milwaukee, WI (MKE) - Ontario, CA (ONT) | 4,742 | 237 |
| Huntsville, AL (HSV) - Los Angeles, CA (LAX) | 3,441 | 237 |
| Minneapolis, MN (MSP) - Syracuse, NY (SYR) | 4,097 | 236 |
| Phoenix, AZ (PHX) - San Antonio, TX (SAT) | 4,728 | 236 |
| Chicago, IL (CHI) - Montgomery, AL (MGM) | 6,507 | 236 |
| Birmingham, AL (BHM) - Des Moines, IA (DSM) | 4,292 | 235 |
| Hartford, CT (BDL) - San Antonio, TX (SAT) | 2,916 | 235 |
| Cincinnati, OH (CIN) - Fayetteville, AR (XNA) | 5,927 | 235 |
| Baton Rouge, LA (BTR) - Greensboro, NC (GSO) | 5,054 | 234 |
| Los Angeles, CA (LAX) - Savannah, GA (SAV) | 4,517 | 234 |
| Pensacola, FL (PNS) - San Diego, CA (SAN) | 3,713 | 234 |
| Hartford, CT (BDL) - Seattle, WA (SEA) | 2,772 | 233 |
| Pensacola, FL (PNS) - San Francisco, CA (SFO) | 2,909 | 233 |
| Austin, TX (AUS) - Grand Junction, CO (GJT) | 4,674 | 233 |
| Hartford, CT (BDL) - Pensacola, FL (PNS) | 4,929 | 233 |
| Omaha, NE (OMA) - Fort Myers, FL (RSW) | 3,008 | 233 |
| Indianapolis, IN (IND) - Knoxville, TN (TYS) | 3,945 | 232 |
| Baton Rouge, LA (BTR) - Pittsburgh, PA (PIT) | 4,397 | 232 |
| Minneapolis, MN (MSP) - Palm Springs, CA (PSP) | 3,824 | 231 |
| Los Angeles, CA (LAX) - Miami, FL (MIA) | 3,410 | 231 |
| Greenville, SC (GSP) - Little Rock, AR (LIT) | 4,770 | 231 |
| Grand Junction, CO (GJT) - Orlando, FL (MCO) | 4,457 | 231 |
| Key West, FL (EYW) - Los Angeles, CA (LAX) | 6,973 | 230 |

APPENDIX A -- CITY PAIRS WHERE THE MERGER IS PRESUMPTIVELY ILLEGAL

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Charlottesville, VA (CHO) - San Antonio, TX (SAT) | 4,463 | 230 |
| Jacksonville, FL (JAX) - Kansas City, MO (MCI) | 3,399 | 230 |
| Key West, FL (EYW) - Norfolk-Virginia Beach, VA (ORF) | 5,747 | 230 |
| Dallas, TX (DFW) - Durango, CO (DRO) | 4,052 | 230 |
| Key West, FL (EYW) - Minneapolis, MN (MSP) | 6,277 | 229 |
| Miami, FL (MIA) - Knoxville, TN (TYS) | 3,304 | 229 |
| Indianapolis, IN (IND) - Philadelphia, PA (PHL) | 6,700 | 229 |
| St. Croix, VI (STX) - Washington, DC (WAS) | 8,150 | 229 |
| Des Moines, IA (DSM) - Tallahassee, FL (TLH) | 6,416 | 229 |
| Boston, MA (BOS) - Knoxville, TN (TYS) | 5,003 | 228 |
| Los Angeles, CA (LAX) - Syracuse, NY (SYR) | 2,935 | 227 |
| Columbia, SC (CAE) - San Diego, CA (SAN) | 4,515 | 227 |
| Baton Rouge, LA (BTR) - Norfolk-Virginia Beach, VA (ORF) | 5,156 | 226 |
| Memphis, TN (MEM) - Syracuse, NY (SYR) | 4,421 | 226 |
| Austin, TX (AUS) - Phoenix, AZ (PHX) | 4,891 | 226 |
| Indianapolis, IN (IND) - Rochester, NY (ROC) | 3,666 | 226 |
| Charleston, SC (CHS) - Seattle, WA (SEA) | 3,380 | 226 |
| San Diego, CA (SAN) - Knoxville, TN (TYS) | 3,233 | 226 |
| Seattle, WA (SEA) - Knoxville, TN (TYS) | 3,046 | 225 |
| Sacramento, CA (SMF) - Washington, DC (WAS) | 2,898 | 225 |
| Denver, CO (DEN) - Tallahassee, FL (TLH) | 5,975 | 225 |
| Los Angeles, CA (LAX) - Fort Walton Beach, FL (VP | 3,815 | 223 |
| Denver, CO (DEN) - Westchester County, NY (HPN) | 3,819 | 223 |
| Phoenix, AZ (PHX) - Raleigh-Durham, NC (RDU) | 3,573 | 223 |
| Hartford, CT (BDL) - Lexington, KY (LEX) | 4,745 | 222 |
| Atlanta, GA (ATL) - Tucson, AZ (TUS) | 4,916 | 222 |
| Monterey, CA (MRY) - Salt Lake City, UT (SLC) | 6,650 | 221 |
| Little Rock, AR (LIT) - San Juan, PR (SJU) | 6,569 | 220 |
| San Diego, CA (SAN) - Tallahassee, FL (TLH) | 6,434 | 219 |
| Key West, FL (EYW) - Memphis, TN (MEM) | 6,557 | 219 |
| Des Moines, IA (DSM) - Westchester County, NY (HPN) | 3,464 | 219 |
| Baton Rouge, LA (BTR) - Phoenix, AZ (PHX) | 4,389 | 219 |
| Baton Rouge, LA (BTR) - New York, NY (NYC) | 3,718 | 218 |
| Jackson, MS (JAN) - Miami, FL (MIA) | 4,304 | 218 |
| Mobile, AL (MOB) - New York, NY (NYC) | 4,452 | 218 |
| Albuquerque, NM (ABQ) - Tampa, FL (TPA) | 3,054 | 218 |
| Boston, MA (BOS) - Gulfport, MS (GPT) | 5,213 | 218 |
| Houston, TX (HOU) - Reno, NV (RNO) | 3,525 | 217 |
| Norfolk-Virginia Beach, VA (ORF) - Seattle, WA (SEA) | 3,247 | 217 |

| CITY PAIR | Post-Merger HHI | Δ HHI |
|---|---|---|
| Mobile, AL (MOB) - Minneapolis, MN (MSP) | 5,888 | 217 |
| Denver, CO (DEN) - Norfolk-Virginia Beach, VA (ORF) | 2,598 | 215 |
| Kansas City, MO (MCI) - Tallahassee, FL (TLH) | 6,205 | 215 |
| Des Moines, IA (DSM) - Harrisburg, PA (MDT) | 3,556 | 215 |
| Columbia, SC (CAE) - Houston, TX (HOU) | 3,634 | 214 |
| Gulfport, MS (GPT) - Washington, DC (WAS) | 4,647 | 214 |
| San Francisco, CA (SFO) - Syracuse, NY (SYR) | 3,547 | 214 |
| Jackson, MS (JAN) - Milwaukee, WI (MKE) | 5,568 | 213 |
| New York, NY (NYC) - San Jose, CA (SJC) | 3,002 | 213 |
| Omaha, NE (OMA) - Knoxville, TN (TYS) | 3,596 | 213 |
| Baton Rouge, LA (BTR) - Indianapolis, IN (IND) | 4,240 | 212 |
| Charleston, WV (CRW) - Dallas, TX (DFW) | 4,244 | 212 |
| Des Moines, IA (DSM) - Fort Myers, FL (RSW) | 3,859 | 211 |
| Houston, TX (HOU) - Santa Barbara, CA (SBA) | 6,373 | 211 |
| Pittsburgh, PA (PIT) - St. Louis, MO (STL) | 3,179 | 211 |
| Westchester County, NY (HPN) - Milwaukee, WI (MKE) | 3,142 | 210 |
| Pensacola, FL (PNS) - St. Thomas, VI (STT) | 5,346 | 210 |
| Harrisburg, PA (MDT) - Minneapolis, MN (MSP) | 3,659 | 208 |
| Pittsburgh, PA (PIT) - Seattle, WA (SEA) | 2,610 | 207 |
| Austin, TX (AUS) - Greenville, SC (GSP) | 2,984 | 207 |
| Albuquerque, NM (ABQ) - Boston, MA (BOS) | 3,294 | 207 |
| Las Vegas, NV (LAS) - Syracuse, NY (SYR) | 2,755 | 207 |
| Houston, TX (HOU) - Monterey, CA (MRY) | 6,287 | 206 |
| Jackson, MS (JAN) - San Juan, PR (SJU) | 6,244 | 205 |
| Chattanooga, TN (CHA) - New York, NY (NYC) | 5,046 | 205 |
| Miami, FL (MIA) - Pensacola, FL (PNS) | 5,066 | 204 |
| Indianapolis, IN (IND) - Harrisburg, PA (MDT) | 3,462 | 203 |
| Gulfport, MS (GPT) - Greenville, SC (GSP) | 4,923 | 203 |
| Norfolk-Virginia Beach, VA (ORF) - Tallahassee, FL (TLH) | 5,030 | 203 |
| Phoenix, AZ (PHX) - Washington, DC (WAS) | 3,416 | 202 |
| Chicago, IL (CHI) - Orange County, CA (SNA) | 3,726 | 201 |
| Austin, TX (AUS) - Charleston, SC (CHS) | 3,275 | 201 |
| Baton Rouge, LA (BTR) - Detroit, MI (DTW) | 5,080 | 201 |

**129**

**PROOF OF SERVICE**

ALL PARTIES ON THE COURT'S DOCKET:

I declare:

I am employed in the County of San Francisco, California. I am over the age of eighteen

(18) years and not a party to the within cause. My business address is One Sansome Street, 35th

Floor, San Francisco, CA 94104. On the date set forth below, I served:

PLAINTIFFS' FIRST AMENDED COMPLAINT

On the above-named persons by:

X        Via the Court's ECF notification system.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated:   April 4, 2014                   s/ Joseph M. Alioto
                                         Joseph M. Alioto

LATHAM & WATKINS LLP
  Daniel M. Wall (admitted *pro hac vice*)
  Sadik Huseny (admitted *pro hac vice*)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Attorneys for Defendants and merged entity*
*American Airlines Group, Inc.*


**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Case No. 11-15463-SHL** |
| | : | |
| **AMR CORPORATION, *et al.*,** | : | **Chapter 11** |
| | : | |
| Debtors. | : | **(Jointly Administered)** |

------------------------------------------------------------x
------------------------------------------------------------x

| | | |
|---|---|---|
| **CAROLYN FJORD, *et al.*,** | : | **Adversary No. 13-01392-SHL** |
| Plaintiffs, | : | |
| vs. | : | |
| **AMR CORPORATION, AMERICAN** | : | |
| **AIRLINES, INC. and US AIRWAYS GROUP,** | : | |
| **INC. and US AIRWAYS, INC.,** | : | |
| Defendants, | : | |
| * * * * * * * | : | |
| **OFFICIAL COMMITTEE OF** | : | |
| **UNSECURED CREDITORS,** | : | |
| As Intervenor. | : | |

------------------------------------------------------------x


**<u>DEFENDANTS' JOINT ANSWER TO FIRST AMENDED COMPLAINT</u>**

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

Defendants AMR Corporation, American Airlines, Inc., US Airways Group, Inc., and US Airways, Inc. (now merged as American Airlines Group, Inc.) ("Defendants") hereby answer the unverified First Amended Complaint (the "First Amended Complaint") filed by plaintiffs ("Plaintiffs") as follows, with headers, paragraph descriptions and numbers that respond to the First Amended Complaint's paragraphs:

\*       \*       \*

Preamble.       Defendants admit that Plaintiffs seek to bring this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for divestiture and injunction prohibiting a claimed violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18 and to prevent a claimed threatened violation of Section 2(c) of the Clayton Antitrust Act, 15 U .S.C. § 13(c). Defendants lack knowledge or information sufficient to form a belief about the truth of the remainder of the allegations of this paragraph, and on that basis, deny the same.

## INTRODUCTION

1.       Defendants admit that on February 14, 2013, AMR Corporation ("AMR") and US Airways Group, Inc. ("US Airways") announced that the boards of directors of both companies had unanimously approved a definitive merger agreement under which the companies would combine to create a premier global carrier, operating under the American Airlines name, which will have an implied combined equity value of approximately $11 billion based on the price of US Airways' stock as of February 13, 2013.  Defendants deny the remaining allegations of this paragraph.

2.       Defendants deny the allegations of this paragraph.

3.       Defendants deny the allegations of this paragraph.

4.       Defendants deny the allegations of this paragraph.

5.       Defendants admit that Plaintiffs seek relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.  Defendants lack knowledge or information sufficient to form a

1

belief as to the truth of the allegations of this paragraph regarding Plaintiffs' purchase of airline tickets and, on that basis, deny the same. Defendants deny the remaining allegations of this paragraph.

## JURISDICTION

6. Defendants admit that Plaintiffs seek to bring claims pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26 and Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, and that this court has jurisdiction over the matter.

7. Defendants admit that this Court has jurisdiction over this matter and that this is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Defendants consent to the entry of final orders or judgments by the bankruptcy judge.

8. Defendants admit that venue is proper in this Court.

## THE PLAINTIFFS

9. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

## THE DEFENDANTS

10. Defendants admit that US Airways Group, Inc. is a corporation incorporated under the laws of the State of Delaware and that its principal executive offices are located in Tempe, Arizona.

11. Defendants admit that US Airways, Inc. is a corporation incorporated under the laws of the State of Delaware and that its principal executive offices are located in Tempe, Arizona.

12. Defendants admit that one revenue passenger mile ("RPM") represents one fare-paying passenger flown one mile, and is one of several measures of airline size. Defendants further admit that, as of February 20, 2013, US Airways operated the fifth largest airline in the United States as measured by domestic RPMs. Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

13.     Defendants admit that US Airways Shuttle service provides hourly and non-hourly service between Boston, New York, and Washington, D.C.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

14.     Defendants admit that US Airways has hubs in Charlotte, Philadelphia, Phoenix, and Washington, D.C. at Ronald Reagan Washington National Airport.

15.     Defendants deny the allegations of this paragraph.

16.     Defendants admit that US Airways transports cargo inside the United States and internationally.

17.     Defendants admit that as of December 31, 2013, US Airways employed approximately 32,100 active full-time equivalent employees.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

18.     Defendants deny the allegations of this paragraph.

19.     Defendants admit that AMR is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Fort Worth, Texas and that it is in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-15463 (SHL).  Defendants admit that AMR closed its merger with US Airways on December 9, 2013, pursuant to which AMR and US Airways legally became one combined company, American Airlines Group, Inc. (AAG).  Defendants admit that as of the present date, the two airlines are merged, integrated and consolidated in certain respects and continue to operate as separate airlines in certain other respects.

20.     Defendants admit the allegations of this paragraph.

21.     Defendants admit the allegations of this paragraph, although American Airlines does not characterize its business as being "the business of air transportation of passengers for hire . . . ."

3

**134**

22.     Defendants admit the allegations of this paragraph.

23.     Defendants admit that AMR closed its merger with US Airways on December 9, 2013, pursuant to which AMR and US Airways legally became one combined company, American Airlines Group, Inc. (AAG).  Defendants admit that as of the present date, the two airlines are merged, integrated and consolidated in certain respects and continue to operate as separate airlines in certain other respects.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

24.     Defendants admit that, prior to the merger, American Airlines was by some measures the fourth largest domestic carrier.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

25.     Defendants deny the allegations of this paragraph.

26.     Defendants deny the allegations of this paragraph.

27.     Defendants admit the allegations of this paragraph.

28.     Defendants deny the allegations of this paragraph.

29.     Defendants admit that the mergers enumerated in this paragraph occurred. Defendants deny the remaining allegations of this paragraph.

30.     Defendants admit that as of December 31, 2013, AAG operated nearly 6,700 flights per day to 339 destinations in 54 countries and employed approximately 110,000 full-time equivalent employees.  Defendants admit that the integration of American Airlines and US Airlines under a single operating certificate is expected to take 18-24 months.  Defendants deny the remaining allegations of this paragraph.

## NATURE OF TRADE AND COMMERCE

31.     Defendants deny the allegations of this paragraph.

32.     Defendants deny the allegations of this paragraph.

4

33.     Defendants deny the allegations of this paragraph.

34.     Defendants deny the allegations of this paragraph.

35.     Defendants admit that US Airways provides passenger service on some airline routes where American Airlines also provides passenger service.  Defendants admit that all other airlines are potentially able to provide competing passenger service against US Airways, American Airlines and each other on airline passenger routes in the United States.

36.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

37.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

38.     Defendants deny the allegations of this paragraph.

39.     Defendants deny the allegations of this paragraph.

40.     Defendants deny the allegations of this paragraph.

41.     Defendants deny the allegations of this paragraph.

42.     Defendants deny the allegations of this paragraph.

43.     Defendants deny the allegations of this paragraph.

44.     Defendants deny the allegations of this paragraph.

45.     Defendants admit that the transportation of airline passengers in the United States often, but not always, involves and affects interstate commerce.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

46.     Defendants deny the allegations of this paragraph.

## TREND TOWARD CONCENTRATION

47.     Defendants admit that the case *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any legal

5

characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

48.     Defendants admit that the case *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

49.     Defendants admit that the case *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

50.     Defendants admit that the case *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

51.     Defendants admit that the case *United States v. Philadelphia Nat'l Bank*, 372 U.S. 321 (1963) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

52.     Defendants deny the allegations of this paragraph.

53.     Defendants deny the allegations in this paragraph, including any characterization or interpretation of the *United States v. Philadelphia Nat'l Bank* case or related legal principles as supporting Plaintiffs' claims in this matter.

54.     Defendants deny the allegations in this paragraph, including any characterization or interpretation of the *United States v. Alcoa* case or related legal principles as supporting Plaintiffs' claims in this matter.

55.     Defendants deny the allegations in this paragraph, including any characterization or interpretation of the *United States v. Continental Can Co.* case or related legal principles as supporting Plaintiffs' claims in this matter.

56.     Defendants admit that the case *United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

57.     Defendants deny the allegations in this paragraph, including any characterization or interpretation of the *United States v. Pabst Brewing Co.* case or related legal principles as supporting Plaintiffs' claims in this matter.

58.     Defendants deny the allegations in this paragraph.

59.     Defendants admit that the case *Hospital Corp. of America v. Federal Trade Commission*, 807 F.3d 1381 (7th Cir. 1986) contains the quoted language, the relevance and meaning of which is for the Court to decide.  Defendants deny the remaining allegations of this paragraph, including any characterization or interpretation of the case or related legal principles as supporting Plaintiffs' claims in this matter.

## CONDUCT GIVING RISE TO VIOLATIONS OF LAW

60.     Defendants admit that on February 14, 2013, AMR Corporation and US Airways Group, Inc. announced that the boards of directors of both companies had unanimously approved a definitive merger agreement under which the companies would combine to form a new company that would have an implied combined equity value of approximately $11 billion based on the price of US Airways' stock as of February 13, 2013.

7

61.     Defendants admit the allegations of this paragraph.

62.     Defendants admit that the combined airline operates under the name American Airlines Group, Inc.

63.     Defendants deny the allegations of this paragraph.

64.     Defendants deny the allegations of this paragraph.

65.     Defendants admit that Douglas Parker, former Chairman and CEO of US Airways, now serves as Chief Executive Officer of the combined airline.

66.     Defendants admit that Thomas Horton, the former Chairman, President and Chief Executive Officer of American Airlines, now serves as Chairman of the combined airline's Board of Directors, and will do so through its first annual meeting of shareholders.

67.     Defendants admit that Mr. Parker will become Chairman of the Board following the conclusion of Mr. Horton's service.

68.     Defendants admit that months prior to the merger announcement, the press reported that Mr. Parker made the statement in quotations in this paragraph but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.

69.     Defendants admit that Mr. Horton received a severance package of various components valued at approximately $16.9 million.  The Court's rulings with respect to Mr. Horton are a matter of public record and speak for themselves.   Defendants deny the remaining allegations of this paragraph.

70.     Defendants deny the allegations of this paragraph.

71.     Defendants admit that Mr. Horton was involved with, and had discussions with US Airways regarding, the contemplated merger.  Defendants deny the remaining allegations of this paragraph.

72.     Defendants admit that Mr. Parker and Mr. Horton met on July 19, 2012 to discuss a potential merger between American Airlines and US Airways.

73.     Defendants admit that Mr. Parker and Mr. Horton have met on more than one occasion.  Defendants deny the remaining allegations of this paragraph.

74.     Defendants deny the allegations of this paragraph.

75.     Defendants deny the allegations of this paragraph.

76.     Defendants deny the allegations of this paragraph.

77.     Defendants deny the allegations of this paragraph.

78.     Defendants deny the allegations of this paragraph.

79.     Defendants deny the allegations of this paragraph.

80.     Defendants deny the allegations of this paragraph.

81.     Defendants deny the allegations of this paragraph.

82.     Defendants deny the allegations of this paragraph.

83.     Defendants deny the allegations of this paragraph.

84.     Defendants deny the allegations of this paragraph.

85.     Defendants deny the allegations of this paragraph.

86.     Defendants deny the allegations of this paragraph.

87.     Defendants admit that as of December 31, 2013, AAG operated nearly 6,700 flights per day to 339 destinations in 54 countries and employed approximately 110,000 full-time equivalent employees.  Defendants admit that as of December 31, 2013, AAG operated 970 mainline jets and is supported by its regional airline subsidiaries and third-party regional carriers operating as American Eagle and US Airways Express under capacity purchase agreements, which operated 519 regional jets and 40 turboprops.  Defendants further admit that AAG is expected to generate more than $40 billion in revenues in 2014.

88.     Defendants admit that the combined company will have more than 119 billion RPMs domestically.  Defendants deny the remaining allegations of this paragraph.

89.     Defendants deny the allegations of this paragraph.

90.     Defendants deny the allegations of this paragraph.

91.     Defendants deny the allegations of this paragraph.

9

92.     Defendants deny the allegations of this paragraph.

93.     Defendants admit that certain airline mergers have been consummated in the United States in the last decade, including Southwest Airlines and AirTran Airways, United Airlines and Continental Airlines, and Delta Air Lines and Northwest Airlines.  Defendants deny the remaining allegations of this paragraph.

94.     Defendants admit that US Airways and American Airlines have been involved in prior mergers, but otherwise deny the allegations of this paragraph.

95.     Defendants deny the allegations of this paragraph.

96.     Defendants admit that United Airlines merged with Continental Airlines in 2010, and that Southwest merged with AirTran in 2011, with Department of Justice approval.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning unspecified "speculation," the beliefs of an industry analyst, or the reasons that the combined United/Continental or Southwest/Air Tran reduced capacity or service at certain of its hubs if such reductions occurred, and, on that basis, deny the allegations.  Defendants state that Plaintiffs' selective quotations are misleading as framed, and respectfully refer the Court to the entire e-mail from which Plaintiffs have selected only excerpts for a complete and accurate description of its contents.  Defendants deny the remaining allegations in this paragraph.

97.     Defendants admit that they are aware of publicly available information on other mergers.  Defendants admit the allegations in the second sentence of this paragraph.  Defendants respectfully refer the Court to the entire document from which Plaintiffs have selected only excerpts for a complete and accurate description of its contents.  Defendants deny the remaining allegations of this paragraph.

98.     Defendants respond that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.  Defendants deny the remaining allegations in this paragraph.

99.     Defendants admit that America West and US Airways merged in 2005 and that the combined company used the name US Airways Group.

100.    Defendants deny the allegations of this paragraph.

101.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

102.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

103.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

104.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

105.    Defendants deny the allegations of this paragraph.

106.    Defendants deny the allegations of this paragraph.

107.    Defendants deny the allegations of this paragraph.

108.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

109.    Defendants admit that as part of their settlement with the Department of Justice in a separate lawsuit, they are required to divest slots from Reagan National and LaGuardia airports. Defendants deny the remaining allegations of this paragraph.

110.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

111.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

112.    Defendants deny the allegations of this paragraph.

113.    Defendants deny the allegations of this paragraph.

11

114.    Defendants admit that in late summer/early fall of 2012, Southwest and United increased some fare prices.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

115.    Defendants lack knowledge and information regarding other airlines' pricing decisions, and, on that basis, deny allegations relating to such in this paragraph.  Defendants deny the remaining allegations of this paragraph.

116.    Defendants deny the allegations of this paragraph.

117.    Defendants deny the allegations of this paragraph.

118.    Defendants deny the allegations of this paragraph.

119.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

120.    Defendants deny the allegations of this paragraph, as they relate to US Airways and American Airlines.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

121.    Defendants admit that in 2013, their ticket change fee changed from $150 to $200.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

122.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

123.    Defendants admit that the Department of Justice approved the mergers of Northwest Airlines and Delta Air Lines in 2008, United Airlines and Continental Airlines in 2010, and Southwest Airlines and AirTran Airways in 2011.  Defendants admit that the quoted language in this paragraph has been attributed to House Judiciary Committee Chairman John Conyers but state that Plaintiffs' selective quotations are misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.  Defendants also admit that the Department of Justice announced it had settled its

12

suit with Defendants on November 12, 2013. Defendants deny the remaining allegations of this paragraph.

124.    Defendants admit that the combined company will operate nine hubs, including hubs in five of the six largest cities in the United States.

125.    Defendants deny the allegations of this paragraph.

126.    Defendants deny the allegations of this paragraph.

127.    Defendants deny the allegations of this paragraph.

128.    Defendants deny the allegations of this paragraph.

129.    Defendants deny the allegations of this paragraph.

130.    Defendants admit that American Airlines offers service to Miami and St. Louis out of Reagan National. Defendants admit that the quoted statement was made on behalf of US Airways in comments to the Federal Aviation Administration but state that Plaintiffs' selective quotations are misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents. Defendants admit that the Department of Transportation allowed US Airways and Delta to exchange certain slots in 2011. Defendants deny the remaining allegations in this paragraph.

131.    Defendants admit the allegations of this paragraph.

132.    Defendants admit that the quoted language has been attributed to Mr. Horton but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.

133.    Defendants deny the allegations of this paragraph.

134.    Defendants deny the allegations of this paragraph.

135.    Defendants deny the allegations of this paragraph.

136.    Defendants deny the allegations of this paragraph.

137.    Defendants admit that some airline passengers likely prefer non-stop airline flights.

138.     Defendants admit that US Airways and American Airlines offer non-stop flights on twelve airport pairs, including the airport pairs listed in this paragraph.  Defendants deny the remaining allegations of this paragraph.

139.     Defendants admit that US Airways and American Airlines offer non-stop flights on twelve airport pairs.  Defendants deny the remaining allegations of this paragraph.

140.     Defendants deny the allegations of this paragraph.

141.     Defendants deny the allegations of this paragraph.

142.     Defendants deny the allegations of this paragraph.

143.     Defendants deny the allegations of this paragraph.

144.     Defendants admit that Defendants' settlement with the Department of Justice required them to divest 104 air carrier slots at Ronald Reagan Washington National Airport.  Defendants deny the remaining allegations of this paragraph.

145.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

146.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

147.     Defendants admit that they agreed on November 12, 2013 with the Department of Transportation that all commuter slots held or operated by US Airways, AMR, or the combined entity shall serve medium, small and non-hub airports for a term of five years.  Defendants deny the remaining allegations of this paragraph.

148.     Defendants deny the allegations of this paragraph.

149.     Defendants admit that one of US Airways' many competitive practices is a program known as "Advantage Fares."  Defendants admit that the Advantage Fares program is used on routes where US Airways offers connecting service and a competitor offers nonstop service.  Defendants deny the remaining allegations of this paragraph.

150.     Defendants admit that one of US Airways' many competitive practices is a program known as "Advantage Fares."  Defendants admit that Advantage Fares have been applied

14

on hundreds of routes, including some where more than one carrier offers nonstop service. Defendants admit that there are routes on which the Advantage Fares program is not offered. Defendants lack knowledge and information on the motivations that drive other airlines' pricing decisions, and, on that basis, deny allegations relating to such in this paragraph. Defendants deny the remaining allegations of this paragraph.

151. Defendants admit that the second through fourth sentences contain quotes from the e-mail of an American Airlines employee but state that Plaintiffs' selective quotations are misleading as framed, and respectfully refer the Court to the entire e-mail from which Plaintiffs have selected only excerpts for a complete and accurate description of its contents. Defendants deny the remaining allegations of this paragraph.

152. Defendants admit that US Air has used the Advantage Fares program as well as many other competitive practices to compete with other airlines. Defendants further respond that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents. Defendants otherwise deny the allegations in this paragraph.

153. Defendants admit that a number of passengers have purchased Advantage Fare tickets. Defendants deny the remaining allegations of this paragraph.

154. Defendants admit that a number of airline mergers and acquisitions have occurred since 1978, including but not limited to those listed in this paragraph.

155. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

156. Defendants deny the allegations of this paragraph.

157. Defendants deny the allegations of this paragraph.

158. Defendants deny the allegations of this paragraph.

159. Defendants admit that the combined company will have nine hubs. Defendants deny the remaining allegations of this paragraph.

15

**146**

160.    Defendants deny the allegations of this paragraph.

161.    Defendants deny the allegations of this paragraph.

162.    Defendants deny the allegations of this paragraph.

163.    Defendants deny the allegations of this paragraph.

164.    Defendants deny the allegations of this paragraph.

165.    Defendants admit that the quoted language in this paragraph has been attributed to Former Chairman of the House Committee on Transportation and Infrastructure, James Oberstar, but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

166.    Defendants admit that each of the cities listed in this paragraph has an airport. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, on that basis, deny the same.

167.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

168.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

169.    Defendants deny the allegations of this paragraph.

170.    Defendants deny the allegations of this paragraph.

171.    Defendants admit that US Airways Group, Inc. was not a failing company. Defendants admit that AMR is a debtor in a case under Chapter 11 of the Bankruptcy Code and filed a plan of reorganization based on its proposed merger with US Airways.

172.    Defendants admit that Mr. Horton has been quoted on the topic referenced in this paragraph but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the

16

Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents. Defendants deny the remaining allegations of this paragraph.

173. Defendants admit that the quoted language has been attributed to Mr. Horton but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents. Defendants deny the remaining allegations on this paragraph.

174. Defendants admit the allegations of this paragraph.

175. Defendants admit the allegations of this paragraph.

176. Defendants admit that American Airlines placed the largest aircraft order ever in 2011. Defendants deny the remaining allegations of this paragraph.

177. Defendants admit that the quoted language has been attributed to Mr. Parker, but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.

178. Defendants admit that in the third quarter of 2013, AMR reported a net profit of $530 million, excluding reorganization and special items, which was the most profitable quarter in company history.

179. Defendants admit that the quoted language has been attributed to US Airways' President Scott Kirby but state that Plaintiffs' selective quotation of unidentified written material or communications, offered without context, is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.

180. Defendants admit that US Airways reported a 2012 net income of $637 million, up 797% from a $71 million net profit in 2011. Defendants deny the remaining allegations of this paragraph.

181.    Defendants admit that the quoted language in this paragraph has been attributed to Representative John Conyers but state that Plaintiffs' selective quotation is misleading as framed, and respectfully refer the Court to the quoted documents, once identified by Plaintiffs, for a complete and accurate description of their contents.  Defendants deny the remaining allegations of this paragraph.

182.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

183.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

184.    Defendants deny the allegations of this paragraph.

185.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

186.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, on that basis, deny the same.

187.    Defendants deny the allegations of this paragraph.

188.    Defendants deny the allegations of this paragraph.

189.    Defendants deny the allegations of this paragraph.

**VIOLATION ALLEGED:  CLAYTON ACT SECTION 7**

190.    Defendants deny the allegations of this paragraph.

**PRAYER FOR RELIEF**

This paragraph of the Complaint sets out the relief sought by Plaintiffs.  To the extent that a response is required, Defendants admit that Plaintiffs seek such relief but deny that Plaintiffs are entitled to any such relief.

## GENERAL DENIAL

Defendants deny any allegations of the Complaint, whether express or implied, that are not specifically admitted, denied or qualified herein.

## AFFIRMATIVE DEFENSES

Defendants asserts the following defenses, each as a separate and distinct defense to Plaintiffs' alleged causes of action:

### First Affirmative Defense

### (Failure to State a Cause of Action)

One or more of the causes of action asserted in the Complaint fails to state a claim for which relief can be granted.

### Second Affirmative Defense

### (Legal Privilege)

Plaintiffs' claims are barred, in whole or in part, because they attack conduct that is authorized by the United States laws and that is not subject to prohibition under the antitrust laws.

### Third Affirmative Defense

### (Justification/Privilege/Excuse)

Plaintiffs are barred from recovery because Defendants' actions were privileged, justified, excused, were taken for a legitimate business reason not prohibited by law, and/or because Defendants at all times acted in good faith and did not directly or indirectly perform any act whatsoever that would constitute a violation of any right of Plaintiffs or any duty owed to Plaintiffs.

### Fourth Affirmative Defense

### (Independent, Legitimate Business and Economic Justifications)

Plaintiffs' claims are barred, in whole or in part, because all conduct engaged in by Defendants was reasonable, based upon judgment, legitimate business and economic justifications, and without any purpose or intent to injure competition.  The combination of  US

19

Airways' and American Airlines' complementary networks will bring new routes online, increase the number and convenience of flights on existing routes, grow capacity, and benefit consumers. These consumer benefits, as well as the cost synergies and other efficiencies that will result from the merger, greatly outweigh any and all proffered alleged anticompetitive effects.

### Fifth Affirmative Defense

### (Meeting Competition/No Harm to Competition)

Defendants' acts as alleged in the Complaint were made in good faith to meet competition. Plaintiffs' claims are barred, in whole or in part, because Defendants' actions have not tended to destroy competition in the relevant market.

### Sixth Affirmative Defense

### (No Antitrust Injury)

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs have not suffered antitrust injury.

### Seventh Affirmative Defense

### (Lack of Standing)

Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' lack of standing to assert any or all of the causes of action alleged in the Complaint individually, in a representative capacity, or on behalf of the general public.

### Eighth Affirmative Defense

### (Laches)

Plaintiffs' Complaint, and each claim and cause of action allegedly contained therein, is barred, in whole or in part, by the doctrine of laches, in that Plaintiffs have unreasonably delayed asserting their alleged damages, and such delay has caused prejudice to Defendants.

### Ninth Affirmative Defense

### (Public Interest)

Granting the relief sought by Plaintiffs would be contrary to the public interest.

20

**Tenth Affirmative Defense**

**(Unclean Hands)**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**Additional Affirmative Defenses**

Defendants presently have insufficient knowledge or information upon which to form a belief as to whether Defendants may have additional, as yet unstated, affirmative defenses. Defendants reserve the right to assert additional affirmative defenses in the event discovery or other developments indicate such defenses may be appropriate.

**PRAYER FOR RELIEF**

**WHEREFORE**, Defendants pray for the following:

1.      Dismissal of Plaintiffs' claims with prejudice;

2.      A finding that Defendants are not liable to Plaintiffs, or that Plaintiffs' claims are barred, in whole or in part, based on one or more of the affirmative defenses asserted herein;

3.      An award to Defendants of their reasonable actual attorneys' fees and costs of suit pursuant to applicable statutes; and

4.      Such other and further relief as the Court deems just.

Dated:  April 22, 2014
    San Francisco, California

                    LATHAM & WATKINS LLP

                    /s/ Sadik Huseny
                    Daniel M. Wall (*admitted pro hac vice*)
                    Alfred C. Pfeiffer, Jr. (*admitted pro hac vice*)
                    Sadik Huseny (*admitted pro hac vice*)

                    LATHAM & WATKINS LLP
                    505 Montgomery Street, Suite 2000
                    San Francisco, CA  94111-6538
                    Telephone: (415) 391-0600
                    Facsimile: (415) 395-8095

                    *Attorneys for Defendants and merged entity*
                    *American Airlines Group, Inc.*

21

## CERTIFICATE OF SERVICE

 I, Elif Kimyacioglu, hereby certify that on April 22, 2014, a true and correct copy of the foregoing document was served via electronic-mail to attorneys who have consented to accept service of this document by electronic means per the SDNY Bankruptcy Court's General Order M-399 and electronic filing guidelines.

 I further certify that a true and correct copy of the foregoing document was served upon the following counsel of record for all parties in the manners, and at the addresses, set forth below, on April 22, 2014:

Joseph M. Alioto            U.S. Mail
ALIOTO LAW FIRM
One Sansome Street
35th Floor
San Francisco, CA 94104
josephalioto@mac.com

Gil D. Messina             U.S. Mail
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
gmessina@messinalawfirm.com

James A. Keyte             U.S. Mail
Kenneth B. Schwartz
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
james.keyte@skadden.com
ken.schwartz@skadden.com

_____
Elif Kimyacioglu

1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

In re:

Chapter 11

AMR CORPORATION, *et al.*,

Case No. 11-15463 (SHL)

                   Reorganized Debtors.

(Jointly Administered)

-------------------------------------------------------------------------x

CAROLYN FJORD, *et al.*,

                   Plaintiffs,

            v.

Adv. Pro. No. 13-01392 (SHL)

AMR CORPORATION, AMERICAN AIRLINES,
AMERICAN GROUP, INC. and AMERICAN, INC.,

                   Defendants,

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

                   As Intervenor.

-------------------------------------------------------------------------x

## MEMORANDUM OF DECISION

A P P E A R A N C E S :

**ALIOTO LAW FIRM**
*Counsel for Plaintiffs*
One Sansome Street, 35th Floor
San Francisco, CA 94104
By:    Joseph M. Alioto, Esq.

**MESSINA LAW FIRM, P.C.**
*Counsel for Plaintiffs*
961 Holmdel Road
Holmdel, NJ 07733
By:    Gil D. Messina, Esq.

**LATHAM & WATKINS LLP**
*Counsel for Defendants and merged entity*
*American Airlines Group, Inc.*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
By:    Daniel M. Wall, Esq.
        Sadik Huseny, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Plaintiffs' motion to amend and supplement the complaint (the "Motion") (ECF No. 106) in this civil antitrust action challenging the merger between American Airlines and US Airways that took place in December 2013. The Motion seeks to add a claim for treble damages under Section 4 of the Clayton Antitrust Act (15 U.S.C. § 15(a)) (the "Clayton Act") and a demand for a jury trial. This is the Plaintiffs' second attempt to add a damages claim and related jury demand. The Court denied the Plaintiffs' first motion to amend because the proposed amendments failed to assert a sufficient basis for the damages suffered by the individual Plaintiffs. *See Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 386 (Bankr. S.D.N.Y. 2014). The Defendants oppose this new Motion, contending that the proposed amendments still fail to state a damages claim for a variety of reasons. For the reasons explained below, the Court agrees and denies the Motion.

## BACKGROUND

A detailed account of the Debtors' bankruptcy case and the early stages of this adversary proceeding can be found in the Court's decision on the Plaintiffs' first motion to amend, familiarity with which is assumed. *See generally Fjord*, 506 B.R. at 373–76. But some brief history is necessary to understand the issues raised by the Motion.

2

In November 2013, the Plaintiffs sought a temporary restraining order to block the proposed merger between American and US Airways, a merger that formed the basis of the Debtors' reorganization. At the hearing on the TRO motion, the Court asked Plaintiffs' counsel to provide information about the individual Plaintiffs and how they would be harmed by the merger. Nov. 25 Hr'g Tr. 35:21–22, 36:16–17 (ECF No. 79). Plaintiffs' counsel could not identify allegations in the complaint that addressed the harm to the named Plaintiffs. *Id.* at 36:18–22. After the hearing, the Court denied the request for a TRO and permitted consummation of the merger because Plaintiffs failed to demonstrate irreparable harm or a likelihood of success on the merits of their antitrust claims. *See Fjord v. AMR Corp. (In re AMR Corp.)*, 502 B.R. 23 (Bankr. S.D.N.Y. 2013). That decision highlighted examples of the deficiencies in the Plaintiffs' pleadings, including the lack of information regarding the individual Plaintiffs and the failure to articulate how they would be harmed by the merger. *Id.* at 33–35.

In January 2014, the Plaintiffs filed their first motion to amend the complaint. In that motion, the Plaintiffs sought to add new factual allegations, a claim for treble damages under Section 4, and a demand for a jury trial. They also sought to modify language regarding the divestiture and declaratory relief sought under Section 16 of the Clayton Act, 15 U.S.C. § 26. *See* Proposed First Amended Complaint at 1, 38-39, Prayer for Relief A–D (ECF No. 91–2).[1] The Court granted in part and denied in part the first motion to amend. *See Fjord*, 506 B.R. 368. On the one hand, the Court permitted amendment to include new factual allegations that arose

---

[1]     The first motion to amend also included a request for a preliminary injunction requiring the Defendants to hold their assets separate during the pendency of the case. At the hearing on the first motion, the Plaintiffs clarified that they were not seeking such preliminary injunctive relief, notwithstanding the language of the proposed amended complaint. Feb. 13 Hr'g Tr. 35:11–38:11, 45:7–13 (ECF No. 100).

3

after the merger and revisions of the proposed divestiture relief.[2]  On the other hand, the Court

denied the remainder of the requested relief, finding that the proposed amended complaint failed

to assert a sufficient basis for treble damages allegedly suffered by the individual Plaintiffs.  *Id.*

at 385–86.  Consistent with the Court's ruling, the Plaintiffs filed an amended complaint in April

2014 (the "Amended Complaint") (ECF No. 103).

The Plaintiffs filed a second motion to amend and supplement the complaint (ECF No.

105), again seeking to add a damages claim and a jury trial demand.  In this motion, the Plaintiffs

sought to add over 160 new paragraphs to the Amended Complaint, but their abbreviated papers

contained only a cursory explanation about why the Plaintiffs would be entitled to the relief

sought.[3]  The Court subsequently expressed concern about the boilerplate content of the motion,

noting that it would be inappropriate for the Plaintiffs to raise new arguments for the first time in

the reply brief.  May 16 Hr'g Tr. 14:7–16:21 (ECF No. 107).  To address these concerns, the

Plaintiffs filed a revised motion to file a second amended complaint (ECF No. 106), which is the

matter now before the Court.

The proposed second amended and supplemental complaint (the "PSASC") (ECF No.

106–1, Ex. A) identifies forty named Plaintiffs.  In ruling on the Plaintiffs' first motion to amend

the complaint, the Court observed that the complaint provided little, if any, information about the

actual Plaintiffs.  *See Fjord*, 506 B.R. at 385-86.  In this second attempt to amend the complaint,

the Plaintiffs propose extensive new allegations about individual Plaintiffs.  But notwithstanding

the additional text, the Plaintiffs still have failed to allege any information regarding twenty-

---

[2]     The modifications regarding divestiture addressed the settlement between the Department of Justice (the "DOJ") and the airlines in the DOJ's antitrust action, which occurred after the filing of the Plaintiffs' original complaint.  *See Fjord*, 502 B.R. at 30.

[3]     The memorandum of law in support of the second motion to amend was only eight pages, consisting largely of boilerplate language (ECF No. 105–1).

4

seven of the Plaintiffs.[4]  As to the remaining thirteen Plaintiffs, the alleged injuries can be

generally grouped into three categories: personal injuries to the Plaintiffs regarding their own

travel plans, *see, e.g.,* PSASC ¶ 248 (Ms. Fjord purchased tickets for her family departing from

San Francisco rather than Sacramento); injuries to Plaintiffs' travel agencies or travel-related

businesses, *see, e.g.,* PSASC ¶¶ 195, 198–200 (Ms. Jolly lost customers for her annual Paris

group trips); and injuries suffered by the Plaintiffs' clients, *see, e.g.,* PSASC ¶¶ 257–62 (Mr.

Fry's client has paid increased airfare on routes out of Philadelphia).[5]

---

[4]     The PSASC provides no new allegations regarding the following Plaintiffs other than their respective addresses: Katherine R. Arcell, Keith Dean Bradt, Jose M. Brito, Robert D. Conway, Judy Crandall, Pamela Faust, Gabriel Garavanian, Harry Garavanian, Lee M. Gentry, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Dana L. Robinson, Bill Rubinsohn, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, and Christine O. Whalen.

        At the hearing on the Motion, the Court asked Plaintiffs' counsel whether there were additional allegations regarding personal injuries.  July 17 Hr'g Tr. 76:2–20 (ECF No. 113).  Plaintiffs' counsel explained that all forty individuals have likely suffered personal injuries.  *See id.* at 76:19–20 ("I believe, Your Honor, that all, most, if not all, would be [alleging] both.").  But when Plaintiffs' counsel could not point to specific paragraphs at the hearing, the Court suggested filing a letter after the hearing to highlight the personal injuries alleged by the Plaintiffs.  The Plaintiffs submitted a letter to chambers, but many of the injuries described in the letter pertain to the Plaintiffs who were "undescribed" in the proposed supplemental complaint.  (ECF No. 114).  In any event, the allegations of the PSASC are the relevant touchstone for this Motion.

[5]     There is one other Plaintiff who alleges a harm that is less clearly a personal injury: Ms. Pulfer bought her children tickets for their honeymoon to St. Lucia.  PSASC ¶¶ 205–12.  Additionally, several Plaintiffs allege prospective injuries that may or may not occur.  *See, e.g.,* PSASC ¶¶ 289–90 (discussing expectation of Plaintiffs that the USAir Vacation practice of paying travel agent commissions will be terminated and the impact this would have on Ms. Davis).

5

## DISCUSSION

### I.  Applicable Legal Standards

A party may amend its pleading as a matter of course within the time limits imposed by

Rule 15(a)(1) of the Federal Rules of Civil Procedure.  When a party seeks to amend its

pleadings outside of the prescribed time frames, the opposing party must consent or the moving

party must obtain leave of the court.  Fed. R. Civ. P. 15(a)(2), incorporated in these proceedings

by Fed. R. Bankr. P. 7015.  Rule 15(a)(2) provides that "[t]he court should freely give leave [to

amend the complaint] when justice so requires."  *Id.*  "[S]ummary disposition of all litigation,

especially antitrust cases, is not favored and . . . amendments should be freely and liberally

granted to the end that all cases are decided on their merits."  *Food Basket, Inc. v. Albertson's,

Inc.*, 383 F.2d 785, 788 (10th Cir. 1967).  The decision to grant or deny a motion to amend rests

within the "sound judicial discretion of the trial court."  *Adelphia Recovery Trust v. FPL Grp.,

Inc. (In re Adelphia Commc'ns Corp.)*, 452 B.R. 484, 489 (Bankr. S.D.N.Y. 2011).  A court may

exercise its discretion to deny leave to amend a pleading where: (i) the movant has acted with

undue delay, bad faith, or a dilatory motive;  (ii) the movant has repeatedly failed to cure a

deficient pleading; (iii) the amendment would unduly prejudice the opposing party; or (iv) the

amendment would be futile.  *See, e.g., Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503

B.R. 239, 340 (Bankr. S.D.N.Y. 2013) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The same standard applies to motions to supplement the complaint pursuant to Rule

15(d).  *See Music Deli & Groceries, Inc. v. I.R.S., Dist. of Manhattan*, 781 F. Supp. 992, 997

(S.D.N.Y. 1991) ("Although Rule 15(d) does not include Rule 15(a)'s mandate that leave to

amend be freely given when justice so requires, the same standards apply to motions under both

of these subdivisions . . . . Thus leave to supplement should be freely granted '[i]n the absence of

6

any apparent or declared reason—such as undue delay, bad faith or dilatory motive . . . .'")
(quoting *Foman*, 371 U.S. at 182) . It is well established that leave to amend or supplement
should be denied if the amendment or supplement would be futile. *Houston Pipeline Co. LP v.
Enron Corp. (In re Enron Corp.)*, 367 B.R. 373, 382 (Bankr. S.D.N.Y. 2007); *see also
Kalimantano GmbH v. Motion in Time, Inc.*, 939 F. Supp. 2d 392, 403 (S.D.N.Y. 2013). An
amendment is futile when the proposed changes would be subject to 'immediate dismissal' for
failure to state a claim or on some other ground. *See Enron*, 367 B.R. at 382; *see also Health-
Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990). The party opposing an amendment has
the burden to establish that a proposed amendment would be futile. *Velez v. Fogarty*, 2008 U.S.
Dist. LEXIS 96999, at *9 (S.D.N.Y. Nov. 20, 2008) (citations omitted). When a defendant
objects to a proposed amended complaint, therefore, the court may scrutinize that complaint as if
it were subject to a motion to dismiss under Rule 12(b)(6). *Id.* at *10. In such a circumstance,
the court must "assume the truth of the well-pled factual allegations in the complaint and must
draw all reasonable interests against the defendant." *Penn Grp., LLC v. Slater*, 2007 U.S. Dist.
LEXIS 50651, at *11 (S.D.N.Y. 2007). Under Rule 12(b)(6), a court must determine whether
the well-pleaded factual allegations, assumed to be true, "state a claim to relief that is plausible
on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Hayden v. Paterson*,
594 F.3d 150, 160 (2d Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Plausibility "is not akin to a probability requirement," but rather requires "more than a
sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and
internal quotation marks omitted). Courts do not make plausibility determinations in a vacuum;
it is a "context-specific task that requires the reviewing court to draw on its judicial experience
and common sense." *Id.* at 679 (citation omitted). A claim is plausible when the factual

7

allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted). A claim that pleads only facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement. *Id.* (quoting *Twombly*, 550 U.S. at 557). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings must create the possibility of a right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

## II.     The Motion to Amend Is Futile

When considering whether amendment is appropriate, the Court must determine if the proposed new allegations allege a plausible claim for damages under antitrust law. As explained by the Supreme Court in *Associated General Contractors*, Congress "did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (citation omitted). "The right to pursue private actions for treble damages under Section 4 has [] developed limiting contours in the thirty years since *Associated General Contractors* was handed down. These contours are embodied in the concept of 'antitrust standing.'" *Gatt Commc'n, Inc., v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013). "'Antitrust standing is a threshold, pleading-stage inquiry. . . .'" *Id.* (quoting *NicSand*,

8

*Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007)). When a complaint fails to establish this requirement, a court must dismiss it as a matter of law. *Gatt*, 711 F.3d at 75.

To plead antitrust standing, a plaintiff must allege that it suffered an antitrust injury and that it is an efficient enforcer of the antitrust laws. *Id.* at 76; *see also DNAML Pty, Ltd. v. Apple Inc.*, 2014 U.S. Dist. LEXIS 77422, at *9 (S.D.N.Y. June 5, 2014). For the first requirement of antitrust injury, a plaintiff must identify the anticompetitive practice complained of and the reasons why such a practice is or might be anticompetitive, and link the anticompetitive practice to the actual injury suffered. S*ee Gatt*, 711 F.3d at 76. The injury must be of the type of harm that antitrust laws were intended to prevent. *Id.* The plaintiff must allege a direct antitrust injury, something more than just an injury causally linked to an antitrust violation. *IBM v. Platform Solutions, Inc.*, 658 F. Supp. 2d 603, 610–11 (S.D.N.Y. 2009) (citing *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995)). In the Second Circuit, it is not sufficient to allege an injury that is indirect or derived from injury sustained by another entity with which the plaintiff has a business relationship. *IBM*, 658 F. Supp. at 609.

While only a short plain statement of an antitrust claim is required to give notice to the opposing party, it is improper to assume that defendants "have violated the antitrust laws in ways that have not been alleged." *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 607 (S.D.N.Y. 2002).

The Plaintiffs' original complaint alleged that the proposed merger between American and US Airways violated Section 7 of the Clayton Act. Section 7 of the Clayton Act provides:

> No person engaged in commerce or in any activity affecting commerce shall acquire the whole or any part of any of the stock . . . where the effect of such acquisition may be to substantially lessen competition or tend to create a monopoly.

9

**162**

15 U.S.C. § 18.  For this alleged Section 7 violation, the Plaintiffs sought to block the merger

under Section 16 of the Clayton Act.  As the merger has now been consummated, the Plaintiffs'

Motion seeks to add a claim for treble damages pursuant to Section 4 of the Clayton Act, which

provides:

> [A]ny person who shall be injured in his business or property by
> reason of anything forbidden in the antitrust laws may sue therefor
> in any district court of the United States . . . and shall recover
> threefold the damages by him sustained, and the cost of suit,
> including a reasonable attorney's fee.

15 U.S.C. § 15.  The Court must determine whether the proposed supplemental pleadings—the

claim for treble damages—state a claim under Section 4 of the Clayton Act.  If the Plaintiffs fail

to state a claim for treble damages, then the Court should deny leave to supplement the

complaint.  Analysis of the Section 4 claim for treble damages, however, requires evaluation of

the related underlying alleged substantive antitrust violation originally plead by the Plaintiffs

under Section 7.  So while the Court must analyze the proposed supplemental allegations, that

analysis requires a review of the sufficiency of the original allegations as well.[6]

Applying the applicable legal standards here, the Court concludes that the PSASC suffers

from two defects.  First, the PSASC does not plausibly define a relevant market for the alleged

antitrust violation and personal harm to the majority of the Plaintiffs.  Most notably, it fails to

allege cross-elasticity and interchangeability as required by applicable law and its allegations of

a national market are flawed.  Second, the Plaintiffs lack antitrust standing to the extent they seek

damages as travel agents—rather than consumers—because they are not efficient enforcers for

the alleged antitrust violations.

---

[6]    As previously noted by the Court, "the Plaintiffs' jury demand rests upon their proposed new treble
damages claim" and therefore is contingent on whether the PSASC asserts a sufficient basis for the treble damages
allegedly suffered by the individual Plaintiffs.  *Fjord*, 506 B.R. at 373.

## A. Plaintiffs Fail to Allege a Relevant Market and Harm to that Market from the Merger

### 1. Failure to Define the Relevant Market is Fatal

The relevant market definition shapes where the Court must look to determine any actual anticompetitive effects. Without one, it is impossible to make that determination and identify any damages flowing from an antitrust violation. *See Re-Alco Indus., Inc. v. Nat'l Ctr. For Health Educ., Inc.*, 812 F. Supp. 387, 392 (S.D.N.Y. 1993) ("Absent an adequate market definition, it is impossible for a court to assess the anticompetitive effect of challenged practices."). To state a claim under Section 7 of the Clayton Act, a plaintiff must allege a plausible relevant market in which competition will be impaired.[7] *City of New York v. Group Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011). "The relevant market must be defined as all products reasonably interchangeable by consumers for the same purposes . . . ." *Id.* (citations omitted). The test for a relevant market considers what is reasonably interchangeable for consumers, not what a particular plaintiff considers to be interchangeable. *See Grp. Health Inc.*, 2010 WL 2132246, at *3; *see also Queen City Pizza v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997). In that way, alleging the product market is distinct from alleging antitrust injury, which requires allegations that are specific to the plaintiff. A plaintiff must provide "at least a theoretically rational explanation" for the boundaries it chooses for the relevant market. *Gianna Enterprises v. Miss World (Jersey) Ltd.*, 551 F. Supp. 1348, 1354 (S.D.N.Y. 1982).

---

[7]    The requirement to identify a relevant product market is the same across many antitrust statutes. *See City of New York v. Grp. Health Inc.*, 2010 WL 2132246, at *2 (S.D.N.Y. May 11, 2010), *aff'd*, 649 F.3d 151 (2d Cir. 2011) ("To state claims under any of the statutes identified above [the Clayton Act, the Sherman Act or the Donnelly Act], Plaintiffs must identify the product market in which competition will be impaired.") (collecting cases); *see also Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 n.2 (9th Cir. 1979) (citing 15 U.S.C. § 18) ("Generally, principles of market definition applicable to cases arising under Sherman Two are also applicable to Sherman One actions, and to merger cases arising under [Section] 7 of the Clayton Act."); *Lektro-Vend Corp. v. The Vendo Corp.*, 500 F. Supp. 332, 349 (N.D. Ill. 1980). For this reason, the Court cites to cases arising under these statutes in addition to those under Section 7 of the Clayton Act.

Although the PSASC contains over 350 paragraphs, it devotes little time to the relevant market definition.[8]  The definition of the market is contained in two short paragraphs:  "The relevant product and geographic markets for purposes of this action are the transportation of airline passengers in the United States.  Within the relevant market, well-defined submarkets exist which, in themselves, constitute geographic and/or product markets for antitrust purposes and include what are known as 'city pairs.'"  PSASC ¶¶ 32–33.[9]

As a threshold matter, the PSASC does not contain any allegations about interchangeability and cross-elasticity, which is fatal to any claim of any market definition.  Indeed, the words "interchangeability" and "cross-elasticity" do not appear anywhere in the PSASC.  "'Interchangeability' looks to the use or function of the given product as compared to other products.  Every product that can be substituted for the same use or purpose should be included within a single product market."  *Intellective*, 190 F. Supp. 2d at 610.  Related to that, "cross-elasticity" looks at the extent to which a change in price of one product might alter demand for another product.  *Id.*  If a change in the price of one product affects demand for the second product, they should be included in the same product market.  *Id.*

"Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient."

---

[8]     Similarly, the Motion states merely that "Plaintiffs allege that they bought airline tickets and ancillary services from the defendants after the merger at the higher prices which were predicted to result from the lessening of competition caused by the merger."  Pls.' Mem. of Law at 12 (ECF No. 106–1).

[9]     By contrast, the DOJ dedicated almost three pages of its significantly shorter complaint to define the relevant product and geographic markets.  *See* DOJ Compl. ¶¶ 24–31.  The DOJ alleged that scheduled air passenger service was the relevant product market and that city-pairs were the relevant geographic market.  *Id.*

*Grp. Health Inc.*, 649 F.3d at 155;[10] *Intellective*, 190 F. Supp. 2d at 610 ("'Interchangeability'

and 'cross-elasticity of demand' are the critical components of a relevant product market.").

Failure to define the market by reference to the rule of interchangeability is, standing alone, valid

grounds for dismissal. *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F.

Supp. 701, 705 (S.D.N.Y. 1997) (finding that plaintiff failed to define the relevant product

market where they alleged only that the market was "tickets for travel on TWA between certain

city pairs … [and that] when a 'consumer needs to fly from a TWA original city to one of

TWA's destination cities, and wants a certain package (flight time and date, mileage, first class

confirmed seat at full faire price, etc.), only a TWA ticket will do.'") (citing *Ford Piano Supply

Co. v. Steinway & Sons*, 1988 WL 3488, at *2 (S.D.N.Y. Jan. 13, 1988) (dismissing claims

relating to monopoly and exclusive dealing due to failure to define market)); *see also Queen City

Pizza*, 124 F.3d at 436 (motion to dismiss may be granted for failure to define relevant market).

In their briefs and at argument, the Plaintiffs have been steadfast in insisting upon a

national market for airline travel. *See, e.g.,* July 17 Hr'g Tr. 42:17–23; Reply ¶¶ 16, 22–23 (ECF

No. 112). But the definition of a national market is problematic for airfare. An airline passenger

cannot buy a ticket that acts as a pass for travel anywhere within the country. They must buy a

ticket with a specific origin and destination. As the Court noted in the TRO Opinion issued well

---

[10]     In *Group Health Inc.*, the City of New York sued several insurance providers under the Clayton Act, the
Sherman Act, and the Donnelly Act, seeking to prevent them from merging. *See Grp. Health*, 649 F.3d at 154. The
City's complaint defined the relevant market as the "low-cost municipal health benefits market" which included
"only those insurance plans that are inexpensive and that the City selects for inclusion in the Health Benefits
Program." *Id.* The Court of Appeals for the Second Circuit found that that the market alleged in the City's
complaint was "legally insufficient because it [was] defined by the City's preferences, not according to the rule of
reasonable interchangeability and cross-elasticity of demand." *Id.* at 156. The Court of Appeals noted that "[t]he
market alleged in the City's complaint ignores the competition existing among insurance providers for the City's
business, as well as the health insurance market for other large employers in the region. The City does not allege an
factor that would prevent insurance companies other than those it selects for the Health Benefits Program from
proposing competitive products should the merged firm raise its premiums to supracompetitive prices." *Id.*

13

before the instant Motion was filed, "Plaintiffs' theory of a national market would require a conclusion that all flights compete with each other. For example, a flight from Los Angeles to New York would compete with a flight from Detroit to Seattle. Plaintiffs have not explained why that would be true here . . . ." *Fjord*, 502 B.R. at 40. Over eight months later, on Plaintiffs' second attempt to amend the complaint, the PSASC still has not alleged why that might be true. *See Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011) ("'The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level.'") (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) (additional internal quotes omitted); *Intellective*, 190 F. Supp. 2d at 610 ("Every product that can be substituted for the same use or purpose should be included within a single product market."); *Pepsico, Inc. v. The Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) ("Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.'") (internal citations and quotations omitted); *Commer. Data Servers, Inc. v. IBM Corp.*, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001) (plaintiff must offer "a theoretically rational explanation" for why the market boundaries are defined as they are) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 893 F. Supp. 1207, 1213 (S.D.N.Y. 1994)).[11]

---

[11] The Plaintiffs allege that both USAir and American have stated that they compete only in a national market. *See* PSASC ¶¶ 43–45. But this does not change the fact that the Plaintiffs must make appropriate allegations of a market for purposes of stating an antitrust complaint and the statements they cite are not determinative of the relevant market. *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1166 (N.D. Cal. 2004) (discounting statements in company's internal documents about competition where inconsistent with evidence in the marketplace); *c.f. A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1402 (7th Cir. 1989) (downplaying utility of statements of senior executives regarding competitive intent).

14

Indeed, the Plaintiffs' national market theory for the airline industry has been rejected by another court for a similar failure. In *Malaney v. UAL Corp.*, 2011 WL 6845773 (N.D. Cal. Dec. 29, 2011), the court dismissed the complaint, noting that:

> [P]laintiffs have already enjoyed ample opportunity to develop a substantial record on this question, yet both this Court and the Ninth Circuit have held that their pleadings, at least in their current form, fail to state a viable market. As both courts have explained, the national market for air transportation does [not] meet *Brown Shoe*'s standard because flights between distant cities are simply not reasonably interchangeable. . . . Plaintiffs have expressly refused to amend their pleadings to cure this defect since denial of the preliminary injunction.

*Id.* at *4; *see id.* at *1 (court referring to prior denial of preliminary injunction where it found, among other things, "no evidentiary support for plaintiffs' position that a New York–Los Angeles flight is a substitute for a Miami–Seattle flight."). Plaintiffs' counsel in this case also represented the Plaintiffs in *Malaney*. Thus, these same issues regarding a national market for airline travel should come as no surprise to Plaintiffs' counsel here, particularly as this Court has previously identified this as a problem. *Fjord*, 502 B.R. at 40.[12]

At oral argument, Plaintiffs' counsel suggested that a national market was evidenced from the "supply side." *See* July 17 Hr'g Tr. 39:13–40:12. He posited that most airports do not use slots, and therefore have low barriers to entry. If a company owns a plane, therefore, an airline simply needs to find a profitable route, "turn [its] airplane and go there." *Id.* But this argument goes against logic. If it is truly this easy to enter the market, the logical conclusion is that there will be low barriers to entry and therefore robust competition in the market. *See* July

---

[12] Plaintiffs cite to items such as baggage fees and frequent flyer awards. *See, e.g.*, PSASC ¶¶ 220. Policies for such items may be set at a national level, *see, e.g.*, July 17 Hr'g Tr. 93:18–20, but they are not stand-alone products that are purchased without having first purchased an airline ticket. In fact, the Plaintiffs characterize changes in these policies, such as increased baggage fees, as "tantamount to fare increases . . . ." PSASC ¶ 221.

17 Hr'g Tr. 90:22–90:24.  If city-pairs have low barriers to entry and cannot sustain lasting market power, therefore, it is hard to follow Plaintiffs' logic that aggregating the city-pairs would amount to lasting market power nationally.[13]

While alleging a national market, the PSASC does make numerous references to city-pairs.  Plaintiffs explain that "the relevant product and geographic markets alleged in the complaint are the transportation of airline passengers in the United States, within which well-defined city-pair submarkets also exist."[14]  Reply ¶ 9.  The Plaintiffs' allegations regarding price increases use city-pairs as a reference.  *See, e.g.,* PSASC ¶ 248 (Ms. Fjord booked tickets from San Francisco to St. Louis, and compared them to Sacramento-St. Louis tickets).  The Plaintiffs also rely heavily on the antitrust action filed—and eventually settled—by the DOJ, which defined the market by city-pairs.  The Plaintiffs even attach the DOJ's chart of relevant city-pairs to the PSASC, although not all of the city-pairs discussed in the allegations correlate to city-pairs on the chart.  *See* Opp'n at 21–22 (ECF No. 108).

Unlike a national market, the case law recognizes that city pairs are an appropriate way to define the market for antitrust purposes in the airline industry.  The court in *Global Discount Travel Services*, recognized city-pairs for all airline tickets as the relevant product market.  960 F. Supp. at 705; *see also In re Northwest Airlines Corp.*, 208 F.R.D. 174, 220 (E.D. Mich. 2002) (noting that "any broader attack on the use of city-pairs [as the relevant market] surely cannot succeed, where the airlines themselves, as well as numerous government and academic reports, have adopted this same general approach to analyzing the air travel industry.").  With city-pairs

---

[13]     At the time, the Court also observed that the "Defendants have raised a legitimate question regarding why, even if a national market existed, such a market would not be deemed 'highly concentrated' using the prevailing industry standards."  *Fjord*, 502 B.R. at 40.

[14]     As courts have noted, submarkets are essentially their own product market for antitrust purposes.  *See Oracle*, 331 F. Supp. 2d at 1118-19 (discussing "the rise (and fall) of the 'submarkets' doctrine.")

16

as the relevant market, "[f]light times, dates, mileage, and other factors [can be understood as] features that enhance the enjoyment of the product." *Global Discount,* 960 F. Supp. at 705. While a consumer might prefer a certain airline based on flight times or frequent flyer programs, those factors were not a basis to restrict the product market in the *Global Discount* case. *Id.*

Despite the recognized use of city pairs as a relevant market in the case law, the Plaintiffs do not explain how the city-pair "submarkets" are relevant to their proposed national market. Indeed, the Plaintiffs make a point of rejecting a market based on city-pairs by stating that "the effects of the merger have been direct and immediate across the entire country and have not been limited to the 'city pair' submarkets in which the defendants seek to cabin their latest view of the relevant market." Reply ¶ 23. Perhaps not surprisingly then, the Plaintiffs never identify what city-pairs are at issue here. While the PSASC attaches a chart from the DOJ antitrust litigation, it does not explain if the city-pairs in the chart are where the alleged antitrust injuries to the named Plaintiffs took place. The Plaintiffs make some modest allegations that suggest that certain city-pairs are relevant, but they do not define which city-pairs are at issue here, much less analyze the impact on competition in those city-pairs. *See, e.g.,* PSASC ¶¶ 259–62 (describing fare increases paid by Mr. Fry's client for tickets in the city-pairs for Philadelphia-Portland, Philadelphia-San Francisco, Philadelphia-Minneapolis, and Philadelphia-Louisville). As Defendants' counsel has articulated, the complaint lacks "that middle content about what on a market level transpired in this particular [city-pair] market." July 17 Hr'g Tr. 63:8–13. Moreover, many of the allegations relate to city-pairs that are not identified on the DOJ chart, further confusing what city-pairs might be at issue in this litigation. *Compare* PSASC ¶¶ 206–08 (discussing city-pair of Columbus, Ohio to St. Lucia), PSASC ¶¶ 216–18 (discussing city-pair of Dallas–Ft. Worth to Ft. Lauderdale), PSASC ¶ 226 (discussing city-pair of Burbank, California

17

to Ft. Lauderdale, Florida), PSASC ¶ 227 (discussing city-pair of Santa Barbara, California to Ft. Lauderdale), *with* DOJ chart attached as Appendix A to PSASC (ECF No. 106–1). Thus, their allegations regarding city-pair markets are insufficient.

Even assuming a city-pair market has been identified—which it has not—such a market in the PSASC would also suffer from the flaw of not alleging cross-elasticity and interchangeability. Some allegations in the PSASC hint at cross-elasticity for city-pairs but appear inconsistent with the Plaintiffs' claims for damages. For example, Ms. Fjord, based in Winters, California, bought her family tickets to St. Louis departing from San Francisco because the airfare from Sacramento was more expensive. *See* PSASC ¶¶ 243, 248. Although the complaint alleges that this was "a great inconvenience," PSASC ¶ 248, and is grounds for damages, it suggests that Sacramento-St. Louis and San Francisco-St. Louis might be included in the same market due to cross-elasticity. But if the product market includes the Sacramento-St. Louis and San Francisco-St. Louis flights, then it remains unclear how Ms. Fjord suffered any injury by choosing to fly from the less expensive airport within that market. *See Hack v. President & Fellows of Yale College*, 237 F.3d 81, 86 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (allegations of interchangeability and cross-elasticity must be plausible).

In fact, much of the Plaintiffs' supplemental allegations boil down to recitations of price fluctuations for tickets on American. For example, Ms. Russell complains of price increases for tickets from Dallas-Fort Worth to Fort Lauderdale. In October 2013, Ms. Russell purchased a round-trip ticket on American for travel in March that cost $425.80. PSASC ¶ 216. In March 2014, she purchased a ticket on American for travel in June that cost $626. PSASC ¶ 217. But the Plaintiffs do not offer any explanation regarding other flight options on the same route, such

18

**171**

as comparable flights on another airline and their cost.[15]  As other antitrust decisions involving

airlines make clear, such allegations do not suffice to define a relevant market.  *See Global*

*Discount*, 960 F. Supp. at 705-06 ("The rule of reasonable interchangeability dictates that the

relevant product market in this case be at least the market for all airline tickets between the

relevant city pairs, not just tickets on TWA. . . . Because [Plaintiff] cannot define a relevant

product market in a single brand product, it is impossible to assess the anticompetitive effects of

the challenged practices . . . . Plaintiff has made no reasonable showing why TWA airline tickets

for travel between certain cities should be considered a market unto itself, as distinguished from

the market consisting of all airline tickets for travel between the paired cities."); *Grp. Health*

*Inc.*, 649 F.3d at 156 ("A single purchaser's preferences . . . cannot define a market.")[16]

Finally, the Plaintiffs have at times also seemed to suggest that there is also an

international market.  For example, Ms. Pulfer alleges price increases on flights from Columbus,

Ohio to St. Lucia, PSASC ¶¶ 205–13, and Mr. Fry complains of increases on flights from Denver

to Tel Aviv and Denver to Delhi.  PSASC ¶¶ 267–71.  In another part of the PSASC, however,

the Plaintiffs define the relevant market as "the transportation of airline passengers *in the United*

*States*."  PSASC ¶ 32 (emphasis added).  Thus, the PSASC does not allege the existence of an

international market, nor does it provide any facts about that potential market.  There are no

---

[15]     Some discrepancies in price fluctuations are alleged in a way that makes comparison problematic.  The price comparison for Ms. Russell, for example, compares one ticket purchased six months in advance against another ticket purchased only three months in advance, with one ticket for spring travel and the other for summer travel.  PSASC ¶¶ 216–17.

[16]     Some allegations focus on specific airports within a city.  *See, e.g.,* PSASC ¶ 140 (discussing airport pair routes); ¶¶ 216–18 (Ms. Russell purchased tickets from Dallas-Fort Worth to Fort Lauderdale).  The Defendants argue that this is an impermissible market as well, because it ignores alternate airports that might be interchangeable.  *See* Opp'n at 20.  An airport-pair market may be very difficult to define because of interchangeability, although airline tickets are booked this way as a practical matter.  But the Plaintiffs do not allege an airport market, or interchangeability and cross-elasticity for such a market.

allegations about how the merger adversely impacted this international market, other than a complaint of higher fares, and there are no allegations regarding interchangeability or cross-elasticity.

### 2. *Failure to Allege Causal Connection Does Not Satisfy* Twombly *Pleading Standard*

Even assuming that the Plaintiffs had properly defined any market, many of their complaints fail to allege a plausible chain of causation for many of the alleged harms arising out of the merger. Simply put, they fail to connect the dots.

As counsel for the airlines explained at the hearing, the PSASC contains allegations regarding the merger and hundreds of allegations of harm without "any explanation for why in *Twombly* terms it is plausible to believe that that is the anticompetitive effects of this merger, as opposed to the millions of other things it might be." July 17 Hr'g Tr. 63:24–64:5. Under *Twombly*, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 570. In *Twombly*, the Supreme Court considered an antitrust claim for violation of the Sherman Act, and concluded that the complaint's allegations of parallel conduct and a bare assertion of conspiracy were insufficient. *Id.* at 556–57. "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. The Court dismissed the complaint in *Twombly* because the plaintiffs did not "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570.

The PSASC suffers from the same problem in many instances, often failing to move beyond the realm of possible claims. As one example, the Court turns to the allegations regarding Mr. Fry. The PSASC details how Mr. Fry and his wife have been inconvenienced since the US Air merger with America West, which has forced them to fly out of Denver rather

20

than Colorado Springs. *See* PSASC ¶¶ 265–70. Most of these allegations concern a flight from Denver to Tel Aviv in October 2013. *Id.* But all of these alleged harms occurred before the American merger. Despite the lengthy description of pre-merger inconveniences, Plaintiffs have failed to allege any plausible explanation as to how the American merger relates to this harm.

Additionally, there are many instances where the PSASC complains of fare increases where no one is alleged to have even purchased a ticket. *See, e.g.,* PSASC ¶¶ 246–47 (discussing increased airfare between Sacramento and Toledo, as well as Sacramento to Caracao [sic], without mention of tickets purchased). The PSASC also fails to allege higher prices for the same product. For instance, the complaint alleges that Ms. Russell "plans to fly on American Airlines again in the foreseeable future . . . . As of April 29, 2014, a ticket which is the same as the one she purchased in March 2014 [for travel in June] on American Airlines, sells for $951.01, and the same ticket if priced using the USAir-American Airlines code share costs $1517.00." PSASC ¶ 218. But as the two tickets were not the same number of days from the proposed travel—the more expensive ticket was closer—the two tickets are not necessarily comparable. Without a comparison of like products, an antitrust injury is not plausibly pled. *See Gatt*, 711 F.3d at 77 (no Section 4 standing where plaintiff did not allege that it paid higher, anticompetitive prices for a product).

Moreover, the Plaintiffs often allege injury to the public at large, rather than harm to any named plaintiff. For example, in the supplemental allegations, the Plaintiffs include a discussion of how flight delays and cancellations have increased as a result of decrease in competition between carriers. PSASC ¶¶ 342–46.[17] "Damages claimed in a private antitrust suit must be

---

[17]    *See also* PSASC ¶¶ 347–51 (alleging that since the merger, American and USAir have begun to sell tickets to customers on the same planes, routes and departure times at substantially different fares, depending on which carrier the flight was booked through); PSASC ¶¶ 220–21 (discussing changes to baggage programs).

different from those suffered by the general public—i.e. they must be special to the claimant." *Highland Supply Corp. v. Reynolds Metals Co.*, 327 F.2d 725, 732 (8th Cir. 1964); *see also United States v. Borden Co.*, 347 U.S. 514, 518 (1954) ("The Government seeks its injunctive remedies on behalf of the general public; the private plaintiff . . . may be expected to exercise it only when his personal interest will be served."); *Burkhead v. Phillips Petroleum Co.*, 308 F. Supp. 120, 123 (N.D. Cal. 1970) (Whether private litigant seeks relief in form of injunction or damages, "suit may not be maintained by the private litigation merely because of violations of the antitrust laws which have resulted in injury to the public.").

The Court previously highlighted this problem in ruling on Plaintiffs' first motion to amend, noting that the alleged Section 4 injuries must be personal to the Plaintiffs and cannot simply be harm suffered by the general public.  *See Fjord*, 506 B.R. at 386 ("Plaintiffs' counsel agreed that a pleading for injury requires allegations that something happened . . . Yet the PAC is devoid of any such allegations . . . In fact, many allegations in the PAC refer to harm to the general public or to 'millions of customers,' rather than any specific harm to these individual plaintiffs.") (internal citations omitted); *Fjord*, 502 B.R. at 33-34 ("The Court has no evidence whatsoever regarding who the Plaintiffs are, what the nature of their interest in the airline industry is, or how they will be individually harmed by the proposed merger. . . . [T]he Court need only consider those injuries plaintiffs advance that are personal to them . . . and cannot consider any injuries that plaintiffs allege would be suffered by the general air carrier flying public as a whole. . . .") (internal citations and quotations omitted).  Counsel for the Plaintiffs has received the same guidance in at least one other antitrust case.  *See Malaney v. UAL Corp.*, 2010 WL 3790296, at *13 (N.D. Cal. Sept. 27, 2010) ("In evaluating plaintiffs' purported irreparable harm as well as the balance of equities, the Court must only consider those injuries plaintiffs

22

advance that are personal to them were defendants to merge, and cannot consider any injuries that plaintiffs allege would be suffered by the general air carrier flying public as a whole."). Despite these repeated admonitions, the Plaintiffs here again level allegations of general harm without connecting such harms to any named plaintiff.

There are numerous other allegations that similarly do not state a personal harm to Plaintiffs, including harm from prior mergers, *see e.g.*, PSASC ¶¶ 274, 281, 291 (discussing results of previous airline mergers); and injuries yet to occur, *see, e.g.*, PSASC ¶¶ 289–90 (discussing expectation of Plaintiffs that the USAir Vacation practice of paying travel agent commissions will be terminated and the impact this would have on Ms. Davis). It would be improper to permit amendment of the complaint to add such deficient allegations. *See Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 313 (S.D.N.Y. 2003) ("[I]t is hardly 'absurd' to require that someone in the class of persons that would have standing if injured actually *be* injured in order for a suit to proceed.").

**B. Plaintiffs Are Not an Efficient Enforcer of Antitrust Laws for the Majority of Their Claims**

In addition to alleging a plausible antitrust claim and related injury, *see supra* Section A, a plaintiff must establish that it is an efficient enforcer of the antitrust laws. As to this second requirement of an efficient enforcer, courts typically examine the following factors:

> (1) the directness or indirectness of the asserted injury;
>
> (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;
>
> (3) the speculativeness of the alleged injury; and

(4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

*Gatt*, 711 F.3d at 78 (citations omitted).

The Plaintiffs here have not shown that they are efficient enforcers of the antitrust laws for many of their alleged harms. Of the forty named Plaintiffs, the PSASC only contains specific allegations as to thirteen. For these thirteen Plaintiffs, the PSASC includes three classes of allegedly injured parties who could serve as antitrust plaintiffs: travel agents, *see, e.g.,* PSASC ¶¶ 195, 198–200 (Ms. Jolly lost customers for her annual Paris group trips); clients of the travel agents, *see, e.g.,* PSASC ¶¶ 257–62 (Mr. Fry's client has paid increased airfare on routes out of Philadelphia); and personal injuries to the Plaintiffs, *see, e.g.,* PSASC ¶ 248 (Ms. Fjord purchased tickets for her family departing from San Francisco rather than Sacramento). Thus, the individuals who could serve as plaintiffs for such harms are airline passengers or the travel agents who act on their behalf. Of these, airline passengers are the more efficient enforcer of the alleged antitrust violation here. Examination of the four relevant factors leads the Court to this conclusion: directness of the injury; existence of an identifiable class motivated to vindicate the public interest; speculativeness of the injury; and difficulty apportioning damages to avoid duplicative recoveries.

With respect to the first factor, "[d]irectness in the antitrust context means close in the chain of causation." *Gatt*, 711 F.3d at 78 (citation omitted). Here, the Plaintiffs' complaint alleges that due to higher travel costs, consumers are choosing to book directly through airlines to avoid paying a travel agent's fee. PSASC ¶¶ 237, 291. If a consumer books a ticket and absorbs the higher cost, therefore, it does not appear that the travel agent would suffer any harm. The travel agents' loss of commissions or fees paid by consumers is further down the chain than

24

any harm suffered directly by the consumers. Thus, it is clear that the injury alleged by the passengers is more direct.

As to the second factor, Plaintiffs' counsel argued that no other party was suing, and that, therefore, these parties were the proper plaintiffs. July 17 Hr'g Tr. 14:5–8 ("[W]e are the only ones challenging this merger for damages. So there is no one else . . . ."). But the fact that no other party is presently bringing suit "does not support recognizing [the travel agents'] standing." *Gatt*, 711 F.3d at 79 (citing *Daniel v. Am. Bd. Of Emergency Med.*, 428 F.3d 408, 444 (2d Cir. 2005)); *see also Associated General Contractors*, 459 U.S. at 542 n.47 ("[I]f there is substance to [the plaintiff's] claim, it is difficult to understand why the[] direct victims of the conspiracy have not asserted any claim in their own right."). Given that customers exist to challenge any anti-competitive conduct, this second factor weighs against the standing of Plaintiffs to sue as travel agents.

The third factor also weighs against the travel agents. Their alleged damages are highly speculative when compared to customers. *See Gatt*, 711 F.3d at 79 (concluding that damages were highly speculative where the plaintiff did not plausibly allege that "in the absence of the alleged scheme, its bids—rather than some other party—would have prevailed."). Where a travel agent has lost business, it is much more difficult to trace that loss of business to the challenged merger, as compared to a more direct and definable loss suffered by a customer paying a higher fare. *See, e.g.*, PSASC ¶¶ 224–37 (alleging loss of income and business to Ms. Brown—who works as a travel agent and travel consultant—due to increased fares and fees and decreased service resulting from lessening competition in airline industry due to Defendants' merger). Other economic factors could greatly affect any losses suffered by travel agents, a concern reflected by allegations in the complaint itself. *Cf. Gatt*, 711 F.3d at 79 ("[T]he profits

25

Gatt earned under a bid-rigging scheme shed little light on how much Gatt would earn in a competitive bidding environment. Moreover, Vertex had no obligation to authorize Gatt to sell Vertex products in the first place. It is thus entirely uncertain whether, absent the scheme, Vertex would have entered into the Dealer Agreement with Gatt at all.").

Fourth and finally, the issue of apportioning damages and the risk of duplicative recoveries are problematic for any travel agent claim. It is unclear from the PSASC how payments to travel agents are apportioned. But it seems clear that if the travel agent booked and paid for a ticket, the passenger reimbursed the travel agent for the cost of the ticket and paid the agent's fee on top of that. As such, it is unclear how to determine what damages are suffered by a travel agent as distinct from the harm suffered by the passenger. Allowing travel agents to pursue claims based on customers also risks duplicative recovers as passengers have four years to bring such an action on their own behalf. *See* July 17 Hr'g Tr. 35:21–23 (noting that statute of limitations for passenger claims would be four years); *see also Gatt*, 711 F.3d at 79-80 ("[T]he risk of multiple and duplicative recoveries, while perhaps not of primary concern here, provides additional support for rejecting Gatt as an efficient enforcer. As we have observed, other Vertex dealers could assert—just as plausibly as Gatt has asserted in this case—that, had the bidding been independent, they would have bid on and won the . . . contracts. We recognize that other Vertex dealers may not file suit, and that future actions may well be time barred. *See* 15 U.S.C. § 15(b) (establishing four-year statue of limitations for private antitrust suits under 15 U.S.C. § 15). Regardless, this factor too works against Gatt.").

None of these factors weighs in favor of the travel agent Plaintiffs. The Court finds that the travel agent Plaintiffs would not be efficient enforcers and could not sustain a private action

for lack of antitrust standing.  Accordingly, the request to supplement the pleadings with respect

to any allegations regarding the travel agent Plaintiffs would be futile.

## **CONCLUSION**

For the reasons set forth above, the Motion is denied.  The Defendants are directed to

settle an order on three days' notice.

Dated: New York, New York
        March 31, 2015


                              */s/ Sean H. Lane*
                              UNITED STATES BANKRUPTCY JUDGE

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------x
                                        :
In re                                   :        Chapter 11 Case No.
                                        :
AMR CORPORATION, et al.,                :        11-15463 (SHL)
                                        :
                 Debtors.               :        (Jointly Administered)
                                        :
------------------------------------------------------------x
CAROLYN FJORD, et al.,                  :        Adversary Proceeding No.
                                        :
                 Plaintiffs,            :        13-01392 (SHL)
                                        :
       v.                               :
                                        :
AMR CORPORATION, AMERICAN               :
AIRLINES, INC., US AIRWAYS GROUP,       :
INC., US AIRWAYS, INC.                  :
                                        :
                 Defendants.            :
                                        :
OFFICIAL COMMITTEE OF                   :
UNSECURED CREDITORS,                    :
                                        :
                 As Intervenor.         :
------------------------------------------------------------x
```

**ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE**
**A SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**
**AND TO ADD A DAMAGES CLAIM AND DEMAND FOR JURY TRIAL**

Upon Plaintiffs' Amended Motion for Leave to File a Second Amended and
Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial, dated June 2,
2014 (Adv. Pro. ECF No. 106) (the **"Motion"**); Defendants' Opposition to the Motion and
accompanying Declaration (Adv. Pro. ECF Nos. 108, 109); Plaintiffs' Reply in Further Support
of the Motion (Adv. Pro. ECF No. 112); the record of the Hearing before the Court on July 17,
2014; Plaintiffs' letter to the Court on August 4, 2014 (Adv. Pro. ECF No. 114); and upon the
decision of the Court issued on March 31, 2015, the Court denies the Motion. Plaintiffs have
failed to state a claim for damages. As the Plaintiffs' jury demand rests upon their proposed new
treble damages claim, the request to add a jury demand must be denied as well.

Accordingly, it is hereby ORDERED that Plaintiffs' Motion is DENIED.

IT IS SO ORDERED.

Dated: April 28, 2015

*/s/ Sean H. Lane*
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                                        :
In re                                   :        Chapter 11 Case No.
                                        :
AMR CORPORATION, *et al.*,              :        11-15463 (SHL)
                                        :
                    Debtors.            :        (Jointly Administered)
                                        :
-----------------------------------------------------------x
CAROLYN FJORD, *et al.*,                :        Adversary Proceeding No.
                                        :
       Plaintiffs,                      :        13-01392 (SHL)
                                        :
       v.                               :
                                        :
AMR CORPORATION, *et al.*,              :
                                        :
                    Defendants.         :
                                        :
----------------------------------------- ----------------------x

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Upon Defendants' Motion for Summary Judgment dated May 12, 2017, and the papers

filed in support (Adv. Pro. ECF Nos. 139, 140, 141, 142) (the "Defendants' Motion"); Plaintiffs'

Opposition to Defendants' Motion and Plaintiffs' Cross-Motion for Summary Judgment dated

June 24, 2017, and the papers filed in support (Adv. Pro. ECF Nos. 149, 150, 151), as well as the

corrected Memorandum and Declarations dated June 27 and 28, 2017, filed in support (Adv. Pro.

ECF Nos. 153, 154, 156) (the "Plaintiffs' Cross-Motion"); Defendants' Reply papers in further

support of Defendants' Motion and in Opposition to Plaintiffs' Cross-Motion dated July 28, 2017

(Adv. Pro. ECF Nos. 160, 161, 162, 163); Plaintiffs' Reply papers in further support of Plaintiffs'

Cross-Motion dated September 1, 2017 (Adv. Pro. ECF No. 167); Plaintiffs' Motion for Order

Correcting the Record and supporting papers dated April 17, 2018 (Adv. Pro. ECF Nos. 172, 173, 174); and the record of the Hearing before the Court on March 26, 2018, for the reasons stated on the record by the Court on August 29, 2018, the Court hereby orders the following:

The Court denies Plaintiffs' Cross-Motion. The Court grants in part Defendants' Motion as to Plaintiffs' claim under Section 2(c) of the Robinson-Patman Act, as well as to Plaintiffs' claim under Section 7 of the Clayton Act, as brought in their roles as travel agents and/or arising in an alleged national market. The Court denies Defendants' Motion for Summary Judgment regarding Plaintiffs' Section 7 claim as brought by Plaintiffs in their roles as domestic airline customers, and arising out of city-pair markets. The Court also denies as moot Plaintiffs' Motion for Order Correcting the Record.

Accordingly, it is hereby ORDERED that Plaintiffs' Cross-Motion for Summary Judgment is DENIED, Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART, and Plaintiffs' Motion for Order Correcting the Record is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: September 14, 2018                    */s/ Sean H. Lane*
New York, New York                          United States Bankruptcy Judge

```
                                                    Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 11-15463-shl

 4    Adv. Case No. 13-01392-shl

 5    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 6    In the Matter of:

 7

 8    AMR CORPORATION,

 9

10            Debtor.

11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

12    FJORD et al.,

13                    Plaintiffs,

14            v.

15    AMR CORPORATION et al.,

16                    Defendants.

17    - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

1                  United States Bankruptcy Court

2                  One Bowling Green

3                  New York, NY  10004

4

5                  August 29, 2018

6                  3:09 PM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

Page 3

1    HEARING re BENCH DECISION

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

Page 4

```
 1    A P P E A R A N C E S :

 2

 3    LATHAM & WATKINS LLP

 4         Attorneys for the Defendants

 5         505 Montgomery Street, Suite 2000

 6         San Francisco, CA 94111

 7

 8    BY:  SADIK HUSENY

 9         ELIF KIMYACIOGLU

10

11    MESSINA LAW FIRM

12         Attorneys for the Plaintiffs

13         961 Holmdel Road

14         Holmdel, NJ 07733

15

16    BY:  GIL D. MESSINA

17

18    ALIOTO LAW FIRM

19         Attorneys for

20         One Sansome Street, 35th Floor

21         San Francisco, CA 94104

22

23    BY:  JOSEPH M. ALIOTO

24

25
```

Page 5

1    ALSO PRESENT TELEPHONICALLY:

2

3    THERESA MOORE

4    ROSEMARY D'AUGUSTA

5    JAMIE L. MILLER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2           THE COURT:  So, we're here this afternoon for a

3     bench ruling in the pending summary judgment motions in the

4     Caroline Fjord v. AMR Corporation et al antitrust -- civil

5     antitrust case, Adversary 13-1392.  That's an adversary

6     proceeding on the AMR Corporation bankruptcy, which is a

7     case from 2011.  So let me get appearances from counsel.

8           MR. ALIOTO:  May it please Your Honor, Joseph M.

9     Alioto for the Plaintiffs.

10          MR. MESSINA:  Joe Masuna, Your Honor, for the

11    Plaintiffs.

12          MR. HUSENY:  Thank you, Your Honor.  Sadik Huseny

13    of Latham Watkins for American Airlines.

14          MS. KIMYACIOGLU:  Elif Kimyacioglu of Latham

15    Watkins, for Defendant, American Airlines.

16          MR. ALIOTO:  And also on the telephone, if it

17    please Your Honor, is Christopher Meadow, also for the

18    Plaintiffs.

19          THE COURT:  All right.  So I have that one

20    appearance on the telephone.  Is there anybody else who's on

21    the telephone who wishes to make an appearance at this time?

22    All right.

23          MS. MOORE:  ...law firm.

24          THE COURT:  I'm sorry, is that -- I heard a very

25    faint voice.  If you could speak up?

Page 7

1          MS. MOORE:  This is Theresa Moore with Alioto Law

2    Firm for Plaintiffs.

3          THE COURT:  All right.  Anyone else?  All right,

4    without further ado, let's proceed.  Before the Court is the

5    motion, which I'll refer to as the motion, at ECF Number 140

6    of Defendants, AMR Corporation, American Airlines, Inc.,

7    U.S. Airlines Group, Inc., and U.S. Airways, Inc., now

8    merged as American Airlines Group, Inc., which I'll refer to

9    as Defendants or AAG, that seeks summary judgment on all

10   claims in the adversary proceeding brought by the

11   Plaintiffs.

12          Also before the Court is the Plaintiff's cross

13   motion, which I'll refer to as the cross motion, at ECF

14   Number 153 seeking summary judgment in favor of their

15   claims. And unless otherwise specified, all references to

16   ECF are to the case management filing docket at Case Number

17   13-1392, that is this adversary proceeding.

18          So, for the reasons set forth below, and I'll

19   explain in some detail, the Court grants in part and denies

20   in part Defendant's motion and denies in full Plaintiff's

21   cross motion.

22          So, turning first to the background.  The relevant

23   background facts in this case are undisputed and set forth

24   in the parties' statements under Federal Rule of Civil

25   Procedure 56F and the supporting evidentiary record.  The

Page 8

1   Court will only provide a citation for a fact when that fact

2   is particularly important.  It might not be easily located

3   or as a flashpoint in the dispute.

4           So, first, some background on the merger at issue

5   in this adversary proceeding.  American Airlines Group is a

6   publicly traded airlines holding company.  AAG was formerly

7   named AMR Corporation prior to its emergence from Chapter 11

8   in late 2013.  In November 29, 2011, AMR had filed its

9   voluntary Chapter 11 petition in U.S. Bankruptcy Court for

10  the Southern District of New York.  AMR's exit from

11  bankruptcy involved the merger with the former U.S. Airway

12  Group, Inc., that is U.S. Airways and the formation of AAG.

13          AMR and U.S. Airways announced that they had

14  reached a merger agreement on February 14, 2013, and this

15  Court approved that agreement on May 10, 2013.  On August

16  13, 2013, the United States Department of Justice, joined by

17  several states, filed a complaint in the United States

18  District Court for the District of Columbia against U.S.

19  Airways and AMR seeking to enjoin the merger.

20          The Plaintiffs in the DOJ action alleged that the

21  merger would violate Section 7 of the Clayton Act by

22  substantially lessening competition in the market for

23  scheduled air passenger service in more than 1,000 domestic

24  City Pairs as well as specifically at the Reagan National

25  Airport, which is one of only four airports in the country

Page 9

1   with flat restrictions which limit access to new

2   competitors.  The DOJ compiled a list of City Pairs based on

3   estimated post-merger concentration levels and concentration

4   level increases using their Herfindahl-Hirschman Index or

5   HHI.  HHI is a commonly accepted measure of market

6   concentration and is calculated by summing the squares of

7   the market shares of each identified market participant.

8           See FTC v. H.J. Hines Company, 246 F.3d 708 at

9   716, (D.C. Circuits 2001).  ("Market concentration or the

10  lack thereof is often measured by the Herfindahl-Hirschman

11  Index, or HHI.") Citation submitted.  See also id at Page

12  716, Note 9.  ("The FTC and the Department of Justice as

13  well as most economics consider the measure superior to such

14  cruder measures as the 4 or 8 firm concentration ratios,

15  which merely sum up the market shares of the four -- largest

16  four or eight firms.") See also Department of Justice and

17  Federal Trade Commission Horizontal Merger Guidelines at

18  Section 5.3, August 19, 2010, which I'll refer to as the

19  Horizontal Merger Guidelines.

20          The DOJ list includes concentration levels --

21  concentration level increases that would be presumptively

22  illegal under the policies set by DOJ's Horizontal Merger

23  Guidelines.  Although the merger guidelines are not binding

24  on the Court, they provide a useful illustration of the

25  application of HHI.  See FTC v. CCC Holdings, Inc., 605

Page 10

1    F.Supp.2d, 2637 (District Court in D.C. 2009), quoting FTC

2    v. PPG Industry, Inc., 798 F.2d 1500 at 1503, Note 4. (D.C.

3    Circuit 1986).  See also United States v. AT&T, Inc., 310

4    F.Supp.3d, 161 at 192, Note 18, (District Court of D.C.

5    2018).  ("Although the guidelines are not binding on this

6    Court, our circuit has noted they're a helpful tool in view

7    of the many years of thoughtful analysis they represent for

8    analyzing proposed mergers.")

9            The DOJ filed an amended complaint in their

10   antitrust case on September 5, 2013, to which it attached an

11   updated list of 1,008 City Pairs and HHI calculations.

12   Ultimately, AMR and DOJ settled the DOJ action with AMR

13   making various changes, including divestiture of certain

14   slots and gates at, among others, Washington Reagan National

15   Airport and New York LaGuardia Airport.  This Court approved

16   the settlement in the DOJ action in November 2013 and it was

17   also approved by the U.S. District Court for the District of

18   Columbia, where the DOJ's antitrust suit was pending.

19            In October of 2013, the Court confirmed AMR's

20   fourth amended joint Chapter 11 plan.  On December 9, 2013,

21   AMR and U.S. Airways closed the merger.  As originally

22   proposed, the merger agreement incorporated a letter

23   agreement between AMR and Tom Horton, its then chairman,

24   president, and CEO, granting him severance compensation of

25   $19 million and $875,000 split evenly between cash and

1   stock, and providing for his employment as chairman of the

2   board of AAG for approximately one year following the

3   merger.  The Court -- this Court ultimately disapproved its

4   inclusion in the merger agreement as violating Section 503C

5   of the Bankruptcy Code.

6           Upon completing of the merger, Mr. Horton

7   transitioned from his role as both executive and chairman of

8   the board of AMR to just the position of chairman of the

9   board of AAG.  The transition agreement approved after the

10  bankruptcy by the board of directors of AAG and signed by

11  the new CEO of AAG included, "Separation payments and

12  benefits" of similar value to the severance compensation

13  contemplated by the chairman letter agreement.  See

14  declaration of Gil D.  Messina, Messina declaration Exhibit

15  Double I -- I'm sorry, Roman Numeral II, the transition

16  agreement.  See ECF Number 156-1.

17          The Court now turns to the background of this

18  adversary proceeding and the Plaintiff's request for a TRO.

19  the Plaintiffs filed the complaint initiating this adversary

20  proceeding in early 20 -- August 2013.  When Debtors filed a

21  motion to consummate the merger, the Plaintiffs filed a

22  cross motion requesting a temporary restraining order to

23  enjoin the merger.  Well, that TRO motion was denied.  See

24  In RE:  AMR Corporation 502 B.R. 23, 47 (Bankr. S.D.N.Y.

25  2013).  It is relevant here in that Plaintiffs submitted the

1   affidavit of Professor Darin Bush in support of their

2   requested relief.   In his affidavit Professor Bush heavily

3   relied on materials filed in the DOJ action.   Professor Bush

4   specifically called attention to Appendix A of the DOJ

5   amended complaint, which contained the list of 1,008 City

6   Pairs where the DOJ had argued the merger would be

7   presumptive illegal due to their then current concentration

8   levels and the post-merger concentration level increases.

9          After the merger was consummated, Plaintiffs filed

10  a first amended complaint in this adversary.   See ECF Number

11  103.   Several subsequent attempts to amend were either

12  denied or withdrawn.   At multiple points in these

13  proceedings, the Court (indiscernible) deficiencies in

14  certain elements of Plaintiff's case, including its framing

15  of the relevant market and claims of injury.   See In RE:

16  AMR Corporation 502 B.R. at 35-36 and 40-41.   (Denying TRO

17  and preventing consummation of the merger.) See also in RE:

18  AMR corporation 527 B.R. 874 at 883, 885-86, 889-92, (Bankr.

19  S.D.N.Y. 2015).   (Denying Plaintiff's motion for a leave to

20  file a second amended and supplemental complaint.)

21          Mindful of the Supreme Court's decision in Stern

22  v. Marshall, 564 U.S. 462, case from 2011, this Court asked

23  the parties about its ability to enter a final judgment in

24  this adversary proceeding.   In response, the parties filed a

25  stipulation confirming consent to have a United States

Page 13

```
1    bankruptcy judge conduct all proceeding in this case,

2    including trial, the entry of final judgment, and all post-

3    trial proceedings.  See Notice Consent and Reference of a

4    Civil Action to the Bankruptcy Court ECF Number 129.  See

5    also Wellness International Network Limited v. Sharif, 135

6    Supreme Court 1932 at 1949, case from 2015.  (Holding that

7    Article III permits Bankruptcy Court to decide Stern claim

8    submitted to them by consent.)

9            So, turning to the background for the claims

10   addressed in this decision.  The first amended complaint

11   identifies the Plaintiffs as "individuals who are passengers

12   and travel agents who purchased airline tickets from

13   Defendants in the past and who are expected to do so in the

14   future." First Amended Compliant, Paragraph 5.

15           Plaintiffs contend that they are threatened with

16   injury from certain allegedly anticompetitive effects of the

17   merger, both in their capacities as passengers and as travel

18   agents.  Given that the case is filed under Section 7 before

19   the merger and that Plaintiffs assert they cannot adequately

20   be compensated by damages, Plaintiffs requested relief

21   (indiscernible) seeking permanent injunctive relief against

22   the merger.  See ID.  But given that the merger has already

23   occurred, such remedy would likely be in the nature of

24   divestiture.

25           In addition, Plaintiffs allege that the payment of
```

Page 14

1    Mr. Horton's severance through the transition agreement and

2    in conjunction with the merger amounted to commercial

3    bribery in violation of Section 2C of the Robinson Patman

4    Act.   See cross motion 55 and also see 15 U.S.C. Section 13,

5    Subsection C.

6          In seeking summary judgment on the Section 7

7    claim, Defendants argue that Plaintiffs have, one, failed to

8    establish a relevant market; two, failed to offer evidence

9    or conduct a requisite analysis of any adverse competitive

10   effects; three, failed to establish antitrust standing by

11   identifying how the merger's alleged anticompetitive effects

12   impact them perfectly or why they're appropriately antitrust

13   plaintiffs.

14          As to Plaintiff's other claim, Defendants contend

15   that, among other things, Section 2C cannot be violated

16   whereas your payment was made with express employer

17   approval, as was true here with the AMR and AAG board of

18   directors.

19          In their cross motion, on the other hand,

20   Plaintiffs argue that they properly alleged two alternative

21   geographic market definitions, City Pairs and the national

22   market, and that Defendants already conceded City Pairs as a

23   relevant market earlier in these proceedings.  Plaintiffs

24   argue that their allegations regarding market concentration

25   create an irrebuttable presumption that the mergers violated

1   Section 7 of the Clayton Act.  As to antitrust standing,

2   Plaintiffs submitted 20 new declarations from

3   (indiscernible) Plaintiffs regarding their flight histories

4   and plans.  See Plaintiff's declarations to support a cross

5   motion.  CECF Numbers 149-5 through 149-25.

6           On the Section 2C claim, Plaintiffs contend, among

7   other things, that Mr. Horton never became an employee of

8   AEG post confirmation, and that a change in his position

9   about whether to go forward with the merger confirms the

10  purpose and consequence of the payment.

11          Turning to the standards for summary judgment in

12  the record here, summary judgment is appropriate if the

13  pleadings depositions answers to interrogatories admissions

14  on file together with the affidavits, if any, show that

15  there is no genuine issue as to any material fact and that

16  the movement is entitled to judgment as a matter of law,

17  from the much quoted Celotext Corporation v. Catrett case,

18  477 U.S. 317 to 322 (1986), which is quoting Federal

19  Procedure 56.

20          In deciding whether material factual issues exist,

21  all ambiguities must be resolved and all reasonable

22  inferences must be drawn in favor of the non-moving party.

23  See In RE:  Ampal-American Israel Corporation 2015 West Law

24  5176395 at *10, (Bankr. S.D.N.Y. September 2, 2015), which

25  is citing Matsushita Electric Industry Corporation v. Zenith

Page 16

1    Radio Corporation 475 U.S. 574 at 587, case from 1986.  The

2    Court determines that the record taken as a whole could not

3    lead a rational trier of fact to find for the non-moving

4    party.  There is no genuine issue for trial.  See Matsushita

5    475 U.S. at 587.

6            As a threshold matter the Court needs to address

7    the scope of the record.  Defendants challenge the

8    proprietary of so-called 11th hour declarations filed in

9    support of the Plaintiff's cross motion arguing that they

10   are the epitome of the type of self-serving and inconsistent

11   declarations raised on the brink of summary judgment that

12   courts routinely view with skepticism.  See Defendant

13   American Airline Group's opposition to Plaintiff's cross

14   motion in reply and support of Defendant's motion, which

15   I'll refer to as AMR opposition at Paragraph 74, which can

16   be found at ACF Number 160.

17           In support of their objection to these 20

18   declarations, Defendants cite to cases on the "sham issue of

19   fact doctrine".  See In RE:  Fosomax Products Liability

20   Litigation 707 F.3d, 189 at 193 (2d Cir. 2013).  See also

21   AMR Opposition Paragraph 74.  But Defendants specifically

22   identify just inconsistencies in the declarations.  See AMR

23   Opposition of Plaintiff -- I'm sorry, Paragraph 74, Note 29.

24           The Court certainly does not condone the filing of

25   these declarations now to the extent it constitutes a

1    failure by Plaintiff's counsel to timely disclose

2    information and discovery.  But without a detailed showing

3    of clear material inconsistencies between the declarations

4    in prior testimony, the Defendants have not justified

5    excluding the declarations under the cases already that they

6    cite.  See In RE:  Fosomax 707 F.3d at 194.  ("A sham issue

7    of fact exists only where there are contradictions

8    in...testimony are inescapable and unequivocal in nature.")

9    And that's citing the Rivera v. Rochester Genesee Regional

10   Transportation Authority 702 F.3d 685 at 696 (2d Cir.

11   2012), which is a case denying summary judgment because the

12   inconsistencies in the Plaintiff's testimony were not real,

13   unequivocal, and inescapably contradictions.  Accordingly,

14   the Court considers the declarations for purposes of these

15   motions.

16            So, the Court now turns to the legal standards

17   governing a Clayton Act Section 7 claim.  Section 7 of the

18   Clayton Act provides as follows:  "No person engaged in

19   commerce..." I'm going to paraphrase here.  No person

20   engaged in commerce or in any activity affecting commerce

21   shall acquire, directly or indirectly, the whole or any part

22   of the stock of another person engaged also in commerce,

23   wherein any line of commerce or in any activity affecting

24   commerce in any section of the country, the effect of such

25   acquisition will be substantially less in competition or to

1    tend to create a monopoly.  See 15 USC Section 18.

2         In other words, Section 7 is concerned with

3    whether an acquisition or a merger itself may cause

4    antitrust injury.  See In RE:  Zink Antitrust Litigation

5    2016 Westlaw 3167192 at *22, (S.D.N.Y June 6, 2016).

6    Quoting Geneva Pharmaceuticals Technical Corporation v. Barr

7    Labs Inc., 386 F3d 485 at 511 (2d. Cir. 2004).  "Modern case

8    law provides for a burden-shifting process in which

9    plaintiffs typically establish a prima facie case with, for

10   example, market concentration statistics, and defendants

11   attempt to rebut it by offering conflicting evidence of the

12   merger's probable effects on competition."

13        See United States v. Baker Hughes, Inc., 908 F.2d

14   981 at 982-83 (D.C. Cir. 1990).  (Describing the familiar

15   burden-shifting network applied to Section 7 Horizontal

16   Acquisition cases.) See also Saint Alphonsus Medical Center

17   Napa, Inc. v. St.  Luke's Health Systems, Limited 778 F.3d

18   at 775, 783 (9th Cir. 2015).  ("Section 7 claims are

19   typically assessed under a burden-shifting framework.") And

20   that's quoting the Chicago Bridge and Iron Company v. FTC,

21   534 F.3d 410 at 423 (5th Cir. 2008).  And see, also, RC

22   Bigelow, Inc. v. Unilever NV, 867 F.2d 102 at 107-108 (2d

23   Cir.  1989).  (Explaining the presumption creation by market

24   share statistics and a defendant's burden of abutting this

25   presumption.)

Page 19

1    Prior to addressing the substance of the Section 7

2    case here, the Court addresses two gating issues:  One,

3    antitrust marketing; and, two, standing.  The Court begins

4    its discussion of the market issue.  It is a threshold

5    requirement for stating a claim under Section 7 of the

6    Clayton Act that a plaintiff must allege a plausible

7    relevant market in which competition will be impaired.  See

8    City of New York v. Group Health, 649 F.3d 151 at 155 (2d

9    Cir. 2011).  See also U.S. v. E.I du Pont de Nemours &

10   Company, 353 U.S. 586 at 593 1957.  ("Determination of the

11   relevant market is a necessary predicate to a finding of a

12   violation of the Clayton Act.") See also Geneva

13   Pharmaceutical Technical Corporation, 386 F.3d at 496.

14   ("Evaluating market power begins with defining the relevant

15   market.")

16       It is well established that market definition is a

17   question of fact.  See Metro Intercollegiate Basketball

18   Association v. National Collegiate Athletic Association, 339

19   F.Supp.2d 545 at 549 (S.D.N.Y. 2004).  ("The definition of a

20   relevant market is an issue of fact.") See also Todd v.

21   Exxon Corporation, 275 F.3d 191 at 199-2000 (2d Cir. 2001).

22   (Referring to market definition as deeply fact intensive

23   inquiry.) And that decision collects cases.

24       Hayden Publishing Company v. Cox Broadcasting

25   Corporation, 730 F.2d 64 at 70 Note 8 (2d Cir. 1984).

1    (Finding that it's "frequently been observed" that market

2    definition is a pronouncement of fact, not law.) And that

3    case sites Jennings Oil Company v. Mobile Oil Company, 539

4    F.Supp. 1349 at 1352 (S.D.N.Y. 1982).

5              Plaintiffs here propose one market definition and

6    two alternative geographic market definitions.  In their

7    first amended complaint, Plaintiffs write that the relevant

8    product and geographic markets for the purposes of this

9    action are the transportation of airline passengers in the

10   United States.  First amended complaint, Paragraph 31.

11             In addition to this national market framing,

12   Plaintiffs identify geographic submarkets in the form of

13   hundreds of "City Pairs".  First amended complaint,

14   Paragraphs 2, 32, Appendix A.  See also the hearing

15   transcript in this court, Page 42 at Lines 12-15 from March

16   26, 2018.  ("I do want to declare that Plaintiffs are

17   alleging two major markets.  One is the national market and

18   then the other markets are the separate City Pair markets.")

19             So, turning first to City Pairs, Plaintiffs plead

20   that the merger is presumptively illegal on nearly 1,000

21   routes between specific City Pairs identified in Exhibit A

22   to their first amended complaint.  See also Plaintiff's

23   reply at 5.  While Defendants now contend that Plaintiffs

24   have failed to set forth an appropriate market, Defendants

25   previously conceded that City Pairs area a proper geographic

1    market for purposes of this proceeding.

2          In their reply to Plaintiff's motion for a TRO,

3    Defendants stated as follows:  "The properly defined market

4    in this case is scheduled air passenger service between City

5    Pairs.  A traveler departs one city and ultimately arrives

6    in another whether on a single flight or several connecting

7    flights.  This City Pair is the relevant geographic market

8    because a consumer seeking to fly to one city generally will

9    not settle for traveling to another city." See Brown Shoe

10   370 U.S. at 325, FTC v. Staples, Inc., 970 F.Supp. 1066

11   1073, (District Court D.C. 1997).  And that all is a quote

12   from Defendant and intervener's joint reply to Plaintiff's

13   objection and opposition to Plaintiff's cross motion for a

14   temporary restraining order at 37 Note 10, which can be

15   found at ECF Number 64.

16          Defendants argue that they have acknowledged only

17   that City Pairs earn appropriate way to think about and

18   define potential antitrust markets in the airline industry,

19   but not that they are de facto relevant markets.  See AMR

20   opposition in Paragraph 22-23.  See also motion at 22.

21          Defendants further argue that by failing to retain

22   an expert to submit requisite economic analysis in evidence,

23   Plaintiffs did not carry their own burden on the issue.  See

24   AMR opposition in Paragraphs 23-27.

25          But Defendants' language on this was unequivocal

Page 22

1   and the Court relied on Defendants' clear statement in a

2   prior decision.  See In RE:  AMR Corporation 502 B.R. at 40.

3   ("While the Defendants accept that City Pairs are the

4   properly defined market..." See reply at 37 Note 10,

5   Adversary Proceeding ECF Number 64 "...neither Mr. Bush's

6   report or the Plaintiff's pleadings identify which City

7   Pairs are at issue in light of the new merger.")

8           Indeed, courts have repeatedly accepted City Pairs

9   as the relevant market in antitrust cases involving the

10  airline industry.  See In RE:  Northwest Airlines

11  Corporation, 208 Federal Rule Decisions 174 at 220, (Eastern

12  District of Michigan 2002).  ("As plaintiffs note, any

13  broader attack on the use of City Pairs surely cannot

14  succeed where the airlines themselves as well as numerous

15  government and academic reports have adopted the same

16  general approach to analyzing the air travel industry.")

17          See also Global Discovery Travel Services, LLC v.

18  Trans World Airlines, Inc., 960 F.Supp. 701 at 704-705

19  (S.D.N.Y. 1997).  (Impliedly accepting City Pairs to the

20  geographic market while rejecting product market pled

21  narrowly as only TWA tickets between the relevant City

22  Pairs.)

23          For all these reasons then the Court construes

24  Defendant's prior statement about the City Pairs market as a

25  judicial admission.  See Banks v. Yokmik, 214 F.Supp.2d 401

1    at 405 (S.D.N.Y. 2002).  ("Judicial admissions are formal

2    concessions in the pleading through stipulations by a party

3    or its counsel and are binding upon the party making them.")

4    Keller v. United States, 58 F.3d 1194 at 1198 Note 8 (7th

5    Cir. 1995).

6            Such assertions are affirmative facts -- factual

7    affirmations or stipulations of some sort that bind both the

8    party making the admissions and the court ID.  Citing Bank

9    of America v. Fairleigh, 2002 Westlaw 5586 at *6 (S.D.N.Y.

10   January 2, 2002).  (Treating the initial answer in which

11   defendants admitted signing credit documents is a formal

12   judicial admission.)

13           Indeed, it is well established that a court can

14   treat a statement in a brief as a binding judicial admission

15   of fact.  See In RE:  Fosomax Product Liability Litigation

16   647 F.Supp.2d 265 at 276 (S.D.N.Y. 2009) citing Purgess v.

17   Sharrock, 33 F.3d 134 at 144 (2d. Cir. 1994).  Rosario v.

18   Goldsmith 84 F.Supp.2d 455 at 464-465 (S.D.N.Y.) which is

19   affirmed at 230 F.3d 518 (2d. Cir. 2000).  CF Baxter v. MBA

20   Group Insurance, Transportation, Health and Welfare Plan,

21   958 F.Supp.2d 1223 at 1232-33 (Western District of

22   Washington 2013).

23           ("Here, plaintiffs unambiguously conceded in a

24   summary judgment motion that proton therapy is more costly

25   than x-ray therapy.  Plaintiffs should not be permitted to

Page 24

1    abandon this argument and take a different position in later

2    filing briefing.") In RE:  Fosomax 647 F.Supp.2d at 276.

3    ("Plaintiff cannot allege one set of facts in support or for

4    failure to win warn claims and then allege a conflicting set

5    of facts in order to admit an expert to support those claims

6    and demand punitive damages flowing from those claims.")

7              Absent such a judicial admission, the Court might

8    be required to consider if Plaintiff's market framing could

9    go forward without expert testimony.  See, e.g., Allen v.

10   Dairy Farmers of America, Inc., 2014 W.L. 2610613 at *5

11   (District of Vermont, June 11, 2014).  (Courts recognize

12   that antitrust plaintiffs often cannot survive summary

13   judgment without the benefit of an expert witness who

14   supports their market definition.) There are a number of

15   citations that I have not included here.

16              State of New York by Abrams v. Anheuser-Busch,

17   Inc., 811 F.Supp. 8484 at 871 (E.D.N.Y. 1993).  ("As was

18   discussed in the findings of fact, numerous conditions

19   contributed to the state's failure to prove its proposed

20   market boundaries, the least of which was not the state's

21   unwillingness to adhere to a single geographic market

22   theory, and its inability to offer any expert testimony on

23   any of its theories.") See also Dial Corporation v. News

24   Corporation, 165 F.Supp.3d 25 at 35 (S.D.N.Y. 2016).

25   (Relying on industry documents, ordinary course business

Page 25

1    statements, as well as expert analysis employing the SSNIP

2    Test to define scope of product market.)

3           But it is unnecessary for the Court to address

4    this issue here about the need for expert testimony.  See

5    Lugue v. Hercules, Inc., 12 F.Supp.2d 1351 at 1357 (S.D.

6    Georgia 1997).  (Plaintiffs are under no burden to provide

7    expert testimony relying on defendant's judicial

8    admissions.) See F. In RE:  Fosomax 647 F.Supp. 2d at 276.

9    (Judicial admissions are not evidence at all but rather have

10   the effect of withdrawing a fact from contention.)

11          See Best Canvas Products and Supplies, Inc. v.

12   Ploof Trucklines, Inc., 713 F.2d 618 and 621 (11th Cir.

13   1983).  (Judicial admissions are proof possessing the

14   highest possible probative value.  Indeed, facts judicially

15   admitted are facts established not only beyond the need of

16   evidence to prove them but beyond the power of evidence to

17   controvert them.) And that cases is citing Hill v. FTC, 124

18   F.2d 104 at 106 (5th Cir. 1941).

19          But see In RE:  Marina IUD Product Liability

20   Litigation 2002 F.Supp. 3d 304, 317 (S.D.N.Y. 2016) affirmed

21   7-13 F Appendix 11 (2d Cir. 2017).  Search (indiscernible)

22   subnom.  Marina MDL v. Bayer Healthcare Pharmaceutical,

23   Incorporated, 138 (Supreme Court 1299 from 2018).  (Granting

24   summary judgment and distinguishing from Lugue where

25   plaintiffs could only point to out of court evidentiary

1    admissions rather than judicial admissions.)

2         Accordingly, for all these reasons, the Court

3    concludes that Defendant's judicial admission is sufficient

4    for the purposes of accepting City Pairs as the proper

5    geographic market in this case.  Of course, Defendants

6    remain free to challenge the suitability of any particular

7    City Pair or group of City Pairs at trial based on their

8    particular circumstances as appropriate.  See R.C. Bigelow,

9    Inc. v. Unilever NV, 876 F.2d at Page 110.

10        So, turning to Plaintiff's proposed national

11   market, this fairs less well.  This Court has previously

12   warned Plaintiffs of the fundamental flaws in the case for a

13   national market for airline travel.  See In RE:  AMR

14   Corporation 527 B.R. 883 Pages 885-86.  (Denying Plaintiff's

15   motion for leave to file a second amended and supplemental

16   complaint.)

17        In that decision the Court explained that

18   Plaintiff's national market theory would require a

19   conclusion that all flights compete with each other, but

20   that Plaintiff's had failed to explain why this would be

21   true.  See id at Page 885.  Nonetheless, Plaintiffs have

22   repeated advocated for a national market.  See first amended

23   complaint, Paragraphs 2-32.  Plaintiff's motion of amended

24   motion for lead to file a second amended and supplemental

25   complaint (indiscernible) damage claim and demand for jury

1    trial.  Exhibit A, Paragraphs 32-33 on ECF Number 106-1.

2    See also Plaintiff's notice of motion for (indiscernible)

3    second amended and supplemental complaint, added damages

4    claim and demand for jury trial, Exhibit A, Paragraphs 40-41

5    ACF Number 118-1.  See also cross motion at 34, 35, and

6    hearing transcript at Page 42, Line 12-15 from the hearing

7    on March 26, 2018.

8            The Court finds the national market theory here to

9    be as deficient as ever.  Plaintiffs continue to ignore this

10   Court and relevant case law by failing to offer the required

11   economic analysis, expert opinions, or even sound logic to

12   justify such framing.  See, United States v. AT&T, Inc., 310

13   F.Supp.3d at 195.  (Market definition is often heavily

14   contested in horizontal merger cases, turning on fine-

15   grained economic analysis of SSNIPs and cross-elasticity of

16   demand.) See also Saint Alphonsus 778 F.3d at 784.  (A

17   common method to determine the relevant geographic market is

18   to find whether a hypothetical monopolist could impose a

19   small but significant non-transatory increase in price SSNIP

20   without losing too many consumers to make the price increase

21   unprofitable.

22           See also Committee Publishers, Inc., v. Don Ray

23   Corporation 892 F.Supp. 1146 and 1155 (Western District of

24   Arkansas 1995).  Affirm sub nom. at 139 F.3d 1180 (8th. Cir.

25   1998).  (With regard to defining the geographic market, the

Page 28

1    same basic principles apply as defining a product market.)

2           Instead, Plaintiffs offer only two things:  One,

3    the assertion that Defendants have in prior litigation

4    admitted to and relied upon the existence of a national

5    relevant geographic market.  That's a statement made in the

6    cross motion at Page 35.  And, two, a theory involving

7    interchangeability of supply between City Pairs.  But both

8    these arguments fail.

9           As to the first argument, the Supreme Court has

10   stated that industry or public recognition may be used as a

11   practical (indiscernible) by which to identify valid product

12   submarkets.  See In RE:  Brown Shoe Company v. United

13   States, 370 U.S. 294 at 325 (1982).  Accordingly, testimony

14   as well as ordinary course and industry materials have been

15   used to help determine market definitions.  See e.g. Dial

16   Corporation, 165 F.Supp.3d at 35.  (Relying in part in the

17   market framing applied by the Defendant's marketing.)

18          While Plaintiffs offer no authority to justify why

19   this Court should rely on statements from Defendant's

20   executives or representatives is evidence of a proper

21   geographic market framing when they were made neither in the

22   ordinary course of business nor in the context of defining a

23   market for antitrust purposes.

24          In any event, the only admissions cited by

25   Plaintiffs are taken out of context and do not confirm that

Page 29

1    Defendants actually hold such a view.  See Berlin, Inc. v.

2    The Gazette Newspapers, Inc., 223 F.Supp.2d 718 at 728

3    (District of Maryland 2002) Affirm sub nom. Berlin, Inc. v.

4    The Gazette Newspapers, Inc., 73 F. App. 576 (4th Cir.

5    2003).  (The deposition excerpts generally are statements of

6    other non-experts as to what the geographical lines of

7    competition are.  There is no evidence, however, that the

8    post internal documents or the opinions of its employees are

9    based on scientific research aimed at determining relevant

10   market for antitrust purposes.)

11          For example, Plaintiff cites the deposition

12   testimony from various AMR and U.S. Airways executives in

13   support of the national market theory.  Plaintiff claims

14   that Mr. Parker conceded such a market framing, but Mr.

15   Parker's cited testimony merely acknowledges the low

16   physical barriers to entry for airlines trying to enter new

17   cities.  See cross motion at 36, citing Messina Declaration

18   Exhibit D, Parka deposition transcript, Page 44, Line 14-22;

19   Page 45, Lines 20 through Page 46, Line 8, all of which can

20   be found at ECF Number 156-1.

21          In fact, in the same passage cited by Plaintiff's,

22   Mr. Parker explains that while his aircraft was capable of

23   serving any market, it is profitability that forms a barrier

24   in different geographies across the country, and observes

25   that in certain hubs U.S. Airways couldn't compete with

Page 30

1    other low-cost carriers which could offer services there

2    more efficiently.  See id Page 45, Lines 8-10 and Page 45,

3    Lines 20-25.

4            Plaintiff's similarly misconstrue the testimony

5    from Mr. Horton that they rely upon.  Although Plaintiffs

6    correctly point out that Mr. Horton testified as to national

7    market shares of the major airlines in the United States...

8    (see cross motion to 37) ...he only did so in response to

9    their express request, and only after asking them to clarify

10   what market framing they wished.  See Messina declaration

11   Exhibit U, Horton deposition transcript Page 37, Line 1

12   through Page 39, Line 10.

13           Similarly, plans selectively quote Mr. Horton as

14   acknowledging that you can look at the United States as a

15   market of competing airlines.  See cross motion at 37 citing

16   Messina declaration, Exhibit U, Horton deposition transcript

17   Page 68, Lines 6-7 and 69, Lines 9-10.

18           But once again, this acknowledgement must be

19   understood in the context of Mr. Horton's explanation that

20   there are many ways to look at a market including at the

21   smallest level of flight from one airport to another airport

22   at a specific time of day.  See Messina declaration Exhibit

23   U, Horton deposition transcript Page 68, Lines 14-19.

24           Quoting ex-American executive Scott Kirby,

25   Plaintiffs again pull individual statements out of context

1    which do not support their national market proposition.  For

2    example, while Mr. Kirby stated that he defined the domestic

3    market as the Continental United States, excluding Hawaii

4    and Alaska, this came in response to being asked to clarify

5    an earlier statement that Southwest was the largest airline

6    in the United States.  See Messina declaration Exhibits YY

7    at 38 and see also cross motion at 37.

8              In other words, Mr. Kirby's statement arose as a

9    result of a request for such a definition in context of a

10   revenue comparison between companies and not as a commentary

11   on the competitive structure of the industry.  Defendant's

12   expert Professor Dennis Carlton came closest to offering

13   support for a national market in his acknowledgment of the

14   complexity of the industry.  See Messina declaration,

15   Exhibit GG at 47.  (While I think that in the case of the

16   airlines, their network industries, it's a little more

17   complicated than your typical industry.  So I think there

18   are aspects of both the local and national market when

19   you're evaluating airlines.)

20             But even this statement falls well short as this

21   observation was never expanded upon, and counsel explicitly

22   stopped short of asking any follow up questions.  See ID.

23   ("And, for instance, when you're looking on it as a national

24   basis, do you understand -- well, strike that.")

25             Plaintiffs also rely on past cases in which they

1    contend the Defendants took positions in support of a

2    national market.  They cite to In RE:  Air Passenger

3    Computer Reservation Systems 294 F.Supp. 1443 (C.D. Cal.

4    1998) Because "U.S. Air took the position that the relevant

5    geographic market was national in scope." See cross motion

6    at 35.

7         But that case is extinguishable.  It did not

8    center on the domestic airline passenger market, but rather

9    on the alleged monopolization of the market for computerized

10   reservation systems. See In RE:  Air Passenger 694 F.Supp.

11   at 1449.

12        The Plaintiffs also cite to Continental Airlines,

13   Inc., v. American Airlines, Inc., 824 F.Supp. 689 at 692

14   (S.D. Tex. 1993).  The case alleging that American violated

15   the Sherman Act by enacting a national value pricing plan

16   with fewer price points in order to make price fixing and

17   collusion easier.

18        While it's correct that AMR argued in support of a

19   national market for air transportation in that case, this

20   single fact from a 25-year old case is woefully insufficient

21   by itself to establish a national market here.  See United

22   States v. AT&T, Inc., 310 F.Supp.3d at 195.  ("Market

23   definition is often heavily contested in horrible merger

24   cases turning on fine grain economic analysis of SSNIPs and

25   cross-elasticity of demand.") And citations are omitted from

Page 33

1    that quote.

2           See Dial Corporation, 165 F.Supp.3d at 35.

3    (Relying on industry documents in ordinary course business

4    statements as well as expert analysis employing the SNIPP

5    Test to define scope of product market.) See Colsa

6    Corporation v. Martin Marietta Services, Inc., 133 F.3d.

7    853 and 855, Note 4 (11th Cir. 1998.) (Upholding

8    (indiscernible) of summary judgment and finding Plaintiff

9    failed to establish a relevant market based on testimony

10   from lay witnesses.)

11          See also FTC v. Freeman Hospital, 911 F.Supp. 1213

12   and 1220 (W.D. Montana) affirmed at 69 F.3d 260 (8th Cir.

13   1995).  (Holding while such non-empirical data as the

14   perceptions of third party hospital administrator, third

15   party payers, and the parties themselves may have some

16   probative value as a starting point to evaluate the market,

17   such data will not carry the Plaintiff's burden.)

18          As to Plaintiff's second argument in favor of a

19   national market, Plaintiff's theory of interchangeability of

20   supply is equally wanting.  Plaintiffs argue that because

21   the existing major airlines in the United States can service

22   America anywhere, the geographically relevant market must be

23   expanded to include the capability of the Defendant airlines

24   to service America anywhere, not just the routes they

25   currently serve.  See cross motion at 36, which is quoting

Page 34

1   the Messina declaration Exhibit D, Parker transcript

2   deposition transcript Page 44, Lines 14-22.

3          Plaintiff's conclusion is unsupported and does not

4   logically follow.  Just because the airlines are able to

5   shift planes from one city to another does not imply that

6   different metropolitan areas are part of the same geographic

7   market.  Many businesses could arrange for their equipment

8   to be transferred to another city but it takes more to

9   conclude that they compete with current vendors in that

10  metropolitan area for antitrust purposes.

11         That a competing airline can redirect its planes

12  to fly in and out of New York Metropolitan Area might must

13  be evidence that New York routes have low barriers to entry;

14  not that flights between LaGuardia and O'Hare compete with

15  flights to LAX and Seattle-Tacoma.  Notably, Plaintiffs

16  provide no evidence or discussion of what is entailed in

17  entering new cities or the impact of supply limitations in

18  the form of flight restrictions or total gates.  This

19  failure precludes any analysis of the significance of cross-

20  elasticity of supply in determining market boundaries.

21         See Bailey v. Allgas, Inc., 284 F.3d 1237 and 1246

22  (11th Cir. 2002).  (Affirming summary judgment in part for

23  failure to provide a sufficient basis for finding a monopoly

24  parallel where the Plaintiff's expert's assessment in the

25  relevant product market was cursory and unclear and in

Page 35

1    defining the relevant geographic market, he ignored

2    instructive guidelines set forth in the governing

3    precedent.)

4         Plaintiffs also contend that a national geographic

5    market for air transportation is not established on the

6    basis of whether a flight from City A to City B is

7    interchangeable with a flight from City C to City D, and

8    that because consumers can turn to Cities A, B, C, and D for

9    Defendant's products, they all should be included in the

10   relevant geographic market.  See cross motions at Pages 34-

11   35.

12        The Court finds this reasoning similarly

13   illogical.  It is not true that because a Plaintiff could

14   theoretically travel to another city and purchase a plane

15   ticket there that it should be included in the same

16   geographic market for antitrust purposes.  The case law

17   embraces defining local markets for national vendors based

18   on actual practicalities of demand.  See United States v.

19   Philadelphia National Bank, 374 U.S. 321 at 328-60 (1963).

20   (Accepting a geographic market for four adjacent counties

21   because of a factor of convenience localizes banking

22   competition as effectively as high transportation costs in

23   other industries.)

24        See also FTC v. Staples, Inc., 970 F.Supp. 1066 at

25   1073 (D.D.C. 1997).  (Accepting party agreement that the

Page 36

1    appropriate geographic market where 42 individual

2    metropolitan areas in which consumers shopped at office

3    superstores.) Bon-Ton Stores, Inc., v. May Department Stores

4    Company, 881 F.Supp. 860 at 867 (W.D.N.Y. 1994).  Decision

5    supplemented in 1995 WL 215307 (W.D.N.Y. March 6, 1995).

6    (Accepting its irrelevant geographic market, the six-county

7    Rochester Metropolitan Region.)

8            Plaintiffs themselves note that the area of

9    effective competition in the known line of commerce was to

10   be charted by careful selection of the market area to which

11   the purchaser can practically turn to for supplies.  See

12   cross motion at 34, which is quoting Philadelphia National

13   Bank, 374 U.S. at 359.  See also Brown Shoe, 370 U.S. at

14   336.  (The geographic market selected must correspond to the

15   commercial realities of the industry.)

16           Finally, as this Court has noted previously,

17   Plaintiff's national market theory has been rejected by

18   other courts for many of the same failings found here.  See

19   In Re:  AMR Corporation, 527 B.R. at 885, 886.  (As this

20   Court and the Ninth Circuit have explained, the national

21   market for air transportation does not meet Brown Shoe's

22   standard because flights between distant cities are simply

23   not reasonably interchangeable.) And that decision quotes

24   the Mellany v. UAL Corporation decision at 2011 WL 6845773

25   at *4.  (N.D. Cal. December 29, 2011.)

1          Having settled Plaintiff's antitrust market, the

2     Court turns to another gating issue, standing.  Antitrust

3     standing is a threshold issue for advancement of Plaintiff's

4     Section 7 case.  See BIOCAD JSC v. F. Hockman Larouche,

5     Ltd., 2017 WL 4402564 at *3 (S.D.N.Y. September 30, 2017),

6     which is citing the Gatt communications, Inc. v. PMC

7     Associates, LLC case, 711 F.3d 68i at 75 (2d.Cir. 2013).

8     See also Savory Pie Guy, LLC v. Comtec Industries, LTD, 2016

9     WL 7471340 at *11 through 12 (S.D.N.Y. December 28, 2016).

10          Antitrust standing is required because Congress

11     did not intend the antitrust laws to provide a remedy in

12     damages for all injuries that might conceivably be traced to

13     an antitrust violation.  See Paycom Billing Services v.

14     MasterCard International, Inc., 467 F.3d 283 at 290-91 (2d.

15     Cir. 2006) quoting Associated General Contractors, Inc., v.

16     California State Council of Carpenters, 459 U.S. 519 at 534

17     (1983).  (While defendants attack both plaintiff's

18     constitutional and antitrust standing, they do so primarily

19     on the same basis, that is, inadequate allegations of

20     injury.) See motion at Section D and AMR opposition at

21     Section C.

22          As antitrust standing is the more stringent and

23     specific standard, the Court focuses its discussion here on

24     that issue.  See Indium Corp. of America v. Semi-Alloys,

25     Inc., 566 F.Supp. 1344 at 1350-51 (N.D.N.Y. 1983)

1          To prove antitrust standing, a plaintiff must

2     demonstrate, A, that it has suffered a special kind of

3     antitrust injury; and, B, that it is a suitable plaintiff to

4     pursue the alleged antitrust violations and, thus, is an

5     efficient enforcer of the antitrust laws.  See BIOCAD JSC,

6     2017 WL 4402564 at *3 through 4, quoting Gatt

7     communications, Inc., 711 F.3d 68.  See also Gelboim v. Bank

8     of America Corporation, 823 F.3d 759 at 771-72 (2d. Cir.

9     2016)

10         The Second Circuit employs a three-step process

11    for determining whether a plaintiff has sufficiently alleged

12    antitrust injuries.  See BIOCAD JSC, 2017 WL 4402564 at *4

13    just quoting Gatt Communications, 711 F.3d at 76.  First,

14    the plaintiff must identify the anticompetitive practice of

15    which it complains.  See Id.

16         Next, the Court must identify the actual injury

17    the plaintiff alleges.  See Id.  Finally, the Court must

18    compare the anticompetitive effect of the specific practice

19    at issue to the actual industry the plaintiff alleges.  See

20    Id.  Likewise, this circuit applies four factors to evaluate

21    the efficient enforcer inquiry.  One, whether the violation

22    has a direct or remote cause to the industry; two, whether

23    there's an identifiable class of other persons whose self-

24    interest would normally lead them to sue for the violation;

25    three, whether the injury was speculative; four, whether

1    there is a risk that other plaintiffs would be entitled to

2    recover duplicative damages where the damages would be

3    difficult to (indiscernible) among possible victims of

4    antitrust injury.  See Port Dock v. Stone Corporation v.

5    Oldcastle NE, Inc., 507 F.3d 1117, Pages 121-22 (2d Cir.

6    2007) citing Paycom Billing Services, Inc.  467 F.3d at 290-

7    91.

8              So, as to standing, the Court's first conclusion

9    is standing is not necessary for all plaintiffs in

10   injunctive cases.  The Plaintiff agrees that they are not

11   required to prove standing 40 times over.  See Plaintiff's

12   reply at 13.  It is widely held in cases requesting

13   injunctive relief, the Court need not address the standing

14   of each plaintiff.  It is concluded that one plaintiff has

15   standing.  See National Association of Optometrists,

16   Opticians Lenscrafter, Inc. v. Brown, 567 F.3d 521 at 523

17   (9th Cir. 2009) See, e.g., In RE:  Old CARCO LLC, 470 B.R.

18   688 at 697 (S.D.N.Y. 2012).  (This Court may entertain a

19   suit as long as one plaintiff has standing and it need not

20   establish whether other plaintiffs also have standing

21   proceeding to the merits of the case.) And that is citing

22   the Bowsher v. Synar case, 478 U.S. 714 at 720 (1986).  See

23   also Project B.A.S.I.C v. O'Rourke, 907 F.2d 1242 at 1244

24   (1st Cir. 1990) (Holding that while one plaintiff has

25   standing and also appeals, it is not necessary to consider

1    whether the second plaintiff has standing as well.)

2         When discussing the differences in the private

3    right of action under the Clayton Act, Section 4 and Section

4    16, the Supreme Court observed that one injunction is

5    effective as 100, and 100 injunctions are no more effective

6    than one, but the position of a defendant faced with

7    numerous claims and damages is much different.  See Hawaii

8    v. Standard Oil Company of California, 405 U.S. 251 at 261-

9    262 (1972).  See also 15 U.S.C.  Section 15 and Section 26.

10        Accordingly, the Court does not need to

11   investigate standing on an individual basis for each and

12   every plaintiff.  But Plaintiffs contend they are threatened

13   with injury from alleged anticompetitive effects, both in

14   their capacities as passengers and as travel agents.  As

15   further explained below, the Court finds the Plaintiffs have

16   standing in certain markets as customers, but that

17   Plaintiffs' proposed standing as travel agents does not

18   satisfy the efficient enforcer requirement.

19        So, turning first to the customer issue.

20   Plaintiffs do have standing as customers.  Plaintiffs are

21   best positioned to bring an antitrust suit in their role as

22   customers of air travel.  Defendants do not challenge the

23   proposition that customers can be efficient enforcers of a

24   Section 7 suit and that customers are regularly find to have

25   antitrust standings challenged and allegedly anticompetitive

Page 41

1    merger.  See e.g. Mellany v. UAL Corporation, 2010 WL

2    3790296 at *12.  (Holding that Plaintiffs challenging an

3    airline merger survive summary judgment on standing grounds

4    as consumers of airline tickets where each Plaintiff had

5    submitted an affidavit saying that he or she had purchased

6    or had plans to purchase commercial airlines tickets for

7    personal use and that five Plaintiffs had provided

8    deposition or hearing testimony as to the specifics of their

9    limited air travel.)

10          See Riley v. Media News Group, Inc., 2007 WL

11   1068202 at *5.  (N.D. Cal. April 10, 2007) (Holding that

12   Plaintiff survive summary judgment on standing, having

13   alleged anticompetitive mergers of local newspapers and

14   provided evidence in the form of a declaration that he was

15   an active consumer in that market by subscribing to one

16   paper and frequently purchasing the other.)

17          See committee Publishers, Inc., 892 F.Supp. at

18   1167.  (Holding that a consumer in the market for a local

19   newspaper advertising had antitrust standing in the face of

20   potential increases in advertising rates as a result of the

21   dominant estimated post-merger market share.)

22          In this context, the Second Circuit's three-step

23   process for assessing antitrust injury boils down to the

24   allegation that the merger results in presumptively illegal

25   market concentration levels, which tends to injure customers

Page 42

```
 1    through increased prices or reduced quality of service.  See

 2    BIOCAD JSC, 2017 WL 4402564 at *4.  (Explain the Second

 3    Circuit three-step process for assessing antitrust injury.)

 4    See also Horizontal Merger Guidelines at Section 1

 5    (Enhancement of market power by sellers often elevates the

 6    prices charged to customers.  Enhanced market power can also

 7    be manifested in non-price terms and conditions that

 8    adversely affected customers, including reduced product

 9    quality, reduced product variety, reduced service, or

10    diminished innovation.)

11            Of course, Plaintiffs must demonstrate that they

12    have remained actual customers in the alleged relevant

13    markets and made plans to patronize those markets again.

14    See In RE:  New Jersey Title Insurance Litigation, 683 F.3d

15    451 at 461 (3rd. Cir. 2012).  (Affirming lack of standing

16    and suit alleging anticompetitive pricing by Title Insurance

17    Companies where homeowners did not have actual plans to buy

18    new Title Insurance, but rather, relied only on statistics

19    that homeowners generally relocate every seven years.)

20            See also Mellany v. UAL Corporation, 2010 WL

21    3790296 at *5.  (Unlike the government suing on behalf of

22    the general public, a private plane may receive injunctive

23    relief "only when he or she shows that the antitrust

24    injuries are personal.") United States v. Borden Company,

25    347 U.S. 514 at 518, a case from 1954, California v.
```

Page 43

1    American Stores Company, 495 U.S. 271 at 295, a case from

2    1990.

3            Defendants contend in their motion that not a

4    single named Plaintiff has any concrete plans to fly

5    domestically on any airline in the future.  See motion,

6    Paragraph 68.  Defendants also contend that nothing in

7    Plaintiff's new declarations establish a standing for the

8    Plaintiffs, except only seven individual Plaintiffs and

9    eight potential allegations is even touching upon any of the

10   City Pair routes appended to the first amended complaint.

11   See AMR opposition, Paragraph 59.

12           Defendants argue that beyond these, what is left

13   are unsubstantiated claims and that none are related to any

14   of the seven (indiscernible) routes.  See AMR opposition at

15   Paragraph 60.  In contrast, Plaintiff's aver that not only

16   are they consumers of air travel who've purchased flights on

17   U.S. Airways and American, but they also are potential

18   purchasers.  See cross motion at 45 and 46.

19           Having reviewed the new declarations, the Court

20   agrees with Defendants about the generality and irrelevance

21   of many of the complaints and statements included in the new

22   declarations.  See, e.g., Taluski declaration in Paragraph

23   16.  (Other airlines have followed suit regarding paid seat

24   assignments and they now charge for most of their desirable

25   seats in Economy.  Thus, when I fly, for instance, Jet Blue

 1    or Delta in Economy, I must now pay for seat assignments,

 2    often paying close to $100 for a round trip.) See id at

 3    Paragraph 19.  (Since almost all the major airlines now

 4    charge baggage fees, I always pay for baggage when I fly Jet

 5    Blue or Delta.) See id at Paragraph 20.  ("I had an incident

 6    after the merger flying American home from Tokyo to Chicago.

 7    There was a problem with the aircraft and we were left

 8    standing in the holding room at the airport for multiple

 9    hours with new communication from American.  We, the

10    passengers, had no idea if we were going to take off that

11    night or not.  Finally, after approximately four hours, we

12    were told to go through Customs in Japan.")

13           The declarations are filled with complaints that

14    do not appear on their face to be tied to the merger, as

15    well as the irrelevant criticisms of other non-defendant

16    airlines and comments about trips that took place long

17    before the merger.

18           Nonetheless, the Court concludes that at least

19    some of the Plaintiffs have submitted sufficient information

20    in their declarations to establish themselves as regular

21    customers of domestic air travel.  See, e.g., Fajora

22    declaration, Paragraph 5.  (Prior to the merger of American

23    Airlines and U.S. Airways, I traveled on American Airlines

24    on at least eight flights; after the merger, I traveled on

25    American Airlines on ten flights.)

1           Palfor declaration, Paragraph 5.  (Between June

2    2010 and June 2017, I personally paid for and/or taken

3    approximately 33 domestic and international airline flights.

4    I have booked and paid for six flights on separate legs or

5    segments for myself and my husband on American Airlines to

6    fly from Dayton to Colorado Springs on June 15, 2017,

7    returning on June 22, 2017.) And Arcell declaration,

8    Paragraph 5.  (In the past year, I have flown on American

9    three times on no less than ten flights.)

10          Several other plaintiffs attest extensively not

11   only to their pre and post-merger travel generally but

12   specifically their travel on American and U.S. Airways as

13   well as their travel on City Pair routes included in Annex A

14   to the first amended complaint.  See, e.g., Garvanian in

15   declaration, Paragraph 4-5.  (In the past eight years I have

16   flown numerous times on both American Airlines and U.S.

17   Airways and have flown on multiple routes listed on Exhibit

18   C to the (indiscernible) report of Carl Lundgrend.)

19          Stansbury declaration, Paragraphs 5, 6, 7, 8.

20   (From 2013 to (indiscernible) I have taken 53 airline

21   flights including on American and/or U.S. Airways.  I have

22   flown at least 13 of the routes listed in the expert report

23   of Carl Lundgrend.  I currently have paid airfare with

24   tickets to fly from Reno to Columbus, Ohio in July of 2017

25   and from Reno to Tucson, Arizona in November 2017.)

Page 46

```
 1              Moreover, at least one Plaintiff, Gabriel
 2     Garavanian, declares that he has flown post-merger on
 3     American on City Pair routes, including in the annex to the
 4     first amended complaint, and alleges in detail the post-
 5     merger impact on him from changes in flight capacity and
 6     lower quality service on American out of Boston and his
 7     preferred home airport in Manchester, New Hampshire.  See
 8     Garavanian declaration, Paragraphs 4-5, 11-16, 19 and 20.
 9              Accordingly, because the Court finds City Pairs to
10     be a proper market framing, Plaintiffs demonstrate standing
11     sufficiently to survive summary judgment.  However,
12     Plaintiffs still retain the burden for a trial of
13     identifying which specific City Pairs are relevant for their
14     claim.  The Court declines to undertake that exercise now,
15     attracting every pledged City Pair against each of the
16     Plaintiffs' declarations, even though it seems that that
17     eventuality has been contemplated and that's reflected in
18     Defendant's criticism of the declarations.  See AMR
19     opposition, Paragraphs 59 and 60, and it's also reflected in
20     several charts the Plaintiff submitted purportedly
21     summarizing the City Pairs mentioned in the various
22     declarations.  See declaration of Joseph M.  Alioto in
23     support of Plaintiff's reply memorandum of law in support of
24     cross-motion for summary judgment.  The Alioto declaration
25     ECF Number 167-1 id at Exhibit 1, which is the Plaintiff's
```

Page 47

1    future flights, ECF 167-2.  It's Exhibit 2.  Plaintiff's

2    travel and presumptively illegal City Pairs, ECF Number 167-

3    3.  See id Exhibit 3.  Plaintiff's travel and City Pair

4    average fare increases, ECF Number 167-4.  See id Exhibit 4.

5    Plaintiff's reply to Defendant's statement of Plaintiff's

6    injuries, ECF Number 167-5.

7             The Court now turns to the proposed standing as

8    travel agents.  This court has already applied the four

9    efficient enforcer factors to reject travel agents' standing

10   in an earlier decision in this case.  See In RE:  AMR

11   Corporation, 527 B.R. at 891-92.  (Denying Plaintiff's

12   request to re-ammend their first amended complaint to add

13   new claims for travel damages under Section 4.) See also 15

14   USC Section 15.

15            In so doing, the Court found that none of these

16   factors weighed in favor of the travel agent Plaintiffs and

17   that the travel agent Plaintiffs would not be efficient

18   enforcers and could not sustain any private action for a

19   lack of antitrust standing.  See id at Page 892.

20            Plaintiffs correctly argue that the efficient

21   enforcer requirements are sometimes applied less stringently

22   for Section 16 claims for injunctive relief and Section 4

23   claims for damages.  See cross motion at Page 52-53.  But as

24   discussed above, these factors are still relevant and, thus,

25   much of the Court's prior analysis remains applicable.  The

Page 48

1    Court will briefly revisit these four factors for purposes

2    of this motion today.

3            First, as to directness of injury, travel agents

4    are simply much less direct antitrust enforcers than actual

5    passengers.  Plaintiff Lisa McCarthy explains in her new

6    declaration that she lost two clients due to their

7    dissatisfaction with observed price increases on routes they

8    had previously flown on U.S. Airways or AMR. See McCarthy

9    declaration, Paragraph 19-iii and 19-iv. Even assuming this

10   to be true, Ms. McCarthy acknowledges that her alleged

11   injury is derivative of the injury experienced by her

12   clients.

13           The second factor, the existence of another

14   identifiable self-interested class also still counts against

15   Plaintiffs' standing as travel agents given the existence of

16   passengers as a category available to challenge the merger.

17   See In RE:  AMR Corporation, 527 B.R. at 891.  (If there is

18   substance to the Plaintiff's claim, it is difficult to

19   understand why the direct victims of the conspiracy have not

20   asserted any claim in their own right.) And that's quoting

21   Associated General Contractors, Inc.  459 U.S. at 542 Note

22   47.

23           Third, for the same reasons that travel agents are

24   not the most direct enforcers, their injuries are also

25   highly speculative when compared to the potential injuries

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400

Page 49

```
1    of actual customers.  See, In RE:  Aluminum Warehousing

2    Antitrust Litigation, 2014 WL 4277510 at *17 (S.D.N.Y.

3    August 29, 2014)(Issues with complex and speculative damages

4    concerning the fact and nature of harm, that is, damage as

5    much as calculation of dollars and cents, is determining the

6    fact of damage complex?  Does remedying Plaintiff's injury

7    through conjunctive relief present complex issues?)

8            As this Court has previously observed, where a

9    travel agent has lost business, it is much more difficult to

10   trace that loss of business to the challenged merger as

11   compared to a more direct and definable law suffered by a

12   customer paying a higher fare.  See In RE:  AMR Corporation

13   527 B.R. at 892.

14           Other economic factors could greatly affect any

15   losses suffered by travel agents.  See id at 892.  Moreover,

16   if a consumer books a ticket and observes the higher cost,

17   it doesn't appear that the travel agent would suffer any

18   harm.  See id at 891.

19           For all these reasons it remains unclear to the

20   Court that travel agents are as "significantly motivated due

21   to their natural economic self-interest in paying the lowing

22   price possible." Gordon v. Amadeus IT Group SA, 194

23   F.Supp.3d, 236 at 247 (S.D.N.Y.  2016), which is quoting In

24   RE:  DDADP Direct Purchaser Antitrust Litigation, 585 F.3d

25   677 at 689 (S.D.N.Y.  2009).
```

1          The fourth and final factor, duplicative damages,

2    seems the least applicable in injunctive relief cases and

3    does not clear the way against travel agents' standing.  But

4    overall, the Court finds applying all these factors that

5    travel agents are not efficient enforcers of the Clayton Act

6    in this context.  Without clearly aligned economic

7    incentives or injuries that flow directly from the alleged

8    harm to competition, this Court does not find that allowing

9    Plaintiffs who are suing this capacity to serve as private

10   attorney generals would best vindicate the public interest

11   in antitrust enforcement.  See Gordon v. Amadeus IT Group

12   SA, 194 F.Supp. at 248, which is quoting Gelbolm 823 F.3d at

13   780.

14          So, having address the parties' disputes about the

15   market and scanning, the Court turns to whether the

16   Plaintiff's Section 7 case presents an issue for trial or

17   whether summary judgment for one or the other parties should

18   be granted.  This analysis requires the Court to examine the

19   Plaintiff's case through the prism of the shifting burdens

20   articulated in the case law.  First, the Plaintiff's prima

21   facie case, then in the Defendant's rebuttal case, and

22   finally in response to that rebuttal by the Plaintiffs.

23          Plaintiffs' prima facie case primarily comprises

24   two allegations.  One, presumptively illegal market

25   concentration levels resulting from the merger demonstrated

Page 51

1    through HHA statistics; and, two, a general trend towards

2    increasing concentration in the domestic passenger airline

3    industry over the last several year.  See first amended

4    complaint at 12 (trend towards concentration) id Appendix A,

5    cross motion at 12-15.

6              Plaintiff's case centers on the HHI calculations

7    performed by Dr.  Lundgrend using the list of City Pair

8    routes first identified in the DOJ complaint.  In their

9    first amended complaint, Plaintiffs claim that by reason of

10   Defendant's unlawful merger on nearly 1,000 routes, changes

11   in market concentration and post-market concentration will

12   exceed the threshold specified in these horizontal merger

13   guidelines by the Department of Justice and are presumed,

14   therefore, to lead to adverse competitive effects.  See

15   first amended complaint, Paragraph 143.

16             As has been repeatedly observed during this case,

17   Plaintiff's original list was simply copied directly from

18   Appendix A to the amended DOJ complaint.  See amended DOJ

19   complaint, Appendix A.  See Messina declaration, Exhibit F,

20   Lundgrend report at 4 ECF Number 156-2.  (The same HHI

21   figures are also contained in the appendix attached to the

22   amended complaint in this case.)

23             That list identified the City Pairs that the DOJ

24   predicted would have post-merger HHIs of greater than 2,500

25   and changes in HHI of greater than 200.  See first amended

1    complaint, Appendix A.  Under DOJ policy, mergers with those

2    HHI numbers are presumed to be likely to enhance market

3    power.  See Horizontal Merger Guidelines, Section 5.3.

4            In March 2017, Dr.  Lundgrend recalculated HHI for

5    the same, 1008 City Pairs using updated DOT data for the

6    Calendar Year 2012 before the merger, and for the then four

7    most recently available quarters.  That's 2105, Quarter 4;

8    2016's Quarters 1, 2, and 3.  See Lundgrend report at 4-5.

9            Dr.  Lundgrend concluded that to a reasonable

10   degree of economic certainty that in approximately 785 City

11   Pair airline markets the post HHI exceeded 2500 and the

12   change in HHI exceeded 200.  See Lundgrend report at 16.  In

13   addition to the City Pair HHI estimates, Plaintiffs allege

14   in the first amended complaint that the merger will result

15   in a monopoly for seven of the City Pairs and that the

16   merger would reduce competitors from 2 to 1 in 24 of the

17   City Pairs; 3 to 2 in 475 of the City Pairs; and 4 to 3 in

18   749 of the City Pairs.  See first amended complaint,

19   Paragraph 140.

20           Plaintiffs also predicted undue increases in

21   market concentration at a number of specific airports.  See

22   first amended complaint, Paragraph 135.  And increases in

23   market concentration in some of the largest U.S. cities.

24   See id at Paragraph 134.  But those predictions do not align

25   with either of Plaintiff's proposed markets.

1          So, Dr. Lundgrend's HHI statistics meet the

2     requirements for a prima facie case.  It is true that the

3     Horizontal Merger Guidelines are not binding on this Court

4     and that the case law varies as to what concentration levels

5     constitute a prima face case under different market

6     conditions.  See, e.g., Baker Hughes, 908 F.2d at 90.

7     (Discussing early Supreme Court cases finding mid to high

8     single-digit market shares sufficient to block a merger

9     under Section 7.) And that's citing United States v. Von's

10    Grocery Company, 384 U.S. 270 (1966).  See also United

11    States v. Pat Boone Company, 384 U.S. 546 at 550-552 (1966).

12    See also United States v. Oracle Corporation, 311 F.Supp.2d

13    1098 at 1110 (N.D. Cal. 2004) (Citing Philadelphia National

14    Bank, which is at 374 U.S. at 357, for the rule that a post-

15    merger market share of 30 percent or higher unquestionably

16    gives rise to a presumption of illegality.)

17          But the concentration statistics at issue here

18    clearly satisfy any historical standard and the Horizontal

19    Merger Guidelines are widely respected for providing a

20    useful illustration of the application of the HHI.  See FDC

21    v. CC Holdings, Inc., 605 F.Supp.2d at 37, which is citing

22    FTC v. PPG Industries, Inc., 798 F.2d at 1503, Note 4.  See

23    also United States v. AT&T, 310 F.Supp.3d at 192, Note 18.

24          The clear general trend towards concentration in

25    the domestic airline industry in recent years likewise adds

Page 54

1   something to Plaintiff's Section 7 case.  To demonstrate the

2   substance of this trend, Plaintiffs highlight the other

3   mergers that have occurred among the large passenger

4   airlines.  These include the mergers from Southwest and

5   AirTran in 2011, United and Continental in 2010, and Delta

6   and Northwest in 2008.  See first amended complaint,

7   Paragraph 93.  Defendant, American Airlines Group, Inc.

8   responds to Plaintiffs' statement of undisputed facts in

9   support of cross motion for summary judgment is at Paragraph

10  3, ECF Number 163.

11          So, Plaintiffs further note that AMR itself had

12  previously merged with Trans World Airlines, that is TWA in

13  2001.  See first amended complaint, Paragraph 95.  And that

14  U.S. Airway had merged with America West in 2005.  See id at

15  Paragraph 99.  Individual Plaintiffs spent portions of their

16  declarations discussing the trends in airline services and

17  pricings they had personally observed during the same

18  period.  See, e.g., Freeland declaration, Paragraph 10

19  (Consolidation in the industry eliminated TWA, Continental,

20  National, Northwest, Air West, Air Transit, and many other

21  carriers that went bankrupt.  There's now much less

22  competition, and that gives the remaining carriers the

23  ability raise fares and decrease service without

24  repercussions.  They also have the ability to add ancillary

25  fees, since there are fewer airlines that need to match the

1    increases.)

2          Britto Declaration, Paragraph 8, listing 15

3    separate costs and services that have impacted customers

4    negatively since all the consolidation of the industry,

5    including the merger of American Airlines and U.S. Airways,

6    including airfares have increased, baggage fees were

7    imposed, and fees for mileage upgrade came to exist, and

8    seat pitches have decreased.)

9          Plaintiffs further argued that there are

10   substantial and significant barriers to entry into the

11   industry in the relevant markets, as well as a history of a

12   lack of successful new entries.  See Id. at Paragraph 159.

13   As example, plaintiffs note that only two major new carriers

14   has entered the industry in recent years, that is Southwest

15   and Jet Blue, both of which took substantial time to

16   develop, see Id. at 159.  Plaintiffs contend that AAG's nine

17   hubs will make entrance in a market between those hubs

18   particularly difficult. See I'd.

19          In sum, the Court finds the Plaintiff has

20   established the burden of a prima facie Section 7 cased,

21   based on Dr. Lundgren's HHI calculations and industry

22   trends.

23          Despite this conclusion, the Court notes that some

24   of the allegations presented by Plaintiffs are not

25   supported, because they are not linked to the merger by

1    evidence.  This includes certain allegations and additional

2    ancillary fees, hub closures, and reduced route capacity.

3    See e.g. First Amended Complaint, Paragraphs 3, 5, 121, 129,

4    138, 147 and 164.

5           Plaintiffs also generally cite to increased prices

6    and reduced quality of service, both of which are standard

7    effects on consumers from a significant reduction in

8    competition.  See Horizonal Merger Guidelines, Section 1.

9    But Plaintiffs present no expert analysis to support their

10   other specific and extensive list of alleged threatened

11   injures.

12          In fact, Dr. Lundgren makes a point in his

13   submission of not making any casual or predictive

14   conclusions regarding the impact of the merger on the

15   industry or customers.  See Lundgren June Declaration

16   Paragraph 16, (Dr. Lundgren average price change

17   calculations were "presented without further analysis or

18   conclusions based on statistical. Econometric, or other

19   expert economic analysis.") See generally the Lundgren

20   Report.

21          Instead, Plaintiffs rely on a comparison of events

22   following prior airline combinations.  For example,

23   Plaintiffs assert anything closing hubs is not

24   unprecedented, that AMR closed a hub in St. Louis after

25   merging with TWA, and that Delta greatly reduced services at

1   the hubs in Cincinnati and Memphis after merging with

2   Northwest.  See First Amended Complaint, Paragraph 133.

3          Plaintiffs also assert or imply that recent

4   capacity reductions, ticket price increases, and increased

5   or additional ancillary fees are all the result of other

6   airline mergers over the last several years.  See Id. at

7   Paragraphs 4, 100, 118 and 121.  Such historical comparisons

8   that are provided by the Plaintiff here can be useful, but

9   only when done in an analytically robust fashion.

10          For example, when DOJ and FTC looked for

11   historical events or natural experiments that are

12   informative, regarding the competitive effects of the merger

13   -- I'm sorry, let me say that again.  For example, DOJ and

14   FTC look for historical events or natural experiments that

15   are informative regarding the competitive effects of a

16   merger.  See Horizontal Merger Guidelines at Section 2.1.2,

17   see also United States v. AT&T, Inc. 310 F.Supp.3d at 1215-

18   18 (reviewing at length the probative value of Defendant's

19   expert empirical analysis of prior similar transactions by

20   considering Plaintiff's critiques of the comparability of

21   the economic conditions surrounding the transactions, and

22   the reliability of the data used to make the comparison.)

23          Such a robust comparison, based on expert opinion

24   or analytical framework is often missing here.  Even on a

25   summary judgment posture, the Court cannot assume any

Page 58

1    comparative inferences about highly complex economic events,

2    based simply on a series of untethered observations and

3    conclusory statements.  See Overhead Door Company v. Whiting

4    Roll-Up Door Manufacturing Corporation 1981 W.L. 48559 at

5    *1, W.D.N.Y. November 16 1981 (Patent cases present complex

6    and technical questions, and almost generically are

7    inappropriate for summary judgment.  To provide summary

8    judgment ultimately turns on the complexity of the patent in

9    question, and degree to which its intricacies are accessible

10   to the trial judge unaided by experts.)

11        See Valle v. Johnson Controls Wells Services, Inc.

12   957 F.Supp. 1404 at 1414-1415, S. D. Miss. 1996, (because

13   Title VII complaints general involve complex and disputed

14   facts, summary judgment is often an inappropriate method of

15   adjudicating such claims, determinations regarding

16   motivation and intent depend on complex inferences from the

17   evidence, and therefore particularly within the province of

18   the factfinder.)

19        So having addressed the Plaintiff's case, I turn

20   to the Defendant's rebuttal.  Defendants submitted three

21   expert reports to support their motion and rebut Plaintiff's

22   claims regarding the probable competitive effects of the

23   merger.  See declaration of Sadik Huseny in support of

24   Defendant American Airlines Group Inc.'s motion for summary

25   judgment and Exhibit 4, Carlton Report, at ECF 141-4;

Page 59

1    Exhibit 5, the Ordover Report, ECF 141-5; and Exhibit 6, the

2    Casper Report, ECF 141-6.

3           See also RC Bigelow, Inc. 867 F.2d 108, (a prima

4    facie case can be rebutted by evidence that the market share

5    data gives an inaccurate account of the acquisition's

6    probable effects on competition.)  Quoting United States v.

7    Citizens and Southern National Bank 422 U.S. 86 at 120,

8    1975.  United States v. Waste Management Inc., 743 F.2d 976

9    at 982, 2d. Cir. 1984, (under General Dynamics, a

10   substantial existing market share is insufficient to void a

11   merger where that share is misleading as to the actual

12   future competitive effect.)

13          So Professor Carlton, Defendant's first expert,

14   also reattached and referenced a declaration he previously

15   prepared in November 2013 in support of the merger, which is

16   Carlton Annex A.  These reports and declarations provide

17   prospective analysis of the airline industry, and the

18   potential impact of the merger, as well as a retrospective

19   analysis of AAG's actions and market developments following

20   the merger.

21          The Court finds that these declarations provide

22   and extensive and grounded rebuttal to the evidence

23   presented by the Plaintiffs.  See FDC v. CC Holdings, Inc.

24   605 F.Supp.2d at 46-47, (the courts have not established a

25   clear standard that the merging parties much meet in order

1    to rebut a prima facie case, other than advise that the more

2    compelling the prima facie case, the more evidence the

3    Defendants must present to rebut the presumption

4    successfully.

5              And that's citing Baker Hughes, 908 F.2d 991.  See

6    also the FTC v. CC Holdings case at Page 47, (to allow the

7    Plaintiff virtually to rest its case on market concentration

8    statistics, leaving the defendant to prove the core of the

9    dispute would grossly inflate the role of statistics in

10   actions brought under Section 7.  The Herfindahl-Hirschman

11   Index cannot guarantee ligation victories.)  Quoting Baker

12   Hughes, 908 F.2d at 992.

13             Accordingly, under the burden-shifting framework

14   applied in Section 7 cases, and for purposes of Plaintiff's

15   cross-motion, the Court concludes the defendants have

16   established questions of material fact whether regarding the

17   effects of the merger may be substantially to lessen

18   competition, or to tend to create a monopoly, and therefore

19   have rebutted Plaintiff's prima facie case.  See 15 U.S.C.

20   Section 18.

21             So the Court will spend a few minutes walking

22   through Defendant's evidence.  First, the Defendants

23   presented evidence of their prospective analysis.  In the

24   analysis he conducted contemporaneously with the merger,

25   Defendant's expert, Professor Dennis Carlton, concluded that

1    the merger would likely result in pro-competitive output

2    expansion, increasing consumer welfare.  See Carlton 2013

3    Declaration, Paragraph 44.

4           Professor Carlton opined that two features of the

5    airline industry, the presence of low-cost carriers, or what

6    you call LCCs, on many of the overlapping U.S. Airways and

7    American Airlines routes, and the ease of entry on many

8    routes, all those reduce the likelihood of anti-competitive

9    effects from the merger.  See Id. at Paragraphs 14 through

10   18.  In general, the professor concluded that LCCs were a

11   disruptive force for pricing in the airline industry. See

12   Id. Paragraph 19.

13          Defendant's second expert, Daniel Casper, studied

14   the development of the airline industry since its

15   deregulation in the 1970s, and also concluded that the U.S.

16   airline industry, pre-merger, was intensely competitive and

17   remained so following the merger of American and U.S.

18   Airways.  See Casper Report, Paragraph 52.  He concurred

19   with Professor Carlton that low-cost airline carriers have

20   been, and will continue to be the dominant competitive force

21   and primary determinant of prices in the U.S. domestic

22   airline industry.  See Id. at Paragraph 32.

23          In contrast to Plaintiff's implication regarding

24   the effect of prior airline mergers, Mr. Casper opined that

25   legacy carrier capacity reductions at the end of the last

1    declared were driven by the Great Recession and the high oil

2    prices during the preceding several years. See Id. At

3    Paragraphs 33 through 45.  He noted that capacity by low-

4    cost carriers increased substantially over the same period,

5    and legacy carriers have begun to increase capacity again

6    recently.  See Id. At Paragraph 45.

7              Defendant's third expert, a Dr. Ordover

8    specifically responded to Plaintiffs' claims that the merger

9    presented increased risk of collusion, or so-called

10   coordinated effects among the major airlines.  See Ordover

11   Report, Paragraph 6.  See FTC v. H.J. Heinz Company, 246

12   F.3d at 724-725, (where rivals are few, firms will be able

13   to coordinate their behavior, either by overt collusion or

14   implicit understanding, in order to restrict output and

15   restrict profits above competitive levels).

16             Dr. Ordover wrote that the airline industry is not

17   readily susceptible to coordinated behavior, and that the

18   LCCs play a continued centered role in driving the key

19   dimensions of competition in the airline industry.  See Id.,

20   the Ordover Report at Paragraph 6.  According to this

21   expert, the obstacles to coordinated effects stem in part

22   from the industry's complex yield management system, i.e.

23   the setting of airfares, and the quantity of seats to offer

24   at each fare.  See Id. Paragraphs 13 through 17.

25             According to Dr. Ordover, airlines do not

1    typically display the number of tickets offered in a given

2    fare class, and the entity which collects and distributes

3    airline fare data within the industry, ATPCO, only provides

4    incomplete information that is not conducive to

5    coordination.  See Id. at Paragraphs 18 through 29.

6              Further, Dr. Ordover posits that ancillary fees,

7    which Plaintiffs allege are used to raise prices in

8    coordination, actually add a layer of complexity that

9    impedes collusion.  See Id. Paragraphs 47 through 49.  As a

10   result of such barriers, firms attempting to collude would

11   struggle to identify if and when their competitors cheat,

12   making coordination difficult to maintain or enforce.  See

13   Id. at Paragraphs 21, 23, 29, 37.

14             Finally, Dr. Ordover asserts that the divestitures

15   agreed upon in the DOJ settlement further enhance the

16   competitive presence and vitality of the LCCs.  These highly

17   competitive airlines would disrupt any form of coordination

18   and prices, and other competitive dimension were it even

19   attempted.  See Id. at Paragraph 6.

20             In addition to their pre-merger analysis, the

21   Defendant's experts have also run studies on post-merger

22   data.  Such data can sometimes be helpful, and the DOJ gives

23   substantial weight to evidence of observed post-merger price

24   increases, or other changes adverse to customers.  See

25   Horizontal Merger Guidelines, Section 2.1.1, but see Alberta

1  Gas Chemicals Ltd. v. EI Du Pont De Nemours & Company 926

2  F.2d 1235-1234, 3d. Cir. 1987 (the probative value of post-

3  acquisition evidence tending to diminish the probability or

4  impact of anti-competitive effects in a Section 7 case is

5  extremely limited.)  And that's citing the United States v.

6  General Dynamics Corporation case, 415 U.S. 486 at 504, a

7  case from 1974.

8          However, post-merger evidence that is not subject

9  to manipulation is of greater probative value, and may be

10  dispositive.  See United States v. Bazaarvoice, Inc. 2014 WL

11  203966 at Star 73, (N.D. Cal., January 4, 2014).

12  Considering this precedent and the facts here, the Court

13  finds Defendant's expert retrospective studies to be

14  relevant, and further support their case, even if perhaps

15  not as supportive as their retrospective analysis.  The

16  Court notes that several years have now passed since the

17  merger, reducing the risk of skewed data.

18          And while Plaintiffs criticize the use of these

19  retrospective analysis, given the sunsetting certain

20  provisions of the DOJ settlement, the Court finds there's

21  still some utility, given the restrictions only affected

22  certain hubs and routes, and the divestitures were designed

23  to produce lasting improvements on competition.

24          So let me turn to Plaintiff's reply.  So in the

25  face of the avalanche of evidence from Defendants,

Page 65

1    Plaintiffs have responded with what I would characterize

2    minimal evidence beyond their original HHI data to buttress

3    their case.  Plaintiff's procedure an additional study by

4    Dr. Lundgren, analyzing post-merger ticket price changes.

5    They also submitted several third-party documents and

6    reports.

7            First as to Dr. Lundgren, he prepared a follow-up

8    study in June 2017.  I have yet to find which of the 1008

9    original city pairs experienced increases in average

10   airfares since the merger.  See Lundgren June Declaration

11   Paragraph 2 and 5.  This study, like his original analysis,

12   relied on public passenger and fare data retrieved from the

13   DOT Bureau of Transportation Statistics.  See Lundgren June

14   Declaration, Paragraph 3.

15           Dr. Lundgren calculated that 723 of the original

16   1008 routes experienced ticket fare increases between

17   Calendar Year 2012, and the four quarters ending with

18   September 2016.  See June Lundgren Declaration, Paragraph 3.

19   Over that time period, Dr. Lundgren calculated a fare growth

20   on both a straight, average, and weighted basis to reflect

21   passenger volume.  See Lundgren Declaration Paragraphs 13

22   through 14.

23           Dr. Lundgren estimates that on average for those

24   723 routes, fares increased by 10.1 and 12.5 percent on a

25   heightened and unweighted basis, respectively.  See Lundgren

Page 66

1    Declaration, Paragraph 15.  Of note, however, Dr. Lundgren

2    acknowledges that these figures were pretend without further

3    analysis or conclusions based on statistical, econometric,

4    or other expert economic analysis.  See Lundgren June

5    Declaration Paragraph 16.

6          As to the third party documents in the report,

7    that is the second bucket of evidence submitted on reply,

8    Plaintiffs rely heavily on a June 2014 report published by

9    the Government Accountability Office before Congress, what

10   we'll call the GAO Report, seen in Messina Declaration,

11   Exhibit B, entitled "Airline Competition - the average

12   numbers of competitors in markets serving the majority of

13   passengers has changed little in recent years, but

14   stakeholders voice concerns about competition."

15         And the Plaintiffs also rely on three MIT white

16   papers issued in a series of the summer of 2013, which I'll

17   refer to as the MIT reports, see Id. Exhibit T, MIT Small

18   Community Air Service White Paper Number 2, Modeling Changes

19   in Connectivity at U.S. Airports: A Small Community

20   Perspective. MIT Report 2, Id. Exhibit AA, MIT Small

21   Community Air Service White Paper Number 3, Evolving Trends

22   of U.S. Domestic Airfares: The Impacts of Competition,

23   Consolidation, and Low Cost Carriers, referred as MIT Report

24   3.  And Id. Exhibit DD, MIT Small Community Air Service

25   White Paper Number 1, Trends and Market Forces Shaping Small

Page 67

1    Community Air Service in the United States, referred to as

2    MIT Report 1.

3              Plaintiffs cite these reports as a source for a

4    laundry list of complaints and the proposition that barriers

5    to new entry in the domestic airline industry are extremely

6    high before the merger, and the merger significantly

7    increased barriers to entry.  See cross-motion at Page 14.

8    However, it appears more accurate to characterize these

9    reports as categorically reviewing premerger data and

10   industry conditions.

11             So the GAO described the purpose and scope of its

12   report as follows, "to which this Congress has overseen

13   changes in the airline industry, GAO is asked to examine the

14   state of competition in the domestic passenger airline

15   industry.   This report addresses one, changes to the

16   financial health of the U.S. airline industry since 2007;

17   two, changes to the structure of the markets since 2007;

18   three, how consumers have been affected by these changes;

19   and four, views of stakeholders on the key challenges to

20   airline competition actions the federal government could

21   take to address these challenges.  See GAO Report 1.

22             The authors of the MIT reports likewise explained

23   "The aim of the paper series to examine and analyze the

24   past, current, and anticipated future trends of small

25   community air service in the United States.  This series is

1    intended for a general audience of airline and airport

2    executives, aviation policymakers, the news media, and

3    anyone with an interest in the availability of commercial

4    air service at the nation's smaller airports."  And that

5    quote is from MIT Report at -- the first one, at Page 2.

6         So considering all the evidence submitted by the

7    parties, and accepting all reasonable inferences in favor of

8    the respective non-movants, the Court denies both

9    Defendant's motion and Plaintiff's cross-motion for summary

10   judgment with respect to Plaintiff's Section 7 claims.  See

11   Matsushita, 475 U.S. at 587.

12        So relying primarily on HHI data, Plaintiffs

13   present a prima facie Section 7 claim, establishing the

14   presumption that the effect of the merger may be to

15   substantially less than competition, or tend to create a

16   monopoly, see 15 U.S.C. Section 18.  See also RC Bigelow,

17   Inc. at 867 F.2d at 10, Baker Hughes, Inc. 908 F.2d at 983,

18   (by presenting statistics showing the combining market

19   shares of Tamrock and Secoma would significantly increase

20   concentration in the already highly-concentrated United

21   States HHUDR market.  The government established a prima

22   facie case of anti-competitive effect.)

23        First, the Plaintiffs here have articulated  a

24   geographic antitrust market to which the Defendants have

25   admitted in the same judicial proceeding.  Second, given

1    this market-framing concession, Plaintiffs have presented

2    market concentration statistics that raise a presumption of

3    illegality.  Third, these statistics are buttressed by clear

4    trends towards concentration in the industry over the last

5    several years.  Initially, where Plaintiffs established

6    standing as customers, injury from an anticompetitive merger

7    is threatened directly in the form of higher price and/or

8    lower quality of service.  See also Horizontal Merger

9    Guidelines at Section 1.

10           Defendants in turn rebutted this prima facie case

11   with extensive expert testimony regarding the competitive

12   structure of the airline industry and actual pricing trends

13   following the merger, all designed to show that the market

14   share statistics give an inaccurate account of the merger's

15   probable effects on competition.  See United States v.

16   Aetna, Inc. 240 F.Supp.3d 1 at Pages 18 through 19, District

17   Court in DC 2017.  The collective evidence presented by

18   defendants is more than sufficient to raise a factual issue

19   for trial on Plaintiff's Section 7 claim, and thus easily

20   defeat Plaintiff's summary judgment cross-motion.

21           That therefore leaves one question, whether

22   Plaintiffs survive summary judgment. Defendants contend that

23   much of the Plaintiff's evidence beyond the HHI data is

24   inadmissible, and that the Defendants further argue that the

25   weakness of Plaintiff's reply to the rebuttal case means

1    that Plaintiffs cannot possibly win at trial, as a matter of

2    law, thus directing summary judgment in their favor.  See

3    AMR Opposition Section III. The Court concludes this is a

4    closed question.

5           But based on the record now before it, the Court

6    rules that there remain genuine disputed issues of fact

7    regarding the significance of Plaintiff's concentration

8    numbers, the competitive structure of the industry overall,

9    the import of various trends and consolidation service

10   offerings, and the differences in competitive structure and

11   barriers to entry among specific city pair markets.  Market

12   share data, like other economic evidence, must be evaluated

13   with care to determine whether it accurate reflects probable

14   market power. See RC Bigelow, Inc. 867 F. 2d at 110.

15          Plaintiffs have raised questions in the face of

16   Defendant's experts declarations by pointing to trends is

17   the industry, such as a series of mega-mergers, offset by a

18   few new entries.  Plaintiffs also point to increased prices,

19   and at least some admissible evidence that presents an issue

20   for trial, when view in a light most favorable to Plaintiff.

21   This evidence that the Court can consider includes the GAO

22   report, which is commissioned to study the state of

23   competition in the industry.  See Federal Rule of Evidence

24   803(8), which talks about a hearsay exception for a record

25   or statement of office.

Page 71

1          Critically, the Defendants have cited to no

2    authority in the Second Circuit holding that a legal opinion

3    is a legal prerequisite to establishing a Section 7

4    violation, or that the lack of expert analysis can justify

5    summary judgment.  In fact, they acknowledge the lack of

6    such authority at oral argument, notwithstanding that the

7    use of experts in these kind of complex antitrust cases

8    appeals to be the norm.

9          So, see hearing transcript at Page 81, Line 6,

10   through Page 82, Line 9, and that's from the hearing on

11   March 26th, 2018, where the Defendants concede there's no

12   case authority on this point.  But see U.S. Healthcare, Inc.

13   v. Healthsource, Inc., 986 F.2d 589 at 599 1st Cir. 1983,

14   ("if there is any case in which counsel has the obligation

15   to cull the record, organize the facts and present them in a

16   framework of a persuasive legal argument, it is a

17   sophisticate antitrust case like this one.")

18          Indeed, the Court continues to have serious

19   questions about Plaintiff's Section 7 claim.  As noted

20   above, Plaintiff's reply to Defendant's rebuttal case with

21   only minimal additional evidentiary support.  Plaintiffs

22   have not presented an expert opinion in support of a

23   competitive effects analysis, and there remain serious

24   questions about the admissibility of certain pieces of

25   evidence submitted in the reply.  And these issues echo many

Page 72

1    of the issues previously identified by the Court in prior

2    decisions in this case.

3            Somewhat relatedly, Plaintiffs suggested in oral

4    argument on these motions a while back that they might plan

5    to rely on individual plaintiff's professional experience as

6    travel agents to qualify as experts in the airline travel

7    industry.  See Hearing Transcript 56, Lines 4 through 16,

8    transcript from March 26th, 2018 hearing.  Such a petition

9    has not been fully explained by the Plaintiffs or addressed

10   by the Defendants, as that issue does not need to be

11   resolved, for purposes of the motions today, it remains for

12   another day.

13           But obviously any such testimony would need to

14   satisfy all applicable requirements under the law, including

15   discloser and discovery requirements, as well as the rules

16   of evidence. See Federal Rules of Civil Procedure 26(a)(2),

17   which talks about disclosure of expert testimony, and

18   provides that a party must disclose to the other parties the

19   identity of any witnesses it may use at trial to present

20   evidence under Federal Rules of Evidence 702, 703, or 705.

21   See also Matsushita 475 U.S. at 587.

22           And even assuming that the requisite disclosure

23   and discovery requirements are satisfied, the Plaintiffs

24   would need to establish the evidentiary significance of such

25   testimony, and how it would be appropriate at trial.  See

1    Halsa Corporation 133 F. 3rd at 855, Note 4 (holding that

2    witnesses offered as experts in government procurement, the

3    core commercial activity in question, we're not experts in

4    federal antitrust law, and therefore could offer nothing

5    more than lay opinion testimony.)

6              See FTC v. Freeman Hospital 911 F. Supp at 1220,

7    (holding that while such nonempirical data as the

8    perceptions of third-party hospital administrators, third-

9    party payers, and the parties themselves may have some

10   probative value as a starting point to valuate the market,

11   such data will not carry the Plaintiff's burden.)

12             So while there are many questions about the

13   Plaintiff's analysis of their data and their case in

14   general, summary judgment is not the stage at which the

15   Court directly weighs the merits of the parties' evidence.

16   See Anderson v. Liberty Lobby, Inc. 477 U.S. 242 at 249,

17   1986.  The parties will be free to argue the superiority of

18   their evidence at trial.

19             See RC Bigelow, Inc., 867 F.2d at 108, see also

20   California v. Sutter Health Systems, 103 F.Supp.2d 1109 and

21   1118, N.D. Cal. 2001, (finally upon a defendant's

22   successfully rebutting the presumption of anti-competitive

23   effects, the burden of procuring additional evidence of

24   anti-competitive effects shifts to the Plaintiff, and merges

25   with the ultimate burden of persuasion, which remains with

1    the plaintiff at all times.)  And that's quoting the Baker

2    Hughes case, 908 F.2d at 982-983.

3          So the Court now turns to the Plaintiff's Section

4    2(c) commercial bribery claim.  Plaintiffs allege a

5    violation of Section 2(c) of the Robinson-Patman Act.

6    Section 2(c) of that act provides in relevant part that is

7    hall be unlawful for any person engaged in commerce to pay,

8    or grant, or to receive or accept anything of value as a

9    commission, brokerage, or other compensation except for

10   services rendered in connection with the purchase or sale of

11   goods, wares, or merchandise.  See 15 U.S.C. Section 13(c).

12         Plaintiffs bring their Section 2(c) under a theory

13   of commercial bribery.  See cross-motion at Pages 57 and 60.

14   The Second Circuit has noted that Section 2(c) "was enacted

15   primarily to target the practice of dummy brokerages where

16   large retail buying groups...would require suppliers to pay

17   fees to dummy brokers who then passed the fees onto the

18   large retailer, effectively reducing the price the retailer

19   paid for the goods."  Blue Tree Hotels Canada, Ltd. V.

20   Starwood Hotels and Resorts Worldwide, 369 F.3d 212 at 221,

21   2d. Cir. 2004.

22         The parties acknowledge that the Second Circuit

23   has not conclusively determined whether Section 2(c) also

24   encompassed commercial bribery theories.  Compare AMR

25   Opposition Paragraph 78, (it remains an open question to the

1    Second Circuit whether such a claim alleging commercial

2    bribery is even viable under Section 2(c) of the Robinson-

3    Patman Act), with cross-motion at 57 (noting that the Second

4    Circuit has declined to enforce a rigid interpretation in

5    the scope of Section 2(c) claims, and the District Courts

6    within the Circuit appear split on the issue.)

7              But even assuming that Section 2(c) extends to

8    commercial bribery, Plaintiffs have not made a claim that

9    can survive summary judgment.  The existence of an improper

10   payment is the core of any Section 2(c) violation.  Blue

11   Tree Hotels Canada, Ltd. 369 F.3d at 223, (the sine qua non

12   of a 2(c) violation is an improper payment)  See also

13   Monsieur Touton Selection v. Future Brands LLC 2006 WL

14   2192790 at *4, S.D.N.Y. August 1st, 2006, (an allegation

15   that a payment was made or received by Defendant, without an

16   allegation that such payment was improper in some way does

17   not state a claim under Section 2(c).)

18             Accordingly, lack of informed consent by an

19   agent's employer or principal is "an element necessary to

20   establish the claim of commercial bribery", Dayton Superior

21   Corporation v. Marjam Supply Company, 2011 WL 710450 at *16,

22   E.D.N.Y. February 22nd, 2011 (granting plaintiff's motion to

23   dismiss defendant's 2(c) counterclaim for failure to allege

24   that the plaintiff principal did not consent to payments to

25   its agent.) See (indiscernible) Callmann on unfair

Page 76

1    competition, trademarks, and monopolies at Section 12:1, 4th

2    Edition 2007 (commercial bribery may be defined as the offer

3    of consideration to another's employer agent in the

4    expectation of the offering will, without full informing its

5    principal, be sufficiently influenced by the offer to favor

6    the offeror.)

7            Courts therefore often tether the definition of

8    improper payment to a showing of breach of fiduciary duty.

9    See e.g., American Federation of State, City, and Municipal

10   Employees District Council 27 Health and Securities Plan,

11   948 F.Supp.2d 338 at 357 through 358, S.D.N.Y. 2013

12   (describing the corruption of the duty of an agency owes as

13   principal as the essence of commercial bribery.) United

14   Magazine Company v. Murdoch Magazines Distributing, Inc.,

15   146 F. 2d 385 at 397, S.D.N.Y. 2001, plaintiffs rejecting a

16   commercial bribery claim, because the allegation does not

17   implicate a bribery involving a breach of fiduciary duty.

18           Accord, 2660 Woodley Road Joint Venture v. ITT

19   Sheraton Corporation, 369 F.3d 732 at 738, Note 4, 3d Cir.

20   2004, (As a general principal, a critical of element of

21   commercial bribery is a breach of the duty of fidelity.)

22   Paris v. Duty-Free Shoppers Ltd. Partnership 940 F.2d 1272

23   at 1274, Note 3, 9th Cir. 1991 (Section 2(c) can be read to

24   prohibit commercial bribery where a fiduciary relationship

25   exists.) Stephen Jay Photography, Ltd. v. Olan Mills, Inc.

1    3903 F.2d 988 and 993, 4th Cir. 1990.  (Circuit Course cases

2    finding commercial bribery in violation of Section 2(c) all

3    involve the corruption of an agency or employment

4    relationship relationship.)

5            Here, Plaintiff's 2(c) claim centers on the $20

6    million payment made by AAG to Mr. Horton in 2003, after

7    American and U.S. Airways consummated the merger. See

8    Transition Agreement, at Paragraph 3, and at Page 6. See

9    also defendant's undisputed fact, Paragraph 83.  Plaintiffs

10   characterize the payment as a bribe, to secure Mr. Horton's

11   assent to the merger.  See Cross-Motion at Page 58 and 59,

12   Plaintiff's Undisputed Fact at Paragraph 89.

13           Defendants in turn describe the payment as a

14   severance agreement for executive services rendered by

15   American Airlines former CEO.  See motion at Paragraph 96.

16   But fatal to Plaintiff's claim, Mr. Horton negotiated the

17   payment from his then-employer American, with the consent of

18   that employer, and broad awareness among relevant

19   stakeholders.  Seen in Declaration Exhibit U, Horton

20   Deposition Transcript at 18, Lines 3 through 20.

21           The payment to Mr. Horton was proposed and

22   negotiated during American's bankruptcy proceeding, earning

23   the approval of the Unsecured Creditors' Committee, the

24   boards of both American and U.S. Airways, and as part of the

25   merger agreement, the shareholders of U.S. Airways.  See

Page 78

1    Memorandum of Decision at 6, Case Number 11-15463, ECF

2    Number 7587.  Seen in Declaration Exhibit U, Horton

3    Deposition Transcript at 18, Lines 3 through 20.

4            When the U.S. Trustee objected to the payment's

5    inclusion in American's plan of reorganization, this Court

6    did not approve the payment as part of the plan.  But it

7    declined to do so, because the payment did not satisfy the

8    requirements for severance payment under the Bankruptcy

9    Code, and Section 503(c) of that code.  See defendant's

10   undisputed facts, Paragraph 82, Memorandum of Decision, at 4

11   and 14 through 20, Case Number 11-15463, ECF Number 7587,

12   and all those cites are to the Court's written decision on

13   Mr. Horton's payment, and the issue of Section 503(c), the

14   Bankruptcy Code.

15           The Court noted that the new merged entity would

16   be free to pay Mr. Horton without the oversight of the

17   Bankruptcy Court, in the confines of the Bankruptcy Code.

18   See In Re AMR Corporation, 497 B.R. 690 at 698, Bankr.

19   S.D.N.Y. 2013.  The involvement of the U.S. Trustee in this

20   Court in considering the payment to Mr. Horton underscores

21   the transparency and broad awareness of the payment among

22   all relevant stakeholders, and that is undisputed.

23           After the merger, and the AAG's emergence from

24   bankruptcy, Mr. Horton served as chairman of the board of

25   directors of the new entity. See Chairman Letter Agreement

1    at 1, seen in Reply Declaration Exhibit 6, Horton Deposition

2    transcript at Page 6, Lines 18 through 19.  Accordingly, the

3    board of AAG vetted, and formally improvement the payment,

4    which was "roughly in line" with that considered as part of

5    the merger agreement.  See Transition Agreement, Paragraph

6    3, and at Page 6, Defendant's Undisputed Fact, Paragraph

7    683, you've seen in Declaration Exhibit U, Horton Deposition

8    Transcript at Page 18, Line 15 through 20, and the cross-

9    motion at 58 (after the merger closed, the new company paid

10   Mr. Horton approximately the same amount.)

11           Plaintiff's argument that AAG's consent to the

12   payment fails to negate their claim of promotional bribery,

13   because Mr. Horton was never an employee of AAG.  See Cross-

14   Motion at 59.  But Plaintiffs provide no legal basis

15   whatsoever for distinguishing directorship from any other

16   employment.

17           In short, it is impossible to construe the facts

18   here to conclude that Mr. Horton received a payment without

19   the consent of, and in breach of a duty to his principal,

20   whether that principal was American or AAG.  Therefore the

21   payment to Mr. Horton cannot constitute an improper payment

22   necessary to sustain a claim under Section 2(c), as there

23   are no genuine issue of material fact Plaintiff's claim

24   under Section 2(c), the Court grants Defendant's motion for

25   summary judgment on that claim.

1          So in conclusion, the Court grants Defendant's

2     motion for summary judgment on Plaintiff's Section 2(c)

3     claim, and on their Section 7 claim, as brought in their

4     roles as travel agents and/or rising in an alleged national

5     market.  But the Court denies both motions as the section

6     claim, as brought by Plaintiffs in their roles as domestic

7     airline customers, and arising out of the city pair markets.

8          In the Court's decision day, moots out several

9     other pending matters, motions, all of which went to the

10    arguments made by the parties for which the Court had ample

11    briefing.  And this includes ECF Number 173, Plaintiff's

12    motion for an order correcting the record, and memorandum in

13    support thereof, ECF Number 172, notice of Plaintiff's

14    motion for order correcting the record, and the declaration

15    in support of that, which is at ECF 174.  That all went to

16    what people arguing, and essentially argument of counsel

17    about how the Court should understand things, and I had

18    plenty of briefing on that.  And so that motion at ECF 173

19    is denied as moot.

20         So with today's decision on summary judgment, the

21    Court has never endeavored to narrow the scope of the

22    dispute for trial, and to provide some guidance to the

23    parties about the biggest questions that remain to be

24    decided.  The Court will hold a robust pretrial conference

25    to discuss any and all outstanding issues about which

Page 81

1    further dialogue may be necessary or helpful before trail,

2    including the admissibility challenges to documents relied

3    upon in these motions, and the scope and nature of testimony

4    to be allowed from the parties and the witnesses.

5           To be candid, the Court remains somewhat mystified

6    by the limited scope of evidence Plaintiffs have provided in

7    the face of the avalanche of expert testimony proffered by

8    Defendants, most notably the Plaintiff's lack of an expert

9    analysis of the undeniably complex antitrust issues

10   discussed in this bench ruling.  But the Court doesn't

11   dictate the evidence that a party decides to put forward in

12   a case, or on summary judgment.  The final weighing of all

13   the evidence in this case, whatever what the scope, would be

14   conducted at trail, and it's to the scheduling of that trial

15   that the Court now turns.

16          So that's the Court's ruling, and I'm happy if any

17   party has any issues we need to discuss, before we discuss

18   scheduling and proceedings, as is necessary to resolve the

19   rest of the adversary proceeding.

20          MR. ALIOTO:  If it please Your Honor. I have

21   discussed previously with Mr. Wall, with regard to the

22   length of trial, and that would obviously be something that

23   would accommodate the Court's calendar.  I don't want to

24   speak, then, for Mr. Wall.  I think he can obviously speak

25   for himself, and I don't want to say what he said to me.

Page 82

1   But I believe that the trial would not be more than three

2   weeks.

3           THE COURT:  I had heard three to four days, when

4   people were here --

5           MR. ALIOTO:  That was the Plaintiff's view, Your

6   Honor.

7           THE COURT:  All right, well let me hear from the

8   other side.

9           MR. HUSENY:  American's view is certainly, Your

10  Honor, that it'll be less than three weeks.  I believe we

11  had said in the past it'd be three, to four, to five days,

12  maybe a week or a little over a week, depending on the

13  Court's trial calendar.

14          THE COURT:  All right, so in matters of experts

15  and expert testimony, I certainly have done this in the

16  past, is use written directs, and then have cross-

17  examination, and that substantially shortens the need for

18  trial time.  And I can't imagine why we wouldn't do that

19  here, at least for the experts, and perhaps for all

20  witnesses, but we can hash that out at our appropriate pre-

21  trial conference.

22          MR. HUSENY:  Very good, Your Honor.

23          THE COURT:  All right.

24          MR. ALIOTO:  Does Your Honor have a convenient

25  date for the pretrial, and even the trial?

Page 83

1           THE COURT:  All right, so how far out do you want

2     to have the pretrial conference?

3           MR. ALIOTO:  What serves Your Honor's convenience?

4           THE COURT:  It really, it's sort of up to you, in

5     the sense that I don't have any additional work to do to get

6     ready for the pretrial conference; you all do.  So I would

7     think a couple weeks, maybe three weeks, if that works for

8     folks?

9           MR. ALIOTO:  Yes, that sounds reasonable, Your

10    Honor.

11          MR. HUSENY:  I would need to just double-check on

12    that, Your Honor.  I think that that sounds reasonable.  I

13    can tell you that I personally have a trial starting in

14    about three weeks, so I would not be able to make that

15    conference.

16          THE COURT:  Well, let's not do that.

17          MR. HUSENY:  And then maybe others --

18          THE COURT:  So yeah, so this is something that

19    needs to work with your calendars.  So we could do this --

20    and Ms. Ebanks is the zen master of the calendar, and

21    getting dates from her actually is a way to ensure that I

22    don't screw that up.  I have the electronic calendar in

23    front of me, but she does her job very well.

24           So I don't want to catch anybody unawares, and I

25    don't want anybody to volunteer for something that's on the

```
 1    eve of a trial in another matter, which would seem to be
 2    cruel and unusual, which would be trying to keep two
 3    significant matters in your head at the same time.  So I
 4    would say sometime early this fall is what I'm thinking.  So
 5    sometime in September, October.
 6            So what you can do is think about some possible
 7    dates, talk to each other, and then if you would call Ms.
 8    Ebanks, and get those dates, and pick a date that works for
 9    both of you, and on the Court's calendar.  And so I don't
10    have a need necessarily to do this today, if you've got some
11    other things that may impact.  And so we can do it that way.
12            And then the idea would be to set -- what I would
13    like to do is what you all would imagine I would want to do,
14    which is to say who you have witness-wise, how long you
15    think it's going to take, who can be done by written direct,
16    and block out time.  And so, and get a sense of once some of
17    the most kind of concrete issues are discussed, we then
18    could have a better idea of how long we expect it to take.
19            I will say that I'm a fan of going late, when it's
20    helpful to finish evidence.  So I hate having a witness say,
21    well we've got another hour or two, but we're going to
22    break.  And it's different when you have a jury, and we're
23    all very solicitous of the time of jurors who aren't getting
24    paid a whole lot to sit through trials.  I don't get paid
25    any more or any less, so that's a risk of the job, and I
```

Page 85

1    think it just tends to be more efficient for everybody

2    involved.  Witnesses tend to like it, even if they have to

3    re-jigger a flight.

4            So I think when you think about the trial days, I

5    like to do that, and then I like to sort of check in with

6    people -- where are we, people on deck so we never run out

7    of witnesses for the trial time we've allotted.  And I can't

8    imagine I would need much in the way of an opening other

9    than maybe 20 minutes.  You all have briefed this very well.

10   And I think I have a pretty good idea of what we're going to

11   be trying, and so the 20 minutes would really be a roadmap

12   of who you're going to call, what you hope those witnesses

13   will show.

14           And I am much more lenient for closings, where

15   you're obviously trying to bring all the evidence together

16   and say, well, this is what the evidence told us, and how

17   you should read the evidence.  So, short openings, longer

18   closings.  And so we can talk about exactly how long, and

19   what you have in mind at another time.  There are even

20   occasions, consistent with what I've seen plenty of other

21   judges do to say, well, once you finish the trial, we

22   wouldn't mind having closings on another date, so we can

23   organize our thoughts about the evidence.  I'm open to

24   anything that's practical and efficient for all parties

25   involved.

1        And so the other thing you can do in thinking

2    about trial dates is think about some witnesses that you

3    know you're going to need, and when you're going to need

4    them, so that they have time.  So what I would say is why

5    don't you -- I'd like to pick maybe -- well, actually, I

6    don't think I need to pick anything to talk directly with

7    you folks.  I think  you can talk to Ms. Ebanks.

8        And if for some reason there's something that

9    people haven't anticipated needing to chat about with me,

10   you can just let Ms. Ebanks know, and we'll schedule a

11   conference call and bang those issues out at your earliest

12   convenience.  But probably the scheduling at least of the

13   pretrial conference and probably even the trial can be done,

14   and then we can just sit down at the pretrial conference.

15       So, but the pretrial conference, I'd want to know

16   what your witnesses are, how you really want to proceed, the

17   order of witnesses, and I want to do what every a federal

18   judge everywhere does, is you have your list of exhibits, we

19   work out what everybody's agreed to, as to admissibility and

20   relevance.  As you know, fighting about relevance in a bench

21   trial is perhaps not the greatest use of anybody's time.  So

22   I certainly -- you know your case better than I do -- but

23   that's probably not the greatest way to spend time.  You'll

24   just tell me why the other side's got it all wrong.

25       But I tend to like to do, and I know some judges

Page 87

1    like to all in advance I tend to like to do things in

2    context.  So if there's a complaint about the admissibility

3    of a particular exhibit by a witness, to deal with it in

4    context, so you don't have to educate me multiple times.  So

5    for specific things, I'd much rather deal with that at

6    trial.  Even if you just put in your thing, we have an

7    objection to the admissibility of this document, or that

8    report.

9              On the other hand, if there are broad categories

10   of things, you say this would have a significant impact on

11   the length of trial, and we think it's important to draw

12   this line, it's a significant line-drawing exercise, those

13   may be appropriate, the subject of a motion in limine, and

14   certainly there have been some things that have been

15   discussed in the context of these motions that people may

16   revisit or may not revisit.  So that's something to think

17   about.

18             I'm trying to think if I had any other basic trial

19   things.  People like to use PowerPoints and things like

20   that.  As you can see, we're pretty well-wired.  There's a

21   screen behind you.  I have a screen, people come in, lots of

22   technology, and our court staff are very helpful with that.

23   So if you say, well, I want to come in, make sure my setup

24   works, we can work that all out, and happy to do that.

25             Given that I know it's an effort to lug stuff

 1    around, we try to reserve rooms for trial, so we can do that

 2    as well.  And certainly to the extent that people can leave

 3    stuff that isn't, to quote My Cousin Vinny, the case-

 4    cracker, your outline of your cross-examination perhaps

 5    wouldn't be such a good idea.  But the stacks of boxes that

 6    come along with any trial, we try to accommodate that,

 7    leaving things in the courtroom, or in whatever trial rooms

 8    we get.

 9           So I'm covering some of the things for pretrial,

10    but just to help you think about what else we need to talk

11    about in pretrial conference.  Trying to think if there's

12    anything else.  Any questions or concerns?

13           MR. ALIOTO:  I just have one item, Your Honor.

14    Mr. Horton is no longer a part of American, and we do want

15    him to be present, to be examined.  If I have to serve a

16    subpoena on him, obviously that's what I'll have to do.

17           THE COURT:  Yeah, all the regular rules apply in

18    terms of non-parties, yeah.

19           MR. ALIOTO:  Okay.  All right, and I wonder if the

20    Court might think that we might be able to have the trial

21    before Thanksgiving.

22           THE COURT:  Well, why don't you talk first, and

23    we'll see where we end up.  Nothing says Thanksgiving more

24    than an antitrust trial, but notwithstanding that -- in

25    Bankruptcy Court, no less -- but see how it goes.  Obviously

1  we're going to try to get this done in a prompt and

2  efficient manner.  Cases take sort of as long as they take,

3  and you all presented some summary judgment motions.  I

4  think I did them promptly.

5           I did not, as I sometimes have to do in Bankruptcy

6  Court, drop everything and issue a decision in 24 hours or

7  48 hours.  This case we should do promptly, but at the same

8  time, I think you all will want to make sure that the time

9  that you choose is appropriate for your schedule, and how

10  long the  presentation's going to last.

11           MR. HUSENY:  We will meet and confer about that,

12  Your Honor.  I could say before Thanksgiving seems

13  difficult, given what I understand is my trial schedule, and

14  Mr. Wall's trial schedule, and the Supreme Court argument.

15  It is either going to be the last week in November or the

16  first week in December.

17           THE COURT:  All right, we'll chat about it.

18           MR. HUSENY:  So we'll meet and confirm with Mr.

19  Alioto.

20           THE COURT:  All right.  There was one other thing

21  that occurred to me that may be particularly relevant here,

22  is you may be not surprised to hear that in bankruptcy cases

23  that are often very voluminous documents that people want to

24  use, and there's always a concern, from a court point of

25  view, of an enormous data dump.

```
1              So my policy has always been for cases is if you
2    want to use a large document, you tell me what I'm looking
3    at.  Nobody wants a trial by ambush, where you give me a
4    300-page document, you cite one line at Page 64, and then
5    after the trial, somebody says. "Well, the case-cracker is
6    on Page 246, Subsection C, we didn't talk about it, but it's
7    in the record already."  So I always tell parties, the
8    record is what you point me to.  So there's no trial by
9    ambush, nobody feels like they're exposed.
10             And frankly, I don't really have the capacity.
11   Any one of you working in this case will have a larger
12   number of people working on trial than I have in my entire
13   chambers.  I don't have the capacity, and frankly I don't
14   think it's fair or a good idea to have me untethered, say,
15   well I'm just looking at whatever.  You don't want judges
16   doing that.  That's not the way it works.  And so it could
17   be large documents here.  And you all need to point me to
18   those things that are appropriate for those documents.
19             And so I trust that'll be true for experts,
20   experts say this is what they rely upon in any exhibits to
21   their reports.  But certainly anything else that people have
22   to let me know what it is, and why they want to use it.
23             MR. ALIOTO:  Very good, Your Honor, of course.
24             THE COURT:  All right.
25             MR. ALIOTO:  May I ask one question?
```

Page 91

```
 1                 THE COURT:  Sure.

 2                 MR. ALIOTO:  Is this where the witness is?

 3                 THE COURT:  That's where the witness is, yes.

 4     Yes, so anything else that we should talk about?

 5                 MR. ALIOTO:  No, not that I know of, Your Honor.

 6                 THE COURT:  All right, so I'd ask that the parties

 7     get together, and provide me with a proposed order

 8     addressing the summary judgment motions, and I think the one

 9     stray motion that I mentioned at the end about the record,

10     and submit it.  And rather than lay out any reasons that the

11     order should just say, here's what the ruling is, and for

12     reasons stated on the record today, so that nobody feels

13     like they have to include -- try to sum things up, and it's

14     just, the transcript speaks for itself.

15                 MR. ALIOTO:  I wondered, Your Honor, if since the

16     Court treated the 2(c) allegations separate and apart, does

17     the Court want a 54(b) judgment on that separating it out,

18     or not, or still, it's still within the main case.

19                 THE COURT:  It's still, I mean, it's been decided,

20     but the case hasn't been decided.  So it's like any

21     interlocutory ruling, although it obviously disposes of a

22     particular claim.  So I assume that none of my judicial

23     brethren up the street would be all that excited about

24     hearing this case piecemeal, and I frankly can't imagine

25     that you all would be all that excited about doing that
```

Page 92

```
 1   either.
 2           MR. ALIOTO:  No, I was just asking the pleasure --
 3           THE COURT:  So it's there, the ruling's there --
 4           MR. ALIOTO:  I was just asking what you wanted to
 5   do.
 6           THE COURT:  And at a certain point, you all will
 7   move on, and that will move on with you, so.
 8           MR. ALIOTO:  Okay, well thank you very, very much,
 9   Your Honor.  Appreciate it, thank you.
10           THE COURT:  Thank you.
11           MR. MESSINA:  One question, Your Honor.
12           THE COURT:  Sure.
13           MR. MESSINA:  Will there be a memorandum of
14   opinion that goes on (indiscernible) --
15           THE COURT:  No.  I use bench rulings often for a
16   variety of circumstances, and particularly in instances
17   where the case continues, and so this seemed appropriate
18   under these circumstances.  So I don't have any intention of
19   issuing a written opinion.
20           The bench ruling is obviously -- any written
21   opinion would be pretty much what you heard, but it is a
22   significant additional undertaking to make it that final
23   level of polish that's appropriate for issuing a written
24   opinion.  So I don't intend on issuing anything, and so the
25   transcript will serve as memorializing the ruling.
```

Page 93

1          MR. ALIOTO:  We will get it, Your Honor.  Yeah, we

2     get the transcript, yeah.

3          THE COURT:  Yeah, you don't have to order the

4     transcript.  Here in the government, we --

5          MR. MESSINA:  You (indiscernible) get it

6     (indiscernible).

7          THE COURT:  Given budget restrictions, we actually

8     don't order them unless somebody else orders them.  But when

9     you get them, if you just put it on the docket as is

10     appropriate.  And we'll have it there.

11          And if anyone notices a serious transcription

12     error that you just -- there's a not that was either added

13     inappropriately or missing, I think there's always a

14     question about citations, but frankly, I don't know that

15     that's worth people's time.

16          MR. ALIOTO:  Can we order it here and now, Your

17     Honor?

18          THE COURT:  No, I confess that's not part of my

19     day job, so I'm happy to not assume that burden.  But there

20     are certainly ways to order it, but I will leave you to

21     that.

22          MR. ALIOTO:  All right, thank you very much.

23          THE COURT:  All right, well then I expect I'll be

24     hearing from you all.  Ms. Ebanks will be hearing from you

25     all in the next couple of weeks, and then I'll be talking to

Page 94

1    you sometimes in the fall.  Thank you.

2              MR. ALIOTO:  Thank you very much, Your Honor.

3         (Whereupon these proceedings were concluded at 5:27 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 95

1                       C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     Sonya

7     Ledanski Hyde

Digitally signed by Sonya
Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o,
ou, email=digital1@veritext.com,
c=US
Date: 2018.08.31 16:26:59 -04'00'

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  August 31, 2018

**&**

**&**   4:3 19:9 64:1

**0**

**07733**   4:14

**1**

**1**   30:11 42:4 46:25
52:8,16 56:8 58:5
66:25 67:2,21
69:9,16 79:1
**1,000**   8:23 20:20
51:10
**1,008**   10:11 12:5
**10**   8:15 15:24
21:14 22:4 30:12
41:11 54:18 68:17
**10.1**   65:24
**100**   40:5,5 44:2
57:7
**10004**   2:3
**1008**   52:5 65:8,16
**102**   18:22
**103**   12:11 73:20
**104**   25:18
**106**   25:18
**106-1**   27:1
**1066**   21:10 35:24
**1068202**   41:11
**107-108**   18:22
**1073**   21:11 35:25
**108**   59:3 73:19
**1098**   53:13
**11**   8:7,9 10:20
24:11 25:21 37:9
**11-15463**   1:3 78:1
78:11
**11-16**   46:8
**110**   26:9 70:14
**1109**   73:20
**1110**   53:13
**1117**   39:5
**1118**   73:21

**1146**   27:23
**11501**   95:23
**1155**   27:23
**1167**   41:18
**118**   57:7
**118-1**   27:5
**1180**   27:24
**1194**   23:4
**1198**   23:4
**11th**   16:8 25:12
33:7 34:22
**12**   25:5 37:9 41:2
51:4
**12-15**   20:15 27:6
51:5
**12.5**   65:24
**120**   59:7
**121**   56:3 57:7
**121-22**   39:5
**1213**   33:11
**1215**   57:17
**1220**   33:12 73:6
**1223**   23:21
**1232-33**   23:21
**1235-1234**   64:2
**1237**   34:21
**124**   25:17
**1242**   39:23
**1244**   39:23
**1246**   34:21
**1272**   76:22
**1274**   76:23
**129**   13:4 56:3
**1299**   25:23
**12:1**   76:1
**13**   8:16 14:4 39:12
45:22 62:24 65:21
74:11
**13-01392**   1:4
**13-1392**   6:5 7:17
**133**   33:6 57:2 73:1
**134**   23:17 52:24

**1344**   37:25
**1349**   20:4
**135**   13:5 52:22
**1350-51**   37:25
**1351**   25:5
**1352**   20:4
**1357**   25:5
**138**   25:23 56:4
**139**   27:24
**14**   8:14 61:9 65:22
67:7 78:11
**14-19**   30:23
**14-22**   29:18 34:2
**140**   7:5 52:19
**1404**   58:12
**141-4**   58:25
**141-5**   59:1
**141-6**   59:2
**1414-1415**   58:12
**143**   51:15
**144**   23:17
**1443**   32:3
**1449**   32:11
**146**   76:15
**147**   56:4
**149-25**   15:5
**149-5**   15:5
**15**   14:4 18:1 40:9
40:9 45:6 47:13
47:14 55:2 60:19
66:1 68:16 74:11
79:8
**1500**   10:2
**1503**   10:2 53:22
**151**   19:8
**153**   7:14
**155**   19:8
**156-1**   11:16 29:20
**156-2**   51:20
**159**   55:12,16
**16**   40:4 43:23
47:22 52:12 56:16
58:5 66:5 72:7

**75:21**
**160**   16:16
**161**   10:4
**163**   54:10
**164**   56:4
**165**   24:24 28:16
33:2
**167**   47:2
**167-1**   46:25
**167-2**   47:1
**167-4**   47:4
**167-5**   47:6
**17**   49:2 62:24
**172**   80:13
**173**   80:11,18
**174**   22:11 80:15
**18**   10:4 18:1 53:23
57:18 60:20 61:10
63:5 68:16 69:16
77:20 78:3 79:2,8
**189**   16:20
**19**   9:18 10:25 44:3
46:8 48:9,9 61:12
69:16 79:2
**191**   19:21
**192**   10:4 53:23
**193**   16:20
**1932**   13:6
**194**   17:6 49:22
50:12
**1941**   25:18
**1949**   13:6
**195**   27:13 32:22
**1954**   42:25
**1957**   19:10
**1963**   35:19
**1966**   53:10,11
**1970s**   61:15
**1972**   40:9
**1974**   64:7
**1975**   59:8
**1981**   58:4,5

**1982**   20:4 28:13
**1983**   25:13 37:17
   37:25 71:13
**1984**   19:25 59:9
**1986**   10:3 15:18
   16:1 39:22 73:17
**1987**   64:2
**1989**   18:23
**199-2000**   19:21
**1990**   18:14 39:24
   43:2 77:1
**1991**   76:23
**1993**   24:17 32:14
**1994**   23:17 36:4
**1995**   23:5 27:24
   33:13 36:5,5
**1996**   58:12
**1997**   21:11 22:19
   25:6 35:25
**1998**   27:25 32:4
   33:7
**1st**   39:24 71:13
   75:14

**2**

**2**   15:24 20:14
   23:10 47:1 52:8
   52:16,17 65:11
   66:18,20 68:5
   72:16 74:4,5,6,12
   74:14,23 75:2,5,7
   75:10,12,17,23
   76:23 77:2,5
   79:22,24 80:2
   91:16
**2,500**   51:24
**2-32**   26:23
**2.1.1**   63:25
**2.1.2**   57:16
**20**   11:20 15:2
   16:17 29:19 44:5
   46:8 77:5,20 78:3
   78:11 79:8 85:9
   85:11

**20-25**   30:3
**200**   51:25 52:12
**2000**   4:5 23:19
**2001**   9:9 19:21
   54:13 73:21 76:15
**2002**   22:12 23:1,9
   23:10 25:20 29:3
   34:22
**2003**   29:5 77:6
**2004**   18:7 19:19
   53:13 74:21 76:20
**2005**   54:14
**2006**   37:15 75:13
   75:14
**2007**   39:6 41:10
   41:11 67:16,17
   76:2
**2008**   18:21 54:6
**2009**   10:1 23:16
   39:17 49:25
**2010**   9:18 41:1
   42:20 45:2 54:5
**2011**   6:7 8:8 12:22
   19:9 36:24,25
   54:5 75:21,22
**2012**   17:11 39:18
   42:15 52:6 65:17
**2013**   8:8,14,15,16
   10:10,16,19,20
   11:20,25 16:20
   23:22 37:7 45:20
   59:15 61:2 66:16
   76:11 78:19
**2014**   24:10,11
   49:2,3 64:10,11
   66:8
**2015**   12:19 13:6
   15:23,24 18:18
**2016**   18:5,5 24:24
   25:20 37:8,9 38:9
   49:23 65:18
**2016's**   52:8

**2017**   25:21 37:5,5
   38:6,12 42:2 45:2
   45:6,7,24,25 52:4
   65:8 69:17
**2018**   2:5 10:5
   20:16 25:23 27:7
   71:11 72:8 95:25
**203966**   64:11
**208**   22:11
**21**   63:13
**2105**   52:7
**212**   74:20
**214**   22:25
**215307**   36:5
**2192790**   75:14
**22**   18:5 21:20 45:7
**22-23**   21:20
**220**   22:11
**221**   74:20
**223**   29:2 75:11
**22nd**   75:22
**23**   11:24 63:13
**23-27**   21:24
**230**   23:19
**236**   49:23
**24**   52:16 89:6
**240**   69:16
**242**   73:16
**246**   9:8 62:11 90:6
**247**   49:23
**248**   50:12
**249**   73:16
**25**   24:24 32:20
**2500**   52:11
**251**   40:8
**26**   20:16 27:7 40:9
   72:16
**260**   33:12
**261**   40:8
**2610613**   24:10
**262**   40:9
**2637**   10:1

**265**   23:16
**2660**   76:18
**26th**   71:11 72:8
**27**   76:10
**270**   53:10
**271**   43:1
**275**   19:21
**276**   23:16 24:2
   25:8
**28**   37:9
**283**   37:14
**284**   34:21
**29**   2:5 8:8 16:23
   36:25 49:3 63:5
   63:13
**290**   39:6
**290-91**   37:14
**294**   28:13 32:3
**295**   43:1
**2c**   14:3,15 15:6
**2d**   16:20 17:10
   18:7,22 19:8,21
   19:25 23:17,19
   25:8,21 37:14
   38:8 39:5 59:9
   70:14 74:21 76:15
**2d.cir.**   37:7

**3**

**3**   37:5 38:6 47:3,3
   52:8,17,17 54:10
   56:3 65:14,18
   66:21,24 76:23
   77:8,20 78:3 79:6
**30**   37:5 53:15
**300**   90:4 95:22
**304**   25:20
**31**   20:10 95:25
**310**   10:3 27:12
   32:22 53:23 57:17
**311**   53:12
**3167192**   18:5
**317**   15:18 25:20

**32**   20:14 61:22
**32-33**   27:1
**321**   35:19
**322**   15:18
**325**   21:10 28:13
**328-60**   35:19
**33**   23:17 45:3 62:3
**330**   95:21
**336**   36:14
**338**   76:11
**339**   19:18
**34**   27:5 35:10 36:12
**347**   42:25
**35**   24:24 27:5 28:6 28:16 32:6 33:2 35:11
**35-36**   12:16
**353**   19:10
**357**   53:14 76:11
**358**   76:11
**359**   36:13
**35th**   4:20
**36**   29:17 33:25
**369**   74:20 75:11 76:19
**37**   21:14 22:4 30:8 30:11,15 31:7 53:21 63:13
**370**   21:10 28:13 36:13
**374**   35:19 36:13 53:14
**3790296**   41:2 42:21
**38**   31:7
**384**   53:10,11
**385**   76:15
**386**   18:7 19:13
**39**   30:12
**3903**   77:1
**397**   76:15

**3:09**   2:6
**3d**   25:20 64:2 76:19
**3rd**   42:15 73:1

**4**

**4**   9:14 10:2 33:7 36:25 38:6,12 40:3 42:2 47:4,13 47:22 51:20 52:7 52:17 53:22 57:7 58:25 64:11 72:7 73:1 75:14 76:19 78:10
**4-5**   45:15 46:8 52:8
**40**   22:2 39:11
**40-41**   12:16 27:4
**401**   22:25
**405**   23:1 40:8
**410**   18:21
**415**   64:6
**42**   20:15 27:6 36:1
**422**   59:7
**423**   18:21
**4277510**   49:2
**44**   29:18 34:2 61:3
**4402564**   37:5 38:6 38:12 42:2
**45**   29:19 30:2,2 43:18 62:3,6
**451**   42:15
**455**   23:18
**459**   37:16 48:21
**46**   29:19 43:18
**46-47**   59:24
**461**   42:15
**462**   12:22
**464-465**   23:18
**467**   37:14 39:6
**47**   11:24 31:15 48:22 60:6 63:9
**470**   39:17

**475**   16:1,5 52:17 68:11 72:21
**477**   15:18 73:16
**478**   39:22
**48**   89:7
**485**   18:7
**48559**   58:4
**486**   64:6
**49**   63:9
**495**   43:1
**496**   19:13
**497**   78:18
**4th**   29:4 76:1 77:1

**5**

**5**   10:10 13:14 20:23 24:10 41:11 42:21 44:22 45:1 45:8,19 56:3 59:1 65:11
**5.3**   9:18
**5.3.**   52:3
**502**   11:24 12:16 22:2
**503**   78:9,13
**503c**   11:4
**504**   64:6
**505**   4:5
**507**   39:5
**511**   18:7
**514**   42:25
**5176395**   15:24
**518**   23:19 42:25
**519**   37:16
**52**   61:18
**52-53**   47:23
**521**   39:16
**523**   39:16
**527**   12:18 26:14 36:19 47:11 48:17 49:13
**53**   45:20
**534**   18:21 37:16

**539**   20:3
**54**   91:17
**542**   48:21
**545**   19:19
**546**   53:11
**549**   19:19
**55**   14:4
**550-552**   53:11
**5586**   23:9
**56**   15:19 72:7
**564**   12:22
**566**   37:25
**567**   39:16
**56f**   7:25
**57**   74:13 75:3
**574**   16:1
**576**   29:4
**58**   23:4 77:11 79:9
**585**   49:24
**586**   19:10
**587**   16:1,5 68:11 72:21
**589**   71:13
**59**   43:11 46:19 77:11 79:14
**593**   19:10
**599**   71:13
**5:27**   94:3
**5th**   18:21 25:18

**6**

**6**   18:5 23:9 36:5 45:19 59:1 62:11 62:20 63:19 71:9 77:8 78:1 79:1,2,6
**6-7**   30:17
**60**   43:15 46:19 74:13
**605**   9:25 53:21 59:24
**618**   25:12
**621**   25:12
**64**   19:25 21:15 22:5 90:4

**647**   23:16 24:2 25:8
**649**   19:8
**677**   49:25
**68**   30:17,23 38:7 43:6
**683**   42:14 79:7
**6845773**   36:24
**685**   17:10
**688**   39:18
**689**   32:13 49:25
**68i**   37:7
**69**   30:17 33:12
**690**   78:18
**692**   32:13
**694**   32:10
**696**   17:10
**697**   39:18
**698**   78:18

**7**

**7**   8:21 13:18 14:6 15:1 17:17,17 18:2,15,18 19:1,5 37:4 40:24 45:19 50:16 53:9 54:1 55:20 60:10,14 64:4 68:10,13 69:19 71:3,19 80:3
**7-13**   25:21
**70**   19:25
**701**   22:18
**702**   17:10 72:20
**703**   72:20
**704-705**   22:18
**705**   72:20
**707**   16:20 17:6
**708**   9:8
**710450**   75:21
**711**   37:7 38:7,13
**713**   25:12
**714**   39:22

**716**   9:9,12
**718**   29:2
**720**   39:22
**723**   65:15,24
**724-725**   62:12
**728**   29:2
**73**   29:4 64:11
**730**   19:25
**732**   76:19
**738**   76:19
**74**   16:15,21,23
**743**   59:8
**7471340**   37:9
**749**   52:18
**75**   37:7
**7587**   78:2,15
**759**   38:8
**76**   38:13
**771-72**   38:8
**775**   18:18
**778**   18:17 27:16
**78**   74:25
**780**   50:13
**783**   18:18
**784**   27:16
**785**   52:10
**798**   10:2 53:22
**7th**   23:4

**8**

**8**   9:14 19:25 23:4 29:19 45:19 55:2 70:24
**8-10**   30:2
**803**   70:24
**81**   71:9
**811**   24:17
**82**   71:10 78:10
**823**   38:8 50:12
**824**   32:13
**83**   77:9
**84**   23:18
**8484**   24:17

**853**   33:7
**855**   33:7 73:1
**86**   59:7
**860**   36:4
**867**   18:22 36:4 59:3 68:17 70:14 73:19
**871**   24:17
**874**   12:18
**875,000**   10:25
**876**   26:9
**881**   36:4
**883**   12:18 26:14
**885**   26:21 36:19
**885-86**   12:18 26:14
**886**   36:19
**889-92**   12:18
**89**   77:12
**891**   48:17 49:18
**891-92**   47:11
**892**   27:23 41:17 47:19 49:13,15
**8th**   27:24 33:12

**9**

**9**   9:12 10:20 71:10
**9-10**   30:17
**90**   53:6
**907**   39:23
**908**   18:13 53:6 60:5,12 68:17 74:2
**91**   39:7
**911**   33:11 73:6
**926**   64:1
**93**   54:7
**940**   76:22
**94104**   4:21
**94111**   4:6
**948**   76:11
**95**   54:13
**957**   58:12

**958**   23:21
**96**   77:15
**960**   22:18
**961**   4:13
**970**   21:10 35:24
**976**   59:8
**981**   18:14
**982**   59:9
**982-83**   18:14
**982-983**   74:2
**983**   68:17
**986**   71:13
**988**   77:1
**99**   54:15
**991**   60:5
**992**   60:12
**993**   77:1
**9th**   18:18 39:17 76:23

**a**

**aa**   66:20
**aag**   7:9 8:6,12 11:2,9,10,11 14:17 77:6 79:3 79:13,20
**aag's**   59:19 78:23 79:11
**aag's**   55:16
**abandon**   24:1
**ability**   12:23 54:23,24
**able**   34:4 62:12 83:14 88:20
**abrams**   24:16
**absent**   24:7
**abutting**   18:24
**academic**   22:15
**accept**   22:3 74:8
**accepted**   9:5 22:8
**accepting**   22:19 26:4 35:20,25 36:6 68:7

**access** 9:1
**accessible** 58:9
**accommodate**
  81:23 88:6
**accord** 76:18
**account** 59:5
  69:14
**accountability**
  66:9
**accurate** 67:8
  70:13 95:4
**acf** 16:16 27:5
**acknowledge** 71:5
  74:22
**acknowledged**
  21:16
**acknowledgement**
  30:18
**acknowledges**
  29:15 48:10 66:2
**acknowledging**
  30:14
**acknowledgment**
  31:13
**acquire** 17:21
**acquisition** 17:25
  18:3,16 64:3
**acquisition's** 59:5
**act** 8:21 14:4 15:1
  17:17,18 19:6,12
  32:15 40:3 50:5
  74:5,6 75:3
**action** 8:20 10:12
  10:16 12:3 13:4
  20:9 40:3 47:18
**actions** 59:19
  60:10 67:20
**active** 41:15
**activity** 17:20,23
  73:3
**actual** 35:18
  38:16,19 42:12,17
  48:4 49:1 59:11

**add** 47:12 54:24
  63:8
**added** 27:3 93:12
**addition** 13:25
  20:11 52:13 63:20
**additional** 56:1
  57:5 65:3 71:21
  73:23 83:5 92:22
**address** 16:6 25:3
  39:13 50:14 67:21
**addressed** 13:10
  58:19 72:9
**addresses** 19:2
  67:15
**addressing** 19:1
  91:8
**adds** 53:25
**adequately** 13:19
**adhere** 24:21
**adjacent** 35:20
**adjudicating**
  58:15
**administrator**
  33:14
**administrators**
  73:8
**admissibility**
  71:24 81:2 86:19
  87:2,7
**admissible** 70:19
**admission** 22:25
  23:12,14 24:7
  26:3
**admissions** 15:13
  23:1,8 25:8,9,13
  26:1,1 28:24
**admit** 24:5
**admitted** 23:11
  25:15 28:4 68:25
**ado** 7:4
**adopted** 22:15

**adv** 1:4
**advance** 87:1
**advancement**
  37:3
**adversary** 6:5,5
  7:10,17 8:5 11:18
  11:19 12:10,24
  22:5 81:19
**adverse** 14:9
  51:14 63:24
**adversely** 42:8
**advertising** 41:19
  41:20
**advise** 60:1
**advocated** 26:22
**aeg** 15:8
**aetna** 69:16
**affect** 49:14
**affidavit** 12:1,2
  41:5
**affidavits** 15:14
**affirm** 27:24 29:3
**affirmations** 23:7
**affirmative** 23:6
**affirmed** 23:19
  25:20 33:12
**affirming** 34:22
  42:15
**afternoon** 6:2
**agency** 76:12 77:3
**agent** 47:16,17
  49:9,17 75:25
  76:3
**agent's** 75:19
**agents** 13:12,18
  40:14,17 47:8
  48:3,15,23 49:15
  49:20 50:5 72:6
  80:4
**agents'** 47:9 50:3
**agreed** 63:15
  86:19

**agreement** 8:14
  8:15 10:22,23
  11:4,9,13,16 14:1
  35:25 77:8,14,25
  78:25 79:5,5
**agrees** 39:10
  43:20
**aim** 67:23
**aimed** 29:9
**air** 8:23 21:4
  22:16 32:2,4,10
  32:19 35:5 36:21
  40:22 41:9 43:16
  44:21 54:20,20
  66:18,21,24 67:1
  67:25 68:4
**aircraft** 29:22
  44:7
**airfare** 45:23
**airfares** 55:6
  62:23 65:10 66:22
**airline** 13:12
  16:13 20:9 21:18
  22:10 26:13 31:5
  32:8 34:11 41:3,4
  43:5 45:3,20 51:2
  52:11 53:25 54:16
  56:22 57:6 59:17
  61:5,11,14,16,19
  61:22,24 62:16,19
  63:3 66:11 67:5
  67:13,14,16,20
  68:1 69:12 72:6
  80:7
**airlines** 6:13,15
  7:6,7,8 8:5,6
  22:10,14,18 29:16
  30:7,15 31:16,19
  32:12,13 33:21,23
  34:4 41:6 43:23
  44:3,16,23,23,25
  45:5,16 54:4,7,12
  54:25 55:5 58:24

61:7 62:10,25
63:17 77:15
**airport**   8:25 10:15
10:15 30:21,21
44:8 46:7 68:1
**airports**   8:25
52:21 66:19 68:4
**airtran**   54:5
**airway**   8:11 54:14
**airways**   7:7 8:12
8:13,19 10:21
29:12,25 43:17
44:23 45:12,17,21
48:8 55:5 61:6,18
77:7,24,25
**al**   1:12,15 6:4
**alaska**   31:4
**alberta**   63:25
**align**   52:24
**aligned**   50:6
**alioto**   4:18,23 6:8
6:9,16 7:1 46:22
46:24 81:20 82:5
82:24 83:3,9
88:13,19 89:19
90:23,25 91:2,5
91:15 92:2,4,8
93:1,16,22 94:2
**allegation**   41:24
75:14,16 76:16
**allegations**   14:24
37:19 43:9 50:24
55:24 56:1 91:16
**allege**   13:25 19:6
24:3,4 52:13 63:7
74:4 75:23
**alleged**   8:20 14:11
14:20 32:9 38:4
38:11 40:13 41:13
42:12 48:10 50:7
56:10 80:4
**allegedly**   13:16
40:25

**alleges**   38:17,19
46:4
**alleging**   20:17
32:14 42:16 75:1
**allen**   24:9
**allgas**   34:21
**allotted**   85:7
**allow**   60:6
**allowed**   81:4
**allowing**   50:8
**alloys**   37:24
**alphonsus**   18:16
27:16
**alternative**   14:20
20:6
**aluminum**   49:1
**amadeus**   49:22
50:11
**ambiguities**   15:21
**ambush**   90:3,9
**amend**   12:11
**amended**   10:9,20
12:5,10,20 13:10
13:14 20:7,10,13
20:22 26:15,22,23
26:24 27:3 43:10
45:14 46:4 47:12
51:3,9,15,18,18
51:22,25 52:14,18
52:22 54:6,13
56:3 57:2
**america**   23:9
24:10 33:22,24
37:24 38:8 54:14
**american**   6:13,15
7:6,8 8:5 15:23
16:13 30:24 32:13
32:14 43:1,17
44:6,9,22,23,25
45:5,8,12,16,21
46:3,6 54:7 55:5
58:24 61:7,17
76:9 77:7,15,17

77:24 79:20 88:14
**american's**   77:22
78:5 82:9
**ammend**   47:12
**amount**   79:10
**amounted**   14:2
**ampal**   15:23
**ample**   80:10
**amr**   1:8,15 6:4,6
7:6 8:7,8,13,19
10:12,12,21,23
11:8,24 12:16,18
14:17 16:15,21,22
21:19,24 22:2
26:13 29:12 32:18
36:19 37:20 43:11
43:14 46:18 47:10
48:8,17 49:12
54:11 56:24 70:3
74:24 78:18
**amr's**   8:10 10:19
**analysis**   10:7 14:9
21:22 25:1 27:11
27:15 32:24 33:4
34:19 47:25 50:18
56:9,17,19 57:19
59:17,19 60:23,24
63:20 64:15,19
65:11 66:3,4 71:4
71:23 73:13 81:9
**analytical**   57:24
**analytically**   57:9
**analyze**   67:23
**analyzing**   10:8
22:16 65:4
**ancillary**   54:24
56:2 57:5 63:6
**anderson**   73:16
**anheuser**   24:16
**annex**   45:13 46:3
59:16
**announced**   8:13

**another's**   76:3
**answer**   23:10
**answers**   15:13
**anti**   61:8 64:4
68:22 73:22,24
**anticipated**   67:24
86:9
**anticompetitive**
13:16 14:11 38:14
38:18 40:13,25
41:13 42:16 69:6
**antitrust**   6:4,5
10:10,18 14:10,12
15:1 18:4,4 19:3
21:18 22:9 24:12
28:23 29:10 34:10
35:16 37:1,2,10
37:11,13,18,22
38:1,3,4,5,12 39:4
40:21,25 41:19,23
42:3,23 47:19
48:4 49:2,24
50:11 68:24 71:7
71:17 73:4 81:9
88:24
**anybody**   6:20
83:24,25
**anybody's**   86:21
**apart**   91:16
**app**   29:4
**appeals**   39:25
71:8
**appear**   44:14
49:17 75:6
**appearance**   6:20
6:21
**appearances**   6:7
**appears**   67:8
**appended**   43:10
**appendix**   12:4
20:14 25:21 51:4
51:18,19,21 52:1

applicable 47:25
  50:2 72:14
application 9:25
  53:20
applied 18:15
  28:17 47:8,21
  60:14
applies 38:20
apply 28:1 88:17
applying 50:4
appreciate 92:9
approach 22:16
appropriate
  15:12 20:24 21:17
  26:8 36:1 72:25
  82:20 87:13 89:9
  90:18 92:17,23
  93:10
appropriately
  14:12
approval 14:17
  77:23
approve 78:6
approved 8:15
  10:15,17 11:9
approximately
  11:2 44:11 45:3
  52:10 79:10
april 41:11
arcell 45:7
area 20:25 34:10
  34:12 36:8,10
areas 34:6 36:2
aren't 84:23
argue 14:7,20,24
  21:16,21 33:20
  43:12 47:20 69:24
  73:17
argued 12:6 32:18
  55:9
arguing 16:9
  80:16

argument 24:1
  28:9 33:18 71:6
  71:16 72:4 79:11
  80:16 89:14
arguments 28:8
  80:10
arising 80:7
arizona 45:25
arkansas 27:24
arose 31:8
arrange 34:7
arrives 21:5
article 13:7
articulated 50:20
  68:23
asked 12:22 31:4
  67:13
asking 30:9 31:22
  92:2,4
aspects 31:18
assent 77:11
assert 13:19 56:23
  57:3
asserted 48:20
assertion 28:3
assertions 23:6
asserts 63:14
assessed 18:19
assessing 41:23
  42:3
assessment 34:24
assignments
  43:24 44:1
associated 37:15
  48:21
associates 37:7
association 19:18
  19:18 39:15
assume 57:25
  91:22 93:19
assuming 48:9
  72:22 75:7

at&t 10:3 27:12
  32:22 53:23 57:17
athletic 19:18
atpco 63:3
attached 10:10
  51:21
attack 22:13
  37:17
attempt 18:11
attempted 63:19
attempting 63:10
attempts 12:11
attention 12:4
attest 45:10
attorney 50:10
attorneys 4:4,12
  4:19
attracting 46:15
audience 68:1
august 2:5 8:15
  9:18 11:20 49:3
  75:14 95:25
authority 17:10
  28:18 71:2,6,12
authors 67:22
availability 68:3
available 48:16
  52:7
avalanche 64:25
  81:7
aver 43:15
average 47:4
  56:16 65:9,20,23
  66:11
aviation 68:2
awareness 77:18
  78:21

**b**

b 2:21 35:6,8 38:3
  66:11 91:17
b.a.s.i.c 39:23
b.r. 11:24 12:16
  12:18 22:2 26:14

36:19 39:17 47:11
  48:17 49:13 78:18
back 72:4
background 7:22
  7:23 8:4 11:17
  13:9
baggage 44:4,4
  55:6
bailey 34:21
baker 18:13 53:6
  60:5,11 68:17
  74:1
bang 86:11
bank 23:8 35:19
  36:13 38:7 53:14
  59:7
banking 35:21
bankr 11:24
  12:18 15:24 78:18
bankrupt 54:21
bankruptcy 1:1
  2:1,23 6:6 8:9,11
  11:5,10 13:1,4,7
  77:22 78:8,14,17
  78:17,24 88:25
  89:5,22
banks 22:25
barr 18:6
barrier 29:23
barriers 29:16
  34:13 55:10 63:10
  67:4,7 70:11
based 9:2 26:7
  29:9 33:9 35:17
  55:21 56:18 57:23
  58:2 66:3 70:5
basic 28:1 87:18
basis 31:24 34:23
  35:6 37:19 40:11
  65:20,25 79:14
basketball 19:17
baxter 23:19

**bayer** 25:22
**bazaarvoice** 64:10
**begins** 19:3,14
**begun** 62:5
**behalf** 42:21
**behavior** 62:13,17
**believe** 82:1,10
**bench** 3:1 6:3 81:10 86:20 92:15 92:20
**benefit** 24:13
**benefits** 11:12
**berlin** 29:1,3
**best** 25:11 40:21 50:10
**better** 84:18 86:22
**beyond** 25:15,16 43:12 65:2 69:23
**bigelow** 18:22 26:8 59:3 68:16 70:14 73:19
**biggest** 80:23
**billing** 37:13 39:6
**bind** 23:7
**binding** 9:23 10:5 23:3,14 53:3
**biocad** 37:4 38:5 38:12 42:2
**block** 53:8 84:16
**blue** 43:25 44:5 55:15 74:19 75:10
**board** 11:2,8,9,10 14:17 78:24 79:3
**boards** 77:24
**boils** 41:23
**bon** 36:3
**booked** 45:4
**books** 49:16
**boone** 53:11
**borden** 42:24
**boston** 46:6

**boundaries** 24:20 34:20
**bowling** 2:2
**bowsher** 39:22
**boxes** 88:5
**brands** 75:13
**breach** 76:8,17,21 79:19
**break** 84:22
**brethren** 91:23
**bribe** 77:10
**bribery** 14:3 74:4 74:13,24 75:2,8 75:20 76:2,13,16 76:17,21,24 77:2 79:12
**bridge** 18:20
**brief** 23:14
**briefed** 85:9
**briefing** 24:2 80:11,18
**briefly** 48:1
**bring** 40:21 74:12 85:15
**brink** 16:11
**britto** 55:2
**broad** 77:18 78:21 87:9
**broadcasting** 19:24
**broader** 22:13
**brokerage** 74:9
**brokerages** 74:15
**brokers** 74:17
**brought** 7:10 60:10 80:3,6
**brown** 21:9 28:12 36:13,21 39:16
**bucket** 66:7
**budget** 93:7
**burden** 18:8,15 18:19,24 21:23 25:6 33:17 46:12

55:20 60:13 73:11 73:23,25 93:19
**burdens** 50:19
**bureau** 65:13
**busch** 24:16
**bush** 12:1,2,3
**bush's** 22:5
**business** 24:25 28:22 33:3 49:9 49:10
**businesses** 34:7
**buttress** 65:2
**buttressed** 69:3
**buy** 42:17
**buying** 74:16

**c**

**c** 4:1 6:1 14:5 35:7 35:8 37:21 45:18 74:4,5,6,11,12,14 74:23 75:2,5,7,10 75:12,17,23 76:23 77:2,5 78:9,13 79:22,24 80:2 90:6 91:16 95:1,1
**c.d.** 32:3
**ca** 4:6,21
**cal** 32:3 36:25 41:11 53:13 64:11 73:21
**calculated** 9:6 65:15,19
**calculation** 49:5
**calculations** 10:11 51:6 55:21 56:17
**calendar** 52:6 65:17 81:23 82:13 83:20,22 84:9
**calendars** 83:19
**california** 37:16 40:8 42:25 73:20
**call** 61:6 66:10 84:7 85:12 86:11

**called** 12:4 16:8 62:9
**callmann** 75:25
**canada** 74:19 75:11
**candid** 81:5
**canvas** 25:11
**capability** 33:23
**capable** 29:22
**capacities** 13:17 40:14
**capacity** 46:5 50:9 56:2 57:4 61:25 62:3,5 90:10,13
**carco** 39:17
**care** 70:13
**careful** 36:10
**carl** 45:18,23
**carlton** 31:12 58:25 59:13,16 60:25 61:2,4,19
**caroline** 6:4
**carpenters** 37:16
**carrier** 61:25
**carriers** 30:1 54:21,22 55:13 61:5,19 62:4,5 66:23
**carry** 21:23 33:17 73:11
**case** 1:3,4 6:5,7 7:16,16,23 10:10 12:14,22 13:1,6 13:18 15:17 16:1 17:11 18:7,9 19:2 20:3 21:4 26:5,12 27:10 31:15 32:7 32:14,19,20 35:16 37:4,7 39:21,22 42:25 43:1 47:10 50:16,19,20,21,21 50:23 51:6,16,22 53:2,4,5 54:1

58:19 59:4 60:1,2
60:6,7,19 64:4,6,7
64:14 65:3 68:22
69:10,25 71:12,14
71:17,20 72:2
73:13 74:2 78:1
78:11 81:12,13
86:22 88:3 89:7
90:5,11 91:18,20
91:24 92:17
**cased** 55:20
**cases** 16:18 17:5
18:16 19:23 22:9
25:17 27:14 31:25
32:24 39:10,12
50:2 53:7 58:5
60:14 71:7 77:1
89:2,22 90:1
**cash** 10:25
**casper** 59:2 61:13
61:18,24
**casual** 56:13
**catch** 83:24
**categorically** 67:9
**categories** 87:9
**category** 48:16
**catrett** 15:17
**cause** 18:3 38:22
**cc** 53:21 59:23
60:6
**ccc** 9:25
**cecf** 15:5
**celotext** 15:17
**center** 18:16 32:8
**centered** 62:18
**centers** 51:6 77:5
**cents** 49:5
**ceo** 10:24 11:11
77:15
**certain** 10:13
12:14 13:16 29:25
40:16 56:1 64:19
64:22 71:24 92:6

**certainly** 16:24
82:9,15 86:22
87:14 88:2 90:21
93:20
**certainty** 52:10
**certified** 95:3
**cf** 23:19
**chairman** 10:23
11:1,7,8,13 78:24
78:25
**challenge** 16:7
26:6 40:22 48:16
**challenged** 40:25
49:10
**challenges** 67:19
67:21 81:2
**challenging** 41:2
**chambers** 90:13
**change** 15:8 52:12
56:16
**changed** 66:13
**changes** 10:13
46:5 51:10,25
63:24 65:4 66:18
67:13,15,17,18
**chapter** 8:7,9
10:20
**characterize** 65:1
67:8 77:10
**charge** 43:24 44:4
**charged** 42:6
**charted** 36:10
**charts** 46:20
**chat** 86:9 89:17
**cheat** 63:11
**check** 83:11 85:5
**chemicals** 64:1
**chicago** 18:20
44:6
**choose** 89:9
**christopher** 6:17
**cincinnati** 57:1

**cir** 16:20 17:10
18:7,14,18,21,23
19:9,21,25 23:5
23:17,19 25:12,18
25:21 27:24 29:4
33:7,12 34:22
37:15 38:8 39:5
39:17,24 42:15
59:9 64:2 71:13
74:21 76:19,23
77:1
**circuit** 10:3,6
36:20 38:10,20
42:3 71:2 74:14
74:22 75:1,4,6
77:1
**circuits** 9:9
**circuit's** 41:22
**circumstances**
26:8 92:16,18
**citation** 8:1 9:11
**citations** 24:15
32:25 93:14
**cite** 16:18 17:6
32:2,12 56:5 67:3
90:4
**cited** 28:24 29:15
29:21 71:1
**cites** 29:11 78:12
**cities** 29:17 34:17
35:8 36:22 52:23
**citing** 15:25 17:9
23:8,16 25:17
29:17 30:15 37:6
39:6,21 53:9,13
53:21 60:5 64:5
**citizens** 59:7
**city** 8:24 9:2
10:11 12:5 14:21
14:22 19:8 20:13
20:18,19,21,25
21:4,5,7,8,9,17
22:3,6,8,13,19,21

22:24 26:4,7,7
28:7 34:5,8 35:6,6
35:7,7,14 43:10
45:13 46:3,9,13
46:15,21 47:2,3
51:7,23 52:5,10
52:13,15,17,17,18
65:9 70:11 76:9
80:7
**civil** 6:4 7:24 13:4
72:16
**claim** 13:7 14:7,14
15:6 17:17 19:5
26:25 27:4 46:14
48:18,20 51:9
68:13 69:19 71:19
74:4 75:1,8,17,20
76:16 77:5,16
79:12,22,23,25
80:3,3,6 91:22
**claims** 7:10,15
12:15 13:9 18:18
24:4,5,6 29:13
40:7 43:13 47:13
47:22,23 58:15,22
62:8 68:10 75:5
**clarify** 30:9 31:4
**class** 38:23 48:14
63:2
**clayton** 8:21 15:1
17:17,18 19:6,12
40:3 50:5
**clear** 17:3 22:1
50:3 53:24 59:25
69:3
**clearly** 50:6 53:18
**clients** 48:6,12
**close** 44:2
**closed** 10:21
56:24 70:4 79:9
**closest** 31:12
**closing** 56:23

**closings**  85:14,18
  85:22
**closures**  56:2
**code**  11:5 78:9,9
  78:14,17
**collective**  69:17
**collects**  19:23
  63:2
**collegiate**  19:18
**collude**  63:10
**collusion**  32:17
  62:9,13 63:9
**colorado**  45:6
**colsa**  33:5
**columbia**  8:18
  10:18
**columbus**  45:24
**combinations**
  56:22
**combining**  68:18
**come**  87:21,23
  88:6
**commentary**
  31:10
**comments**  44:16
**commerce**  17:19
  17:20,20,22,23,24
  36:9 74:7
**commercial**  14:2
  36:15 41:6 68:3
  73:3 74:4,13,24
  75:1,8,20 76:2,13
  76:16,21,24 77:2
**commission**  9:17
  74:9
**commissioned**
  70:22
**committee**  27:22
  41:17 77:23
**common**  27:17
**commonly**  9:5
**communication**
  44:9

**communications**
  37:6 38:7,13
**community**  66:18
  66:19,21,24 67:1
  67:25
**companies**  31:10
  42:17
**company**  8:6 9:8
  18:20 19:10,24
  20:3,3 28:12 36:4
  40:8 42:24 43:1
  53:10,11 58:3
  62:11 64:1 75:21
  76:14 79:9
**comparability**
  57:20
**comparative**  58:1
**compare**  38:18
  74:24
**compared**  48:25
  49:11
**comparison**  31:10
  56:21 57:22,23
**comparisons**  57:7
**compelling**  60:2
**compensated**
  13:20
**compensation**
  10:24 11:12 74:9
**compete**  26:19
  29:25 34:9,14
**competing**  30:15
  34:11
**competition**  8:22
  17:25 18:12 19:7
  29:7 35:22 36:9
  50:8 54:22 56:8
  59:6 60:18 62:19
  64:23 66:11,14,22
  67:14,20 68:15
  69:15 70:23 76:1
**competitive**  14:9
  31:11 51:14 57:12

57:15 58:22 59:12
  61:1,8,16,20
  62:15 63:16,17,18
  64:4 68:22 69:11
  70:8,10 71:23
  73:22,24
**competitors**  9:2
  52:16 63:11 66:12
**compiled**  9:2
**complains**  38:15
**complaint**  8:17
  10:9 11:19 12:5
  12:10,20 13:10
  20:7,10,13,22
  26:16,23,25 27:3
  43:10 45:14 46:4
  47:12 51:4,8,9,15
  51:18,19,22 52:1
  52:14,18,22 54:6
  54:13 56:3 57:2
  87:2
**complaints**  43:21
  44:13 58:13 67:4
**completing**  11:6
**complex**  49:3,6,7
  58:1,5,13,16
  62:22 71:7 81:9
**complexity**  31:14
  58:8 63:8
**compliant**  13:14
**complicated**
  31:17
**comprises**  50:23
**computer**  32:3
**computerized**
  32:9
**comtec**  37:8
**concede**  71:11
**conceded**  14:22
  20:25 23:23 29:14
**conceivably**  37:12
**concentrated**
  68:20

**concentration**  9:3
  9:3,6,9,14,20,21
  12:7,8 14:24
  18:10 41:25 50:25
  51:2,4,11,11
  52:21,23 53:4,17
  53:24 60:7 68:20
  69:2,4 70:7
**concern**  89:24
**concerned**  18:2
**concerning**  49:4
**concerns**  66:14
  88:12
**concession**  69:1
**concessions**  23:2
**conclude**  34:9
  79:18
**concluded**  39:14
  52:9 60:25 61:10
  61:15 94:3
**concludes**  26:3
  44:18 60:15 70:3
**conclusion**  26:19
  34:3 39:8 55:23
  80:1
**conclusions**  56:14
  56:18 66:3
**conclusively**
  74:23
**conclusory**  58:3
**concrete**  43:4
  84:17
**concurred**  61:18
**conditions**  24:18
  42:7 53:6 57:21
  67:10
**condone**  16:24
**conducive**  63:4
**conduct**  13:1 14:9
**conducted**  60:24
  81:14
**confer**  89:11

**conference** 80:24
82:21 83:2,6,15
86:11,13,14,15
88:11
**confess** 93:18
**confines** 78:17
**confirm** 28:25
89:18
**confirmation** 15:8
**confirmed** 10:19
**confirming** 12:25
**confirms** 15:9
**conflicting** 18:11
24:4
**congress** 37:10
66:9 67:12
**conjunction** 14:2
**conjunctive** 49:7
**connecting** 21:6
**connection** 74:10
**connectivity**
66:19
**consent** 12:25
13:3,8 75:18,24
77:17 79:11,19
**consequence**
15:10
**consider** 9:13
24:8 39:25 70:21
**consideration**
76:3
**considered** 79:4
**considering** 57:20
64:12 68:6 78:20
**considers** 17:14
**consistent** 85:20
**consolidation**
54:19 55:4 66:23
70:9
**conspiracy** 48:19
**constitute** 53:5
79:21

**constitutes** 16:25
**constitutional**
37:18
**construe** 79:17
**construes** 22:23
**consumer** 21:8
41:15,18 49:16
61:2
**consumers** 27:20
35:8 36:2 41:4
43:16 56:7 67:18
**consummate**
11:21
**consummated**
12:9 77:7
**consummation**
12:17
**contained** 12:5
51:21
**contemplated**
11:13 46:17
**contemporaneo...**
60:24
**contend** 13:15
14:14 15:6 20:23
32:1 35:4 40:12
43:3,6 55:16
69:22
**contention** 25:10
**contested** 27:14
32:23
**context** 28:22,25
30:19,25 31:9
41:22 50:6 87:2,4
87:15
**continental** 31:3
32:12 54:5,19
**continue** 27:9
61:20
**continued** 62:18
**continues** 71:18
92:17

**contractors** 37:15
48:21
**contradictions**
17:7,13
**contrast** 43:15
61:23
**contributed** 24:19
**controls** 58:11
**controvert** 25:17
**convenience**
35:21 83:3 86:12
**convenient** 82:24
**coordinate** 62:13
**coordinated**
62:10,17,21
**coordination** 63:5
63:8,12,17
**copied** 51:17
**core** 60:8 73:3
75:10
**corp** 37:24
**corporation** 1:8
1:15 6:4,6 7:6 8:7
11:24 12:16,18
15:17,23,25 16:1
18:6 19:13,21,25
22:2,11 24:23,24
26:14 27:23 28:16
33:2,6 36:19,24
38:8 39:4 41:1
42:20 47:11 48:17
49:12 53:12 58:4
64:6 73:1 75:21
76:19 78:18
**correct** 32:18
**correcting** 80:12
80:14
**correctly** 30:6
47:20
**correspond** 36:14
**corruption** 76:12
77:3

**cost** 30:1 49:16
61:5,19 62:4
66:23
**costly** 23:24
**costs** 35:22 55:3
**couldn't** 29:25
**council** 37:16
76:10
**counsel** 6:7 17:1
23:3 31:21 71:14
80:16
**counterclaim**
75:23
**counties** 35:20
**country** 8:25
17:24 29:24 95:21
**counts** 48:14
**county** 36:6
**couple** 83:7 93:25
**course** 24:25 26:5
28:14,22 33:3
42:11 77:1 90:23
**court** 1:1 2:1 6:2
6:19,24 7:3,4,12
7:19 8:1,9,15,18
9:24 10:1,4,6,15
10:17,19 11:3,3
11:17 12:13,22
13:4,6,7 16:2,6,24
17:14,16 19:2,3
20:15 21:11 22:1
22:23 23:8,13
24:7 25:3,23,25
26:2,11,17 27:8
27:10 28:9,19
35:12 36:16,20
37:2,23 38:16,17
39:13,18 40:4,10
40:15 43:19 44:18
46:9,14 47:7,8,15
48:1 49:8,20 50:4
50:8,15,18 53:3,7
55:19,23 57:25

59:21 60:15,21
64:12,16,20 68:8
69:17 70:3,5,21
71:18 72:1 73:15
74:3 78:5,15,17
78:20 79:24 80:1
80:5,10,17,21,24
81:5,10,15 82:3,7
82:14,23 83:1,4
83:16,18 87:22
88:17,20,22,25
89:6,14,17,20,24
90:24 91:1,3,6,16
91:17,19 92:3,6
92:10,12,15 93:3
93:7,18,23
**court's**  78:12 80:8
81:16,23 82:13
84:9
**courtroom**  88:7
**courts**  16:12 22:8
24:11 36:18 59:24
75:5 76:7
**court's**  12:21 39:8
47:25
**cousin**  88:3
**covering**  88:9
**cox**  19:24
**cracker**  88:4 90:5
**create**  14:25 18:1
60:18 68:15
**creation**  18:23
**credit**  23:11
**creditors**  77:23
**critical**  76:20
**critically**  71:1
**criticism**  46:18
**criticisms**  44:15
**criticize**  64:18
**critiques**  57:20
**cross**  7:12,13,21
11:22 14:4,19
15:4 16:9,13

21:13 27:5,15
28:6 29:17 30:8
30:15 31:7 32:5
32:25 33:25 34:19
35:10 36:12 43:18
46:24 47:23 51:5
54:9 60:15 67:7
68:9 69:20 74:13
75:3 77:11 79:8
79:13 82:16 88:4
**cruder**  9:14
**cruel**  84:2
**cull**  71:15
**current**  12:7 34:9
67:24
**currently**  33:25
45:23
**cursory**  34:25
**customer**  40:19
49:12
**customers**  40:16
40:20,22,23,24
41:25 42:6,8,12
44:21 49:1 55:3
56:15 63:24 69:6
80:7
**customs**  44:12

**d**

**d**  4:16 6:1 11:14
29:18 34:1 35:7,8
37:20 58:12
**d.c.**  9:9 10:1,2,4
18:14 21:11
**d.d.c.**  35:25
**dairy**  24:10
**damage**  26:25
49:4,6
**damages**  13:20
24:6 27:3 37:12
39:2,2 40:7 47:13
47:23 49:3 50:1
**daniel**  61:13

**darin**  12:1
**data**  33:13,17
52:5 57:22 59:5
63:3,22,22 64:17
65:2,12 67:9
68:12 69:23 70:12
73:7,11,13 89:25
**date**  82:25 84:8
85:22 95:25
**dates**  83:21 84:7,8
86:2
**day**  30:22 72:12
80:8 93:19
**days**  82:3,11 85:4
**dayton**  45:6 75:20
**dc**  69:17
**dd**  66:24
**ddadp**  49:24
**de**  19:9 21:19 64:1
**deal**  87:3,5
**debtor**  1:10
**debtors**  11:20
**december**  10:20
36:25 37:9 89:16
**decide**  13:7
**decided**  80:24
91:19,20
**decides**  81:11
**deciding**  15:20
**decision**  3:1 12:21
13:10 19:23 22:2
26:17 36:4,23,24
47:10 78:1,10,12
80:8,20 89:6
**decisions**  22:11
72:2
**deck**  85:6
**declaration**  11:14
11:14 29:17 30:10
30:16,22 31:6,14
34:1 41:14 43:22
44:22 45:1,7,15
45:19 46:8,22,24

48:6,9 51:19
54:18 55:2 56:15
58:23 59:14 61:3
65:10,14,18,21
66:1,5,10 77:19
78:2 79:1,7 80:14
**declarations**  15:2
15:4 16:8,11,18
16:22,25 17:3,5
17:14 43:7,19,22
44:13,20 46:16,18
46:22 54:16 59:16
59:21 70:16
**declare**  20:16
**declared**  62:1
**declares**  46:2
**declined**  75:4 78:7
**declines**  46:14
**decrease**  54:23
**decreased**  55:8
**deeply**  19:22
**defeat**  69:20
**defendant**  6:15
16:12 21:12 33:23
40:6 44:15 54:7
58:24 60:8 75:15
**defendant's**  57:18
58:20 59:13 60:22
60:25 61:13 62:7
63:21 64:13 68:9
70:16 71:20 73:21
75:23 77:9 78:9
79:6,24 80:1
**defendants**  1:16
4:4 7:6,9 13:13
14:7,14,22 16:7
16:18,21 17:4
18:10 20:23,24
21:3,16,21 22:3
23:11 26:5 28:3
29:1 32:1 37:17
40:22 43:3,6,12
43:20 58:20 60:3

60:15,22 64:25
68:24 69:10,18,22
69:24 71:1,11
72:10 77:13 81:8
**defendants'** 21:25
22:1
**defendant's** 7:20
16:14 18:24 22:24
25:7 26:3 28:17
28:19 31:11 35:9
46:18 47:5 50:21
51:10
**deficiencies** 12:13
**deficient** 27:9
**definable** 49:11
**define** 21:18 25:2
33:5
**defined** 21:3 22:4
31:2 76:2
**defining** 19:14
27:25 28:1,22
35:1,17
**definition** 19:16
19:19,22 20:2,5
24:14 27:13 31:9
32:23 76:7
**definitions** 14:21
20:6 28:15
**degree** 52:10 58:9
**delta** 44:1,5 54:5
56:25
**demand** 24:6
26:25 27:4,16
32:25 35:18
**demonstrate** 38:2
42:11 46:10 54:1
**demonstrated**
50:25
**denied** 11:23
12:12 80:19
**denies** 7:19,20
68:8 80:5

**dennis** 31:12
60:25
**denying** 12:16,19
17:11 26:14 47:11
**department** 8:16
9:12,16 36:3
51:13
**departs** 21:5
**depend** 58:16
**depending** 82:12
**deposition** 29:5
29:11,18 30:11,16
30:23 34:2 41:8
77:20 78:3 79:1,7
**depositions** 15:13
**deregulation**
61:15
**derivative** 48:11
**describe** 77:13
**described** 67:11
**describing** 18:14
76:12
**designed** 64:22
69:13
**desirable** 43:24
**despite** 55:23
**detail** 7:19 46:4
**detailed** 17:2
**determinant**
61:21
**determination**
19:10
**determinations**
58:15
**determine** 27:17
28:15 70:13
**determined** 74:23
**determines** 16:2
**determining** 29:9
34:20 38:11 49:5
**develop** 55:16
**development**
61:14

**developments**
59:19
**dial** 24:23 28:15
33:2
**dialogue** 81:1
**dictate** 81:11
**differences** 40:2
70:10
**different** 24:1
29:24 34:6 40:7
53:5 84:22
**difficult** 39:3
48:18 49:9 55:18
63:12 89:13
**digit** 53:8
**dimension** 63:18
**dimensions** 62:19
**diminish** 64:3
**diminished** 42:10
**direct** 38:22 48:4
48:19,24 49:11,24
84:15
**directing** 70:2
**directly** 17:21
50:7 51:17 69:7
73:15 86:6
**directness** 48:3
**directors** 11:10
14:18 78:25
**directorship**
79:15
**directs** 82:16
**disapproved** 11:3
**disclose** 17:1
72:18
**discloser** 72:15
**disclosure** 72:17
72:22
**discovery** 17:2
22:17 72:15,23
**discuss** 80:25
81:17,17

**discussed** 24:18
47:24 81:10,21
84:17 87:15
**discussing** 40:2
53:7 54:16
**discussion** 19:4
34:16 37:23
**dismiss** 75:23
**display** 63:1
**disposes** 91:21
**dispositive** 64:10
**dispute** 8:3 60:9
80:22
**disputed** 58:13
70:6
**disputes** 50:14
**disrupt** 63:17
**disruptive** 61:11
**dissatisfaction**
48:7
**distant** 36:22
**distinguishing**
25:24 79:15
**distributes** 63:2
**distributing** 76:14
**district** 1:2 8:10
8:18,18 10:1,4,17
10:17 21:11 22:12
23:21 24:11 27:23
29:3 69:16 75:5
76:10
**divestiture** 10:13
13:24
**divestitures** 63:14
64:22
**dock** 39:4
**docket** 7:16 93:9
**doctrine** 16:19
**document** 87:7
90:2,4
**documents** 23:11
24:25 29:8 33:3
65:5 66:6 81:2

89:23 90:17,18
doesn't 49:17
  81:10
doing 47:15 90:16
  91:25
doj 8:20 9:2,20
  10:9,12,12,16
  12:3,4,6 51:8,18
  51:18,23 52:1
  57:10,13 63:15,22
  64:20
doj's 9:22 10:18
dollars 49:5
domestic 8:23
  31:2 32:8 44:21
  45:3 51:2 53:25
  61:21 66:22 67:5
  67:14 80:6
domestically 43:5
dominant 41:21
  61:20
don 27:22
don't 81:23,25
  83:5,22,24,25
  84:9,24 86:5 87:4
  88:22 90:10,13,15
  92:24 93:3,8
door 58:3,4
dot 52:5 65:13
double 11:15
  83:11
dr 51:7 52:4,9
  53:1 55:21 56:12
  56:16 62:7,16,25
  63:6,14 65:4,7,15
  65:19,23 66:1
draw 87:11
drawing 87:12
drawn 15:22
driven 62:1
driving 62:18
drop 89:6

du 19:9 64:1
due 12:7 48:6
  49:20
dummy 74:15,17
dump 89:25
duplicative 39:2
  50:1
duty 76:8,12,17
  76:21,22 79:19
dynamics 59:9
  64:6
d'augusta 5:4

## e

e 2:21,21 4:1,1 6:1
  6:1 95:1
e.d.n.y. 24:17
  75:22
e.g. 24:9 28:15
  39:17 41:1 43:22
  44:21 45:14 53:6
  54:18 56:3 76:9
e.i 19:9
earlier 14:23 31:5
  47:10
earliest 86:11
early 11:20 53:7
  84:4
earn 21:17
earning 77:22
ease 61:7
easier 32:17
easily 8:2 69:19
eastern 22:11
ebanks 83:20 84:8
  86:7,10 93:24
ecf 7:5,13,16
  11:16 12:10 13:4
  21:15 22:5 27:1
  29:20 46:25 47:1
  47:2,4,6 51:20
  54:10 58:25 59:1
  59:2 78:1,11
  80:11,13,15,18

echo 71:25
econometric
  56:18 66:3
economic 21:22
  27:11,15 32:24
  49:14,21 50:6
  52:10 56:19 57:21
  58:1 66:4 70:12
economics 9:13
economy 43:25
  44:1
ecro 2:25
edition 76:2
educate 87:4
effect 17:24 25:10
  38:18 59:12 61:24
  68:14,22
effective 36:9 40:5
  40:5
effectively 35:22
  74:18
effects 13:16
  14:10,11 18:12
  40:13 51:14 56:7
  57:12,15 58:22
  59:6 60:17 61:9
  62:10,21 64:4
  69:15 71:23 73:23
  73:24
efficient 38:5,21
  40:18,23 47:9,17
  47:20 50:5 85:1
  85:24 89:2
efficiently 30:2
effort 87:25
ei 64:1
eight 9:16 43:9
  44:24 45:15
either 12:11 52:25
  62:13 89:15 92:1
  93:12
elasticity 27:15
  32:25 34:20

electric 15:25
electronic 83:22
element 75:19
  76:20
elements 12:14
elevates 42:5
elif 4:9 6:14
eliminated 54:19
embraces 35:17
emergence 8:7
  78:23
empirical 33:13
  57:19
employee 15:7
  79:13
employees 29:8
  76:10
employer 14:16
  75:19 76:3 77:17
  77:18
employing 25:1
  33:4
employment 11:1
  77:3 79:16
employs 38:10
enacted 74:14
enacting 32:15
encompassed
  74:24
endeavored 80:21
enforce 63:12
  75:4
enforcement
  50:11
enforcer 38:5,21
  40:18 47:9,21
enforcers 40:23
  47:18 48:4,24
  50:5
engaged 17:18,20
  17:22 74:7
enhance 52:2
  63:15

enhanced 42:6
enhancement
  42:5
enjoin 8:19 11:23
enormous 89:25
ensure 83:21
entailed 34:16
enter 12:23 29:16
entered 55:14
entering 34:17
entertain 39:18
entire 90:12
entitled 15:16
  39:1 66:11
entity 63:2 78:15
  78:25
entrance 55:17
entries 55:12
  70:18
entry 13:2 29:16
  34:13 55:10 61:7
  67:5,7 70:11
epitome 16:10
equally 33:20
equipment 34:7
error 93:12
essence 76:13
essentially 80:16
establish 14:8,10
  18:9 32:21 33:9
  39:20 43:7 44:20
  72:24 75:20
established 19:16
  23:13 25:15 35:5
  55:20 59:24 60:16
  68:21 69:5
establishing 68:13
  71:3
estimated 9:3
  41:21
estimates 52:13
  65:23

et 1:12,15 6:4
evaluate 33:16
  38:20
evaluated 70:12
evaluating 19:14
  31:19
eve 84:1
evenly 10:25
event 28:24
events 56:21
  57:11,14 58:1
eventuality 46:17
everybody 85:1
everybody's
  86:19
evidence 14:8
  18:11 21:22 25:9
  25:16,16 28:20
  29:7 34:13,16
  41:14 56:1 58:17
  59:4,22 60:2,22
  60:23 63:23 64:3
  64:8,25 65:2 66:7
  68:6 69:17,23
  70:12,19,21,23
  71:25 72:16,20,20
  73:15,18,23 81:6
  81:11,13 84:20
  85:15,16,17,23
evidentiary 7:25
  25:25 71:21 72:24
evolving 66:21
ex 30:24
exactly 85:18
examination
  82:17 88:4
examine 50:18
  67:13,23
examined 88:15
example 18:10
  29:11 31:2 55:13
  56:22 57:10,13

exceed 51:12
exceeded 52:11,12
exception 70:24
excerpts 29:5
excited 91:23,25
excluding 17:5
  31:3
executive 11:7
  30:24 77:14
executives 28:20
  29:12 68:2
exercise 46:14
  87:12
exhibit 11:14
  20:21 27:1,4
  29:18 30:11,16,22
  31:15 34:1 45:17
  46:25 47:1,3,4
  51:19 58:25 59:1
  59:1 66:11,17,20
  66:24 77:19 78:2
  79:1,7 87:3
exhibits 31:6
  86:18 90:20
exist 15:20 55:7
existence 28:4
  48:13,15 75:9
existing 33:21
  59:10
exists 17:7 76:25
exit 8:10
expanded 31:21
  33:23
expansion 61:2
expect 84:18
  93:23
expectation 76:4
expected 13:13
experience 72:5
experienced
  48:11 65:9,16
experiments
  57:11,14

expert 21:22 24:5
  24:9,13,22 25:1,4
  25:7 27:11 31:12
  33:4 45:22 56:9
  56:19 57:19,23
  58:21 59:13 60:25
  61:13 62:7,21
  64:13 66:4 69:11
  71:4,22 72:17
  81:7,8 82:15
experts 29:6
  58:10 63:21 70:16
  71:7 72:6 73:2,3
  82:14,19 90:19,20
expert's 34:24
explain 7:19
  26:20 42:2
explained 26:17
  36:20 40:15 67:22
  72:9
explaining 18:23
explains 29:22
  48:5
explanation 30:19
explicitly 31:21
exposed 90:9
express 14:16
  30:9
extends 75:7
extensive 56:10
  59:22 69:11
extensively 45:10
extent 16:25 88:2
extinguishable
  32:7
extremely 64:5
  67:5
exxon 19:21

| f |
| --- |

f 2:21,25 25:8,21
  29:4 37:4 51:19
  70:14 73:1,6
  76:15 95:1

**f.2d** 10:2 18:13,22
19:25 25:12,18
26:9 39:23 53:6
53:22 59:3,8 60:5
60:12 64:2 68:17
68:17 71:13 73:19
74:2 76:22 77:1
**f.3d** 9:8 16:20
17:6,10 18:17,21
19:8,13,21 23:4
23:17,19 27:16,24
33:12 34:21 37:7
37:14 38:7,8,13
39:5,6,16 42:14
49:24 50:12 62:12
74:20 75:11 76:19
**f.3d.** 33:6
**f.supp.** 20:4 21:10
22:18 24:17 25:8
25:20 27:23 32:3
32:10,13 33:11
35:24 36:4 37:25
41:17 50:12 58:12
**f.supp.2d** 10:1
19:19 22:25 23:16
23:18,21 24:2
25:5 29:2 53:12
53:21 59:24 73:20
76:11
**f.supp.3d** 10:4
24:24 27:13 28:16
32:22 33:2 49:23
53:23 57:17 69:16
**f3d** 18:7
**face** 41:19 44:14
53:5 64:25 70:15
81:7
**faced** 40:6
**facie** 18:9 50:21
50:23 53:2 55:20
59:4 60:1,2,19
68:13,22 69:10

**fact** 8:1,1 15:15
16:3,19 17:7
19:17,20,22 20:2
23:15 24:18 25:10
29:21 32:20 49:4
49:6 56:12 60:16
70:6 71:5 77:9,12
79:6,23
**factfinder** 58:18
**facto** 21:19
**factor** 35:21 48:13
50:1
**factors** 38:20 47:9
47:16,24 48:1
49:14 50:4
**facts** 7:23 23:6
24:3,5 25:14,15
54:8 58:14 64:12
71:15 78:10 79:17
**factual** 15:20 23:6
69:18
**fail** 28:8
**failed** 14:7,8,10
20:24 26:20 33:9
**failing** 21:21
27:10
**failings** 36:18
**fails** 79:12
**failure** 17:1 24:4
24:19 34:19,23
75:23
**faint** 6:25
**fair** 90:14
**fairleigh** 23:9
**fairs** 26:11
**fajora** 44:21
**fall** 84:4 94:1
**falls** 31:20
**familiar** 18:14
**fan** 84:19
**far** 83:1
**fare** 47:4 49:12
62:24 63:2,3

65:12,16,19
**fares** 54:23 65:24
**farmers** 24:10
**fashion** 57:9
**fatal** 77:16
**favor** 7:14 15:22
33:18 47:16 68:7
70:2 76:5
**favorable** 70:20
**fdc** 53:20 59:23
**features** 61:4
**february** 8:14
75:22
**federal** 7:24 9:17
15:18 22:11 67:20
70:23 72:16,20
73:4 86:17
**federation** 76:9
**feels** 90:9 91:12
**fees** 44:4 54:25
55:6,7 56:2 57:5
63:6 74:17,17
**ferguson** 2:25
**fewer** 32:16 54:25
**fidelity** 76:21
**fiduciary** 76:8,17
76:24
**fighting** 86:20
**figures** 51:21 66:2
**file** 12:20 15:14
26:15,24
**filed** 8:8,17 10:9
11:19,20,21 12:3
12:9,24 13:18
16:8
**filing** 7:16 16:24
24:2
**filled** 44:13
**final** 12:23 13:2
50:1 81:12 92:22
**finally** 36:16
38:17 44:11 50:22
63:14 73:21

**financial** 67:16
**find** 16:3 27:18
40:24 50:8 65:8
**finding** 19:11 20:1
33:8 34:23 53:7
77:2
**findings** 24:18
**finds** 27:8 35:12
40:15 46:9 50:4
55:19 59:21 64:13
64:20
**fine** 27:14 32:24
**finish** 84:20 85:21
**firm** 4:11,18 6:23
7:2 9:14
**firms** 9:16 62:12
63:10
**first** 7:22 8:4
12:10 13:10,14
20:7,10,13,19,22
26:22 28:9 38:13
39:8 40:19 43:10
45:14 46:4 47:12
48:3 50:20 51:3,8
51:9,15,25 52:14
52:18,22 54:6,13
56:3 57:2 59:13
60:22 65:7 68:5
68:23 88:22 89:16
**five** 41:7 82:11
**fixing** 32:16
**fjord** 1:12 6:4
**flashpoint** 8:3
**flat** 9:1
**flaws** 26:12
**flight** 15:3 21:6
30:21 34:18 35:6
35:7 46:5 85:3
**flights** 21:7 26:19
34:14,15 36:22
43:16 44:24,25
45:3,4,9,21 47:1

**floor** 4:20
**flow** 50:7
**flowing** 24:6
**flown** 45:8,16,17
45:22 46:2 48:8
**fly** 21:8 34:12
43:4,25 44:4 45:6
45:24
**flying** 44:6
**focuses** 37:23
**folks** 83:8 86:7
**follow** 31:22 34:4
65:7
**followed** 43:23
**following** 11:2
56:22 59:19 61:17
69:13
**follows** 17:18 21:3
67:12
**force** 61:11,20
**forces** 66:25
**foregoing** 95:3
**form** 20:12 34:18
41:14 63:17 69:7
**formal** 23:1,11
**formally** 79:3
**formation** 8:12
**former** 8:11 77:15
**formerly** 8:6
**forms** 29:23
**forth** 7:18,23
20:24 35:2
**forward** 15:9 24:9
81:11
**fosomax** 16:19
17:6 23:15 24:2
25:8
**found** 16:16 21:15
29:20 36:18 47:15
**four** 8:25 9:15,16
35:20 38:20,25
44:11 47:8 48:1
52:6 65:17 67:19

82:3,11
**fourth** 10:20 50:1
**framework** 18:19
57:24 60:13 71:16
**framing** 12:14
20:11 24:8 27:12
28:17,21 29:14
30:10 46:10 69:1
**francisco** 4:6,21
**frankly** 90:10,13
91:24 93:14
**free** 26:6 73:17
76:22 78:16
**freeland** 54:18
**freeman** 33:11
73:6
**frequently** 20:1
41:16
**front** 83:23
**ftc** 9:8,12,25 10:1
18:20 21:10 25:17
33:11 35:24 53:22
57:10,14 60:6
62:11 73:6
**full** 7:20 76:4
**fully** 72:9
**fundamental**
26:12
**further** 7:4 21:21
40:15 54:11 55:9
56:17 63:6,15
64:14 66:2 69:24
81:1
**future** 13:14 43:5
47:1 59:12 67:24
75:13

**g**

**g** 6:1
**gabriel** 46:1
**gao** 66:10 67:11
67:13,21 70:21
**garavanian** 46:2,8

**garvanian** 45:14
**gas** 64:1
**gates** 10:14 34:18
**gating** 19:2 37:2
**gatt** 37:6 38:6,13
**gazette** 29:2,4
**gelboim** 38:7
**gelbolm** 50:12
**general** 22:16
37:15 42:22 48:21
51:1 53:24 58:13
59:9 61:10 64:6
68:1 73:14 76:20
**generality** 43:20
**generally** 21:8
29:5 42:19 45:11
56:5,19
**generals** 50:10
**generically** 58:6
**genesee** 17:9
**geneva** 18:6 19:12
**genuine** 15:15
16:4 70:6 79:23
**geographic** 14:21
20:6,8,12,25 21:7
22:20 24:21 26:5
27:17,25 28:5,21
32:5 34:6 35:1,4
35:10,16,20 36:1
36:6,14 68:24
**geographical** 29:6
**geographically**
33:22
**geographies**
29:24
**georgia** 25:6
**getting** 83:21
84:23
**gg** 31:15
**gil** 4:16 11:14
**give** 69:14 90:3
**given** 13:18,22
48:15 63:1 64:19

64:21 68:25 87:25
89:13 93:7
**gives** 53:16 54:22
59:5 63:22
**global** 22:17
**go** 15:9 24:9 44:12
**goes** 88:25 92:14
**going** 17:19 44:10
84:15,19,21 85:10
85:12 86:3,3 89:1
89:10,15
**goldsmith** 23:18
**good** 82:22 85:10
88:5 90:14,23
**goods** 74:11,19
**gordon** 49:22
50:11
**governing** 17:17
35:2
**government** 22:15
42:21 66:9 67:20
68:21 73:2 93:4
**grain** 32:24
**grained** 27:15
**grant** 74:8
**granted** 50:18
**granting** 10:24
25:23 75:22
**grants** 7:19 79:24
80:1
**great** 62:1
**greater** 51:24,25
64:9
**greatest** 86:21,23
**greatly** 49:14
56:25
**green** 2:2
**grocery** 53:10
**grossly** 60:9
**grounded** 59:22
**grounds** 41:3
**group** 7:7,8 8:5,12
19:8 23:20 26:7

41:10 49:22 50:11
54:7 58:24
**groups** 74:16
**group's** 16:13
**growth** 65:19
**guarantee** 60:11
**guidance** 80:22
**guidelines** 9:17,19
9:23,23 10:5 35:2
42:4 51:13 52:3
53:3,19 56:8
57:16 63:25 69:9
**guy** 37:8

**h**

**h** 2:22
**h.j.** 9:8 62:11
**hall** 74:7
**halsa** 73:1
**hampshire** 46:7
**hand** 14:19 87:9
**happy** 81:16
87:24 93:19
**harm** 49:4,18 50:8
**hash** 82:20
**hasn't** 91:20
**hate** 84:20
**hawaii** 31:3 40:7
**hayden** 19:24
**head** 84:3
**health** 18:17 19:8
23:20 67:16 73:20
76:10
**healthcare** 25:22
71:12
**healthsource**
71:13
**hear** 82:7 89:22
**heard** 6:24 82:3
92:21
**hearing** 3:1 20:14
27:6,6 41:8 71:9
71:10 72:7,8
91:24 93:24,24

**hearsay** 70:24
**heavily** 12:2 27:13
32:23 66:8
**heightened** 65:25
**heinz** 62:11
**held** 39:12
**help** 28:15 88:10
**helpful** 10:6 63:22
81:1 84:20 87:22
**hercules** 25:5
**herfindahl** 9:4,10
60:10
**hha** 51:1
**hhi** 9:5,5,11,25
10:11 51:6,20,25
52:2,4,11,12,13
53:1,20 55:21
65:2 68:12 69:23
**hhis** 51:24
**hhudr** 68:21
**high** 35:22 53:7
62:1 67:6
**higher** 49:12,16
53:15 69:7
**highest** 25:14
**highlight** 54:2
**highly** 48:25 58:1
63:16 68:20
**hill** 25:17
**hines** 9:8
**hirschman** 9:4,10
60:10
**historical** 53:18
57:7,11,14
**histories** 15:3
**history** 55:11
**hockman** 37:4
**hold** 29:1 80:24
**holding** 8:6 13:6
33:13 39:24 41:2
41:11,18 44:8
71:2 73:1,7

**holdings** 9:25
53:21 59:23 60:6
**holmdel** 4:13,14
**home** 44:6 46:7
**homeowners**
42:17,19
**hon** 2:22
**honor** 6:8,10,12
6:17 81:20 82:6
82:10,22,24 83:10
83:12 88:13 89:12
90:23 91:5,15
92:9,11 93:1,17
94:2
**honor's** 83:3
**hope** 85:12
**horizonal** 56:8
**horizontal** 9:17
9:19,22 18:15
27:14 42:4 51:12
52:3 53:3,18
57:16 63:25 69:8
**horrible** 32:23
**horton** 10:23 11:6
15:7 30:5,6,11,13
30:16,23 77:6,16
77:19,21 78:2,16
78:20,24 79:1,7
79:10,13,18,21
88:14
**horton's** 77:10
78:13
**horton's** 14:1
30:19
**hospital** 33:11,14
73:6,8
**hotels** 74:19,20
75:11
**hour** 16:8 84:21
**hours** 44:9,11
89:6,7
**hub** 56:2,24

**hubs** 29:25 55:17
55:17 56:23 57:1
64:22
**hughes** 18:13 53:6
60:5,12 68:17
74:2
**hundreds** 20:13
**husband** 45:5
**huseny** 4:8 6:12
6:12 58:23 82:9
82:22 83:11,17
89:11,18
**hyde** 3:25 95:3,8
**hypothetical**
27:18

**i**

**i.e.** 62:22
**idea** 44:10 84:12
84:18 85:10 88:5
90:14
**identifiable** 38:23
48:14
**identified** 9:7
20:21 51:8,23
72:1
**identifies** 13:11
**identify** 16:22
20:12 22:6 28:11
38:14,16 63:11
**identifying** 14:11
46:13
**identity** 72:19
**ignore** 27:9
**ignored** 35:1
**ii** 11:15
**iii** 13:7 48:9 70:3
**illegal** 9:22 12:7
20:20 41:24 47:2
50:24
**illegality** 53:16
69:3
**illogical** 35:13

illustration  9:24
53:20
imagine  82:18
84:13 85:8 91:24
impact  14:12
34:17 46:5 56:14
59:18 64:4 84:11
87:10
impacted  55:3
impacts  66:22
impaired  19:7
impedes  63:9
implicate  76:17
implication  61:23
implicit  62:14
impliedly  22:19
imply  34:5 57:3
import  70:9
important  8:2
87:11
impose  27:18
imposed  55:7
impossible  79:17
improper  75:9,12
75:16 76:8 79:21
improvement
79:3
improvements
64:23
inability  24:22
inaccurate  59:5
69:14
inadequate  37:19
inadmissible
69:24
inappropriate
58:7,14
inappropriately
93:13
inc.'s  58:24
incentives  50:7
incident  44:5

include  33:23
54:4 91:13
included  11:11
24:15 35:9,15
43:21 45:13
includes  9:20 56:1
70:21 80:11
including  10:13
12:14 13:2 30:20
42:8 45:21 46:3
55:5,6 72:14 81:2
inclusion  11:4
78:5
incomplete  63:4
inconsistencies
16:22 17:3,12
inconsistent  16:10
incorporated
10:22 25:23
increase  27:19,20
62:5 68:19
increased  42:1
55:6 56:5 57:4
62:4,9 65:24 67:7
70:18
increases  9:4,21
12:8 41:20 47:4
48:7 52:20,22
55:1 57:4 63:24
65:9,16
increasing  51:2
61:2
index  9:4,11
60:11
indirectly  17:21
indiscernible
12:13 13:21 15:3
25:21 26:25 27:2
28:11 33:8 39:3
43:14 45:18,20
75:25 92:14 93:5
93:6

indium  37:24
individual  30:25
36:1 40:11 43:8
54:15 72:5
individuals  13:11
industries  31:16
35:23 37:8 53:22
industry  10:2
15:25 21:18 22:10
22:16 24:25 28:10
28:14 31:11,14,17
33:3 36:15 38:19
38:22 51:3 53:25
54:19 55:4,11,14
55:21 56:15 59:17
61:5,11,14,16,22
62:16,19 63:3
67:5,10,13,15,16
69:4,12 70:8,17
70:23 72:7
industry's  62:22
inescapable  17:8
inescapably  17:13
inferences  15:22
58:1,16 68:7
inflate  60:9
influenced  76:5
information  17:2
44:19 63:4
informative  57:12
57:15
informed  75:18
informing  76:4
initial  23:10
initially  69:5
initiating  11:19
injunction  40:4
injunctions  40:5
injunctive  13:21
39:10,13 42:22
47:22 50:2
injure  41:25

injures  56:11
injuries  37:12
38:12 42:24 47:6
48:24,25 50:7
injury  12:15
13:16 18:4 37:20
38:3,16,25 39:4
40:13 41:23 42:3
48:3,11,11 49:6
69:6
innovation  42:10
inquiry  19:23
38:21
instance  31:23
43:25
instances  92:16
instructive  35:2
insufficient  32:20
59:10
insurance  23:20
42:14,16,18
intend  37:11
92:24
intended  68:1
intensely  61:16
intensive  19:22
intent  58:16
intention  92:18
interchangeability
28:7 33:19
interchangeable
35:7 36:23
intercollegiate
19:17
interest  38:24
49:21 50:10 68:3
interested  48:14
interlocutory
91:21
internal  29:8
international  13:5
37:14 45:3

**interpretation** 75:4
**interrogatories** 15:13
**intervener's** 21:12
**intricacies** 58:9
**investigate** 40:11
**involve** 58:13 77:3
**involved** 8:11 85:2,25
**involvement** 78:19
**involving** 22:9 28:6 76:17
**iron** 18:20
**irrebuttable** 14:25
**irrelevance** 43:20
**irrelevant** 36:6 44:15
**israel** 15:23
**issue** 8:4 15:15 16:4,18 17:6 19:4 19:20 21:23 22:7 25:4 37:2,3,24 38:19 40:19 50:16 53:17 69:18 70:19 72:10 75:6 78:13 79:23 89:6
**issued** 66:16
**issues** 15:20 19:2 49:3,7 70:6 71:25 72:1 80:25 81:9 81:17 84:17 86:11
**issuing** 92:19,23 92:24
**it'd** 82:11
**it'll** 82:10
**item** 88:13
**itt** 76:18
**it's** 20:1 31:16 32:18 46:19 47:1

**iud** 25:19
**iv** 48:9
**i'll** 7:5,8,13,18 9:18 16:15
**i'm** 6:24 11:15 16:23 17:19

**j**

**jamie** 5:5
**january** 23:10 64:11
**japan** 44:12
**jay** 76:25
**jennings** 20:3
**jersey** 42:14
**jet** 43:25 44:4 55:15
**jigger** 85:3
**job** 83:23 84:25 93:19
**joe** 6:10
**johnson** 58:11
**joined** 8:16
**joint** 10:20 21:12 76:18
**joseph** 4:23 6:8 46:22
**jsc** 37:4 38:5,12 42:2
**judge** 2:23 13:1 58:10 86:18
**judges** 85:21 86:25 90:15
**judgment** 6:3 7:9 7:14 12:23 13:2 14:6 15:11,12,16 16:11 17:11 23:24 24:13 25:24 33:8 34:22 41:3,12 46:11,24 50:17 54:9 57:25 58:7,8 58:14,25 68:10 69:20,22 70:2 71:5 73:14 75:9

79:25 80:2,20 81:12 89:3 91:8 91:17
**judicial** 22:25 23:1,12,14 24:7 25:7,9,13 26:1,3 68:25 91:22
**judicially** 25:14
**july** 45:24
**june** 18:5 24:11 45:1,2,6,7 56:15 65:8,10,13,18 66:4,8
**jurors** 84:23
**jury** 26:25 27:4 84:22
**justice** 8:16 9:12 9:16 51:13
**justified** 17:4
**justify** 27:12 28:18 71:4

**k**

**keep** 84:2
**keller** 23:4
**key** 62:18 67:19
**kimyacioglu** 4:9 6:14,14
**kind** 38:2 71:7 84:17
**kirby** 30:24 31:2
**kirby's** 31:8
**know** 86:3,10,15 86:20,22,25 87:25 90:22 91:5 93:14
**known** 36:9

**l**

**l** 5:5
**labs** 18:7
**lack** 9:10 42:15 47:19 55:12 71:4 71:5 75:18 81:8
**laguardia** 10:15 34:14

**lane** 2:22
**language** 21:25
**large** 54:3 74:16 74:18 90:2,17
**larger** 90:11
**largest** 9:15 31:5 52:23
**larouche** 37:4
**lasting** 64:23
**late** 8:8 84:19
**latham** 4:3 6:13 6:14
**laundry** 67:4
**law** 4:11,18 6:23 7:1 15:16,23 18:8 20:2 27:10 35:16 46:23 49:11 50:20 53:4 70:2 72:14 73:4
**laws** 37:11 38:5
**lax** 34:15
**lay** 33:10 73:5 91:10
**layer** 63:8
**lccs** 61:6,10 62:18 63:16
**lead** 16:3 26:24 38:24 51:14
**leave** 12:19 26:15 88:2 93:20
**leaves** 69:21
**leaving** 60:8 88:7
**ledanski** 3:25 95:3 95:8
**left** 43:12 44:7
**legacy** 61:25 62:5
**legal** 17:16 71:2,3 71:16 79:14 95:20
**legs** 45:4
**length** 57:18 81:22 87:11
**lenient** 85:14

lenscrafter 39:16
lessen 60:17
lessening 8:22
letter 10:22 11:13
  78:25
let's 7:4
level 9:4,21 12:8
  30:21 92:23
levels 9:3,20 12:8
  41:25 50:25 53:4
  62:15
liability 16:19
  23:15 25:19
liberty 73:16
ligation 60:11
light 22:7 70:20
likelihood 61:8
likewise 38:20
  53:25 67:22
limine 87:13
limit 9:1
limitations 34:17
limited 13:5 18:17
  41:9 64:5 81:6
line 17:23 27:6
  29:18,19 30:11,12
  36:9 71:9,10 79:4
  79:8 87:12,12
  90:4
lines 20:15 29:6
  29:19 30:2,3,17
  30:17,23 34:2
  72:7 77:20 78:3
  79:2
linked 55:25
lisa 48:5
list 9:2,20 10:11
  12:5 51:7,17,23
  56:10 67:4 86:18
listed 45:17,22
listing 55:2
litigation 16:20
  18:4 23:15 25:20

28:3 42:14 49:2
  49:24
little 31:16 66:13
  82:12
llc 22:17 37:7,8
  39:17 75:13
llp 4:3
lobby 73:16
local 31:18 35:17
  41:13,18
localizes 35:21
located 8:2
logic 27:11
logically 34:4
long 39:19 44:16
  84:14,18 85:18
  89:2,10
longer 85:17
  88:14
look 30:14,20
  57:14
looked 57:10
looking 31:23
  90:2,15
losing 27:20
loss 49:10
losses 49:15
lost 48:6 49:9
lot 84:24
lots 87:21
louis 56:24
low 29:15 30:1
  34:13 61:5,19
  62:3 66:23
lower 46:6 69:8
lowing 49:21
lug 87:25
lugue 25:5,24
luke's 18:17
lundgren 56:12
  56:15,16,19 65:4
  65:7,10,13,15,18
  65:19,21,23,25

66:1,4
lundgrend 45:18
  45:23 51:7,20
  52:4,8,9,12
lundgrend's 53:1
lundgren's 55:21

**m**

m 4:23 6:8 46:22
magazine 76:14
magazines 76:14
main 91:18
maintain 63:12
major 20:17 30:7
  33:21 44:3 55:13
  62:10
majority 66:12
making 10:13
  23:3,8 56:13
  63:12
management 7:16
  59:8 62:22
manchester 46:7
manifested 42:7
manipulation
  64:9
manner 89:2
manufacturing
  58:4
march 20:15 27:7
  36:5 52:4 71:11
  72:8
marietta 33:6
marina 25:19,22
marjam 75:21
market 8:22 9:5,7
  9:7,9,15 12:15
  14:8,21,22,23,24
  18:10,23 19:4,7
  19:11,14,15,16,20
  19:22 20:1,5,6,11
  20:17,24 21:1,3,7
  22:4,9,20,20,24
  24:8,14,20,21

25:2 26:5,11,13
  26:18,22 27:8,13
  27:17,25 28:1,5
  28:15,17,21,23
  29:10,13,14,23
  30:7,10,15,20
  31:1,3,13,18 32:2
  32:5,8,9,19,21,22
  33:5,9,16,19,22
  34:7,20,25 35:1,5
  35:10,16,20 36:1
  36:6,10,14,17,21
  37:1 41:15,18,21
  41:25 42:5,6
  46:10 50:15,24
  51:11,11 52:2,21
  52:23 53:5,8,15
  55:17 59:4,10,19
  60:7 66:25 68:18
  68:21,24 69:1,2
  69:13 70:11,14
  73:10 80:5
marketing 19:3
  28:17
markets 20:8,17
  20:18,18 21:18,19
  35:17 40:16 42:13
  42:13 52:11,25
  55:11 66:12 67:17
  70:11 80:7
marshall 12:22
martin 33:6
maryland 29:3
master 83:20
mastercard 37:14
masuna 6:10
match 54:25
material 15:15,20
  17:3 60:16 79:23
materials 12:3
  28:14
matsushita 15:25
  16:4 68:11 72:21

matter 1:6 15:16
16:6 70:1 84:1
matters 80:9
82:14 84:3
mba 23:19
mccarthy 48:5,8
48:10
mdl 25:22
meadow 6:17
mean 91:19
means 69:25
measure 9:5,13
measured 9:10
measures 9:14
media 41:10 68:2
medical 18:16
meet 36:21 53:1
59:25 89:11,18
mega 70:17
mellany 36:24
41:1 42:20
memorandum
46:23 78:1,10
80:12 92:13
memorializing
92:25
memphis 57:1
mentioned 46:21
91:9
merchandise
74:11
merely 9:15 29:15
merged 7:8 54:12
54:14 78:15
merger 8:4,11,14
8:19,21 9:3,17,19
9:22,23 10:21,22
11:3,4,6,21,23
12:6,8,9,17 13:17
13:19,22,22 14:2
15:9 18:3 20:20
22:7 27:14 32:23
41:1,3,21,24 42:4

44:6,14,17,22,24
45:11 46:2,5
48:16 49:10 50:25
51:10,12,24 52:3
52:6,14,16 53:3,8
53:15,19 55:5,25
56:8,14 57:12,16
57:16 58:23 59:11
59:15,18,20 60:17
60:24 61:1,9,16
61:17 62:8 63:20
63:21,23,25 64:8
64:17 65:4,10
67:6,6 68:14 69:6
69:8,13 77:7,11
77:25 78:23 79:5
79:9
merger's 69:14
mergers 10:8
14:25 41:13 52:1
54:3,4 57:6 61:24
70:17
merger's 14:11
18:12
merges 73:24
merging 56:25
57:1 59:25
merits 39:21
73:15
messina 4:11,16
6:10 11:14,14
29:17 30:10,16,22
31:6,14 34:1
51:19 66:10 92:11
92:13 93:5
method 27:17
58:14
metro 19:17
metropolitan 34:6
34:10,12 36:2,7
michigan 22:12
mid 53:7

mileage 55:7
miller 5:5
million 10:25 77:6
mills 76:25
mind 85:19,22
mindful 12:21
mineola 95:23
minimal 65:2
71:21
minutes 60:21
85:9,11
misconstrue 30:4
misleading 59:11
missing 57:24
93:13
mit 66:15,17,17
66:20,20,23,24
67:2,22 68:5
mobile 20:3
modeling 66:18
modern 18:7
monopolies 76:1
monopolist 27:18
monopolization
32:9
monopoly 18:1
34:23 52:15 60:18
68:16
monsieur 75:13
montana 33:12
montgomery 4:5
moore 5:3 6:23
7:1,1
moot 80:19
moots 80:8
motion 7:5,5,13
7:13,20,21 11:21
11:22,23 12:19
14:4,19 15:5 16:9
16:14,14 21:2,13
21:20 23:24 26:15
26:23,24 27:2,5
28:6 29:17 30:8

30:15 31:7 32:5
33:25 36:12 37:20
43:3,5,18 46:24
47:23 48:2 51:7
54:9 58:21,24
60:15 67:7 68:9,9
69:20 74:13 75:3
75:22 77:11,15
79:9,14,24 80:2
80:12,14,18 87:13
91:9
motions 6:3 17:15
35:10 72:4,11
80:5,9 81:3 87:15
89:3 91:8
motivated 49:20
motivation 58:16
movants 68:8
move 92:7,7
movement 15:16
moving 15:22
16:3
multiple 12:12
44:8 45:17 87:4
municipal 76:9
murdoch 76:14
mystified 81:5

**n**

n 4:1 6:1 95:1
n.d. 36:25 41:11
53:13 64:11 73:21
n.d.n.y. 37:25
named 8:7 43:4
napa 18:17
narrow 80:21
narrowly 22:21
nation's 68:4
national 8:24
10:14 14:21 19:18
20:11,17 26:10,13
26:18,22 27:8
28:4 29:13 30:6
31:1,13,18,23

32:2,5,15,19,21
33:19 35:4,17,19
36:12,17,20 39:15
53:13 54:20 59:7
80:4
**natural** 49:21
57:11,14
**nature** 13:23 17:8
49:4 81:3
**ne** 39:5
**nearly** 20:20
51:10
**necessarily** 84:10
**necessary** 19:11
39:9,25 75:19
79:22 81:1,18
**need** 25:4,15
39:13,19 40:10
54:25 72:10,13,24
81:17 82:17 83:11
84:10 85:8 86:3,3
86:6 88:10 90:17
**needing** 86:9
**needs** 16:6 83:19
**negate** 79:12
**negatively** 55:4
**negotiated** 77:16
77:22
**neither** 22:5 28:21
**nemours** 19:9
64:1
**network** 13:5
18:15 31:16
**never** 15:7 31:21
79:13 80:21 85:6
**new** 1:2 2:3 8:10
9:1 10:15 11:11
15:2 19:8 22:7
24:16 29:16 34:12
34:13,17 42:14,18
43:7,19,21 44:9
46:7 47:13 48:5
55:12,13 67:5

70:18 78:15,25
79:9
**news** 24:23 41:10
68:2
**newspaper** 41:19
**newspapers** 29:2
29:4 41:13
**night** 44:11
**nine** 55:16
**ninth** 36:20
**nj** 4:14
**nom** 27:24 29:3
**non** 15:22 16:3
27:19 29:6 33:13
42:7 44:15 68:8
75:11 88:18
**nonempirical**
73:7
**norm** 71:8
**normally** 38:24
**northwest** 22:10
54:6,20 57:2
**notably** 34:15
81:8
**note** 9:12 10:2,4
16:23 19:25 21:14
22:4,12 23:4 33:7
36:8 48:21 53:22
53:23 54:11 55:13
66:1 73:1 76:19
76:23
**noted** 10:6 36:16
62:3 71:19 74:14
78:15
**notes** 55:23 64:16
**notice** 13:3 27:2
80:13
**notices** 93:11
**noting** 75:3
**notwithstanding**
71:6 88:24
**november** 8:8
10:16 45:25 58:5

59:15 89:15
**number** 7:5,14,16
11:16 12:10 13:4
16:16 21:15 22:5
24:14 27:1,5
29:20 46:25 47:2
47:4,6 51:20
52:21 54:10 63:1
66:18,21,25 78:1
78:2,11,11 80:11
80:13 90:12
**numbers** 15:5
52:2 66:12 70:8
**numeral** 11:15
**numerous** 22:14
24:18 40:7 45:16
**nv** 18:22 26:9
**ny** 2:3 95:23

**o**

**o** 2:21 6:1 95:1
**objected** 78:4
**objection** 16:17
21:13 87:7
**obligation** 71:14
**observation** 31:21
**observations** 58:2
**observed** 20:1
40:4 48:7 49:8
51:16 54:17 63:23
**observes** 29:24
49:16
**obstacles** 62:21
**obviously** 72:13
81:22,24 85:15
88:16,25 91:21
92:20
**occasions** 85:20
**occurred** 13:23
54:3 89:21
**october** 10:19
84:5
**offer** 14:8 24:22
27:10 28:2,18

30:1 62:23 73:4
76:2,5
**offered** 63:1 73:2
**offering** 18:11
31:12 76:4
**offerings** 70:10
**offeror** 76:6
**office** 36:2 66:9
70:25
**offset** 70:17
**ohio** 45:24
**oil** 20:3,3 40:8
62:1
**okay** 88:19 92:8
**olan** 76:25
**old** 32:20 39:17
95:21
**oldcastle** 39:5
**omitted** 32:25
**once** 30:18 84:16
85:21
**open** 74:25 85:23
**opening** 85:8
**openings** 85:17
**opined** 61:4,24
**opinion** 57:23
71:2,22 73:5
92:14,19,21,24
**opinions** 27:11
29:8
**opposition** 16:13
16:15,21,23 21:13
21:20,24 37:20
43:11,14 46:19
70:3 74:25
**opticians** 39:16
**optometrists**
39:15
**oracle** 53:12
**oral** 71:6 72:3
**order** 11:22 21:14
24:5 32:16 59:25
62:14 80:12,14

86:17 91:7,11
93:3,8,16,20
**orders** 93:8
**ordinary** 24:25
28:14,22 33:3
**ordover** 59:1 62:7
62:10,16,20,25
63:6,14
**organize** 71:15
85:23
**original** 51:17
65:2,9,11,15
**originally** 10:21
**outline** 88:4
**output** 61:1 62:14
**outstanding** 80:25
**overall** 50:4 70:8
**overhead** 58:3
**overlapping** 61:6
**overseen** 67:12
**oversight** 78:16
**overt** 62:13
**owes** 76:12
**o'hare** 34:14
**o'rourke** 39:23

**p**

**p** 4:1,1 6:1
**page** 9:11 20:15
26:9,21 27:6 28:6
29:18,19,19 30:2
30:2,11,12,17,23
34:2 47:19,23
60:6 67:7 68:5
71:9,10 77:8,11
79:2,6,8 90:4,4,6
**pages** 26:14 35:10
39:5 69:16 74:13
**paid** 43:23 45:2,4
45:23 74:19 79:9
84:24,24
**pair** 20:18 21:7
26:7 43:10 45:13
46:3,15 47:3 51:7

52:11,13 70:11
80:7
**pairs** 8:24 9:2
10:11 12:6 14:21
14:22 20:13,19,21
20:25 21:5,17
22:3,7,8,13,19,22
22:24 26:4,7 28:7
46:9,13,21 47:2
51:23 52:5,15,17
52:17,18 65:9
**palfor** 45:1
**paper** 41:16 66:18
66:21,25 67:23
**papers** 66:16
**paragraph** 13:14
16:15,21,23 20:10
21:20 43:6,11,15
43:22 44:3,5,22
45:1,8,15 48:9
51:15 52:19,22,24
54:7,9,13,15,18
55:2,12 56:16
57:2 61:3,12,18
61:22 62:6,11,20
63:19 65:11,14,18
66:1,5 74:25 77:8
77:9,12,15 78:10
79:5,6
**paragraphs** 20:14
21:24 26:23 27:1
27:4 45:19 46:8
46:19 56:3 57:7
61:9 62:3,24 63:5
63:9,13 65:21
**parallel** 34:24
**paraphrase** 17:19
**paris** 76:22
**parka** 29:18
**parker** 29:14,22
34:1
**parker's** 29:15

**part** 7:19,20
17:21 28:16 34:6
34:22 62:21 74:6
77:24 78:6 79:4
88:14 93:18
**participant** 9:7
**particular** 26:6,8
87:3 91:22
**particularly** 8:2
55:18 58:17 89:21
92:16
**parties** 12:23,24
33:15 50:17 59:25
68:7 72:18 73:9
73:15,17 74:22
80:10,23 81:4
85:24 88:18 90:7
91:6
**parties'** 7:24
50:14
**partnership** 76:22
**party** 15:22 16:4
23:2,3,8 33:14,15
35:25 65:5 66:6
72:18 73:8,9
81:11,17
**passage** 29:21
**passed** 64:16
74:17
**passenger** 8:23
21:4 32:2,8,10
51:2 54:3 65:12
65:21 67:14
**passengers** 13:11
13:17 20:9 40:14
44:10 48:5,16
66:13
**pat** 53:11
**patent** 58:5,8
**patman** 14:3 74:5
75:3
**patronize** 42:13

**pay** 44:1,4 74:7,16
78:16
**paycom** 37:13
39:6
**payers** 33:15 73:9
**paying** 44:2 49:12
49:21
**payment** 13:25
14:16 15:10 75:10
75:12,15,16 76:8
77:6,10,13,17,21
78:6,7,8,13,20,21
79:3,12,18,21,21
**payment's** 78:4
**payments** 11:11
75:24
**pending** 6:3 10:18
80:9
**people** 80:16 82:4
85:6,6 86:9 87:15
87:19,21 88:2
89:23 90:12,21
**people's** 93:15
**percent** 53:15
65:24
**perceptions** 33:14
73:8
**perfectly** 14:12
**performed** 51:7
**period** 54:18 62:4
65:19
**permanent** 13:21
**permits** 13:7
**permitted** 23:25
**person** 17:18,19
17:22 74:7
**personal** 41:7
42:24
**personally** 45:2
54:17 83:13
**persons** 38:23
**perspective** 66:20

persuasion 73:25
persuasive 71:16
petition 8:9 72:8
pharmaceutical 19:13 25:22
pharmaceuticals 18:6
philadelphia 35:19 36:12 53:13
photography 76:25
physical 29:16
pick 84:8 86:5,6
pie 37:8
piecemeal 91:24
pieces 71:24
pitches 55:8
place 44:16
plaintiff 16:23 19:6 24:3 29:11 29:13 33:8 35:13 38:1,3,11,14,17 38:19 39:10,14,14 39:19,24 40:1,12 41:4,12 43:4 46:1 46:20 48:5 55:19 57:8 60:7 70:20 73:24 74:1 75:24
plaintiff's 57:20 58:19,21 60:14,19 61:23 64:24 65:3 68:9,10 69:19,20 69:23,25 70:7 71:19,20 72:5 73:11,13 74:3 75:22 77:5,12,16 79:11,23 80:2,11 80:13 81:8 82:5
plaintiffs 1:13 4:12 6:9,11,18 7:2 7:11 8:20 11:19 11:21,25 12:9 13:11,15,19,20,25

14:7,13,20,23
15:2,3,6 18:9 20:5
20:7,12,16,19,23
21:23 22:12 23:23
23:25 24:12 25:6
25:25 26:12,21
27:9 28:2,18,25
30:5,25 31:25
32:12 33:20 34:15
35:4 36:8 39:1,9
39:20 40:12,15,20
40:20 41:2,7
42:11 43:8,8
44:19 45:10 46:10
46:12 47:16,17,20
50:9,22 51:9
52:13,20 54:2,11
54:15 55:9,13,16
55:24 56:5,9,21
56:23 57:3 59:23
62:8 63:7 64:18
65:1 66:8,15 67:3
68:12,23 69:1,5
69:22 70:1,15,18
71:21 72:3,9,23
74:4,12 75:8
76:15 77:9 79:14
80:6 81:6
plaintiffs' 40:17 46:16 48:15 50:23 54:8
plaintiff's 7:12,20 11:18 12:14,19 14:14 15:4 16:9 16:13 17:1,12 20:22 21:2,12,13 22:6 24:8 26:10 26:14,18,20,23 27:2 29:21 30:4 33:17,18,19 34:3 34:24 36:17 37:1 37:3,17 39:11 43:7,15 46:23,25

47:1,3,5,5,11
48:18 49:6 50:16
50:19,20 51:6,17
52:25 54:1
plan 10:20 23:20 32:15 72:4 76:10 78:5,6
plane 35:14 42:22
planes 34:5,11
plans 15:4 30:13 41:6 42:13,17 43:4
plausible 19:6
play 62:18
plead 20:19
pleading 23:2
pleadings 15:13 22:6
please 6:8,17 81:20
pleasure 92:2
pled 22:20
pledged 46:15
plenty 80:18 85:20
ploof 25:12
pm 2:6 94:3
pmc 37:6
point 25:25 30:6 33:16 56:12 70:18 71:12 73:10 89:24 90:8,17 92:6
pointing 70:16
points 12:12 32:16
policies 9:22
policy 52:1 90:1
policymakers 68:2
polish 92:23
pont 19:9 64:1
port 39:4

portions 54:15
position 11:8 15:8 24:1 32:4 40:6
positioned 40:21
positions 32:1
posits 63:6
possessing 25:13
possible 25:14 39:3 49:22 84:6
possibly 70:1
post 9:3 12:8 13:2 15:8 29:8 41:21 45:11 46:2,4 51:11,24 52:11 53:14 63:21,23 64:2,8 65:4
posture 57:25
potential 21:18 41:20 43:9,17 48:25 59:18
power 19:14 25:16 42:5,6 52:3 70:14
powerpoints 87:19
ppg 10:2 53:22
practical 28:11 85:24
practicalities 35:18
practically 36:11
practice 38:14,18 74:15
pre 45:11 61:16 63:20 82:20
precedent 35:3 64:12
preceding 62:2
precludes 34:19
predicate 19:11
predicted 51:24 52:20

predictions  52:24
predictive  56:13
preferred  46:7
premerger  67:9
prepared  59:15
  65:7
prerequisite  71:3
presence  61:5
  63:16
present  5:1 49:7
  56:9 58:5 60:3
  68:13 71:15 72:19
  88:15
presentation's
  89:10
presented  55:24
  56:17 59:23 60:23
  62:9 69:1,17
  71:22 89:3
presenting  68:18
presents  50:16
  70:19
president  10:24
presumed  51:13
  52:2
presumption
  14:25 18:23,25
  53:16 60:3 68:14
  69:2 73:22
presumptive  12:7
presumptively
  9:21 20:20 41:24
  47:2 50:24
pretend  66:2
pretrial  80:24
  82:25 83:2,6
  86:13,14,15 88:9
  88:11
pretty  85:10
  87:20 92:21
preventing  12:17
previously  20:25
  26:11 36:16 48:8

49:8 54:12 59:14
  72:1 81:21
price  27:19,20
  32:16,16 42:7
  48:7 49:22 56:16
  57:4 63:23 65:4
  69:7 74:18
prices  42:1,6 56:5
  61:21 62:2 63:7
  63:18 70:18
pricing  32:15
  42:16 61:11 69:12
pricings  54:17
prima  18:9 50:20
  50:23 53:2,5
  55:20 59:3 60:1,2
  60:19 68:13,21
  69:10
primarily  37:18
  50:23 68:12 74:15
primary  61:21
principal  75:19
  75:24 76:5,13,20
  79:19,20
principles  28:1
prior  8:7 17:4
  19:1 22:2,24 28:3
  44:22 47:25 56:22
  57:19 61:24 72:1
prism  50:19
private  40:2 42:22
  47:18 50:9
pro  61:1
probability  64:3
probable  18:12
  58:22 59:6 69:15
  70:13
probably  86:12
  86:13,23
probative  25:14
  33:16 57:18 64:2
  64:9 73:10

problem  44:7
procedure  7:25
  15:19 65:3 72:16
proceed  7:4 86:16
proceeding  6:6
  7:10,17 8:5 11:18
  11:20 12:24 13:1
  21:1 22:5 39:21
  68:25 77:22 81:19
proceedings
  12:13 13:3 14:23
  81:18 94:3 95:4
process  18:8
  38:10 41:23 42:3
procurement  73:2
procuring  73:23
produce  64:23
product  20:8
  22:20 23:15 25:2
  25:19 28:1,11
  33:5 34:25 42:8,9
products  16:19
  25:11 35:9
professional  72:5
professor  12:1,2,3
  31:12 59:13 60:25
  61:4,10,19
proffered  81:7
profitability
  29:23
profits  62:15
prohibit  76:24
project  39:23
promotional
  79:12
prompt  89:1
promptly  89:4,7
pronouncement
  20:2
proof  25:13
proper  20:25 26:4
  28:20 46:10

properly  14:20
  21:3 22:4
propose  20:5
proposed  10:8,22
  24:19 26:10 40:17
  47:7 52:25 77:21
  91:7
proposition  31:1
  40:23 67:4
proprietary  16:8
prospective  59:17
  60:23
proton  23:24
prove  24:19 25:16
  38:1 39:11 60:8
provide  8:1 9:4
  25:6 34:16,23
  37:11 58:7 59:16
  59:21 79:14 80:22
  91:7
provided  41:7,14
  57:8 81:6
provides  17:18
  18:8 63:3 72:18
  74:6
providing  11:1
  53:19
province  58:17
provisions  64:20
public  28:10
  42:22 50:10 65:12
publicly  8:6
published  66:8
publishers  27:22
  41:17
publishing  19:24
pull  30:25
punitive  24:6
purchase  35:14
  41:6 74:10
purchased  13:12
  41:5 43:16

**purchaser** 36:11
49:24
**purchasers** 43:18
**purchasing** 41:16
**purgess** 23:16
**purportedly**
46:20
**purpose** 15:10
67:11
**purposes** 17:14
20:8 21:1 26:4
28:23 29:10 34:10
35:16 48:1 60:14
72:11
**pursue** 38:4
**put** 81:11 87:6
93:9

**q**

**qua** 75:11
**qualify** 72:6
**quality** 42:1,9
46:6 56:6 69:8
**quantity** 62:23
**quarter** 52:7
**quarters** 52:7,8
65:17
**question** 19:17
58:9 69:21 70:4
73:3 74:25 90:25
92:11 93:14
**questions** 31:22
58:6 60:16 70:15
71:19,24 73:12
80:23 88:12
**quote** 21:11 30:13
33:1 68:5 88:3
**quoted** 15:17
**quotes** 36:23
**quoting** 10:1
15:18 18:6,20
30:24 33:25 36:12
37:15 38:6,13
48:20 49:23 50:12

59:6 60:11 74:1

**r**

**r** 2:21 4:1 6:1 95:1
**r.c.** 26:8
**radio** 16:1
**raise** 54:23 63:7
69:2,18
**raised** 16:11
70:15
**rates** 41:20
**rational** 16:3
**ratios** 9:14
**ray** 23:25 27:22
**rc** 18:21 59:3
68:16 70:14 73:19
**reached** 8:14
**read** 76:23 85:17
**readily** 62:17
**ready** 83:6
**reagan** 8:24 10:14
**real** 17:12
**realities** 36:15
**really** 83:4 85:11
86:16 90:10
**reason** 51:9 86:8
**reasonable** 15:21
52:9 68:7 83:9,12
**reasonably** 36:23
**reasoning** 35:12
**reasons** 7:18
22:23 26:2 48:23
49:19 91:10,12
**reattached** 59:14
**rebut** 18:11 58:21
60:1,3
**rebuttal** 50:21,22
58:20 59:22 69:25
71:20
**rebutted** 59:4
60:19 69:10
**rebutting** 73:22
**recalculated** 52:4

**receive** 42:22 74:8
**received** 75:15
79:18
**recession** 62:1
**recognition** 28:10
**recognize** 24:11
**record** 7:25 15:12
16:2,7 70:5,24
71:15 80:12,14
90:7,8 91:9,12
95:4
**recover** 39:2
**redirect** 34:11
**reduce** 52:16 61:8
**reduced** 42:1,8,9
42:9 56:2,6,25
**reducing** 64:17
74:18
**reduction** 56:7
**reductions** 57:4
61:25
**refer** 7:5,8,13
9:18 16:15 66:17
**reference** 13:3
**referenced** 59:14
**references** 7:15
**referred** 66:23
67:1
**referring** 19:22
**reflect** 65:20
**reflected** 46:17,19
**reflects** 70:13
**regard** 27:25
81:21
**regarding** 14:24
15:3 43:23 56:14
57:12,15 58:15,22
60:16 61:23 69:11
70:7
**region** 36:7
**regional** 17:9
**regular** 44:20
88:17

**regularly** 40:24
**reject** 47:9
**rejected** 36:17
**rejecting** 22:20
76:15
**related** 43:13
**relatedly** 72:3
**relationship**
76:24 77:4,4
**relevance** 86:20
86:20
**relevant** 7:22
11:25 12:15 14:8
14:23 19:7,11,14
19:20 20:7 21:7
21:19 22:9,21
27:10,17 28:5
29:9 32:4 33:9,22
34:25 35:1,10
42:12 46:13 47:24
55:11 64:14 74:6
77:18 78:22 89:21
**reliability** 57:22
**relied** 12:3 22:1
28:4 42:18 65:12
81:2
**relief** 12:2 13:20
13:21 39:13 42:23
47:22 49:7 50:2
**relocate** 42:19
**rely** 28:19 30:5
31:25 56:21 66:8
66:15 72:5 90:20
**relying** 24:25 25:7
28:16 33:3 68:12
**remain** 26:6 70:6
71:23 80:23
**remained** 42:12
61:17
**remaining** 54:22
**remains** 47:25
49:19 72:11 73:25
74:25 81:5

**remedy** 13:23 37:11
**remedying** 49:6
**remote** 38:22
**rendered** 74:10 77:14
**reno** 45:24,25
**reorganization** 78:5
**repeated** 26:22
**repeatedly** 22:8 51:16
**repercussions** 54:24
**reply** 16:14 20:23 21:2,12 22:4 39:12 46:23 47:5 64:24 66:7 69:25 71:20,25 79:1
**report** 22:6 45:18 45:22 51:20 52:8 52:12 56:20 58:25 59:1,2 61:18 62:11,20 66:6,8 66:10,20,23 67:2 67:12,15,21 68:5 70:22 87:8
**reports** 22:15 58:21 59:16 65:6 66:17 67:3,9,22 90:21
**represent** 10:7
**representatives** 28:20
**request** 11:18 30:9 31:9 47:12
**requested** 12:2 13:20
**requesting** 11:22 39:12
**require** 26:18 74:16

**required** 24:8 27:10 37:10 39:11
**requirement** 19:5 40:18
**requirements** 47:21 53:2 72:14 72:15,23 78:8
**requires** 50:18
**requisite** 14:9 21:22 72:22
**research** 29:9
**reservation** 32:3 32:10
**reserve** 88:1
**resolve** 81:18
**resolved** 15:21 72:11
**resorts** 74:20
**respect** 68:10
**respected** 53:19
**respective** 68:8
**respectively** 65:25
**responded** 62:8 65:1
**responds** 54:8
**response** 12:24 30:8 31:4 50:22
**rest** 60:7 81:19
**restraining** 11:22 21:14
**restrict** 62:14,15
**restrictions** 9:1 34:18 64:21 93:7
**result** 31:9 41:20 52:14 57:5 61:1 63:10
**resulting** 50:25
**results** 41:24
**retail** 74:16
**retailer** 74:18,18
**retain** 21:21 46:12
**retrieved** 65:12

**retrospective** 59:18 64:13,15,19
**returning** 45:7
**revenue** 31:10
**reviewed** 43:19
**reviewing** 57:18 67:9
**revisit** 48:1 87:16 87:16
**right** 6:19,22 7:3 7:3 40:3 48:20 82:7,14,23 83:1 88:19 89:17,20 90:24 91:6 93:22 93:23
**rigid** 75:4
**riley** 41:10
**rise** 53:16
**rising** 80:4
**risk** 39:1 62:9 64:17 84:25
**rivals** 62:12
**rivera** 17:9
**road** 4:13 76:18 95:21
**roadmap** 85:11
**robinson** 14:3 74:5 75:2
**robust** 57:9,23 80:24
**rochester** 17:9 36:7
**role** 11:7 40:21 60:9 62:18
**roles** 80:4,6
**roll** 58:4
**roman** 11:15
**room** 44:8
**rooms** 88:1,7
**rosario** 23:17
**rosemary** 5:4
**roughly** 79:4

**round** 44:2
**route** 56:2
**routes** 20:21 33:24 34:13 43:10 43:14 45:13,17,22 46:3 48:7 51:8,10 61:7,8 64:22 65:16,24
**routinely** 16:12
**rule** 7:24 22:11 53:14 70:23
**rules** 70:6 72:15 72:16,20 88:17
**ruling** 6:3 81:10 81:16 91:11,21 92:20,25
**ruling's** 92:3
**rulings** 92:15
**run** 63:21 85:6

**s**

**s** 4:1 6:1 58:12
**s.d.** 25:5 32:14
**s.d.n.y** 18:5
**s.d.n.y.** 11:24 12:19 15:24 19:19 20:4 22:19 23:1,9 23:16,18 24:24 25:20 37:5,9 39:18 49:2,23,25 75:14 76:11,15 78:19
**sa** 49:22 50:12
**sadik** 4:8 6:12 58:23
**saint** 18:16 27:16
**sale** 74:10
**san** 4:6,21
**sansome** 4:20
**satisfied** 72:23
**satisfy** 40:18 53:18 72:14 78:7
**savory** 37:8

saying 41:5
says 88:23 90:5
scanning 50:15
schedule 86:10
89:9,13,14
scheduled 8:23
21:4
scheduling 81:14
81:18 86:12
scientific 29:9
scope 16:7 25:2
32:5 33:5 67:11
75:5 80:21 81:3,6
81:13
scott 30:24
screen 87:21,21
screw 83:22
sean 2:22
search 25:21
seat 43:23 44:1
55:8
seats 43:25 62:23
seattle 34:15
secoma 68:19
second 12:20
26:15,24 27:3
33:18 38:10 40:1
41:22 42:2 48:13
61:13 66:7 68:25
71:2 74:14,22
75:1,3
section 8:21 9:18
11:4 13:18 14:3,4
14:6,15 15:1,6
17:17,17,24 18:1
18:2,15,18 19:1,5
37:4,20,21 40:3,3
40:9,9,24 42:4
47:13,14,22,22
50:16 52:3 53:9
54:1 55:20 56:8
57:16 60:10,14,20
63:25 64:4 68:10

68:13,16 69:9,19
70:3 71:3,19 74:3
74:5,6,11,12,14
74:23 75:2,5,7,10
75:17 76:1,23
77:2 78:9,13
79:22,24 80:2,3,5
secure 77:10
securities 76:10
see 9:8,11,16,25
10:3 11:13,16,23
12:10,15,17 13:3
13:4,22 14:4,4
15:4,23 16:4,12
16:19,20,22 17:6
18:1,4,13,16,21
19:7,9,12,17,20
20:14,22 21:9,19
21:20,23 22:2,4
22:10,17,25 23:15
24:9,23 25:4,8,11
25:19 26:8,13,21
26:22 27:2,5,12
27:16,22 28:12,15
29:1,17 30:2,8,10
30:15,22 31:6,7
31:14,22 32:5,10
32:21 33:2,5,11
33:25 34:21 35:10
35:18,24 36:11,13
36:18 37:4,8,13
37:20,24 38:5,7
38:12,15,17,19
39:4,11,15,17,22
40:7,9 41:1,10,17
42:1,4,14,20 43:5
43:11,14,18,22
44:2,5,21 45:14
46:7,18,22 47:3,4
47:10,13,19,23
48:8,17 49:1,12
49:15,18 50:11
51:3,14,18,19,25

52:3,8,12,18,21
52:24 53:6,10,12
53:20,22 54:6,13
54:14,18 55:12,16
55:18 56:3,8,15
56:19 57:2,6,16
57:17 58:3,11,23
59:3,23 60:5,19
61:2,9,11,18,22
62:2,6,10,11,19
62:24 63:5,9,12
63:19,24,25 64:10
65:10,13,18,21,25
66:4,17 67:7,21
68:10,16,16 69:8
69:15 70:2,14,23
71:9,12 72:7,16
72:21,25 73:6,16
73:19,19 74:11,13
75:12,25 76:9
77:7,8,11,15,25
78:9,18,25 79:5
79:13 87:20 88:23
88:25
seeking 7:14 8:19
13:21 14:6 21:8
seeks 7:9
seen 66:10 77:19
78:2 79:1,7 85:20
segments 45:5
selected 36:14
selection 36:10
75:13
selectively 30:13
self 16:10 38:23
48:14 49:21
sellers 42:5
semi 37:24
sense 83:5 84:16
separate 20:18
45:4 55:3 91:16
separating 91:17

separation 11:11
september 10:10
15:24 37:5 65:18
84:5
series 58:2 66:16
67:23,25 70:17
serious 71:18,23
93:11
serve 33:25 50:9
88:15 92:25
served 78:24
serves 83:3
service 8:23 21:4
33:21,24 42:1,9
46:6 54:23 56:6
66:18,21,24 67:1
67:25 68:4 69:8
70:9
services 22:17
30:1 33:6 37:13
39:6 54:16 55:3
56:25 58:11 74:10
77:14
serving 16:10
29:23 66:12
set 7:18,23 9:22
20:24 24:3,4 35:2
84:12
setting 62:23
settle 21:9
settled 10:12 37:1
settlement 10:16
63:15 64:20
setup 87:23
seven 42:19 43:8
43:14 52:15
severance 10:24
11:12 14:1 77:14
78:8
sham 16:18 17:6
shaping 66:25
share 18:24 41:21
53:15 59:4,10,11

69:14 70:12
**shareholders**
  77:25
**shares** 9:7,15 30:7
  53:8 68:19
**sharif** 13:5
**sharrock** 23:17
**sheraton** 76:19
**sherman** 32:15
**shift** 34:5
**shifting** 18:8,15
  18:19 50:19 60:13
**shifts** 73:24
**shl** 1:3,4
**shoe** 21:9 28:12
  36:13
**shoe's** 36:21
**shopped** 36:2
**shoppers** 76:22
**short** 31:20,22
  79:17 85:17
**shortens** 82:17
**show** 15:14 69:13
  85:13
**showing** 17:2
  68:18 76:8
**shows** 42:23
**side** 82:8
**side's** 86:24
**signed** 11:10
**significance** 34:19
  70:7 72:24
**significant** 27:19
  55:10 56:7 84:3
  87:10,12 92:22
**significantly**
  49:20 67:6 68:19
**signing** 23:11
**similar** 11:12
  57:19
**similarly** 30:4,13
  35:12

**simply** 36:22 48:4
  51:17 58:2
**sine** 75:11
**single** 21:6 24:21
  32:20 43:4 53:8
**sit** 84:24 86:14
**sites** 20:3
**six** 36:6 45:4
**skepticism** 16:12
**skewed** 64:17
**slots** 10:14
**small** 27:19 66:17
  66:19,20,24,25
  67:24
**smaller** 68:4
**smallest** 30:21
**snipp** 33:4
**solicitous** 84:23
**solutions** 95:20
**somebody** 90:5
  93:8
**somewhat** 72:3
  81:5
**sonya** 3:25 95:3,8
**sophisticate** 71:17
**sorry** 6:24 11:15
  16:23 57:13
**sort** 23:7 83:4
  85:5 89:2
**sound** 27:11
**sounds** 83:9,12
**source** 67:3
**southern** 1:2 8:10
  59:7
**southwest** 31:5
  54:4 55:14
**speak** 6:25 81:24
  81:24
**speaks** 91:14
**special** 38:2
**specific** 20:21
  30:22 37:23 38:18
  46:13 52:21 56:10

70:11 87:5
**specifically** 8:24
  12:4 16:21 45:12
  62:8
**specifics** 41:8
**specified** 7:15
  51:12
**speculative** 38:25
  48:25 49:3
**spend** 60:21 86:23
**spent** 54:15
**split** 10:25 75:6
**springs** 45:6
**squares** 9:6
**ssnip** 25:1 27:19
**ssnips** 27:15 32:24
**st** 18:17 56:24
**stacks** 88:5
**staff** 87:22
**stage** 73:14
**stakeholders**
  66:14 67:19 77:19
  78:22
**standard** 36:22
  37:23 40:8 53:18
  56:6 59:25
**standards** 15:11
  17:16
**standing** 14:10
  15:1 19:3 37:2,3
  37:10,18,22 38:1
  39:8,9,11,13,15
  39:19,20,25 40:1
  40:11,16,17,20
  41:3,12,19 42:15
  43:7 44:8 46:10
  47:7,9,19 48:15
  50:3 69:6
**standings** 40:25
**stansbury** 45:19
**staples** 21:10
  35:24

**star** 64:11
**starting** 33:16
  73:10 83:13
**starwood** 74:20
**state** 24:16 37:16
  67:14 70:22 75:17
  76:9
**stated** 21:3 28:10
  31:2 91:12
**statement** 22:1,24
  23:14 28:5 31:5,8
  31:20 47:5 54:8
  70:25
**statements** 7:24
  25:1 28:19 29:5
  30:25 33:4 43:21
  58:3
**states** 1:1 2:1 8:16
  8:17,17 10:3
  12:25 18:13 20:10
  23:4 27:12 28:13
  30:7,14 31:3,6
  32:22 33:21 35:18
  42:24 53:9,11,12
  53:23 57:17 59:6
  59:8 64:5,10 67:1
  67:25 68:21 69:15
**state's** 24:19,20
**stating** 19:5
**statistical** 56:18
  66:3
**statistics** 18:10,24
  42:18 51:1 53:1
  53:17 60:8,9
  65:13 68:18 69:2
  69:3,14
**stem** 62:21
**step** 38:10 41:22
  42:3
**stephen** 76:25
**stern** 12:21 13:7
**stipulation** 12:25

stipulations 23:2
23:7
stock 11:1 17:22
stone 39:4
stopped 31:22
stores 36:3,3 43:1
straight 65:20
stray 91:9
street 4:5,20
91:23
strike 31:24
stringent 37:22
stringently 47:21
structure 31:11
67:17 69:12 70:8
70:10
struggle 63:11
studied 61:13
studies 63:21
64:13
study 65:3,8,11
70:22
stuff 87:25 88:3
sub 27:24 29:3
subject 64:8 87:13
submarkets 20:12
28:12
submission 56:13
submit 21:22
91:10
submitted 9:11
11:25 13:8 15:2
41:5 44:19 46:20
58:20 65:5 66:7
68:6 71:25
subnom 25:22
subpoena 88:16
subscribing 41:15
subsection 14:5
90:6
subsequent 12:11
substance 19:1
48:18 54:2

substantial 55:10
55:15 59:10 63:23
substantially 8:22
17:25 60:17 62:4
68:15 82:17
succeed 22:14
successful 55:12
successfully 60:4
73:22
sue 38:24
suffer 49:17
suffered 38:2
49:11,15
sufficient 26:3
34:23 44:19 53:8
69:18
sufficiently 38:11
46:11 76:5
suggested 72:3
suing 42:21 50:9
suit 10:18 39:19
40:21,24 42:16
43:23
suitability 26:6
suitable 38:3
suite 4:5 95:22
sum 9:15 55:19
91:13
summarizing
46:21
summary 6:3 7:9
7:14 14:6 15:11
15:12 16:11 17:11
23:24 24:12 25:24
33:8 34:22 41:3
41:12 46:11,24
50:17 54:9 57:25
58:7,7,14,24 68:9
69:20,22 70:2
71:5 73:14 75:9
79:25 80:2,20
81:12 89:3 91:8

summer 66:16
summing 9:6
sunsetting 64:19
superior 9:13
75:20
superiority 73:17
superstores 36:3
supp 73:6
supplemental
12:20 26:15,24
27:3
supplemented
36:5
suppliers 74:16
supplies 25:11
36:11
supply 28:7 33:20
34:17,20 75:21
support 12:1 15:4
16:9,14,17 24:3,5
29:13 31:1,13
32:1,18 46:23,23
54:9 56:9 58:21
58:23 59:15 64:14
71:21,22 80:13,15
supported 55:25
supporting 7:25
supportive 64:15
supports 24:14
supreme 12:21
13:6 25:23 28:9
40:4 53:7 89:14
sure 87:23 89:8
91:1 92:12
surely 22:13
surprised 89:22
surrounding
57:21
survive 24:12
41:3,12 46:11
69:22 75:9
susceptible 62:17

sustain 47:18
79:22
sutter 73:20
synar 39:22
system 62:22
systems 18:17
32:3,10 73:20

**t**

t 66:17 95:1,1
tacoma 34:15
take 24:1 44:10
67:21 84:15,18
89:2,2
taken 16:2 28:25
45:2,20
takes 34:8
talk 84:7 85:18
86:6,7 88:10,22
90:6 91:4
talking 93:25
talks 70:24 72:17
taluski 43:22
tamrock 68:19
target 74:15
technical 18:6
19:13 58:6
technology 87:22
telephone 6:16,20
6:21
telephonically 5:1
tell 83:13 86:24
90:2,7
temporary 11:22
21:14
ten 44:25 45:9
tend 18:1 60:18
68:15 85:2 86:25
87:1
tending 64:3
tends 41:25 85:1
terms 42:7 88:18
test 25:2 33:5

testified 30:6
testimony 17:4,8
  17:12 24:9,22
  25:4,7 28:13
  29:12,15 30:4
  33:9 41:8 69:11
  72:13,17,25 73:5
  81:3,7 82:15
tether 76:7
tex 32:14
thank 6:12 92:8,9
  92:10 93:22 94:1
  94:2
thanksgiving
  88:21,23 89:12
that's 6:5 17:9
  18:20 28:5 46:17
  48:20 52:7 53:9
theoretically
  35:14
theories 24:23
  74:24
theory 24:22
  26:18 27:8 28:6
  29:13 33:19 36:17
  74:12
therapy 23:24,25
thereof 9:10 80:13
theresa 5:3 7:1
there's 38:23
they're 10:6 14:12
thing 86:1 87:6
  89:20
things 14:15 15:7
  28:2 80:17 84:11
  87:1,5,10,14,19
  87:19 88:7,9
  90:18 91:13
think 21:17 31:15
  31:17 81:24 83:7
  83:12 84:6,15
  85:1,4,4,10 86:2,6
  86:7 87:11,16,18

88:10,11,20 89:4
  89:8 90:14 91:8
  93:13
thinking 84:4
  86:1
third 33:14,14
  48:23 62:7 65:5
  66:6 69:3 73:8,8
thoughtful 10:7
thoughts 85:23
threatened 13:15
  40:12 56:10 69:7
three 14:10 38:10
  38:25 41:22 42:3
  45:9 58:20 66:15
  67:18 82:1,3,10
  82:11 83:7,14
threshold 16:6
  19:4 37:3 51:12
ticket 35:15 49:16
  57:4 65:4,16
tickets 13:12
  22:21 41:4,6
  45:24 63:1
tied 44:14
time 6:21 30:22
  55:15 65:19 82:18
  84:3,16,23 85:7
  85:19 86:4,21,23
  89:8,8 93:15
timely 17:1
times 39:11 45:9
  45:16 74:1 87:4
title 42:14,16,18
  58:13
today 48:2 72:11
  84:10 91:12
today's 80:20
todd 19:20
tokyo 44:6
told 44:12 85:16
tom 10:23

ton 36:3
tool 10:6
total 34:18
touching 43:9
touton 75:13
trace 49:10
traced 37:12
trade 9:17
traded 8:6
trademarks 76:1
trail 81:1,14
trans 22:18 54:12
transactions
  57:19,21
transatory 27:19
transcribed 3:25
transcript 20:15
  27:6 29:18 30:11
  30:16,23 34:1,2
  71:9 72:7,8 77:20
  78:3 79:2,8 91:14
  92:25 93:2,4 95:4
transcription
  93:11
transferred 34:8
transit 54:20
transition 11:9,15
  14:1 77:8 79:5
transitioned 11:7
transparency
  78:21
transportation
  17:10 20:9 23:20
  32:19 35:5,22
  36:21 65:13
travel 13:12,17
  22:16,17 26:13
  35:14 40:14,17,22
  41:9 43:16 44:21
  45:11,12,13 47:2
  47:3,8,9,13,16,17
  48:3,15,23 49:9
  49:15,17,20 50:3

50:5 72:6,6 80:4
traveled 44:23,24
traveler 21:5
traveling 21:9
treat 23:14
treated 91:16
treating 23:10
tree 74:19 75:11
trend 51:1,4
  53:24 54:2
trends 54:16
  55:22 66:21,25
  67:24 69:4,12
  70:9,16
trial 13:2,3 16:4
  26:7 27:1,4 46:12
  50:16 58:10 69:19
  70:1,20 72:19,25
  73:18 80:22 81:14
  81:22 82:1,13,18
  82:21,25 83:13
  84:1 85:4,7,21
  86:2,13,21 87:6
  87:11,18 88:1,6,7
  88:20,24 89:13,14
  90:3,5,8,12
trials 84:24
trier 16:3
trip 44:2
trips 44:16
tro 11:18,23 12:16
  21:2
trucklines 25:12
true 14:17 26:21
  35:13 48:10 53:2
  90:19 95:4
trust 90:19
trustee 78:4,19
try 88:1,6 89:1
  91:13
trying 29:16 84:2
  85:11,15 87:18
  88:11

tucson 45:25
turn 35:8 36:11
58:19 64:24 69:10
77:13
turning 7:22 13:9
15:11 20:19 26:10
27:14 32:24 40:19
turns 11:17 17:16
37:2 47:7 50:15
58:8 74:3 81:15
twa 22:21 54:12
54:19 56:25
two 14:8,20 19:2,3
20:6,17 28:2,6
38:22 48:6 50:24
51:1 55:13 61:4
67:17 84:2,21
type 16:10
typical 31:17
typically 18:9,19
63:1

**u**

u 30:11,16,23
77:19 78:2 79:7
u.s. 2:23 7:7,7 8:9
8:11,12,13,18
10:17,21 12:22
15:18 16:1,5 19:9
19:10 21:10 28:13
29:12,25 32:4
35:19 36:13,13
37:16 39:22 40:8
42:25 43:1,17
44:23 45:12,16,21
48:8,21 52:23
53:10,11,14 54:14
55:5 59:7 61:6,15
61:17,21 64:6
66:19,22 67:16
68:11 71:12 72:21
73:16 77:7,24,25
78:4,19

u.s.c. 14:4 40:9
60:19 68:16 74:11
ual 36:24 41:1
42:20
ultimate 73:25
ultimately 10:12
11:3 21:5 58:8
unaided 58:10
unambiguously
23:23
unawares 83:24
unclear 34:25
49:19
undeniably 81:9
underscores
78:20
understand 31:24
48:19 80:17 89:13
understanding
62:14
understood 30:19
undertake 46:14
undertaking
92:22
undisputed 7:23
54:8 77:9,12
78:10,22 79:6
undue 52:20
unequivocal 17:8
17:13 21:25
unfair 75:25
unilever 18:22
26:9
united 1:1 2:1
8:16,17 10:3
12:25 18:13 20:10
23:4 27:12 28:12
30:7,14 31:3,6
32:21 33:21 35:18
42:24 53:9,10,12
53:23 54:5 57:17
59:6,8 64:5,10
67:1,25 68:20

69:15 76:13
unlawful 51:10
74:7
unnecessary 25:3
unprecedented
56:24
unprofitable
27:21
unquestionably
53:15
unsecured 77:23
unsubstantiated
43:13
unsupported 34:3
untethered 58:2
90:14
unusual 84:2
unweighted 65:25
unwillingness
24:21
updated 10:11
52:5
upgrade 55:7
upholding 33:7
usc 18:1 47:14
use 22:13 41:7
64:18 71:7 72:19
82:16 86:21 87:19
89:24 90:2,22
92:15
useful 9:24 53:20
57:8
utility 64:21

**v**

v 1:14 6:4 9:8,25
10:2,3 12:22 13:5
15:17,25 17:9
18:6,13,17,20,22
19:8,9,18,20,24
20:3 21:10 22:17
22:25 23:4,9,16
23:17,19 24:9,16
24:23 25:5,11,17

25:22 26:9 27:12
27:22 28:12 29:1
29:3 32:13,22
33:6,11 34:21
35:18,24 36:3,24
37:4,6,8,13,15,24
38:7 39:4,4,16,22
39:23 40:8 41:1
41:10 42:20,24,25
49:22 50:11 53:9
53:11,12,21,22,23
57:17 58:3,11
59:6,8,23 60:6
62:11 64:1,5,10
69:15 71:13 73:6
73:16,20 74:19
75:13,21 76:14,18
76:22,25
valid 28:11
valle 58:11
valuate 73:10
value 11:12 25:14
32:15 33:16 57:18
64:2,9 73:10 74:8
varies 53:4
variety 42:9 92:16
various 10:13
29:12 46:21 70:9
vendors 34:9
35:17
venture 76:18
veritext 95:20
vermont 24:11
vetted 79:3
viable 75:2
victims 39:3 48:19
victories 60:11
view 10:6 16:12
29:1 70:20 82:5,9
89:25
views 67:19
vii 58:13

**vindicate** 50:10
**vinny** 88:3
**violate** 8:21
**violated** 14:15,25
  32:14
**violating** 11:4
**violation** 14:3
  19:12 37:13 38:21
  38:24 71:4 74:5
  75:10,12 77:2
**violations** 38:4
**virtually** 60:7
**vitality** 63:16
**voice** 6:25 66:14
**void** 59:10
**volume** 65:21
**voluminous** 89:23
**voluntary** 8:9
**volunteer** 83:25
**von's** 53:9

**w**

**w.d.** 33:12
**w.d.n.y.** 36:4,5
  58:5
**w.l.** 24:10 58:4
**walking** 60:21
**wall** 81:21,24
**wall's** 89:14
**want** 20:16 81:23
  81:25 83:1,24,25
  84:13 86:15,16,17
  87:23 88:14 89:8
  89:23 90:2,15,22
  91:17
**wanted** 92:4
**wanting** 33:20
**wants** 90:3
**warehousing** 49:1
**wares** 74:11
**warn** 24:4
**warned** 26:12
**washington** 10:14
  23:22

**waste** 59:8
**watkins** 4:3 6:13
  6:15
**way** 21:17 50:3
  75:16 83:21 84:11
  85:8 86:23 90:16
**ways** 30:20 93:20
**we've** 84:21 85:7
**weakness** 69:25
**week** 82:12,12
  89:15,16
**weeks** 82:2,10
  83:7,7,14 93:25
**weighed** 47:16
**weighing** 81:12
**weighs** 73:15
**weight** 63:23
**weighted** 65:20
**welfare** 23:20
  61:2
**wellness** 13:5
**wells** 58:11
**went** 54:21 80:9
  80:15
**west** 15:23 54:14
  54:20
**western** 23:21
  27:23
**westlaw** 18:5 23:9
**we're** 6:2
**whatsoever** 79:15
**white** 66:15,18,21
  66:25
**whiting** 58:3
**who's** 6:20
**who've** 43:16
**widely** 39:12
  53:19
**win** 24:4 70:1
**wired** 87:20
**wise** 84:14
**wished** 30:10

**wishes** 6:21
**withdrawing**
  25:10
**withdrawn** 12:12
**witness** 24:13
  84:14,20 87:3
  91:2,3
**witnesses** 33:10
  72:19 73:2 81:4
  82:20 85:2,7,12
  86:2,16,17
**wl** 36:5,24 37:5,9
  38:6,12 41:1,10
  42:2,20 49:2
  64:10 75:13,21
**woefully** 32:20
**wonder** 88:19
**wondered** 91:15
**woodley** 76:18
**words** 18:2 31:8
**work** 83:5,19
  86:19 87:24
**working** 90:11,12
**works** 83:7 84:8
  87:24 90:16
**world** 22:18 54:12
**worldwide** 74:20
**worth** 93:15
**wouldn't** 82:18
  85:22
**write** 20:7
**written** 78:12
  82:16 84:15 92:19
  92:20,23
**wrong** 86:24
**wrote** 62:16

**x**

**x** 1:5,11,17 23:25

**y**

**yeah** 83:18 88:17
  88:18 93:1,2,3
**year** 11:2 32:20
  45:8 51:3 52:6

65:17
**years** 10:7 42:19
  45:15 53:25 55:14
  57:6 62:2 64:16
  66:13 69:5
**yield** 62:22
**yokmik** 22:25
**york** 1:2 2:3 8:10
  10:15 19:8 24:16
  34:12,13
**you're** 31:19,23
**you've** 79:7 84:10
**yy** 31:6

**z**

**zen** 83:20
**zenith** 15:25
**zink** 18:4

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:                                                             Chapter 11

AMR CORPORATION, *et al.*,                         Case No. 11-15463 (SHL)

                                   Debtors.          (Jointly Administered)

------------------------------------------------------------------------x

CAROLYN FJORD, *et al.*,

                                   Plaintiffs,

                  v.                                               Adv. Proc. No. 13-01392 (SHL)

AMR CORPORATION, AMERICAN AIRLINES,
US AIRWAYS GROUP, INC. and
US AIRWAYS, INC.,

                                   Defendants,

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS,

                                   As Intervenor.

------------------------------------------------------------------------x

### ORDER DENYING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Before the Court is Plaintiffs' *Motion for Leave to File a Second Amended and Supplemental Complaint to Allege Injury and Damages Under Section 4 of the Clayton Act and Demand for Jury Trial (Fed. R. Civ. P. 15 and Bankruptcy Rule 7015)* (the "Motion") [Adv. Proc. ECF No. 189] and *Memorandum of Law in Support of Plaintiffs' Motion* (the "Memo of Law") [Adv. Proc. ECF No. 190].  The Motion requests that the Court grant leave to file a second amended and supplemental complaint to add a claim for treble damages and a demand for a jury trial.

## **BACKGROUND**

The history of the Debtors' bankruptcy case and this five-year-old adversary proceeding has been previously set forth in prior decisions, familiarity with which is assumed. *See, e.g.*, *Fjord v. AMR Corp. (In re AMR Corp.)*, 506 B.R. 368, 373–76 (Bankr. S.D.N.Y. 2014) ("*Fjord I*"); *Fjord v. AMR Corp. (In re AMR Corp.)*, 527 B.R. 874, 878–80 (Bankr. S.D.N.Y. 2015) ("*Fjord II*"). But to understand the Court's decision today on the Motion, we must revisit some of that history, including previous iterations of the complaint.

In August 2013, Plaintiffs filed this adversary proceeding against US Airways, AMR Corporation, and American Airlines, seeking to enjoin the entities' proposed merger that formed the basis of the Debtors' plan of reorganization. Plaintiffs claimed the proposed merger would violate Section 7 of the Clayton Antitrust Act. Subsequent to the filing of this case, the United States Department of Justice filed its own antitrust suit against the merger in August 2013—an action that was settled in November 2013. Plaintiffs' request for a temporary restraining order to block the merger was subsequently denied, *see Fjord v. AMR Corp. (In re AMR Corp.)*, 502 B.R. 23 (Bankr. S.D.N.Y. 2013), and the merger went forward at the end of 2013.

In early 2014, Plaintiffs for the first time moved to amend their complaint by adding new factual allegations, a claim for damages, a demand for a jury trial, and modifications to the declaratory relief sought. *See* Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages Claim (the "First Motion") [Adv. Proc. ECF No. 91]. The Court granted Plaintiffs' requests to add new factual declarations and modify the request for declaratory relief but denied Plaintiffs' claim for damages and demand for a jury trial. *See Fjord I*, 506 B.R. 368. Plaintiffs subsequently filed an amended complaint consistent with the Court's ruling (the "April

2014 Complaint") [Adv. Proc. ECF No. 103]. The April 2014 Complaint remains the operative complaint in this case.

Plaintiffs subsequently sought to further amend the April 2014 Complaint. *See* Plaintiffs' Motion for Leave to File a Second Amended Complaint (the "Second Motion") [Adv. Proc. ECF No. 105]. The Court denied the motion without prejudice, criticizing it as mere "boilerplate without any analysis." *See* May 16, 2014 Hr'g Tr. at 15:13 [Adv. Proc. ECF No. 107]. This prompted Plaintiffs to file a revised motion (the "Amended Second Motion") that proposed an amended complaint with 160 new allegations, a claim for treble damages, and a jury demand (the "June 2014 Complaint") [Adv. Proc. ECF No. 106-1, Ex. A]. The Court ultimately denied the Amended Second Motion in its entirety, concluding that the June 2014 Complaint "[did] not plausibly define a relevant market for the alleged antitrust violation and personal harm to the majority of the Plaintiffs" and that "Plaintiffs lack antitrust standing to the extent they seek damages as travel agents—rather than consumers—because they are not efficient enforcers for the alleged antitrust violations." *Fjord II*, 527 B.R. at 883.

In August 2015, Plaintiffs again moved to amend their complaint. *See* Plaintiffs' Motion for Leave to File Second Amended and Supplemental Complaint to Add Damages Claim and for Jury Trial (the "Fourth Motion") [Adv. Proc. ECF No. 118].[1] This iteration of the complaint sought to add claims under Sections 1 and 3 of the Sherman Act (the "August 2015 Complaint") [Adv. Proc. ECF No. 118-1, Ex. A]. At Plaintiffs' request, the Court withheld a decision on the Fourth Motion, as Plaintiffs sought to have this case transferred to the Multidistrict Litigation Panel overseeing dozens of other lawsuits filed around the country regarding collusion and price

---

[1]    For the avoidance of doubt, Plaintiffs made four motions to amend before the current Motion: the First Motion, the Second Motion, the Amended Second Motion, and the Fourth Motion. As explained above, the Court only ruled on the first three of these motions.

3

fixing by airlines, including American. *See* Memorandum Endorsed Order dated Oct. 27, 2015
[Adv. Proc. ECF No. 123]; *see also* Sept. 9, 2015 Hr'g Tr. at 5:14–6:3 [Adv. Proc. ECF No.
121]. However, Plaintiffs' motion to transfer the action was ultimately denied by the MDL
Panel in February 2016. *See In re Domestic Airline Travel Antitrust Litig.*, MDL No. 2656, ECF
No. 304 (Order Denying Transfer). While the Court requested that the parties establish a
briefing schedule on the Fourth Motion, *see* Apr. 4, 2016 Hr'g Tr. at 13:6–10 [Adv. Proc. ECF
No. 126], Plaintiffs ultimately chose "not [to] proceed with the pending motion to amend their
complaint" and instead decided to "proceed on the basis of [the April 2014 Complaint]." Decl.
of Robin L. Kuntz, Ex. A (Sept. 7, 2016 Joint Ltr. to Court) at 1 [Adv. Proc. ECF No. 202-1]; *see
also* Dec. 18, 2018 Hr'g Tr. at 11:2–3 (Court stating that it "remember[ed] there was another
[motion for leave to amend the complaint] teed up, and then that was taken off the table, saying
[that the Court did not] have to address it") [Adv. Proc. ECF No. 200].

        In February 2017, the parties notified the Court of their proposed schedule for completion
of pretrial matters and a trial date. *See* Memorandum Endorsed Order dated Feb. 1, 2017 [Adv.
Proc. ECF No. 127]. Mindful of the four prior motions to amend, the Court at a hearing that
month repeatedly stressed the need for clarity as to where trial would eventually take place and
whether it would include a jury. *See* Feb. 8, 2017 Hr'g Tr. at 15:11–12 ("Is this jury, non-jury,
what is contemplated here?"), 15:18–22 ("But what's pretty clear from the jurisprudence is that
if everyone is saying well we want to have it here because you all consent to having here in the
bankruptcy court it's pretty clear that that consent should be very clear on the record."), 16:1–2
("I want to make sure any such consent here is reflected in a very clear, unambiguous, and
written way."), 18:11–14 ("[A]t the risk of beating a dead horse I think it's appropriate to have
something filed in the court that's written that reflects that so that that issue is forever put to

bed.") [Adv. Proc. ECF No. 130]. In response to the Court's concerns, the parties appeared to

agree that the case would proceed before this Court without a jury. *See id.* at 16:18–22 ("We did

go through this process several times in this case, and I believe the record is very clear in written

submissions and the hearing, that the parties have agreed to proceed before Your Honor for this

trial and that it would be a non-jury bench trial . . . ."), 17:2–5 ("On the issue of trying it before

Your Honor that did come up previously and it is on the record that we're prepared to do that and

I think [Defendants are] quite right about that."), 18:16–17 (counsel for both Plaintiffs and

Defendants agreeing to submit a written consent to trial before the bankruptcy court).

Consistent with the Court's instructions at that hearing, the parties subsequently filed a

written notice of consent to have a bench trial before this Court, which explicitly stipulated that

"a United States Bankruptcy Judge [would] conduct all proceedings in this case including trial,

the entry of final judgment, and all post-trial proceedings." Notice, Consent, and Reference of a

Civil Action to the Bankruptcy Court [Adv. Proc. ECF No. 129]. On the same day, the Court

approved the parties' proposed scheduling order that provided for the close of fact discovery on

March 15, 2017, deadlines for expert discovery, and deadlines for summary judgment briefing.

*See* Interim Scheduling Order dated Feb. 22, 2017 [Adv. Proc. ECF No. 128]. Shortly thereafter,

the Court approved a revised schedule for summary judgment briefing. *See* Memorandum

Endorsed Order dated May 1, 2017 [Adv. Proc. ECF No. 134].

The Court ultimately ruled on the parties' cross-motions for summary judgment in a

bench ruling delivered in August 2018 (the "Summary Judgment Decision") [Adv. Proc. ECF

No. 177]. At the conclusion of the bench ruling, the Court stated that it anticipated trial would

be scheduled sometime in the fall of 2018 and requested proposed dates from the parties. *See id.*

at 84:4–5. The Court did not hear from the parties until they sent a letter in November (the

"Letter") [Adv. Proc. ECF No. 178]. The Letter set forth a proposed pretrial schedule, but it also requested the Court's guidance on the admissibility of a supplemental expert report. *See id.* at 1. After denying Plaintiffs' request to admit such report, the Court entered an order on January 9, 2019 scheduling a weeklong trial to begin on March 11, 2019 (the "Trial Date Order") [Adv. Proc. ECF No. 188]. Four days later, Plaintiffs filed the Motion seeking to amend their complaint once again (the "January 2019 Complaint") [Adv. Proc. ECF No. 191-1]. The Court heard argument on the Motion on February 20, 2019.

## DISCUSSION

A party may amend its pleading as a matter of course within the time limits imposed by Rule 15(a)(1) of the Federal Rules of Civil Procedure. When a party seeks to amend its pleadings outside of the prescribed time frames, the opposing party must consent or the moving party must obtain leave of the court. *See* Fed. R. Civ. P. 15(a)(2) (incorporated in these proceedings by Fed. R. Bankr. P. 7015). Rule 15(a)(2) provides that "[t]he court should freely give leave [to amend the complaint] when justice so requires." *Id.*

While "summary disposition of all litigation, especially antitrust cases, is not favored and . . . amendments should be freely and liberally granted to the end that all cases are decided on their merits," *Food Basket, Inc. v. Albertson's, Inc.*, 383 F.2d 785, 788 (10th Cir. 1967), the decision to grant or deny a motion to amend nevertheless rests within the "sound judicial discretion of the trial court." *Adelphia Recovery Trust v. FPL Grp., Inc. (In re Adelphia Commc'ns Corp.)*, 452 B.R. 484, 489 (Bankr. S.D.N.Y. 2011). More specifically, a court may exercise its discretion to deny leave to amend a pleading where: (i) the movant has acted with undue delay, bad faith, or a dilatory motive; (ii) the movant has repeatedly failed to cure a deficient pleading; (iii) the amendment would unduly prejudice the opposing party; or (iv) the

6

amendment would be futile. *See, e.g.*, *Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503

B.R. 239, 340 (Bankr. S.D.N.Y. 2013) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Applying these standards here, the Court denies the Motion for four reasons.

First, the Motion is untimely. Case law in this Circuit is clear that motions for leave to

amend complaints are untimely when such motions are not made until after the close of

discovery, especially if made after summary judgment or on the eve of trial. *See, e.g.*, *Krumme*

*v. WestPoint Stevens, Inc.*, 143 F.3d 71, 88 (2d Cir. 1998) (affirming denial of motion to amend

that was filed after the close of discovery and the filing of a motion for summary judgment as

untimely and prejudicial), *cert. denied*, 525 U.S. 1041 (1998); *Zahra v. Town of Southold*, 48

F.3d 674, 686 (2d Cir. 1995) (affirming denial of leave to amend sought two-and-a-half years

after the filing of an action and three months before trial).

Moreover, the history of this case confirms undue delay by Plaintiffs. Long before the

Court was faced with this Motion, the Court commented on the slow pace of this case, in part

caused by Plaintiffs' numerous motions to amend their complaint. *See* Apr. 4, 2016 Hr'g Tr. at

10:17–21 ("I too grow weary of this case sitting here with not a whole lot happening. . . . [T]he

judges and courts in the federal system are—pretty uniformly like to move things with

appropriate speed, and this case is lagging behind."). Nearly three years have passed since the

Court made that statement. This case has continued to trudge along over the past several years,

and discovery has been closed for almost two years. But there is finally an end in sight, as

summary judgment has been decided and trial is scheduled to begin in less than a month. The

procedural posture of this case weighs heavily against granting the Motion.

Plaintiffs attempt to undermine this timing problem by arguing that there is no undue

delay because the January 2019 Complaint would have been futile if it were filed at any point

before the Summary Judgment Decision.  *See* Reply Memorandum in Support of Plaintiffs'

Motion at 4 (the "Reply") [Adv. Proc. ECF No. 204].  Plaintiffs' position also does not hold

water given the timeline of events.  The Summary Judgment Decision was issued in August

2018.  Plaintiffs did not even hint that they were considering moving to amend the complaint

until a conference on December 18, 2018 and ultimately did not file the Motion until nearly a

month later—five months after the Summary Judgment Decision had been issued.  Plaintiffs

offer no explanation for this delay.  But the Summary Judgment Decision did not somehow—

directly or indirectly—grant Plaintiffs the right or basis to add a damages claim.  Plaintiffs

specifically rely on the discussion in the Summary Judgment Decision of the alleged harm to

Plaintiffs and the antitrust market.  *See* Memo of Law at 3, 8; Reply at 3.  But that discussion

was in the context of antitrust standing, not a damages claim.  That is significant because, for

standing purposes, injunctive relief only requires an allegation that one plaintiff suffered antitrust

injury.  *See* Summary Judgment Decision at 39:9–10, 39:19 (concluding that "standing is not

necessary for all plaintiffs in injunctive cases" and that it was enough for "one plaintiff [to have]

standing").  The Summary Judgment Decision then concluded that at least some of the Plaintiffs

had established themselves as regular customers of domestic air travel.  *See id.* at 44:18–21.  Just

as the Summary Judgment Decision did not open the door to new discovery, *see* Order on

Plaintiffs' Motion for Reconsideration at 7 (the "Reconsideration Order") [Adv. Proc. ECF No.

199], the Court's ruling on antitrust standing likewise does not permit Plaintiffs to amend the

April 2014 Complaint on the eve of trial without satisfying the applicable legal requirements.

Notably, Plaintiffs cite no authority for their theory that the Summary Judgment Decision

somehow allows them yet another bite at this apple.

Second, the Motion is prejudicial to Defendants in light of its timing. "One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action." *H.L. Hayden Co. v. Siemens Med. Sys., Inc.*, 112 F.R.D. 417, 419 (S.D.N.Y. 1986); *see also State Farm Ins. Cos. V. Kop-Coat, Inc.*, 183 F. App'x 36, 37–38 (2d Cir. 2006) (affirming denial of motion for leave to amend where it was "submitted four years after commencement of this action, almost one year after the close of discovery, and five months after the district court's summary judgment ruling"). The proposed amendment would clearly delay the final disposition here. Trial is scheduled for next month, and a new damages claim would require a reopening of discovery on the new claim and likely the need for additional expert discovery. *See* Defendant American Airlines Group Inc.'s Opposition to Plaintiffs' Motion at 8 ("A trial on a damages claim would necessarily involve extensive factual and expert discovery from both parties (including from each of the 40 named plaintiffs in this case, whereas there were depositions allowed of only 6 such plaintiffs)[.]") (the "Opposition") [Adv Proc. ECF No. 201].

Since the Summary Judgment Decision, it has been clear that the next step for this case is trial. Indeed, the Court anticipated that trial would take place in early Fall 2018, but parties did not contact the Court with a proposed schedule until they sent the Letter in November. In early January—after ruling on a separate but similar attempt by Plaintiffs to add new expert evidence, *see* Order on Plaintiffs' Request to Supplement Dr. Lundgren's Expert Report [Adv. Proc. ECF No. 179]; Reconsideration Order—the Court ordered that trial will commence on March 11, 2019. The Court likewise entered the Agreed Upon Scheduling Order of Pretrial Deadlines in late January [Adv. Proc. ECF No. 196]. The law is clear that allowing an amendment at this

juncture in the case would be prejudicial to Defendants and would upend the process—a process designed to bring this case to a final disposition.

Third, Plaintiffs' Motion is undermined by the fact that they largely requested this exact same relief earlier in the case and it was denied. Plaintiffs' Amended Second Motion sought to add more than 160 allegations to the April 2014 Complaint, a request that the Court denied. *See generally Fjord II*, 527 B.R. 874; *see also* Order Denying Plaintiffs' Amended Second Motion. Plaintiffs now seek to add more than 160 new paragraphs, with all but three of these paragraphs being exact duplicates of allegations that Plaintiffs sought to add as part of the Amended Second Motion. *Compare* January 2019 Compl. *with* June 2014 Compl; *see also* Opposition at 18 (discussing redline of proposed new complaint with proposed new complaint of Amended Second Motion).[2] But nothing in the Summary Judgment Decision somehow overturned the Court's prior decision denying the Amended Second Motion and its rejection of the 160 allegations proposed in the June 2014 Complaint.[3] Moreover, the three new proposed paragraphs do little to help Plaintiffs. They rely solely on data that Plaintiffs have had at their disposal since 2017, which again underscores the fact that Plaintiffs acted with undue delay.

Fourth and finally, Plaintiffs unsuccessfully seek to characterize the current dispute as an attempt to take away their Seventh Amendment right to a jury. Plaintiffs' argument that they did not waive their right to a jury trial presupposes a fact not in evidence: that they have a right to a jury trial on the operative complaint, *i.e.* the April 2014 Complaint. As this Court already explained in ruling on Plaintiffs' First Motion back in March 2014, "actions for injunctive relief under Section 16 of the Clayton Act are equitable in nature and create no right to a trial by jury." *Fjord I*, 506 B.R. at 376. The April 2014 Complaint was brought "under Section 16 of the

---

[2]     This fact was confirmed at the hearing on this Motion but no transcript of that hearing is available.
[3]     Nor have Plaintiffs sought reconsideration of the Court's prior ruling on the Amended Second Motion.

Clayton Antitrust Act . . . for divestiture and an injunction prohibiting further violations of

Section 7 of the Clayton Act . . . arising from and out of the anticompetitive combination of the

defendants, and to prevent a threatened violation of Section 2(c) of the Clayton Antitrust Act[.]"

April 2014 Compl. at 1.  While it is true that "a claim for treble damages under Section 4 of the

Clayton Act falls within the ambit of the Seventh Amendment's right to a jury trial," *Fjord I*, 506

B.R. at 377, the Court has denied Plaintiffs' motions to amend the complaint to add such a claim.

*See id.* at 384–86; *Fjord II*, 527 B.R. at 890 ("Despite these repeated admonitions, the Plaintiffs

here again level allegations of general harm without connecting such harms to any named

plaintiff.").  Though they make yet another attempt to add such a claim through the current

Motion and the January 2019 Complaint, this attempt fails for the reasons set forth above.  As

such, their demand for a jury trial must also necessarily fail.[4]

      While the Court does not rely on waiver in reaching its conclusion on the Motion, a good

argument can be made that Plaintiffs here did waive their right to a jury.  Back in 2017, the Court

explicitly asked parties about the nature of this matter—including whether they contemplated it

as a "jury [or] non-jury" case.  Feb. 8, 2017 Hr'g Tr. at 15:11–12.  They agreed that the case

would proceed before this Court, and it was represented to the Court that it would be a non-jury

bench trial.  *See id.* at 16:18–22 ("We did go through this process several times in this case, and I

believe the record is very clear in written submissions and the hearing, that the parties have

agreed to proceed before Your Honor for this trial and that it would be a non-jury bench trial . . .

---

[4]    At the hearing on the Motion, Plaintiffs posited that the April 2014 Complaint nevertheless entitled them to
a jury trial because of the language included in their prayer for relief.  Specifically, the April 2014 Complaint notes
that "[i]f and when one or more of the plaintiffs experiences damages by reasoning of the lessening of competition,
plaintiffs will move to amend or supplement this complaint to request treble damages and a trial by jury."  April
2014 Compl. at 38.  The Court rejects Plaintiffs' argument to the extent they are arguing that they automatically
have a right to a jury trial (and a claim for treble damages) simply because they provided for such possibilities in a
reservation of rights.  Critically, Plaintiffs must still satisfy the underlying legal standards for a treble damages claim
and a jury trial right as well as the legal standard for a motion to amend in order to obtain such relief.  They have
done none of these things.

11

.").  While the Court expressed the need to "forever put [this issue] to bed," *id.* at 18:14, even though it was "at the risk of beating a dead horse," *id.* at 18:9, Plaintiffs now claim that they only waived their right to have the case tried by an Article III Judge—not their right to a jury trial. But as Plaintiffs are well aware, cases before a Bankruptcy Court are tried before the Judge, not a jury.

For the foregoing reasons, therefore, the Court denies Plaintiffs' Motion for leave to file the January 2019 Complaint.

IT IS SO ORDERED.

Dated:  New York, New York
        February 26, 2019

                                        */s/ Sean H. Lane*_____
                                        UNITED STATES BANKRUPTCY JUDGE

12

**UNITED STATES BANKRUPTCY COURT**                  **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re:                                     Chapter 11

AMR CORPORATION, *et al.*,              Case No. 11-15463 (SHL)

              Reorganized Debtors.           (Confirmed)

-------------------------------------------------------------x

CAROLYN FJORD, *et al.*,

                 Plaintiffs

            v.                              Adv. No. 13-01392 (SHL)

AMR CORPORATION, *et al.*,

                 Defendants.

-------------------------------------------------------------x

## <u>MEMORANDUM OF DECISION</u>

**A P P E A R A N C E S :**

**LATHAM & WATKINS**
*Counsel for Defendant Merged Entity American Airlines Group Inc.*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
By:     Daniel M. Wall, Esq.
        Sadik Huseny, Esq.

**ALIOTO LAW FIRM**
*Counsel for the Clayton Act Plaintiffs*
One Sansome Street, 35th Floor
San Francisco, CA 94104
By:     Joseph M. Alioto, Esq.
        Jamie L. Miller, Esq.

**MESSINA LAW FIRM, P.C.**
*Counsel for the Clayton Act Plaintiffs*
961 Holmdel Road
Holmdel, NJ 07733
By:     Gil D. Messina, Esq.

**NEDEAU LAW FIRM**
*Counsel for the Clayton Act Plaintiffs*
154 Baker Street
San Francisco, CA 94117
By:     Christopher A. Nedeau, Esq.

# TABLE OF CONTENTS

**BACKGROUND** .................................................................................................................. **2**

**I. PROCEDURAL HISTORY** ........................................................................................ **2**

    A.    The Chapter 11 Cases and the Proposed Merger ...................................... 2

    B.    The Filing of this Adversary Proceeding and the Department of Justice Lawsuit .... 3

    C.    Plaintiffs' Request for a Temporary Restraining Order ............................ 6

    D.    Confirmation and the Consummation of the Merger ................................. 7

    E.    Plaintiffs' Motions to Amend the Complaint ............................................ 7

    F.    The Plaintiffs' Expert Witness – Dr. Carl Lundgren ............................... 10

    G.    The Parties' Cross-Motions for Summary Judgment ............................... 12

    H.    Further Pretrial Procedure ........................................................................ 15

    I.    Trial and Related Filings .......................................................................... 17

**II. THE PRE-MERGER AIRLINE INDUSTRY** ........................................................ **19**

    A.    Deregulation and the Structural Dynamics of the Airline Industry ......... 19

    B.    External Shocks to the Airline Industry ................................................... 22

    C.    Mergers and Restructurings of Other Airline Carriers ........................... 22

    D.    Competitiveness of American and US Airways ....................................... 24

**III. THE PREDICTED BENEFITS OF THE PROPOSED MERGER ON THE
AIRLINE INDUSTRY** ................................................................................................ **25**

    A.    Strengthened Competitive Position for American and US Airways ......... 25

    B.    Pro-Competitive Benefits for Consumers ................................................ 26

    C.    Anticipated Impact on Competition in the Airline Industry Generally .... 27

**IV. THE POST-MERGER EFFECTS ON THE AIRLINE INDUSTRY** ..................... **28**

    A.    Expansion of Capacity and Impact on Prices .......................................... 28

    B.    Improvements in Infrastructure and Fleet Utilization ............................. 31

    C.    Continued Growth and Impact of Low-Cost Carriers .............................. 32

**V. THE PLAINTIFFS' CASE** ....................................................................................... **34**

    A.    Plaintiffs' Lay Witness Testimony .......................................................... 34

    B.    Plaintiffs' Expert Witness Testimony ...................................................... 38

i

VI.     **THE DEFENDANTS' CASE** ............................................................................ **39**

**DISCUSSION** ........................................................................................................ **42**

I.      **THE GOVERNING LEGAL FRAMEWORK** ................................. **42**

II.    **APPLICATION OF THE *BAKER HUGHES* STANDARD** ................... **46**

    A.    Relevant Market Definition and Plaintiffs' Standing ................ 46

    B.    Post-Merger Evidence ................................................................ 49

    C.    Plaintiffs' *Prima Facie* Case .................................................... 52

    D.    Defendants' Rebuttal Case ........................................................ 54

    E.    Plaintiffs' Additional Evidence of Anticompetitive Effects .................... 70

**CONCLUSION** .................................................................................................... **80**

ii

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are the merits of the First Amended Complaint (the "First Amended Complaint") [Adv. Proc. ECF No. 103] of the plaintiffs (the "Plaintiffs")[1] in the above-captioned adversary proceeding. The Plaintiffs allege that the merger (the "Merger") between AMR Corporation ("AMR") and US Airways Group, Inc. ("US Airways")—which ultimately formed American Airlines Group Inc. ("AAG" or the "Defendants")[2] —violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18 (the "Clayton Antitrust Act").[3] Accordingly, the Plaintiffs seek, among other things, a final judgment of divestiture to unwind the Merger as well as injunctive relief to enjoin any future mergers pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26. The Court held a trial on the Plaintiffs' Section 7 claim as it had been narrowed by the Court's prior rulings in the case, including the parties' summary judgment motions discussed in greater detail below. For the reasons set forth below, the Court denies the Plaintiffs' requested

---

[1]    The Plaintiffs in this adversary proceeding are: Carolyn Fjord, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, José M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, and Christine O. Whalen. *See* First Amended Complaint ¶ 9.

[2]    The Plaintiffs' initial complaint was filed against AMR, American Airlines, Inc., US Airways, and US Airways, Inc. that have since merged into the single entity, AAG. *See* Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act [Adv. Proc. ECF No. 1]. For purposes of consistency with the Court's prior rulings, the Court shall continue to refer to AAG as the "Defendants" rather than the "Defendant."

[3]    The preamble to the First Amended Complaint indicates that the Plaintiffs also filed this action to "prevent a threatened violation of Section 2(c) of the [Robinson-Patman Act], 15 U.S.C. § 13(c)," which prohibits false commissions or brokerage fees as a disguised form of price discrimination. First Amended Complaint at 2. As the Court previously granted the Defendants' motion for summary judgment with respect to the Plaintiffs' Section 2(c) claim, this claim is not the subject of this decision. *See* Aug. 29, 2018 Hr'g Tr. at 79:17–25 [Adv. Proc. ECF No. 177]; Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for Summary Judgment [Adv. Proc. ECF No. 176].

relief and grants judgment to the Defendants. The following constitutes the Court's findings of fact and conclusions of law after trial, including relevant procedural background in the case.[4]

## BACKGROUND

## I.  PROCEDURAL HISTORY

### A.  The Chapter 11 Cases and the Proposed Merger

In late November 2011, AMR and certain of its affiliates and subsidiaries (collectively, the "Debtors") filed a voluntary petition for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of New York. *See* Voluntary Petition [Case No. 11-15463, ECF No. 1]; Plaintiffs Carolyn Fjord, et. al.'s and Defendant American Airlines Group Inc.'s Stipulation of Undisputed Facts ¶ 7 [Adv. Proc. ECF No. 214-1] (the "Undisputed Facts"). The Debtors initially contemplated reorganizing in Chapter 11 as a standalone entity. *See In re AMR Corp., et al.,* 477 B.R. 384, 417 (Bankr. S.D.N.Y. 2012) ("*AMR I*") (holding that "American's Business Plan is a reasonable stand-alone business strategy to serve as the basis for American's Section 1113 Motion"). Ultimately, the Debtors—with the support of the Official Committee of Unsecured Creditors—pivoted to a reorganization predicated upon a merger between AMR and US Airways that would ultimately result in the combined entity, AAG, which would continue to operate under the "American Airlines" name. *See In re AMR Corp., et al.*, 490 B.R. 158, 160

---

[4]     Defendants sought to seal certain witness statements and later, certain portions of the witness statement of Janusz A. Ordover concerning data with respect to fares, ticketing data, pricing information and pricing trends. *See* Notice of Defendant American Airlines Group Inc.'s Motion for Entry of Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Provisionally Under Seal in Connection with Defendant American Airlines Group Inc.'s Witness Statements [Adv. Proc. ECF No. 246]; Defendant American Airlines Group Inc.'s Motion for Entry of Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Under Seal in Connection with the Witness Statement of Janusz A. Ordover [Adv. Proc. ECF No. 261]. In response to the Defendants' requests, the Court entered an order sealing portions of Janusz A. Ordover's witness statement. *See* Order Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information Under Seal in Connection with the Witness Statement of Janusz A. Ordover [Adv. Proc. ECF No. 266] (the "Ordover Sealing Order"). Nothing in this decision implicates the information set forth in the Ordover Sealing Order. Coupled with the conduct of trial and the public filing of the trial transcripts, the Court concludes that there is nothing in this decision that requires sealing. *See* Order Designating Official Real-Time Trial Transcripts [Adv. Proc. ECF No. 282].

2

(Bankr. S.D.N.Y. 2013) ("*AMR II*") (describing the then-proposed merger between AMR and US Airways that would establish the "American Airlines Group Inc.").  Prior to the Merger, US Airways was a Delaware corporation and holding company whose primary business was the operation of a network of air carriers through its subsidiaries that included, among others, US Airways Inc.  *See* Undisputed Facts ¶¶ 5–6.  On February 13, 2013, the Debtors entered into an agreement and plan of merger with US Airways which the Court approved on May 10, 2013. *See* Order Authorizing and Approving (I) Merger Agreement Among AMR Corporation, AMR Merger Sub, Inc., and US Airways Group, Inc., (II) Debtors' Execution of and Performance Under Merger Agreement, (III) Certain Employee Compensation and Benefit Arrangements, (IV) Termination Fees, and (V) Related Relief [Case No. 11-15463, ECF No. 8096].  Shortly thereafter, on June 5, 2013, the Debtors filed the Second Amended Joint Chapter 11 Plan, which was predicated upon the Merger.  *See* Second Amended Joint Chapter 11 Plan [Case No. 11-15463, ECF No. 8590].

### B. The Filing of this Adversary Proceeding and the Department of Justice Lawsuit

The Plaintiffs commenced this adversary proceeding in the Debtors' Chapter 11 cases in August 2013.  They alleged that the proposed Merger between AMR and US Airways would violate Section 7 of the Clayton Antitrust Act, as its "effect . . . may be substantially to lessen competition, or to tend to create a monopoly in the transportation of airline passengers in the United States."  Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act ¶ 166 [Adv. Proc. ECF No. 1] (the "Initial Complaint"); *see also id*. at ¶¶ 1–5. Accordingly, the Plaintiffs sought preliminary and permanent injunctive relief to enjoin the Debtors from consummating the Merger and/or requiring divestiture as well as the Plaintiffs'

3

recovery of legal and reasonable attorneys' fees pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.[5]  *Id.* at 25.

Shortly after the commencement of the Plaintiffs' adversary proceeding, the United States Department of Justice (the "DOJ"), joined by several states (together with the DOJ, the "DOJ Plaintiffs"), filed a complaint against AMR and US Airways in the U.S. District Court for the District of Columbia seeking to enjoin the Merger (the "DOJ Proceeding").  *See* Complaint, United States, et al. v. US Airways Grp., Inc., et al.*,* No. 13-CV-01236 (D.D.C. Aug. 13, 2013), ECF No. 1 (the "DOJ Complaint"); Undisputed Facts ¶ 9.  Alleging that the Merger would violate Section 7 of the Clayton Antitrust Act, the DOJ Plaintiffs asserted that the effect of the Merger would "likely . . . be to lessen competition substantially, or tend to create a monopoly, in interstate trade and commerce in the relevant markets" which were defined to be "city pair[s]," comprised of a "flight's departure and arrival cities."  DOJ Complaint ¶¶ 26, 28, 95.  The DOJ Plaintiffs asserted that the Merger, among other things, would result in a substantial dampening of competition among network airlines in these city pairs, thereby leading to an increase in prices, a reduction in output, and a lessening of service.  *See id.* ¶ 96.  Such predicted effects were argued to be most pronounced at Ronald Reagan Washington National Airport due to its requirement of "slots for takeoffs and landings" that would ultimately restrict new entry.  *Id.* ¶¶ 30–31; *see also id.* ¶¶ 10, 84–86, 96.

The DOJ Plaintiffs utilized the Herfindahl-Hirschman Index ("HHI") as a measurement for market concentration, which is generally calculated as the sum of the squares of market

---

[5]     Both the Plaintiffs and the Defendants agreed that the Court has jurisdiction over these matters, that this proceeding is a "core proceeding" under 28 U.S.C. § 157(b)(2), and that venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  *See* Initial Complaint ¶¶ 6–8; Defendant US Airways' Answer to Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act ¶¶ 6–8 [Adv. Proc. ECF No. 32]; Answer of Defendants AMR Corporation and American Airlines to Complaint for Injunctive Relief Against Violation of Section 7 of the Clayton Antitrust Act ¶¶ 6–8 [Adv. Proc. ECF No. 40]; *see also* First Amended Complaint ¶¶ 6–8 (stating the same).

shares of each identified market participant.  *See* U.S. DEP'T OF JUSTICE AND FED. TRADE

COMM'N, HORIZONTAL MERGER GUIDELINES § 5.3 (2010) (the "Horizontal Merger Guidelines")

(summarizing the methodology to calculate HHI figures).  They found more than 1,000 domestic

city-pairs where the estimated post-Merger HHI concentration levels and level increases would

be deemed "presumptively illegal" under the DOJ's Horizontal Merger Guidelines.[6]  *See* DOJ

Complaint ¶ 38, App. A (listing more than 1,000 "presumptively illegal" city-pairs); *see also*

Horizontal Merger Guidelines § 5.3 (setting forth policy guidelines regarding a presumption of

enhancement of market power in highly concentrated markets).  In early September 2013, the

DOJ Plaintiffs amended the DOJ Complaint to include an additional plaintiff, the state of

Michigan, as well as an updated list of 1,008 city-pairs and the corresponding HHI calculations

(the "DOJ City-Pairs") that the DOJ deemed to be presumptively illegal under the Horizontal

Merger Guidelines.  *See* Amended Complaint, United States, et al. v. US Airways Grp., Inc., et

al., No. 13-CV-01236 (D.D.C. Aug. 13, 2013), ECF No. 73.

Following weeks of negotiations and discussions, AMR and US Airways entered into a

settlement agreement with the DOJ in mid-November 2013 (the "DOJ Settlement") that offered a

complete and final resolution of the DOJ Action.  *See* Undisputed Facts ¶ 10.  Later that month,

the Court approved the DOJ Settlement.  *See* Order Pursuant to Bankruptcy Rule 9019(a)

Approving Settlement Between Debtors, US Airways, Inc., and United States Department of

Justice, et al. [Case No. 11-15463, ECF No. 11321]; *Fjord v. AMR Corp. (In re AMR Corp.)*, 502

B.R. 23, 29 (Bankr. S.D.N.Y. 2013) ("*Fjord I*").  The DOJ Settlement provided for, among other

things, a divestiture of certain airport slots, gates, and related ground facilities to certain of

---

[6]    The Horizontal Merger Guidelines do not use the phrase "presumptively illegal."  Rather, they state that
post-merger HHI concentration levels in excess of 2,500 generally result in a market classification of "highly
concentrated" and post-merger increases in HHI levels in excess of 200 are "presumed to . . . likely . . . enhance
market power."  Horizontal Merger Guidelines § 5.3.

5

AAG's competitors, including JetBlue and Southwest. *See* Motion of Debtors for Entry of Order Pursuant to Bankruptcy Rule 9019(a) Approving Settlement Between Debtors, US Airways Group, Inc., and United States Department of Justice, et al. ¶¶ 2, 16 [Case No. 11-15463, ECF No. 10610] (the "DOJ Settlement Motion"). The DOJ Settlement also incorporated a supplemental stipulated order under which AAG committed for a specified period of time to maintain certain hubs and to provide daily scheduled service from its hubs to certain airports that had such service at the time the DOJ Action commenced. *See id.* ¶¶ 2, 17. In late April 2014, the U.S. District Court for the District of Columbia, where the DOJ Action was pending, entered an order of final judgment approving the DOJ Settlement and concluding the DOJ Action. *See* Final Judgment, United States, et al. v. US Airways Grp., Inc., et al., No. 13-CV-01236 (D.D.C. April 25, 2014), ECF No. 170.

### C. Plaintiffs' Request for a Temporary Restraining Order

Prior to this Court's approval of AMR's entry into the DOJ Settlement—in late November 2013—the Plaintiffs filed a motion for a temporary restraining order to block the Merger. *See* Plaintiffs' Cross-Motion for Temporary Restraining Order [Adv. Proc. ECF No. 57] (the "TRO Motion"). The TRO Motion was filed in response to the DOJ Settlement Motion and the Debtors' related motion requesting that the Court permit the Merger to be consummated without delay, notwithstanding the pendency of this adversary proceeding. *See* TRO Motion at 14 (describing the responsive nature of the TRO Motion); *see also* Motion of Debtors for Entry of Order Regarding Consummation of Merger Pursuant to Scheduling Order [Adv. Proc. ECF No. 47].

At the end of that month, the Court denied the Plaintiffs' TRO Motion and granted the DOJ Settlement Motion as well as the Debtors' related motion seeking consummation of the

Merger. *See Fjord I,* 502 B.R. at 29. With respect to the TRO Motion, the Court concluded that

the Plaintiffs failed to establish that the Merger would cause irreparable harm to each of the

Plaintiffs on an individual basis, failed to demonstrate a likelihood of success on the merits of the

Plaintiffs' underlying antitrust claims, and failed to show that the balance of the hardships and

public interest weighed in their favor. *See id.* at 37–42.

### D. Confirmation and the Consummation of the Merger

The Court confirmed the Debtors' Fourth Amended Joint Chapter 11 Plan, which paved

the way for the Merger to move forward. *See* Findings of Fact, Conclusions of Law and Order

Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules

of Bankruptcy Procedure Confirming Debtors' Fourth Amended Joint Chapter 11 Plan [Case No.

11-15463, ECF No. 10367]. Accordingly, on December 9, 2013, AMR and US Airways

consummated the Merger which resulted in the formation of AAG. *See* Undisputed Facts ¶ 11.

Today, AAG is a publicly-traded airline holding company headquartered in Fort Worth, Texas

and parent company to—among others—American Airlines, Inc. ("American"), which is a

wholly-owned subsidiary. *See id.* ¶¶ 1–3. American continues to operate airline carriers and

provides domestic and international transportation services for passengers. *See id.* ¶ 4.

### E. Plaintiffs' Motions to Amend the Complaint

In January 2014, the Plaintiffs filed the first of several motions to amend their Initial

Complaint. *See* Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages

Claim [Adv. Proc. ECF No. 91]. Specifically, the Plaintiffs sought to amend the Initial

Complaint to include, among other things, (1) new factual allegations; (2) a claim for treble

damages under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15(a); (3) a demand for a jury

trial; (4) modifications to the declaratory relief sought under Section 16 of the Clayton Antitrust

Act, 15 U.S.C. § 26; and (5) a request to require AMR and US Airways to hold their assets

separate during the pendency of the case, which was subsequently withdrawn.  *See id.* at Ex. A.

The Court granted in part and denied in part the Plaintiffs' first motion to amend, permitting the

inclusion of new factual allegations as well as a revision of the proposed divestiture relief, but

denying the Plaintiffs' request for treble damages and a jury trial.  *See Fjord v. AMR Corp. (In re*

*AMR Corp.)*, 506 B.R. 368, 373 (Bankr. S.D.N.Y. 2014) ("*Fjord II*").  In accordance with the

Court's ruling, the Plaintiffs filed the First Amended Complaint which remains the operative

complaint in this case.

    Some months later, the Plaintiffs filed a second motion to amend and supplement the

First Amended Complaint, seeking to once more to include a claim for treble damages and a

demand for a jury trial.  *See* Plaintiffs' Motion for Leave to File a Second Amended and

Supplemental Complaint and to Add a Damages Claim and Demand for Jury Trial, Ex. A [Adv.

Proc. ECF No. 105].  The Court denied the second motion to amend without prejudice,

highlighting that the motion was "all boilerplate" and devoid of any analysis.  Hr'g Tr. at 15:13,

19–20 (May 16, 2014) [Adv. Proc. ECF No. 107]; *see also id.* at 19:5 (emphasizing that the

motion was "just boilerplate").  In response to the Court's ruling, the Plaintiffs filed a third

motion to amend to address the Court's concerns.  *See* Plaintiffs' Amended Motion for Leave to

File Second Amended and Supplemental Complaint and to Add Damages Claim and Demand for

Jury Trial (Federal Rule of Civil Procedure 15 and Bankruptcy Rule 7015), Ex. A [Adv. Proc.

ECF No. 106].  The Court ultimately denied the third motion to amend in its entirety.  *See Fjord*

*v. AMR Corp. (In re AMR Corp.)*, 527 B.R. 874, 878 (Bankr. S.D.N.Y. 2015) ("*Fjord III*").

    Several months later, the Plaintiffs filed a fourth motion to amend and supplement the

First Amended Complaint, seeking once again to include a claim for treble damages and a

demand for a jury trial and add claims under Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 3. *See* Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint, Add a Damages Claim and Demand for Jury Trial [Adv. Proc. ECF No. 118]. At Plaintiffs' request, the Court withheld ruling on the Plaintiffs' fourth motion to amend pending the outcome of the Plaintiffs' request to transfer and consolidate this case with the multidistrict airline price-fixing and collusion lawsuits then-pending before the U.S. Judicial Panel on Multidistrict Litigation (the "MDL Panel"). *See* Memorandum Endorsed Order, dated Oct. 27, 2015 [Adv. Proc. ECF No. 123]; *see also* Hr'g Tr. at 5:14–6:7 (Sept. 9, 2015) [Adv. Proc. ECF No. 121]. The Plaintiffs' request to transfer this action to the MDL Panel, however, was ultimately denied. *See* Order Denying Transfer, In re Domestic Airline Travel Antitrust Litig. [MDL No. 2656, ECF No. 301].

Following the MDL Panel's denial of the Plaintiffs' request to transfer, the Plaintiffs notified the Court that they will no longer be "proceed[ing] with the pending motion to amend" but rather, will now be "proceed[ing] on the basis of [the First Amended Complaint]." Joint Letter to Chambers, dated Sept. 7, 2016 [Adv. Proc. ECF No. 202-1]. Given the Plaintiffs' prior efforts to seek a jury trial, the Court then inquired as to the parties' intention regarding trial. *See, e.g.,* Hr'g Tr. at 15:11–12, 15:18–22, 16:1–2, 16:18–22 (Feb. 8, 2017) [Adv. Proc. ECF No. 130].[7] In response, the parties filed a written notice of consent, agreeing to a bench trial before this Court. *See* Notice, Consent, and Reference of a Civil Action to the Bankruptcy Court [Adv. Proc. ECF No. 129] (the "Consent Notice"); Hr'g Tr. at 16:18–22 (Feb. 8, 2017) (stating that the parties have agreed to a non-jury bench trial before this Court); *id.* at 18:9–17 (stating that the parties will submit a written consent to trial before this Court); *see also Wellness Int'l Network*

---

[7]     The Court's inquiry was driven in part to address any concerns regarding this Court's jurisdiction in light of *Stern v. Marshall,* 564 U.S. 462 (2011).

9

*Ltd. v. Sharif*, 135 S. Ct. 1932, 1949 (2015) (holding that Article III of the Constitution "permits bankruptcy courts to decide *Stern* claims submitted to them by consent"). Specifically, the parties explicitly stipulated that "a United States Bankruptcy Judge [will] conduct all proceedings in this case including trial, the entry of final judgment, and all post-trial proceedings." Consent Notice at 1.

### F. The Plaintiffs' Expert Witness – Dr. Carl Lundgren

The parties completed fact discovery and expert discovery consistent with the stipulated case scheduling order. *See* Interim Scheduling Order at 1 [Adv. Proc. ECF No. 128]. Notably, the Plaintiffs submitted only one expert in support of their case, Dr. Carl Lundgren. *See* Expert Report of Carl Lundgren for the Alioto Law Firm in the Matter of the Merger of American Airlines and US Airways [Adv. Proc. ECF No. 141-1] (the "Lundgren Report"); Declaration of Sadik Huseny in Support of Defendant American Airlines Group Inc.'s Motion for Summary Judgment ¶ 4 [Adv. Proc. ECF No. 141]. The Plaintiffs submitted the Lundgren Report notwithstanding their prior position that an expert opinion was not necessary as part of their evidentiary case. *See* Hr'g Tr. at 80:20–22 (Feb. 13, 2014) [Adv. Proc. No. 100] (stating that "[the Plaintiffs have] taken the position, Your Honor, that we don't need any experts . . . the [D]efendants do"); *see also* Letter and Proposed Agreed Pre-Trial Scheduling at 2 and n.2 [Adv. Proc. ECF No. 178] (noting that the Plaintiffs' reliance upon the Supreme Court's prior cases, which they argued "dictate that [the Merger] has substantially lessened competition" is "why [P]laintiffs' counsel initially stated [P]laintiffs would not require an expert").

Dr. Lundgren was tasked by Plaintiffs with: (1) reviewing and updating the DOJ's post-Merger HHI figures for the 1,008 presumptively illegal DOJ City-Pairs, and (2) calculating the post-Merger HHI figures for the then-most recent four quarters of data from October 1, 2015

through September 30, 2016.  *See* Lundgren Report at 4.  As a preliminary matter, Dr. Lundgren

began his analysis with an attempt to replicate the DOJ's HHI figures for the 1,008

presumptively illegal DOJ City-Pairs in order to "[ensure] that no grievous errors are introduced

into the HHI calculations."  *Id.*  Dr. Lundgren noted that, although there was a strong correlation

between his HHI calculations and the DOJ's calculations set forth in the DOJ Complaint, "most

[of his] HHI calculation[s] for the 1,008 city-pair markets showed deviations."  *Id.* at 5.  He

attributed such deviations to the DOJ's cursory description of its HHI calculation methodologies

and the U.S. Department of Transportation's April 2014 revision of the 2012 DB1B dataset[8] that

the DOJ used to perform its calculations.  *See generally id.* at 5–13.  Notwithstanding the

deviations, Dr. Lundgren believed that the 98% correlation between his figures and the DOJ's

suggested "reasonable similarit[ies]" in their computations such that "[i]n terms of antitrust

implications, the conclusions that can be derived from these two sets of HHI calculations are

basically the same."  *Id.* at 14.  Accordingly, using the same 2012 dataset, Dr. Lundgren

calculated that 985 of the 1,008 city-pairs the DOJ originally identified would have

presumptively illegal post-Merger HHI concentration levels and level increases under the

Horizontal Merger Guidelines.  *See id.*; *see also id.* at 15 (stating that post-merger HHI

concentration levels in excess of 2,500 and post-merger increases in HHI levels in excess of 200,

thresholds set forth under the Horizontal Merger Guidelines, would render a merger

"presumptively illegal").

---

[8]    The U.S. Department of Transportation's Origin and Destination Survey Data, more commonly referred to
as DB1B, is a "public database published by the U.S. Department of Transportation, Bureau of Transportation
Statistics" that served as the "data source for all . . . experts in this case."  Declaration of Dr. Carl Lundgren in
Support of Plaintiffs' Cross-Motion for Summary Judgment ¶ 16 [Adv. Proc. ECF No. 149-4] (the "2017 Lundgren
Declaration").

Utilizing his replication methodology, Dr. Lundgren then calculated the post-Merger HHI figures. *See id.* at 14–16. Dr. Lundgren found that of the 1,008 city-pairs the DOJ had initially identified (for the period of October 2015 through September 2016) 785 of these city-pairs would still be deemed to have presumptively illegal post-Merger HHI concentration levels and level increases under the Horizontal Merger Guidelines. *See id.* at 15–16.

### G. The Parties' Cross-Motions for Summary Judgment

After the close of discovery, the Defendants sought summary judgment on the Plaintiffs' First Amended Complaint. *See* Defendant American Airlines Group Inc.'s Notice of Motion for Summary Judgment [Adv. Proc. ECF No. 139]; Memorandum of Law in Support of Defendant American Airlines Group Inc.'s Motion for Summary Judgment [Adv. Proc. ECF No. 140] ("Defendants' Summary Judgment Motion"). The Defendants argued that summary judgment on the Section 7 claim was appropriate because Plaintiffs failed to: (1) conduct a competitive effects analysis of the Merger under the applicable legal framework; (2) establish a defined and cognizable relevant market; (3) offer evidence of any adverse competitive effects of the Merger; and (4) establish antitrust standing in the form of personal injury, real or threatened, from the Merger. *See* Defendants' Summary Judgment Motion at 2–3, 11–36.

The Plaintiffs cross-moved for summary judgment. *See* Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment [Adv. Proc. ECF No. 149]; Memorandum of Law in Support of Plaintiffs' Cross-Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment [Adv. Proc. ECF No. 149-1] ("Plaintiffs' Cross-Motion"). The Plaintiffs argued, among other things, that they had: (1) established an irrebuttable presumption that the Merger violates Section 7 of the Clayton Antitrust Act; (2) properly alleged two alternative geographic market definitions (while noting

12

that the Defendants have already conceded that city-pairs are a relevant market); and (3)

established standing to bring this action. *See* Plaintiffs' Cross-Motion at 5–12, 34–55; *see also*

Plaintiffs' Declarations in Support of Cross-Motion [Adv. Proc. ECF Nos. 149-5–149-25]

(providing 20 declarations from individual Plaintiffs outlining their flight histories and future

travel plans in support of their antitrust standing). Additionally, the Plaintiffs further argued that

circumstantial evidence supported the Plaintiffs' allegation that the severance payment to Mr.

Thomas Horton, the former Chief Executive Officer of AMR, constituted a form of commercial

bribery in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). *See*

Plaintiffs' Cross-Motion at 55–60.

In support of their request for summary judgment, Plaintiffs submitted an additional

declaration from Dr. Carl Lundgren to "identify . . . city-pair markets from the list of 1,008 city-

pairs initially identified by the [DOJ] to be presumptively illegal after the [Merger] where

average airfares have increased since the [Merger]." 2017 Lundgren Declaration ¶ 2. Excluding

all HHI concentration levels and level increases, the 2017 Lundgren Declaration focused solely

on 723 city-pairs, a subset of the original 1,008 presumptively illegal city-pairs, which he argued

experienced an increase in average fares post-Merger. *See id.* ¶ 3. Consistent with the prior

analysis in the Lundgren Report, Dr. Lundgren examined the differences between the 2012

DB1B dataset and the fiscal year[9] 2016 DB1B dataset (the "FY 2016 Dataset"). *See id.* ¶¶ 10–

13, 15. Notably, Dr. Lundgren twice emphasized that his calculations and figures were

"presented without further analysis or conclusions based on statistical, econometric, or other

expert economic analysis." *Id.* ¶¶ 3, 16.

---

[9] For purposes of this decision, the term "fiscal year" refers to the beginning of the fourth quarter of the prior year through the third quarter of the current year. Accordingly, the dataset for fiscal year 2016 encompasses the four quarters of data beginning with fourth quarter of 2015 through the third quarter of 2016 (i.e., October 1, 2015– September 30, 2016). *See* 2017 Lundgren Declaration ¶ 10.

13

Ultimately, the Court denied the parties' cross-motions for summary judgment as to

Plaintiffs' Section 7 claim as domestic airline passengers. *See generally* Hr'g Tr. (Aug. 29,

2018) [Adv. Proc. ECF No. 177] (the "Summary Judgment Decision"). In making its

determination, the Court construed the Defendants' prior statements regarding city-pairs as a

judicial admission that city-pairs constituted the proper geographic market. *See id*. at 22:23–25

(construing Defendants' "prior statement about the City Pairs market as a judicial admission");

*id.* at 26:2–5 (concluding that Defendants' "judicial admission is sufficient for the purposes of

accepting City Pairs as the proper geographic market in this case"); *see also Fjord I*, 502 B.R. at

40 (noting, in this Court's prior ruling, that "the Defendants accept that city-pairs are the

properly defined market"). Utilizing a city-pairs framework as the relevant market, the Court

determined that the Plaintiffs made a sufficient showing of standing to survive a ruling on

summary judgment in their capacity as domestic airline customers. *See* Summary Judgment

Decision at 46:9–11. More specifically, the Court found that there remained "genuine disputed

issues of fact regarding the significance of [Plaintiffs'] concentration numbers, the competitive

structure of the industry overall, the import of various trends and consolidation service offers,

and the differences in competitive structure and barriers to entry among specific city pair

markets." *Id.* at 70:5–11. But the Court granted Defendants' summary judgment on Plaintiffs'

Section 7 claim to the extent it was based on Plaintiffs' roles as travel agents and/or arising out

of an alleged national market.[10] *See id.* at 80:1–7 (summarizing the Court's ruling); Order

Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying

Plaintiffs' Cross-Motion for Summary Judgment [Adv. Proc. ECF No. 176].

---

[10]   The Court also granted summary judgment to Defendants on Plaintiffs' claim under Section 2(c) of the
Robinson-Patman Act, 15 U.S.C. § 13(c). *See* Summary Judgment Decision at 79:17–25; Order Granting in Part
and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for
Summary Judgment [Adv. Proc. ECF No. 176].

14

In its Summary Judgment Decision, the Court expressed concerns regarding the minimal breadth of evidence the Plaintiffs submitted for the Court's consideration. *See, e.g.,* Summary Judgment Decision at 64:24–65:3 ("[I]n the face of the avalanche of evidence from Defendants, Plaintiffs have responded with what I would characterize [sic] minimal evidence beyond their original HHI data to buttress their case."); *id.* at 71:21 (noting, once again, the Plaintiffs' "minimal additional evidentiary support"). Specifically, the Court highlighted the Plaintiffs' lack of an expert opinion that offered any sort of analytical examination of the antitrust issues before the Court. *See id.* at 71:21–72:2 (noting that "Plaintiffs have not presented an expert opinion in support of a competitive effects analysis"). Nonetheless, the Court concluded that any determination concerning the sufficiency of the Plaintiffs' proffered evidence would be an issue reserved for trial. *See id.* 73:12–15 ("So while there are many questions about the [Plaintiffs'] analysis of their data and their case in general, summary judgment is not the stage at which the Court directly weighs the merits of the parties' evidence."); *id.* at 81:10–15 (stating that the "final weighing of all the evidence in this case, whatever . . . the scope, [will] be conducted at trail [sic]").

## H. Further Pretrial Procedure

After the Court's ruling on summary judgment, the Plaintiffs sought to introduce an updated and supplemental expert report by Dr. Lundgren (the "Lundgren Supplemental Report"). *See* Letter and Proposed Agreed Pre-Trial Scheduling at 1–6 [Adv. Proc. ECF No. 178]. The Plaintiffs explained that they wanted to offer a "causal effects" opinion on any anticompetitive ramifications of the Merger based on the most current data in order to show the Merger's impact on the relevant markets and to address the Court's expressed concerns regarding the lack of competitive effects analysis in the Plaintiffs' evidentiary case. *See id.* at 2–4. The Plaintiffs also argued that admission of the Lundgren Supplemental Report was appropriate given (1) the

15

developments in the airline industry since the Plaintiffs' initial complaint was filed and (2) the

newly available DB1B data from the U.S. Department of Transportation for the period of April

1, 2017 through March 31, 2018. *See id.* at 1–2. After objection by the Defendants, the Court

rejected the admission of the Lundgren Supplemental Report to the extent that it sought to

include a "new opinion regarding the competitive effects of the [M]erger" and requested that the

parties attempt to reach consensus on whether incorporation of the newly available data would

constitute a permissible supplement under Rule 26 of the Federal Rules of Civil Procedure.[11]

Order on Plaintiffs' Request to Supplement Dr. Lundgren's Expert Report at 4–7 [Adv. Proc.

ECF No. 179] (the "Exclusion Order"); *see also* Order Denying Plaintiffs' Motion for

Reconsideration [Adv. Proc. ECF No. 199] (the "Reconsideration Order") (denying Plaintiffs'

subsequent motion seeking permission for the Plaintiffs to serve the Lundgren Supplemental

Report or, in the alternative, for the Court to reconsider its ruling set forth in the Exclusion

Order). But the Court permitted the Lundgren Supplemental Report to the extent that it updated

the data relevant to the opinions that Dr. Lundgren had already provided in the case. *See*

Exclusion Order at 7 (denying Plaintiffs' request to admit the Lundgren Supplemental Report's

new opinions concerning the competitive impact of the Merger); *see also* Hr'g Tr. at 29:24–30:6

(Feb. 20, 2019) [Adv. Proc. ECF No.264] (noting that when the "expert issue came up and there

was a need for some rulings . . . [it was the Court's] understanding that there wasn't really a

debate about [Dr.] Lundgren updating his HHI calculations . . . for purposes of the Plaintiffs'

prima facie case").

---

[11] Following the Court's rulings on the Lundgren Supplemental Report, the Plaintiffs filed a fifth motion to amend, seeking for a fifth time to add a claim for treble damages under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15(a) and a demand for a jury trial, which was denied. *See Fjord v. AMR Corp. (In re AMR Corp.)*, 597 B.R. 486, 491–94 (Bankr. S.D.N.Y. 2019) (*"Fjord IV"*) (denying motion to amend on grounds that it was untimely, the relief sought would be prejudicial to the Defendants, and that the Plaintiffs had acted with undue delay).

## I. Trial and Related Filings

The parties filed a joint pretrial order setting forth, among other things, the parties' stipulations of undisputed facts, witness lists, the Plaintiffs' list of relevant city-pairs, and the parties' list of trial exhibits. *See* Joint Pretrial Order at 1–2 [Adv. Proc. ECF No. 214] (the "Joint Pretrial Order"). Subsequent to the entry of the Joint Pretrial Order, the parties filed an additional stipulation of undisputed facts. *See* Plaintiffs Carolyn Fjord, et al.'s and Defendant American Airlines Group Inc.'s Stipulation of Undisputed Facts [Adv. Proc. ECF No. 260] (highlighting certain city-pairs flown by Plaintiffs Carolyn Fjord, Don Freeland and Gail Kosach). In accordance with the Joint Pretrial Order, the parties filed the written direct examinations of the witnesses testifying at trial.[12] In addition to the live witnesses,[13] both parties submitted the deposition testimony of other witnesses.[14]

---

[12]    For purposes of this decision, the Court shall hereinafter refer to each respective witness' written direct examination as "[Witness] Dir. Ex."

The Plaintiffs filed written direct examinations for each of the following witnesses: Dr. Carl Lundgren, Jose Brito, Don Fry, Gabe Garavarian, Valarie Jolly, Lisa McCarthy, Bill Rubinsohn, Sondra Russell, June Stansbury, and Gary Talewsky. *See* Joint Pretrial Order at Ex. 3 [Adv. Proc. ECF No. 214-3]; Written Direct Examination of Dr. Carl Lundgren [Adv. Proc. ECF No. 236] (the "Lundgren Dir. Ex."); Written Direct Examination of Jose Brito [Adv. Proc. ECF No. 237] (the "Brito Dir. Ex."); Written Direct Examination of Don Fry [Adv. Proc. ECF No. 238] (the "Fry Dir. Ex."); Written Direct Examination of Gabe Garavarian [Adv. Proc. ECF No. 239] (the "Garavarian Dir. Ex."); Written Direct Examination of Valerie Jolly [Adv. Proc. ECF No. 240] (the "Jolly Dir. Ex."); Written Direct Examination of Lisa McCarthy [Adv. Proc. ECF No. 241] (the "McCarthy Dir. Ex."); Written Direct Examination of Bill Rubinsohn [Adv. Proc ECF No. 242] (the "Rubinsohn Dir. Ex."); Written Direct Examination of Sondra Russell [Adv. Proc. ECF No. 243] (the "Russell Dir. Ex."); Written Direct Examination of June Stansbury [Adv. Proc. ECF No. 244] (the "Stansbury Dir. Ex."); Written Direct Examination of Gary Talewsky [Adv. Proc. ECF No. 245] (the "Talewsky Dir. Ex.").

The Defendants filed written direct examinations for each of the following witnesses provisionally under seal: Heather Garboden, William Douglas Parker, Dennis W. Carlton, Daniel M. Kasper, and Janusz A. Ordover. *See* Witness Statement of Heather Garboden [Adv. Proc. ECF No. 249-1] (the "Garboden Dir. Ex."); Witness Statement of William Douglas Parker [Adv. Proc. ECF No. 249-2] (the "Parker Dir. Ex."); Witness Statement of Dennis W. Carlton [Adv. Proc. ECF No. 249-3] (the "Carlton Dir. Ex."); Witness Statement of Daniel M. Kasper [Adv. Proc. ECF No. 249-4] (the "Kasper Dir. Ex."); Witness Statement of Janusz A. Ordover [Adv. Proc. ECF No. 249-5] (the "Ordover Dir. Ex."). At trial, the Defendants presented a corrected version of Daniel Kasper's written statement which the Court ultimately accepted into evidence. *See* Mar. 14, 2019 Trial Tr. at 973:21–975:10, 980:4–14 [Adv. Proc. ECF No. 288]. Accordingly, for purposes of this decision, all references to "Kasper Dir. Ex." shall refer to the corrected version.

Both parties also filed a number of motions *in limine* and related oppositions to exclude

certain evidence and arguments at trial, including evidence and argument relating to prior

litigation as well as the testimony of witness Heather Garboden.[15]  The Court reserved ruling on

these motions *in limine* until rulings became appropriate and necessary at trial.  *See* Hr'g Tr. at

9:7–20 (Mar. 11, 2019) [Adv. Pro. ECF No. 276] (stating that, with respect to the motions *in*

*limine*, the Court will "deal with them as [they] go").  At trial, the Court denied Plaintiffs'

Motion *in Limine* No. 5, which sought to exclude the testimony of Heather Garboden on grounds

---

[13]  The Plaintiffs' witness list indicated that they intended to submit written direct testimony of non-testifying Plaintiffs, Brenda Davis, Carolyn Fjord, Don Freeland, Gail Kosach, and Deborah Pulfer, solely with respect to the matter of standing.  *See* Joint Pretrial Order at Ex. 3 [Adv. Proc. ECF No. 214-3].  Ultimately, Plaintiffs and Defendants submitted an additional statement of undisputed facts highlighting city-pairs flown by Plaintiffs Carolyn Fjord, Don Freeland and Gail Kosach.  *See* Hr'g Tr. at 30:10–32:24 (Mar. 6, 2019) [Adv. Proc. ECF No. 281] (noting that Plaintiffs and Defendants would submit a stipulation reflecting their agreement on the written direct testimony of non-testifying Plaintiffs as to standing); Plaintiffs Carolyn Fjord, et al.'s and Defendant American Airlines Group Inc.'s Stipulation of Undisputed Facts [Adv. Proc. ECF No. 260].

[14]   Plaintiffs submitted the deposition testimony of several other witnesses: Thomas Horton, Andrew Nocella, Virasb Vahidi, Beverly Goulet, Scott Kirby and Donald Casey.  *See* Joint Pretrial Order, Ex. 2.

     The Defendants submitted the depositions of Jerald Behrens, Derek DeCross, Thomas Horton, Scott Kirby, Michael Malaney, and Andrew Nocella.  *See* Joint Pretrial Order at Ex. 4 [Adv. Proc. ECF No. 214-4].

[15]   The Plaintiffs filed the following motions *in limine*: (1) Motion *in Limine* to Exclude Certain Evidence of Plaintiffs' Prior Litigation [Adv. Proc. ECF No. 223] ("Plaintiffs' Motion *in Limine* No. 1") to exclude certain evidence relating to the Plaintiffs' prior litigation which the Plaintiffs asserted were unrelated, irrelevant, and prejudicial; (2) Plaintiffs' Motion *in Limine* No. 2 to Exclude Deposition Testimony Designated by Defendants in U.S. v. US Airways [Adv. Proc. ECF No. 226] ("Plaintiffs' Motion *in Limine* No. 2") to exclude certain of the Defendants' designations of deposition testimony in *United States v. U.S. Airways Grp., Inc., et al.*, 1:13-CV-1236 as inadmissible hearsay; (3) Plaintiffs' Motion *in Limine* No. 3 to Exclude Evidence of Efficiencies and/or to Exclude Evidence of Efficiencies Unrelated to Any City-Pair Relevant Market [Adv. Proc. ECF No. 227] ("Plaintiffs' Motion *in Limine* No. 3") to exclude certain evidence of "purported efficiencies" as a result of the Merger as irrelevant; and (4) Plaintiffs' Motion *in Limine* No. 5 to Exclude Testimony of Heather Garboden [Adv. Proc. ECF No. 228] ("Plaintiffs' Motion *in Limine* No. 5") to exclude the testimony of Heather Garboden on grounds that she was an "undisclosed expert witness."

     The Defendants filed the following motions *in limine*: (1) Notice of Motion and Motion *in Limine* to Exclude Evidence and Argument Regarding Plaintiffs' Other Litigations Against American Airlines [Adv. Proc. ECF No. 210] ("Defendants' Motion *in Limine* No. 1") to exclude evidence and argument relating to the Plaintiffs' other litigations against AAG on grounds of irrelevancy (2) Notice of Motion and Motion *in Limine* to Exclude News Articles and Third-Party Report [Adv. Proc. ECF No. 211] ("Defendants' Motion *in Limine* No. 2") to exclude news articles or third-party reports relating to air travel on grounds of inadmissibility.  In support of the Defendants' motions *in limine*, the Defendants also filed the related Memorandum of Law in Support of American Airlines' Group Inc.'s Motions *in Limine* [Adv. Proc. ECF No. 212] and the Declaration of Sadik Huseny in Support of American Airlines Group Inc.'s Motions *in Limine* [Adv. Proc. ECF No. 213].

18

that she was an "undisclosed expert witness," permitting her to testify solely as to facts stemming

from her capacity as an employee.  *See* Hr'g Tr. at 674:5–675:17 (Mar. 12, 2019) [Adv. Pro.

ECF No. 277] (ruling that Heather Garboden's testimony will be "appropriate to the extent it

talks about . . . facts well within the scope of her employment").  As for the remaining motions *in*

*limine*, the Court now denies each as moot.[16]

## II.    THE PRE-MERGER AIRLINE INDUSTRY

### A.  Deregulation and the Structural Dynamics of the Airline Industry

The Airline Deregulation Act of 1978 signaled a radical shift in the federal government's

stance on the level of regulation and restraint to be imposed on competition in the airline

industry.  As a result of the United States Civil Aeronautics Board's ("CAB") stringent

regulations on airfares, airline routes, and new entry into the industry, the airline industry before

1978 was generally characterized by high costs, inflated prices set by the CAB, and limited

---

[16]    With respect to Plaintiffs' Motion *in Limine* No. 1 and Defendants' Motion *in Limine* No. 1 concerning the exclusion of evidence relating to Plaintiffs' prior litigation and other litigation proceedings against American, respectively, the Court denies these motions as moot since neither party attempted to introduce such evidence at trial.  *See* Defendant American Airlines Group Inc.'s Proposed Findings of Fact and Conclusions of Law [Adv. Proc. ECF No. 272] ("Defendants' Proposed FOF/COL") at 11 n.3 (noting that parties did not introduce evidence of Plaintiffs' prior or other litigations against American).  Similarly, with respect to Defendants' Motion *in Limine* No. 2, which sought the exclusion of news articles and third-party reports, the Court denies the motion as moot. Plaintiffs did not submit into evidence any of the specified news articles and third-party reports nor does the Court rely on any of the foregoing in reaching its decision.  *See* Defendant American Airlines Group Inc.'s Memorandum of Law in Support of its Motions *in Limine* [Adv. Pro. ECF No. 212] (seeking the exclusion of exhibit numbers PX-050, PX-082, PX-087, PX-089, PX-092, PX-106, PX-112 and PX-115).  The Court notes, however, that Plaintiffs submitted exhibit PX-02 into evidence during the examination of witness Douglas Parker, which is comprised of an email chain discussing a published news article regarding the merger between United and Continental airlines and their decision to keep Cleveland as a hub.  *See* Hr'g Tr. at 479:8–14, 481:14–482:20 (Mar. 12, 2019) (questioning Parker concerning his statements surrounding the article).  As Defendants did not object to its admission at trial, that exhibit was admitted.  *Id.* at 481:14–19.

Moreover, the Court denies Plaintiffs' Motion *in Limine* No. 2 concerning the exclusion of certain deposition testimony in the DOJ Proceeding as moot as the Court does not rely on such testimony to reach its ruling as discussed below.  In a similar vein, the Court also denies Plaintiffs' Motion *in Limine* No. 3 which seeks to bar testimony from certain of Defendants' witnesses focusing on the purported efficiencies stemming from the Merger that are untethered to a specific city-pair market. The Court does not rely on Defendants' submitted evidence concerning efficiencies as the basis for a classic efficiencies defense, but rather considers the submitted evidence as factual context.  *See also infra* Discussion, Section II.D.iii (addressing consideration of evidence of the Merger's efficiencies).

point-to-point networks unable to support frequent flights between cities.  *See* Kasper Dir. Ex. ¶¶ 13, 15; *see also AMR I,* 477 B.R. at 396 (offering a brief summary on the domestic deregulation of the airline industry).  Facing minimal direct competition and an inability to reduce prices to capture lower costs, airlines were effectively disincentivized at the time from partaking in cost-efficient and profit-maximizing behaviors.  *See* Kasper Dir. Ex. ¶ 14; *see also AMR I*, 477 B.R. at 396 (discussing the impact of CAB regulations on airline decision-making).

The enactment of the Airline Deregulation Act of 1978 was transformative, introducing competitive market forces in the airline industry and paving the way for the development of the hub-and-spoke "legacy" network carriers as well as the entry and expansion of "point-to-point" low-cost carriers ("LCCs") and later, ultra-low-cost carriers (the "ULCCs").  *See* Kasper Dir. Ex. ¶¶ 8, 16; *id.* ¶¶ 18, 21–25 (discussing, among other things, the "LCC revolution" and the rapid expansion of LCCs beginning in the 1980s); Garboden Dir. Ex. ¶¶ 7–8; *see also AMR I*, 477 B.R. at 396 (noting the emergence of LCCs as a consequence of deregulation).  Network carriers—generally understood to include American, Delta Airlines, and United Airlines—operate on a "hub-and-spoke" model, a system of interconnecting flights or "spokes" originating at a "hub," a centralized point in a route network through which flights are routed.  *See* Kasper Dir. Ex. ¶¶ 16, 17; Garboden Dir. Ex. ¶ 9.  Such a structure enables network carriers to provide an "anywhere to everywhere" service, allowing them to offer routes to smaller cities or regions that would not otherwise be economical to serve and increasing the number of options available for consumers.  *See* Parker Dir. Ex. ¶ 6; Kasper Dir. Ex. ¶ 17; Garboden Dir. Ex. ¶ 9.

In contrast, LCCs—such as Southwest Airlines—operate on a lower cost point-to-point basis, flying direct between two locations, predominantly on lucrative routes that contain sufficient local air travel demand to sustain operations.  *See* Garboden Dir. Ex. ¶¶ 8, 11; Parker

Dir. Ex. ¶ 8. The cost savings from the point-to-point structure are then transferred to consumers in the form of lower airfares, giving LCCs a competitive edge over higher cost carriers and allowing them to gain market share. *See* Garboden Dir. Ex. ¶ 8; Kasper Dir. Ex. ¶ 19. LCCs also generally maintain lower labor and aircraft costs. *See* Kasper Dir. Ex. ¶ 19.

Since deregulation, LCCs have grown rapidly, accelerating their expansion in the 1990s and extending their geographic scope. *See* Kasper Dir. Ex. ¶ 23. By the end of 2000, LCCs offered substantial service in the West, the South, and the Great Lakes regions, as well as the beginnings of service in the East. *See* Kasper Dir. Ex. ¶ 25. By the early 2000s, LCC influence arguably reached a "tipping point," ushering in a new era where LCCs were considered a formidable competitive force in the airline industry and their appeal extended to both leisure and business passengers alike. *See id.* ¶¶ 29, 39–40; Ordover Dir. Ex. ¶ 22 (stating that LCCs "effectively constrain industry pricing"). As of 2018, more than 75% of domestic air travelers nationwide had access to LCC options. *See* Kasper Dir. Ex. ¶ 31; *see also* Parker Dir. Ex. ¶ 8 (estimating that nearly 80% of American passengers are traveling on routes served by one or more LCC or ULCC). The impact of LCCs on the airline industry had become so remarkable that the United States Department of Transportation coined the term the "Southwest Effect" to denote the influence of Southwest and other LCCs on air travel demand and corresponding prices. *See* Kasper Dir. Ex. ¶ 24; *id.* ¶ 36–38 (summarizing the results of several studies which examined the relationship between LCC expansion and decline in airfares); *see also AMR I*, 477 B.R. at 396 (describing the "Southwest Effect" and its impact on the airline industry); Hr'g Tr. at 110:21–25 (Mar. 11, 2019) (Bill Rubinsohn, a named Plaintiff, testifying that "airfares were significantly less" because US Airways had to match Southwest's prices).

### B. External Shocks to the Airline Industry

The first decade of the 2000s was a precarious period for the now deregulated airline industry as it was marred by a series of external shocks and macroeconomic events that resulted in severe reductions in demand and surges in costs. *See* Garboden Dir. Ex. ¶ 10; Parker Dir. Ex. ¶ 9; Kasper Dir. Ex. ¶ 27. The collapse of the internet bubble, the 9/11 terrorist attacks, the subsequent Great Recession of 2008-2009, coupled with unprecedented spikes in oil prices from 2003-2008, all contributed to a period of substantial upheaval and a period of significant losses in revenue. *See* Garboden Dir. Ex. ¶ 10; Parker Dir. Ex. ¶¶ 9–10. The flexibility of network carriers to quickly respond to these sharp dips in demand was limited by the high fixed costs of maintaining hubs. *See* Parker Dir. Ex. ¶ 10 (noting that the hub-and-spoke structure requires airlines to be committed to a scale of operations that, in difficult times, could greatly exceed demand). By contrast, LCCs during this time continued to expand and increase profits despite these outside events. *See* Kasper Dir. Ex. ¶¶ 27, 73; Parker Dir. Ex. ¶ 10; *see also* Kasper Dir. Ex. ¶ 9 (noting that capacity reductions by legacy carriers from 2001-2009 were largely offset by increases in LCC capacity and load factors).

### C. Mergers and Restructurings of Other Airline Carriers

Facing billions of dollars in lost revenue because of these macroeconomic shocks and the increasing competition from LCCs, numerous legacy carriers—US Airways, Northwest Airlines, Delta Airlines, United Airlines, and American—filed for bankruptcy between 2003 and 2012. *See* Garboden Dir. Ex. ¶¶ 5, 10; Parker Dir. Ex. ¶¶ 4, 10; Kasper Dir. Ex. ¶ 74. While Chapter 11 restructurings helped reduce carrier costs and mitigate the effects of these outside events, the bankruptcy restructurings alone were insufficient to fully restore the legacy carriers to profitability. *See* Kasper Dir. Ex. ¶ 74. Specifically, legacy carriers remained unable to raise

22

**351**

post-9/11 load factors above break-even levels—there were insufficient passengers to cover the airlines' cost—resulting in massive losses and underutilized capacity. *See id.* ¶¶ 75–76. Consequently, network carriers sought out mergers to weather the new competitive environment and achieve long-term sustainability. *See* Garboden Dir. Ex. ¶ 12; Parker Dir. Ex. ¶ 11. The mergers enabled network airlines to capture "efficiencies and network synergies" that could not otherwise be realized. Parker Dir. Ex. ¶ 4; *see* Kasper Dir. Ex. ¶ 84 (stating that the "success of large network carriers today hinges in significant part on the scope of their networks"). This is because, generally speaking, the utility and value of a network carrier is directly related to the size of its network; expansion of an airline's network leads to an increase in the number of possible routes and allows an airline to capture a larger portion of the passenger market. *See* Parker Dir. Ex. ¶ 4; Kasper Dir. Ex. ¶¶ 79–80.

Not surprisingly then, the mergers between Delta and Northwest Airlines in 2008 and United and Continental Airlines in 2010 resulted in integrated national networks that improved the competitiveness of these merged legacy carriers, while at the same time reducing their costs. *See* Garboden Dir. Ex. ¶¶ 5, 12; Kasper Dir. Ex. ¶¶ 10, 84 & Dem. 10. The newly merged entities of Delta and United increased their market share and passenger traffic, particularly from "high-yield" business travelers, and ultimately expanded their networks without incurring the enormous risk and capital costs normally associated with organic growth and the opening of new hubs. *See* Parker Dir. Ex. ¶¶ 4, 7, 11, 14. The newly formed national networks of the merged legacy carriers have led to an increase in overall legacy carrier capacity over the last several years. *See* Kasper Dir. Ex. ¶ 77.

### D. Competitiveness of American and US Airways

Following the mergers of Delta and United, American and US Airways faced structural network disadvantages relative to their newly merged competitors as both American and US Airways maintained limited networks only concentrated in certain segments of the country. *See* Garboden Dir. Ex. ¶¶ 5, 12–13; Parker Dir. Ex. ¶¶ 4, 13–14, 23–24; Kasper Dir. Ex. ¶¶ 84–86. Prior to the Merger, US Airways' presence was predominantly in the East Coast with hubs in Charlotte, Philadelphia, Phoenix and Washington, whereas American was strongest in the Midwest. *See* Garboden Dir. Ex. ¶ 13; Parker Dir. Ex. ¶¶ 4, 12. American also only maintained a minimal market presence between its Miami hub and New York, which limited its ability to offer service to passengers seeking to travel up and down the East Coast. *See* Parker Dir. Ex. ¶ 23; Hr'g Tr. at 538:7–17 (Mar. 12, 2019) (stating that American passengers flying from the Northeast to the Southeast would have to fly through Dallas or Chicago to reach their destination as there was "no other alternative"). Further threatening US Airways' long-term sustainability and competitiveness was its diminishing labor cost advantage due to the expiration of certain of its labor agreements. *See* Parker Dir. Ex. ¶ 13.

Despite the limited scope of their individual networks, however, American and US Airways' networks were, together, perfectly complementary—each airline maintained its strongest presence in a differing region of the country, and the two had minimal overlap. *See* Garboden Dir. Ex. ¶ 13; Parker Dir. Ex. ¶ 26 (noting that United and American codenamed the Merger "Project Tetris" to reflect the complementary nature of their networks). In light of this, American and US Airways believed that a merger would be an ideal resolution to address their structural disadvantages, enabling the airlines to create an integrated, national network and to realize considerable synergies for the benefit of consumers. *See* Garboden Dir. Ex. ¶¶ 5, 14–17;

24

Parker Dir. Ex. ¶¶ 27–28, 30–31; *see also* Kasper Dir. Ex. ¶ 88 (stating that "[c]ombining their networks was the only practical way for American and US Airways to attain the network scope and resulting competitive benefits . . . enjoyed by their competitors").

## III. THE PREDICTED BENEFITS OF THE PROPOSED MERGER ON THE AIRLINE INDUSTRY

### A. Strengthened Competitive Position for American and US Airways

The success of the legacy carrier business model is generally predicated upon a carrier's ability to provide passengers with an "anywhere-to-everywhere" service and offering a wide range of products. *See* Kasper Dir. Ex. ¶¶ 79, 80; *see also id.* ¶ 84 (stating that the "success of large network carriers . . . hinges in significant part on the scope of their networks"). Accordingly, the melding of American and US Airways' complementary networks was anticipated to strengthen American and US Airways' competitive positions as well as provide several additional benefits, including significant growth and connectivity opportunities that would be otherwise unattainable absent a merger. *See* Garboden Dir. Ex. ¶ 15; Parker Dir. Ex. ¶¶ 4, 14–15; *see also id.* ¶ 21 (stating that the "core" of US Airways' "advocacy for the Merger" was "competitive strategy" through the resolution of the "network disadvantage that both American and US Airways faced"). It was thought that a more comprehensive network resulting in expanded service and coverage would enable American and US Airways to better compete with other legacy carriers as well as LCCs, ULCCs and regional airlines, particularly for corporate consumers who generally favor carriers with larger and more ubiquitous networks. *See* Garboden Dir. Ex. ¶¶ 5, 15; Parker Dir. Ex. ¶¶ 17, 21, 31, 43; Kasper Dir. Ex. ¶ 86; *see also* Parker Dir. Ex. ¶ 38 (noting the Merger would result in the addition to the carriers' network of 130 cities served by American and not US Airways and 62 cities served by US Airways but not American).

Furthermore, due to the complementary nature of American and US Airways' networks, the Merger was also expected to allow American and US Airways to maintain the same levels of "available seat miles" ("ASM")[17] post-Merger without a reduction in either airline's fleet or employees. *See* Parker Dir. Ex. ¶ 29; *see also* Garboden Dir. Ex. ¶ 16 (highlighting that the Merger was a "significant opportunity for fleet optimization"). Both airlines believed that the Merger was the "best possible outcome" and a "better way to achieve all the benefits of a more competitive network, including real, sustainable capacity expansion." Parker Dir. Ex. ¶¶ 31, 35.

## B. Pro-Competitive Benefits for Consumers

In addition to the improved competitive posture of American and US Airways, the Defendants believed that the Merger would provide significant value and benefits to consumers. *See, e.g., id.* ¶ 30 (stating that the "most significant consumer benefit" of the Merger was that consumers would have a "one-stop shop" for their travel needs); Carlton Dir. Ex. ¶ 26 (concluding in his 2013 prospective study that the post-Merger consumer benefits were "driven by network quality improvements that flowed directly from the [then-proposed Merger]"). On whole, American and US Airways estimated that the Merger would generate over $1 billion per year in total cost, network and other synergies stemming primarily from consumer value derived from the merged airlines' expanded network. *See* Parker Dir. Ex. ¶ 30; *see also* Garboden Dir. Ex. ¶ 14 (stating that the post-Merger synergies were "expected to be significant"). American and US Airways believed that the combination of their complementary networks would increase the number of direct and non-stop routes between cities, the number of city-pair options via a connecting route as well as the number of travel itineraries for each city-pair within the network.

---

[17] "Available Seat Miles," a metric commonly used in the airline industry, serves as the "standard unit of measure for passenger carrying capacity" and represents one seat flying one mile. Garboden Dir. Ex. ¶ 25; *see also* Carlton Dir. Ex. ¶ 21 (stating that ASMs are a "standard measure of airline capacity").

*See* Garboden Dir. Ex. ¶ 5; Carlton Dir. Ex. ¶ 26; *see also* Garboden Dir. Ex. ¶ 17 (noting that

the "entire thrust behind the Merger was to create a . . . network carrier that would *expand*

offerings and choices for consumers") (emphasis in original); Parker Dir. Ex. ¶ 28 (American

estimated that the combination of airlines would create about 1,300 new connecting

opportunities that would not exist outside of the Merger).  They also anticipated new

connectivity opportunities and increased accessibility for consumers in small and medium-sized

cities to American and US Airways' hubs.  *See* Parker Dir. Ex. ¶ 30.  Specifically, the Merger

would result in the connection of passengers through five East Coast hubs and consequently

create new routes that would link smaller cities in the Midwest and East Coast.  *See id.* ¶ 27.

The Merger was further projected to create the largest frequent flyer program of any U.S.

carrier that would yield additional miles and increased opportunities for consumers to apply such

miles to a greater variety of itineraries.  *See* Garboden Dir. Ex. ¶ 16; Parker Dir. Ex. ¶ 30; *see*

*also id.* ¶ 39 (noting that American and US Airways anticipated that the combined airline would

have 101 million frequent flyer program members, larger than either United or Delta's

programs).  Additionally, American and US Airways believed that the Merger would lead to

additional improvements, including the strengthening of the oneworld Alliance program, a global

alliance of major airlines, and the enhancement of operations and services.  *See* Garboden Dir.

Ex. ¶ 16 (citing the expected enhancement of customer-valued services, including on-time

performance, baggage handling and other customer amenities).

### C. Anticipated Impact on Competition in the Airline Industry Generally

American and US Airways believed that the Merger would not lead to anticompetitive

effects on the airline industry.  *See, e.g.,* Carlton Dir. Ex. ¶ 7 (concluding in his 2013 prospective

analysis of the impact of the Merger that the Merger would likely expand American's output by

an estimated 2.9 million passengers and produce other net consumer benefits estimated to be at least $750 million per year); *id.* ¶ 33 (stating that, not even considering the DOJ Settlement in his 2013 prospective study, "consumer benefits from the [then-proposed Merger] would exceed many times over any plausible adverse fare effects . . . yielding large net consumer benefits"). In fact, they believed the Merger would allow for the existence of a third national network carrier, one that likely would not have existed otherwise. *See* Parker Dir. Ex. ¶ 31 (stating that, absent the Merger, American and US Airways would have continued to lose market share to the other legacy carriers such that there "could very well" be just two national network carriers). As Defendants' witnesses testified, the complementary nature of American and US Airways' networks—coupled with LCC competition—reduced concerns of an increase of airfares or reduction of competition post-Merger. *See id.* ¶ 32; Carlton Dir. Ex. ¶ 7 (finding in his 2013 prospective study that LCCs were the "truly disruptive force," putting downward pressure on prices). Indeed, American and US Airways directly competed with respect to nonstop service on only 12 routes out of nearly 700 non-stop routes. *See* Parker Dir. Ex. ¶ 32. Overall capacity for the combined airlines was also not expected to decrease. *See id.* ¶ 29 (stating that ASM of the combined carriers was anticipated to remain at the same levels).

## IV.   THE POST-MERGER EFFECTS ON THE AIRLINE INDUSTRY[18]

### A.  Expansion of Capacity and Impact on Prices

Five years following the Merger, the newly combined American has expanded its overall capacity, including an increase in the number of flight offerings and travel options for

---

[18]   The following discussion concerning the impact of the Merger on the airline industry is accurate with respect to the periods of time discussed at trial, all of which occurred prior to the outbreak of the COVID-19 pandemic. Since the start of the pandemic, the global economy has faced substantial difficulties and the airline industry specifically has suffered a dramatic and sustained drop in air travel demand. *See* Alison Sider, *Airlines Plan for Prolonged Coronavirus Drought*, WALL ST. J., (Oct. 16, 2020), https://www.wsj.com/articles/airlines-plan-for-prolonged-coronavirus-travel-drought-11602848431 (discussing how passenger volume was more than 60%

consumers.  *See* Garboden Dir. Ex. ¶ 21–22 (stating that, since 2013, post-Merger American has increased its offering of non-stop routes by 14.5%, unique city-pairs by 19% and unique itineraries across the American network by 17%); *id.* ¶ 26 (stating that, from 2013–2018, post-Merger American has had an increase of 4.5% in total seats, a 4.6% increase in total passengers flown and an 8.5% increase in total ASMs); Parker Dir. Ex. ¶ 45 (post-Merger American has added over 3,000 connecting opportunities, including service to regions where neither American or US Airways have flown before the Merger).  The upward trend in post-Merger American's capacity parallels that of the airline industry, which has also experienced considerable growth on whole since 2013.  *See* Garboden Dir. Ex. ¶ 28.  Notably, the number of regional network and flight options for small and mid-sized communities have increased since the Merger, including the number of direct flight options from the combined airline's now nine hubs, resulting in more efficient and less circuitous travel paths for travelers from such communities.  *See id.* ¶¶ 32–36 (noting, among other things, that post-Merger American has seen an increase of 18.9% in domestic regional ASMs and a 10.3% increase in domestic regional seats); Parker Dir. Ex. ¶ 46 (stating that the new American can serve omni-directional travel needs from most of its hubs).  In fact, the post-Merger American now offers service in 17 domestic cities that were not previously served by either American or US Airways prior to the Merger.  *See* Garboden Dir. Ex. ¶ 35.

The most recent Department of Transportation quarterly airfare report offered at trial showed that real average domestic airfares have in fact decreased by 4.5% during the second quarter of 2018 in comparison to the second quarter of 2017, the lowest level for a second quarter since the government began recording prices in 1995.  *See* Kasper Dir. Ex. ¶ 34.  Along a

---

lower than what it was the year prior and that "U.S. airlines expect that it will be years before their business recovers from the coronavirus pandemic").  The status of the airline industry in the COVID-19 era is not before this Court.

similar vein, a retrospective econometric[19] study in 2016 on the impact of the Merger further suggests that the Merger did not increase prices. *See* Carlton Dir. Ex. ¶ 7. Specifically, this 2016 retrospective study concluded that the Merger reduced the post-Merger American's average fares by approximately 12.3%, increased the volume of passengers by 20.2%, and increased the number of seats by approximately 19.6%. *See id.* ¶ 43. As one of Defendants' experts explained, any anticompetitive effect on prices would likely have been observed on overlapping routes where American and US Airways were directly competing prior to the Merger. *See id.* ¶ 37 (noting that overlapping routes would be "where one would expect a merger's anticompetitive effects to be concentrated"). But notably, the 2016 retrospective study concluded there was "no evidence of anticompetitive effects for connecting overlaps relative to non-overlap connecting routes" following the Merger. *Id.* ¶ 42.

An examination of trends in the post-Merger American and the industry's overall "total revenue per available per seat mile" ("TRASM")[20] further confirms the 2016 retrospective study's conclusions as to the Merger's impact on price. *See* Garboden Dir. Ex. ¶¶ 40–41. TRASM is a metric which accounts for the base fare of a ticket as well as other fees paid (e.g., baggage fees). *See id.* ¶ 40. The post-Merger American's marginal increase of 1.6% in TRASM levels from 2013 to 2018 was outpaced by the rate of inflation in the amount of 7.8% during the same timeframe. *See id.* ¶ 41. Similarly, the overall airline industry's TRASM decreased 1.3% from 2013 to 2018, indicating that the overall TRASM for both the post-Merger American and the industry on whole, when adjusted for inflation, has declined since the Merger. *See id.* The

---

[19]    Econometric analysis is the application of statistical techniques and methodologies to economic data while controlling for additional factors. *See* Hr'g Tr. at 1261:21–1262:21 (Mar. 15, 2019) [Adv. Proc. ECF No. 280] (Dr. Carlton defining econometrics generally).

[20]    "Total Revenue Per Available Seat Mile" is generally calculated by dividing the total operating revenue by ASMs and represents the amount of revenue per every seat-mile flown. *See* Garboden Dir. Ex. ¶ 40.

fluctuations in TRASM for both American and other network airlines during 2013 through 2018 appear to track the changes in fuel prices, one of the primary determinants of airline costs. *See id.* ¶ 42. Finally, a comparison of TRASM for the airline industry in general against overall changes in ASMs and seats for the period of 2013 to 2018 reflects a steady increase in capacity relative to generally stagnant revenue for the industry on whole. *See id.* ¶ 43.

**B. Improvements in Infrastructure and Fleet Utilization**

The Merger has also enabled American to expand service from its nine hubs in Charlotte, Chicago, Dallas, Los Angeles, Miami, New York, Philadelphia, Phoenix, and Washington, D.C. and permitted American to invest heavily in improving its infrastructure. *See* Garboden Dir. Ex. ¶¶ 28–31. Since December 2013, there has been a 5% increase in total annual seats on the post-Merger American from its 9 hubs in conjunction with an overall increase of 12% across all carriers servicing those hubs as of 2018. *See id.* ¶ 29. American has also invested significant capital into facility and infrastructure improvements at certain of its hubs. *See id.* ¶ 30 (stating that, among other things, the combined airline has already invested more than $2 billion at its Dallas hub, $200 million at its Philadelphia hub, $100 million at its Charlotte hub and $18 million at its Washington D.C. hub).

The Merger has also enabled American and US Airways to better optimize the use of their combined fleet and more efficiently allocate aircraft throughout their network to routes where such aircraft would be better suited. *See id.* ¶ 38 (stating that the post-Merger American has since reallocated several Boeing 767 wide-body aircrafts and has replaced regional jets on high-demand routes with larger airplanes). The more efficient allocation of aircraft has led to an increase in consumer options and overall offerings from the combined airline. *See id.* Since the Merger, American also has purchased several new mainline and regional aircraft to replace older

31

**360**

and less efficient airplanes, resulting in the largest and youngest fleet of any U.S. network carrier.  *See id.* ¶ 37.

### C.  Continued Growth and Impact of Low-Cost Carriers

The competitive influence of LCC and ULCC carriers has continued after the Merger, with such carriers continuing to expand and grow.  *See* Parker Dir. Ex. ¶ 53.  LCCs and ULCCs currently comprise nearly 40% of the combined market for domestic air travel and maintain a customer base that includes both leisure and business passengers.  *See id.*; Kasper Dir. Ex. ¶¶ 39–40.  LCC and ULCC options are now available to nearly 80% of passengers who fly on American, including at every one of the combined airline's nine hub cities.  *See* Parker Dir. Ex. ¶ 53; *see also* Kasper Dir. Ex. ¶ 31 (noting that, as of 2018, over 75% of domestic air travelers industry-wide now have access to LCCs in most states across the country).  In fact, LCCs now compete with non-stop service on 5 of the 12 previously overlapping routes that American and US Airways directly competed on prior to the Merger.  *See* Parker Dir. Ex. ¶ 53.  Considering their historical growth pattern and considerable low operation costs, it is anticipated that LCCs and ULCCs will continue to expand and increase market share.  *See* Kasper Dir. Ex. ¶¶ 43–44; *see also id.* ¶ 46 (explaining that a significant portion of future LCC growth is likely to come from ULCCs).

Moreover, the "Southwest Effect" remains in force, as the evidence suggests that the presence of an LCC on a route continues to place downward pressure on prices.  *See* Kasper Dir. Ex. ¶¶ 37–38.  In an analysis performed in 2015, for example, the DOJ found that on routes at Newark Liberty International Airport that Southwest entered in 2010, average airfares year-over-year declined between 5% and 27%.  *See id.* ¶ 38 (citing Verified Complaint at 9–10, U.S. v. United Cont'l Holdings Inc., et al., No. 2:15-CV-07992-WHW-CLW (D.N.J. Nov. 10, 2015));

32

*see also id.* (noting that certain research has found that even the threat of Southwest's entry on a route can cause network carriers to reduce their fares). The Department of Transportation has generally recognized that on routes where LCCs are present, legacy carriers are "usually forced to adopt a pricing and yield management posture similar to that of their low-cost carrier competition." *See* Kasper Dir. Ex. ¶ 38 (quoting U.S. DEP'T OF TRANSP., OFFICE OF AVIATION AND INT'L AFFAIRS, AVIATION ANALYSIS, FARE RESTRUCTURING IN CINCINNATI – SECOND QUARTER 2005, 6 (2006)).

The extent of LCC influence is also reflected in the network airlines' response to "unbundling" and the offering of low-cost, connecting service. *See, e.g.,* Parker Dir. Ex. ¶ 55 (noting that American's reinstatement of low-cost, connecting service was in response to Southwest's pricing approach). In response to the proliferation of ULCCs—ultra low-cost airlines whose business model is predicated upon the "unbundling" of charges for services previously "bundled" together at a single price—legacy carriers have since introduced "basic" economy fares. *See* Kasper Dir. Ex. ¶¶ 41–42. Such "basic" fares offer discounted pricing but include restrictions such as the inability to fly standby and limits on the ability to select a seat prior to check-in. *See id.* ¶ 42. Similarly, American restarted its Advantage Fares program after the Merger in response to Southwest's offering of a similar service at Advantage Fare prices. See Parker Dir. Ex. ¶ 55 (stating that Delta and United reinstated their discounted connecting fare programs as well). The Advantage Fares program, originally offered by US Airways, provided discounted and lower fares on connecting routes in order to induce consumers to select a connecting service as opposed to a non-stop alternative with a competing airline. *See id.* ¶ 54. Finally, as further incentive to price-sensitive consumers, American has at times undercut its own prices, offering lower-priced one-step fares on routes where it also offers non-stop service

33

to capture consumers who are willing to trade convenience for low prices and will purchase tickets when they would otherwise not fly at all. *See id.* ¶ 55.

## V.    THE PLAINTIFFS' CASE

The Plaintiffs' case-in-chief relies heavily on two sources of evidence: (1) testimony from some named Plaintiffs about their individual experiences with airline travel and (2) the expert opinion of Dr. Carl Lundgren. During the course of trial, the Plaintiffs called nine of the named Plaintiffs for live testimony in support of their case: Bill Rubinsohn, Sondra Russell, Donald Fry, Lisa McCarthy, Gabriel Garavanian, Jose Brito, Valarie Jolly, Gary Talewsky, and June Stansbury (collectively, the "Named Plaintiffs"). Plaintiffs also presented their expert witness, Dr. Carl Lundgren live at trial. For the sake of efficiency, the Plaintiffs presented the direct testimony of their live witnesses in written format (collectively, the "Named Plaintiffs' Written Testimony"). *See* Joint Pretrial Order at 2. At trial, Plaintiffs also called as an adverse witness William Douglas Parker, the Chairman and Chief Executive Officer of AAG.

### A.  Plaintiffs' Lay Witness Testimony

The Named Plaintiffs are nine travel agency owners and/or travel agents who have collectively flown on hundreds of domestic and international flights with various airlines pre- and post-Merger, including American and US Airways. *See* Brito Dir. Ex. ¶¶ 1, 5–6 (travel agency owner who has flown on 156 domestic and international flights, including 31 American or US Airways flights); Fry Dir. Ex. ¶¶ 2–3, 4–6 (travel agency owner and travel agent who flew on 51 flights between 2009 and 2017, including 9 pre-Merger American or US Airways flights, as well as a handful of American flights since 2017); Garavanian Dir. Ex. ¶¶ 4, 5–6 (travel agency part-owner and travel agent who has flown "numerous times" on American and US Airways); Jolly Dir. Ex. ¶¶ 2, 5–7, 22 (travel agency owner who has flown 44 pre-Merger

34

American flights and 52 post-Merger American flights since 2009); McCarthy Dir. Ex. ¶¶ 3–4, 9–14 (travel agency owner and travel agent who has flown on 238 flights since 2009, including 18 American or US Airways post-Merger flights); Rubinsohn Dir. Ex. ¶¶ 1, 5–7 (travel agency owner who, between 2008 and 2017, has flown on 310 domestic and international flights, including 145 pre-Merger American or US Airways flights and 175 post-Merger American flights); Russell Dir. Ex. ¶¶ 3, 6, 8–10 (travel agency owner and travel agent who, between 2009 and 2017, has flown on 110 domestic and international flights, including 52 pre-Merger American flights and 58 post-Merger American flights); Stansbury Dir. Ex. ¶¶ 3, 9–16 (travel agency owner and travel agent who has flown on 94 domestic and international flights since 2009, including 18 pre-Merger American or US Airways flights and 76 post-Merger American or US Airways flights); Talewsky Dir. Ex. ¶¶ 4, 10–18 (travel agency owner and travel agent who has flown 215 domestic and international flights since 2009, including 56 pre-Merger American flights and 32 post-Merger American flights).

The Named Plaintiffs allege a litany of harms purportedly suffered from the Merger, ranging from economic harms to the overall deterioration in the quality of the flying experience. The alleged economic harms include increases in airfares and ancillary fees, as well as the imposition of fees for services that were previously complimentary such as checked baggage, in-flight meals, lounge access and seat assignments. *See, e.g.,* Brito Dir. Ex. ¶ 7 (alleging, among other things, increased airfares, the imposition of baggage fees, charges for inflight meals and lounge access and "outrageous" fuel surcharges); Garavanian Dir. Ex. ¶¶ 9–12 (discussing the increases in airfares for flights in and out of Manchester, NH resulting from a decrease in flight availability); Jolly Dir. Ex. ¶¶ 9, 12, 16 (discussing, among other things, the increase in baggage and change fees, as well as higher airfares); Fry Dir. Ex. ¶¶ 7, 8 (stating that "in [his] experience,

35

**364**

air travel has continued to degrade, particularly since the [M]erger of American Airlines and US Airlines"); Hr'g Tr. at 81:21–82:2, 84:23–85:8, 85:23–86:15 (Mar. 11, 2019) (Rubinsohn testifying as to the increase in airfares and baggage fees, the lack of food service and the imposition of change fees); *id.* at 147:16–24 (Russell testifying as to the imposition of baggage fees and the increase in change fees); *id.* at 224:10–22, 229:4–17 (McCarthy testifying as to the increase in airfares); Hr'g Tr. at 707:18–22, 708:8–11, 708:16–709:17, 713:20–714:13, 720:2–14 (Mar. 13, 2019) [Adv. Proc. ECF No. 278] (Talewsky testifying as to the increase in airfares and fees for lounge access, the imposition of fees for seat assignments, baggage and change fees).

The Named Plaintiffs also testified as to the negative impact of the Merger on their ability to operate their travel agencies, including a reduction in demand and loss of business. *See, e.g.,* Jolly Dir. Ex. ¶ 18 (testifying that it has become "difficult and time consuming to offer good service" at her travel agency and that she has lost clients when they "blame [her] for overbooked flights or when airlines take away pre-reserved and paid for seats"); McCarthy Dir. Ex. ¶ 25 (stating that the reduction in flight options following the Merger has resulted in a decrease in "demand for the entire travel industry, which hurts travel agencies' ability to survive"); Hr'g Tr. at 769:7–16 (Mar. 13, 2019) (Stansbury explaining that the Merger has "further complicated [his job] by having to explain these ancillary fees, by having to go on and purchase seats for people or pay ancillary fees").[21]

Aside from economic harms, the Named Plaintiffs also complained of the deterioration in quality of the overall flying experience as reflected in the decreased number of connecting flight options from smaller hubs, a reduction in benefits and value in frequent flyer programs, a

---

[21]    But as discussed in greater detail below, the Court previously ruled that the Plaintiffs' testimony would only be considered as to alleged harms they incurred as domestic airline customers in the relevant city-pair markets, and not as alleged harms suffered by the public or by the Plaintiffs' travel agent customers. *See infra* Discussion, Section II.A.

36

reduction in seat pitches and the reduction in quality of customer service. *See, e.g.,* Fry Dir. Ex. ¶ 7 (stating that "air travel has continued to degrade" with smaller planes that were "most often more crowded, with less legroom and smaller cabin facilities such as overhead storage"); Jolly Dir. Ex. ¶¶ 12–13 (citing a reduction in available flight options); McCarthy Dir. Ex. ¶ 18 (asserting that the Merger has resulted in "less options, less seat assignments and availability, and reduced customer service"); Rubinsohn Dir. Ex. ¶ 13 (noting reduced flight route options between American and US Airways hubs and cities such as Raleigh, NC, Pittsburgh, PA and St. Louis, MO); Stansbury Dir. Ex. ¶¶ 8, 18, 26 (stating that the Merger has resulted in reduced seat availability, lack of seat assignments, lack of legroom, reduced or cancelled service on routes to smaller cities and a loss of privileges for AAdvantage loyalty program members); Hr'g Tr. at 270:11–272:12 (Mar. 11, 2019) (Garavanian detailing the devaluation of his frequent flyer miles and the "terrible" customer service he received after being bumped out of first class).

Certain of the Named Plaintiffs further attribute the alleged harms in part to the overall consolidation of the airline industry generally, opining that "airline consolidation in general and more specifically, the 2013 merger of American and [US Airways] has caused a loss of competition in the industry." Rubinsohn Dir. Ex. ¶ 8; Russell Dir. Ex. ¶ 11; Stansbury Dir. Ex. ¶ 29; Talewsky Dir. Ex. ¶ 40; *see also* Brito Dir. Ex. ¶ 15 (concluding that competition has decreased as a result of "consolidation in the airline industry and after the most recent merger of [American] and [US Airways]"); Jolly Dir. Ex. ¶ 8 (stating that "airline consolidation in general and more specifically, the 2013 merger of American and [US Airways], threatens to cause and has caused a loss of competition in the industry"); McCarthy Dir. Ex. ¶ 18 (attributing the alleged harms suffered to "airline mergers and consolidation and specifically the American merger").

37

In addition to the Named Plaintiffs, Plaintiffs also called on William Douglas Parker to testify during which he was questioned about, among other things, US Airways' rationale for pursuing the Merger and AMR's proposed standalone business plan. *See, e.g.,* Hr'g Tr. at 338:20–339:5 (Mar. 12, 2019) (questioning Mr. Parker concerning the estimated valuation of the then-proposed Merger); *id.* at 357:20–358:3 (inquiring with Mr. Parker about his knowledge of AMR's plan to emerge from Chapter 11 on a standalone basis).

### B. Plaintiffs' Expert Witness Testimony

The testimony of Dr. Carl Lundgren, an economist and the Plaintiffs' sole expert witness, included the following: (1) the Lundgren Report; (2) the 2017 Lundgren Declaration; and (3) Dr. Lundgren's declaration, dated Dec. 21, 2018 (the "2018 Lundgren Declaration"). Lundgren Dir. Ex. ¶¶ 1–4. The 2018 Lundgren Declaration updated the conclusions set forth in the Lundgren Report and the 2017 Lundgren Declaration with "more recent data from the DB1B public database published by the U.S. Department of Transportation, Bureau of Transportation Statistics" spanning the period of July 1, 2017 through June 30, 2018. *Id.*, Ex. 3 ¶ 3. Specifically, Dr. Lundgren concluded in the 2018 Lundgren Declaration that 765 of the 1,008 DOJ City-Pairs would still be deemed to have presumptively illegal post-Merger HHI concentration levels and level increases under the Horizontal Merger Guidelines, reflecting a decrease from the 785 city-pairs previously described in the Lundgren Report. *Id.*, Ex. 3 at 5. With respect to average fares, Dr. Lundgren further concluded that 708 of the 1,008 DOJ City-Pairs experienced an increase in average fares over the same time period, a decrease from the 723 city-pairs originally identified in the 2017 Lundgren Declaration. *Id.*, Ex. 3 ¶ 13; *see also* Hr'g Tr. at 847:16-24 (Mar. 13, 2019) (testifying that the fare growth figures exclude ancillary fees but do account for the fares of LCCs and ULCCs). Dr. Lundgren stated that his opinion was

"consistent with the facts, analysis and opinions" contained in each of the Lundgren Report, the 2017 Lundgren Declaration and the 2018 Lundgren Declaration. Lundgren Dir. Ex. ¶¶ 2–4.

## VI. THE DEFENDANTS' CASE

At trial, the Defendants called upon three expert witnesses—Daniel M. Kasper, Dennis W. Carlton and Janusz A. Ordover—and one lay witness, Heather Garboden, for live testimony in support of their case. The Defendants' three expert witnesses offered testimony that assessed the competitive impacts of the Merger on the airline industry. Each provided a different perspective.

The first of the Defendants' experts was Mr. Daniel M. Kasper, a specialist in the transportation industry who serves as a senior consultant at the firm Compass Lexecon. *See* Kasper Dir. Ex. ¶ 1; Hr'g Tr. at 975:14–17 (Mar. 14, 2019) [Adv. Proc. ECF No. 279]. Mr. Kasper examined the airline industry prior to and following the Merger and concluded that the industry was "intensely competitive before the [Merger] and remains so." Kasper Dir. Ex. ¶ 7. Mr. Kasper attributed the high levels of price competition in the pre-Merger airline industry to the elimination of regulatory barriers and the pervasive presence of LCCs, which he argues have and will continue to exert "downward pressure . . . on prices." *Id.* ¶ 8. Additionally, Mr. Kasper asserted that the recent mergers of other legacy carriers, whose business models are predicated upon a hub-and-spoke structure, have further contributed to robust post-Merger competition in the domestic airline market. *See id.* ¶¶ 10, 89. Mr. Kasper finally explained that the decrease and later increase in airline capacity beginning in 2001 can be attributed to factors other than legacy airline mergers (i.e., exogenous macroeconomic events and the subsequent strengthening of the national economy resulting in increased demand for air travel). *See id.* ¶¶ 9, 62.

39

The second of Defendants' experts was Dr. Dennis W. Carlton, a professor of economics at the Booth School of Business at the University of Chicago and a consultant at Compass Lexecon. *See* Carlton Dir. Ex. ¶¶ 1, 4; Hr'g Tr. at 1236:9–14, 1237:2–5, 1239:4–10 (Mar. 15, 2019) [Adv. Proc. ECF No. 280]. Dr. Carlton previously served as Deputy Assistant Attorney General for Economic Analysis at the Antitrust Division for the DOJ. *See* Carlton Dir. Ex. ¶ 3. Dr. Carlton employed econometric analysis to examine the Merger and addressed the Plaintiffs' claims of adverse competitive effects, as well as Plaintiffs' claim that the Merger would eliminate US Airways' frequent flyer program. *See* Carlton Dir. Ex. ¶ 6. Underlying Dr. Carlton's analysis were certain baseline assumptions concerning the characteristics of the airline industry, including the "substantial number of competitors on many of the routes; the importance of [LCC] competition [on prices] on these routes; and the relative ease and frequency of entry on most routes." *Id.* ¶¶ 7, 14–15. In performing three different econometric studies, Dr. Carlton looked to changes in total output and capacity as "key summary measures of competitive effects." *Id.* ¶ 13. Dr. Carlton noted that his methodology applied the "standard economic approach" set forth in the Horizontal Merger Guidelines and related literature. *Id.* ¶ 11.

The first of Dr. Carlton's three econometric studies, performed in 2013 on a retrospective basis, examined the competitive impacts of the prior mergers of Delta and Northwest, as well as United and Continental. *See id.* ¶¶ 20–23. The 2013 retrospective study, based in part on regression analysis, concluded that the prior legacy carrier mergers had "no adverse effects on competition." *Id.* ¶¶ 20, 23. The second of the econometric studies, also performed in 2013 but on a prospective basis, examined the Merger itself and predicted that the Merger would have a procompetitive effect; he concluded that it would generate "substantial procompetitive output expansions [that] would exceed, many times over, any plausible nominal fare increases from the

transaction." *Id.* ¶ 24. Dr. Carlton asserted that his conclusions would remain the same even without the divestures that were part of the DOJ Settlement. *See id.* ¶ 35. Finally, in 2016, Dr. Carlton performed a retrospective study of all three legacy carrier mergers and concluded that the legacy carrier mergers, including the Merger, were procompetitive, thus confirming the results of both his 2013 prospective and retrospective studies. *See id.* ¶¶ 41, 44. In reaching this conclusion, Dr. Carlton focused on pre-merger overlapping routes between merging airlines. *See id.* ¶ 37. Specifically as to the Merger, he found that it "reduced average fares, increased the number of passengers flying, and increased the number of seats available." *Id.* ¶¶ 7, 44. As for the Plaintiffs' assertion that the Merger would eliminate US Airways' frequent flyer program, Dr. Carlton concludes that this allegation was unfounded as US Airways has continued to offer its frequent flyer program and such program was in fact expanded post-Merger. *See id.* ¶¶ 77, 79.

The last of the Defendants' testifying expert witnesses, Dr. Janusz A. Ordover, serves as a professor of economics at New York University and consultant at Compass Lexecon. *See* Ordover Dir. Ex. ¶¶ 1, 4; Hr'g Tr. at 1139:7–12 (Mar. 14, 2019). Previously, Mr. Ordover served as the Deputy Assistant Attorney General for Economics at the Antitrust Division for the DOJ. *See* Ordover Dir. Ex. ¶ 2. He provided an "economic perspective" that specifically addressed the Plaintiffs' assertion that the Merger would "'substantially increase' the 'prospects for effective collusion among the airlines remaining after [the] [M]erger.'" *Id.* ¶ 5. Accounting for the DOJ Settlement, Dr. Ordover concluded that the airline industry is not conducive to effective coordination and the Merger did not enhance effective coordination. *See id.* ¶¶ 6–7. In fact, he asserted that the airline industry was "highly competitive prior to the [M]erger and remains so." *Id.* ¶ 9. His conclusions were primarily driven by "overwhelming empirical

41

evidence" and "substantiated, significant consumer benefits from this [M]erger," observations that the airline industry behaves in a manner consistent with "effective competition" such that the Merger did not elevate the risks of "coordinated effects." *Id.* ¶¶ 7, 103. Additionally, the prevalence of LCCs, further enhanced by the divestitures that were part and parcel to the DOJ Settlement, would "disrupt any form of coordination on prices or other competitive dimensions." *Id.* ¶¶ 7, 104.

In addition to the expert witnesses, Defendants also presented Heather Garboden to testify as a lay witness solely as to facts within the scope of her employment. *See* Hr'g Tr. at 674:5–675:17 (Mar. 12, 2019) (holding that Heather Garboden's testimony will be "appropriate" as to facts stemming from her capacity as an employee). Ms. Garboden testified as to the strategic rationale behind the Merger and internal post-Merger metrics that offer insight concerning the impact of the Merger. *See* Garboden Dir. Ex. ¶ 5.

## DISCUSSION

## I. THE GOVERNING LEGAL FRAMEWORK

Generally, Section 7 of the Clayton Antitrust Act prohibits a merger or acquisition that "*itself* may cause antitrust injury." *In re Zinc Antitrust Litig.*, No. 14-CV-3728, 2016 WL 3167192, at *22 (S.D.N.Y. June 6, 2016) (quoting *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 511 (2d Cir. 2004)) (emphasis in original). Specifically, Section 7 provides:

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . where in any line of commerce or in any activity affecting commerce in any section of the country, *the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly.*

15 U.S.C. § 18 (emphasis added).

Any analysis performed under Section 7 is immersed in a realm of "*probabilities*, not certainties or possibilities." *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 984 (D.C. Cir.

42

1990) (emphasis in original).  In considering a merger's effect on competition, modern courts

have applied a burden-shifting analysis in which plaintiffs bear the initial burden of establishing

a *prima facie* case.  *See id.* at 982–83 (establishing a burden-shifting analysis to a horizontal

acquisition case);[22] *United States v. Waste Mgmt. Inc.*, 743 F.2d 976, 983–84 (2d Cir. 1984)

(concluding that the ease of entry into the relevant market was sufficient to rebut a *prima facie*

showing of illegality under a burden-shifting analysis); *New York v. Deutsche Telekom AG*, 439

F. Supp. 3d 179, 198–99 (S.D.N.Y. 2020) (applying the three-part burden shifting analysis to

assess a Section 7 claim); *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,

778 F.3d 775, 783 (9th Cir. 2015) (stating that "Section 7 claims are typically assessed under a

'burden-shifting framework'") (quoting *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 423 (5th

Cir. 2008)); Summary Judgment Decision at 18:7–12 ("Modern case law provides for a burden-

shifting process in which plaintiffs typically establish a *prima facie* case with, for example,

market concentration statistics, and defendants attempt to rebut it by offering conflicting

evidence of the merger's probable effects on competition.").

Under such a framework, a plaintiff must first make a "showing that a transaction will

lead to undue concentration in the market for a particular product in a particular geographic area"

which establishes a "presumption that the transaction will substantially lessen competition."

---

[22] Horizontal mergers are defined to be "mergers and acquisitions involving actual or potential competitors" whereas vertical mergers encompass non-horizontal transactions, including, in its strictest form, the combination of "firms or assets at different stages of the same supply chain." Horizontal Merger Guidelines § 1 (defining horizontal mergers); U.S. DEP'T OF JUSTICE AND FED. TRADE COMM'N, VERTICAL MERGER GUIDELINES § 1 (2020) (defining vertical mergers).  Notably, despite its initial formulation within the horizontal merger context, the *Baker Hughes'* burden-shifting analysis has been applied to both horizontal and vertical mergers subject to differences in the type and nature of evidence a plaintiff must present to satisfy its initial burden.  *See, e.g., United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (applying the *Baker Hughes* burden-shifting analysis to a horizontal merger); *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (stating that, in applying *Baker Hughes* to a proposed vertical merger, a plaintiff must make a "fact-specific" showing that a merger is "likely to be anticompetitive" as opposed to a mere offering of market concentration statistics to establish a *prima facie* case).

43

*Baker Hughes*, 908 F.2d at 982. To satisfy this initial burden, plaintiffs have typically made a showing, pursuant to the Horizontal Merger Guidelines, of post-merger HHI concentration levels in excess of 2,500 and post-merger increases in HHI levels in excess of 200.[23] *See, e.g., United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (noting that the "most common way to make [a] showing is through . . . [HHI]" and the application of the Horizontal Merger Guidelines), *cert. dismissed*, 137 S.Ct. 2250 (2017); *Baker Hughes*, 908 F.2d at 983 & n.3 (utilizing the DOJ's then-merger guidelines to conclude that the government "established a *prima facie* case of anticompetitive effect" through its showing that the merger would "significantly increase" concentration in an already highly concentrated market); *Saint Alphonsus*, 778 F.3d at 788 (concluding that the "extremely high HHI on its own establishes the *prima facie* case"). Such showings lead to presumptions of market concentration and the enhancement of market power. *See* Horizontal Merger Guidelines § 5.3.

Once a plaintiff makes its *prima facie* case, the burden then shifts to a defendant to "rebut [the] presumption" with "sufficient evidence" to show that the "*prima facie* case inaccurately predicts the relevant transaction's probable effect on future competition." *Baker Hughes*, 908 F.2d at 982, 989, 991. A defendant may satisfy its burden by making an "affirmative[] showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the [plaintiff's] favor." *Id.* at 991. The required sufficiency of a defendant's evidence, however, is directly proportional to the strength of plaintiffs' *prima facie* case. *See id.* (stating that "[t]he more compelling the *prima facie* case, the more evidence

---

[23]     The Court notes that, while not binding on courts, the Horizontal Merger Guidelines serve a significant role in the evaluation of proposed mergers. *See* Horizontal Merger Guidelines § 1 (noting that the Horizontal Merger Guidelines were prepared in part to "assist . . . courts in developing an appropriate framework for interpreting and applying . . . antitrust laws in the horizontal merger context"); *Anthem,* 855 F.3d at 349 (stating that the Horizontal Merger Guidelines remain a "helpful tool" for analyzing proposed mergers).

44

the defendant must present to rebut it successfully").  Once rebutted, the "burden of producing additional evidence of anticompetitive effect shifts to the [plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times."  *Id.* at 983.

Throughout this case, Plaintiffs have consistently maintained that a line of Supreme Court merger cases decided in the 1960s, which promulgated the "incipiency doctrine,"[24] serve as the governing legal standard for Section 7 claims.[25]  But as this Court has previously noted, modern antitrust case law has evolved since the 1960s, developing into a more flexible, totality-of-the-circumstances approach.  *See Fjord I*, 502 B.R. at 39 n.12 ("[A] quick review of the relevant antitrust case law suggests that antitrust law has evolved since the 1960s to encompass a more flexible, industry-specific analysis."); Summary Judgment Decision at 18:7–12 (noting that modern antitrust case law adopts a burden-shifting analysis); *see also Baker Hughes*, 908 F.2d at 984 (stating that the "Supreme Court has adopted a totality-of-the-circumstances approach to [Section 7], weighing a variety of factors to determine the effects of particular transactions on competition"); *United States v. AT&T Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (discussing how a merger should be analyzed within the "context of its particular industry" and "in light of a

---

[24]   The phrase "incipiency doctrine" refers the congressional policy to restrict mergers that may lead to a possible restriction of competition.  *See, e.g., Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 346 (1962) (stating that the court could not "avoid the mandate of Congress that tendencies toward concentration in industry [were] to be curbed in their incipiency"); *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966) (discussing the underlying congressional intent to enact Section 7 as a desire to "preserve competition among many small businesses by arresting a trend toward competition in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies"); *E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (defining "incipiency" within this context to mean "any time when the acquisition threatens to ripen into a prohibited effect").

[25]   Plaintiffs argued repeatedly that the "incipiency doctrine" remains the controlling precedent.  *See, e.g.,* First Amended Complaint ¶ 47 (asserting that the line of Supreme Court cases relying on the "incipiency doctrine" has "never been overruled and remains controlling law"); Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 15 ("Plaintiffs' Proposed FOF/COL") [Adv. Proc. ECF No. 273] (citing a line of "binding Supreme Court precedents [that] recognized and developed what is known as the 'incipiency doctrine'"); Hr'g Tr. at 10:25–11:5 (Mar. 11, 2019) (stating that the Plaintiffs "also rely on the Supreme Court decisions, none of which have been overruled, and no action has been taken by Congress to overrule them, and with regard to those cases, [the Plaintiffs] will be following the law on them"); Hr'g Tr. at 1274:13–1280:25 (Mar. 15, 2019) (cross-examining Defendants' expert witness, Dr. Carlton, concerning his writings on "decisions by the Supreme Court . . . with regard to mergers").

45

**374**

'variety of factors'—including the transaction's size, structure, and potential to generate efficiencies . . . that 'are relevant in determining whether a transaction is likely to lessen competition'") (citing *Baker Hughes*, 908 F.2d at 985 (internal quotation marks omitted)). This shift in contemporary merger analysis towards a more comprehensive inquiry has its genesis in *United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974). Citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 321–22 (1962), the Supreme Court in *General Dynamics* concluded that "statistics concerning market share and concentration, while of great significance, were not conclusive indicators of anticompetitive effects" and that a merger should be evaluated within the "context of its particular industry." *Gen. Dynamics*, 415 U.S. at 498. Since *General Dynamics*, various courts—including the Second Circuit—have relied upon a multiplicity of relevant factors in performing a Section 7 violation analysis. *See Waste Mgmt.*, 743 F.2d at 981–84 (considering ease of entry into the relevant product and geographic market in its determination that the merger did not violate Section 7); *see also Chi. Bridge*, 534 F.3d at 437–39 (offering a detailed analysis of a barriers-to-entry defense, ultimately determining that there was substantial evidence to conclude that such defense was insufficient to rebut the *prima facie* case); *Anthem*, 855 F.3d at 364 (affirming the lower court's ruling after a consideration of the "totality of circumstances," including an examination of claimed merger-specific efficiencies); Horizontal Merger Guidelines (offering in great detail the variety and types of evidence the DOJ relies upon to determine whether a horizontal merger would substantially lessen competition).

## II.  APPLICATION OF THE *BAKER HUGHES* STANDARD

### A.  Relevant Market Definition and Plaintiffs' Standing

Prior to analyzing a potential Section 7 violation, a court must first address the gating issues of market definition and standing. *See United States v. E.I. du Pont de Nemours & Co.*,

353 U.S. 586, 593 (1957) ("Determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act."); *Biocad, JSC v. F. Hoffman-La-Roche, Ltd.,* No. 16 Civ. 4226, 2017 WL 4402564, at *3 (S.D.N.Y. 2017) ("[A]ntitrust standing is 'a threshold, pleading-stage inquiry'") (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75 (2d Cir. 2013)).  As this Court has already held, city-pairs constitute the relevant market for purposes of this proceeding.[26]  *See* Summary Judgment Decision at 26:2–5 (concluding that Defendants' judicial admission concerning the appropriate market definition was enough to support a ruling that city-pairs constitute the "proper geographic market in this case"); Hr'g Tr. at 53:19–20 (Mar. 11, 2019) (Defendants agreeing that "the city pair markets . . . are the relevant markets here"); *see also* First Amended Complaint ¶ 32 (Plaintiffs asserting that "well-defined submarkets exist which, in themselves constitute geographic and/or product markets for antitrust purposes and include what are known as 'city pairs'"); *Fjord I*, 502 B.R. at 40 (stating that "Defendants accept that city-pairs are the properly defined market").  Moreover, within the confines of this city-pairs market definition, the Court has already concluded that these Plaintiffs have made a sufficient showing of standing, finding that Plaintiffs had established their standing as airline customers.  *See* Summary Judgment Decision at 40:20–22 ("Plaintiffs are best positioned to bring an antitrust suit in their role as customers of air travel.").  But such standing does not otherwise extend to allegations of harm suffered by their customers.[27]  *See id.* at 40:14–

---

[26]    In its Summary Judgment Decision, the Court rejected the Plaintiffs' national market theory.  *See* Summary Judgment Decision at 27:8–9 (holding that the Plaintiffs' national market theory is "as deficient as ever"); Hr'g Tr. at 54:11–14 (Mar. 11, 2019) (Defendants stating that they "agree that the relevant markets are city pairs" and noting that the Court has "already held that there is no national market").

[27]    The Court held in its Summary Judgment Decision that Plaintiffs lacked standing in their capacity as travel agents as they were not "efficient enforcers" of antitrust laws.  Summary Judgment Decision at 47:15–19.  In reaching its conclusion, the Court noted that "Plaintiffs [were required to] demonstrate that they [had] remained actual customers in the alleged relevant markets and made plans to patronize those markets again."  *Id.* at 42:11–13 (citing *In re N.J. Title Ins. Litig.*, 683 F.3d 451, 461 (3d Cir. 2012)).

47

18 (finding that Plaintiffs have standing "in certain markets as customers, but . . . [not] as travel agents"); *see also* Hr'g Tr. at 89:3–8 (Mar. 11, 2019) ("[T]here was a ruling about standing and what was decided was that the [P]laintiffs . . . did not have antitrust standing for purposes of their role as travel agents.").

Notwithstanding the Court's conclusion that Plaintiffs have standing, the "Plaintiffs [at trial] still retain[ed] the burden . . . of identifying which specific [c]ity [p]airs [were] relevant for their claim." Summary Judgment Decision at 46:12–14. In an attempt to satisfy this burden, the Plaintiffs submitted a list of 298 city-pairs before trial as relevant to the Named Plaintiffs' testimony, a notable decrease from the 1,008 city-pairs originally identified as presumptively illegal in the Lundgren Report. *See* Joint Pretrial Order, Ex. 5; Hr'g Tr. at 913:12–19 (Mar. 13, 2019) (stating that Exhibit 5 to the Joint Pretrial Order contains "[t]hree hundred one" city-pairs which include "three duplicates so . . . actually 298" city-pairs that are relevant to the Court's analysis); Hr'g Tr. at 957:7–16 (Mar. 14, 2019) (both Plaintiffs and Defendants affirmed they were in agreement that their respective exhibits of city-pairs reflect the 298 city-pairs originally designated in the Joint Pretrial Order).[28] While the parties initially agreed as to the 298 city-pairs comprising the relevant market, this number shifted during and after trial. *See* Plaintiffs' Proposed FOF/COL ¶ 165 (asserting that the relevant market of city-pairs was instead 204 city-pairs); Defendants' Proposed FOF/COL ¶ 151 (asserting that the relevant market of city-pairs was instead 228 city-pairs). Ultimately, both Plaintiffs and Defendants agreed that the relevant

---

The Court notes that the Defendants continue to dispute that Plaintiffs have in fact established standing. *See* Defendants' Proposed FOF/COL, Section IV(G) (arguing that Plaintiffs lack standing). But for the reasons summarized above and set forth in the Court's prior decisions, the Court overrules the Defendants' objection based on standing.

[28] The Court further notes that the Plaintiffs, in fact, listed only 296 city-pairs—as opposed to 298—in their trial exhibit, a discrepancy not explained during trial. *See* PX-149 (listing 296 city-pairs as the relevant market).

city-pairs for the Court's consideration were the 204 city-pairs listed in Table A to the Plaintiffs'

Proposed FOF/COL. *See* Hr'g Tr. at 17:5–6 (Apr. 26, 2019) [Adv. Proc. ECF No. 286]

(Plaintiffs' counsel stating that "[t]he 204 . . . are the presumptive illegal markets in which the

Plaintiffs flew"); *id.* at 19:1–3 (Plaintiffs' counsel stating that "for purposes of liability . . . you

would use the numbers in which the Plaintiffs were threatened and that would be the 204"); *id.* at

20:18–23 (Plaintiffs' counsel affirming that "the Court should be looking at the 204" in

determining whether a violation of Section 7 exists); *id.* at 66:20–21 (Defendants' counsel stating

that, on the particular issue of standing, Plaintiffs would need to "show . . . injury in these 204

markets"). Accordingly, the Court's Decision will address the Plaintiffs' claims as to these 204

city pairs.[29]

## B. Post-Merger Evidence

While most antitrust trials challenging a merger occur before consummation and thus, are

limited to assessing the facts prior to any merger, that is not the case here.[30] In such

---

[29] The Plaintiffs state that the 204 city-pairs listed in Table A to the Plaintiffs' Proposed FOF/COL are comprised "[o]f the city pairs . . . which Plaintiffs have flown or will fly in the future [where] presumptively illegal concentrations exist." Plaintiffs' Proposed FOF/COL ¶ 165. The Court understands the 204 city-pairs to indicate that the Named Plaintiffs have flown or will fly on 204 of the 765 city-pairs that Dr. Lundgren previously identified in the 2018 Lundgren Declaration as having presumptively illegal post-Merger HHI concentration levels and level increases under the Horizontal Merger Guidelines. *See also* Hr'g Tr. at 17:3–10 (Apr. 26, 2019) (Plaintiffs' counsel stating that "there is the 765, which was an initial . . . part of the presumptive illegal markets. The 204, you know . . . . are the presumptive illegal markets in which the Plaintiffs flew on . . . [and allege] would likely fly in the future").

[30] The language of Section 7 is forward-looking in assessing an acquisition that "may" substantially lessen competition. 15 U.S.C. § 18; *see also E.I. du Pont de Nemours & Co.*, 353 U.S. at 597 (noting that the objective of the Clayton Antitrust Act was "primarily to arrest apprehended consequences of inter corporate relationships before those relationships could work their evil, which may be at or any time after the acquisition, depending on the circumstances of the case"); H.R. REP. NO. 94-1373, at 7 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 2637 (noting that "Section 7 is an 'incipiency' statute . . . intended to halt monopolies and restraints of trade in their initial stages, before they ripen into full-scale Sherman Act violations"). The federal pre-merger notification and waiting-period system for large mergers and acquisitions established under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "HSR Act"), 15 U.S.C. § 18a, has contributed to this trend of pre-merger challenges. *See* ABA Antitrust Law Section, Competition/Consumer Protection Policy and North American Comments Task Force, *Analyzing the Scope of Enforcement Actions Against Consummated Mergers in a Time of Heightened Scrutiny* (Apr. 2020) at 1–2 & n.3, https://ourcuriousamalgam.com/wp-content/uploads/Consummated-Mergers-Policy-Task-Force-Apr-2020-FINAL.pdf (noting that "most U.S. merger enforcement challenges are made before the underlying merger has taken place" in part due to an emphasis on pre-merger analysis under the HSR Act); *see also* H.R. REP. NO. 94-1373, at 8

49

circumstances, post-merger evidence may be potentially probative and relevant for a court's review of the competitive impact of a merger. *See, e.g., Gen. Dynamics*, 415 U.S. at 504–06 (finding that the lower court's use of post-merger evidence was "justified" as such evidence "went directly to the question of whether future lessening of competition was probable"); Horizontal Merger Guidelines § 2.1.1 (indicating that "[e]vidence of observed post-merger price increases or other changes adverse to customers is given substantial weight" when evaluating a consummated merger); *see also* Horizontal Merger Guidelines § 5.3 (considering "both the post-merger level of market concentration and the change in concentration resulting from a merger" when examining market concentrations). Not surprisingly, both Plaintiffs and Defendants have submitted post-Merger evidence for the Court's consideration, including Dr. Lundgren's 2018 calculations, lay testimony from certain Named Plaintiffs and Dr. Carlton's retrospective econometric studies. *See, e.g.,* 2018 Lundgren Declaration ¶ 3 (summarizing his updated findings using post-Merger data from 2017 and 2018); Carlton Dir. Ex. ¶¶ 36–44 (discussing his retrospective analysis of data from 2016); Fry Dir. Ex. ¶ 5 (summarizing his domestic flight history since June 2017).

A court, however, may not blindly rely on post-merger evidence. To be considered, such evidence must not be the product of manipulative behavior of "violators [attempting to] stave off . . . actions merely by refraining from aggressive or anticompetitive behavior when such a suit

---

(stating that the HSR Act was proposed to provide the government a "realistic chance" to challenge mergers and address larger mergers before they "become almost unchallengeable" post-consummation). Indeed, challenges to mergers have occurred prior to or shortly after consummation. *See, e.g., E.I. du Pont de Nemours & Co.*, 353 U.S. at 598 (noting that "[p]rior cases under [Section] 7 were brought at or near the time of acquisition"); *Baker Hughes*, 908 F.2d 981 (reviewing a lower court's denial to issue an injunction to enjoin a proposed acquisition); *Anthem*, 855 F.3d 345 (reviewing a lower court's granting of a permanent injunction of a proposed merger between the second- and third-largest national health insurance carriers); *see also New York v. Kraft Gen. Foods Inc.*, 926 F. Supp. 321 (S.D.N.Y. 1995) (assessing a Section 7 challenge to a merger brought approximately 5 weeks after its consummation); *United States v. Bazaarvoice, Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) (assessing a Section 7 challenge to a merger approximately one year after the merger closed).

[is] threatened or pending." *Gen. Dynamics*, 415 U.S. at 504–05. Indeed, courts have recognized that determination of the probative value of post-merger evidence is tied to whether it is possible for such evidence to be easily manipulated. *Compare Chi. Bridge*, 534 F.3d at 435 (stating that the probative value of post-merger evidence easily subject to manipulation is "deemed limited") *with United States v. Bazaarvoice*, *Inc.*, No. 13-CV-00133-WHO, 2014 WL 203966, at *4 (N.D.Ca. 2014) (noting that "post-merger evidence that is not subject to manipulation is of greater probative value, and may be dispositive")*; see also Lektro–Vend Corp. v. Vendo Co.*, 660 F.2d 255, 276 (7th Cir. 1981) (holding that "post-acquisition evidence favorable to a defendant can be an important indicator of the probability of anticompetitive effects," particularly where such evidence "could not reflect deliberate manipulation by the merged companies [to] temporarily . . . avoid anticompetitive activity"); *United States v. Int'l Harvester Co.*, 564 F.2d 769, 780 (7th Cir. 1977) (holding that post-merger evidence that is "beyond the power of the parties to manipulate" may be properly considered).

Applying these principles here, the Court concludes that the post-Merger evidence here is appropriate and helpful in assessing the Section 7 inquiry now before it. Considering the amount of time that has passed since the consummation of the Merger in 2013 and the nature of the evidence presented, the Court finds little basis, if any, to suggest that the evidence submitted is subject to American's manipulation. The majority of the evidence provided by Defendants centers on market trends involving third parties such as LCCs and ULCCs, as well as industry metrics on pricing, capacity and output spanning a period of up to five years. If anything, the protracted passage of time since the closing of the Merger makes the conclusions derived from the post-Merger evidence even more compelling.

### C. Plaintiffs' *Prima Facie* Case

Under the burden-shifting Section 7 analysis, plaintiffs generally bear the initial burden of formulating a *prima facie* case, which may be established on "only one factor, market concentration." *Baker Hughes*, 908 F.2d at 984; *see also* Summary Judgment Decision at 18:7–12 (stating that a *prima facie* case is typically established with market concentration statistics). The Plaintiffs' *prima facie* case here rests on two principal allegations: (1) that the Merger has led to presumptively illegal market concentrations in relevant city-pair markets as reflected in Dr. Lundgren's HHI calculations and (2) that there has been a general market trend towards an increase in concentration in the domestic passenger airline industry over the past year. *See* Summary Judgment Decision at 50:23–51:5 (citing the First Amended Complaint at 12 & App. A and Plaintiffs' Cross-Motion at 12–15).

The Court finds that Plaintiffs have satisfied their burden of establishing a *prima facie* Section 7 case based on the updated post-Merger HHI calculations provided in the 2018 Lundgren Declaration with respect to each of the 204 city-pairs comprising the relevant market. While the 80% reduction in relevant city-pairs from the Plaintiffs' original 1,008 DOJ City-Pairs to the 204 number now before the Court is striking, the Court finds that the concentration statistics provided by Plaintiffs for the 204 city-pairs satisfy the requirements set forth in the Horizontal Merger Guidelines. *See* Horizontal Merger Guidelines § 5.3. Plaintiffs indicated that post-Merger HHI concentration levels and changes in HHI levels for each of the 204 city-pairs were in excess of 2,500 and 200, respectively. *See* Plaintiffs' Proposed FOF/COL, Table A. Specifically, Dr. Lundgren's calculations reflected 2018 HHI levels for the relevant city-pairs ranging from 2,640 to 9,635 and changes in HHI levels from 2012 to 2018 ranging from 215 to 5,693, levels which were sufficiently high under the Horizontal Merger Guidelines to establish a

52

presumption of anticompetitive concerns.[31]  *See id.* (providing the city-pairs for which, pursuant

to Dr. Lundgren's HHI calculations, are "presumptively illegal" under the DOJ's Horizontal

Merger Guidelines); *see, e.g., United States v. Anthem Inc., et al.*, 236 F. Supp. 3d 171, 257

(D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017) (holding that plaintiffs' post-merger market

share and HHI concentration figures were "sufficiently large" to establish a *prima facie* case);

*United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (concluding that a post-

merger change in HHI levels of approximately 400 and a post-acquisition HHI level of 4,691

was sufficient to establish a *prima facie* case of anticompetitive effects); *FTC v. H.J. Heinz Co.*,

246 F.3d 708, 716 (D.C. Cir. 2001) (finding that a post-merger increase in HHI levels of 510

points established a presumption of anticompetitive effects by a "wide margin" pursuant to the

Horizontal Merger Guidelines).  Generally speaking, only the "closest available approximation"

of market shares and HHI estimates is all that is needed; exact precision is not necessary.[32]

*Anthem*, 236 F. Supp. 3d at 207 (stating that plaintiffs "need not present market shares and HHI

estimates with the precision of a NASA scientist") (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d

1, 54 (D.D.C. 2015)); *see also H&R Block*, 833 F. Supp. 2d at 72 (indicating that a "reliable,

reasonable, close approximation of relevant market share is sufficient").

Additionally, the Court notes that there is a "clear general trend towards concentration" in

the domestic airline industry, a fact not contested by Defendants.  Summary Judgment Decision

---

[31]  Notably, Defendants "[do] not assert that Plaintiffs have failed to meet their *prima facie* burden." Defendants' Proposed FOF/COL ¶ 70.

[32]  As previously noted, Dr. Lundgren attempted to replicate the DOJ's HHI figures as set forth in the DOJ Complaint and acknowledged that although there was a 98% correlation between his calculations and the DOJ's calculations, "most [of his] HHI calculation[s] . . . showed deviations."  Lundgren Report at 5.  Nonetheless, Dr. Lundgren believed that, because of the high correlation between the two sets of figures, any antitrust conclusions derived would essentially be the same. *See id.* at 14.  Since only an approximation is required to establish a *prima facie* case, the Court will not address the precision of Dr. Lundgren's HHI calculations at this juncture.  Indeed, Defendants do not take any position as to the accuracy of Dr. Lundgren's calculation of HHI figures in his various reports and declarations.  *See* Defendants' Proposed FOF/COL ¶ 69.

at 53:24–55:24 (discussing the mergers among the other large passenger airlines in recent years as well as Plaintiffs' assertions concerning barriers to entry). Accordingly, the Court concludes that Plaintiffs have sufficiently established a *prima facie* case of anticompetitive effects in the relevant market.

### D. Defendants' Rebuttal Case

Generally, "[i]t is a foundation of [S]ection 7 doctrine . . . that evidence on a variety of factors can rebut a *prima facie* case." *Baker Hughes*, 908 F.2d at 984. Indeed, courts have looked to a number of factors in deciding whether defendants have made a successful rebuttal, including, among other things: ease of entry, market share and concentration, industry structure and supply and demand elasticities. *See id.* at 985 (citing examples of a multiplicity of factors that courts have considered in determining whether a *prima facie* case has been rebutted). While there is no clear standard governing a defendant's rebuttal of a *prima facie* case, there is a general principle of direct proportionality between the compelling nature of a *prima facie* case and the amount of evidence that a defendant must present to successfully rebut a presumption of undue concentration. *See FTC v. CCC Holdings Inc.,* 605 F. Supp. 2d 26, 46–47 (D.D.C. 2009) (stating that despite a lack of a clear standard, "[t]he more compelling the prima facie case, the more evidence the defendant must present to rebut [the presumption] successfully") (quoting *Baker Hughes*, 908 F.2d at 991) (internal quotations omitted). To rebut the Plaintiffs' *prima facie* showing, Defendants have submitted, among other things, both expert and lay witness testimony on the various effects of the Merger on the airline industry.

### i. Dr. Carlton's Econometric Analysis

Defendants' expert witness, Dr. Carlton, presented three separate econometric analyses to rebut Plaintiffs' allegation that the Merger had resulted in presumptively illegal market concentrations. Courts have generally recognized and accepted the use of econometric analysis

54

in evaluating a potential Section 7 violation. *See, e.g., United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 215–18 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019) (determining that Dr. Carlton's regression analysis provided "significant, real-world evidence" and could be afforded probative weight in predicting the potential pricing effects of a challenged vertical merger); *New York v. Kraft Gen. Foods Inc.*, 926 F. Supp. 321, 333–35, 341 (S.D.N.Y. 1995) (evaluating econometric analysis from both plaintiffs and defendants in assessing a potential Section 7 violation); *see also* Horizontal Merger Guidelines § 6.1 (stating that in determining extent of unilateral effects and "[w]here sufficient data are available, the Agencies may construct economic models designed to quantify the . . . price effects resulting from the merger"). Dr. Carlton's first study examined the retrospective impact of prior legacy carrier mergers, his second analyzed the prospective impact of the Merger as of 2013 and his third reviewed the retrospective impact as of 2016 of the last three legacy airline mergers, including this Merger. *See* Carlton Dir. Ex. ¶ 7. The Court finds these three studies—and Dr. Carlton's related testimony—to be credible and very persuasive evidence.

Dr. Carlton's first study is a 2013 retrospective analysis, employing a "variety of analyses, including the use of regression techniques" and concluding that the prior two legacy mergers of Delta and Northwest and United and Continental Airlines "did not generate anticompetitive fare increases or output reductions." *Id.* ¶ 23. Specifically, the 2013 retrospective study examined overall trends in post-9/11 ASMs and found that capacity had, in fact, increased following each of the two prior legacy mergers. *See id.* ¶ 21. Notably, the 2013 study further concluded that fluctuations in airline capacity were "effectively . . . mirror image[s] of . . . pattern[s] in unemployment," thereby suggesting that capacity reductions in the years prior to the Merger were likely "associated with poor macroeconomic conditions" and not with other

55

legacy airline mergers. *Id.* ¶ 22. The results of Dr. Carlton's 2013 retrospective study lend support to the notion that, despite the airline industry's overall trend towards concentration, the prior legacy airline mergers did not, as of 2013, result in anticompetitive effects.

Dr. Carlton next performed a prospective study in 2013 to investigate the potential competitive impact of the then-proposed Merger. *See id.* ¶ 24. Specifically, Dr. Carlton concluded that the Merger would yield considerable consumer benefits as a result of improved network quality and thus would have a procompetitive effect. *See id.* Incorporating American's internal estimates that the Merger could lead to an overall increase of 2.9 million passengers (or approximately 2.8%)[33] for the combined entity, Dr. Carlton estimated that the Merger, on a "conservative" basis, would produce over $900 million in "consumer benefits associated with [the] merged-party traffic increases," which he viewed as "direct evidence of the increase in [post-Merger] network quality." *Id.* ¶ 25–26, 29; *see also id.* ¶ 25 (indicating that his monetization of consumer benefits, based on an estimation of demand elasticity, was built upon "well-accepted methodologies . . . also relied upon by DOJ staff to assess past airline mergers"). Coupling this with overestimates of possible post-Merger fare increases from separate published papers,[34] Dr. Carlton concluded that the estimated $900 million in consumer benefits would far

---

[33] American's estimate was achieved through QSI modeling, a planning tool generally utilized among airline carriers in the ordinary course to predict traffic levels for schedules of flights by all carriers. *See* Carlton Dir. Ex. ¶ 27.

[34] Dr. Carlton's estimated fare increases were based on the following: (1) "Baseline fare concentration effects" figures derived from Dr. Carlton's own study and (2) "BLS fare effects" figures derived from Jan K. Brueckner, Darin Lee & Ethan S. Singer, *Airline Competition and Domestic US Airfares: A Comprehensive Reappraisal*, 2 ECON. OF TRANSP. 1 (2013). Carlton Dir. Ex. ¶ 32 & n.2.

56

exceed any possible adverse impacts on prices, resulting in significant net consumer benefits.[35]
*See id.* ¶ 33.[36]

Finally, Dr. Carlton performed a final retrospective study in 2016 that examined the competitive impact of the last three legacy carrier mergers, including the Merger, on both a collective and individual basis.[37] The results of the 2016 retrospective study confirmed the conclusions of Dr. Carlton's prior 2013 studies and found that, as of 2016, the Merger did not have an anticompetitive impact. *See id.* ¶¶ 38, 44. Rather, the 2016 retrospective study found, among other things, that the Merger produced "procompetitive output expansions on nonstop overlap routes, indicating reductions in quality-adjusted fares[38] and a lack of anticompetitive effects on connecting overlaps." *See id.* ¶ 44.

Of particular significance is the 2016 retrospective study's use of the multiple regression "difference-in-differences" technique[39] and its findings on overlapping routes served by either both merging carriers or one of the merging carriers and one other carrier, the routes where

---

[35] The fare increase estimates were predicated upon the assumption that there would be "no rival response to a merger which combine[d] two carriers on a route." Carlton Dir. Ex. ¶ 32.

[36] The 2013 prospective study did not account for the divestitures that were a part of the DOJ Settlement. *See* Carlton Dir. Ex. ¶ 35. Dr. Carlton opined that the estimated net consumer benefits would be even greater to the extent the DOJ Settlement produced additional benefits to consumers. *See id.*

[37] The data used for the 2016 study was derived from the DB1B database, the same database used by Dr. Lundgren, as well as airline schedules from the Official Airline Guide and the T100 (Form 41) database from the Bureau of Transportation Statistics. *See* Carlton Dir. Ex. ¶ 40.

[38] To estimate changes in quality-adjusted fares that cannot generally be directly computed, Dr. Carlton relied on the assumption that output as measured in number of passengers and quality-adjusted fares were inversely related. *See* Carlton Dir. Ex. ¶ 39 (noting that this was done to recognize that quality-adjusted fares may have decreased despite an increase in nominal fares).

[39] The "difference-in-differences" estimation methodology, a "standard econometric technique," is a form of multiple regression analysis that compares changes in a treatment group versus changes in a control group to capture general trends while controlling for outside factors. *See* Carlton Dir. Ex. ¶ 38 (summarizing the "difference-in-differences" estimation methodology); *see also* Hr'g Tr. at 1248:3–11 (Mar. 15, 2019) (Carlton testifying that the difference-in-differences methodology is used to "evaluate the effect of . . . a treatment, in this case a merger . . . [and] allows you to isolate what is the effect of . . . the merger as distinct from all other factors in the industry").

57

anticompetitive impacts likely would be most pronounced.  *See id.* ¶¶ 37–38.  Specifically, Dr.

Carlton compared changes on these potentially affected routes (i.e., a "treatment" group) against

changes on routes likely not impacted by the merger (i.e., a "control group"), allowing for the

isolation of merger effects and the suggestion of a causal impact.[40]  *See id.* ¶ 38.  The

"difference-in-differences" methodology allows for the accounting of "confounding effects of

non-merger related changes in economic conditions, identifying the merger effects by relying on

effects experienced only on overlap routes but not on control routes, with common changes

across overlap and control routes attributed to non-merger related changes."  *Id*.  As noted in the

publication of Dr. Carlton's 2016 retrospective study in the *International Journal of Industrial

Organization*, the "difference-in-differences" methodology "account[s] for inflation when

examining changes in fares over time."  Dennis Carlton, Mark Israel, Ian MacSwain & Eugene

Orlov, *Are Legacy Airline Mergers Pro- or Anti-Competitive? Evidence from Recent U.S. Airline

Mergers*, 62 INT'L J. OF INDUS. ORG. 58, 66 n.8 (2019); *see* Carlton Dir. Ex. ¶ 7 (noting the

publication of the 2016 retrospective study in the "peer-reviewed International Journal of

Industrial Organization").  Examining nonstop routes where the impact of the Merger would be

most evident, Dr. Carlton found that prices after the Merger decreased by approximately 12.3%,

the number of passengers (i.e., output) increased by approximately 20.2% while the number of

available seats (i.e., capacity) increased by approximately 19.6%.  *See* Carlton Dir. Ex. ¶¶ 37, 43.

Dr. Carlton's findings of an increase in output on these routes are consistent with other findings

of increases in American's capacity since the Merger was consummated.  *See* Garboden Dir. Ex.

---

[40]    The 2016 retrospective study examined both nonstop and connecting routes.  With respect to nonstop
routes, the "treatment" group was comprised of pre-merger routes where the merging parties were either the only
two nonstop carriers ("2-to-1 nonstop routes") or were two of three nonstop carriers ("3-to-2 nonstop routes").  *See*
Carlton Dir. Ex. ¶ 41.  In contrast, the "control group" was generally comprised of connecting or non-nonstop
overlapping routes comprised of the same number of nonstop carriers as those in the "treatment" group during the
respective pre-merger period.  *Id.*  Similar analysis was used to examine overlap connecting routes, comparing such
routes against non-overlap connecting routes.  *Id.*

¶ 27, Table 4 (reflecting an annual increase in ASMs for American beginning in 2013).

Moreover, Defendants have shown that such increases in output continued for another two years

following Dr. Carlton's final study. *See id.* ¶ 26 (noting an increase of 8.5% in total ASMs from

2013 through 2018); *id.* ¶ 29 & Table 5 (stating that there was a "5% increase in total annual

seats on American flights alone for flights to and from its 9 hubs" between 2013 and 2018).

      The conclusions set forth in Dr. Carlton's 2016 retrospective study on overlapping

routes—where anticompetitive effects likely would be most evident—are especially compelling

because the study utilized methodologies that isolated merger effects and accounted for factors

such as inflation. Impacts on prices, market output and capacity are generally considered

indicators of a merger's competitive impact, and showings of increased output have been found

to overcome claims of anticompetitive effects in other antitrust contexts. *See, e.g., Ohio v. Am.

Express Co.*, 138 S.Ct. 2274, 2288 (2018) (stating that, in evaluating alleged violations under the

Sherman Act, the court "[would] 'not infer competitive injury from price and output data absent

some evidence that tends to prove that output was restricted or prices were above a competitive

level'") (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237

(1993)); *Brooke Grp.*, 509 U.S. at 237 (noting, in a predatory price discrimination suit under the

Robinson-Patman Act, "[w]here . . . output is expanding at the same time prices are increasing,

rising prices are equally consistent with growing product demand"); *cf.* Horizontal Merger

Guidelines § 2.2.1 ("Explicit or implicit evidence that the merging parties intend to raise prices,

reduce output or capacity . . . after the merger, or explicit or implicit evidence that the ability to

engage in such conduct motivated the merger, can be highly informative in evaluating the likely

effects of a merger.").

Dr. Carlton also pointed out difficulties with Dr. Lundgren's approach. Dr. Carlton examined changes in airfares for the 15 largest city-pairs of the 1,008 presumptively illegal city-pairs Dr. Lundgren initially identified in the Lundgren Report. *See* Carlton Dir. Ex. ¶ 65. He found that Dr. Lundgren's calculations reflect decreased average airfares for 13 of the 15 routes between 2012 and 2018. *See id.* Moreover, to the extent such changes in airfares are weighted by traffic, the weighted average fare actually decreased over the same period, implying that the average customer actually paid less post-Merger. *See id.* ¶ 66. Similarly, Dr. Carlton looked at changes in fares for the 15 largest city-pairs of the 298 city-pairs originally identified in the Joint Pretrial Order as comprising the relevant market for this proceeding.[41] *See id.* ¶ 68; Joint Pretrial Order, Ex. 5 (listing the 298 city-pairs relevant to the Named Plaintiffs' testimony to comprise the relevant market for purposes of this proceeding). He also found that average fares typically fell and, when weighted by traffic, average passengers paid approximately the same post-Merger as they did pre-Merger. *See* Carlton Dir. Ex. ¶¶ 68–69. Of the 15 largest city-pairs in the subset of 298 city-pairs, 11 of these city-pairs remain as part of the relevant market for purposes of this proceeding. *Compare* Carlton Dir. Ex., Dem. 8 *with* Plaintiffs' Proposed FOF/COL, Table A (listing the 204 city-pairs ultimately comprising the relevant market).

Taken together, Dr. Carlton's three econometric analyses and his related testimony credibly demonstrate that the Merger has expanded airline output, and that it has resulted in a reduction of average fares, an increase in the number of total passengers, and an increase in the

---

[41] Plaintiffs criticize Dr. Carlton for his failure to individually address all of the 1,008 city-pairs identified as presumptively illegal in the Lundgren Report as well as the subset of 298 city-pairs initially comprising the relevant market for this proceeding. *See* Plaintiffs' Proposed FOF/COL ¶ 327 ("Dr. Carlton's study did not analyze all 1,008 city pair relevant markets identified in Plaintiffs' First Amended Complaint or all 298 city pairs identified by Plaintiffs in this case"). The Court notes that Dr. Carlton's analysis was prepared prior to the commencement of trial during which time the number of city-pairs that Plaintiffs sought to include as the relevant market was in flux. As previously discussed, the Plaintiffs further modified the number of relevant city-pairs downward to 204 after the start of trial. *See* Plaintiffs' Proposed FOF/COL, Table A. Given the changing scope and number of relevant city-pairs over the course of this proceeding, the Court rejects Plaintiffs' criticism of Dr. Carlton on this score.

60

number of seats available. *See* Carlton Dir. Ex. ¶¶ 7, 44. Dr. Carlton has demonstrated that competition in the relevant markets and the airline industry generally remains robust and that the Merger has not substantially lessened competition. Dr. Carlton's studies are particularly compelling when juxtaposed against Dr. Lundgren's testimony primarily centered on HHI calculations for the 204 city-pairs comprising the relevant market. Generally speaking, HHI calculations alone are only a starting point in an antitrust inquiry. *See Anthem*, 236 F. Supp. 3d at 209 (noting that the Horizontal Merger Guidelines "make clear that calculating market shares and applying them in the HHI is a predicate step to determining whether agencies need to investigate a potential merger further"); *FTC v. Warner Comm'ns, Inc.*, 742 F.2d 1156, 1163 n.1 (9th Cir. 1984) (holding that concentration statistics merely provide a "meaningful context within which to address the question of [a] merger's competitive effects"); *Chi. Bridge,* 534 F.3d at 432 (cautioning that a party was "plac[ing] too much weight on the HHIs as a dispositive measure of market concentration" in light of other existing evidence). Rather, HHI calculations are primarily useful in providing a useful framework and starting point for a more fulsome analysis of competition in the relevant market. *See* Horizontal Merger Guidelines § 5.3 (stating that market concentration is "often one useful indicator of [the] likely competitive effects of a merger . . . used in conjunction with other evidence of competitive effects" and "may not fully reflect the competitive significance of firms in the market or the impact of a merger"). In fact, Dr. Lundgren himself acknowledged that higher HHIs are merely "*associated* with an increased likelihood of reduced competition." Hr'g Tr. at 809:2–6 (Mar. 13, 2019) (emphasis added); *see also* Carlton Dir. Ex. ¶ 9 (discussing how an increase in HHI "by itself is not evidence of harm to competition"); *id.* ¶ 50 (providing a hypothetical situation where a single firm's increase in

output results in an overall increase in HHI despite other firms remaining unchanged to illustrate a scenario in which increases in HHI may be entirely consistent with increases in competition).

### ii. Other Evidence of Competition in the Airline Industry

The Defendants' other evidence further rebuts the Plaintiffs' *prima facie* case. In the five years after the Merger's consummation, measures of airline capacity—total seats, total ASMs and total passengers flown—for both American individually as well as the airline industry overall have seen notable increases. *See* Garboden Dir. Ex. ¶¶ 26–27 (stating that from 2013-2018, American saw "a 4.5% increase in total seats, a 4.6% increase in total passengers flown, and an 8.5% increase in total ASMs" while the largest U.S. airlines have seen year-by-year increases in capacity). In the same vein, post-Merger TRASM in real dollars, after accounting for inflation, has also declined for both American and the overall industry. *See* Garboden Dir. Ex. ¶¶ 41–43 & Tables 8–10 (finding that overall TRASM for American and the airline industry has declined since the Merger in a manner consistent with fluctuations in fuel prices).

Additional characteristics of the airline industry further reflect a continuing trend of robust competition. Foremost of these is the continued vitality of LCCs. The evidence conclusively establishes that they remain a formidable competitive force within the airline industry and place downward pressure on air fares—a phenomenon that even Plaintiffs' own witnesses, including Dr. Lundgren, have acknowledged.[42] *See, e.g.,* Hr'g Tr. at 823:6–22 (Mar.

---

[42] Plaintiffs, citing to a study prepared by the Government Accounting Office, have argued that the Southwest Effect "may not be as prominent following a merger," a contention derived from a finding that Southwest had raised fares in markets following the mergers of Delta and Northwest and US Airways and America West. Hr'g Tr. at 427:12–428:6 (Mar. 11, 2019). However, as noted, Plaintiffs' own witnesses, including Dr. Lundgren, have offered both statements and anecdotal observations which detract from Plaintiffs' assertions.

Additionally, Plaintiffs' assertions run contrary to the findings set forth in the paper, "Airline Competition and Domestic U.S. Airfares: A Comprehensive Reappraisal," published in the *Economics of Transportation*, which both parties refer to and rely upon for its methodologies. *See* Brueckner, Lee & Singer, *supra* note 34; Lundgren Report at 9 & n.3 (describing his adoption of the authors' approach for combining airports into city markets in an attempt to replicate the DOJ's HHI figures); Lundgren Report, Ex. B (including a copy of the cited paper); Carlton Dir. Ex. ¶ 32 (discussing his use of the authors' fare estimates in addition to his own to evaluate the impact of the

62

13, 2019) (Dr. Lundgren stating during direct examination that "[i]n those markets where the LCCs are operating, there would be—I'm going to assume that they have lower, the legacy airlines, that those fares are lower typically. Yes, [LCCs] would bring down the average in those markets."); Hr'g Tr. at 110:16–111:4 (Mar. 11, 2019) (Rubinsohn agreeing that his observation that airfares were "significantly less" on routes where Southwest flies was an example of the "Southwest Effect"). Given their low-cost business model and relatively younger aircraft fleet, LCCs remain poised for additional growth and expansion. *See* Kasper Dir. Ex. ¶¶ 43–46 (stating that LCCs are likely to continue their growth, largely driven by the expansion of ULCCs whose cost structures are lower than even that of Southwest or JetBlue). While there are substantial capital costs for new entrants into the airline industry generally, barriers to entry for existing carriers into new routes are relatively low, suggesting that the further expansion of LCCs and ULCCs remains a possibility.[43] *See* Parker Dir. Ex. ¶ 7 (highlighting the "low barriers to entry into routes"); Kasper Dir. Ex. ¶ 50 (stating that "LCC entry into particular city-pairs can (and does) occur rapidly"). Indeed, the expansive growth of LCCs over the past several years reflects the degree to which LCCs are able to enter into routes. *See, e.g.,* Kasper Dir. Ex. ¶ 50 (noting that Spirit, a ULCC, added non-stop service to 25 new destinations from Dallas Fort-Worth between 2011 and 2013); *id.* (noting that LCC flights at three slot-controlled airports increased

---

Merger). The Court notes the paper concludes that "most forms of legacy-carrier competition have weak effects on average fares" while LCC competition has "dramatic fare impacts, whether it occurs at the airport-pair, at adjacent airports, or as potential competition." Brueckner, Lee & Singer, *supra* note 34, at 1; *see also id.* at 2 (highlighting the study's empirical findings that show decreases in airfares where LCCs are present).

[43] Plaintiffs argue that there are substantial barriers to entry in the airline industry based on the assertion that there have not been any major airline entrants to the market in recent years. *See* First Amended Complaint, ¶¶ 159–60 (stating that there have only been two new major carrier entrants in recent years and no "new, viable competitors in the national market since 2000"); Plaintiffs' Proposed FOF/COL ¶¶ 181, 185 (noting testimony of Daniel Kasper acknowledging that Virgin America was the last major airline carrier to enter the market in 2007) (citing Hr'g Tr. at 1040:16–22 (Mar. 14, 2019)). But Plaintiffs do not themselves provide any further evidence or analysis to support their contention, which the Court finds unpersuasive given the continued expansion of LCCs.

more than nine-fold between 1999 and 2016); *id.* ¶ 61 ("LCCs have more than quintupled their

share of the U.S. domestic airline market . . . [and] 87% of all domestic air passengers travel on

city-pairs that are served by at least one LCC").[44]

In sum, Defendants were uniquely positioned to observe the effects of the Merger several

years after its consummation given the timing of trial in this case.  This evidence about the

airline industry pre- and post-Merger, as well as an analysis of the impact of the Merger

specifically through the use of econometric methodologies (which isolate and control for factors

such as inflation), was highly persuasive in supporting Defendants' position.  Moreover, given

the length of time that has passed since the Merger, the potential for manipulation of post-Merger

evidence appears improbable.  Given all the compelling evidence outlined above that has been

presented by the Defendants, the Court concludes that Defendants have easily overcome

Plaintiffs' *prima facie* showing.[45]

### iii.  Evidence of the Merger's Efficiencies

Defendants have also turned to purported efficiencies in support of their position.  Some

courts have considered a merger's efficiencies when evaluating an antitrust claim.  *See Deutsche

Telekom*, 439 F. Supp. 3d at 207 (noting that the trend among lower courts has been to

---

[44]    Indeed, as previously discussed, the Merger itself was driven in part by a desire to strengthen American and
US Airways' ability to compete with LCCs and ULCCs.  *See* Parker Dir. Ex. ¶ 32 (noting that LCCs have "entered
many of these routes since the Merger"); Kasper Dir. Ex. ¶ 73 (noting that American's initial foray into bankruptcy
was driven in part by "heightened competition from LCCs").  The recent gate and slot divestitures that were part of
the DOJ Settlement may further strengthen the competitive position of LCCs.  *See* Carlton Dir. Ex. ¶ 17 (noting that
the role of LCC competition was "enhanced by the slot and gate divestitures agreed to in the settlement of the DOJ
litigation").

[45]    Defendants have further argued that the Merger resulted in additional procompetitive efficiencies,
stemming from the combination of American and US Airways' complementary networks.  They believed that the
merging of the airlines' networks would yield "significant benefits for consumers, particularly with respect to travel
options"—resulting in procompetitive benefits to consumers generally as well as to smaller communities—and
increased efficiencies in infrastructure investments and the expansion of its fleet aircraft.  Defendants' Proposed
FOF/COL ¶ 89; *see id.* ¶¶ 95, 97–98; Kasper Dir. Ex. ¶ 86.

64

"recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive, even if such evidence could not be used as a defense to an actually anticompetitive merger"); *see also Anthem*, 855 F.3d at 355 (stating that the court will "proceed on the assumption that efficiencies as presented by Anthem could be such a defense under a totality of the circumstances approach"); *Saint Alphonsus*, 778 F.3d at 790 (stating that the court will "assume . . . [that] a defendant can rebut a prima facie case with evidence that the proposed merger will create a more efficient combined entity and thus increase competition"); *cf. Deutsche Telekom*, 439 F. Supp. 3d at 208 (noting that claimed efficiencies must be "both merger-specific and verifiable"); *Anthem*, 855 F.3d. at 356 (stating that to be deemed merger-specific, any claimed efficiency must be shown to be unachievable "by either company alone because, if [it] can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor.'") (citing *Heinz*, 246 F.3d at 722); Horizontal Merger Guidelines § 10 (describing when efficiencies would be deemed merger-specific). While the Court finds Defendants' evidence of efficiencies both credible and persuasive, the Court does not need to rely upon the purported efficiencies claimed by Defendants in reaching its conclusion today given that the Defendants' other evidence discussed above easily overcomes Plaintiffs' *prima facie* case.

### iv. Likelihood of Coordination in the Airline Industry

Nonetheless, while the Court finds the Defendants' evidence discussed above to be credible and convincing, it is not persuaded by one aspect of Defendants' case. The Defendants have argued, in part, that conditions in the airline industry are generally not conducive to effective coordination and that the Merger itself was not likely to enhance such coordination to the detriment of competition. *See* Ordover Dir. Ex. ¶¶ 6–7. They explain that successful coordination hinges upon participants' ability to enforce coordination, which is dependent upon

65

the "availability of key information concerning market conditions, transactions, and individual

competitors." *Id.* ¶¶ 11, 15–16; *see also id.* ¶¶ 12–13 (noting that successful coordination is less

likely when parties are unable to monitor rivals' behavior and rivals must adjust prices or

strategic actions in response to market conditions). Transparency and full and complete

knowledge as to participants' actions is critical. *See id.* ¶ 16 (stating that "transparency is an

especially important factor" for parties to both reach terms of coordination and to detect and

punish detractors). Defendants assert that the industry is not conducive to coordination, in part,

because airlines are unable to properly monitor other airlines' pricing behavior as the "process of

setting fares and determining how many seats (if any) to offer at each fare and at each point in

time is highly complex," resulting in an "essentially opaque" system. *Id.* ¶¶ 25, 27.

But the Court finds the Defendants' arguments regarding the transparency of airline

carrier pricing to be unpersuasive given the history of this bankruptcy. In the main bankruptcy

case before this Court, the Debtor AMR sought the Court's approval of its motion to reject

certain collective bargaining agreements pursuant to Section 1113 of the Bankruptcy Code. *See*

*generally* Debtors' Section 1113 Application; *AMR I*, 477 B.R. at 393. As part of that

proceeding, AMR submitted the expert testimony of Daniel Kasper, one of the same experts who

testified in this matter. In explaining the economic challenges facing AMR and the airline

industry as a whole, Mr. Kasper opined that there is now "an *unprecedented* level of price

transparency resulting from online distribution channels to exert further downward pressure on

fares over the past decade." Declaration of Daniel M. Kasper in Support of Debtors' Motion to

Reject Collective Bargaining Agreements Pursuant to 11 U.S.C. § 1113 ¶ 72 [Case No. 11-

15463, ECF No. 2041, Ex. 1] (emphasis added). A result of this increased transparency has been

the "increased commodization of airline travel, especially for price sensitive passengers." *Id.* ¶

66

73.  He attributed the newfound transparency to the "rapid spread of Internet-based airfare search engines [which has] greatly reduced (indeed, almost eliminated) the costs of searching for the lowest possible fares."  *Id.* ¶ 72.  Having found Mr. Kasper to be a highly credible witness in that prior proceeding as well as in this case, the Court cannot reconcile Mr. Kasper's statements concerning "unprecedented" transparency for consumers with the notion that sophisticated corporations (like airlines) lack the ability to monitor fellow competing airlines' prices.  Thus, the Court is not convinced that that coordination within the airline industry is unlikely.  But given the wealth of other evidence provided by Defendants, the Court's view about coordination does not impact the Court's ultimate conclusions concerning the Merger.

### v.  Plaintiffs' Reliance on the Standalone Plan

Plaintiffs seek to undercut Defendants' case by relying on the standalone plan that was discussed in the bankruptcy case before the Merger was proposed.  Plaintiffs harp on the fact that American's capacity increase of 8.5% fell well short of the projected 20% capacity growth over the course of five years under American's standalone plan.  *See, e.g.,* Hr'g Tr. at 12:12–17 (Mar. 11, 2019) (noting that American intended to increase its capacity by approximately 20% over a five-year period); Hr'g Tr. at 372:22–376:3 (Mar. 12, 2019) (suggesting that America, along with other legacy carriers, "rationalized" or reduced capacity since 2005).  But Plaintiffs have failed to demonstrate why a merger should be deemed anticompetitive simply because a merged company failed to ultimately meet a projected benchmark as to capacity or output that was made under an alternative restructuring plan.

Moreover, Plaintiffs' reliance on the projection in the standalone plan takes that projection out of context.  Bankruptcy courts are routinely presented with projections as a basis for confirmation of a plan or other purposes.  The projection relied upon by Plaintiffs here was presented as part of a Section 1113 application by Debtor AMR that sought permission to reject

its collective bargaining agreements with its unions.  *See generally* Motion of Debtors for Entry

of Order Pursuant to 11 U.S.C. § 1113 Authorizing Debtors to Reject Collective Bargaining

Agreements [Case No. 11-15463, ECF No. 2035] ("Debtors' Section 1113 Application"); *AMR I*,

477 B.R. at 417 (discussing the propriety of American formulating a standalone business plan).

That proceeding examined whether Debtor AMR's proposed changes to the collective bargaining

agreements were necessary for reorganization.  As such, the focus was on the Debtors' proposed

changes to the collective bargaining agreements viewed in the context of AMR's ongoing losses.

The capacity increase projected was but one part of AMR's multifaceted standalone plan of that

was the backdrop to an evaluation of AMR's extensive and complex proposed change to the

collective bargaining agreements.  *See AMR I*, 477 B.R. at 401–02 (describing the various

elements of the standalone plan).  And even where projections are central to an inquiry before

the Bankruptcy Court, they are best understood as estimates based on available information, with

such estimates considered as less reliable the further out in time they extend.  *See id.* at 415

(noting that satisfaction of Section 1113(b)'s requirement that a proposal be "based on the most

complete and reliable information available at the time" is difficult to satisfy because "available

information may change based on the twists and turns of the bankruptcy"); *cf.* Kasper Dir. Ex. ¶¶

75–76 (explaining that airlines "respon[d] to . . . changing economic and competitive

conditions," lending support to the notion that projections are not guarantees and remain subject

to ever-changing economic factors).  This is powerfully demonstrated by the current economic

difficulties of businesses stemming from the current unforeseen COVID-19 pandemic.

Relatedly, Plaintiffs assert that the many of Defendants' claimed benefits were achievable absent

the Merger, rendering the Merger unnecessary.  *See* Plaintiffs' Proposed FOF/COL ¶¶ 241–75

(arguing that American and US Airways' standalone plans for growth obviated the need for the

68

Merger); *id.* ¶¶ 290–93 (arguing that American could have achieved an expansion of its network

through codesharing as provided for under its standalone plan which "included agreements with

its unions to increase its code sharing [sic] arrangements for which American received approval

as part of the restructuring process"). But once again, that is not the inquiry now before the

Court, which is whether the Merger violates Section 7 of the Clayton Antitrust Act. In any

event, Plaintiffs' assertions about codesharing ignore the history of this case. Under AMR's

motion to reject its collective bargaining agreements, AMR did seek approval to enter into

unlimited codesharing agreements. *See AMR I*, 477 B.R. at 431–32. But the Court denied that

request. While the Court acknowledged that increases in codesharing could be beneficial, it

ultimately held that American had not shown "by a preponderance of the evidence . . . that

essentially unlimited codesharing [was] necessary to achieve a successful reorganization." *Id.* at

433. Additionally, Plaintiffs failed to offer any other evidence to establish that codesharing

could serve as a viable alternative to the Merger. In fact, Mr. Kasper testified that codesharing

was generally a "considerably inferior" method to expand a network as opposed to a merger due

to the lack of ability to "coordinate schedules . . . [and] pricing." Hr'g Tr. at 1056:24–1057:6

(Mar. 14, 2019); *see also id.* at 1087:12–1088:14 (Kasper stating that the "literature . . . is quite

clear, and that is that a merger has far more economic benefit for the consumers [sic] than

codesharing").[46]

---

[46] While the Plaintiffs' argument about whether the Merger was really necessary is not the relevant inquiry
now before this Court, Plaintiffs have not demonstrated that the standalone plan was as good or better in creating
value for stakeholders as the Merger. Indeed, the Merger that was the basis for AMR's ultimate plan of
reorganization, eventually proved to be highly successful in maximizing value for its constituents and stakeholders,
including providing for recovery to equityholders, a rare occurrence in Chapter 11 proceedings. *See, e.g.,* Conor
Shine, *What's Next for American Airlines Five Years After its Merger with US Airways*, Dall. Morning News, Dec.
9, 2018, https://www.dallasnews.com/business/local-companies/2018/12/09/what-s-next-for-american-airlines-five-
years-after-its-merger-with-us-airways/; *AMR Shareholders to Receive Rare Value from Chapter 11*, Reuters, Feb.
14, 2013, https://www.reuters.com/article/americanairlines-merger-equity/amr-shareholders-to-receive-rare-value-
from-chapter-11-idUSL1N0BF0T020130215 (highlighting that American's shareholders expected to receive

69

### E. Plaintiffs' Additional Evidence of Anticompetitive Effects

With Defendants' successful rebuttal of Plaintiffs' *prima facie* case, the burden now

shifts to Plaintiffs to produce sufficient additional evidence of the Merger's anticompetitive

effects. *See Baker Hughes*, 908 F.2d at 983. To satisfy their burden, Plaintiffs have submitted

additional information from Dr. Lundgren and testimony from a number of the Named Plaintiffs.

### i. Dr. Lundgren's Additional Calculations

In addition to his initial HHI figures, Dr. Lundgren submitted unweighted average[47] fare

and passenger growth calculations for the relevant city-pairs. He contends that a subset of this

data demonstrates fare increases for 2012 through 2016, as well as weighted average fare growth

calculations for the FY 2016 Dataset.[48] *See* 2017 Lundgren Declaration (calculating unweighted

average fare and passenger growths for the period of 2012 through fiscal year 2016 for

individual city-pairs and an overall average fare growth weighted by passengers on all routes that

experienced increases); 2018 Lundgren Declaration (calculating unweighted average fare and

passenger growths for the period of 2012 through fiscal year 2018 for individual city-pairs). To

compute unweighted averages for each relevant city-pair, Dr. Lundgren employed the following

formula: the change in the average fare or passenger growth between 2012 and the respective

---

recoveries valued at approximately $350 to $400 million, something "unusual in Chapter 11 cases—and unprecedented in recent airline restructurings").

[47] The phrase, "unweighted average," simply refers to an arithmetic mean. *See* Hr'g Tr. at 1262:22–1263:20 (Mar. 15, 2019) (Carlton testifying that Dr. Lundgren took a "simple average" of fluctuations in average fares). In contrast, a "weighted average" is defined to be "an average that can attach more importance (weight) to some observations than to others." GRAHAM UPTON & IAN COOK, *Weighted Average, in* A DICTIONARY OF STATISTICS (3d. ed. 2014), https://www.oxfordreference.com/view/10.1093/acref/9780199679188.001.0001/acref-9780199679188-e-1741.

[48] Of the 298 city-pairs parties comprising the relevant market at the beginning of trial, 78 city-pair routes had nominal average fares that *decreased*, resulting in only 220 city-pairs reflecting an unweighted increase. *See* PX-149; *see also supra* note 28 (noting that PX-149 lists 296 city-pairs as opposed to 298). Of the remaining 204 city-pairs being considered at the end of trial, Plaintiffs identified 54 city-pair routes where nominal average fares had decreased, resulting in 150 city-pairs reflecting an unweighted increase. *See* Plaintiffs' Proposed FOF/COL, Table B.

year of the dataset (i.e., either 2016 or 2018) divided by the corresponding fare or passenger growth figure for 2012. *See* 2017 Lundgren Declaration ¶ 12; 2018 Lundgren Declaration ¶ 14. Finally, Dr. Lundgren's 2017 declaration further includes an average of the change in fares weighted by passenger growth on all routes that experienced unweighted average increases for the period 2012 through fiscal year 2016. *See* 2017 Lundgren Declaration, Annex A. Plaintiffs' primary evidence of alleged anticompetitive effects stems from the alleged changes in average fares in a subset of the city-pairs identified, which Dr. Lundgren states "are presented without further analysis or conclusions based on statistical, econometric, or other expert economic analysis." 2017 Lundgren Declaration ¶ 3.

Plaintiffs assert that Dr. Lundgren's average fare calculations are sufficient to establish a causal link between the Merger and the observed post-Merger average fares. But the Court disagrees for a variety of reasons. First, Dr. Lundgren's fare calculations do not account for inflation and, therefore, do not shed any light as to the changes in average fares in real-dollar terms that would permit more informed and accurate comparisons. *See* Hr'g Tr. at 878:4–11 (Mar. 13, 2019) (Dr. Lundgren conceding that his nominal fares calculations "[do] not talk about inflation . . . [but rather] the average fare growth in terms of the fares paid in 2012 and the fares paid in 2016"); *id.* at 880:1–10 (Dr. Lundgren further conceding that "there is no part of [his] average fare work that is presented in either of [his] two reports that tries to convert the nominal data into real dollars"). In fact, as Dr. Carlton noted in his testimony, Dr. Lundgren's estimated 7.9% increase in unweighted average fares overall between 2012 and fiscal year 2018 was in actuality lower than the inflation rate over the same period, implying that "in real terms the price . . . if [the Court] accepted it . . . means in real terms [that] prices are falling." Hr'g Tr. at 1262:22–1263:20 (Mar. 15, 2019).

71

Without addressing the effect of inflation on airfares, one cannot conclude that the Merger is responsible for changes in post-Merger prices. *See* Carlton Dir. Ex. ¶ 64 (noting that Dr. Lundgren "presents no analysis that accounts for changes in economic conditions . . . and how such changes . . . affected airline fares independent of any purported effect of the Merger"); Hr'g Tr. at 1248:9–17 (Mar. 15, 2019) (Carlton testifying that he used the "difference-in-differences" methodology to "isolate what is the effect of, say, the merger as distinct from all other factors in the industry . . . [including] inflation [and] a whole bunch of things that are going on"); *see also* Carlton, Israel, MacSwain, & Orlov, *supra* p. 58 , at 58 (stating that because "fares are affected by many economic factors other than the number of competitors on a route and those factors may be changing over time . . .  a simple before-and-after examination of *nominal* fares on routes affected by [a] merger risks attributing the merger trends in fares that may have some other causes") (emphasis added); *id.* at 66 n.8 ("Generally, one needs to account for inflation when examining changes in fares over time.").  Considerations of the impact of inflation are even more paramount where there has been a considerable passage of time.  *See* Carlton Dir. Ex. ¶ 9 (highlighting that Dr. Lundgren's analysis spans over a period of approximately five-and-a-half years).

Indeed, courts performing antitrust analysis have considered whether fluctuations in prices could be explained by inflation or otherwise attributed to anticompetitive behavior.  *See, e.g., Brooke Grp.*, 509 U.S. at 213 (noting, as part of its evaluation of a claim under the Robinson-Patman Act, that "[l]ist prices for cigarettes increased in lockstep, twice a year, for a number of years, irrespective of the rate of inflation"); *Cablevision Sys. Corp. v. FCC,* 649 F.3d 695, 712 (D.C. Cir. 2011) (affirming the FCC's findings in its issued order that, among other things, there was still "evidence that cable prices have risen in excess of inflation") (citing to *In*

72

*re Review of the Comm'n's Program Access Rules & Examination of Program Tying Arrangements*, 25 FCC Rcd. 746, 776 ¶ 42 (2010)); *United States v. Eastman Kodak Co.*, 853 F. Supp. 1454, 1473 (W.D.N.Y. 1994) (citing to defendant's expert's conclusion that, among other things, "inflation-adjusted film prices have declined over the previous two years, due primarily . . . to increasing competition" in evaluating whether relief from an antitrust consent decree was warranted). Because Dr. Lundgren did not control for inflation, concrete conclusions or even inferences cannot be drawn concerning whether the changes in airfares were actually caused by the Merger as opposed to other factors.

Second, Dr. Lundgren's average fare calculations do not account for changes in output, capacity, or quality adjustments during the relevant periods of time, all of which may impact airfares. *See* Hr'g Tr. at 881:6–15 (Mar. 13, 2019) (Dr. Lundgren acknowledging that his nominal fares computations do not account for industry capacity or output); *id.* at 882:8–883:10 (Dr. Lundgren conceding that his methodology does not account for changes in quality which could have otherwise been achieved through the use of a "hedonic model," a model that allows for the adjustment of price data to account for changes in quality). Determination of pricing in the airline industry is a multifaceted and complex process and is contingent upon a number of factors, including capacity, which Plaintiffs themselves acknowledge can result in fluctuations in prices. *See* Ordover Dir. Ex. ¶ 27 (describing the "highly complex" price-setting process of the airline industry); Plaintiffs' Proposed FOF/COL ¶ 280 (stating that "[a]irlines use GDP growth as a predictor of demand to calibrate capacity"); First Amended Complaint ¶ 107 (asserting that "[c]apacity reduction has resulted in higher prices for fares and other services"). As such, the Court is unable to draw any conclusions from Dr. Lundgren's analysis as to whether the variations in airfares are the result of the Merger as opposed to other factors.

Third, Dr. Lundgren treated each city-pair equally, not accounting for the amount of airline traffic. *See* 2018 Lundgren Declaration ¶ 14 (describing his computation methodology). When a weighted analysis is actually done, average fares on the largest city-pairs appear to have fallen between 2012 and 2018 as previously discussed. *See* Carlton Dir. Ex. ¶¶ 65–68 (noting that if changes in fares for each of the 1,008 city-pairs were weighted by traffic, the weighted average fare has fallen by 2.1% to 5.3% depending on the weighting performed); Hr'g Tr. at 888:24–889:22 (Mar. 13, 2019) (Dr. Lundgren acknowledging that the calculations submitted in connection with the 2018 Lundgren Declaration did not include an examination of the impact of number of passengers on changes in average fares). Oddly, only the 2017 Lundgren Declaration included any sort of a weighted analysis, diminishing the ability to perform any meaningful comparisons between Dr. Lundgren's 2017 and 2018 findings or draw his intended inferences as to trends. The lack of a weighted analysis in his 2018 findings forecloses a conclusion that, at least as of 2018, the average passenger paid more on an identified route pre-Merger than post-Merger. *See* Carlton Dir. Ex. ¶ 66 (stating that, after weighing each city-pair by traffic, the weighted average fare fell, "imply[ing] that the average passenger . . . paid less after the Merger than before the Merger").

Fourth and finally, Dr. Lundgren's analysis begins in 2012, approximately one year prior to the consummation of the Merger. Thus, his baseline for comparison does not portray the actual state of the airline industry and market at the time of the Merger. This calls into question whether anyone may confidently conclude or even infer that any changes in fares actually stemmed from the Merger.

On whole, Dr. Lundgren's barebones calculations—that fail to account for outside factors—do not support Plaintiffs' contention that the Merger resulted in higher post-Merger

prices for certain city-routes, let alone establish a causal relationship between the Merger and post-Merger fares.[49]  Accordingly, the Court finds that Dr. Lundgren has failed to sufficiently demonstrate that the Merger resulted in an increase in airfares on the identified city-pairs.

### ii.  Analysis of the Named Plaintiffs' Testimony

Plaintiffs have also submitted testimony from various Named Plaintiffs about purported harms they have allegedly suffered because of the Merger.  Plaintiffs' testimony, however, is largely anecdotal and fails to establish a causal relationship between these alleged harms and the Merger, rendering this evidence insufficient to establish a showing of the Merger's supposed anticompetitive impact.

First and foremost, many of the Named Plaintiffs' alleged harms are a laundry list of general grievances concerning the state of the airline industry untethered from the Merger.  *See, e.g.,* Hr'g Tr. at 81:14–20 (Mar. 11, 2019) (Rubinsohn testifying that because he was no longer at the "top of the frequent flyer list," he was no longer "boarding in the first group"); *id.* at 84:15–22 (Rubinsohn testifying that due to the closer spacing between seats, there is "not as much knee room as there used to be"); Hr'g Tr. at 572:9–15 (Mar. 12, 2019) (Brito testifying that first-class passengers were no longer entitled to lounge access); *id.* at 574:3–7 (Brito testifying that in-flight seats "don't recline as much and you have less legroom"); *id.* at 612:23–614:17 (Jolly testifying that prices had "increased" because there was a reduction in availability of seats that could be purchased with frequent flier miles and she instead was required to use cash); *id.* at 636:8–21

---

[49]   As previously noted, the Court rejected the admission of the Lundgren Supplemental Report to the extent that it sought to include new opinions concerning the competitive impact of the Merger.  *See* Exclusion Order at 4–7 (denying the Plaintiffs' request to admit the Lundgren Supplemental Report on grounds that, among other things, the Lundgren Supplemental Report did not constitute a "supplement" under Federal Rules of Civil Procedure Rule 26(e) and the timing of the request was inappropriate); *see also* Reconsideration Order (denying Plaintiffs' request for permission to serve the Lundgren Supplemental Report or, in the alternative, for the Court to reconsider the ruling under the Exclusion Order).  As the underlying reasoning for the exclusion of the Lundgren Supplemental Report is set forth in detail in the Exclusion and Reconsideration Orders, the Court will not repeat that analysis here today.

(Jolly testifying that she was "harmed" by an incident with an American employee: "I was on a flight and I was watching the movie, and the flight attendant came from behind me and slammed a can of Coke down on my tray. And I said, I did not order that. And she said, I know you didn't because you had your headphones in and you couldn't hear me. And I just said, please take it away."); Hr'g Tr. at 717:4–718:6 (Mar. 13, 2019) (Talewsky testifying that the quality of food service for first-class had declined because he received a "cold meal" and "on a coast-to-coast flight . . . [he] got, like, a fig bar . . . [and] [t]here was maybe a piece of fruit"). Moreover, some of Plaintiffs' grievances were the direct product of circumstances and choices made by the Named Plaintiff and thus, provided little insight into the industry. *See, e.g.,* Hr'g Tr. at 245:3–21 (Mar. 11, 2019) (McCarthy testifying that she was "forced" to pay over $3,600.00 to purchase a first-class ticket due to a lack of availability of coach seats when she booked tickets one day prior to her desired travel date); *id.* at 247:17–248:20 (McCarthy testifying that she elected to pay $761 for a first-class flight from Fort Myers to Newark after considering her checked bag, "comfort and value" and "timing"). Plaintiffs have not offered any persuasive explanation as to how the Merger bears a relationship to such alleged harms.[50]

Indeed, the weight of the credible evidence suggests that any of the Plaintiffs' purported "injuries" likely originate not from the Merger itself, but rather from industry changes, particularly amongst legacy carriers, in response to the growth and proliferation of LCCs and ULCCs. *See* Kasper Dir. Ex. ¶ 41 (discussing how ULCCs have "unbundled" ancillary services, allowing consumers to elect which services they would like to purchase, including carry-on luggage and seat selection); *id.* ¶ 42 (noting that, in response to the proliferation of ULCCs,

---

[50] The Court had previously highlighted this issue in its Summary Judgment Decision and Plaintiffs have not made any effort to address this problem at trial. *See* Summary Judgment Decision at 43:19–22 (stating that the "Court agrees with the Defendants about the generality and irrelevance of many of the complaints and statements included").

legacy carriers have adopted "basic" economy fares where, in exchange for a discounted fare, certain ancillary services are unbundled); *see also* Hr'g Tr. at 1085:8–23 (Mar. 14, 2019) (Kasper testifying that legacy carriers were "forced into [unbundling services] kicking and screaming" as a result of a need to compete with LCCs and ULCCs). In fact, the implementation of baggage fees specifically predates the consummation of the Merger. *See* Hr'g Tr. at 123:11–124:4 (Mar. 11, 2019) (Rubinsohn testifying that he "[paid] for baggage before the [M]erger on American); Hr'g Tr. at 625:13–626:3 (Mar. 12, 2019) (Brito testifying that the "baggage fees started when the fuel crisis [occurred in] 2008, 2010"); *id.* at 656:9–23 (Jolly testifying that the "baggage fees were implemented prior to the [M]erger . . . in 2008"). Sole reliance on the mere coincidence that the alleged harms occurred post-Merger cannot and does not alone establish a conclusion of causation. *See Lavoho, LLC v. Apple, Inc.*, 232 F. Supp. 3d 513, 530 (S.D.N.Y. 2016) (stating that plaintiffs' reliance on the timing of events to prove causation is "a *post hoc ergo propter hoc* logical fallacy" and is insufficient to satisfy their burden), *aff'd sub nom., Diesel eBooks, LLC v. Simon & Schuster, Inc.*, 869 F.3d 55 (2d Cir. 2017). Given the credible evidence before the Court, Plaintiffs have not established a "plausible chain of causation" between the Merger and these subsequent events, rendering Plaintiffs' attempts to make a showing of adverse competitive effects utterly lacking. *Fjord III*, 527 B.R. at 888–89.

Moreover, the timing of Plaintiffs' alleged harms often fails to align with the Merger; that is, the claimed harms supposedly occurred before the Merger was ever consummated. *See, e.g.,* Hr'g Tr. at 109:12–17 (Mar. 11, 2019) (Rubinsohn alleging harm because Pittsburgh and Raleigh ceased to be hubs but later acknowledged that both, in fact, ceased being hubs "way before the [M]erger"); *id.* at 153:3–10 (Russell alleging harm because only American served her preferred airport in Waco but later acknowledging that Continental, a former competitor at the Waco

location, had in fact dropped its flights at least a year prior to the consummation of the Merger);
Hr'g Tr. at 274:23–275:11 (Mar. 12, 2019) (Garavanian acknowledging that the issues he
experienced in booking flights from Boston to Miami on American in 2013 occurred prior to the
closing of the Merger); Hr'g Tr. at 785:12–786:8 (Mar. 13, 2019) (Stansbury acknowledging that
the "increase in fares [she] observed on [a] Reno to New York flight could not have been a result
of the American/US Airways [M]erger"). As the Court has recognized, Plaintiffs bear the
burden of making a showing as to how such alleged harms, which occurred pre-Merger, may be
attributed to the consummation of the Merger itself. *See Fjord III*, 527 B.R. at 889 (noting that
"all of these alleged harms occurred before the American merger" and that "Plaintiffs have failed
to allege any plausible explanation as to how the American merger relates to this harm"); *see
also* Summary Judgment Decision at 44:13–17 (noting that the "declarations are filled with
complaints that do not appear on their face to be tied to the [M]erger, as well as the irrelevant
criticisms of other non-defendant airlines and comments about trips that took place long before
the [M]erger").

Named Plaintiffs' testimony is also riddled with other issues which greatly diminish its
persuasiveness. For example, multiple Named Plaintiffs testified to harms experienced on flights
and routes that fall outside of the scope of the relevant market and this proceeding, including
testimony concerning international flights as well as flights taken on city-pair routes not
identified by Dr. Lundgren as being presumptively illegal. *See, e.g.,* Hr'g Tr. at 164:21–165:20
(Mar. 11, 2019) (Russell alleging harm on a flight from Dallas to Fort Lauderdale, a route that
Dr. Lundgren did not argue was a city-pair that had experienced an increase in concentration); *id.*
at 201:4–15 (Fry acknowledging that only 2 of the last 38 flights he has flown were included in
Dr. Lundgren's report); *id.* at 236:15–19 (McCarthy acknowledging that only 6 of the 105 city-

pairs she alleged experienced harm were included in Dr. Lundgren's report); *id.* at 246:3–14

(McCarthy acknowledging that her written testimony included an international flight to Punta

Cana, Mexico); Hr'g Tr. at 583:25–584:3 (Mar. 12, 2019) (Brito acknowledging that the

majority of his flying is comprised of international travel); Hr'g Tr. at 744:23–745:9 (Mar. 13,

2019) (Talewsky acknowledging that the alleged harmful incident he suffered from occurred on

an international flight from Tokyo to Chicago).

      Similarly, Named Plaintiffs testified to harms suffered on connecting flights, and failed to

tie those flights to the city-pairs identified by Dr. Lundgren. *See* Hr'g Tr. at 813:12–21 (Mar. 13,

2019) (Dr. Lundgren stating that his report covers solely city-pairs comprised of "ultimate origin

and destination of . . . flights," "[n]one of [which] would be connecting flights, in which you first

fly to an airport that's in between or somewhere and . . . then fly out to your ultimate

destination"); *but see, e.g.*, Hr'g Tr. at 204:4–8 (Mar. 11, 2019) (Fry acknowledging that his

flight from Tucson to Dallas/Fort Worth was in actuality the first leg of a connecting flight); *id.*

at 296:12–23 (Garavanian clarifying that a large number of city-pairs provided in his written

testimony were in actuality connecting flights). Named Plaintiffs have also testified as to city-

pairs they intend to fly on in the future on a purely speculative basis with no concrete plans to do

so. *See Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 WL 3790296, at *14 (N.D.Ca.

Sept. 27, 2010) (concluding that plaintiffs' affidavits stating an "unformed hope of future air

travel . . . [a] speculative and *de* minimis injury (assuming there would be injury) [are]

insufficient to establish irreparable harm"); *see also, e.g.,* Hr'g Tr. at 205:23–206:22 (Mar. 11,

2019) (Fry admitting that, with the exception of one flight, he had not purchased tickets or made

any concrete plans to visit any of the other roughly 33 cities he testified that he "may" travel to);

Hr'g Tr. at 787:13–20 (Mar. 13, 2019) (Stansbury stating that she had not actually booked travel

on those routes where she was a "potential city-pair consumer"). These issues raise questions concerning the credibility of certain Named Plaintiffs as well as their standing with respect to the relevant city-pairs.

In sum, Plaintiffs have failed to establish a causal relationship between the Merger and the Named Plaintiffs' alleged harms, rendering the Named Plaintiffs' testimony insufficient to establish a showing of the Merger's alleged anticompetitive impact.

### iii. Plaintiffs' Evidence in Summary

For the reasons set forth above and based on the entire record before the Court, the Court concludes that Plaintiffs have not effectively rebutted Defendants' evidence and thus, fail to carry their ultimate burden to show that the effect of the Merger has been to substantially lessen competition. *See, e.g., Anthem,* 855 F.3d at 364 (evaluating the propriety of a proposed merger after "[h]aving considered the totality of circumstances") (citing *Baker Hughes*, 908 F.2d at 984); *Anthem*, 236 F. Supp. 3d at 180, 258–59 (determining whether plaintiffs have "met their ultimate burden of persuasion" based on the "entire record"); *H&R Block*, 833 F. Supp. 2d at 92 (utilizing a "totality of the evidence" approach to determine whether the anticompetitive effects were a likely result of the proposed merger).

### CONCLUSION

For the reasons set forth above, the Court denies Plaintiffs' request for permanent injunctive relief and grants judgment to the Defendants. The Defendants should settle an order on 10 days' notice consistent with this Decision. The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Filing docket, with a copy of the proposed order attached as an exhibit to the notice. A copy of the notice and proposed order shall also be served upon Plaintiffs' counsel.

80

Dated: New York, New York
      January 29, 2021

*/s/ Sean H. Lane*
UNITED STATES BANKRUPTCY JUDGE

81

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                        :
                                        :        **Case No. 11-15463-SHL**
                                          :
**AMR CORPORATION**, *et al.*,                               :        **Chapter 11**
                                          :
                      Debtors.        :        **(Jointly Administered)**
-------------------------------------------------------------x
-------------------------------------------------------------x
**CAROLYN FJORD**, *et al.*,                                 :        **Adversary No. 13-01392-SHL**
                    **Plaintiffs,**     :
           **vs.**                :
                                          :
**AMR CORPORATION**, *et al.*,                               :
                                          :
                    **Defendants.**     :
-------------------------------------------------------------x

### ORDER DENYING PLAINTIFFS' REQUESTED RELIEF AND GRANTING JUDGMENT TO DEFENDANTS MERGED ENTITY AMERICAN AIRLINES GROUP INC.

       Upon consideration of the applicable law, the evidence presented at trial, the parties' arguments, and the entire record before the Court, and for all of the reasons given in the Memorandum of Decision issued on January 29, 2021 (Adv. Pro. ECF No. 292), the Court concludes that Plaintiffs have failed to carry their burden to show that the merger between AMR Corporation and US Airways Group, Inc.—which ultimately formed American Airlines Group Inc. ("Defendants")—is likely to "substantially . . . lessen competition" in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

       It is therefore **ORDERED** that Plaintiffs' request of a final judgment of divestiture to unwind the merger and related injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, is **DENIED**, and judgment is granted to Defendants as to all matters alleged

in the case.

Dated: February 22, 2021
        New York, New York

                                        **_/s/ Sean H. Lane_**
                                        United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:                                                    Chapter 11

AMR CORPORATION, *et al.*,

                         Reorganized Debtors.            Case No. 11-15463 (SHL)

---------------------------------------------------------------x

CAROLYN FJORD, *et al.*,

                           Plaintiffs

               v.

AMR CORPORATION, *et al.*,                      Adv. No. 13-01392 (SHL)

                           Defendants.

---------------------------------------------------------------x

## NOTICE OF APPEAL AND STATEMENT OF ELECTION

### Part 1: Identify the appellant(s)

1. Name(s) of appellant(s):

   Carolyn Fjord, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie
   Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela
   Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian,; Harry Garavanian, Yvonne Jocelyn
   Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo,
   Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah
   M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia
   N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M.
   Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen

2. Position of appellant(s) in the adversary proceeding or bankruptcy case that is the subject of this appeal:

For appeals in an adversary proceeding.
 _X_ Plaintiffs
___ Defendant
___ Other (describe) _____

For appeals in a bankruptcy case and not in an adversary proceeding.
___ Debtor
___ Creditor
___ Trustee
___ Other (describe) _____

## Part 2: Identify the subject of this appeal

1. Describe the judgment, order, or decree appealed from:   (1) Order Denying Plaintiffs' Requested Relief and Granting Judgment to Defendants Merged Entity American Airlines Group Inc., Dkt. 294 (Ex. 1), and all opinions and orders that merge therein, including but not limited to: (2) Memorandum of Decision in which the court granted judgment to defendants and denied plaintiffs relief, Dkt. 292 (Ex. 2); (3) Order Denying Plaintiffs' Motion for Leave to File a Second Amended and Supplemental Complaint, Dkt. 206 (Ex. 3); (4) Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment and Denying Plaintiffs' Cross-Motion for Summary Judgment, Dkt. 176 (Ex. 4); (5) Bench Decision set forth in Transcript of Hearing re Bench Decision on August 29, 2018, Dkt. 177 (Ex. 5); (6) Order Denying Plaintiff's Motion for Leave to File a Second Amended and Supplemental Complaint and to Add Damages Claim and Demand for Jury Trial, Dkt. 117 (Ex. 6); (7) Memorandum of Decision Re: Amended Motion to Amend and Supplement Complaint, Dkt. 115 (Ex. 7); (8) Order Granting in Part and Denying in Part Plaintiffs' Motion for Leave to File an Amended Complaint to Add Damages Claim, Dkt. 102 (Ex. 8); (9) Memorandum of Decision Re: Plaintiffs' Motion to Amend the Complaint, Dkt. 101 (Ex. 9).

2. State the date on which the judgment, order, or decree was entered:   February 22, 2021. Merging opinions and orders were entered January 29, 2021 (Dkt. 292); February 26, 2019 (Dkt. 206); September 14, 2018 (Dkt. 176); August 29, 2018 (Dkt. 177); April 28, 2015 (Dkt. 117); March 31, 2015 (Dkt. 115); March 31, 2014 (Dkt. 102); March 14, 2014 (Dkt. 101).

## Part 3: Identify the other parties to the appeal

List the names of all parties to the judgment, order, or decree appealed from and the names, addresses, and telephone numbers of their attorneys.

| Party | Attorney |
|---|---|
| Plaintiffs Carolyn Fjord, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian,; Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward, Christine O. Whalen | Joseph M. Alioto ALIOTO LAW FIRM One Sansome Street, 35th Floor San Francisco, CA 94104 (415) 434-8900 Theresa D. Moore LAW OFFICES OF THERESA D. MOORE, PC One Sansome Street, 35th Floor San Francisco, CA 94104 (415) 613-1414 Christopher Nedeau NEDEAU LAW FIRM 154 Baker Street San Francisco, CA 94117 (415) 516-4010 Lawrence G. Papale LAW OFFICES OF LAWRENCE G. PAPALE 1308 Main Street Suite 117 St. Helena, CA 94574 (707) 963-1704 |
| Defendant AMR Corporation | Stephen Karotkin WEIL, GOTSHAL & MANGES LLP 767 Fifth Avenue New York, NY 10153 (212) 310-8350 |
| Defendant American Airlines | Daniel Murray Wall Sadik Harry Huseny LATHAM & WATKINS LLP 505 Montgomery Street, Suite 2000 San Francisco, CA 94111 (415) 391-0600 |
| Defendant US Airways Group, Inc. | Daniel Murray Wall Sadik Harry Huseny LATHAM & WATKINS LLP 505 Montgomery Street, Suite 2000 San Francisco, CA 94111 |

| | (415) 391-0600 |
|---|---|
| Defendant US Airways, Inc. | Daniel Murray Wall<br>Sadik Harry Huseny<br>LATHAM & WATKINS LLP<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111<br>(415) 391-0600 |

**Part 4: Optional election to have appeal heard by District Court (applicable only in certain districts)**

If a Bankruptcy Appellate Panel is available in this judicial district, the Bankruptcy Appellate Panel will hear this appeal unless, pursuant to 28 U.S.C. § 158(c)(1), a party elects to have the appeal heard by the United States District Court. If an appellant filing this notice wishes to have the appeal heard by the United States District Court, check below. Do not check the box if the appellant wishes the Bankruptcy Appellate Panel to hear the appeal.

 _X_  Appellant(s) elect to have the appeal heard by the United States District Court rather than by the Bankruptcy Appellate Panel.

**Part 5: Sign below**

 _/s/ Joseph M. Alioto_                          Date:  _February 23, 2021_
Joseph M. Alioto
Alioto Law Firm
One Sansome Street, 35th Floor
San Francisco, CA 94104
(415) 434-8900
*Counsel for Plaintiffs-Appellants*

**Certificate of Service**

The undersigned certifies he electronically filed the foregoing via the CM/ECF system for the U.S. Bankruptcy Court of the Southern District of New York, thus sending the foregoing to the Clerk of the Court and also effecting service on all attorneys registered for electronic filing.

Dated: <u>February 23, 2021</u>

<u>/s/ *Joseph M. Alioto*</u>
Joseph M. Alioto