# EXHIBIT A

Joseph M. Alioto (SBN 42680)
*Admitted Pro Hac Vice*
Jamie L. Miller (SBN 271452)
*Admitted Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email:  jmalioto@aliotolaw.com
       jmiller@aliotolaw.com

*Attorneys for the Clayton Act Plaintiffs*
[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE:** ) | |
| ) | |
| **AMR CORPORATION, et al.** ) | **Case No:  11-15463-SHL** |
| ) | |
| **Debtors,** ) | **Chapter 11** |
| ) | |
| ————————————————— ) | **(Jointly Administered)** |
| **CAROLYN FJORD, ET AL.,** ) | |
| ) | **Adversary No. 13-01392-SHL** |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **AMR CORPORATION, AMERICAN** ) | |
| **AIRLINES, and US AIRWAYS GROUP,** ) | |
| **INC. and US AIRWAYS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————— ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1

PROPOSED FINDINGS OF FACT ....................................................... 4

    I.      THE PARTIES ........................................................... 4

          A.     The Plaintiffs ........................................................ 4

          B.     The Defendants .................................................... 7

    II.     THE MERGER ......................................................... 9

    III.    THE RELEVANT MARKETS IN THIS CASE ARE CITY PAIRS ..................................................................... 10

    IV.    PLAINTIFFS ARE THREATENED WITH LOSS OR DAMAGE ................................................................. 12

          A.     Bill Rubinsohn ................................................... 12

          B.     Sondra Russell .................................................. 15

          C.     Don Fry ............................................................. 16

          D.     Lisa McCarthy ................................................... 20

          E.     Gabriel Garavanian ........................................... 23

          F.     Valarie Jolly ..................................................... 25

          G.     Jose Brito .......................................................... 27

          H.     June Stansbury ................................................... 28

          I.     Gary Talewsky ................................................... 30

          J.     Carolyn Fjord .................................................... 31

          K.     Don Freeland ..................................................... 31

          L.     Gail Kosach ....................................................... 31

    V.     INDUSTRY TERMS .............................................. 32

    VI.    THE MERGER HAS AND WILL LESSEN COMPETITION IN THE RELEVANT CITY PAIR MARKETS ....................................... 32

          A.     The Merger is Presumptively Illegal in Numerous City-Pair Markets ....................................... 32

B.     There Has Been a Strong Trend Towards Concentration In the Airline Industry ................................................................ 34

C.     There are Barriers to the Entry in the Airline Industry ............ 35

D.     Average Airfares Have Increased in Presumptively Illegal City Pair Markets ...................................................................... 36

E.     Passenger Traffic Has Declined in Presumptively Illegal City Pairs ................................................................................... 39

F.     Defendants' Expert Admits that Increases in Price and Decreases in Passenger Traffic are Indicators of Anticompetitive Effects ............................................................. 40

G.     The Merger Threatens to Decrease Service at the Combined Entities Smaller Hubs .............................................. 40

H.     Fees Have Increased Post-Merger ............................................ 41

I.     Decreased Quality of Service ................................................... 42

J.     Anticompetitive Effects – Conclusion ..................................... 44

VII.    DEFENDANTS HAVE NOT OVERCOME THE STRONG PRESUMPTION AND ADDITIONAL EVIDENCE OF ANTICOMPETITIVE EFFECTS ........................................................ 44

A.     Defendants' Efficiencies Claims Are Not Merger Specific ..... 44

      1.     The Merger Was Not Necessary for Defendants To Continue Competing in the Relevant Markets Because Before the Merger, American and US Airways Had Viable Standalone Plans for Growth That were Abandoned Post-Merger .............................. 45

      2.     Post-Merger, American Grew Less Than Any Other Carrier ........................................................................ 49

      3.     American's Increase in Capacity Is More Likely the Result of Macroeconomic Conditions, Not the Merger ........................................................................ 52

      4.     Under American's Standalone Plan, It Planned to Increase Its Network Through Code Sharing ................ 52

5. American Had Already Ordered New Aircraft, Before The Merger Was Announced .........................................53

6. Under American's Standalone Plan, it Had Already Planned to Increase Departures and Add Service to New Cities ....................................................................54

7. Before the Merger, American Was Already Increasing Its Corporate Business....................................................55

8. Defendants Did Not Reach the Efficiencies Predicted In Dr. Carlton's 2013 Prospective Study ......................56

9. Defendants' Efficiencies Are Not Related to Any City-Pair Market at Issue in this Case...........................56

10. American's Internal Analysis Suggests that US Was A Disruptive Presence ....................................................58

B. Five Years Post-Merger, Entry in the Relevant City Pair Markets is Not Timely or Likely ...............................59

C. Smaller Communities Have Been Injured by Higher Airfares Because of the Merger Which Will Not be Corrected by Entry of LCC's....................................................61

D. The Testimony of Dr. Ordover is Completely Insufficient to Overcome the Presumed Likelihood of Coordinated Activity Among the Network Airlines, Especially Given Their History of Such Activity Both Before and After the Merger ....................................................................63

1. Dr. Ordover's Chart's Do Not Reflect Evidence That Is Relevant to this Case.........................................65

PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW ..........................................80

I. NATURE OF THE ACTION AND JURISDICTION........................80

II. LEGAL STANDARDS UNDER THE CLAYTON ACT...................80

iii

    A.    Supreme Court Precedent Prohibits the Elimination of a Significant Rival in a Non-Trivial Transaction ....................... 81

    B.    Requirements Under a Burden Shifting Framework ............... 86

III.    UNDER THE DOCTRINE OF THE LAW OF THE CASE, THE RELEVANT MARKETS ARE CITY PAIRS ........................... 86

IV.    PLAINTIFFS HAVE STANDING AND ARE THREATENED WITH LOSS OR DAMAGE ................................................. 89

V.    THE MERGER IS PRESUMPTIVELY ILLEGAL ........................... 91

    A.    Post-Merger Concentration Levels Exceed Established Thresholds ................................................................. 91

    B.    Other Evidence Establishing a Prima Facie Case ................... 93

VI.    DEFENDANTS FAILED TO REBUT THE STRONG PRESUMPTION OF HARM TO COMPETITION ........................... 94

    A.    No Court has Found Efficiencies Sufficient to Rescue an Otherwise Unlawful Merger ..................................... 94

    B.    Defendants Efficiency Claims Do Not Address the Harm To Competition in the Relevant Markets ................................. 96

    C.    Defendants Efficiency Claims Have Not Been Verified .......... 98

    D.    Defendants Efficiency Claims are Not Merger Specific .......... 98

    E.    Entry Has Not Counteracted the Presumed Anticompetitive Effects of the Merger in the Relevant Markets ....................... 99

    F.    Defendants Have Not Shown that The Merger is Unlikely to Enhance the Tacit Coordination That Already Exists Among Network Carriers ........................................... 101

VII.    THE APPROPRIATE REMEDY IS DIVESTITURE .................... 103

## TABLE OF AUTHORITIES

### *Cases*

*7 West 57th Street Realty Company, LLC v. CitiGroup, Inc.*,
   314 F.Supp.3d 497 (S.D.N.Y. 2018) ............................................................ 88

*Ash Grove Cement Co. v. FTC,*
   577 F.2d 1368 (9th Cir.1978) ...................................................................... 103

*Bank of America v. Fairleigh,*
   2002 Westlaw 5586 (S.D.N.Y. January 2, 2002) .......................................... 11

*Banks v. Yokmik,*
   214 F.Supp.2d 401 (S.D.N.Y. 2002) ............................................................ 87

*Brown Shoe Co., Inc. v. United States,*
   370 U.S. 294 (1962) ...........................................................1, 81, 82, 83, 104

*California v. Am. Stores Co.,*
   872 F.2d 837 (9th Cir. 1989) ................................................................... 91, 94

*California v. Am. Stores Co.,*
   495 U.S. 271 (1990) .............................................................1, 2, 81, 103, 104

*California v. Am. Stores Co.*,
   930 F.2d 776 (9th Cir. 1991) ........................................................................ 91

*CF Baxter v. MBA Group Insurance, Transportation, Health and Welfare Plan,*
   958 F.Supp.2d 1223 (W.D. Wash. 2013) ...................................................... 88

*Cargill, Inc. v. Monfort of Colo., Inc.,*
   479 U.S. 104 (1986) ....................................................................................... 90

*DiLaura v. Power Auth. of State of New York.*,
   982 F.2d 73 (2d Cir. 1992) ............................................................................ 88

*FTC v. Cardinal Health, Inc.,*
   12 F. Supp. 2d 34 (D.D.C. 1998) ............................................................93, 100

*FTC v. CCC Holdings*,
   605 F.Supp.2d 26 (D.D.C. 2009) ................................................86, 96, 98, 101

*F.T.C. v. H.J. Heinz Co.*,
   246 F.3d 708 (D.C. Cir. 2001) ...............................................................passim

*FTC v. OSF Healthcare Sys.*,
    852 F.Supp.2d 1069 (N.D. Ill. 2012) ....................................................93, 94, 96

*Federal Trade Commission v. Penn State Hershey Medical Center*,
    838 F.3d 327 (3d Cir. 2016) ............................................................................ 95

*FTC v. Procter & Gamble Co.*,
    386 U.S. 568 (1967) ..............................................................................95, 100

*FTC v. ProMedica Health Sys., Inc.*,
    No. 11-CV-47, 2011 WL 1219281 (N.D. Ohio 2011)................................... passim

*FTC v. Staples, Inc.*,
    970 F.Supp. 1066 (D.D.C. 1997) ..................................................................... 10

*F.T.C. v. University Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991) .........................................................95, 96, 98

*Ford v. Motor Co. v. United States*,
    405 U.S. 562 (1972) ...................................................................................... 105

*Freedom Holdings, Inc. v. Cuomo*,
    592 F.Supp.2d 684 (S.D.N.Y. 2009) ................................................................ 89

*Global Discovery Travel Services, LLC v. Trans World Airlines, Inc.*,
    960 F.Supp. 701 (S.D.N.Y. 1997) .................................................................... 87

*Hospital Corporation of America v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ....................................................................83, 84

*In re Domestic Airline Travel Antitrust Litigation*,
    221 F.Supp.3d 46 (D.D.C. 2016)................................................................... 102

*In RE: Fosomax Product Liability Litigation*,
    647 F.Supp.2d 265 (S.D.N.Y. 2009) ............................................................... 11

*In re Northwest Airlines Corporation*,
    208 F.R.D. 174 (E.D. Mich. 2002) ................................................................. 87

*Keller v. United States*,
    58 F.3d 1194 (7th Cir. 1995) .......................................................................... 87

*Malaney v. UAL Corporation*,
    2010 WL2 3790296 (N.D. Cal. Sept. 27, 2010) ............................................. 90

*Mathias v. Daily News, L.P.,*
   152 F. Supp.2d 465 (S.D.N.Y. 2001) ............................................................ 90

*Nader v. Air Transport Association of America,*
   426 F.Supp. 1035 (S.D.N.Y. 1977) ............................................................... 90

*Pappan Enters. Inc., Hardee's Food Sys., Inc.,*
   143 F.3d 800 (3d Cir. 1998) ....................................................................... 105

*Purgess v. Sharrock,*
   33 F.3d 134 (2d. Cir. 1994) ......................................................................... 88

*ProMedica Health Sys., Inc. v. FTC,*
   749 F.3d 559 (6th Cir. 2014) ................................................................... 32, 92

*Prosterman v. American Airlines,*
   747 Fed.Appx. 458 (9th Cir. 2018) ............................................................ 102

*Riley v. Media News Group, Inc.,*
   2007 WL 11 1068202 (N.D. Cal. April 10, 2007) .......................................... 90

*Rosario v. Goldsmith,*
   84 F.Supp.2d 455 (S.D.N.Y. 2000);
   affirmed *Maurizio v. Goldsmith,* 230 F.3d 518 (2d. Cir. 2000) ...................... 88

*RSR Corp. v. FTC,*
   602 F.2d 1317 (9th Cir. 1979) .................................................... 95, 96, 97, 103

*Sierra Club v. Army Corps. Of Eng'rs.,*
   645 F.3d 978 (8th Cir. 2011) ....................................................................... 105

*St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd,*
   778 F.3d 775 (9th Cir. 2015) ................................................................ passim

*Stanley Works v. FTC,*
   469 F.2d 498 (2d Cir. 1972) ......................................................................... 85

*Steves and Sons, Inc. v. Jeld Wen, Inc.,*
   292 F.Supp. 3d 656 (E.D. Va. 2018) ........................................................... 105

*United States v. Aluminum Co. of America,*
   377 U.S. 271 (1964) ...................................................................... 82, 83, 104

*United States v. Anthem, Inc.,*
   855 F.3d 345 (D.C. Cir. 2017) ...................................................................... 93

*United States v. Baker Hughes*,
   908 F.2d 981 (D.C. Cir. 1990) ...................................................................... 94

*United States v. Columbia Pictures Corp.*,
   189 F. Supp. 153 (S.D.N.Y. 1960) .................................................................. 81

*United States v. Continental Can Co.*,
   378 U.S. 441 (1964) ........................................................................................ 82

*United States v. E.I. du Pont de Nemours, Inc*,
   366 U.S. 316 (1961) ............................................................................... 103, 104

*United States v. Falstaff Brewing Corp.*,
   410 U.S. 526 (1973) ........................................................................... 82, 83, 105

*United States v. First Nat'l Bank & Trust Co. of Lexington*,
   376 U.S. 665 (1964) ........................................................................................ 85

*United States v. H. & R. Block*,
   833 F.Supp.2d 36 (D.D.C. 2011) ............................................................ passim

*United States v. Long Island Jewish Med. Ctr.*,
   983 F.Supp. 121 (E.D.N.Y.1997) ................................................................. 96

*U.S. v. Manufacturers Hanover Trust*,
   240 F.Supp. 867 (S.D.N.Y. 1965) ........................................................... 81, 84,

*United States v. Pabst Brewing Co.*,
   384 U.S. 546 (1966) ........................................................................... 82, 83, 105

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) ................................................................................ passim

*United States v. Rockford Mem'l Corp.*,
   717 F. Supp. 1251 (N.D. Ill. 1989) ............................................................... 96

*United States v. Rockford Mem'l Corp.*,
   898 F.2d. 1278 (7th Cir. 1990) ...................................................................... 97

*United States v. Von's Grocery Co.*,
   384 U.S. 270 (1966) ..................................................................81, 82, 83, 94, 105

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ........................................................................................ 90

## Rules and Statutes

28 U.S.C. §§ 1331 ................................................................................ 80

28 U.S.C. § 1337 ................................................................................ 80

Section 1 of the Clayton Act, 15 U.S.C. § 12 .......................................... 80

Section 7 of the Clayton Act, 15 U.S.C. § 18 ....................................... passim

Section 16 of the Clayton Act, 15 U.S.C. § 26 ..................................... passim

## Other Authority

1 Callmann on Unfair Comp., Tr. & Mono. § 4:49, Enforcement of private rights
    —Standing to sue, (4th Ed.) .............................................................. 89

4 Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law*
    ¶ 901b2 (rev. ed.1998) .................................................................. 101

2006 Merger Guidelines Commentary § 3.2 ........................................... 100

2010 Horizontal Merger Guidelines .................................................. passim

## **FINDINGS OF FACT AND CONCLUSIONS OF LAW**
## **INTRODUCTION**

The law of competition in this country, as mandated by Congress and as applied by the Supreme Court, has consistently and repeatedly repudiated attempts by rivals to eliminate actual or potential competition among themselves, whether by acquisition, merger, or by other contrivance.

It has always been the intent of Congress, as interpreted by the Supreme Court, to favor business growth through competition over unbridled expansion through acquisition or merger. This resolve was and is based on sound and constructive economic, social and political policies and principles: internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry. *Brown Shoe Co. v. United States*, 370 U.S., 294, 346 n.72 (1962).

In order to further these important goals, Congress granted extraordinary power to private plaintiffs to challenge any such acquisition if threatened with potential harm under Section 7. That authority grants to an individual the power and the right to seek the extreme remedy of divestiture, if necessary, to eliminate the harm. When lower courts have questioned Congress' intent to grant such power to individuals to compel divestiture, questioning their right to second guess antitrust law enforcement agencies like the FTC or the Department of Justice, the Supreme Court has unanimously and soundly reversed the lower courts.

In *California v American Stores*, 495 U.S. 271, 284 (1990) the Supreme Court wrote in

1

unmistakable and unequivocal language that "Private enforcement [of Section 7] of the Act was in no sense an afterthought: it was an integral part of the congressional plan for protecting competition. [cite omitted] Congress also made express its view that divestiture was the most suitable remedy in a suit for relief from a §7 violation." The Court declared that "the plain text of §16 authorizes divestiture decrees to remedy §7 violations" (495 U.S. at 282-283) and that, "We have recognized when construing §16 that it was enacted 'not merely to provide private relief, but … to serve as well the high purpose of enforcing the antitrust laws.'" [cite omitted].  The Court continued, "by construing §16 to encompass divestiture" the other provisions of §16 "manifest a clear intent to encourage private litigation against anticompetitive mergers …. To show that a merger is unlawful, a plaintiff need only prove that its effect 'may be substantially to lessen competition.'" The Court dispelled the notion that divestiture may be difficult to administer by stating: "Divestiture has been called the most important of antitrust remedies. It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of §7 has been found."

Finally, a unanimous Court specifically and clearly held that "Section 16, construed to authorize a private divestiture remedy when appropriate in light of equitable principles, fits well in a statutory scheme that favors private enforcement, subjects mergers to searching scrutiny, and regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger." *American Stores*, 495 U.S. at 272.

Here, the Defendants have merged to create the largest airline in the nation and the world. It was a merger born, not of necessity -- for either airline would have thrived with proper management, low prices and good customer service -- but of the desire to become the largest and most powerful.  By virtually every measure of scrutiny applied to such mergers, this one fails the

test.  It has resulted in market concentrations in relevant city pair markets that are presumed to be illegal.  Airfares and "ancillary fees" have risen in most, passenger growth has declined in many, and the product and customer service have been degraded across the board.  The evidence has shown that so-called "efficiencies" resulting from the merger is a chimera.  Indeed, the evidence upon which the Defendants' mostly rely does not even relate to many of the city pair markets relevant to this case.  Their experts speak in terms of national markets, large city pairs and competing low cost carriers which, in turn, primarily serve large cities in "point to point" service.  As predicted, and as Plaintiffs' evidence shows, the harm to the city pairs relevant to this case, has now manifested itself.

There has not been a single successful meaningful entry into the product market in 12 years, while many large competitors have merged and smaller ones have simply gone out of business.  Why?  Because entry barriers are high and potential entrants cannot cover the cost of their capital.  They face a real risk of unrecoverable capital if forced to exit the market once they manage to get in.  The large, and in some cases record, margins the participants in the domestic passenger airline industry, including American, have consistently realized since the American-US Airways merger over five years ago should dictate entry by new competitors.  The fact that there have been none is strong evidence that there are likely to be none.  This is discussed below.

American was slated to emerge from Chapter 11 as a lean and potent competitor against all comers.  It was projected to grow its capacity 20 percent over five years.  It placed the largest order for aircraft in history.  US Airways was also a vital competitor with its own plans to grow.  But combination rather than competition was the enticement because it entailed less cost and risk than would merging.  Without having to compete on price or service, fares and fees have increased, while service has declined, following the merger.  Needless to say, the pro-consumer

benefits that would have resulted from an increase in capacity have not materialized because the merged entity has not grown as American initially planned.  Not only has the New American not come close to 20 percent growth over five years, the evidence showed it has had the most anemic growth of all the major carriers.

This case presents a test of whether Section 7 of the Clayton Act remains a statutory force for the protection of the American consumer or is now relegated to the status of a marionette whose strings can be pulled any which way by oligopolists and their statistically-laden experts to achieve a desired result.  At some point, the facts, informed by common sense and experience, must provide the answer.  This is that point.  The evidence has shown that the merger violates Section 7 of the Clayton because it has lessened competition and is likely to continue to do so in the future if it is not unwound.

## PROPOSED FINDINGS OF FACT

### I.    THE PARTIES

#### A.    The Plaintiffs

1.    Bill Rubinsohn ("Rubinsohn") resides in Elkins Park, Pennsylvania, is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 53 years. (Rubinsohn Written Direct Examination ("Dir. Ex.") ¶¶ 1-6).

2.    Sondra Russell ("Russell") resides in Waco, Texas, is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 31 years.  (Russell Dir. Ex. ¶¶ 1-10).

3.    Lisa McCarthy ("McCarthy") resides in Naples, Florida, is a consumer of scheduled air passenger transportation, and has been a travel agency professional since January 2005.  (McCarthy Dir. Ex., ¶¶ 1-15).

4.      Don Fry ("Fry") has resided in Tucson, Arizona since January 23, 2018.  From November 1991 to January 2018, Mr. Fry resided in Colorado Springs, Colorado.  (Fry Dir. Ex., ¶ 1).  Mr. Fry is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 37 years.  (*Id*. at ¶¶ 3-6, 10, 11).

5.      Gabriel Garavanian ("Garavanian") resides in Tyngsboro, Massachusetts, is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 32 years.  (Garavanian Dir. Ex., ¶¶ 1, 4-7).

6.      Valarie Jolly ("Jolly") resides in Mabank, Texas, is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 35 years.  (Jolly Dir. Ex., ¶¶ 1-7, 22, 27).

7.      José Brito ("Brito") resides in Reno, Nevada, is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 39 years.  (Brito Dir. Ex., ¶¶ 1-6, 19, 20).

8.      June Stansbury ("Stansbury") resides in Reno, Nevada, is a consumer of scheduled air passenger transportation, and has worked in the travel industry for 40 years. (Stansbury Dr. Ex., ¶¶ 1-4, 9-16).

9.      Gary Talewsky ("Talewsky") resides in Sharon, Massachusetts from May until November and in Boca Raton, Florida from December to April. (Talewsky Dir. Ex., ¶ 2).  Mr. Talewsky is a consumer of scheduled air passenger transportation and has worked in the travel industry since 1981).  (*Id*. at ¶¶ 3-5, 10-18).

10.     Carolyn Fjord ("Fjord") resides in Winters, California and flew on the Sacramento (SMF) – St. Louis (STL) city pair in September 2016 and October 2016.  (March 18, 2019, Stip., ¶ 1 and Dkt. No. 103, ¶ 9).

5

11.    Don Freeland ("Freeland") resides in Thousand Palms, California and flew on the Detroit (DTW) – Palm Springs, CA (PSP) city pair between 2009 and June 2017, and has confirmed tickets for two on this city pair for travel in April 2019.  (March 18, 2019, Stip., ¶ 2 and Dkt. No. 103, ¶ 9).

12.    Gail Kosach ("Kosach") resides in Reno, Nevada, and flew on the Chicago (CHI)-Reno (RNO) and Chicago (CHI) – Palm Beach, FL (PBI) city pairs in May 2018.  (March 18, 2019, Stip., ¶ 3 and Dkt. No. 103, ¶ 9).

13.    Katherine R. Arcell ("Arcell") resides in New Orleans, Louisiana.  (Dkt. No. 103, ¶ 9).

14.    Keith Dean Bradt ("Bradt") resides in Reno, Nevada.  (Dkt. No. 103, ¶ 9).

15.    Judy Bray ("Bray") resides in Colorado Springs, Colorado.  (Dkt. No. 103, ¶ 9).

16.    Jan Marie Brown ("Brown") resides in Carson City, Nevada.  (Dkt. No. 103, ¶ 9).

17.    Robert D. Conway ("Conway") resides in Las Vegas, Nevada.  (Dkt. No. 103, ¶ 9).

18.    Judy Crandall ("Crandall") resides in Reno, Nevada.  (Dkt. No. 103, ¶ 9).

19.    Rosemary D'Augusta ("D'Augusta") resides in Millbrae, California.  (Dkt. No. 103, ¶ 9).

20.    Brenda K. Davis ("Davis") resides in Forney, Texas.  (Dkt. No. 103, ¶ 9).

21.    Pamela Faust ("Faust") resides in Loveland, Ohio.  (Dkt. No. 103, ¶ 9).

22.    Harry Garavanian ("Garavanian") resides in Tyngsboro, Massachusetts.  (Dkt. No. 103, ¶ 9).

23.    Yvonne Jocelyn Gardner ("Gardner") resides in Colorado Springs, Colorado. (Dkt. No. 103, ¶ 9).

24.    Lee M. Gentry ("Gentry") resides in West Chester, Ohio.  (Dkt. No. 103, ¶ 9).

25.     Michael C. Malaney ("Malaney") resides in Ada, Michigan.  (Dkt. No. 103, ¶ 9 and Malaney Depo. 14:1-9).

26.     Len Marazzo ("Marazzo") resides in Reno, Nevada.  (Dkt. No. 103, ¶ 9).

27.     Patricia Ann Meeuwsen ("Meeuwsen") resides in Plainwell, Michigan.  (Dkt. No. 103, ¶ 9).

28.     Cynthia Prosterman ("Prosterman") resides in San Francisco, California.  (Dkt. No. 103, ¶ 9).

29.     Deborah M. Pulfer ("Pulfer") resides in Sidney, Ohio.  (Dkt. No. 103, ¶ 9).

30.     Dana L. Robinson ("Robinson") resides in Palm Beach Gardens, Florida.  (Dkt. No. 103, ¶ 9).

31.     Robert A. Rosenthal ("Rosenthal") resides in Colorado Springs, Colorado.  (Dkt. No. 103, ¶ 9).

32.     Sylvia N. Sparks ("Sparks") resides in Carson City, Nevada.  (Dkt. No. 103, ¶ 9).

33.     Clyde D. Stensrud ("Stensrud") resides in Kirkland, Washington.  (Dkt. No. 103, ¶ 9).

34.     Wayne Taleff ("Taleff") resides in Cincinnati, Ohio.  (Dkt. No. 103, ¶ 9).

35.     Diana Lynn Ultican ("Ultican") resides in Kirkland, Washington.  (Dkt. No. 103, ¶ 9).

36.     J. Michael Walker resides in Grass Valley, California.  (Dkt. No. 103, ¶ 9).

37.     Pamela S. Ward resides in Garland, Texas.  (Dkt. No. 103, ¶ 9).

38.     Christine O. Whalen resides in New Orleans, Louisiana.  (Dkt. No. 103, ¶ 9).

**B.**     **The Defendants**

39.     American Airlines Group Inc. ("AAG") is a publicly traded airline holding company headquartered in Fort Worth, Texas.  (March 4, 2019, Stip., ¶ 1).

40.     AAG's wholly owned subsidiaries include American Airlines, Inc., ("American"), among others.  (March 4, 2019, Stip., ¶ 2).

41.     AAG was formerly named AMR Corporation ("AMR") prior to its emergence from Chapter 11 Bankruptcy on December 9, 2013.  (March 4, 2019, Stip., ¶ 3).

42.     American Airlines filed for bankruptcy on November 29, 2011.  (Parker Dir. Ex., ¶ 18).

43.     American Airlines operates airline carriers and provides scheduled air passenger transportation services for passengers.  American provides both domestic and international air transportation service.  (March 4, 2019, Stip., ¶ 4).

44.     US Airways Group, Inc. ("US Airways Group") is a former Delaware corporation and holding company that merged with a subsidiary of AMR on December 9, 2013.  (March 4, 2019, Stip., ¶ 5).

45.     US Airways Group's primary business was the operation of network air carriers through its subsidiaries, including US Airways Inc. ("US Airways").  (March 4, 2019, Stip., ¶ 5).

46.     Thomas Horton ("Horton") was the Chairman and CEO of American Airlines from November 2011 to December 2013.  (Horton Depo. (12/12/13) 6:13-20 and Parker Dir. Ex., ¶ 2).

47.     William Douglas Parker ("Parker") was the Chairman and CEO of US Airways from 2005 to 2013.  (Parker Dir. Ex., ¶ 2).

48.     Parker has been the CEO of American since the merger closed in December 2013. (Parker Dir. Ex., ¶ 2).

49.     Parker was the Chairman and CEO of America West Airlines from 2001 to 2005, until it merged with US Airways in September 2005.  (Parker Dir. Ex. ¶ 2).

50.     Before the merger, American and US Airways were significant rivals.  (Horton Depo. (9/20/13) 8:17-22; Kirby Depo. (2/28/14) 271:9-12).

51.     Before the merger, American had hubs in Los Angeles, New York, Dallas-Fort Worth, Miami, and Chicago.  (Kirby Depo. (2/28/14) 167:20-22).

52.     Before the merger, American's hubs were located in the largest markets.  (PX-045, at p. 6 of 45).

53.     Before the merger, American maintained strong market share in all of its hubs – ORD (Chicago O'Hare) – 38%; NYC—18%; LAX – 25%; DFW – 86%; MIA – 90%.  (PX-049 at p. 19 of 115).

54.     Before the merger, US Airways had hubs in Phoenix, Charlotte, Philadelphia, and Washington, DC (DCA).  (Kirby Depo. (2/28/14) 167:13-19).

55.     Before the merger, American and US Airways competed on 1,008 nonstop and one-stop city pair markets, which were identified by the Department of Justice and in Plaintiffs' First Amended Complaint.  (Horton Depo. (9/20/13) 34:9-35:1; Kirby Depo. (10/10/13) 43:12-17).

## II.     THE MERGER

56.     US Airways began considering the possibility of merging with American in early 2011. (Parker Dir. Ex., ¶ 16).

57.     Parker and Horton first discussed merging in September 2011.  (Parker Dir. Ex. ¶ 17).

58.     American Airlines filed for bankruptcy on November 29, 2011.  (Parker Dr. Ex., ¶

18).

59.     On February 14, 2013, AMR and US Airways Group announced that they had

reached a definitive merger agreement.  (March 4, 2019, Stip., ¶ 8).

60.     The transaction was valued at $11 billion.  (PX-90 at p. 2 of 31).

61.     The merger of AMR and US Airways Group occurred on December 9, 2013.

(March 4, 2019, Stip., ¶ 11).

62.     Post-merger, American is now the largest airline in the United States and in the

world. (Horton Depo. (12/12/13) 39:5-13).

63.     The merger eliminated competition between American and US Airways.  (Kirby

Depo. (10/10/13) 42:7-10 and 42:13-17); (Kirby Depo. (2/28/14) 29:2-4).

### III.     THE RELEVANT MARKETS IN THIS CASE ARE CITY PAIRS

64.     In its Bench Decision, this Court noted that:

> In their reply to Plaintiff's motion for a TRO, Defendants stated as
> follows: 'The properly defined market in this case is scheduled air
> passenger service between City Pairs. A traveler departs one city and
> ultimately arrives in another whether on a single flight or several
> connecting flights. This City Pair is the relevant geographic market
> because a consumer seeking to fly to one city generally will not settle for
> traveling to another city.' *See Brown Shoe,* 370 U.S. at 325, *FTC v.
> Staples, Inc*., 970 F.Supp. 1066 1073, (District Court D.C. 1997)."

(August 29, 2018, Bench Decision, Dkt. No. 177 at 21:2-11).

65.     Courts have repeatedly accepted city pairs as the relevant market in cases

involving the airline industry.  *See In re Northwest Airlines Corporation*, 208 F.R.D. 174, 220

(E.D. Mich. 2002) ("As plaintiffs note, any broader attack on the use of City Pairs surely cannot

succeed where the airlines themselves as well as numerous government and academic reports

have adopted the same general approach to analyzing the air travel industry"); *See also Global*

*Discovery Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F.Supp. 701 at 704-705 19 (S.D.N.Y. 1997).

66.     This Court ruled that Defendants' prior statement was a judicial admission:

> For all these reasons then the Court construes Defendant's prior statement about the City Pairs market as a judicial admission. *See Banks v. Yokmik*, 214 F.Supp.2d 401 at 405 (S.D.N.Y. 2002). ("Judicial admissions are formal concessions in the pleading through stipulations by a party or its counsel and are binding upon the party making them.") *Keller v. United States*, 58 F.3d 1194 at 1198 Note 8 (7th 5 Cir. 1995) [sic].

> Such assertions are affirmative facts – factual affirmations or stipulations of some sort that bind both the party making the admissions and the court ID. Citing *Bank of America v. Fairleigh*, 2002 Westlaw 5586 at *6 (S.D.N.Y. January 2, 2002). (Treating the initial answer in which defendants admitted signing credit documents is a formal judicial admission.)

> Indeed, it is well established that a court can treat a statement in a brief as a binding judicial admission of fact. *See In RE: Fosomax Product Liability Litigation*, 647 F.Supp.2d 265 at 276 (S.D.N.Y. 2009) citing *Purgess v. Sharrock*, 33 F.3d 134 at 144 (2d. Cir. 1994). *Rosario v. Goldsmith*, 84 F.Supp.2d 455 at 464-465 (S.D.N.Y.) which is affirmed at 230 F.3d 518 (2d. Cir. 2000). *CF Baxter v. MBA Group Insurance, Transportation, Health and Welfare Plan*, 958 F.Supp.2d 1223 at 1232-33 (Western District of Washington 2013.

(August 29, 2018, Bench Decision, Dkt. No. 177 at 22:23-23:22).

67.     Plaintiffs' First Amended Complaint alleged 1,008 overlapping city pairs between American and US Airways where post-merger concentrations were presumptively illegal.  (Dkt. No. 103 at Appendix A).

68.     Pursuant to this Court's August 29, 2018, Bench Decision, Plaintiffs identified 298 city pairs as relevant to their claims.  (August 29, 2018, Bench Decision, Dkt. No. 177 at 46:12-14 and Plaintiffs' Identification of City Pairs, Dkt. No. 214-5).

69.     Thus, scheduled air transportation between the 298 city pairs identified by

Plaintiffs at Dkt. No. 214-5 are the relevant markets in this case (and *see* PX-149, cross-referencing identified city pairs to Plaintiffs' Written Direct Examinations and Dr. Lundgren's Written Dir. Testimony).

## IV.   PLAINTIFFS ARE THREATENED WITH LOSS OR DAMAGE

### A.   Bill Rubinsohn

70.     Plaintiff Bill Rubinson is a regular consumer of air travel.  (Rubinsohn Dir. Ex., ¶¶ 5, 6, 7, 19, 20, 22).

71.     Between January 2008 and June 2017, Mr. Rubinsohn and his family personally took and paid for three hundred and ten (310) domestic and international flights on American Airlines and US Airways.  Of those, one hundred and forty-five flights (145) were taken on American and US Airways before the merger.  One hundred and seventy-five flights (175) were taken on American after the merger.  (Rubinsohn Dir. Ex. ¶ 5).

72.     Mr. Rubinsohn and his family have traveled on American Airlines and/or US Airways on numerous city pairs, including the following:

> Philadelphia-Orlando; Philadelphia-Buffalo; Philadelphia-Portland, ME; Philadelphia, Manchester; Philadelphia-Wilmington, NC; Philadelphia-Boston; Philadelphia-Miami; Philadelphia-West Palm; Philadelphia-Fort Lauderdale; Philadelphia-Chicago-O'Hare; Philadelphia-Las Vegas; Philadelphia-Charlotte; Philadelphia-Indianapolis; Philadelphia-Phoenix; Philadelphia-Charleston, SC; Philadelphia-La Guardia; Detroit-La Guardia; Dallas-Las Vegas; Philadelphia-Providence; Philadelphia-St. Louis; Philadelphia-Bangor; Philadelphia-San Diego; Philadelphia-Nashville; Philadelphia-Los Angeles; Philadelphia-Detroit; Philadelphia-Dallas; Dallas-Santa Fe; Santa Fe-Phoenix; and Dallas-San Francisco.

(Rubinsohn Dir. Ex. ¶¶ 6, 19).

73.     Mr. Rubinsohn has travelled on and/or plans to fly in the future on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| | |
|---|---|
| Chicago, IL (CHI) | Philadelphia, PA (PHL) |
| Philadelphia, PA (PHL) | San Diego, CA (SAN) |
| Philadelphia, PA (PHL) | Phoenix, AZ (PHX) |
| Los Angeles, CA (LAX) | Philadelphia, PA (PHL) |
| Indianapolis, IN (IND) | Philadelphia, PA (PHL) |
| Philadelphia, PA (PHL) | St. Louis, MO (STL) |
| Dallas, TX (DFW) | Philadelphia, PA (PHL) |
| Miami, FL (MIA) | Philadelphia, PA (PHL) |
| Philadelphia, PA (PHL) | Tucson, AZ (TUS) |
| Albuquerque, NM (ABQ) | Philadelphia, PA (PHL) |
| Philadelphia, PA (PHL) | St. Croix, VI (STX) |
| Philadelphia, PA (PHL) | Orange County, CA (SNA) |
| Philadelphia, PA (PHL) | St. Thomas, VI (STT) |
| Kahului, HI (OGG) | Philadelphia, PA (PHL) |
| Austin, TX (AUS) | Philadelphia, PA (PHL) |
| Key West, FL (EYW) | Philadelphia, PA (PHL) |
| Philadelphia, PA (PHL) | San Antonio, TX (SAT) |
| Philadelphia, PA (PHL) | Seattle, WA (SEA) |
| Philadelphia, PA (PHL) | San Jose, CA (SJC) |
| Dallas, TX (DFW) | Palm Springs, CA (PSP) |
| New Orleans, LA (MSY) | Philadelphia, PA (PHL) |

(Rubinsohn Dir. Ex., ¶¶ 20, 22; and PX-149).

74.     Mr. Rubinsohn is a member of the American AAdvantage frequent flyer program,
having accrued over 2 million miles since 1986.  (Rubinsohn Dir. Ex. ¶ 10).

75.     Before the merger, Mr. Rubinsohn was a member of US Airways' frequent flyer
program.  (Rubinsohn Dir. Ex. ¶ 10)

76.     On cross-examination, Mr. Rubinsohn was asked whether he was aware that
carriers offer service on 23 specific city pairs.  (Trial Tr. 92:9-96:20, Rubinsohn).  Of those city
pairs, the following are not at issue in this case: Philadelphia-San Francisco, Philadelphia-
Denver, Philadelphia-Houston, Philadelphia-Newark, Philadelphia-Detroit, Philadelphia-Atlanta,
Philadelphia-Minneapolis, Philadelphia-Boston, Philadelphia-Salt Lake City, Philadelphia-

Orlando, Philadelphia-Tampa, Philadelphia-Myrtle Beach, SC, Philadelphia-Las Vegas, Philadelphia-Nashville, Philadelphia-Ft. Myers, Philadelphia-Charleston, SC (*See* PX-149).

77.     As to the remaining city pairs:  Philadelphia-Chicago (Lundgren Dir. Ex., p. 115, line 317), Philadelphia-Ft. Lauderdale (Lundgren Dir. Ex., p. 127, line 974) (Fort Lauderdale is part of the Miami city pair, Lundgren Dir. Ex., p. 14), Philadelphia-Dallas (Lundgren Dir. Ex. p. 127, line 955) (Love Field and Dallas/Fort Worth are part of the same city pair, Lundgren Dir. Ex. p. 14), Philadelphia-Los Angeles (Lundgren Dir. Ex. p. 121, line 668), Philadelphia-Phoenix (Lundgren Dir. Ex. 118, line 474), Philadelphia-St. Louis (Lundgren Dir. Ex. p. 111, line 70), Philadelphia-New Orleans (Lundgren Dir. Ex., p. 126, line 928), the established service of these carriers was captured in Dr. Lundgren's post-merger concentrations calculations on these city pairs. (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

78.     On cross-examination, on the Philadelphia-St. Thomas city pair, Mr. Rubinsohn testified that before the merger, American did not offer nonstop service on that city pair.  (Trial Tr. 105:9-105:19, Rubinsohn).   But before the merger, American and US Airways did compete on the Philadelphia-St. Thomas city pair through either non-stop or one-stop service.  (Lundgren Dir. Ex. pp. 9-10, explaining that HHI calculations were performed based on the merging parties' competing nonstop and one-stop city pairs, and *see* pp. 50, 88 and 114).

79.     Mr. Rubinsohn was asked on cross-examination about various travel options on the Philadelphia-Tucson city pair.  (Trial Tr. 122:8-18, Rubinsohn).  The established service of other carriers was captured in Dr. Lundgren's post-merger concentrations calculations on these city pairs. (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

80.     Mr. Rubinsohn was asked on cross-examination about choices for *nonstop* service on the Philadelphia-Phoenix city pair, not connecting service.  (Trial Tr. 122:19-123:9,

Rubinsohn).  Connecting service is an alternative for Mr. Rubinsohn.  (Trial Tr. 102:13-17, Rubinsohn).  Before the merger, American and US Airways competed on the Philadelphia-Phoenix city pair either through nonstop or one-stop service.  (Lundgren Dir. Ex. pp. 9-10, explaining that HHI calculations were performed based on the merging parties' competing nonstop and one-stop city pairs).

81.     Low-cost carriers and ultra-low cost carriers like Spirit and Frontier are not viable travel alternatives for Mr. Rubinsohn "unless it's a very short flight."  (Trial Tr. 129:20-130:17, Rubinsohn).

### B.     Sondra Russell

82.     Plaintiff Sondra Russell is a regular consumer of air travel.  (Russell Dir. Ex., ¶¶ 6, 7, 8, 9, 10).

83.     Ms. Russell has travelled on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal: Dallas-Seattle and Dallas-Honolulu.  (Russell Dir. Ex., ¶ 9 and PX-149).

84.     Based on her location in Waco, Texas, Ms. Russell may travel on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal in the future:

| Dallas, TX (DFW) | Honolulu, HI (HNL) |
|---|---|
| Dallas, TX (DFW) | Seattle, WA (SEA) |
| Dallas, TX (DFW) | Tucson, AZ (TUS) |
| Dallas, TX (DFW) | West Palm Beach (PBI) |
| Dallas, TX (DFW) | Salt Lake City, UT (SLC) |
| Dallas, TX (DFW) | San Diego, CA (SAN) |
| Dallas, TX (DFW) | Fort Walton Beach, FL (VPS) |
| Dallas, TX (DFW) | Ontario, CA (ONT) |
| Dallas, TX (DFW) | Raleigh-Durham, NC (RDU) |
| Dallas, TX (DFW) | Reno, NV (RNO) |
| Dallas, TX (DFW) | Jacksonville, FL (JAX) |
| Dallas, TX (DFW) | Westchester County, NY (HPN) |

| | |
|---|---|
| Dallas, TX (DFW) | Greenville, SC (GSP) |
| Charlotte, NC (CLT) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Portland, OR (PDX) |
| Dallas, TX (DFW) | Harrisburg, PA (MDT) |
| Dallas, TX (DFW) | Kapaa, HI (LIH) |
| Dallas, TX (DFW) | Santa Barbara, CA (SBA) |
| Dallas, TX (DFW) | Hilo, HI (KOA) |
| Dallas, TX (DFW) | Greensboro, NC (GSO) |
| Dallas, TX (DFW) | Durango, CO (DRO) |
| Dallas, TX (DFW) | Louisville, KY (SDF) |
| Dallas, TX (DFW) | Montgomery, AL (MGM) |
| Dallas, TX (DFW) | Syracuse, NY (SYR) |
| Dallas, TX (DFW) | Fresno, CA (FAT) |
| Dallas, TX (DFW) | Knoxville, TN (TYS) |
| Dallas, TX (DFW) | Tallahassee, FL (TLH) |
| Dallas, TX (DFW) | Fort Myers, FL (RSW) |
| Dallas, TX (DFW) | Palm Springs, CA (PSP) |
| Dallas, TX (DFW) | Monterey, CA (MRY) |
| Columbia, SC (CAE) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Grand Junction, CO (GJT) |
| Dallas, TX (DFW) | Rochester, NY (ROC) |
| Dallas, TX (DFW) | Lexington, KY (LEX) |
| Dallas, TX (DFW) | Jacksonville, FL (JAX) |
| Buffalo, NY(BUF) | Dallas, TX (DFW) |
| Hartford, CT (BDL) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Norfolk-Virginia Beach, VA (ORF) |
| Dallas, TX (DFW) | Savannah, GA (SAV) |
| Dallas, TX (DFW) | Richmond, VA (RIC) |
| Charlottesville, VA (CHO) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Sacramento, CA (SMF) |
| Charleston, WV (CRW) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Huntsville, AL (HSV) |
| Dallas, TX (DFW) | Phoenix, AZ (PHX) |
| Dallas, TX (DFW) | Philadelphia, PA (PHL) |
| Cleveland, OH (CLE) | Dallas, TX (DFW) |

(Russell Dir. Ex., ¶¶ 10, 20; and PX-149).

85.    Ms. Russell is a member of the American Airlines AAdvantage frequent flyer program.  (Russell Dir. Ex., ¶ 13).

16

86.     Ms Russell intends to continue to travel by air in the future.  (Russell Dir. Ex., ¶¶ 10, 20).

87.     On cross-examination, Ms. Russell was asked about travel options on a number of city pairs that are not at issue in this case, including:  Dallas-Las Vegas, Dallas-San Francisco, Austin-Los Angeles, Dallas-Fort Lauderdale/Miami.  (Trial Tr. 160:17-165:20, Russell and see PX-149).

88.     On cross-examination, Ms. Russell was asked about travel options on other carriers on the Dallas-Seattle, Dallas-Honolulu, and Dallas-San Juan city pairs.  (Trial Tr. 167:7-168:3, Russell).  The established service of other carriers was captured in Dr. Lundgren's post-merger concentrations calculations on these city pairs. (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

89.     Spirit is not a viable option for Ms. Russell because it is "listed as the worst airline" and there are numerous additional fees that she would be required to pay along with the price of a ticket.  (Trial Tr. 179:5-19 Russell).

### C.     Don Fry

90.     Plaintiff Don Fry is a regular consumer of air travel.  (Fry Dir. Ex., ¶¶ 4, 5, 6, 7, 10, 11). Between January 2009 and March 2017, Mr. Fry and his wife traveled by air on 23 itineraries on 51 separate domestic flights.  (Fry Dir. Ex., ¶ 4).  Of those 51 flights, 7 were on American before the merger and two were on US Airways before the merger.  (Fry Dir. Ex., ¶ 4).

91.     Since June 2017, Mr. Fry and his wife have continued to travel extensively domestically, having traveled on or paid for 17 itineraries, comprising 38 flights:  TUS-COS (two fares); TUS-CHI (two fares); CHI-SEA (two fares); SEA-TUS (two fares); TUS-SEA;

TUS-SEA (American Airlines); SEA-PHX; PHX-TUS (American Airlines); TUS-NYC (two

fares) (American Airlines); and TUS-SFO (two fares).  (Fry Dir. Ex., ¶ 5).

92.     Mr. Fry has travelled on the following city pair identified by Plaintiffs' expert Dr.

Carl Lundgren as having post-merger concentrations that are presumptively illegal:  TUS-CHI.

(Fry Dir. Ex., ¶ 6; PX-149).

93.     Based on his location in Tucson, Arizona, future travel plans and location of

friends and family, Mr. Fry may travel on the following city pairs identified by Plaintiffs' expert

Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| Dallas, TX (DFW) | Phoenix, AZ (PHX) |
|---|---|
| Chicago, IL (CHI) | Tucson, AZ (TUS) |
| Santa Barbara, CA (SBA) | Tucson, AZ (TUS) |
| New York, NY (NYC) | Tucson, AZ (TUS) |
| Dallas, TX (DFW) | Tucson, AZ (TUS) |
| Pittsburgh, PA (PIT) | Tucson, AZ (TUS) |
| Hilo, HI (KOA) | Tucson, AZ (TUS) |
| Tucson, AZ (TUS) | Washington, DC (WAS) |
| Detroit, MI (DTW) | Tucson, AZ (TUS) |
| Monterey, CA (MRY) | Tucson, AZ (TUS) |
| Kansas City, MO (MCI) | Tucson, AZ (TUS) |
| Charlotte, NC (CLT) | Tucson, AZ (TUS) |
| Kapaa, HI (LIH) | Tucson, AZ (TUS) |
| Fresno, CA (FAT) | Tucson, AZ (TUS) |
| Kahului, HI (OGG) | Tucson, AZ (TUS) |
| Milwaukee, WI (MKE) | Tucson, AZ (TUS) |
| Philadelphia, PA (PHL) | Tucson, AZ (TUS) |
| Houston, TX (HOU) | Tucson, AZ (TUS) |
| Columbus, OH (CMH) | Tucson, AZ (TUS) |
| Atlanta, GA (ATL) | Tucson, AZ (TUS) |
| St. Louis, MO (STL) | Tucson, AZ (TUS) |
| Boston, MA (BOS) | Tucson, AZ (TUS) |
| Honolulu, HI (HNL) | Tucson, AZ (TUS) |
| Tampa, FL (TPA) | Tucson, AZ (TUS) |
| Des Moines, IA (DSM) | Tucson, AZ (TUS) |
| Indianapolis, IN (IND) | Tucson, AZ (TUS) |

| | |
|---|---|
| Orlando, FL (MCO) | Tucson, AZ (TUS) |
| Austin, TX (AUS) | Tucson, AZ (TUS) |
| Omaha, NE (OMA) | Tucson, AZ (TUS) |
| Miami, FL (MIA) | Tucson, AZ (TUS) |
| San Antonio, TX (SAT) | Tucson, AZ (TUS) |
| Greensboro, NC (GSO) | Phoenix, AZ (PHX) |
| Harrisburg, PA (MDT) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Knoxville, TN (TYS) |
| West Palm Beach (PBI) | Phoenix, AZ (PHX) |
| Key West, FL (EYW) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Savannah, GA (SAV) |
| Baton Rouge, LA (BTR) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Syracuse, NY (SYR) |
| Jackson, MS (JAN) | Phoenix, AZ (PHX) |
| Greenville, SC (GSP) | Phoenix, AZ (PHX) |
| Huntsville, AL (HSV) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Fort Myers, FL (RSW) |
| Westchester County, NY (HPN) | Phoenix, AZ (PHX) |
| Montgomery, AL (MGM) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Richmond, VA (RIC) |
| Phoenix, AZ (PHX) | Raleigh-Durham, NC (RDU) |
| Jacksonville, FL (JAX) | Phoenix, AZ (PHX) |
| Mobile, AL (MOB) | Phoenix, AZ (PHX) |
| Norfolk-Virginia Beach, VA (ORF) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Tallahassee, FL (TLH) |
| Boston, MA (BOS) | Phoenix, AZ (PHX) |
| Hilo, HI (KOA) | Phoenix, AZ (PHX) |
| Fresno, CA (FAT) | Phoenix, AZ (PHX) |
| Charlottesville, VA (CHO) | Phoenix, AZ (PHX) |
| Hartford, CT (BDL) | Phoenix, AZ (PHX) |
| Kahului, HI (OGG) | Phoenix, AZ (PHX) |
| Philadelphia, PA (PHL) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | San Juan, PR (SJU) |
| Kapaa, HI (LIH) | Phoenix, AZ (PHX) |
| Lexington, KY (LEX) | Phoenix, AZ (PHX) |
| Monterey, CA (MRY) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Fort Walton Beach, FL (VPS) |
| Miami, FL (MIA) | Phoenix, AZ (PHX) |
| Phoenix, AZ (PHX) | Tampa, FL (TPA) |
| Phoenix, AZ (PHX) | St. Thomas, VI (STT) |

| Dallas, TX (DFW) | Fort Myers, FL (RSW) |
|---|---|
| Fort Myers, FL (RSW) | San Francisco, CA (SFO) |
| Phoenix, AZ (PHX) | Washington, DC (WAS) |
| Phoenix, AZ (PHX) | Pittsburgh, PA (PIT) |
| Charlotte, NC (CLT) | Phoenix, AZ (PHX) |
| Orlando, FL (MCO) | Phoenix, AZ (PHX) |
| Chattanooga, TN (CHA) | Phoenix, AZ (PHX) |
| Des Moines, IA (DSM) | Phoenix, AZ (PHX) |
| Chicago, IL (CHI) | Phoenix, AZ (PHX) |

(Fry Dir. Ex., ¶ 10; PX-149; Trial Tr. 206:11-15, Fry).  One of these city pairs, Tucson-Dallas, was flown as a leg on other itineraries.  (Trial Tr. 204:4-8, Fry).  By having traveled on a presumptively illegal city pair (even a leg), Mr. Fry is threatened with harm in the form of decreased quality of service and other presumed anticompetitive effects on that city pair.

94.     Tucson is Mr. Fry's preferred airport because of its proximity to his home.  (Trial Tr. 193:3-6, Fry).

95.     Mr. Fry intends to travel by air in the future.  (Fry Dir. Ex. ¶¶ 10, 11).

96.     On cross-examination, Mr. Fry was asked about various travel options on city pairs.  (Trial Tr. 193:23-196:7, 204:4-25, Fry).  Of those city pairs, the following are not at issue in this case:  Tucson-San Francisco, Tucson-Seattle, Tucson-Denver, Tucson-Los Angeles, Tucson-Salt Lake City, Tucson-Santa Fe, Tucson-Las Vegas, Tucson-Denver, Tucson-San Diego.  (*See* PX-149).  As to the other city pairs, Tucson-Chicago, Tucson-Atlanta, Tucson-Houston, Tucson-Dallas, Tucson-New York, the established service of other carriers was captured in Dr. Lundgren's post-merger concentrations calculations on these city pairs.  (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

**D.     Lisa McCarthy**

97.     Plaintiff Lisa McCarthy is a regular consumer of air travel.  (McCarthy Dir. Ex., ¶¶ 2, 9, 10, 11, 12, 13, 14, 15).

98.     Between 2009 and March 2019, Ms. McCarthy purchased two-hundred and thirty-eight (238) airline flights for herself, her spouse, and her family.  Two-hundred and thirty-one of those flights were for Ms. McCarthy and her spouse.  (McCarthy Dir. Ex. ¶ 9).  Eighty-two of those flights were purchased after Defendants' merger in 2013.  (McCarthy Dir. Ex. ¶ 10). Eighteen of those flights were on American after the merger.  (McCarthy Dir. Ex. ¶ 11).

99.     Ms. McCarthy has flown on the following flights identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| | |
|---|---|
| Fort Myers, FL (RSW) | San Francisco, CA (SFO) |
| Fort Myers, FL (RSW) | San Diego, CA (SAN) |
| Fort Myers, FL (RSW) | Seattle, WA (SEA) |
| Dallas, TX (DFW) | Fort Myers, FL (RSW) |
| Dallas, TX (DFW) | Salt Lake City, UT (SLC) |
| Atlanta, GA (ATL) | Reno, NV (RNO) |

(McCarthy Dir. Ex. ¶ 13; PX-149).

100.     Of these city pairs, Dallas-Fort Myers, Dallas-Salt Lake City, and Atlanta-Reno were flown as legs on other itineraries.  (McCarthy Dir. Ex. ¶ 12 and PX-136 at p. 9).  By having traveled on these presumptively illegal city pairs, Ms. McCarthy is threatened with harm in the form of decreased quality of service and other presumed anticompetitive effects on those city pairs.

101.     Based on Ms. McCarthy's future travel plans and her residence in Florida, she may fly on the following city pairs in the future, which are identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| | |
|---|---|
| Fort Myers, FL (RSW) | St. Thomas, VI (STT) |
| Little Rock, AR (LIT) | Fort Myers, FL (RSW) |

| | |
|---|---|
| Los Angeles, CA (LAX) | Fort Myers, FL (RSW) |
| Des Moines, IA (DSM) | Fort Myers, FL (RSW) |
| Fort Myers, FL (RSW) | Fayetteville, AR (XNA) |
| Kansas City, MO (MCI) | Fort Myers, FL (RSW) |
| Austin, TX (AUS) | Fort Myers, FL (RSW) |
| Miami, FL (MIA) | Orange County, CA (SNA) |
| Jackson, MS (JAN) | Miami, FL (MIA) |
| Harrisburg, PA (MDT) | Miami, FL (MIA) |
| Durango, CO (DRO) | Miami, FL (MIA) |
| Greensboro, NC (GSO) | Miami, FL (MIA) |
| Fresno, CA (FAT) | Miami, FL (MIA) |
| Miami, FL (MIA) | Ontario, CA (ONT) |
| Grand Junction, CO (GJT) | Miami, FL (MIA) |
| Kapaa, HI (LIH) | Miami, FL (MIA) |
| Miami, FL (MIA) | Pensacola, FL (PNS) |
| Hilo, HI (KOA) | Miami, FL (MIA) |
| Honolulu, HI (HNL) | Miami, FL (MIA) |
| Miami, FL (MIA) | Raleigh-Durham, NC (RDU) |
| Miami, FL (MIA) | Reno, NV (RNO) |
| Miami, FL (MIA) | San Jose, CA (SJC) |
| Miami, FL (MIA) | Norfolk-Virginia Beach, VA (ORF) |
| Little Rock, AR (LIT) | Miami, FL (MIA) |
| Miami, FL (MIA) | St. Louis, MO (STL) |
| Miami, FL (MIA) | Washington, DC (WAS) |
| Des Moines, IA (DSM) | Miami, FL (MIA) |
| Columbus, OH (CMH) | Miami, FL (MIA) |
| Miami, FL (MIA) | Richmond, VA (RIC) |
| Miami, FL (MIA) | Salt Lake City, UT (SLC) |
| Miami, FL (MIA) | Louisville, KY (SDF) |
| Miami, FL (MIA) | Knoxville, TN (TYS) |
| Indianapolis, IN (IND) | Miami, FL (MIA) |
| Miami, FL (MIA) | San Diego, CA (SAN) |
| Las Vegas, NV (LAS) | Miami, FL (MIA) |
| Charleston, SC (CHS) | Miami, FL (MIA) |
| Miami, FL (MIA) | Phoenix, AZ (PHX) |
| Miami, FL (MIA) | Sacramento, CA (SMF) |
| Miami, FL (MIA) | Palm Springs, CA (PSP) |
| Miami, FL (MIA) | Tucson, AZ (TUS) |
| Phoenix, AZ (PHX) | Fort Myers, FL (RSW) |
| Charlotte, NC (CLT) | Miami, FL (MIA) |

| Miami, FL (MIA) | Philadelphia, PA (PHL) |
|---|---|

(McCarthy Dir. Ex. ¶¶ 14, 15; PX-149).

102.    Ms. McCarthy's preferred airport for travel is Fort Myers.  (Trial Tr. 227:13-228:12, McCarthy).

103.    Ms. McCarthy intends to travel by air in the future.  (McCarthy Dir. Ex. ¶¶ 14, 15).

104.    On cross-examination, Ms. McCarthy was asked about *nonstop* service on the Fort Myers -Dallas city pair.  (Trial Tr. 237:3-16, McCarthy).  Before the merger, American and US Airways competed on the Fort-Myers-Dallas city pair either through nonstop or one-stop service.  (Lundgren Dir. Ex. pp. 9-10, explaining that HHI calculations were performed based on the merging parties' competing nonstop and one-stop city pairs, *and see* Lundgren Dir. Ex. p. 114 at line 252).

105.    On cross-examination, Ms. McCarthy was asked about various travel options on city pairs.  (Trial Tr. 237:17-243:13, McCarthy).  Of those city pairs, Fort-Myers -Dallas; Fort-Myers-San Francisco, the established service of other carriers was captured in Dr. Lundgren's post-merger concentrations calculations on these city pairs. (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

### E.    Gabriel Garavanian

106.    Plaintiff Gabriel Garavanian is a regular consumer of air travel.  (Garavanian Dir. Ex. ¶¶ 5, 6, 7).

107.    Mr. Garavanian has traveled on both American Airlines and US Airways on numerous flights.  (Garavanian Dir. Ex. ¶ 5).

108.    Mr. Garavanian regularly flies out of Boston and may fly on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having presumptively illegal post-merger concentrations:

| Boston, MA (BOS) | Huntsville, AL (HSV) |
|---|---|
| Boston, MA (BOS) | Fresno, CA (FAT) |
| Boston, MA (BOS) | Santa Barbara, CA (SBA) |
| Boston, MA (BOS) | Tallahassee, FL (TLH) |
| Boston, MA (BOS) | Gainesville, FL (GNV) |
| Boston, MA (BOS) | Ontario, CA (ONT) |
| Boston, MA (BOS) | Jackson, MS (JAN) |
| Boston, MA (BOS) | Phoenix, AZ (PHX) |
| Boston, MA (BOS) | Orange County, CA (SNA) |
| Boston, MA (BOS) | Pensacola, FL (PNS) |
| Boston, MA (BOS) | Monterey, CA (MRY) |
| Boston, MA (BOS) | Fayetteville, AR (XNA) |
| Boston, MA (BOS) | Fort Walton Beach, FL (VPS) |
| Boston, MA (BOS) | Des Moines, IA (DSM) |
| Boston, MA (BOS) | Little Rock, AR (LIT) |
| Boston, MA (BOS) | Tucson, AZ (TUS) |
| Boston, MA (BOS) | Baton Rouge, LA (BTR) |
| Boston, MA (BOS) | Reno, NV (RNO) |
| Boston, MA (BOS) | Lexington, KY (LEX) |
| Boston, MA (BOS) | Louisville, KY (SDF) |
| Nashville, TN (BNA) | Boston, MA (BOS) |
| Boston, MA (BOS) | Palm Springs, CA (PSP) |

(Garavanian Dir. Ex. ¶ 7; PX-149).

109.    In addition, Mr. Garavanian flew on the presumptively illegal city pairs, Dallas-Phoenix, Charlotte-Miami, Miami-Philadelphia, and New York-Reno as legs on itineraries to and from Boston.  (Trial Tr. 294:3-296:11, Garavanian).  By having traveled on presumptively illegal city pairs (even as legs), Mr. Fry is threatened with harm in the form of decreased quality of service and other presumed anticompetitive effects on those city pair.

110.    Mr. Garavanian is an American AAdvantage program member.  (Garavanian Dir. Ex. ¶ 17).

111.    Mr. Garavanian intends to travel by air in the future.  (Garavanian Dir. Ex. ¶ 7).

112.    On cross-examination, Mr. Garavanian was asked about various travel options on city pairs.  (Trial Tr. 275:24-278:5, 279:6-22, Garavanian).  Of these city pairs, the following are not at issue in this case:  Boston-Washington, DC, Boston-New Orleans, Boston-Los Angeles, Boston-New York, Boston-Denver, Boston-Miami/Fort Lauderdale, Boston-Chicago, Boston-Tampa, Boston-Orlando, Boston-Long Beach, Boston-Austin, Boston-San Francisco, Boston-Dallas, Boston-Philadelphia, Boston-Charlotte.  *(See* PX-149).   Only one of those city pairs is relevant to this case, Boston-Phoenix, and the established service of other carriers was captured in Dr. Lundgren's post-merger concentrations calculations on that city pair. (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

### F.    Valarie Jolly

113.    Plaintiff Valarie Jolly is a regular consumer of air travel.  (Jolly Dir. Ex. ¶¶ 5, 6, 7, 22, 25, 26, 27).

114.    Between March 2009 and June 2016, Ms. Jolly took one hundred and two (102) domestic and international airline flights.  Of these, sixty-nine (69) were on American Airlines. Forty-four (44) of these flights were taken on American prior to the merger and twenty-five flights were taken after the merger.  (Jolly Dir. Ex. ¶ 5).

115.    Since June 11, 2017, Ms. Jolly has taken approximately twenty-seven (27) additional flights on American.  (Jolly Dir. Ex. ¶ 22).

116.    Ms. Jolly has flown on the following city pairs identified by Plaintiffs' expert Dr. Lundgren as having post-merger concentrations that are presumptively illegal:

| Dallas, TX (DFW) | St. Thomas, VI (STT) |
| Dallas, TX (DFW) | Tucson, AZ (TUS) |
| Dallas, TX (DFW) | West Palm Beach (PBI) |
| Dallas, TX (DFW) | Salt Lake City, UT (SLC) |
| Dallas, TX (DFW) | San Diego, CA (SAN) |
| Dallas, TX (DFW) | Fort Walton Beach, FL (VPS) |
| Dallas, TX (DFW) | Seattle, WA (SEA) |
| Dallas, TX (DFW) | Ontario, CA (ONT) |
| Dallas, TX (DFW) | Raleigh-Durham, NC (RDU) |
| Dallas, TX (DFW) | Reno, NV (RNO) |
| Dallas, TX (DFW) | Jacksonville, FL (JAX) |
| Dallas, TX (DFW) | Honolulu, HI (HNL) |
| Dallas, TX (DFW) | Westchester County, NY (HPN) |
| Dallas, TX (DFW) | Greenville, SC (GSP) |
| Charlotte, NC (CLT) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Portland, OR (PDX) |

(Jolly Dir. Ex. ¶¶ 6, 7, 22 and PX-149).

117.    Ms. Jolly has made a flight reservation to travel on the following city pair which has been identified by Plaintiffs' expert Dr. Lundgren as having a post-merger concentration that is presumptively illegal:  Dallas-Greenville.

(Jolly Dir. Ex. ¶ 26 and PX-149).

118.    Ms. Jolly most often travels out of Dallas-Fort Worth on American because while she may have other choices, she does not view them as "good ones."  (Trial Tr. 641:11-21, Jolly).

119.    In addition to those city pairs listed above, Ms. Jolly may fly on the following city pairs in the future, which have been identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| Dallas, TX (DFW) | St. Thomas, VI (STT) |
| Dallas, TX (DFW) | West Palm Beach (PBI) |
| Dallas, TX (DFW) | Salt Lake City, UT (SLC) |
| Dallas, TX (DFW) | Fort Walton Beach, FL (VPS) |

26

| Dallas, TX (DFW) | Seattle, WA (SEA) |
| Dallas, TX (DFW) | Reno, NV (RNO) |
| Dallas, TX (DFW) | Syracuse, NY (SYR) |
| Dallas, TX (DFW) | Lexington, KY (LEX) |
| Charleston, SC (CHS) | Dallas, TX (DFW) |
| Dallas, TX (DFW) | Philadelphia, PA (PHL) |

(Jolly Dir. Ex. ¶ 27; PX-149).

120.     Ms. Jolly is a member of American's AAdvantage member program.  (Jolly Dir.

Ex. ¶ 9, 19).

121.     Ms. Jolly intends to travel by air in the future. (Jolly Dir. Ex. ¶ 26, 27).

122.     On cross-examination, Ms. Jolly was asked about various travel options on city

pairs.  (Trial Tr. 644:9-647:3, Jolly).  Of those city pairs, San Francisco-Dallas, and Dallas-Los

Angeles, are not at issue in this case.  (PX-149).   As to the remaining city pair, Dallas-Salt Lake

City, the established service of other carriers was captured in Dr. Lundgren's post-merger

concentrations calculations on this city pair. (Lundgren Dir. Ex. p. 103-104, ¶¶ 3, and 5-9).

123.     Southwest is not a desirable option for Ms. Jolly and when she must fly on

Southwest, she sustains "damage."  (Trial Tr. 646:24-647:17, Jolly).

124.     Flying on Spirit is not a viable option for Ms. Jolly.  (Trial Tr. 648:10-649:7,

Jolly).

### G.     Jose Brito

125.     Plaintiff José Brito is a regular consumer of air travel.  (Brito Dir. Ex., ¶¶ 4, 5, 6,

17, 19, 20).

126.     Between April 20, 2009, and March 26, 2017, Mr. Brito has personally taken and

paid for approximately one hundred and fifty-six (156) domestic and international flights.  Of

these, seventy-eight (78) were taken before the December 9, 2019, merger and seventy-eight (78)

were taken after the merger.  Approximately twenty-four (24) flights were on American and seven (7) were on US Airways.  (Brito Dir. Ex., ¶ 5).

127.     Mr. Brito has travelled on the following city pairs on American:  Reno-Dallas, Reno-Phoenix, Phoenix-Boston, Dallas-Miami, and Miami-Phoenix.  (Brito Dir. Ex., ¶ 6).

128.     Since June 20, 2017, Mr. Brito has flown on the following city pairs:  Reno-Denver; Denver-Washington, DC; Washington, DC-San Francisco; San Francisco-Reno; Tucson-Denver; Denver-Reno; Reno-Phoenix; and Phoenix-Tucson.  (Brito Dir. Ex., ¶ 19).

129.     Mr. Brito has flown on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| Dallas, TX (DFW) | Reno, NV (RNO) |
|---|---|
| Miami, FL (MIA) | Phoenix, AZ (PHX) |
| Boston, MA (BOS) | Phoenix, AZ (PHX) |

(Brito Dir. Ex., ¶¶ 6, 19).  These city pairs were traveled as legs on other itineraries.  (Trial Tr. 585:25-586:25, Brito).  By having traveled on these presumptively illegal city pairs (even as legs), Mr. Brito is threatened with harm in the form of decreased quality of service and other presumed anticompetitive effects on those city pairs.

130.     In addition, Mr. Brito may also travel on the New York-Reno and Boston-Reno city pairs in the future, which are also identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal.  (Brito Dir. Ex., ¶ 20).

131.     Mr. Brito is a member of American Airlines AAdvantage program.  (Brito Dir. Ex. ¶ 17).  He has 180,000 points and intends to use them in the future.  *Id.*

132.     Mr. Brito intends to continue to fly in the future.  (Brito Dir. Ex., ¶¶ 17, 20, 21).

### H.     June Stansbury

133.    Plaintiff June Stansbury is a regular consumer of air travel.  (Stansbury Dir. Ex., ¶¶ 2, 9, 10, 11, 12, 13, 14, 15, 16).

134.    Between 2009 and March 2019, Ms. Stansbury took approximately ninety-four (94) domestic and international flights.  (Stansbury Dir. Ex., ¶ 9).

135.    From 2009 to 2013, Ms. Stansbury took eighteen (18) flights, including on American Airlines and US Airways.  (Stansbury Dir. Ex., ¶ 10).

136.    From 2013 to March 2019, Ms. Stansbury flew on seventy-six (76) flights, including on American and/or US Airways.  (Stansbury Dir. Ex., ¶ 11).

137.    Ms. Stansbury has flown on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| | |
|---|---|
| Dallas, TX (DFW) | Reno, NV (RNO) |
| Columbus, OH (CMH) | Reno, NV (RNO) |
| Miami, FL (MIA) | Reno, NV (RNO) |
| Boston, MA (BOS) | Reno, NV (RNO) |
| New York, NY (NYC) | Reno, NV (RNO) |
| Reno, NV (RNO) | Washington, DC (WAS) |
| Atlanta, GA (ATL) | Reno, NV (RNO) |

(Stansbury Dir. Ex., ¶¶ 13, 14; PX-149).

138.    Ms. Stansbury has future travel plans on the following city pair identified by Plaintiffs expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:  New York – Reno.  (Stansbury Dir. Ex., ¶¶ 13, 14; PX-149).

139.    Ms. Stansbury is a potential future consumer on the following city pairs:  Dallas-Louisville and Phoenix-Kahului.  (Stansbury Dir. Ex. ¶ 16, Trial Tr. 788:5-10, Stansbury).  On both of those routes, Ms. Stansbury anticipates originating in Reno.  (Trial Tr. 788:11-14, Stansbury).  She is nevertheless threatened with the presumed anticompetitive effects associated with traveling on those presumptively illegal city pairs.  (See PX-149).

29

140.    Ms. Stansbury intends to continue to fly in the future.  (Stansbury Dir. Ex., ¶ 16).

**I.    Gary Talewsky**

141.    Plaintiff Gary Talewsky is a regular consumer of air travel.  (Talewsky Dir. Ex., ¶¶ 3, 10, 11, 12, 13, 14, 15, 16, 17, 18).

142.    From 2009 to March 2019, Mr. Talewsky has flown on approximately 215 domestic and international flights.  (Talewsky Dir. Ex. ¶ 10).  Eighty-eight of those flights were on American Airlines.  (Talewsky Dir. Ex. ¶ 11).  Fifty-six of those flights were taken before the merger and 32 were taken after the merger.  (Talewsky Dir. Ex. ¶ 12).

143.    From 2013 to the present, Mr. Talewsky has taken one hundred and eight (108) flights.  (Talewsky Dir. Ex. ¶ 13).

144.    Mr. Talewsky has flown on the following city pairs identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:  Boston-Tucson, AZ and Dallas-Tucson.  (Talewsky Dir. Ex. ¶ 15 and PX-149).

145.    In addition, based on Mr. Talewsky's future travel plans, he may fly on the following city pairs in the future identified by Plaintiffs' expert Dr. Carl Lundgren as having post-merger concentrations that are presumptively illegal:

| Miami, FL (MIA) | Palm Springs, CA (PSP) |
| Boston, MA (BOS) | Palm Springs, CA (PSP) |
| Miami, FL (MIA) | Phoenix, AZ (PHX) |
| Boston, MA (BOS) | Phoenix, AZ (PHX) |
| West Palm Beach (PBI) | Phoenix, AZ (PHX) |
| Nashville, TN (BNA) | Boston, MA (BOS) |

(Talewsky Dir. Ex. ¶¶ 17, 18; PX-149.)

146.    Mr. Talewsky is an American AAdvantage Platinum Member and plans to use his accrued miles in the future.  (Talewsky Dir. Ex. ¶¶ 22, 23).

147.    Mr. Talewsky intends to travel by air in the future.  (Talewsky Dir. Ex. ¶ 18).

148.     Spirit is not a competitive option for Mr. Talewsky because it is "a very inferior product" and his "company will not sell [tickets on Spirit]."  (Trial Tr. 738:19-25, Talewsky).

149.     While Mr. Talewsky will occasionally fly from Boston to Miami, his preferred airports are "West Palm or Fort Lauderdale" because Miami is "too far away."  (Trial Tr. 739:10-21, Talewsky).

### J.     Carolyn Fjord

150.     Plaintiff Carolyn Fjord flew on the Sacramento (SMF) – St. Louis (STL) city pair in September 2016 and October 2016.  (March 18, 2019, Stip., ¶ 1 and Dkt. No. 103, ¶ 9); PX-149.  This city pair is identified by Plaintiffs' expert as having presumptively illegal post-merger concentrations.  *Id*.

### K.     Don Freeland

151.     Plaintiff Don Freeland flew on the Detroit (DTW) – Palm Springs, CA (PSP) city pair between 2009 and June 2017, and has confirmed tickets for two on this city pair for travel in April 2019.  (March 18, 2019, Stip., ¶ 2 and Dkt. No. 103, ¶ 9; PX-149).  This city pair is identified by Plaintiffs' expert as having presumptively illegal post-merger concentrations.  *Id*.

### L.     Gail Kosach

152.     Plaintiff Gail Kosach flew on the Chicago (CHI)-Reno (RNO) and Chicago (CHI) – Palm Beach, FL (PBI) city pairs in May 2018.  (March 18, 2019, Stip., ¶ 3 and Dkt. No. 103, ¶9); PX-149.  This city pair is identified by Plaintiffs' expert as having presumptively illegal post-merger concentrations.  *Id*.

153.     As regular consumers of air travel, including on the presumptively illegal city pairs identified by Plaintiffs' expert Dr. Lundgren, Plaintiffs are threatened with loss or injury from the merger of American and US Airways.

## V.     INDUSTRY TERMS

154.     ASM - "Available seat mile," is the industry measure of capacity representing one seat flown one mile.  (Garboden Dir. Ex. ¶ 25; Nocella Depo. (4/7/17) 86:25-87:3).

155.     TRASM- The "total revenue per available seat mile" metric is the amount of revenue an airline sees for every seat-mile flown—and therefore includes not only the base fare of a ticket, but also any other fees associated with that ticket that a consumer might pay, including, for instance, bag fees. (Garboden Dir. Ex. ¶ 40).

156.     CAGR –is cumulative annual growth rate.  (Trial Tr. 376:8-9, Parker).

## VI.    THE MERGER HAS AND WILL LESSEN COMPETITION IN THE RELEVANT CITY PAIR MARKETS

### A.     The Merger is Presumptively Illegal in Numerous City Pair Markets

157.     A commonly used metric for determining market share is the Herfindahl–Hirschman Index ("HHI").  (Trial Tr. 798:9-799:20, Lundgren); *St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd*, 778 F.3d 775, 786 (9th Cir. 2015), citing *See ProMedica Health Sys., Inc. v. FTC,* 749 F.3d 559, 568 (6th Cir. 2014).

158.     HHI is "calculated by summing the squares of the individual firms" market shares," which "gives proportionately greater weight to the larger market shares." *St. Alphonsus*, 778 F.3d at 786, citing Merger Guidelines § 5.3, PX-148.

159.     Analysis of market concentration "consider[s] both the post-merger level of the HHI and the increase in the HHI resulting from the merger."  *St. Alphonsus,* 778 F.3d at 786, citing Merger Guidelines § 5.3, PX-148.

160.     A market is considered highly concentrated if the HHI is above 2,500, and a merger that increases the HHI by more than 200 points will be presumed to likely enhance

market power.  (Trial Tr. 798:9-799:20); *St. Alphonsus*, 778 F.3d at 786, citing Merger

Guidelines, § 5.3.

161.    "Sufficiently large HHI figures establish the [Plaintiffs'] prima facie case that a

merger is anticompetitive."  *St. Alphonsus*, 778 F.3d at 786, citing *FTC v. H.J. Heinz Co.,* 246

F.3d 708, 716 (D.C. Cir. 2001).

162.    Plaintiffs identified 1,008 overlapping non-stop and one-stop city pair markets

where the calculated post-merger concentration levels would rise above presumptively illegal

thresholds.  (Lundgren Dir. Ex. at p. 8 of 128 and pp. 47-71 of 128).

163.    Non-stop city pair markets compete with one-stop city pair markets for

passengers.  (Kirby Depo. (10/10/13) 26:12-14).

164.    As a result of the merger, concentration levels are presumptively illegal under the

standards in the DOJ's Horizontal Merger Guidelines in 765 of the 1,008 city pairs originally

identified by Plaintiffs.  (Lundgren Dir. Ex. at p. 106 of 128 and pp. 110-128).

165.    Of the city pairs on which Plaintiffs have flown or will fly in the future,

presumptively illegal concentrations exist in 204 city pairs, which are identified in the **Table A**,

attached hereto.  (**Table A** cross-references Lundgren Dir. Ex. at 110-128, Plaintiffs' written

direct examinations, and PX-149).

166.    Dr. Carlton does not contest Dr. Lundgren's HHI calculations, incorporating them

into his own analysis.  (Carlton Dir. Ex. ¶¶ 53-60).

167.    Dr. Carlton identified 22 routes between major cities from Appendix A of Dr.

Lundgren's 2017 Report on which post-merger concentration was not presumptively illegal.

(Carlton Dir. Ex. ¶¶ 54, 59).  Of those city pairs, only one is at issue in this case, Philadelphia-

Seattle.  (PX-149).  The post-merger change in concentration in 2018 on that city pair is presumptively illegal with an increase in HHI of 324, to 3,964.  *Id.*

168.     Dr. Carlton identified 14 routes between smaller cities from Appendix A of Dr. Lundgren's 2017 report on which post-merger concentration levels were not presumptively illegal. (Carlton Dir. Ex. ¶¶ 55, 59).  None of those city pairs is at issue in this case.  (PX-149).

169.     Dr. Carlton identified four city pairs on which post-merger concentrations fell because rival carriers expanded market share.  (Carlton Dir. Ex. ¶¶ 56, 60).  None of these city pairs are at issue in this case.  (PX-149).

170.     The acquisition results in a substantial market share for American in the city pair relevant markets identified in **Table A**, attached hereto.

171.     The acquisition is therefore presumptively anticompetitive under § 7 of the Clayton Act in each of the relevant city pair markets identified in **Table A**.

       **B.**     **There Has Been a Strong Trend Towards Concentration In the Airline Industry**

172.     Since 2000, there has been a strong trend in concentration in the airline industry. (PX-90 at p. 5-6 of 31; Horton Depo. (12/12/13) 43:6-19; PX-049 at p. 18 of 115).

173.     In 2008, Delta Airlines acquired Northwest.  (PX-90 at p. 5 of 31).

174.     In 2010, United acquired Continental Airlines.  (PX-90 at p. 5 of 31).

175.     In 2011, Southwest acquired AirTran.  (PX-90 at p. 5 of 31).

176.     In 2013, American Airlines merged with Defendant US Airways.  (March 4, 2019, Stip., ¶ 11).

177.     In 2016, Alaska Airlines acquired Virgin America.  (Trial Tr. 1026:11-16, Kasper).

178.    The Defendants themselves are the products of mergers.  In 2001, American Airlines acquired TWA.  (PX-90 at p. 5 of 31).  In 2005, US Airways acquired America West. (PX-90 at p. 5 of 31).

179.    The Plaintiffs personally observed the trend in concentration in the airline industry.  (Brito Dir. Ex. ¶ 7; Jolly Dir. Ex. ¶ 8; Stansbury Dir. Ex. ¶¶ 8, 9, 18, 29; Rubinsohn Dir. Ex., ¶¶ 3, 8, 16, 17; Russell Dir. Ex. ¶¶ 5, 11; Talewsky Dir. Ex. ¶¶ 9, 19; McCarthy Dir. Ex., ¶ 7; Garavanian Dir. Ex. ¶ 4).

180.    Consolidation in the airline industry has impacted consumers negatively, including by enabling the few remaining airlines to increase fares, impose new fees (including baggage fees and fees for mileage upgrades), increase change fees, eliminate complimentary meal service, decrease seat pitches, eliminate and reduce service at nearby airports, and increase unannounced schedule changes. (Brito Dir. Ex. ¶¶ 7, 15; Jolly Dir. Ex. ¶¶ 12, 15, 17; Stansbury Dir. Ex. ¶ 8, 9, 18 (loss of nonstop and regional service), 19, 29; Rubinsohn Dir. Ex., ¶¶ 13 (loss of service to Raleigh, Pittsburgh, and St. Louis), 16, 17; Russell Dir. Ex., ¶¶ 5, 11, 15 (decreased service to and from hubs like St. Louis, Phoenix, Houston, Chicago, Salt Lake City, Atlanta, Minneapolis, and Newark) 17 (unannounced schedule changes); Talewsky Dir. Ex., ¶¶ 9, 19, 40; McCarthy Dir. Ex. ¶¶ 7, 18, 24, 26, 28).

### C.    There are Barriers to Entry in the Airline Industry

181.    There are substantial barriers to entry in the airline industry.

182.    A new major airline attempting to enter the market today cannot recover its cost of capital.  (Parker D., PX-085 at 43 of 44).

183.    A new major airline attempting to enter the market today "cannot make any money." (Parker, D, PX-085 at 43 of 44).

184.    No new major airline has entered the market since Virgin America in 2007. (Trial. Tr. 1040:16-22, Kasper).

185.    Ultimately, Virgin America was acquired in 2016 by Alaska.  (Trial Tr. 1026:11-16, Kasper).

### D.    Average Airfares Have Increased in Presumptively Illegal City Pair Markets

186.    Of the initial 1,008 city pairs identified by Plaintiffs, since the merger, average airfares have increased on 708 city pairs.  (Lundgren Dir. Ex. at 110-128).

187.    Of the initial 1,008 city pairs identified by Plaintiffs, post-merger concentration levels are presumptively illegal and average airfares have increased on 575 city pairs.  (Lundgren Dir. Ex. at 110-128).

188.    Average fare increases range from 73.6% to .2%.  (Lundgren Dir. Ex. at 110-128).

189.    PX-149 lists the city pair markets in which 13 plaintiffs have flown and in which they are likely to fly in the future. (PX-149; Trial Tr. (3/13/19) 836:17-839:6, Lundgren)

190.    PX-149 lists city pair markets which correlate to city pair markets, average air fare growth, and passenger growth listed in the written direct testimony of Dr. Carl Lundgren. (Trial Tr. 795:18-797:13; 836:17-839:6, Lundgren).

191.    Of the city pairs on which Plaintiffs have flown or will fly in the future, post-merger concentration levels are presumptively illegal and average airfares have increased on 150 out of 204 of them.  (*See* **Table B**, attached hereto, cross-references data in the Lundgren Dir. Ex. at 110-128, Plaintiffs' written direct examinations, and PX-149).

192.     On the city pairs identified in **Table B**, competition has not entered the market sufficient to counter the presumed anticompetitive effects in each city pair market, in this case increased prices.

193.     Average fare increases on concentrated city pairs are consistent with Dr. Carlton's assumption that the merger would cause fare increases, having "estimat[ed] [] fare increases [caused] by the Merger" when conducting his analysis.  (Carlton Dir. Ex. ¶ 32).

194.     These average airfare increases are contrary to the overall trend in the industry that average airfares decreased.  (*See* Kasper Dir. Ex. Table 7, showing that average fares decreased about 11% from 2013 to 2017).

195.     The general cumulative rate of inflation from 2012 through the second quarter of 2018, the period Dr. Lundgren used to calculate the percentage change in average airfares and passenger growth in his written direct testimony, was less than 10 percent. (Trial Tr. 879:19-25, Lundgren).

196.     Defendants acknowledge that the actual general cumulative rate of inflation for the period from 2012 through the second quarter of 2018 was 9.5 percent.  (Trial Tr. (3/13/19) 892:16-22, Lundgren).

197.     Defendants' expert Daniel Kasper's written direct testimony shows that average real domestic one-way airfares declined from $164 to $147 in the period from 2012 to 2017, representing a real price decrease during that period of 10.4 percent. (Kasper Dir. Ex. p.29 (Demonstrative 7).

198.     Kasper's Demonstrative 7 also shows average real domestic one-way airfares of $151 in 2016, compared to 2012's average $164 fare, representing a cumulative real price decrease of 7.9 percent between 2012 and 2016.  (Kasper Dir. Ex.  p.29 (Demonstrative 7).

199.    Based upon Dr. Lundgren's trial testimony and Mr. Kasper's written direct testimony, the 2016 average fare was $151 in 2012 dollars which, after applying cumulative inflation of 10 percent, yields $166.10 in nominal dollars for the 2016 average fare.  This represents, at most, a nominal increase of $2.10 ($166.10 - [Kasper's] $164) or 1.3 percent on a typical national route, although, since cumulative inflation was less than 10 percent, the average nominal fare increase was less than 1.3 percent. This establishes that city pairs identified in Dr. Lundgren's written direct testimony as having had average fare increases of 1.3 percent or more experienced price increases relative to average national fares between 2012 and 2016. Lundgren Dir. Ex. pp.80-99 of 128 (Exhibit 2, Annex A, lines 1-695).  This includes at least 695 city pairs on the DOJ's list of 1,008 city pairs identified as presumptively illegal.

200.    Based upon Dr. Lundgren's trial testimony and Mr. Kasper's written direct testimony, the 2017 average fare was $147 in 2012 dollars which, after applying cumulative inflation of 10 percent, yields $161.70 in nominal dollars for the 2017 average fare. This represents a nominal decrease of at least – since inflation was less than 10 percent – $2.30 ($161.70 - [Kasper's] $164) or a reduction of 1.4 percent on a typical national route. This establishes that city pairs identified in Dr. Lundgren's written direct testimony as having had average fare growth of *negative* 1.4 percent or more experienced price increases relative to average national fares between 2012 and 2017.  (Lundgren Dir. Ex. pp.110-123 of 128 (Exhibit, Annex-Table A, lines 6-750). This includes at least 745 city pairs on the DOJ's list of 1,008 city pairs identified as presumptively illegal.

201.    Average national nominal fares decreased by more than 1.4 percent during the period 2012 to 2017. Therefore, where nominal prices increased in the Plaintiffs' relevant city pairs shown in PX-149, it represents a significant price increase to consumers in those

markets. Plaintiffs' list includes 172 (out of 227) unique city pairs where nominal prices increased. (PX-149).  Moreover, where fares in the Plaintiffs' relevant city pairs shown in PX-149 decreased by less than the national average, it represents an increase in price relative to the national average.

202.     Whereas larger city pair markets often experienced lower fares and passenger growth after the merger, smaller city pair markets generally did not experience lower fares and passenger growth following the merger. (Trial Tr. 919:18-920:5).

203.     Dr. Carlton identified 15 of the "top" 1,008 city pairs on which average fares decreased.  (Carlton Dir. Ex. ¶ 65).  Of those, only five are at issue in this case, Miami-Washington;  Charlotte-New York; Los Angeles-Miami; Miami-Philadelphia; and Dallas-Phoenix.  (PX-149). On the Miami-Los Angeles city pair, average airfares increased 2.2%.  *Id*. at ¶ 65.  On the Miami-Washington city pair, average airfares decreased by .5%, well below the industry average.  (*Id*. at ¶ 65 and Kasper Dir. Ex. Table 7).

### E.     Passenger Traffic Has Declined in Presumptively Illegal City Pairs

204.     Of the initial 1,008 city pairs identified by Plaintiffs, since the merger, passenger traffic has decreased on 336 city pairs.  (Lundgren Dir. Ex. at 110-128).

205.     Of the initial 1,008 city pairs identified by Plaintiffs, since the merger, post-merger concentration levels are presumptively illegal and passenger growth has declined on 264 of them.  (Lundgren Dir. Ex. at 110-128).

206.     Of the city pairs on which Plaintiffs have flown or will fly in the future, post-merger concentration levels are presumptively illegal and passenger traffic has decreased on 59 out of 204 of them.  (*See* **Table C**, attached hereto. Table C cross-references data from the Lundgren Dir. Ex. at 110-128, Plaintiffs' written direct examinations, and PX-149).

207.     These city pairs on which passenger traffic has declined are contrary to the overall trend in the industry of passenger growth, increasing over 100 million passengers from 2013 to Q2 2018.  (Kasper Dir. Ex. ¶ 9).  Indeed, American claims that from 2013 to 2018 passengers increased by 9 million, or 4.6%.  (Garboden Dir. Ex. p. 11, Table 3).

208.     On the city pairs identified in **Table C**, competition has not entered the market sufficient to counter the presumed anticompetitive effects in each city pair market, in this case, decreases in passenger growth.

### F.     Defendants' Expert Admits that Increases in Price and Decreases in Passenger Traffic are Indicators of Anticompetitive Effects

209.     Dr. Carlton acknowledges that if a merger is anticompetitive, analysis would tend to show higher fares and lower output "on routes where the merging carriers overlapped…" (Carlton Dir. Ex. ¶ 37).

210.     Of the initial 1,008 city pairs identified by Plaintiffs, since the merger, post-merger concentration levels are presumptively illegal, average fares have increased, and passenger traffic has declined on 251 of them.  (Lundgren Dir. Ex. at pp. 110-128).

211.     Of the city pairs on which Plaintiffs have flown or will fly in the future, post-merger concentration levels are presumptively illegal, average airfares have increased, and passenger traffic has declined on 57 out of 204 of them.  (*See* **Table D**, attached hereto, Table D cross-references data from the Lundgren Dir. Ex. at 110-128, Plaintiffs written direct examinations and PX-149).

212.     According to Dr. Carlton, this analysis shows anticompetitive effects in these city pair relevant markets.  (Carlton Dir. Ex. ¶ 37).

### G.     The Merger Threatens to Decrease Service at the Combined Entities' Smaller Hubs

213.    It is likely that post-merger, American will reduce service at some of the combined airlines' nine hubs.  For example, Defendants' own internal documents admit that it is, "Highly unlikely that the combined airline would continue to create five large East Coast operations, particularly given CLT status as over scale, connect hub…Combined entity would likely re-distribute and reduce capacity to maximize profitable flying."  (PX-043 at p. 18 of 33 and PX-045 at p. 38 of 45).

214.    US Airways predicted that after a merger, the Phoenix hub may not be needed after a merger.  (PX-014, p. 22 of 24).

215.    Post-merger, Delta/Northwest reduced capacity at Memphis and Cincinnati, smaller connecting hubs, that are similar to Charlotte and Phoenix.  (Casey Depo. (10/14/13) 131:14-132:18 and 134:14-135:13).

216.    Post-merger, American cut flights at Phoenix, Dallas, and Philadelphia.  (Nocella Depo. (4/7/17) 110:22-111:15).

217.    Decreases in service have already been reported by Phoenix Sky Harbor International Airport, as predicted.  (See PX-112 (reporting decrease of 1.6% in passengers, p. 1; reporting departures down 8.1% and elimination of nonstop service and reduction of service to numerous cities, p. 6, reporting fares have not fallen in line with rest of industry, p. 7)).

### H.    Fees Have Increased Post-Merger

218.    There has been an increase in the fees associated with the cost of a ticket since the merger.  (Talewsky Dir. Ex. ¶¶ 21, 22, 23; Jolly Dir. Ex. ¶¶ 9; Stansbury Dir. Ex. ¶ 8, 21, 23; Fry Dir. Ex. ¶ 7; Rubinsohn Dir. Ex. ¶ 9; Russell Dir. Ex. ¶ 12; Garavanian Dir. Ex. ¶ 19).

219.    Since the merger, American has imposed a new seat assignment fee that did not exist before the merger, which now ranges from about $14 to $280.  (Talewsky Dir. Ex. ¶¶ 21; Jolly Dir. Ex. ¶ 9, 21, 23, 24; Russell Dir. Ex. ¶ 12; Garavanian Dir. Ex. ¶ 18, 19).

220.    Since the merger, other carriers have matched American's baggage fee, including Jet Blue.  (Talewsky Dir. Ex. ¶ 25).

221.    Since the merger, American, United, and Delta have increased baggage fees from $25 to $30.  (Fry Dir. Ex. ¶ 8; Rubinsohn Dir. Ex. ¶ 9; Russell Dir. Ex. ¶ 12; Garavanian Dir. Ex. ¶ 19).

222.    These reported increases in fees are corroborated by Defendants' evidence.

223.    According to the demonstrative in Heather Garboden's testimony, American's TRASM (a measurement that includes fares plus all fees associated with the price of a ticket) in 2017 was about 100 percent of its TRASM in 2013, or virtually the same.  (Garboden Dir. Ex. ¶ Table 8).  According to Mr. Kasper's demonstrative, average fares over that same time period have decreased about 11 percent from 2013 to 2017.  (Kasper Dir. Ex. Table 7).  Thus, in order for TRASM to have remained flat, all of the fees associated with the price of a ticket increased by the same percentage that average fares decreased, or about 11 percent from 2013 to 2017, as reported by Mr. Kasper.

224.    These increases in fees are consistent with the presumed anticompetitive effects on the relevant city pairs identified by Plaintiffs.

## I.    Decreased Quality of Service

225.    Since the merger there has been a decrease in the quality of service offered by American.  (Talewsky Dir. Ex. ¶¶ 26, 27, 28, 29, 37; Jolly Dir. Ex. ¶ 21; Stansbury Dir. Ex. ¶¶ 19, 20; Fry Dir. Ex. ¶ 7; Rubinsohn Dir. Ex. ¶¶ 15, 16).

226.     The quality of American's AAdvantage Program has declined since the merger. (Jolly Dir. Ex. ¶ 15; Stansbury Dir. Ex. ¶ 25; Rubinsohn Dir. Ex. ¶¶ 9, 10; Russell Dir. Ex. ¶ 13; Garavanian Dir. Ex. ¶ 17; Trial Tr. 124:5-125:7, 175:3-175:22 (Rubinsohn, Russell).

227.     After the merger, when American combined its AAdvantage program with US Airways' frequent flyer program, many members lost their Elite Status because American did not expand its top 3 percent Elite category, even though the number of frequent flyers nearly doubled.  (Jolly Dir. Ex. ¶¶ 15).

228.     After the merger, the availability of frequent flyer seats through American's AAdvantage program has been reduced substantially.  (Jolly Dir. Ex. ¶¶ 19; Stansbury Dir. Ex. ¶ 25; Rubinsohn Dir. Ex. ¶ 10; McCarthy Dir. Ex. ¶ 23(iv); Trial Tr. 124:5-125:7, 175:3-22 (Rubinsohn, Russell).

229.     Since the merger, it is no longer possible to check bags through to a final destination when flying on two different airlines.  Before the merger, interline baggage transfer through to a final destination was done at no cost to consumers by American for years.  Since the merger, consumers must pick up and re-check bags on each airline and pay twice as much in baggage fees.  (Jolly Dir. Ex. ¶¶ 10; Rubinsohn Dir. Ex. ¶ 11; Russell Dir. Ex. ¶ 14).

230.     American's customer service has decreased since the merger, often with fewer or no representatives available to assist with immediate customer service issues on site.  (Talewsky Dir. Ex. ¶¶ 26, 27 (no availability of representatives on site); Jolly Dir. Ex. ¶ 21 (reporting verbal abuse by flight attendant); Stansbury Dir. Ex. ¶¶ 19, 20 (no availability of representatives on site); Rubinsohn Dir. Ex. ¶ 15; McCarthy Dir. Ex. ¶ 24; Garavanian Dir. Ex. ¶ 16).

231.    The quality of food served on flights has diminished since the merger, "cold snacks" are often now served instead of a "hot meal."  (Talewsky Dir. Ex. ¶ 28; Stansbury Dir. Ex. ¶ 21; Garavanian Dir. Ex. ¶ 19).

        **J.    Anticompetitive Effects - Conclusion**

232.    The merger has resulted in a substantial increase in market share for American in the relevant city pair markets identified in **Table A**, attached hereto.

233.    This substantial market share increases American's market power in these relevant city pair markets.

234.    Anticompetitive effects are presumed in the city pair markets identified in **Table A**, attached hereto, including increases in prices and deterioration of service.  This is illustrated by the post-merger increase in average airfares in the city pair markets identified in Table B, passenger traffic decline in Table C, combined fare increases and passenger decreases on city pairs in Table D, and increases in ancillary fees.

235.    It is highly likely that those price increases will continue in the future, since no competitive force has entered those city pair markets since the merger to counteract these price increases or halt the increases in ancillary fees.

236.    Quality of service has deteriorated since the merger, in that customer service has diminished, American's AAdvantage member program is less valuable, service of food on flights has been downgraded or eliminated altogether.

    **VII.    DEFENDANTS HAVE NOT OVERCOME THE STRONG
           PRESUMPTION AND ADDITIONAL EVIDENCE OF
           ANTICOMPETITIVE EFFECTS**

        **A.    Defendants' Efficiencies Claims Are Not Merger-Specific**

237.     Through the merger, Defendants sought to increase the size of their network to attract more business travelers.  (Trial Tr. 31:6-10, 44:4-8, Defendants' Opening Statement).

238.     High value customers are business customers who tend to buy higher value products, including first-class product and late booking.  (Horton Depo. (9/20/13) 16:2-6).

239.     Defendants argue that the merger's network efficiencies have so expanded output that it outweighs any anticompetitive effects.  (Carlton Dir. Ex. ¶¶ 24, 25).

240.     As discussed below in the Conclusions of Law section, the efficiencies must be merger specific—that is, "they must be efficiencies that cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor."  *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 722 (D.C. Cir. 2001).

> **1.     The Merger Was Not Necessary for Defendants to Continue Competing in the Relevant Markets Because Before the Merger, American and US Airways Had Viable Standalone Plans for Growth That were Abandoned Post-Merger**

241.     Beginning in 2005, the United States' airline industry began engaging in a practice known as capacity discipline or capacity restraint or capacity rationalization.  (PX-027, pp. 13-14 of 37; PX-36, p. 9 of 27; PX-43, p. 19 of 33; PX-058, pp. 27, 33, 39 of 46; Casey Depo. (10/4/13) 242:4-19).

242.     Capacity discipline, sometimes referred to as capacity restraint or rationalization of capacity, refers to increasing capacity at a rate less than the growth of GDP.  (Casey Depo. (10/4/18) 232:12-233:5).

243.     While American was in bankruptcy, it announced a standalone plan.  (Goulet Depo. (9/12/13) 25:8-17, 58:22-60:3; Horton Depo. (9/20/13) 44:11-45:15; Vahidi Depo. (9/25/13) 243:25-244:9).

244.    Under American's standalone plan, it projected "$3 billion annual improvement," including "revenue improvements of a billion dollars and cost savings of 2 billion."  (Vahidi Depo. (1/22/14) 157:17-158:2).

245.    The standalone plan included four primary revenue components, including (1) joint business agreements; (2) codeshare; (3) gauge changes (new optimized fleet); and (4) product improvements to improve inflight experience.  (PX-058 at p. 5 of 46).

246.    American viewed its standalone plan as "position[ing] the company for long-term success."  (PX-43 at p. 3 of 33).

247.    Under American's standalone plan, it was "already on a path to becoming a highly successful independent carrier."  (PX-43 at p. 33 of 33).

248.    Under American's standalone plan, revenue and operational performance were improving significantly.  (PX-43 at p. 4 of 33).

249.    American's standalone plan, "fully address[ed] sources of historical underperformance" including "labor costs" and "operational constraints."  (PX-43 at p. 4 of 33).

250.    American's standalone plan would have allowed it to be a strong and viable competitor to Delta and United without merging with US Airways.  (Goulet Depo. (9/12/13) 102:3-103:2).

251.    Implementation of American's standalone plan would have allowed American to lower its costs below United and Delta.  (Goulet Depo. (9/12/13) 73:15-20).

252.    American had a very viable business plan that it could have executed with or without a merger with US Airways.  (Goulet Depo. (9/12/13) 108:19-109:9; Vahidi Depo. (9/25/13) 344:19-345:3; Horton Depo. (12/12/13) 27:17-24).

46

253.    American's then Chairman and CEO Tom Horton in July 2012 said, "This company is going to be very successful.  I think we have a very powerful company coming out of restructuring…" (Horton Depo. (12/12/13) 134:4-15, PX-50 and *see* Horton Depo. (12/12/13) 255:10-256:14).

254.    Mr. Horton acknowledged that, "[W]e didn't have to merge.  This quote actually says it pretty well, because the company is going to be very successful, and that was demonstrated through the restructuring."  (Horton Depo. (12/12/13) 137:16-22).

255.    If the standalone plan was implemented, American would have been the number two airline in the top 50 U.S. markets in terms of corporate revenues, twice as big as Delta, and number one when its joint business agreements were taken into account.  (Goulet Depo. (9/12/13) 215:3-217:3).

256.    Under American's standalone plan, it had returned to profitability.  (Goulet Depo. (9/12/13) 76:18-77:7).

257.    Under American's standalone plan, it intended to grow American's capacity 20 percent by 2017.  (PX-058, p. 27 of 46; Goulet Depo. (9/12/13) 67:13-68:5 and 153:7-155:5; Horton Depo. (9/20/13) 59:25-60:4; Horton Depo. (12/12/13) 167:3-11; Vahidi Depo. (1/22/14) 15:6-16:8 and 264:10-23).

258.    The 20 percent capacity growth in American's standalone plan was intended to drive revenue growth.  (Vahidi Depo. (1/22/14) 34:10-17).

259.    Under American's growth plan, by 2017, 20 percent of American's capacity would have been "new flying" including new "markets or frequencies."  (PX-058, p. 27 of 46).

260.    Under American's 20 percent growth plan, "Growth ASMs" would account for "20% of capacity by 2017."  (PX-058 at p. 45 of 46).

261.    American's 20 percent growth plan included both international and domestic capacity.  (Vahidi Depo. (1/22/14) 23:2-23).

262.    US Airways publicly discredited American's standalone plan "by campaigning with Wall Street analysts and pundits and others, and the media."  (Horton Depo. (12/12/13) 53:11-14 and 53:16-54:2).

263.    One such criticism of American's standalone plan was its projected 20 percent capacity growth rate.  (Horton Depo. (12/12/13) 56:10-15).  Mr. Parker's trial testimony that US Airways' view that American's 20 percent growth plan "seemed like a reasonable standalone plan" is contradicted by the testimony of Mr. Horton and is not credible. (Trial Tr. 393:20-394:8, Parker).  In addition, Mr. Parker's testimony lacks credibility overall because in the past, he has urged "saying" whatever is necessary to "get [a merger] approved."  (PX-002 at p. 1 of 4).

264.    US Airways viewed "more capacity via new markets, frequency growth or larger planes" as "tend[ing] to dilute RASM."  (PX-058, at p. 19 of 46 and see PX-058, at p. 27 of 46).

265.    US Airways viewed American's 20 percent growth plan as "forecasting unprecedented industry and internal capacity growth, which will impose a strong negative impact to their RASM."  (PX-058, at p. 41 of 46 and see PX-058 at p. 45 of 46).

266.    American's 20 percent growth plan "deviat[ed] from industry practice with a high assumed growth rate…"  (PX-058, p. 27 of 46; Goulet Depo. (9/12/13) 159:22-160:18).

267.    US Airways viewed American's 20 percent growth plan as "revers[ing] industry capacity trends."  (PX-058, p. 33 of 46).

268.    US Airways viewed American's 20 percent growth plan as "high risk."  (PX-058, p. 27 of 46).

269.    US Airways viewed American's 20 percent growth plan as "industry destabilizing" because "other[] [airlines] may react to AMRs plans with their own enhanced growth plans."  (PX-058, pp. 27 and 33 of 46).

270.    US Airways viewed American's 20 percent growth plan as "unprecedented…internal capacity growth."   (PX-058, p. 41 of 46).

271.    US Airways viewed a merger with American as a lower risk alternative to competing through organic growth.  (PX-058 at p. 33 of 46).

272.    US Airways had its own independent plan.   By contrast, US Airways planned to return to "modest capacity growth."  (PX-058, p. 41 of 46).

273.    By contrast, US Airways planned to grow capacity 2.5 to 3 percent per year. (Nocella Depo. (10/4/13) 205:8-11; Goulet Depo. (9/12/13) 153:7-11).

274.    US Airways' independent business plan was sustainable.  (Casey (10/4/13) 70:12-22; Nocella (10/4/13) 207:13-208:14).

275.    Many of Defendants' claimed network benefits or efficiencies could have been achieved by American independently, without merging.  (Vahidi Depo. (9/25/13) 349:17-25).

### 2.    Post-Merger, American Grew Less Than Any Other Carrier

276.    Since the merger, American has grown 8.5%, including domestic and international capacity, well below American's 20 percent target and US Airways' 3 percent per year target.  (Trial Tr. 1134:21-1135:4, Garboden; Garboden Dir. Ex. p. 12, Table 4 showing 2018 year-end total ASMs as 286,096 million; and PX-147, AAG 10-K at p. 76 of 325, showing 2018 year-end total AAG ASMs—domestic and international—as 282,054 million).

277.    Mr. Kasper incorrectly testified that American "fell a little bit short" of their 20 percent growth plan, in that 8.5 percent is well short of 20 percent.  (Trial Tr. 1059:14-21, Kasper).  Dr. Carlton incorrectly testified that Ms. Garboden's Table 4 included only domestic

ASMs.  (Trial Tr. 1334:7-1335:6, Carlton; and Trial Tr. 1134:21-1135:4, 1136:9-1138:4,

Garboden (testifying that American grew 8.5% from 2013 to 2018); Garboden Dir. Ex. p. 12,

Table 4 showing 2018 total year-end total ASMs as 286,096 million; and PX-147, AAG 10-K at

p. 76 of 325, showing 2018 total year-end AAG ASMs—domestic and international—as 282,054

million).

     278.    From 2013 to 2018, U.S. carriers grew as follows:

     American—8.5%

     Delta—13.5%

     United—11.7%

     JetBlue—41%

     Southwest—23.5%

     Spirit—162.7%

     Alaska—43.1%

(Trial Tr. 1134:22-1136:8, Garboden).

     279.    American has grown less than any other major domestic carrier post-merger.

(Trial Tr. 1136:9-17, Garboden).

     280.    Airlines use GDP growth as a predictor of demand to calibrate capacity.  (Horton

Depo. (12/12/13) 86:15-25).

     281.    The United States' increase in GDP from 2013 to 2018 was 14.8 percent.[1]

---

[1] Defendants' counsel, Mr. Wall, referenced gross domestic product or GDP growth in Opening
Statements, post-merger (2014-2018) as 12.5%.  (Trial Tr. (3/11/19) 50:17-23, Defendants'
Opening). Plaintiffs hereby request that this Court take judicial notice of GDP from 2013-2018,
which can be "accurately and readily determined" and taken at "any stage of the proceeding."
*See* https://www.whitehouse.gov/articles/2018-banner-year-u-s-economy/, Figure 2, Source:
Office of Management and Budget, Bureau of Economic Analysis, and CEA calculations, last
accessed 4/14/19.

282.    At 8.5 percent, American grew well below GDP from 2013 to 2018.  (FOF, ¶¶ 276, 281).

283.    Projected revenue synergies were calculated from the combined business plans of both entities.  (Vahidi Depo. (9/25/13) 265:19-25).

284.    The post-merger capacity increase projected for the combined carrier was in the high teens, up to 19 percent, over five years.  (Vahidi Depo. (1/22/14) 35:25-36:19).  Thus, post-merger, the combined American grew at less than half of its projected pre-merger estimates.

285.    American's sluggish post-merger growth is explained by its own internal analysis. By way of example, an internal American document explains that post-merger, airlines cut capacity or grow more slowly than the rest of the industry:



(PX-43 at p. 19 of 33 and *see* similar chart, PX-45 at p. 37 of 45).

286.    American's internal document predicts that it is, "Unlikely that combined US Airways/American would pursue growth in line with industry." (PX-43 at p. 19 of 33 and PX-45 at p. 37 of 45).  In 2013, when Mr. Horton was asked whether he agreed with this statement, he responded, "I think that's yet to be determined."  (Horton Depo. (12/12/13) 216:14-19).  Five years post-merger, it is evident that American did not grow in line with the rest of the industry.

287.    American's own internal analyses contradict the testimony of Dr. Carlton who concluded that Delta/Northwest and United/Continental mergers "did not generate anticompetitive…output reductions."  (*See supra*, FOF at ¶¶ 285, 286 and Dr. Carlton Dir. Ex. ¶ 23).

### 3.    American's Increase in Capacity Is More Likely the Result of Macroeconomic Conditions, Not the Merger

288.    Defendants' expert Dr. Carlton claims that total output is a more appropriate focus to analyze a merger's competitive effects than is price.  (Carlton Dir. Ex. ¶ 13).  But Dr. Carlton's own testimony claims that capacity trends before the AA/US merger were "associated with poor macroeconomic conditions, not with…airline mergers."  (Carlton Dir. Ex. ¶ 22).

289.    According to Defendants' expert, Mr. Kasper, the converse is true—increases in capacity are closely related to positive macroeconomic conditions.  (*See* Kasper Dir. Ex. ¶ 9, "And since 2013, as the U.S. economy has strengthened and demand for air travel increased, each of the legacy carriers has increased capacity. Between 2013 and FYE 2018 Q2, the number of domestic passengers increased by over 100 million.")  Thus, the strengthening of the U.S. economy from 2013 to 2018—a factor unrelated to the merger—has caused increases in capacity.

### 4.    Under American's Standalone Plan, It Planned to Increase Its Network Through Code Sharing

290.    Before the merger, American planned to increase its network through reciprocal code-sharing agreements on non-overlapping domestic routes and joint business agreements. (PX-43 p. 9 of 33).

291.    American Airlines had a code share arrangement with Alaska Airlines before the former merged with US Airways that afforded American the benefit of Alaska's strong presence in the northwestern U.S. and American, before the merger, intended to make it as robust as possible.  (Horton Depo. (2/20/13) 81:16-19; 82:4-22; 87:4-16; 89:1-8; 96:4-22).

292.    A key strategy underlying American's standalone business plan in its restructuring was to increase passenger traffic to American's hubs through increased code sharing which would allow it to increase the size and scope of its domestic network.  (Goulet Depo. (9/12/13) 62:12-64:6 and 133:11-17).

293.    American's standalone plan included agreements with its unions to increase its code sharing arrangements for which American received approval as part of the restructuring process.  (Goulet Depo. (9/12/13) 64:7-65:4).

294.    American had a plan to increase its domestic feeds to its hubs without merging by code sharing and American was well advanced in talks with Jet Blue Airlines to establish a code share arrangement before the former merged with US Airways.  (Goulet Depo. (9/12/13) 100:24-101:19).

295.    Code share agreements between American and other airlines would have afforded American the ability to successfully make up some of its network gaps on the East and West Coasts without having to merge with US Airways.  (Goulet Depo. (9/12/13) 157:13-19).

296.    American could have expanded its network by entering into any market where it was profitable to do so.  (Horton Depo. (12/12/13) 71:16-72:17).

### 5. American Had Already Ordered New Aircraft, Before the Merger Was Announced

297.    Defendants' claim that the merger enabled American to improve its fleet is not true.  (Trial Tr. 49:3-5, Defendants' Opening).

298.    Before the merger, American had already planned to "shift to regional flying and right-sizing aircraft to match market characteristics, increase frequency and improve feed."  (PX-43, p. 9 of 33).

299.    While in bankruptcy, American placed the largest order for aircraft in history, ordering 460 new aircraft, which was to form the basis of the company moving forward.  (Horton Depo. (12/12/13) 48:18-49:13; Goulet Depo. (9/12/13) 14:14-23; Vahidi Depo. (1/22/14) 76:6-77:3).

300.    As part of its standalone plan, American planned to "better match[] aircraft size to the size of the market."  (Goulet Depo. (9/12/13) 63:6-13).

301.    American's new aircraft were intended to replace older planes and increase American's capacity.  (Horton Depo. (12/12/13) 52:2-7; Goulet Depo. (9/12/13) 70:13-20).

302.    US Airways estimated that under American's standalone plan, 126 narrow-body and 28 wide-body planes would be used for growth versus today.  (PX-058 at p. 29 of 46).

### 6. Under American's Standalone Plan, it Had Already Planned to Increase Departures and Add Service to New Cities

303.    American's standalone plan included expansion of American's network through organic growth.  (Vahidi Depo. (1/22/14) 91:3-92:9 and 93:10-20 and 156:23-157:8).

304.    Under its standalone plan, American planned to add to the number of cities it served.  (Goulet Depo. (9/12/13) 137:17-22).

305.    Under its standalone plan, American intended to increase departures at

Dallas-Fort Worth from 770 in 2011 to 932 in 2019.  (Goulet Depo. (9/12/13) 137:7-10).

306.    Under its standalone plan, American planned to add 153 more flights by 2017 at Dallas-Fort Worth.  (Goulet Depo. (9/12/13) 137:23-138:7).

307.    Under its standalone plan, American planned to fly more departures out of each hub by 2019, including Dallas, Chicago, Miami, Los Angeles, and JFK.  (Goulet Depo. (9/12/13) 137:11-16).

308.    Under its standalone plan, American planned to add a large percentage of flights at JFK and LAX.  (Goulet Depo. (9/12/13) 138:8-10).

309.    Before the merger, under its standalone plan, American had added up to 20 new destinations, "a number of new flights and new frequencies in existing markets, and grow the airline."  (Vahidi Depo. (1/22/14) 96:2-5).

### 7.    Before the Merger, American Was Already Increasing Its Corporate Business

310.    Defendants' claim that the merger was necessary to increase the scope of its network to attract corporate business is unfounded.   (Trial Tr. 31:6-10, 44:4-8, Defendants' Opening Statement).

311.    Before the merger, American was already increasing its corporate business.  (PX-43 p. 6 of 33, "Since December, corporate account wins and renewals have increased year over year." Goulet Depo (9/12/13) 228:23-229:2; Horton Depo. (9/20/13) 170:9-171:9).

312.    From November 2011 to March 2012, American secured over 40 corporate "deals," including with Bank of America, Novartis, Black Rock, Honda, Wells Fargo, eBay, and IBM.  (PX-31, pp. 1-3 of 5 and PX-036 at p. 25 of 27).

313.    In March 2012, American acknowledged that, "[B]ased on industry data (QSI), American continues to get more than its fair share of corporate revenue and customers,

55

demonstrating the strength of [American's] network, products and services, frequent flyer program, and overall value proposition."  (PX-31, p. 3 of 5).

314.    Before the merger, American was "very confident that [it] could offer the business traveler a very comprehensive solution."  (Goulet Depo. (9/12/13) 247:4-13).

315.    Under the standalone plan, American would have a more appealing product to offer corporate customers.  (Goulet Depo. (9/12/13) 229:3-11 and 230:12-23).

316.    Internal analysis establishes that American viewed US Airways network as "…a domestic network not well suited for corporate America..."  because US Airways hubs were only home to 29 Fortune 500 companies.  (PX-43 at p. 27 of 33; Goulet Depo. (9/12/13) 319:12-320:23; PX-049 at p. 32 of 115).  By contrast, American's standalone plan would be successful because American's hubs are located in cities where 145 Fortune 500 companies are located.  (Goulet Depo. (9/12/13) 148:20-25 and 149:4-11; PX-49, p. 6 of 115; PX-049 at p. 32 of 115).

### 8.    Defendants Did Not Reach the Efficiencies Predicted in Dr. Carlton's 2013 Prospective Study

317.    Dr. Carlton's 2013 prospective analysis claimed that the merger would cause an increase in traffic on American of 2.9 million passengers per year.  (Carlton Dir. Ex. ¶ 28).  Based on this analysis, Dr. Carlton projected consumer benefits to be over $900 million per year.  (Carlton Dir. Ex. ¶ 31).  Heather Garboden's testimony establishes that American never achieved those numbers post-merger, having increased passengers by a total of only 9 million since the merger.  (Garboden Dir. Ex. p. 11 at Table 3).  Thus, Dr. Carlton's projected consumer benefits offer an inaccurate account of the merger's benefits to consumers.

### 9.    Defendants' Efficiencies Are Not Related to Any City Pair Market at Issue in this Case

318.    Defendants have not rebutted the presumption with respect to any specific city pair relevant market identified by Plaintiffs.

319.    Dr. Carlton's testimony regarding his prospective study and its estimate of "net consumer benefits" does not establish net consumer benefits with regard to any specific relevant city pair market at issue in this case.  (Carlton Dir. Ex. ¶ 33).

320.    Dr. Carlton's testimony regarding his retrospective merger analysis discusses the *overlapping non-stop routes* between the parties with no other major competitor or one major competitor.  (Carlton Dir. Ex. ¶ 37, 41).

321.    Before the merger, American and US Airways overlapped on 12 nonstop overlapping routes or city pairs.  (Horton Depo. (12/12/13) 64:20-23; Nocella Depo. (10/4/13) 43:7-43:16; Kirby (10/10/13) 42:7-10 and 42:13-17; Horton Depo. (9/20/13) 32:11-14; PX-90, p. 2 of 31).  Thus, the conclusions Dr. Carlton drew from his 2016 analysis of Defendants' overlapping nonstop routes were based upon no more than 12 city pair markets, none of which are specifically identified by Dr. Carlton.

322.    Dr. Carlton's conclusion that the merger reduced average fares by 12.3 percent is limited to no more than the 12 nonstop city pairs in which Defendants competed pre-merger.  (Carlton Dir. Ex. ¶ 43 and FOF, ¶ 321).

323.    Of the 12 nonstop overlapping city pairs on which Defendants competed before the merger, only six are at issue in this case:  Charlotte-Dallas/Fort Worth; Charlotte-Miami; Dallas-Phoenix; Los Angeles-Phoenix; Chicago-Phoenix; Chicago-Phoenix.  (PX-90 at p. 22 of 31; Table A; PX-149).  Because Dr. Carlton does not identify the overlapping nonstop routes he analyzed, it is unknown whether his analysis included any of these city pairs.

324.    Dr. Carlton's testimony does not discuss in detail his 2016 analysis of connecting city pairs, including failing to specifically identify the connecting city pairs he analyzed. (Carlton Dir. Ex. ¶ 41).

325.    Dr. Carlton did not testify that the merger was procompetitive as to connecting city pairs, rather he concluded that he found "no evidence of anticompetitive effects" in unidentified connecting city pair relevant markets.  (Carlton Dir. Ex. ¶ 44).

326.    Portions of Dr. Carlton's study "pool the information from each of the three legacy of mergers" and is not limited to the analysis of the American-US Airways merger. (Carlton Dir. Ex., ¶ 42).

327.    Dr. Carlton's study did not analyze all 1,008 city pair relevant markets identified in Plaintiffs' First Amended Complaint or all 298 city pairs identified by Plaintiffs in this case, limiting his study to unidentified "overlap routes with no major competitor or only one major competitor."  (Carlton Dir. Ex. ¶ 37).

328.    Further, Dr. Carlton's analysis calculating average fares and traffic growth, weighted by traffic across 298 city pairs, is insufficient to rebut the presumption of illegality that attaches to each city pair.  (Carlton Dir. Ex. ¶ 69-70).

**10.    American's Internal Analysis Suggests that US Was a Disruptive Presence**

329.    Dr. Carlton's claim that US Airways was not a disruptive presence in the airline industry (Carlton Dir. Ex. p. 30) is contradicted by Defendants' internal documents and admissions.  (PX-43 at p. 30 of 33, "As a result, US appears to frequently undercut in order to fill planes (even when fares are highest);" Casey Depo. (10/4/13) 57:11-22).  Thus, American, US Airways' competitor, viewed US Airways as a disruptive presence before the merger.

### B.   Five Years Post-Merger, Entry in the Relevant City Pair Markets is Not Timely or Likely

330.   There has not been a successful new major entrant into the domestic airline passenger industry since 2007 when Virgin America started. (Kasper Dir. Ex. p.19; Trial Tr. 1041:10-1042:7, Kasper).

331.   Of the 24 LCCs that were in the domestic U.S. market during the period between 1990 through the second quarter of 2018, the vast majority, 17 LCCs, no longer continue in business.  (Trial Tr. 1043:18-1046:22, Kasper).

332.   LCCs that operated in the U.S. in the period between 1990 through the second quarter of 2018 which are no longer in business are National, Morris, AccessAir, Pro Air, AirTran, Reno Air, Valujet, ATA, Eastwind, Vanguard, Skybus, Virgin America, Western Pacific, Air South, Midway, Kiwi, and Independence Air. (Trial Tr. 1043:18-1046:17, Kasper).

333.   Of the 24 LCCs that were in the domestic U.S. market during the period between 1990 through the second quarter of 2018, only six or seven survive. They are Southwest, JetBlue, Spirit Air, Sun Country, Allegiant and Frontier, or seven, if Alaska is considered an LCC after its merger with Virgin America in 2017.  (Kasper Dir. Ex. 13 (Demonstrative 3); Trial Tr. 1043:18-1046:22, Kasper).

334.   Barriers for *new* airlines to enter any of the relevant markets in the United States are prohibitively high because of the inability of a new airline to cover its cost of capital. (PX-85 p.43 of 44 (Parker Senate Committee Testimony); Trial Tr. 1093:9-1094:8, Kasper).

335.   In the three years following the merger, American realized substantial increases in profits, including approximately $5 billion in 2016. (Nocella Depo. (4/7/17) 47:7-8; 47:11-25).

336.   The domestic airline industry had record profits in 2015 and in 2016 it again had record profits of approximately $20 billion.  (Trial Tr. 1080:19-1081:25, Kasper).

337.    The domestic airline industry and American also had highly profitable years in 2017 and 2018, despite higher fuel costs. (PX-147 (American Airlines Group Form 10-K (2/25/19)) pp.78, 107, 109 of 325).

338.    Fuel costs were on average approximately 33 percent higher in 2018 as compared to 2017. The average daily spot price for Brent crude oil during 2018 was $72 per barrel as compared to an average daily spot price of $54 per barrel during 2017. On a daily basis, Brent crude oil prices fluctuated during 2018 between a high of $86 per barrel to a low of $50 per barrel, and closed the year on December 31, 2018 at $54 per barrel. PX-147 (American Airlines Group Form 10-K (2/25/19)) p.78 of 325.

339.    In 2018, with respect to revenue, the domestic network airlines reported positive unit revenue growth driven by strong demand and higher yields as airlines attempted to pass along the cost of rising fuel prices to consumers. PX-147 (American Airlines Group Form 10-K (2/25/19)) p.78 of 325).

340.    American, along with the other domestic network airlines, offset increased fuel costs in part by passing along the additional cost to consumers. PX-147 (American Airlines Group Form 10-K (2/25/19)) pp.107, 109 of 325.

341.    In 2014, when fuel costs dropped dramatically following the merger, American's CEO Douglas Parker announced that the company would continue to price fares as if fuel had remained at $100 per barrel and would not pass the savings on to consumers, but would instead keep the approximately $5 billion in savings which, its CFO said, went straight to "bottom line" profits.  PX-106 (Q4 2014 Earnings Call Transcript (1/27/15)) pp.5-6, 9.

342.    In 2016, jet fuel costs decreased by approximately 50 percent from what they had been in 2014.  Trial Tr. 1082:3-13, Kasper.

343.    American expected its profit margin in the first quarter of 2015 to be between 13 and 15 percent, an approximately 1,000 basis point improvement from the first quarter of 2014, which was the quarter immediately following the merger.  (PX-106 (Q4 2014 Earnings Call Transcript (1/27/15)) pp.9- 10)

344.    The lack of successful and effective entry in the face of non-transitory increases in the margins earned on products in the relevant market is strong evidence that successful entry is slow or difficult in the domestic airline industry.  (PX-148 (Merger Guidelines § 9) p. 31 of 37).

345.    Since successful entry into the market has not occurred since 2007, entry cannot, therefore, be considered timely, likely, and sufficient in magnitude, character, and scope to deter or counteract the anti-competitive effects of the merger.  (PX-148 (Merger Guidelines § 9) p. 29 of 37; PX-149).

346.    There is no evidence that new entry will satisfy the conditions of timeliness, likelihood, and sufficiency such that the presumption of the merger's illegality can be overcome and, therefore, it must be found that they will not.  (PX-148 (Merger Guidelines § 9) p. 31 of 37)

## C.    Smaller Communities Have Been Injured by Higher Airfares Because of the Merger Which Will Not be Corrected by Entry of LCC's

347.    In city pair markets which involve a smaller city with a smaller number of passengers, LCCs cannot compete effectively because smaller cities are typically connecting flight markets, where most flights are through a connection which is served by a legacy network carrier such as American. (Trial Tr. 935:25-937:20; PX-090, GAO Report - Issues Raised by the Proposed Merger of American Airlines and US Airways (6/19/13)) p.3 of 31).

348.    There has been no major entry into the domestic passenger airline market

since 2007, much less entry into the relevant city pair markets, which has been rapid enough that customers have not been significantly harmed by the merger. (PX-148, Merger Guidelines § 9.1) p.32 of 37).

349.    As a result of the merger, service has been – and will likely continue to be – reduced to small- and mid-sized communities in the U.S. (PX-88, MIT White Paper # 2, June 2013, p.22 of 37).

350.    Airfares for consumers in small- mid-sized communities in the U.S. have risen and are reasonably expected to continue to rise as a result of the merger. (PX-92, MIT White Paper # 3, Aug. 2013, pp. 3-4 of 34).

351.    Smaller communities served by regional carriers are facing pilot shortages as pilots move to network carriers. (PX-087, MIT Report # 1, May 2013, p.18 of 34).

352.    The study by defendants' expert, Dr. Ordover, focuses on airfares in the "Top Routes" in the national market, thus making it clear that the presumed harm caused by this merger in the smaller city pair markets that are relevant markets in this case has not been considered, much less rebutted, by the defendants. (Ordover Dir. Ex. Exhibit A, Demonstratives 9, 10, 11).

353.    Even if new LCCs were to enter the domestic airline industry, which has not occurred since 2007, their entry would be insufficient to overcome the harm in the relevant city pairs because the business plans of LCCs require that they fly point-to-point to larger markets and not to the smaller city pairs that are relevant markets in this case and they are, therefore, subject to constraints that would limit their competitive effectiveness in many of the relevant city pair markets. (PX-148, Merger Guidelines § 9.3, p.32 of 37).

354.    From 1979 through 2012, there have been at least 194 airline bankruptcies, most

of which affected small airlines that were eventually liquidated.  (PX-090 (GAO Report - Issues Raised by the Proposed Merger of American Airlines and US Airways (6/19/13)) p.6 of 31).

355.     New entry is not likely because, as American's CEO admitted, there is an inability on the part of new entrants to cover their cost of capital. Moreover, the significant risks that the entrant's costs of entry would not be recovered if the entrant later exits militates against new entry.  (PX-148 (Merger Guidelines § 9.2) p.32 of 37).

> **D.    The Testimony of Dr. Ordover is Completely Insufficient to Overcome the Presumed Likelihood of Coordinated Activity Among the Network Airlines, Especially Given Their History of Such Activity Both Before and After the Merger**

356.     The Department of Justice's Horizontal Merger Guidelines are intended to address the concern that a merger is going to reduce a number of firms and potentially increase concentration as to create risks that the firms will be able to coordinate their activities better. (Trial Tr. 1143:16-1144:18, Ordover).

357.     A relevant market is vulnerable to coordinated conduct following a merger if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm=s rivals.  (PX-148 (Merger Guidelines § 7.2) p.29 of 37).

358.     Similarly, a market is more apt to be vulnerable to coordinated conduct if a firm that first offers a lower price or improved product to customers will retain relatively few customers thus attracted away from its rivals after those rivals respond.  (PX-148 (Merger Guidelines § 7.2) p.29 of 37).

359.     American and other network carriers engage in what are called "cross-market initiatives," according to American's former Chief Commercial Officer, Virasb Vahidi.  (Vahidi Depo. (9/25/13) 180:15-182:12).

360.    Mr. Vahidi confirmed that a cross-market initiative is an example of a competitive reward which occurs when an airline goes into a domestic market and undercuts the fares of a second airline in order to take traffic away from that airline.  The second airline which has lost traffic deploys a similar strategy in another market of the first airline.  (Vahidi Depo. (9/25/13) 180:11-181:12).

361.    The purpose of a cross-market initiative is to cause the first discounting airline to withdraw its original discount (Vahidi Depo. (9/25/13) 180:11-181:12) which often succeeds. (Vahidi Depo. (9/25/13) 181:12-22).

362.    American and other network carriers engage in cross-market initiatives.  (Vahidi Depo. (9/25/13) 180:15-182:12).

363.    As in the case of cross-market initiatives, a market typically is more vulnerable to coordinated conduct if a firm=s prospective competitive reward from attracting customers away from its rivals will be significantly diminished by likely responses of those rivals.   (PX-148 (Merger Guidelines § 7.2) p.29 of 37).

364.    To the extent US Airways' cross-market initiatives to lower fares instigated fare wars before the merger until such fares were rescinded due to other carriers' retaliatory cross-market initiatives, such fare wars have been expected to be extremely challenging to maintain following the merger.  (Vahidi Depo. (9/25/13) 182:22-183:3).

365.    A cross-market initiative is more likely to result in a response from a competitor which will diminish the rewards of the initiative if there are few significant competitors in the market, as is the case with domestic network carriers following the merger.  (PX-148 (Merger Guidelines § 7.2) p.29 of 37).

366.    Dr. Ordover's conclusory and unsupported reliance upon the government's Competitive Impact Statement that the divestitures agreed to by the defendants and the government will result in LCCs gaining access to markets to new nonstop and connecting service to points throughout the country behind and beyond the large airports at which gates and slots were divested does not state that service by LCCs to smaller, typically connecting, cities will increase as a result of the merger.  (Ordover Dir. Ex. ¶ 100). In fact, this was contradicted by American's former Vice President of Financial Planning and Analysis, Heather Garboden, who testified that ALCCs operate a point-to-point model, which involves flying between two cities directly typically those with enough population and local passenger air travel to sustain such routes regardless of connecting traffic.  (Garboden Dir. Ex. ¶ 8).

367.    Dr. Ordover's analysis addressed only the general nature or state of pricing in the airline industry and did not focus[] on any particular [city] pair... (Trial Tr. (3/14/19) 1208:12-20, Ordover).  As such, his coordinated effects analysis is not relevant to the city pair markets in this case.

### 1.    Dr. Ordover's Chart's Do Not Reflect Evidence That is Relevant to this Case

368.    Demonstrative 1a: GDS Fares - Fares for Different Departure Dates Cincinnati to Miami does not relate to any relevant market in this case.  (Ordover Dir. Ex., Exhibit A (Demonstrative 1a)).

369.    Demonstrative 1b: GDS Fares - Fares for Different Departure Dates Charlotte to Syracuse does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 1b)).

370.    Demonstrative 1c: GDS Fares - Fares for Different Departure Dates Cleveland to Pittsburg [sic] does not relate to any relevant market in this case.  (Ordover Dir. Ex., Exhibit A (Demonstrative 1c)).

371.    Demonstrative 1f: GDS Fares - Fares for Different Departure Dates Boston to New York does not relate to any relevant market in this case. (Ordover Dir. Ex., Exhibit A (Demonstrative 1f)).

372.    Demonstrative 1g: GDS Fares - Fares for Different Departure Dates Cincinnati to Miami does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 1g)).

373.    Demonstrative 1h: GDS Fares - Fares for Different Departure Dates Charlotte to Syracuse does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 1h)).

374.    Demonstrative 1j: GDS Fares - Fares for Different Departure Dates Cincinnati to Pittsburg [sic] does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 1j)).

375.    Demonstrative 2a: GDS Fares - Fares for Different Departure Dates Cincinnati to Miami does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 2a)).

376.    Demonstrative 2b: GDS Fares - Fares for Different Departure Dates Charlotte to Syracuse does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 2b)).

377.     Demonstrative 2c: GDS Fares - Fares for Different Departure Dates Cleveland to Pittsburgh does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 2c)).

378.     Demonstrative 2f: GDS Fares - Fares for Different Departure Dates Boston to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 2f)).

379.     Demonstrative 2g: GDS Fares - Fares for Different Departure Dates Cincinnati to Miami does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 2g)).

380.     Demonstrative 2h: GDS Fares - Fares for Different Departure Dates Charlotte to Syracuse does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 2h)).

381.     Demonstrative 2j: GDS Fares - Fares for Different Departure Dates Cincinnati to Pittsburgh does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 2j)).

382.     Demonstrative 3b: GDS Fares - Fares over the Booking Cycle Cincinnati to Pittsburgh does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 3b)).

383.     Demonstrative 3e: GDS Fares - Fares over the Booking Cycle Houston to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 3e)).

384.     Demonstrative 3f: GDS Fares - Fares over the Booking Cycle Cincinnati to Pittsburgh does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 3f)).

385.     Demonstrative 3j: GDS Fares - Fares over the Booking Cycle Houston to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 3j)).

386.     Demonstrative 4a: GDS Fares - Fares over the Booking Cycle Cincinnati to Pittsburgh does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 4a)).

387.     Demonstrative 4e: GDS Fares - Fares over the Booking Cycle Houston to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 4e)).

388.     Demonstrative 4f: GDS Fares - Fares over the Booking Cycle Cincinnati to Pittsburgh does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 4f)).

389.     Demonstrative 4j: GDS Fares - Fares over the Booking Cycle Houston to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex.. Exhibit A (Demonstrative 4j)).

390.     Demonstrative 5b: US Airways and American Airlines Individual Ticket Prices Boston to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 5b)).

391.    Demonstrative 5f: US Airways and American Airlines Individual Ticket Prices Boston to New York does not relate to any relevant market in this case. Ordover Dir. Ex. Exhibit A (Demonstrative 5f)).

392.    Demonstrative 5i: US Airways and American Airlines Individual Ticket Prices Boston to Los Angeles does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 5i)).

393.    Demonstrative 5j: US Airways and American Airlines Individual Ticket Prices Chicago to Portland does not relate to any relevant market in this case.  (Ordover Dir. Test. Exhibit A (Demonstrative 5j)).


394.    Demonstrative 5k: US Airways and American Airlines Individual Ticket Prices Washington, DC to San Francisco does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 5k)).

395.    Demonstrative 5l: US Airways and American Airlines Individual Ticket Prices Los Angeles to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 5l)).

396.    Demonstrative 6a: American Airlines Individual Ticket Prices New York to Los Angeles does not relate to any relevant market in this case. Ordover Dir. Ex. Exhibit A (Demonstrative 6a)).

397.    Demonstrative 6b: American Airlines Individual Ticket Prices Los Angeles to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 6b)).

398.     Demonstrative 6i: American Airlines Individual Ticket Prices New York to Boston does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 6i)).

399.     Demonstrative 6j: American Airlines Individual Ticket Prices Boston to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 6j)).

400.     Demonstrative 6k: American Airlines Individual Ticket Prices Boston to Los Angeles does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 6k)).

401.     Demonstrative 6l: American Airlines Individual Ticket Prices Los Angeles to Boston does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 6l)).

402.     Demonstrative 6m: American Airlines Individual Ticket Prices Washington, DC to San Francisco does not relate to any relevant market in this case. (Ordover Dir. Ex.. Exhibit A (Demonstrative 6m)).

403.     Demonstrative 6n: American Airlines Individual Ticket Prices San Francisco to Washington, DC does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 6n)).

404.     Demonstrative 6o: American Airlines Individual Ticket Prices Chicago to Portland does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 6o)).

405.    Demonstrative 6p: American Airlines Individual Ticket Prices Portland to Chicago does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 6p)).

406.    Demonstrative 7a: Distribution of Fares Relative to Airlines Mean Fare Boston to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 7a)).

407.    Demonstrative 8d: Distribution of Fares Relative to Airlines Mean Fare Boston to New York does not relate to any relevant market in this case. (Ordover Dir. Ex. Exhibit A (Demonstrative 8d)).

408.    Demonstrative 8e: Distribution of Fares Relative to Airlines Mean Fare Los Angeles to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 8e)).

409.    Demonstrative 8f: Distribution of Fares Relative to Airlines Mean Fare Boston to Los Angeles does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 8f)).

410.    Demonstrative 8g: Distribution of Fares Relative to Airlines Mean Fare Washington, DC to San Francisco does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 8g)).

411.    Demonstrative 8h: Distribution of Fares Relative to Airlines Mean Fare Chicago to Portland does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 8h)).

412.     Demonstrative 9: Variation in Fares Across Top Routes.  None of the city pairs listed in Demonstrative 9 relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 9):

- Los Angeles - New York;
- Miami - New York;
- New York - San Francisco;
- Chicago - New York;
- Orlando - New York;
- Los Angeles - San Francisco;
- Las Vegas - New York;
- Dallas - New York;
- Washington, DC - Los Angeles;
- Atlanta - New York;
- New York - West Palm Beach;
- Washington, DC - San Francisco.

413.     Demonstrative 10: Variation in Fares Across Top Routes.  None of the city pairs listed in Demonstrative 10 relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 10):

- Los Angeles - New York;
- New York - San Francisco;
- Miami - New York;
- Chicago - New York;
- Los Angeles - San Francisco;
- Atlanta - New York;
- Orlando - New York;
- Washington, DC - Los Angeles;
- Washington, DC - San Francisco;
- Las Vegas - New York;
- Boston - San Francisco;
- Chicago - Los Angeles.

414.     Demonstrative 11: Variation in Fares Across Top Routes.  None of the city pairs listed in Demonstrative 11 relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 11):

- Los Angeles - New York;
- New York - San Francisco;
- Miami - New York;
- Chicago - New York;
- Atlanta - New York;
- Los Angeles - San Francisco;
- Orlando - New York;
- Washington, DC - Los Angeles;
- Washington, DC - San Francisco;
- Dallas/Fort Worth - New York;
- Las Vegas - New York;
- Chicago - Washington, DC.

415.    Demonstrative 12a: Average Fares and Cumulative Percent of Seats Sold New York to Los Angeles does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12a)).

416.    Demonstrative 12b: Average Fares and Cumulative Percent of Seats Sold Boston to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12b)).

417.    Demonstrative 12c: Average Fares and Cumulative Percent of Seats Sold Chicago to Portland does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12c)).

418.    Demonstrative 12e: Average Fares and Cumulative Percent of Seats Sold Los Angeles to Boston does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12e)).

419.    Demonstrative 12f: Average Fares and Cumulative Percent of Seats Sold New York to Boston does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12f)).

420.      Demonstrative 12g: Average Fares and Cumulative Percent of Seats Sold Boston to Los Angeles does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12g)).

421.      Demonstrative 12h: Average Fares and Cumulative Percent of Seats Sold Portland to Chicago does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 12h)).

422.      Demonstrative 13a: Distribution of Fare Basis Codes Los Angeles to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 13a)).

423.      Demonstrative 13b: Distribution of Fare Basis Codes New York to Los Angeles does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 13b).

424.      Demonstrative 13f: Distribution of Fare Basis Codes Los Angeles to Boston does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 13f)).

425.      Demonstrative 13g: Distribution of Fare Basis Codes Boston to Los Angeles does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 13g)).

426.      Demonstrative 13h: Distribution of Fare Basis Codes Boston to New York does not relate to any relevant market in this case.  (Ordover Dir. Ex. Exhibit A (Demonstrative 13h)).

427.     Demonstrative 13i: Distribution of Fare Basis Codes New York to Boston does not relate to any relevant market in this case.  Ordover Dir. Ex. Exhibit A (Demonstrative 13i).

428.     Demonstrative 13m: Distribution of Fare Basis Codes Chicago to Portland does not relate to any relevant market in this case.  Ordover Dir. Ex. Exhibit A (Demonstrative 13m).

429.     Dr. Ordover's analysis is of city pairs which have a high volume of traffic, representing the top ten percent of the routes that were at issue in the merger, and are not probative of possible coordinated effects in most of the relevant city pair markets in this case. (Trial Tr. 193:5-10, Ordover).

430.     According to American's former Chief Commercial Officer, pre-merger, US Airways did not offer nonstop service to many of the largest markets in the country (Vahidi Depo. (9/25/13) 180:2-6), thereby rendering much of Dr. Ordover's pre- and post-merger analysis irrelevant.

431.     Of the 26 city pair markets that are the subject of Dr. Ordover's direct testimony and demonstratives, only five appear on the Department of Justice's list of 1,008 presumptively illegal city pairs following the merger.  They are Chicago-Philadelphia, Chicago-Phoenix, Cincinnati-Miami, Dallas-Philadelphia and Dallas-New York.  (Ordover Dir. Ex. Exhibit A (Demonstratives 1a - 13m) and Lundgren Dir. Ex. Exhibit C, pp.48-71 of 128).

432.     Of the five post-merger, presumptively illegal, city pairs that are the subject of Dr. Ordover's direct testimony and demonstratives, only three (Chicago-Philadelphia; Chicago-Phoenix and Dallas-Phoenix) are relevant city pair markets in this case.  (PX-149 (and the references to the Plaintiffs written direct testimony listed therein).  All three remain

presumptively illegal following the merger: Chicago-Philadelphia's HHI is 3,958, having increased 1,289 points since the merger; Chicago-Phoenix's HHI is 3,339, having increased 695 points since the merger; and Dallas-Phoenix's HHI is 6,967, having increased 2,970 points since the merger.  (Lundgren Dir. Ex. Annex Table A, pp. 115 and 127 of 128).

433.     The remaining two city pairs that are the subject of Dr. Ordover's direct testimony and demonstratives (Cincinnati-Miami and Dallas-New York) are not relevant city pairs in this case and neither are presumptively illegal since the merger.  (Lundgren Dir. Ex. Annex Table A, p.127 of 128).

434.     Dr. Ordover testified that his graphs at Demonstratives 1a-1k and 2a-2k relate to the exact same city pairs, but that Demonstrative 1a-1k examined the pre-merger situation whereas Demonstratives 2a-2k examined the post-merger situation.  (Trial Tr. (3/14/19) 1207:20-1208:4, Ordover).  However, whereas the time period in Demonstratives 2a-2k from March 14, 2017 to June 6, 2017, was intended to exclude holiday and winter travel (Trial Tr. (3/14/19) 1196:5-15), the time period included in Demonstratives 1a-1k (October 9, 2013 to December 25, 2013) includes travel during the Thanksgiving and Christmas seasons, two of the most heavily traveled periods for airline travel, when flights are generally fully booked well in advance, at fares which are transparent and less likely to be subject to variations due to "yield management" systems.  Therefore, Dr. Ordover's pre- and post-merger comparison between the two sets of Demonstratives does not allow meaningful assessment of the likelihood of coordination before and after the merger (even if they were related to city pairs relevant to this case).

435.     Mergers can pose a real danger of harm through coordinated effects, even without specific evidence showing precisely how the coordination likely would take place.  (PX-148 (Merger Guidelines § 7.1) p.28 of 37).

436.     By reducing the number of legacy airlines and aligning the economic incentives of those that remain, the merger has made it easier for the remaining legacy airlines to cooperate, rather than compete, on price and service.   (PX-96 (DOJ Competitive Impact Statement) p.6 of 21).

437.     Absent the merger, US Airways and American, as independent competitors, would have had unique incentives to disrupt coordination that already occurs to some degree among the legacy carriers (PX-96 (DOJ Competitive Impact Statement) p.6 of 21), leading to the reasonable conclusion that the ability to coordinate after the merger Amay tend to make success more likely.”  (PX-148 (Merger Guidelines § 7.2) p.28 of 37).

438.     Market conditions are presumed to be conducive to coordinated interaction if firms representing a substantial share in the relevant market appear to have previously engaged in express collusion affecting the relevant market, unless competitive conditions in the market have since changed significantly.  (PX-148 (Merger Guidelines § 7.2) p.28 of 37).  Here, the most significant change in the relevant markets has increased the likelihood of coordinated interaction by eliminating one of four remaining legacy network airlines.

439.     Previous express collusion in another geographic market will have the same weight if the salient characteristics of that other market at the time of the collusion are comparable to those in the relevant market. Failed previous attempts at collusion in the relevant market suggest that successful collusion was difficult pre-merger but not so difficult as to deter

attempts, and a merger may tend to make success more likely.  (PX-148 (Merger Guidelines §7.2) p.28 of 37).

440.    ATPCO is the Airline Tariff Publishing Company which is, according to Dr. Ordover, ʌa receptacle of fare data from the participating airlines and which aggregates the fare data and disseminates it down to a lot of recipients, including GDSs.  (Trial Tr. 1175:11-17, Ordover).

441.    In his written direct testimony, Dr. Ordover identified ATPCO's role in publishing airlines' fares.  ʌFirst, airlines file their fare structures in the [ATPCO] system. These fare structures list possible fares on each route and the rules and restrictions that apply to different types of tickets.  (Ordover Dir. Ex. p.10, & 28).

442.    Among the legacy carriers, fares are not opaque as claimed by Dr. Ordover. (Ordover Dir. Ex. p.9, & 25).  Instead, according to AMR's CEO, Thomas Horton, a carrier's pricing is readily transparent to other carriers due to a vast array of online sources of visible fares.  (Horton Depo. (9/20/13) 179:4-11).

443.    According to US Airways president Scott Kirby, with the exception of off-tariff programs such as corporate discounts and wholesale programs, like fares given to Priceline (Kirby Depo. (10/10/13) 44:19-45:6), fares and fare changes are transparent to domestic air carriers and are quickly matched.  (Kirby Depo. (10/10/13) 48:9-49:19).

444.    Coordination occurred among the legacy carriers before the merger (PX-96 (DOJ Competitive Impact Statement p.6)) and following the merger. The three remaining network airlines, American, Delta and United, in March 2016, coordinated the change in ATPCO's pricing rules by changing its Category-10 airfare pricing rules simultaneously, thereby raising airfares to consumers flying on multi-city itineraries.  (PX-125, PX-108, PX-109).

445.     Contrary to Dr. Ordover's view that ancillary fees are not disclosed or transparent, according to American itself, DOT consumer rules...require disclosures concerning airline fares and ancillary fees such as baggage fees. (PX-147 (American Airlines Group Form 10-K (2/25/19)) p. 41 of 325).

446.     The legacy airlines are able to coordinate their price structures through ATPCO because ATPCO is principally owned by the legacy airlines, now American, Delta and United.  (Trial Tr. 1176:14-22, Ordover).  The members of ATPCO's board of directors are all employees of airlines (Nocella Depo. (4/7/17) 144:14-23) and the three legacy carriers (as well as US Airways before the merger) all have senior executives on ATPCO's board of directors. (Nocella Depo. (4/7/17) 150:16-18; 151:5-12; 152:9-17; 152:25-153:7).

447.     ATPCO has previously been investigated with respect to anticompetitive activities relating to its rule relating to the disclosure of airfares.  While Dr. Ordover was employed by the DOJ, they Awere investigating the economic consequences of various rules that ATPCO had about disclosure of fares."  (Trial Tr. 1175:2-1176:13, Ordover).

448.     With the additional concentration in the domestic passenger airline industry following the merger, the industry's history of price coordination before and since the merger through ATPCO, and the legacy airline's control of ATPCO, the likelihood that American, Delta and United will coordinate fares and price structures either directly or through ATPCO is enhanced.

449.     The prospect of harm from coordinated conduct is increased by the enhanced collective market power of American, Delta and United in the relevant city pair markets, which is evidenced by the very high HHI concentrations and increases in HHI that have followed the merger.  (PX-148 (Merger Guidelines § 7.2) p.29 of 37; PX-149).

## PLAINTIFFS' PROPOSED CONCLUSIONS OF LAW

**I.      NATURE OF THE ACTION AND JURISDICTION**

1.      This is a civil action arising under Section 7 of the Clayton Act, 15 U.S.C. § 18.

2.      This Court has subject matter jurisdiction over this action pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and based upon 28 U.S.C. §§ 1331, 1337, and 1345.

3.      The parties filed a Stipulation confirming their consent to have a United States Bankruptcy Judge conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings.  (*See* Notice Consent and Reference of a Civil Action to the Bankruptcy Court, Dkt. No. 129).

4.      Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes these private party Plaintiffs to seek injunctive relief for Defendants' violation of § 7 of the Clayton Act, 15 U.S.C. § 18.

5.      Defendant AMR Corporation, now known as American Airlines Group, Inc., is, and at all relevant times has been, engaged in activities in or affecting "commerce" as defined in Section 1 of the Clayton Act, 15 U.S.C. § 12.

6.      By virtue of Defendants' engagement in activities in or affecting "commerce" as defined by Section 1 of the Clayton Act, they are subject to enforcement of Section 7 of the Clayton Act, 15 U.S.C. § 18 by private parties.

7.      Defendants transact business in the Southern District of New York and are subject to personal jurisdiction there.  (American's Answer, Dkt. No. 104 at ¶¶ 6-8).

**II.     LEGAL STANDARDS UNDER THE CLAYTON ACT**

8.      Section 7 of the Clayton Act, as amended, prohibits any acquisition "where in any line of commerce…in any section of the country, the effect of such acquisition may be

substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. [emphasis added].

9.      "An underlying premise of the Clayton Act, however, is that internal expansion is more healthy for the economy than expansion by merger." *U.S. v. Manufacturers Hanover Trust,* 240 F. Supp. 867, 949-950 (S.D.N.Y. 1965)

10.     Congress used the words "may be" "to indicate that its concern was with probabilities, not certainties" and to "arrest restraints of trade in their incipiency and before they develop into full-fledged restraints." *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 323 n.39 (1962).  A fundamental purpose of § 7 is "to arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappear through merger…" *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 367 (1963).

11.     Indeed, Section 7 requires "a prediction, and doubts are to be resolved against the transaction." *California v. American Stores Co,* 495 U.S. 271, 282 n.8 (1990).

12.     The merger of AMR Corporation and US Airways Group was an acquisition under Section 7 of the Clayton Act.  *United States v. Columbia Pictures Corp.,* 189 F. Supp. 153, 182 (S.D.N.Y. 1960).

### A.      Supreme Court Precedent Prohibits the Elimination of a Significant Rival in a Non-Trivial Transaction

13.     In enacting and amending § 7 of the Clayton Act, "Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co.,* 384 U.S. 270 (1966).  The Supreme Court explained that:

The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy.' To arrest this 'rising tide' towards concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers…Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers…If ever such a merger would not violate § 7, certainly it does so when it takes place in a market characterized by a long and continuous trend toward fewer and fewer owner competitors which is exactly the sort of trend which Congress, with the power to do so, declared must be arrested.

*Id.* at 276-278.

14.    "[Section] 7 'requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anti-competitive tendencies in their 'incipiency.'" *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 362 (1963).

15.    A line of binding Supreme Court precedents recognized and developed what is known as the "incipiency doctrine." *See Brown Shoe, Co. v. United States*, 370 U.S. 294 (1962); *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *United States v. Aluminum Co. of America*, 377 U.S. 271 (1964); *United States v. Continental Can Co.,* 378 U.S. 441 (1964); *United States v. Pabst Brewing Co*., 384 U.S. 546 (1966); *United States v. Von's Grocery Co*., 384 U.S. 270, 277 19 (1966); and *United States v. Falstaff Brewing Corp*., 410 U.S. 526 (1973). These rulings still stand today, never having been overruled or diminished by later authority.

16.    Under this line of precedent, the Supreme Court enjoined a series of mergers involving lower market share levels than those created in relevant city pair markets by this Merger:

17.

## SUMMARY/COMPARISON OF KEY SECTION 7 CASES

| CASE | MARKET(S) | ACQUIRING COMPANY: MARKET SHARE PRIOR TO MERGER | ACQUIRED COMPANIE(S): MARKET SHARE PRIOR TO MERGER | MARKET SHARE OF MERGED ENTITY | MARKET CONCENTRATION |
|---|---|---|---|---|---|
| *Brown Shoe Company, Inc., v. United States*, 370 U.S. 294 (1962) | Nationwide: 1) Manufacturing of shoes  2) Retail sales of shoes | Brown Shoe Company: 1) #3 in Market with 6% share | Kinney Shoe: 1) #12 in Market with .05% share  2) 2% share | 1) #3 in Market with 6% share  2) #2 in Market with 9.5% share | Nationwide: 4 largest Firms controlled 23% of Manufacturing Market |
| *United States v. Philadelphia National Bank, et al.*, 374 U.S. 321 (1963) | Philadelphia Four Country Area | Philadelphia National Bank; #2 in Market | Girard Trust Corn Exchange Bank: #3 in Market | #1 in Market with 36% share (of assets) | Post-merger: 4 Largest Firms would have 78% of Market |
| *United States v. Aluminum Company of America, et al.*, 377 U.S. 271 (1964) | Aluminum Conductor | Aluminum Company (Alcoa):  #1 in Market with 27.8% share | Rome Cable Company:  #9 in Market with 1.3% share | 29.1% share | Addition of Rome Cable Corp. added only 1.3% to Alcoa's share of Market; the 4 Largest Firms controlled 76% of the Market prior to merger |
| *United States v. Pabst Brewing Company, et al.*, 384 U.S. 546 (1966) | 1) Nationwide  2) Tri-State (Wisconsin, Illinois, Michigan)  3) Wisconsin | Pabst Brewing Company: 1) #10 in Market  2) #7 in Market with 5.48% share  3) #4 in Market | Blatz Brewing Company: 1) #18 in Market  2) #6 in Market with 5.84% share  3) #1 in Market | 1) #5 in Market with 4.49% share  2) 11.32% share  3) #1 in Market with 23.95% share | Nationwide: 4 Largest Firms controlled 58.93% share |
| *United States v. Von's Grocery Company, et al.*, 384 U.S. 270 (1966) | Retail Grocers in Los Angeles area | Von's Grocery Company: #3 in Market with 4.7% share | Shopping Bag: #6 in Market with 4.2% share | #2 in Market with 7.5% share | Market share of 4 Largest Companies: Prior to merger: 24.4% Post-merger: 28.8% |
| *United States v. Falstaff Brewing Corporation*, 410 U.S. 526 (1973) | Beer in New England (Six States) | Falstaff Brewing Corp.: 0% in New England  5.9% Nationally (4th Largest in U.S.) | Narragansett Brewing Co.: 20% in New England (Largest seller of Beer in New England) | 20% in New England | Five years preceding merger: Market share went from 50% to 61.3% of 4 Largest Sellers in New England; Number of brewers decreased from 32 in 1935, to 11 in 1957, & to 6 in 1964 |
| *Hospital Corporation of America v. Federal Trade Commission*, 807 F.2d 1381 (7th Cir. 1986) | Hospitals in Chattanooga, Tennessee | Hospital Corporation of America, Inc.: 14% share - owned 1 of 11 area Hospitals | Hospital Affiliates Int'l, Inc.: Managed 2 of 11 area Hospitals Health Care Corp.: Owned 2 of 11 Hospitals | #2 in Market with 26% share (owned or managed 5 of 11 Hospitals) | Market share of 4 Largest Companies: Prior to merger: 79% Post-merger: 91% |

18. "This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects." *Philadelphia National Bank*, 374 U.S. at 363.

19.     A combined 30% market share clearly "presents [a] threat" of undue concentration in violation of § 7 of the Clayton Act.  *Philadelphia National Bank*, 374 U.S. at 364.

20.     Taken together these cases "…establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing. The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words 'may…substantially…lessen competition.'" *Hospital Corporation of America v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986). Put another way, in an industry trending towards concentration, the elimination by merger or acquisition of a significant rival in a "nontrivial" transaction is illegal under § 7 of the Clayton Act.

21.     This Court adopted the approach set forth by the Supreme Court in *U.S. v. Manufacturers Hanover Trust*, 240 F.Supp. 867, 949-950 (S.D.N.Y. 1965).  The *Manufacturers Hanover Trust* court explained:

> This merger offends Clayton § 7 in so many ways that to allow it to stand would be to ignore the statute altogether. It tends to create a monopoly by significantly increasing concentration and accelerating a trend toward oligopoly. The case more than satisfies the rule that where concentration is already great, even slight increases must be prevented. *United States v. Aluminum Co. of America, supra*, 377 U.S. at 280, 84 S.Ct. 1283; *United States v. Philadelphia Nat'l Bank, supra*, 374 U.S. at 367 n. 43, 83 S.Ct. 1715; *Brown Shoe Co. v. United States, supra,* 370 U.S. at 334, 82 S.Ct. 1502. It also runs afoul of the principle that where there is a strong trend toward oligopoly, further tendencies in that direction are to be curbed in their incipiency, whatever the number, or vigor, of remaining competitors. *United States v. Continental Can Co., supra*, 378 U.S. at 461, 84 S.Ct. 1738; *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. at 367 n. 43, 83 S.Ct. 1715; *Brown Shoe Co. v. United States, supra*, 370 U.S. at 333, 345-346, 82 S.Ct. 1502.
>
> The merger substantially lessens competition and restrains trade by the permanent elimination of significant competition formerly existing between major competitors, and that in 'itself constitutes a violation of § 1 of the Sherman Act,'

and, a fortiori, of the Clayton Act. *United States v. First Nat'l Bank & Trust Co. of Lexington, supra*, 376 U.S. at 671-672, 84 S.Ct. 1037.

22.     These Supreme Court decisions were applied by the Second Circuit in

*Stanley Works v. FTC*, 469 F.2d 498 (2d Cir. 1972), where Stanley, which controlled more than

22 percent of the cabinet hardware market and which was one of four firms that together

controlled 49-50 percent of the market, acquired a competitor with only a 1percent share in 1966.

The FTC held that violated Section 7 of the Clayton Act and ordered divestiture in May of 1971.

Upon review, the Second Circuit ordered that the FCC's order of divestiture be enforced in

October of 1972:

> The law is clear in its teaching that in an already concentrated industry with few sellers, in which the four leading companies dominate approximately 50% of the market, a merger involving the leading firm, controlling 22-24% of the market, with a firm like Stanley, would seriously threaten substantial anticompetitive consequences. This merger cannot survive in the face of the Clayton Act and its history. Accordingly, we affirm the Commission's order and direct its enforcement.

*Id*. at p. 508.

23.     The *Stanley* court wrote that the continued independence of firms with small

market shares is crucial to the health and vitality of a market threatening to become oligopolistic

and quoted from the seminal Supreme Court merger cases:

> The Supreme Court noted in *United States v. Aluminum Co. of America*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), that central to the underlying philosophy of § 7, as amended, is the principle "that competition will be most vital 'when there are many sellers, none of which has any significant market share.' *United States v. Philadelphia National Bank*, 374 U.S. at 363, 83 S.Ct. 1715, 10 L.Ed.2d 915." *United States v. Aluminum Co. of America*, *supra*, 377 U.S. at 280, 84 S.Ct. at 1289. But the greater the concentration in the market 'the greater is the likelihood that parallel policies of mutual advantage, not competition, will emerge. That tendency may well be thwarted by the presence of small but significant competitors.' *Ibid*. 19.

*Stanley Works,* 469 F.2d at 507.

24.     The merger of American and US Airways is a non-trivial transaction that eliminated US Airways as a significant rival in violation of § 7 of the Clayton Act.

### B.      Requirements Under a Burden Shifting Framework

24.     Under the burden shifting framework approach, Plaintiffs must show that the Merger would produce "a firm controlling an undue percentage share of the relevant market, and [would] result[] in a significant increase in concentration of firms in that market."  *Philadelphia Nat'l Bank*, 374 U.S. at 363.

25.     A showing of undue concentration in any relevant market is sufficient to meet Plaintiffs' *prima facie* burden.  *FTC v. CCC Holdings*, 605 F.Supp.2d 26, 45-46 (D.D.C. 2009). Thus, an "extremely high HHI on its own establishes the prima facie case." *St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015), citing *H.J. Heinz*, 246 F.3d at 716.

26.     Such a showing establishes a "presumption" that the merger will substantially lessen competition."  *FTC v. Heinz Co.,* 246 F.3d 708, 215 (D.C. Cir. 2001).

27.     To rebut the presumption, the defendants must produce evidence that "'show [s] that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition' <u>in the relevant market</u>. (citations omitted)."  *Heinz Co.,* 246 F.3d at 715. [emphasis added].

28.     If the defendant successfully rebuts the presumption of illegality, the burden of producing additional evidence of anticompetitive effects shifts to the plaintiffs, and merges with the ultimate burden of persuasion, which remains with the plaintiffs at all times.  *Heinz*, 246 F.3d at 715.

### III.     UNDER THE DOCTRINE OF THE LAW OF THE CASE, THE RELEVANT MARKETS ARE CITY PAIRS

29.     In its Bench Decision, this Court noted that:

> "In their reply to Plaintiff's motion for a TRO, Defendants stated as follows: 'The properly defined market in this case is scheduled air passenger service between City Pairs. A traveler departs one city and ultimately arrives in another whether on a single flight or several connecting flights. This City Pair is the relevant geographic market because a consumer seeking to fly to one city generally will not settle for traveling to another city.' *See Brown Shoe,* 370 U.S. at 325, *FTC v. Staples, Inc*., 970 F.Supp. 1066 1073, (District Court D.C. 1997)."

(August 29, 2018, Bench Decision, Dkt. No. 177 at 21:2-11).

30.     Courts have repeatedly accepted city pairs as the relevant market in cases involving the airline industry.  *See In re Northwest Airlines Corporation*, 208 F.R.D. 174, 220 (E.D. Mich. 2002) ("As plaintiffs note, any broader attack on the use of City Pairs surely cannot succeed where the airlines themselves as well as numerous government and academic reports have adopted the same general approach to analyzing the air travel industry"); *See also Global Discovery Travel Services, LLC v. Trans World Airlines, Inc.*, 960 F.Supp. 701 at 704-705 19 (S.D.N.Y. 1997).

31.     It its *Bench Decision*, this Court held that the Defendants' prior statement was a judicial admission:

> For all these reasons then the Court construes Defendant's prior statement about the City Pairs market as a judicial admission. *See Banks v. Yokmik*, 214 F.Supp.2d 401 at 405 (S.D.N.Y. 2002). ("Judicial admissions are formal concessions in the pleading through stipulations by a party or its counsel and are binding upon the party making them.") *Keller v. United States*, 58 F.3d 1194 at 1198 Note 8 (7th 5 Cir. 1995).

> Such assertions are affirmative facts – factual affirmations or stipulations of some sort that bind both the party making the admissions and the court ID. Citing *Bank of America v. Fairleigh*, 2002 Westlaw 5586 at *6 (S.D.N.Y. January 2, 2002). (Treating the initial answer in which defendants admitted signing credit documents is a formal judicial admission.)

> Indeed, it is well established that a court can treat a statement in a brief as a binding judicial admission of fact. *See In RE: Fosomax Product Liability Litigation*, 647 F.Supp.2d 265 at 276 (S.D.N.Y. 2009) citing *Purgess v. Sharrock*, 33 F.3d 134 at 144 (2d. Cir. 1994). *Rosario v. Goldsmith*, 84 F.Supp.2d 455 at 464-465 (S.D.N.Y.) which is affirmed at 230 F.3d 518 (2d. Cir. 2000). *CF Baxter v. MBA Group Insurance, Transportation, Health and Welfare Plan*, 958 F.Supp.2d 1223 at 1232-33 (Western District of Washington 2013.

(August 29, 2018, Bench Decision, Dkt. No. 177 at 22:23-23:22).

32.    There have been no changes in controlling law or factual circumstances, nor any clear error or manifest injustice to warrant a departure from this Court's earlier ruling on relevant market.  The Court's ruling is the law of the case.  *See 7 West 57th Street Realty Company, LLC v. CitiGroup, Inc.*, 314 F.Supp.3d 497, 516 (S.D.N.Y. 2018), quoting *DiLaura v. Power Auth. of State of New York.*, 982 F.2d 73, 76 (2d Cir 1992)  ("'The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" (citations omitted)).

33.    The relevant market product market in this case is scheduled air passenger service.

34.    The relevant geographic markets in this case are the city pairs identified by the Plaintiffs.

35.    Plaintiffs' First Amended Complaint alleged 1,008 overlapping city pairs between American and US Airways where post-merger concentrations were presumptively illegal.  (Dkt. No. 103 at Appendix A).

36.    Pursuant to this Court's August 29, 2018, Bench Decision, Plaintiffs identified 298 city pairs as relevant to their claims.  (August 29, 2018, Bench Decision, Dkt. No. 177 at 46:12-14 and Plaintiffs' Identification of City Pairs, Dkt. No. 214-5).

37.     Thus, scheduled air transportation between the 298 city pairs identified by Plaintiffs at Dkt. No. 214-5 are the relevant markets in this case.

## IV.     PLAINTIFFS HAVE STANDING AND ARE THREATENED WITH LOSS OR DAMAGE

38.     This Court held that Plaintiffs have antitrust standing as consumers in its Bench Decision.  (Dkt. No. 177 at 37:2-46:11).  There have been no changes in controlling law or factual circumstances, nor any clear error or manifest injustice to warrant a departure from this Court's earlier ruling on antitrust standing.

39.     Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, provides that, "Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief…against <u>threatened</u> loss or damage by a violation of the antitrust laws…" [emphasis added].

40.     Under § 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, "[t]he requirements for standing to seek such injunctive relief are much less restrictive than for monetary relief." 1 Callmann on Unfair Comp., Tr. & Mono. § 4:49, Enforcement of private rights—Standing to sue, (4th Ed.); *See*, *Freedom Holdings, Inc. v. Cuomo*, 592 F.Supp.2d 684, 693-694 (S.D.N.Y. 2009) (Holding that, "The antitrust standing analysis is more flexible and less demanding for claims for injunctive relief than it is for those seeking money damages, because 'one injunction is as effective as 100, and ... 100 injunctions are no more effective than one (citations omitted)," and that "the standing inquiry is more flexible, reflecting greater concern for the public interest and reduced risk of duplicative recovery.")

41.     Thus, "[n]o proof of actual past injury is required; only a causal connection to the antitrust violation, and at least a threat of *future* injury." 1 Callmann on Unfair Comp., Tr. &

Mono. § 4:49, Enforcement of private rights—Standing to sue, (4th Ed.) [emphasis in original];

*see, Nader v. Air Transport Association of America*, 426 F.Supp. 1035, 1038 (S.D.N.Y. 1977).

42.     In a suit for equitable relief under § 16 of the Clayton Act, the plaintiff must also

establish an antitrust injury, although the injury need only be threatened. *See Zenith Radio Corp.*

*v. Hazeltine Research, Inc.* 395 U.S. 100, 130 (1969); *see also Cargill, Inc. v. Monfort of Colo.,*

*Inc.,* 479 U.S. 104, 122 (1986).

43.     Section 16 of the Clayton Act was intended to confer standing on consumers of

air travel, like the Plaintiffs here. *See Nader v. Air Transport Association of America*, 426 F.

Supp. 1035, 1040 (D.D.C. 1977); *Malaney v. UAL Corporation*, 2010 WL2 3790296 at *12

(N.D. Cal. Sept. 27, 2010); *See Riley v. Media News Group, Inc*., 2007 WL 11 1068202 at *5.

(N.D. Cal. April 10, 2007).

44.     The "prototypical example of antitrust injury is an allegation by consumers that

they have had to pay higher prices (or experienced a reduction in the quality of service) as a result

of a defendant's anticompetitive conduct." *Mathias v. Daily News, L.P.,* 152 F. Supp.2d 465, 478

(S.D.N.Y. 2001).

45.     The antitrust injuries in the record include higher air fares, higher ancillary fees,

reduction in the quality of service, reductions in service and flights in city pairs where passenger

traffic has decreased, and American's rival, US Airways, has been eliminated as a competitive

choice for consumers.  (FOF, ¶¶ 70-153 (standing) and 157-236).

46.     Of the city pairs on which Plaintiffs have flown and/or will fly in the future, post-

merger concentrations are presumptively illegal and anticompetitive effects are presumed in 204

of them.  (FOF, ¶ 165).  Defendants have failed to rebut the presumption of illegality.

47.     Plaintiffs are threatened with harm by having traveled on or intending to travel in the future on the presumptively illegal city pairs identified in **Table A**.

48.     Plaintiffs are threatened with harm by having traveled on or intending to travel in the future on the city pairs where average airfares have increased, as identified in **Table B**.

49.     Plaintiffs are threatened with harm by having traveled on or intending to travel in the future on the city pairs where passenger traffic has declined, as identified in **Table C.**

50.     Plaintiffs are threatened with harm by having traveled on or intending to travel in the future on city pairs where concentrations are presumptively illegal, average airfares have increased, and passenger growth has declined, as identified in **Table D**.

51.     Thus, Plaintiffs are threatened with harm by reason of Defendants' merger on the city pairs in which they have traveled and/or intend to travel in the future, *see* **Table A** and PX-149.

## V.     THE MERGER IS PRESUMPTIVELY ILLEGAL

### A.     Post-Merger Concentration Levels Exceed Established Thresholds

52.     A merger that allows a firm to control an "undue percentage" of a relevant market and that causes a "significant increase in…concentration" is "so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects."  *Phila. Nat'l Bank*, 374 U.S. at 363 [emphasis added]; *accord California v. Am. Stores Co.,* 872 F.2d 837, 842 (9th Cir. 1989), *rev'd on other grounds,* 495 U.S. 271 (1990), *reinstated in relevant part*, 930 F.2d 776, 777 (9th Cir. 1991); *see also Rockford Mem'l*, 898 F.2d at 1285 ("The defendants' immense shares in a reasonably defined market create a presumption of illegality.")

91

53.     Upon a showing of a *prima facie* case, "traditional economic theories of the competitive effects of market concentration" are presumed. *United States v. H. & R. Block*, 833 F.Supp.2d 36, 71-73 and 77 (D.D.C. 2011).

54.     A commonly used metric for determining market share is the Herfindahl–Hirschman Index ("HHI"). *St. Alphonsus*, 778 F.3d at 786, *citing, ProMedica Health Sys., Inc. v. FTC,* 749 F.3d 559, 568 (6th Cir.2014) and *H.J. Heinz,* 246 F.3d at 716. "HHI is 'calculated by summing the squares of the individual firms' market shares,' which 'gives proportionately greater weight to the larger market shares.' (citation omitted) The analysis "consider[s] both the post-merger level of the HHI and the increase in the HHI resulting from the merger." *Id.,* citing Merger Guidelines § 5.3. "The Merger Guidelines classify markets as (1) unconcentrated (HHI below 1500); (2) moderately concentrated (HHI between 1500 and 2500); or (3) highly concentrated (HHI above 2500). *Id.* Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power.'" *Id.* "'Sufficiently large HHI figures establish the [] prima facie case that a merger is anticompetitive.' *H.J. Heinz,* 246 F.3d at 716." *Id*.

55.     The market shares and HHI levels in the relevant city pair markets identified in **Table A** exceed the thresholds set forth in the Department of Justice's Horizontal Merger Guidelines and far exceed the levels found to be unlawful by the Supreme Court and other courts.  In *Philadelphia National Bank*, the Supreme Court found that a combined market share of 30 percent, with many remaining competitors, violated the Clayton Act.  *Phila. Nat'l Bank*, 374 U.S. at 364.

56.     Other courts have enjoined mergers involving lower markets shares and HHI levels than those produced by this Merger in many of the relevant city pair markets:

| Case | Combined Share | Pre-Merger HHI | HHI Increase | Post-Merger HHI | Holding |
|---|---|---|---|---|---|
| *Phila. Nat'l Bank,* 374 U.S. at 364. | 30% | N/A | N/A | N/A | Enjoined |
| *FTC v. Cardinal Health, Inc.,* 12 F. Supp. 2d 34, 53-54 (D.D.C. 1998) | 37% | 1648 | 1431 | 3079 | Enjoined |
| *U.S. v. H&R Block, Inc.,* 833 F.Supp.2d 36, 72 (D.D.C. 2011) | 28% | 4291 | 400 | 4691 | Enjoined |
| *FTC v. ProMedica Health Sys., Inc.,* No. 11-CV-47, 2011 WL 1219281, at *12 (N.D. Ohio 2011) | 58% | 3313 | 1078 | 4391 | Enjoined |
| *St. Alphonsus,* 778 F.3d at 786 (9th Cir. 2015) | N/A | 4,612 | 1,607 | 6,219 | Enjoined |
| *United States v. Anthem, Inc.,* 855 F.3d 345, 351 (D.C. Cir. 2017). | N/A | 2,500 | 500 | 3,000 | Enjoined |

57.     A merger is presumptively unlawful even though it may not eliminate all competition in a relevant market.  *See OSF Healthcare*, 852 F. Supp. 2d at 1083 ("[T]he continued existence of one competitor following a merger, even a strong competitor does not necessarily reduce the probability that the proposed merger would substantially lessen competition in the future."

### B.     Other Evidence Establishing a *Prima Facie* Case

58.     In addition, other evidence can be presented to establish a *prima facie* case.  *St. Alphonsus*, 778 F.3d at 786.

59.     In its Bench Decision, this Court held that a trend in concentration and barriers to entry in the industry supported Plaintiffs' *prima facie* case.  (Bench Decision, Dkt. No. 177 at p. 53:24-55:1 and 55:9-18) and *see* FOF ¶¶ 172-180).   This is because in enacting §7 of the Clayton Act, "Congress sought to preserve competition among many small businesses <u>by</u>

arresting a trend towards concentration in its incipiency before that trend developed to the point

that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co*.,

384 U.S. 270, 277 (1966). [emphasis added].

60.     For all these reasons, Plaintiffs have established a *prima facie* case that the merger

is anticompetitive. *Heinz*, 246 F.3d at 716.

## VI.    DEFENDANTS FAILED TO REBUT THE STRONG PRESUMPTION OF HARM TO COMPETITION

61.     Proof that an acquisition will increase concentration in a relevant market

establishes a *prima facie* case that a merger is anticompetitive.  *Phila. Nat'l Bank*, 374 U.S. at

363; *Heinz*, 246 F.3d at 716; *Am. Stores*, 872 F.2d at 842.

62.     Upon a showing of a *prima facie* case, "traditional economic theories of the

competitive effects of market concentration" are presumed. *United States v. H. & R. Block*, 833

F.Supp.2d 36, 71-73 and 77 (D.D.C. 2011).

63.     "The more compelling the prima facie case, the more evidence the defendants

must present to rebut it successfully."  *Heinz*, 246 F.3d at 725; *see also Baker Hughes*, 908 F.2d

at 991; *FTC v. OSF Healthcare Sys*., 852 F.Supp.2d 1069, 1094 (N.D. Ill. 2012).

64.     To rebut the presumption, the defendants must produce evidence that "'show [s]

that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on

competition' in the relevant market. (citations omitted)."  *Heinz Co.,* 246 F.3d at 715. [emphasis

added].

### A.     No Court has Found Efficiencies Sufficient to Rescue an Otherwise Unlawful Merger

65.     Because § 7 seeks to avert monopolies, proof of "extraordinary efficiencies" is

required to offset the anticompetitive concerns in highly concentrated markets. *F.T.C. v. H.J.*

*Heinz Co.,* 246 F.3d 708, 720–22; *see also* Merger Guidelines § 10 ("Efficiencies almost never justify a merger to monopoly or near-monopoly."); *H & R Block*, 833 F. Supp. 2d at 89; *OSF Healthcare*, 852 F. Supp. 2d at 1089; *Heinz*, 246 F.3d at 720-22.

66.     "No court…has found efficiencies sufficient to rescue an otherwise illegal merger."  *ProMedica*, 2011 WL 1219281, *57; *RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979) ("RSR argues that the merger can be justified because it allows greater efficiency of operation.  This argument has been rejected repeatedly.")

67.     There is substantial doubt as to whether an efficiencies defense can rebut a *prima facie* case.  *See Federal Trade Commission v. Penn State Hershey Medical Center*, 838 F.3d 327, 348 (3d Cir. 2016) ("…we are skeptical that such an efficiencies defense even exists."); *St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015) ("We remain skeptical about the efficiencies defense in general and about its scope in particular.").

68.     "[P]ossible economies cannot be used as a defense to illegality."  *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967).

69.     Those courts that recognize the defense require that, "the companies must 'demonstrate that their claimed efficiencies would benefit customers,' (citation omitted) and, more particularly, the customers in the challenged markets, see Guidelines § 10 ('[T]he Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential harm to customers in the relevant market.')" *St. Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health System, Ltd*, 778 F.3d 775, 790-791 (9th Cir. 2015) [emphases added]; *See also*, *F.T.C. v. University Health, Inc.,* 938 F.2d 1206, 1222 (11th Cir. 1991).

70.     The defendant must also demonstrate that the claimed efficiencies are "merger-specific," *see United States v.  H & R Block, Inc.,* 833 F.Supp.2d 36, 89–90 (D.D.C.2011), which is to say that the efficiencies cannot readily "be achieved without the concomitant loss of a competitor." *H.J. Heinz,* 246 F.3d at 722.  Claimed efficiencies must be verifiable, not merely speculative. *See, e.g., FTC v. CCC Holdings Inc.,* 605 F.Supp.2d 26, 74–75 (D.D.C.2009).

71.     Courts recognizing the defense have made clear that a Clayton Act defendant must "clearly demonstrate" that "the proposed merger enhances rather than hinders competition because of the increased efficiencies." *United States v. Long Island Jewish Med. Ctr.,* 983 F.Supp. 121, 137 (E.D.N.Y.1997) [emphasis added].

72.     Defendants must establish efficiencies by clear and convincing evidence.  *United States v. Rockford Mem'l Corp.,* 717 F. Supp. 1251, 1289 (N.D. Ill. 1989).

73.     Thus, it is "incumbent upon the court to 'undertake a rigorous analysis of the kind of efficiencies being urged by the parties…'" *OSF Healthcare*, 852 F. Supp. 2d at 1088-1089.

### B.     Defendants Efficiency Claims Do Not Address the Harm to Competition in the Relevant Markets

74.     Defendants must show that the "claimed efficiencies would benefit customers,' (citation omitted) and, more particularly, the customers in the challenged markets." *St. Alphonsus*, 778 F.3d at 790-79 [emphases added], citing Merger Guidelines § 10 ('[T]he Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential harm to customers in the relevant market.')" [emphasis added]; *See also*, *F.T.C. v. University Health, Inc.,* 938 F.2d 1206, 1222 (11th Cir. 1991).

75.     The court in *St. Alphonsus* explained that, "A quarter of a century ago, we rejected an efficiencies defense in *RSR Corp. v. FTC,* 602 F.2d 1317, 1325 (9th Cir.1979). *RSR,* however, involved an argument that the merger would allow the defendant to compete more

efficiently *outside* the relevant market. *Id.* More recent cases focus on whether efficiencies in the relevant market <u>negate the anticompetitive effect of the merger *in that market*</u>." *Id.* at 789. [emphasis added].

76.     Courts have rejected the claim that anticompetitive effects in one market can be offset by potential procompetitive benefits in another market.  *Phila. Nat'l Bank*, 374 U.S. at 370-71; *RSR Corp.*, 602 F.2d at 1325, *Rockford Mem'l*, 717 F. Supp. at 1288-89.

77.     Similar to the efficiencies claimed by Defendants here (more itinerary options, upgraded facilities, service to new cities), in *Rockford*, the purported efficiencies included the assertion that as a result of the merger, the "number, depth, and quality of services…will improve…" 717 F. Supp. at 1288.  While the *Rockford* court acknowledged that while "the improvement in services would have a positive impact for consumers of healthcare," it determined that that was "not relevant for our purposes today." *Id.*  The court noted that its "exclusive role is t*o* <u>evaluate the merger's effect on competition for the relevant market and no more.</u>" *Id.*  [emphasis added].  More itinerary options or upgraded facilities do not avoid competitive harm to consumers in the form of higher prices or fewer competitive choices.

78.     An otherwise unlawful merger cannot be saved because "on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial… Congress determined to preserve our traditionally competitive economy.  It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid." *United States v. Philadelphia National Bank*, 374 U.S. 321, 371 (1963).  Thus, efficiencies outside the relevant markets in this case are irrelevant.

79.     Defendants have not shown that the purported efficiencies benefit consumers in each of the presumptively illegal city pair markets identified in **Table A** and *see* PX-149.

97

### C.    Defendants Efficiency Claims Have Not Been Verified

80.    Defendants must "verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific." *H & R Block*, 833 F. Supp. 2d at 89.

81.    Defendants cannot "overcome a presumption of illegality based solely on speculative, self-serving assertions." *Univ. Health*, 938 F.2d at 1223.

82.    Defendants must prove that the merger will result in "significant economies, and that these economies would benefit competition and, hence, consumers." *Id.*

83.    Efficiency claims "generated outside of the usual business planning process" are "viewed with skepticism." *ProMedica*, 2011 WL 1219281, at 40; Horizontal Merger Guidelines, § 10.  This skepticism is particularly important for efficiency claims developed after the Defendants became aware that the transaction was under investigation. *See ProMedica*, 2011WL 1219281, at *40-41.

84.    "Delayed benefits…are less proximate and more difficult to predict," and thus are entitled to little weight. *CCC Holdings*, 605 F. Supp. 2d at 73; Horizontal Merger Guidelines, § 10.

85.    Defendants have not verified the benefits of the merger.

86.    Defendants have not verified the purported benefit of the merger with respect to any city pair relevant market at issue in this case.

### D.    Defendants' Efficiency Claims are Not Merger Specific

87.    Efficiencies that are "merger-specific" are those "that cannot be achieved without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 721-22.

88.     Efficiencies claimed by a defendant are not to be credited unless they are merger-specific, substantiated, and of such a magnitude that the transaction *is* <u>not likely to be anticompetitive in *any market*</u>.  Merger Guidelines, § 10 [emphasis added].

89.     Efficiencies that are "merger specific" are those "that cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor."  *Heinz*, 246 F.3d at 721-22.

90.     "The Merger Guidelines 'credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects.  These are termed merger-specific efficiencies."  *ProMedica*, 2011 WL 1219281, at *39 (quoting Horizontal Merger Guidelines § 10.

91.     The types of efficiencies claimed by Defendants in this case can be accomplished through other means, including codeshare agreements, product enhancements, new aircraft purchases, joint business agreements, and *de novo* entry into markets.  *ProMedica*, 2011 WL 1219281, at *41.

92.     Absent a showing of merger-specificity, Defendants' goal of building a bigger network is insufficient to rebut a compelling *prima facie* case of presumed anticompetitive effects.

E.     **Entry Has Not Counteracted the Presumed Anticompetitive Effects of the Merger in the Relevant Markets**

93.     The mere possibility that an airline may enter the market or an existing provider may be able to expand its operations is not sufficient to counteract the anticompetitive effect of the Merger.  The Horizontal Merger Guidelines provide that entry must be "timely, likely, and sufficient in magnitude, character and scope to deter or counteract the competitive effects of the

proposed transaction."  Horizontal Merger Guidelines § 9; *FTC v. Procter & Gamble*, 386 U.S.

568, 579-81 (1967).

94.     In order to deter the competitive effects of concern, entry must be rapid enough to

make unprofitable overall the actions causing those effects and thus leading to entry, even

though those actions would be profitable until entry takes effect. Horizontal Merger Guidelines,

§ 9.1.  "For entry to be considered timely, it typically <u>must occur within approximately two years</u>

<u>post-merger</u>."  *H&R Block*, 833 F.Supp.2d at n.28, citing Commentary on the Horizontal Merger

Guidelines (2006) at 45–46 (discussing prior Merger Guidelines § 3.2, which specified that

timely entry should occur within two years).[2]  Thus, since it has been more than five years since

the merger and no new entrants have entered the relevant city pair markets there is insufficient

evidence to counter the presumptively illegal concentration levels in the markets identified in

**Table A**, and <u>timely</u> entry is, therefore, unlikely.

95.     Defendants must show both that entry or expansion is likely—in other words,

both technically possible and economically sensible—and that it will replace the competition that

existed prior to the merger.  *See Cardinal Health*, 12 F. Supp. 2d at 56-58.

96.     In assessing this evidence, the "history of entry <u>into the relevant market</u> is a

central factor in assessing the likelihood of entry in the future."  *Cardinal Health*, 12 F. Supp. 2d

at 56; see also Horizontal Merger Guidelines, § 9 ("Lack of successful and effective entry in the

face of non-transitory increases in [prices]...in the relevant market tends to suggest that

successful entry is slow or difficult.")

---

[2] The 2010 Horizontal Merger Guidelines expressly state that, "The Commentary on the
Horizontal Merger Guidelines issued by the Agencies in 2006 remains a valuable supplement to
these Guidelines."  Horizontal Merger Guidelines, at p. 1, fn.1.

97.     "[F]or entry or expansion to be sufficient," to replace the competition lost through the merger of head-to-head-competitors, "it must replace at least the scale and strength of one of the merging firms in order to replace the lost competition from the [Merger]."  *ProMedica,* 2011 WL 1219281, at *34.

98.     Defendants have not shown that entry will be "timely" or "likely" with respect to any city pair identified in **Table A**.

> F.     **Defendants Have Not Shown that The Merger is Unlikely to Enhance the Tacit Coordination That Already Exists Among Network Carriers**

99.     Merger law "rests upon the theory that, where rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding in order to restrict output and achieve profits above competitive levels." *CCC Holdings,* 605 F.Supp.2d at 60 (quoting *Heinz,* 246 F.3d at 715).

100.    "Whether a merger will make coordinated interaction more likely depends on whether market conditions, on the whole, are conducive to reaching terms of coordination and detecting and punishing deviations from those terms." *CCC Holdings,* 605 F.Supp.2d at 60 (internal quotation omitted).

101.    Tacit coordination is "feared by antitrust policy even more than express collusion, for tacit coordination, even when observed, cannot easily be controlled directly by the antitrust laws. It is a central object of merger policy to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur."  *Heinz,* 246 F.3d at 725, citing, 4 Phillip E. Areeda, Herbert Hovenkamp & John L. Solow, *Antitrust Law* ¶ 901b2, at 9 (rev. ed.1998).

102.     The burden is on the Defendants to produce evidence of "structural market barriers to collusion" specific to this industry that would defeat the "ordinary presumption of collusion" that attaches to a merger in a highly concentrated market.  *See Heinz,* 246 F.3d at 725.

103.     The tacit coordination that exists in the airline industry today has been well-recognized by Courts and wielded by these Defendants as a shield from allegations of express collusion.  The purported barriers to tacit collusion claimed by Defendants are inconsistent with the rulings of other Courts and the positions these Defendants have taken in other litigation.  As the Ninth Circuit recently explained:

> Every commuter knows the gas station effect. The prices on two gas stations on opposing corners of a busy intersection often move in near unison. This phenomenon also occurs in the airline industry. With a market comprised of a few dominant players and publicly available pricing information, it is no surprise that consumer fares remain relatively uniform across the industry. That is not to say that unlawful agreements among air carriers never occur, nor that all claims based on Section 1 of the Sherman Act must fail. But in an interdependent oligopoly such as the U.S. airline industry, a plaintiff whose claim lies under Section 1 of the Sherman Act must plead more than conscious parallelism to survive a motion to dismiss.

*Prosterman v. American Airlines*, 747 Fed.Appx. 458, 460 (9th Cir. 2018) [emphasis added].

104.     In addition, American and the other major network carriers are the subject of multidistrict litigation in the United States District Court for the District of Columbia, *In re Domestic Airline Travel Antitrust Litigation,* 221 F.Supp.3d 46, 53 (D.D.C. 2016), alleging that the defendant airlines "colluded to limit capacity on their respective airlines in a conspiracy to fix, raise, maintain, and/or stabilize prices for air passenger transportation services within the United States…" in violation of § 1 of the Sherman Act.

105.     Defendants have not rebutted the presumption of coordinated effects.

106.     Defendants have not rebutted the presumption of coordinated effects as to each city pair relevant market in this case.

## VII.   THE APPROPRIATE REMEDY IS DIVESTITURE

107.    It "is well settled that once [a plaintiff] has successfully borne the considerable burden of establishing a violation of [section 7], all doubts as to the remedy are to be resolved in its favor." *United States v. E.I. du Pont de Nemours, Inc,* 366 U.S. 316, 334 (1961).

108.    Divestiture is "the remedy best suited to redress the ills of an anticompetitive merger." *California v. Am. Stores Co.*, 495 U.S. 271, 285 (1990); *see also ProMedica,* 749 F.3d at 573; *RSR,* 602 F.2d at 1325–26; *Ash Grove Cement Co. v. FTC,* 577 F.2d 1368, 1379–80 (9th Cir.1978).

109.    Divestiture is the "most important of antitrust remedies," and "should always be in the forefront of a court's mind when a violation of § 7 has been found." *E.I. du Pont,* 366 U.S. at 330–31; *see also id.* at 329 ("The very words of § 7 suggest that an undoing of the acquisition is a natural remedy.").

110.    "Private enforcement [of Section 7] of the Act was in no sense an afterthought: it was an integral part of the congressional plan for protecting competition. [citation omitted] Congress also made express its view that divestiture was the most suitable remedy in a suit for relief from a §7 violation."  *American Stores*, 495 U.S. at 284.

111.    The Supreme Court declared that "the plain text of §16 authorizes divestiture decrees to remedy §7 violations," and that, "We have recognized when construing §16 that it was enacted 'not merely to provide private relief, but … to serve as well the high purpose of enforcing the antitrust laws. (citation omitted)" *American Stores*, 495 U.S. at 282-283.

112.    "Section 16, construed to authorize a private divestiture remedy when appropriate in light of equitable principles, fits well in a statutory scheme that favors private enforcement,

subjects mergers to searching scrutiny, and regards divestiture as the remedy best suited to redress the ills of an anticompetitive merger." *American Stores*, 495 U.S. at 272.

113.    "Divestiture is 'simple, relatively easy to administer, and sure," *E.I. du Pont,* 366 U.S. at 331, while conduct remedies risk excessive government entanglement in the market. (citations omitted)."  *St. Alphonsus*, 778 F.3d at 793.

114.    Courts "are authorized, indeed required, to decree relief effective to redress the violations, whatever the adverse effect of such a decree on private interests." *E.I. du Pont,* 366 U.S. at 326.

115.    "The District Courts, in the framing of equitable decrees, are clothed 'with large discretion to model their judgments to fit the exigencies of the particular case.' (citation omitted)."  *United States v. E.I. du Pont de Nemours, Inc,* 353 U.S. 586, 607 (1957).

116.    The Supreme Court has ordered divestiture in numerous cases, well after a merger closed:

| CASE | MERGER/ACQUISITION EFFECTED DATE | DIVESTITURE ORDERED | SUPREME COURT DECISION DATE | YEARS B/T MERGER AND DIVESTITURE/ DECISION |
|---|---|---|---|---|
| Brown Shoe Company, Inc., v. United States, 370 U.S. 294 (1962) | Merger of Brow n Shoe & G.R. Kinney Co. effected on May 1, 1956 | yes | Monday, June 25, 1962 | 6 years |
| United States v. Philadelphia National bank, et al., 374 U.S. 321 (1963) | Acquisition of Girard Trust Corn Exchange Bank; comptroller approved merger on February 24, 1961, but no steps taken to consummate merger pending outcome of litigation | | Monday, June 17, 1963 | 2 years |
| United States v. Aluminum Company of America, et al., 377 U.S. 271 (1964) | Acquisition of Rome Cable co. in 1959 | yes | Monday, June 01, 1964 | 5 years |

| United States v. Pabst Brewing Company, et al., 384 U.S. 546 (1966) | Acquisition of Blatz brewing co. in 1958 | | Monday, June 13, 1966 | 6 years |
|---|---|---|---|---|
| United States v. Von's Grocery Company, et al., 384 U.S. 270 (1966) | Acquisition of Shopping Bag Food Stores in 1960 | yes | Tuesday, May 31, 1966 | 6 years |
| United States v. Falstaff Brewing Corporation, 410 U.S. 526 (1973) | Acquisition of the Narrangansett Brewing Co. in 1965 | | Wednesday, February 28, 1973 | 8 years |

117.    The Supreme Court has squarely rejected the argument that an otherwise unlawful acquisition can be permitted if it has the "beneficial effect" of making the acquired entity a "more vigorous and effective competitor." *Ford v. Motor Co. v. United States*, 405 U.S. 562, 569-70 (1972).

118.    It is undisputed that Defendants entered into a settlement with the Government whereby they agreed to divest and did divest certain gates and slots at airports.  (DX-50 at p. 2-3 of 21).  Thus, divestiture is unquestionably a viable remedy in this case.

119.    The Defendants have been on notice of the competitive concerns regarding the 1,008 city pairs identified in Plaintiffs' First Amended Complaint since well before the Merger closed and elected to close at their own risk.  The Court does not consider self-inflicted wounds in fashioning an appropriate remedy.  *Sierra Club v. Army Corps. Of Eng'rs*., 645 F.3d 978, 997-97 (8th Cir. 2011); *Pappan Enters. Inc., Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998).

120.    In *Steves and Sons, Inc. v. Jeld Wen, Inc.,* United States District Court for the Eastern District of Virginia, Case No. 3:16-cv-545, the court ordered divestiture of a manufacturing plant under § 16 of the Clayton Act in a private antitrust case, six years after the

merger closed.  (*Jeld Wen* Dkt. No. 1783). After the *Jeld Wen* court conducted a jury trial determining the defendants' liability under § 7 of the Clayton Act, the parties submitted briefing regarding an appropriate remedy and an evidentiary hearing was ultimately held by the Court regarding equitable relief.  (*Jeld Wen* Dkt. No. 1783 at p. 1-2).  Once this Court issues a ruling as to Defendants' liability under § 7, Plaintiffs submit that the procedure undertaken by the Court in *Steves* on the issue of fashioning appropriate equitable relief could and should be used in this case.

121.    The Private Plaintiffs as prevailing parties are entitled to recover their reasonable attorneys' fees.  15 U.S.C. § 26.

Respectfully submitted:

Dated: April 15, 2019

By: */s/ Joseph M. Alioto*
     Joseph M. Alioto (SBN 42680)
     Admitted *Pro Hac Vice*
     Jamie L. Miller (SBN 271452)
     Admitted *Pro Hac Vice*
     Theresa D. Moore (SBN 99978)
     Admitted *Pro Hac Vice*
     Thomas P. Pier (SBN 235740)
     Admitted *Pro Hac Vice*
     ALIOTO LAW FIRM
     One Sansome Street, 35th Floor
     San Francisco, CA  94104
     Telephone: (415) 434-8900
     Facsimile: (415) 434-9200
     Email:  jmiller@aliotolaw.com

     Gil D. Messina (SBN 029661978)
     *Admitted Pro Hac Vice*
     MESSINA LAW FIRM, P.C.
     961 Holmdel Road
     Holmdel, NJ 07733
     Telephone: (742) 332-9300
     Facsimile: (742) 332-9301
     Email:
     gmessina@messinalawfirm.com

     Christopher A. Nedeau (SBN 81297)
     *Admitted Pro Hac Vice*
     NEDEAU LAW FIRM
     154 Baker Street
     San Francisco, CA 94117
     Telephone:  415-516-4010
     Email:  cnedeau@nedeaulaw.net

     *Attorneys for the Clayton Act*
     *Plaintiffs*

## COUNSEL FOR PLAINTIFFS

Joseph M. Alioto (SBN 42680)
Admitted *Pro Hac Vice*
Jamie L. Miller (SBN 271452)
Admitted *Pro Hac Vice*
Theresa D. Moore (SBN 99978)
Admitted *Pro Hac Vice*
Thomas P. Pier (SBN 235740)
Admitted *Pro Hac Vice*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email:   jmiller@aliotolaw.com


Gil D. Messina (SBN 029661978)
*Admitted Pro Hac Vice*
MESSINA LAW FIRM, P.C.
961 Holmdel Road
Holmdel, NJ 07733
Telephone: (742) 332-9300
Facsimile: (742) 332-9301
Email: gmessina@messinalawfirm.com


Christopher A. Nedeau (SBN 81297)
*Admitted Pro Hac Vice*
NEDEAU LAW FIRM
154 Baker Street
San Francisco, CA 94117
Telephone:  415-516-4010
Email:  cnedeau@nedeaulaw.net

TABLE A

# Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Dallas, TX (DFW) | Reno, NV (RNO) | Brito, 6; Jolly, 7, 27; Russell, 10; Stansbury 13 | 331 | 6,267 | 1,112 | YES |
| Miami, FL (MIA) | Phoenix, AZ (PHX) | Brito, 6; Fry, 11; McCarthy 14; Talewsky, 17 | 645 | 4,184 | 1,518 | YES |
| Boston, MA (BOS) | Phoenix, AZ (PHX) | Brito, 6; Fry, 11; Garavanian, 6,7; Talewsky, 11 | 263 | 5,207 | 2,207 | YES |
| New York, NY (NYC) | Reno, NV (RNO) | Brito, 20: Garavanaian, 6; Stansbury, 13, 15 | 880 | 2,640 | 397 | YES |
| Boston, MA (BOS) | Reno, NV (RNO) | Brito, 20; Garavanian, 6, 7; Stansbury, 13 | 785 | 2,676 | 523 | YES |
| Charlotte, NC (CLT) | Dallas, TX (DFW) | Davis, 2; Jolly, 6, 22; Russell, 10 | 855 | 7,589 | 3,163 | YES |
| Sacramento, CA (SMF) | St. Louis, MO (STL) | Fjord, 2, 3 | 627 | 4,113 | 1,432 | YES |
| Detroit, MI (DTW) | Palm Springs, CA (PSP) | Freeland, 2 | 77 | 3,452 | 755 | YES |
| Dallas, TX (DFW) | Phoenix, AZ (PHX) | Fry, 11; Garavanian, 6; Russell, 10 | 950 | 4,959 | 1,357 | YES |
| Chicago, IL (CHI) | Tucson, AZ (TUS) | Fry,5, 10 | 370 | 4,711 | 703 | YES |
| Santa Barbara, CA (SBA) | Tucson, AZ (TUS) | Fry, 10 | 33 | 8,116 | 2,618 | YES |
| New York, NY (NYC) | Tucson, AZ (TUS) | Fry, 5, 10 | 98 | 3,980 | 1,053 | YES |
| Dallas, TX (DFW) | Tucson, AZ (TUS) | Fry, 10; Jolly, 7; Russell, 10; Talewsky, 15 | 104 | 8,521 | 1,949 | YES |
| Pittsburgh, PA (PIT) | Tucson, AZ (TUS) | Fry, 10 | 176 | 3,944 | 1,541 | YES |

# Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Hilo, HI (KOA) | Tucson, AZ (TUS) | Fry, 10 | 178 | 3,991 | 578 | YES |
| Tucson, AZ (TUS) | Washington, DC (WAS) | Fry, 10 | 201 | 3,785 | 731 | YES |
| Detroit, MI (DTW) | Tucson, AZ (TUS) | Fry, 10 | 237 | 2,989 | 771 | YES |
| Monterey, CA (MRY) | Tucson, AZ (TUS) | Fry, 10 | 276 | 7,816 | 2,413 | YES |
| Kansas City, MO (MCI) | Tucson, AZ (TUS) | Fry, 10 | 288 | 3,964 | 1,212 | YES |
| Charlotte, NC (CLT) | Tucson, AZ (TUS) | Fry, 10 | 308 | 5,734 | 2,741 | YES |
| Kapaa, HI (LIH) | Tucson, AZ (TUS) | Fry, 10 | 379 | 5,581 | 1,949 | YES |
| Fresno, CA (FAT) | Tucson, AZ (TUS) | Fry, 10 | 399 | 7,922 | 2,445 | YES |
| Kahului, HI (OGG) | Tucson, AZ (TUS) | Fry, 10 | 403 | 4,543 | 1,205 | YES |
| Milwaukee, WI (MKE) | Tucson, AZ (TUS) | Fry, 10 | 437 | 3,441 | 1,527 | YES |
| Philadelphia, PA (PHL) | Tucson, AZ (TUS) | Fry, 10; Rubinsohn, 7, 22 | 438 | 5,160 | 2,532 | YES |
| Houston, TX (HOU) | Tucson, AZ (TUS) | Fry, 10 | 463 | 4,409 | 458 | YES |
| Columbus, OH (CMH) | Tucson, AZ (TUS) | Fry, 10 | 510 | 3,410 | 909 | YES |
| Atlanta, GA (ATL) | Tucson, AZ (TUS) | Fry, 10 | 589 | 6,046 | 1,401 | YES |
| St. Louis, MO (STL) | Tucson, AZ (TUS) | Fry, 10 | 640 | 4,249 | 1,311 | YES |
| Boston, MA (BOS) | Tucson, AZ (TUS) | Fry, 10; Garavanian, 7; Talewsky, 15, 17 | 679 | 4,205 | 986 | YES |
| Honolulu, HI (HNL) | Tucson, AZ (TUS) | Fry, 10 | 684 | 3,955 | 1,001 | YES |
| Tampa, FL (TPA) | Tucson, AZ (TUS) | Fry, 10 | 757 | 3,602 | 1,132 | YES |
| Des Moines, IA (DSM) | Tucson, AZ (TUS) | Fry, 10 | 792 | 6,370 | 3,165 | YES |
| Indianapolis, IN (IND) | Tucson, AZ (TUS) | Fry, 10 | 828 | 3,709 | 1,080 | YES |
| Orlando, FL (MCO) | Tucson, AZ (TUS) | Fry, 10 | 830 | 3,653 | 1,275 | YES |
| Austin, TX (AUS) | Tucson, AZ (TUS) | Fry, 10 | 840 | 4,775 | 1,488 | YES |
| Omaha, NE (OMA) | Tucson, AZ (TUS) | Fry, 10 | 863 | 3,518 | 1,207 | YES |
| Miami, FL (MIA) | Tucson, AZ (TUS) | Fry, 10; McCarthy, 14 | 864 | 4,772 | 1,468 | YES |
| San Antonio, TX (SAT) | Tucson, AZ (TUS) | Fry, 10 | 881 | 4,957 | 1,869 | YES |
| Greensboro, NC (GSO) | Phoenix, AZ (PHX) | Fry, 11 | 9 | 4,819 | 944 | YES |
| Harrisburg, PA (MDT) | Phoenix, AZ (PHX) | Fry, 11 | 12 | 5,644 | 2,318 | YES |
| Phoenix, AZ (PHX) | Knoxville, TN (TYS) | Fry, 11 | 21 | 3,665 | 958 | YES |
| West Palm Beach (PBI) | Phoenix, AZ (PHX) | Fry, 11; Talewsky, 17 | 43 | 4,121 | 1,781 | YES |

# Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Key West, FL (EYW) | Phoenix, AZ (PHX) | Fry, 11 | 44 | 6,183 | 2,359 | YES |
| Phoenix, AZ (PHX) | Savannah, GA (SAV) | Fry, 11 | 47 | 4,294 | 620 | YES |
| Phoenix, AZ (PHX) | Syracuse, NY (SYR) | Fry, 11 | 79 | 3,937 | 1,133 | YES |
| Jackson, MS (JAN) | Phoenix, AZ (PHX) | Fry, 11 | 83 | 4,247 | 1,771 | YES |
| Greenville, SC (GSP) | Phoenix, AZ (PHX) | Fry, 11 | 118 | 3,226 | 681 | YES |
| Huntsville, AL (HSV) | Phoenix, AZ (PHX) | Fry, 11 | 150 | 3,619 | 690 | YES |
| Phoenix, AZ (PHX) | Fort Myers, FL (RSW) | Fry, 11; McCarthy, 14 | 152 | 2,894 | 889 | YES |
| Westchester County, NY (HPN) | Phoenix, AZ (PHX) | Fry, 11 | 179 | 4,524 | 1,707 | YES |
| Montgomery, AL (MGM) | Phoenix, AZ (PHX) | Fry, 11 | 180 | 5,045 | 733 | YES |
| Phoenix, AZ (PHX) | Richmond, VA (RIC) | Fry, 11 | 189 | 3,655 | 1,228 | YES |
| Phoenix, AZ (PHX) | Raleigh-Durham, NC (RDU) | Fry, 11 | 203 | 3,355 | 335 | YES |
| Jacksonville, FL (JAX) | Phoenix, AZ (PHX) | Fry, 11 | 216 | 2,939 | 621 | YES |
| Mobile, AL (MOB) | Phoenix, AZ (PHX) | Fry, 11 | 219 | 3,471 | 505 | YES |
| Norfolk-Virginia Beach, VA (ORF) | Phoenix, AZ (PHX) | Fry, 11 | 235 | 3,183 | 635 | YES |
| Phoenix, AZ (PHX) | Tallahassee, FL (TLH) | Fry, 11 | 249 | 5,060 | 558 | YES |
| Hilo, HI (KOA) | Phoenix, AZ (PHX) | Fry, 11 | 266 | 4,430 | 851 | YES |
| Fresno, CA (FAT) | Phoenix, AZ (PHX) | Fry, 11 | 286 | 9,493 | 558 | YES |
| Charlottesville, VA (CHO) | Phoenix, AZ (PHX) | Fry, 11 | 386 | 6,368 | 1,237 | YES |
| Hartford, CT (BDL) | Phoenix, AZ (PHX) | Fry, 11 | 392 | 3,090 | 869 | YES |
| Kahului, HI (OGG) | Phoenix, AZ (PHX) | Fry, 11; Stansbury, 16 | 421 | 4,621 | 1,115 | YES |
| Philadelphia, PA (PHL) | Phoenix, AZ (PHX) | Fry, 11; Rubinsohn, 6, 7, 19, 20 | 474 | 6,535 | 1,375 | YES |
| Phoenix, AZ (PHX) | San Juan, PR (SJU) | Fry, 11 | 527 | 3,843 | 1,171 | YES |
| Kapaa, HI (LIH) | Phoenix, AZ (PHX) | Fry, 11 | 556 | 4,522 | 1,046 | YES |
| Lexington, KY (LEX) | Phoenix, AZ (PHX) | Fry, 11 | 573 | 4,167 | 849 | YES |
| Monterey, CA (MRY) | Phoenix, AZ (PHX) | Fry, 11 | 588 | 9,635 | 1,148 | YES |
| Phoenix, AZ (PHX) | Fort Walton Beach, FL (VPS) | Fry, 11 | 601 | 4,054 | 1,145 | YES |
| Phoenix, AZ (PHX) | Tampa, FL (TPA) | Fry, 11 | 672 | 4,246 | 748 | YES |
| Phoenix, AZ (PHX) | St. Thomas, VI (STT) | Fry, 11 | 711 | 5,702 | 2,203 | YES |
| Phoenix, AZ (PHX) | Washington, DC (WAS) | Fry, 11 | 771 | 3,581 | 518 | YES |
| Phoenix, AZ (PHX) | Pittsburgh, PA (PIT) | Fry, 11 | 798 | 4,436 | 939 | YES |
| Charlotte, NC (CLT) | Phoenix, AZ (PHX) | Fry, 11 | 799 | 7,313 | 1,944 | YES |

# Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Orlando, FL (MCO) | Phoenix, AZ (PHX) | Fry, 11 | 884 | 3,903 | 381 | YES |
| Chattanooga, TN (CHA) | Phoenix, AZ (PHX) | Fry, 11 | 887 | 4,598 | 291 | YES |
| Des Moines, IA (DSM) | Phoenix, AZ (PHX) | Fry, 11 | 898 | 5,665 | 1,730 | YES |
| Chicago, IL (CHI) | Phoenix, AZ (PHX) | Fry, 11; Garavanian, 6 | 954 | 3,339 | 695 | YES |
| Charlotte, NC (CLT) | Miami, FL (MIA) | Garavnian, 6; McCarthy, 14 | 407 | 8,740 | 3,600 | YES |
| Miami, FL (MIA) | Philadelphia, PA (PHL) | Garavnian, 5, 6; McCarthy, 14; Rubinsohn, 6, 7, 19, 22 | 974 | 5,177 | 1,283 | YES |
| Boston, MA (BOS) | Huntsville, AL (HSV) | Garavnian, 7 | 65 | 4,660 | 1,245 | YES |
| Boston, MA (BOS) | Fresno, CA (FAT) | Garavnian, 7 | 124 | 4,431 | 1,130 | YES |
| Boston, MA (BOS) | Santa Barbara, CA (SBA) | Garavnian, 7 | 145 | 4,875 | 1,085 | YES |
| Boston, MA (BOS) | Tallahassee, FL (TLH) | Garavnian, 7 | 190 | 5,274 | 585 | YES |
| Boston, MA (BOS) | Gainesville, FL (GNV) | Garavnian, 7 | 223 | 5,020 | 575 | YES |
| Boston, MA (BOS) | Ontario, CA (ONT) | Garavnian, 7 | 229 | 3,489 | 1,275 | YES |
| Boston, MA (BOS) | Jackson, MS (JAN) | Garavnian, 7 | 233 | 5,138 | 1,381 | YES |
| Boston, MA (BOS) | Orange County, CA (SNA) | Garavnian, 7 | 284 | 3,245 | 805 | YES |
| Boston, MA (BOS) | Pensacola, FL (PNS) | Garavnian, 7 | 294 | 3,895 | 899 | YES |
| Boston, MA (BOS) | Monterey, CA (MRY) | Garavnian, 7 | 296 | 4,979 | 641 | YES |
| Boston, MA (BOS) | Fayetteville, AR (XNA) | Garavnian, 7 | 406 | 4,567 | 1,521 | YES |
| Boston, MA (BOS) | Fort Walton Beach, FL (VPS) | Garavnian, 7 | 412 | 5,113 | 460 | YES |
| Boston, MA (BOS) | Des Moines, IA (DSM) | Garavnian, 7 | 631 | 2,755 | 689 | YES |
| Boston, MA (BOS) | Little Rock, AR (LIT) | Garavnian, 7 | 649 | 3,089 | 735 | YES |
| Boston, MA (BOS) | Baton Rouge, LA (BTR) | Garavnian, 7 | 746 | 3,894 | 215 | YES |
| Boston, MA (BOS) | Lexington, KY (LEX) | Garavnian, 7 | 808 | 4,044 | 228 | YES |
| Boston, MA (BOS) | Louisville, KY (SDF) | Garavnian, 7 | 958 | 2,988 | 293 | YES |
| Nashville, TN (BNA) | Boston, MA (BOS) | Garavnian, 7; Talewsky, 17 | 1005 | 3,234 | 409 | YES |
| Boston, MA (BOS) | Palm Springs, CA (PSP) | Garavnian, 7; Talewsky, 17 | 275 | 3,538 | 580 | YES |
| Dallas, TX (DFW) | St. Thomas, VI (STT) | Jolly, 7 27 | 395 | 6,378 | 961 | YES |
| Dallas, TX (DFW) | West Palm Beach (PBI) | Jolly, 6, 27; Russell, 10 | 247 | 7,300 | 551 | YES |

**Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Dallas, TX (DFW) | Salt Lake City, UT (SLC) | Jolly, 6, 22, 27; McCarthy, 12; Russell, 10 | 951 | 3,964 | 651 | YES |
| Dallas, TX (DFW) | San Diego, CA (SAN) | Jolly, 7; Russell, 10 | 970 | 4,847 | 532 | YES |
| Dallas, TX (DFW) | Fort Walton Beach, FL (VPS) | Jolly, 7, 27; Russell, 10 | 582 | 8,717 | 314 | YES |
| Dallas, TX (DFW) | Seattle, WA (SEA) | Jolly, 7, 27; Russell, 8, 9, 10 | 969 | 3,968 | 280 | YES |
| Dallas, TX (DFW) | Ontario, CA (ONT) | Jolly, 6; Russell, 10 | 941 | 5,978 | 1,181 | YES |
| Dallas, TX (DFW) | Raleigh-Durham, NC (RDU) | Jolly, 7; Russell, 10 | 891 | 5,442 | 354 | YES |
| Dallas, TX (DFW) | Jacksonville, FL (JAX) | Jolly, 7; Russell, 10 | 429 | 5,863 | 503 | YES |
| Dallas, TX (DFW) | Honolulu, HI (HNL) | Jolly, 7; Russell, 8, 9 | 194 | 6,210 | 604 | YES |
| Dallas, TX (DFW) | Westchester County, NY (HPN) | Jolly, 7; Russell, 10 | 851 | 4,933 | 2,093 | YES |
| Dallas, TX (DFW) | Greenville, SC (GSP) | Jolly, 22, 26; Russell, 10 | 456 | 5,173 | 891 | YES |
| Dallas, TX (DFW) | Portland, OR (PDX) | Jolly, 7; Russell, 10 | 938 | 3,452 | 290 | YES |
| Dallas, TX (DFW) | Syracuse, NY (SYR) | Jolly, 27; Russell, 10 | 205 | 4,525 | 1,957 | YES |
| Dallas, TX (DFW) | Lexington, KY (LEX) | Jolly, 27; Russell, 10 | 352 | 6,870 | 490 | YES |
| Charleston, SC (CHS) | Dallas, TX (DFW) | Jolly, 27 | 820 | 5,563 | 2,002 | YES |
| Dallas, TX (DFW) | Philadelphia, PA (PHL) | Jolly, 27; Rubinsohn, 6, 7, 19, 20, 22; Russell, 10 | 955 | 6,967 | 2,970 | YES |
| Chicago, IL (CHI) | West Palm Beach (PBI) | Kosach, 3 | 912 | 5,333 | 777 | YES |

## Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Dallas, TX (DFW) | Fort Myers, FL (RSW) | McCarthy, 12, 13, 14; Russell, 10 | 252 | 6,841 | 739 | YES |
| Fort Myers, FL (RSW) | San Francisco, CA (SFO) | McCarthy, 12, 13, 14, 20 | 339 | 2,661 | 528 | YES |
| Fort Myers, FL (RSW) | San Diego, CA (SAN) | McCarthy, 13, 14 | 500 | 2,912 | 492 | YES |
| Fort Myers, FL (RSW) | Seattle, WA (SEA) | McCarthy, 13, 14 | 621 | 2,982 | 454 | YES |
| Atlanta, GA (ATL) | Reno, NV (RNO) | McCarthy, 13; Kosach, 3; Stansbury, 13 | 435 | 2,980 | 280 | YES |
| Fort Myers, FL (RSW) | St. Thomas, VI (STT) | McCarthy, 14 | 153 | 9,311 | 4,778 | YES |
| Little Rock, AR (LIT) | Fort Myers, FL (RSW) | McCarthy, 14 | 348 | 5,454 | 1,559 | YES |
| Los Angeles, CA (LAX) | Fort Myers, FL (RSW) | McCarthy, 14 | 424 | 2,734 | 311 | YES |
| Des Moines, IA (DSM) | Fort Myers, FL (RSW) | McCarthy, 14 | 676 | 3,843 | 420 | YES |
| Fort Myers, FL (RSW) | Fayetteville, AR (XNA) | McCarthy, 14 | 783 | 5,188 | 1,511 | YES |
| Kansas City, MO (MCI) | Fort Myers, FL (RSW) | McCarthy, 14 | 875 | 4,216 | 1,364 | YES |
| Austin, TX (AUS) | Fort Myers, FL (RSW) | McCarthy, 14 | 914 | 2,933 | 452 | YES |
| Miami, FL (MIA) | Orange County, CA (SNA) | McCarthy, 14 | 140 | 3,205 | 549 | YES |
| Jackson, MS (JAN) | Miami, FL (MIA) | McCarthy, 14 | 143 | 6,299 | 2,609 | YES |
| Harrisburg, PA (MDT) | Miami, FL (MIA) | McCarthy, 14 | 154 | 5,436 | 915 | YES |
| Durango, CO (DRO) | Miami, FL (MIA) | McCarthy, 14 | 166 | 6,946 | 3,197 | YES |
| Greensboro, NC (GSO) | Miami, FL (MIA) | McCarthy, 14 | 168 | 5,105 | 1,677 | YES |
| Fresno, CA (FAT) | Miami, FL (MIA) | McCarthy, 14 | 172 | 6,745 | 1,089 | YES |
| Miami, FL (MIA) | Ontario, CA (ONT) | McCarthy, 14 | 321 | 4,857 | 2,477 | YES |
| Grand Junction, CO (GJT) | Miami, FL (MIA) | McCarthy, 14 | 416 | 7,506 | 2,755 | YES |
| Kapaa, HI (LIH) | Miami, FL (MIA) | McCarthy, 14 | 427 | 6,176 | 1,878 | YES |
| Miami, FL (MIA) | Pensacola, FL (PNS) | McCarthy, 14 | 436 | 6,078 | 1,329 | YES |
| Hilo, HI (KOA) | Miami, FL (MIA) | McCarthy, 14 | 454 | 5,788 | 2,084 | YES |
| Honolulu, HI (HNL) | Miami, FL (MIA) | McCarthy, 14 | 502 | 3,802 | 263 | YES |
| Miami, FL (MIA) | Raleigh-Durham, NC (RDU) | McCarthy, 14 | 570 | 2,978 | 460 | YES |
| Miami, FL (MIA) | Reno, NV (RNO) | McCarthy, 14; Stansbury, 13 | 612 | 3,813 | 925 | YES |
| Miami, FL (MIA) | San Jose, CA (SJC) | McCarthy, 14 | 625 | 3,026 | 492 | YES |
| Miami, FL (MIA) | Norfolk-Virginia Beach, VA (ORF) | McCarthy, 14 | 670 | 4,055 | 1,616 | YES |
| Little Rock, AR (LIT) | Miami, FL (MIA) | McCarthy, 14 | 673 | 3,845 | 1,055 | YES |
| Miami, FL (MIA) | St. Louis, MO (STL) | McCarthy, 14 | 680 | 4,180 | 852 | YES |

## Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Miami, FL (MIA) | Washington, DC (WAS) | McCarthy, 14 | 729 | 2,993 | 763 | YES |
| Des Moines, IA (DSM) | Miami, FL (MIA) | McCarthy, 14 | 789 | 3,450 | 261 | YES |
| Columbus, OH (CMH) | Miami, FL (MIA) | McCarthy, 14 | 803 | 3,474 | 612 | YES |
| Miami, FL (MIA) | Richmond, VA (RIC) | McCarthy, 14 | 811 | 3,343 | 805 | YES |
| Miami, FL (MIA) | Salt Lake City, UT (SLC) | McCarthy, 14 | 902 | 3,194 | 481 | YES |
| Miami, FL (MIA) | Louisville, KY (SDF) | McCarthy, 14 | 943 | 3,042 | 511 | YES |
| Miami, FL (MIA) | Knoxville, TN (TYS) | McCarthy, 14 | 946 | 3,522 | 622 | YES |
| Indianapolis, IN (IND) | Miami, FL (MIA) | McCarthy, 14 | 947 | 3,052 | 309 | YES |
| Miami, FL (MIA) | San Diego, CA (SAN) | McCarthy, 14 | 961 | 3,357 | 1,116 | YES |
| Las Vegas, NV (LAS) | Miami, FL (MIA) | McCarthy, 14 | 983 | 3,155 | 273 | YES |
| Charleston, SC (CHS) | Miami, FL (MIA) | McCarthy, 14 | 1000 | 4,248 | 996 | YES |
| Miami, FL (MIA) | Sacramento, CA (SMF) | McCarthy, 14 | 515 | 2,775 | 546 | YES |
| Miami, FL (MIA) | Palm Springs, CA (PSP) | McCarthy, 14; Talewsky, 17 | 264 | 5,530 | 771 | YES |
| Chicago, IL (CHI) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 317 | 3,958 | 1,289 | YES |
| Philadelphia, PA (PHL) | San Diego, CA (SAN) | Rubinsohn, 6, 7 | 490 | 5,861 | 2,211 | YES |
| Los Angeles, CA (LAX) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7, 22 | 668 | 5,350 | 1,779 | YES |
| Indianapolis, IN (IND) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 200 | 7,710 | 1,413 | YES |
| Philadelphia, PA (PHL) | St. Louis, MO (STL) | Rubinsohn, 6, 7 | 70 | 4,756 | 466 | YES |
| Albuquerque, NM (ABQ) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 53 | 3,518 | 1,125 | YES |
| Philadelphia, PA (PHL) | St. Croix, VI (STX) | Rubinsohn, 22 | 68 | 9,230 | 1,466 | YES |
| Philadelphia, PA (PHL) | Orange County, CA (SNA) | Rubinsohn, 22 | 99 | 3,930 | 1,748 | YES |
| Philadelphia, PA (PHL) | St. Thomas, VI (STT) | Rubinsohn, 22 | 268 | 8,138 | 1,857 | YES |
| Kahului, HI (OGG) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 368 | 5,674 | 1,734 | YES |
| Austin, TX (AUS) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 390 | 4,944 | 2,905 | YES |
| Key West, FL (EYW) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 439 | 7,227 | 4,878 | YES |
| Philadelphia, PA (PHL) | San Antonio, TX (SAT) | Rubinsohn, 22 | 553 | 3,233 | 1,168 | YES |
| Philadelphia, PA (PHL) | Seattle, WA (SEA) | Rubinsohn, 22 | 674 | 3,965 | 324 | YES |
| Philadelphia, PA (PHL) | San Jose, CA (SJC) | Rubinsohn, 22 | 739 | 3,539 | 1,090 | YES |
| Dallas, TX (DFW) | Palm Springs, CA (PSP) | Rubinsohn, 19, 20; Russell, 10 | 271 | 9,319 | 2,846 | YES |
| New Orleans, LA (MSY) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 928 | 4,442 | 915 | YES |
| Dallas, TX (DFW) | Harrisburg, PA (MDT) | Russell, 10 | 6 | 5,306 | 2,747 | YES |
| Dallas, TX (DFW) | Kapaa, HI (LIH) | Russell, 10 | 38 | 7,072 | 947 | YES |

## Table A - Presumptively Illegal City-Pairs and Plaintiffs' Travel

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? |
|---|---|---|---|---|---|---|
| Dallas, TX (DFW) | Santa Barbara, CA (SBA) | Russell, 10 | 52 | 8,507 | 4,578 | YES |
| Dallas, TX (DFW) | Hilo, HI (KOA) | Russell, 10 | 59 | 5,914 | 1,126 | YES |
| Dallas, TX (DFW) | Greensboro, NC (GSO) | Russell, 10 | 81 | 7,286 | 2,790 | YES |
| Dallas, TX (DFW) | Durango, CO (DRO) | Russell, 10 | 82 | 9,381 | 5,693 | YES |
| Dallas, TX (DFW) | Louisville, KY (SDF) | Russell, 10; Stansbury, 16 | 84 | 6,929 | 967 | YES |
| Dallas, TX (DFW) | Montgomery, AL (MGM) | Russell, 10 | 151 | 7,964 | 511 | YES |
| Dallas, TX (DFW) | Fresno, CA (FAT) | Russell, 10 | 214 | 8,591 | 3,029 | YES |
| Dallas, TX (DFW) | Knoxville, TN (TYS) | Russell, 10 | 236 | 7,575 | 1,533 | YES |
| Dallas, TX (DFW) | Tallahassee, FL (TLH) | Russell, 10 | 241 | 7,565 | 3,220 | YES |
| Dallas, TX (DFW) | Monterey, CA (MRY) | Russell, 10 | 274 | 7,329 | 2,861 | YES |
| Columbia, SC (CAE) | Dallas, TX (DFW) | Russell, 10 | 302 | 7,118 | 1,750 | YES |
| Dallas, TX (DFW) | Grand Junction, CO (GJT) | Russell, 10 | 313 | 9,195 | 3,034 | YES |
| Dallas, TX (DFW) | Rochester, NY (ROC) | Russell, 10 | 346 | 3,438 | 673 | YES |
| Buffalo, NY (BUF) | Dallas, TX (DFW) | Russell, 10 | 443 | 2,846 | 399 | YES |
| Hartford, CT (BDL) | Dallas, TX (DFW) | Russell, 10 | 543 | 6,344 | 646 | YES |
| Dallas, TX (DFW) | Norfolk-Virginia Beach, VA (ORF) | Russell, 10 | 609 | 5,979 | 2,144 | YES |
| Dallas, TX (DFW) | Savannah, GA (SAV) | Russell, 10 | 628 | 7,055 | 2,077 | YES |
| Dallas, TX (DFW) | Richmond, VA (RIC) | Russell, 10 | 647 | 5,669 | 446 | YES |
| Charlottesville, VA (CHO) | Dallas, TX (DFW) | Russell, 10 | 732 | 6,189 | 3,086 | YES |
| Dallas, TX (DFW) | Sacramento, CA (SMF) | Russell, 10 | 751 | 5,376 | 972 | YES |
| Charleston, WV (CRW) | Dallas, TX (DFW) | Russell, 10 | 11 | 4,275 | 376 | YES |
| Dallas, TX (DFW) | Huntsville, AL (HSV) | Russell, 10 | 825 | 7,305 | 507 | YES |
| Cleveland, OH (CLE) | Dallas, TX (DFW) | Russell, 10 | 980 | 5,198 | 1,976 | YES |
| Columbus, OH (CMH) | Reno, NV (RNO) | Stansbury, 12, 13, 14 | 487 | 4,058 | 454 | YES |
| Reno, NV (RNO) | Washington, DC (WAS) | Stansbury, 13, 14 | 671 | 2,826 | 478 | YES |

TABLE B

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Harrisburg, PA (MDT) | Russell, 10 | 6 | 5,306 | 2,747 | YES | 45,260 | $211.90 | 21,810 | $367.83 | 73.6% |
| Phoenix, AZ (PHX) | Fry, 11 | 9 | 4,819 | 944 | YES | 27,730 | $227.82 | 17,080 | $345.57 | 51.7% |
| #REF! | Russell, 10 | 11 | 4,275 | 376 | YES | 15,050 | $238.04 | 11,140 | $355.43 | 49.3% |
| Phoenix, AZ (PHX) | Fry, 11 | 12 | 5,644 | 2,318 | YES | 25,610 | $223.05 | 18,250 | $329.79 | 47.8% |
| Knoxville, TN (TYS) | Fry, 11 | 21 | 3,665 | 958 | YES | 25,640 | $229.20 | 21,780 | $326.90 | 42.6% |
| Tucson, AZ (TUS) | Fry, 10 | 33 | 8,116 | 2,618 | YES | 6,190 | $203.87 | 4,900 | $281.70 | 38.2% |
| Kapaa, HI (LIH) | Russell, 10 | 38 | 7,072 | 947 | YES | 22,400 | $366.37 | 21,650 | $503.17 | 37.3% |
| Phoenix, AZ (PHX) | Fry, 11; Talewsky, 17 | 43 | 4,121 | 1,781 | YES | 35,930 | $213.26 | 34,560 | $287.46 | 34.8% |
| Phoenix, AZ (PHX) | Fry, 11 | 44 | 6,183 | 2,359 | YES | 2,480 | $278.61 | 3,050 | $375.55 | 34.8% |
| Savannah, GA (SAV) | Fry, 11 | 47 | 4,294 | 620 | YES | 21,360 | $237.71 | 21,050 | $318.91 | 34.2% |
| Santa Barbara, CA (SBA) | Russell, 10 | 52 | 8,507 | 4,578 | YES | 23,990 | $222.49 | 26,570 | $295.70 | 32.9% |
| Philadelphia, PA (PHL) | Rubinsohn, 22 | 53 | 3,518 | 1,125 | YES | 57,470 | $195.08 | 41,470 | $258.93 | 32.7% |
| Hilo, HI (KOA) | Russell, 10 | 59 | 5,914 | 1,126 | YES | 14,980 | $390.32 | 19,450 | $514.81 | 31.9% |
| Huntsville, AL (HSV) | Garavnian, 7 | 65 | 4,660 | 1,245 | YES | 27,840 | $246.52 | 20,020 | $324.46 | 31.6% |
| St. Croix, VI (STX) | Rubinsohn, 22 | 68 | 9,230 | 1,466 | YES | 3,900 | $291.17 | 4,820 | $382.47 | 31.4% |
| St. Louis, MO (STL) | Rubinsohn, 6, 7 | 70 | 4,756 | 466 | YES | 222,140 | $182.83 | 195,920 | $239.19 | 30.8% |
| Palm Springs, CA (PSP) | Freeland, 2 | 77 | 3,452 | 755 | YES | 16,920 | $239.26 | 18,610 | $310.76 | 29.9% |
| Syracuse, NY (SYR) | Fry, 11 | 79 | 3,937 | 1,133 | YES | 32,040 | $239.19 | 28,980 | $310.41 | 29.8% |
| Greensboro, NC (GSO) | Russell, 10 | 81 | 7,286 | 2,790 | YES | 57,770 | $249.61 | 44,670 | $323.69 | 29.7% |
| Durango, CO (DRO) | Russell, 10 | 82 | 9,381 | 5,693 | YES | 22,300 | $195.19 | 29,650 | $253.01 | 29.6% |
| Phoenix, AZ (PHX) | Fry, 11 | 83 | 4,247 | 1,771 | YES | 14,710 | $258.61 | 11,510 | $335.10 | 29.6% |
| Louisville, KY (SDF) | Russell, 10; Stansbury, 16 | 84 | 6,929 | 967 | YES | 114,800 | $209.05 | 107,320 | $270.72 | 29.5% |
| Tucson, AZ (TUS) | Fry, 5, 10 | 98 | 3,980 | 1,053 | YES | 112,700 | $211.67 | 102,800 | $271.80 | 28.4% |
| Orange County, CA (SNA) | Rubinsohn, 22 | 99 | 3,930 | 1,748 | YES | 88,100 | $236.54 | 72,660 | $303.64 | 28.4% |
| Tucson, AZ (TUS) | Fry, 10; Jolly, 7; Russell, 10; Talewsky, 15 | 104 | 8,521 | 1,949 | YES | 102,940 | $196.78 | 92,300 | $252.02 | 28.1% |
| Phoenix, AZ (PHX) | Fry, 11 | 118 | 3,226 | 681 | YES | 30,000 | $202.45 | 29,080 | $256.34 | 26.6% |
| Fresno, CA (FAT) | Garavnian, 7 | 124 | 4,431 | 1,130 | YES | 14,880 | $256.82 | 13,170 | $324.12 | 26.2% |
| Orange County, CA (SNA) | McCarthy, 14 | 140 | 3,205 | 549 | YES | 63,380 | $238.57 | 59,750 | $298.01 | 24.9% |
| Miami, FL (MIA) | McCarthy, 14 | 143 | 6,299 | 2,609 | YES | 20,090 | $241.07 | 14,650 | $300.99 | 24.9% |
| Santa Barbara, CA (SBA) | Garavnian, 7 | 145 | 4,875 | 1,085 | YES | 17,670 | $290.04 | 16,480 | $361.68 | 24.7% |
| Phoenix, AZ (PHX) | Fry, 11 | 150 | 3,619 | 690 | YES | 19,860 | $271.28 | 19,570 | $336.65 | 24.0% |
| Montgomery, AL (MGM) | Russell, 10 | 151 | 7,964 | 511 | YES | 23,610 | $213.43 | 17,800 | $264.71 | 24.0% |
| Fort Myers, FL (RSW) | Fry, 11; McCarthy, 14 | 152 | 2,894 | 889 | YES | 44,310 | $213.87 | 48,210 | $265.21 | 24.0% |
| St. Thomas, VI (STT) | McCarthy, 14 | 153 | 9,311 | 4,778 | YES | 550 | $312.80 | 370 | $387.34 | 23.8% |
| Miami, FL (MIA) | McCarthy, 14 | 154 | 5,436 | 915 | YES | 25,080 | $217.93 | 15,030 | $269.42 | 23.6% |
| Miami, FL (MIA) | McCarthy, 14 | 166 | 6,946 | 3,197 | YES | 2,650 | $276.84 | 3,500 | $340.48 | 23.0% |
| Miami, FL (MIA) | McCarthy, 14 | 168 | 5,105 | 1,677 | YES | 62,940 | $167.45 | 56,950 | $205.73 | 22.9% |

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Miami, FL (MIA) | McCarthy, 14 | 172 | 6,745 | 1,089 | YES | 8,870 | $268.53 | 11,000 | $328.85 | 22.5% |
| Tucson, AZ (TUS) | Fry, 10 | 176 | 3,944 | 1,541 | YES | 23,620 | $211.76 | 18,200 | $258.35 | 22.0% |
| Tucson, AZ (TUS) | Fry, 10 | 178 | 3,991 | 578 | YES | 2,070 | $320.03 | 3,570 | $390.13 | 21.9% |
| Phoenix, AZ (PHX) | Fry, 11 | 179 | 4,524 | 1,707 | YES | 10,380 | $229.66 | 8,880 | $279.93 | 21.9% |
| Phoenix, AZ (PHX) | Fry, 11 | 180 | 5,045 | 733 | YES | 4,840 | $288.72 | 3,950 | $351.46 | 21.7% |
| Richmond, VA (RIC) | Fry, 11 | 189 | 3,655 | 1,228 | YES | 49,590 | $223.35 | 54,640 | $270.83 | 21.3% |
| Tallahassee, FL (TLH) | Garavnian, 7 | 190 | 5,274 | 585 | YES | 15,290 | $240.66 | 13,670 | $291.80 | 21.2% |
| Honolulu, HI (HNL) | Jolly, 7; Russell, 8, 9 | 194 | 6,210 | 604 | YES | 105,330 | $416.33 | 117,710 | $504.25 | 21.1% |
| Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 200 | 7,710 | 1,413 | YES | 160,630 | $234.07 | 137,650 | $281.81 | 20.4% |
| Washington, DC (WAS) | Fry, 10 | 201 | 3,785 | 731 | YES | 156,060 | $242.07 | 125,600 | $291.41 | 20.4% |
| Raleigh-Durham, NC (RDU) | Fry, 11 | 203 | 3,355 | 335 | YES | 121,520 | $204.94 | 139,070 | $246.38 | 20.2% |
| Syracuse, NY (SYR) | Jolly, 27; Russell, 10 | 205 | 4,525 | 1,957 | YES | 37,730 | $248.22 | 39,730 | $298.38 | 20.2% |
| Fresno, CA (FAT) | Russell, 10 | 214 | 8,591 | 3,029 | YES | 41,580 | $252.28 | 44,030 | $302.29 | 19.8% |
| Phoenix, AZ (PHX) | Fry, 11 | 216 | 2,939 | 621 | YES | 56,310 | $221.31 | 64,190 | $264.92 | 19.7% |
| Phoenix, AZ (PHX) | Fry, 11 | 219 | 3,471 | 505 | YES | 6,470 | $257.56 | 6,730 | $307.95 | 19.6% |
| Gainesville, FL (GNV) | Garavnian, 7 | 223 | 5,020 | 575 | YES | 13,090 | $194.72 | 12,130 | $232.57 | 19.4% |
| Ontario, CA (ONT) | Garavnian, 7 | 229 | 3,489 | 1,275 | YES | 31,350 | $250.45 | 24,250 | $297.94 | 19.0% |
| Jackson, MS (JAN) | Garavnian, 7 | 233 | 5,138 | 1,381 | YES | 15,130 | $270.86 | 13,050 | $320.62 | 18.4% |
| Phoenix, AZ (PHX) | Fry, 11 | 235 | 3,183 | 635 | YES | 43,790 | $230.48 | 47,710 | $272.55 | 18.3% |
| Knoxville, TN (TYS) | Russell, 10 | 236 | 7,575 | 1,533 | YES | 56,290 | $241.96 | 62,100 | $285.86 | 18.1% |
| Tucson, AZ (TUS) | Fry, 10 | 237 | 2,989 | 771 | YES | 42,430 | $216.11 | 31,360 | $254.48 | 17.8% |
| Tallahassee, FL (TLH) | Russell, 10 | 241 | 7,565 | 3,220 | YES | 19,020 | $237.32 | 22,600 | $279.22 | 17.7% |
| West Palm Beach (PBI) | Jolly, 6, 27; Russell, 10 | 247 | 7,300 | 551 | YES | 84,390 | $216.14 | 87,890 | $253.93 | 17.5% |
| Tallahassee, FL (TLH) | Fry, 11 | 249 | 5,060 | 558 | YES | 6,610 | $282.04 | 7,350 | $331.28 | 17.5% |
| Fort Myers, FL (RSW) | McCarthy, 12, 13, 14; Russell, 10 | 252 | 6,841 | 739 | YES | 83,010 | $218.07 | 105,030 | $255.80 | 17.3% |
| Phoenix, AZ (PHX) | Brito, 6; Fry, 11; Garavanian, 6,7; Talewsky, 11 | 263 | 5,207 | 2,207 | YES | 368,400 | $211.89 | 432,550 | $247.51 | 16.8% |
| Palm Springs, CA (PSP) | McCarthy, 14; Talewsky, 17 | 264 | 5,530 | 771 | YES | 12,070 | $275.37 | 15,500 | $321.22 | 16.7% |
| Phoenix, AZ (PHX) | Fry, 11 | 266 | 4,430 | 851 | YES | 36,200 | $340.36 | 41,600 | $396.67 | 16.5% |
| St. Thomas, VI (STT) | Rubinsohn, 22 | 268 | 8,138 | 1,857 | YES | 33,560 | $339.02 | 9,750 | $395.00 | 16.5% |
| Palm Springs, CA (PSP) | Rubinsohn, 19, 20; Russell, 10 | 271 | 9,319 | 2,846 | YES | 34,020 | $249.02 | 40,520 | $289.87 | 16.4% |
| Monterey, CA (MRY) | Russell, 10 | 274 | 7,329 | 2,861 | YES | 9,700 | $237.07 | 8,370 | $275.53 | 16.2% |
| Palm Springs, CA (PSP) | Garavnian, 7; Talewsky, 17 | 275 | 3,538 | 580 | YES | 19,970 | $259.46 | 27,460 | $301.45 | 16.2% |
| Tucson, AZ (TUS) | Fry, 10 | 276 | 7,816 | 2,413 | YES | 3,890 | $211.27 | 3,160 | $245.40 | 16.2% |

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI >200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Orange County, CA (SNA) | Garavnian, 7 | 284 | 3,245 | 805 | YES | 66,740 | $264.69 | 53,970 | $306.50 | 15.8% |
| Phoenix, AZ (PHX) | Fry, 11 | 286 | 9,493 | 558 | YES | 54,680 | $165.82 | 69,250 | $191.83 | 15.7% |
| Tucson, AZ (TUS) | Fry, 10 | 288 | 3,964 | 1,212 | YES | 37,200 | $172.18 | 30,840 | $198.97 | 15.6% |
| Pensacola, FL (PNS) | Garavnian, 7 | 294 | 3,895 | 899 | YES | 26,500 | $220.42 | 25,270 | $254.36 | 15.4% |
| Monterey, CA (MRY) | Garavnian, 7 | 296 | 4,979 | 641 | YES | 6,440 | $311.15 | 4,920 | $358.93 | 15.4% |
| Dallas, TX (DFW) | Russell, 10 | 302 | 7,118 | 1,750 | YES | 46,560 | $243.91 | 38,360 | $280.94 | 15.2% |
| Tucson, AZ (TUS) | Fry, 10 | 308 | 5,734 | 2,741 | YES | 22,730 | $221.60 | 20,720 | $254.19 | 14.7% |
| Grand Junction, CO (GJT) | Russell, 10 | 313 | 9,195 | 3,034 | YES | 16,340 | $237.47 | 20,210 | $272.16 | 14.6% |
| Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 317 | 3,958 | 1,289 | YES | 911,360 | $197.03 | 930,380 | $225.46 | 14.4% |
| Ontario, CA (ONT) | McCarthy, 14 | 321 | 4,857 | 2,477 | YES | 30,310 | $232.97 | 28,090 | $266.35 | 14.3% |
| Reno, NV (RNO) | Brito, 6; Jolly, 7, 27; Russell, 10; Stansbury 13 | 331 | 6,267 | 1,112 | YES | 79,820 | $207.38 | 100,390 | $235.96 | 13.8% |
| San Francisco, CA (SFO) | McCarthy, 12, 13, 14, 20 | 339 | 2,661 | 528 | YES | 48,230 | $267.70 | 47,930 | $303.87 | 13.5% |
| Rochester, NY (ROC) | Russell, 10 | 346 | 3,438 | 673 | YES | 41,890 | $232.76 | 47,720 | $263.74 | 13.3% |
| Fort Myers, FL (RSW) | McCarthy, 14 | 348 | 5,454 | 1,559 | YES | 6,400 | $236.19 | 7,630 | $267.50 | 13.3% |
| Lexington, KY (LEX) | Jolly, 27; Russell, 10 | 352 | 6,870 | 490 | YES | 31,260 | $255.41 | 35,060 | $288.90 | 13.1% |
| Philadelphia, PA (PHL) | Rubinsohn, 22 | 368 | 5,674 | 1,734 | YES | 14,930 | $504.39 | 17,880 | $567.30 | 12.5% |
| Tucson, AZ (TUS) | Fry,5, 10 | 370 | 4,711 | 703 | YES | 154,000 | $209.19 | 136,480 | $235.15 | 12.4% |
| Tucson, AZ (TUS) | Fry, 10 | 379 | 5,581 | 1,949 | YES | 2,830 | $373.51 | 3,670 | $418.84 | 12.1% |
| Phoenix, AZ (PHX) | Fry, 11 | 386 | 6,368 | 1,237 | YES | 7,990 | $262.49 | 10,580 | $293.31 | 11.7% |
| Philadelphia, PA (PHL) | Rubinsohn, 22 | 390 | 4,944 | 2,905 | YES | 120,980 | $199.88 | 193,800 | $222.81 | 11.5% |
| Phoenix, AZ (PHX) | Fry, 11 | 392 | 3,090 | 869 | YES | 84,730 | $242.57 | 92,130 | $270.25 | 11.4% |
| St. Thomas, VI (STT) | Jolly, 7 27 | 395 | 6,378 | 961 | YES | 24,950 | $295.19 | 18,500 | $328.70 | 11.4% |
| Tucson, AZ (TUS) | Fry, 10 | 399 | 7,922 | 2,445 | YES | 7,150 | $196.10 | 7,140 | $217.90 | 11.1% |
| Tucson, AZ (TUS) | Fry, 10 | 403 | 4,543 | 1,205 | YES | 4,030 | $371.16 | 6,080 | $412.36 | 11.1% |
| Fayetteville, AR (XNA) | Garavnian, 7 | 406 | 4,567 | 1,521 | YES | 15,280 | $309.01 | 20,770 | $343.12 | 11.0% |
| Miami, FL (MIA) | Garavnian, 6; McCarthy, 14 | 407 | 8,740 | 3,600 | YES | 277,170 | $209.02 | 310,530 | $232.02 | 11.0% |
| Fort Walton Beach, FL (VPS) | Garavnian, 7 | 412 | 5,113 | 460 | YES | 13,430 | $243.54 | 14,760 | $269.71 | 10.7% |
| Miami, FL (MIA) | McCarthy, 14 | 416 | 7,506 | 2,755 | YES | 3,580 | $299.44 | 4,200 | $331.30 | 10.6% |
| Phoenix, AZ (PHX) | Fry, 11; Stansbury, 16 | 421 | 4,621 | 1,115 | YES | 78,830 | $338.21 | 101,850 | $373.56 | 10.5% |
| Fort Myers, FL (RSW) | McCarthy, 14 | 424 | 2,734 | 311 | YES | 55,460 | $257.73 | 57,640 | $284.37 | 10.3% |
| Miami, FL (MIA) | McCarthy, 14 | 427 | 6,176 | 1,878 | YES | 1,600 | $531.38 | 2,320 | $585.88 | 10.3% |
| Jacksonville, FL (JAX) | Jolly, 7; Russell, 10 | 429 | 5,863 | 503 | YES | 160,910 | $222.79 | 178,000 | $245.52 | 10.2% |
| Reno, NV (RNO) | McCarthy, 13; Kosach, 3; Stansbury, 13 | 435 | 2,980 | 280 | YES | 34,840 | $253.16 | 44,480 | $278.67 | 10.1% |
| Pensacola, FL (PNS) | McCarthy, 14 | 436 | 6,078 | 1,329 | YES | 51,710 | $207.60 | 55,240 | $228.52 | 10.1% |

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Tucson, AZ (TUS) | Fry, 10 | 437 | 3,441 | 1,527 | YES | 26,950 | $186.79 | 27,510 | $205.59 | 10.1% |
| Tucson, AZ (TUS) | Fry, 10; Rubinsohn, 7, 22 | 438 | 5,160 | 2,532 | YES | 37,160 | $257.26 | 37,460 | $282.96 | 10.0% |
| Philadelphia, PA (PHL) | Rubinsohn, 22 | 439 | 7,227 | 4,878 | YES | 27,980 | $233.90 | 29,470 | $257.10 | 9.9% |
| Dallas, TX (DFW) | Russell, 10 | 443 | 2,846 | 399 | YES | 90,840 | $192.06 | 88,010 | $210.95 | 9.8% |
| Miami, FL (MIA) | McCarthy, 14 | 454 | 5,788 | 2,084 | YES | 2,040 | $535.19 | 4,440 | $585.80 | 9.5% |
| Greenville, SC (GSP) | Jolly, 22, 26; Russell, 10 | 456 | 5,173 | 891 | YES | 69,040 | $222.24 | 78,050 | $243.16 | 9.4% |
| Tucson, AZ (TUS) | Fry, 10 | 463 | 4,409 | 458 | YES | 46,310 | $241.17 | 43,140 | $263.56 | 9.3% |
| Phoenix, AZ (PHX) | Fry, 11; Rubinsohn, 6, 7, 19, 20 | 474 | 6,535 | 1,375 | YES | 323,350 | $229.55 | 389,370 | $250.33 | 9.1% |
| Reno, NV (RNO) | Stansbury, 12, 13, 14 | 487 | 4,058 | 454 | YES | 12,960 | $251.27 | 15,480 | $272.74 | 8.5% |
| San Diego, CA (SAN) | Rubinsohn, 6, 7 | 490 | 5,861 | 2,211 | YES | 230,920 | $267.65 | 262,830 | $290.43 | 8.5% |
| San Diego, CA (SAN) | McCarthy, 13, 14 | 500 | 2,912 | 492 | YES | 25,400 | $256.89 | 30,170 | $278.08 | 8.2% |
| Miami, FL (MIA) | McCarthy, 14 | 502 | 3,802 | 263 | YES | 21,020 | $529.70 | 33,760 | $573.15 | 8.2% |
| Tucson, AZ (TUS) | Fry, 10 | 510 | 3,410 | 909 | YES | 17,400 | $223.94 | 18,110 | $241.71 | 7.9% |
| Sacramento, CA (SMF) | McCarthy, 14 | 515 | 2,775 | 546 | YES | 58,860 | $254.76 | 72,910 | $274.33 | 7.7% |
| San Juan, PR (SJU) | Fry, 11 | 527 | 3,843 | 1,171 | YES | 33,530 | $267.00 | 35,930 | $286.39 | 7.3% |
| Dallas, TX (DFW) | Russell, 10 | 543 | 6,344 | 646 | YES | 128,390 | $276.67 | 119,220 | $295.87 | 6.9% |
| San Antonio, TX (SAT) | Rubinsohn, 22 | 553 | 3,233 | 1,168 | YES | 111,790 | $200.35 | 134,540 | $213.40 | 6.5% |
| Phoenix, AZ (PHX) | Fry, 11 | 556 | 4,522 | 1,046 | YES | 46,800 | $350.23 | 54,700 | $372.90 | 6.5% |
| Raleigh-Durham, NC (RDU) | McCarthy, 14 | 570 | 2,978 | 460 | YES | 329,350 | $139.26 | 446,860 | $147.59 | 6.0% |
| Phoenix, AZ (PHX) | Fry, 11 | 573 | 4,167 | 849 | YES | 8,730 | $313.49 | 10,580 | $332.05 | 5.9% |
| Fort Walton Beach, FL (VPS) | Jolly, 7, 27; Russell, 10 | 582 | 8,717 | 314 | YES | 64,720 | $201.79 | 80,620 | $212.84 | 5.5% |
| Phoenix, AZ (PHX) | Fry, 11 | 588 | 9,635 | 1,148 | YES | 26,760 | $173.08 | 40,660 | $182.34 | 5.3% |
| Tucson, AZ (TUS) | Fry, 10 | 589 | 6,046 | 1,401 | YES | 49,870 | $252.87 | 55,730 | $266.39 | 5.3% |
| Fort Walton Beach, FL (VPS) | Fry, 11 | 601 | 4,054 | 1,145 | YES | 10,620 | $256.06 | 11,780 | $268.60 | 4.9% |
| Norfolk-Virginia Beach, VA (ORF) | Russell, 10 | 609 | 5,979 | 2,144 | YES | 83,740 | $242.64 | 103,520 | $254.25 | 4.8% |
| Reno, NV (RNO) | McCarthy, 14; Stansbury, 13 | 612 | 3,813 | 925 | YES | 25,590 | $265.33 | 33,320 | $277.86 | 4.7% |
| Seattle, WA (SEA) | McCarthy, 13, 14 | 621 | 2,982 | 454 | YES | 33,280 | $269.24 | 39,810 | $280.86 | 4.3% |
| San Jose, CA (SJC) | McCarthy, 14 | 625 | 3,026 | 492 | YES | 35,470 | $241.17 | 40,960 | $251.15 | 4.1% |
| St. Louis, MO (STL) | Fjord, 2, 3 | 627 | 4,113 | 1,432 | YES | 62,200 | $238.16 | 68,050 | $247.91 | 4.1% |
| Savannah, GA (SAV) | Russell, 10 | 628 | 7,055 | 2,077 | YES | 47,700 | $246.95 | 60,730 | $256.94 | 4.0% |
| Des Moines, IA (DSM) | Garavnian, 7 | 631 | 2,755 | 689 | YES | 32,600 | $246.24 | 37,290 | $255.50 | 3.8% |
| Tucson, AZ (TUS) | Fry, 10 | 640 | 4,249 | 1,311 | YES | 27,680 | $212.46 | 28,180 | $219.96 | 3.5% |
| Phoenix, AZ (PHX) | Brito, 6; Fry, 11; McCarthy 14; Talewsky, 17 | 645 | 4,184 | 1,518 | YES | 237,460 | $231.85 | 319,770 | $239.53 | 3.3% |
| Richmond, VA (RIC) | Russell, 10 | 647 | 5,669 | 446 | YES | 107,930 | $271.95 | 120,830 | $280.70 | 3.2% |
| Little Rock, AR (LIT) | Garavnian, 7 | 649 | 3,089 | 735 | YES | 22,150 | $265.69 | 27,120 | $273.99 | 3.1% |

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Philadelphia, PA (PHL) | Rubinsohn, 6, 7, 22 | 668 | 5,350 | 1,779 | YES | 662,540 | $245.66 | 798,820 | $251.14 | 2.2% |
| Norfolk-Virginia Beach, VA (ORF) | McCarthy, 14 | 670 | 4,055 | 1,616 | YES | 96,270 | $183.72 | 116,430 | $187.42 | 2.0% |
| Washington, DC (WAS) | Stansbury, 13, 14 | 671 | 2,826 | 478 | YES | 76,330 | $268.79 | 87,260 | $274.15 | 2.0% |
| Tampa, FL (TPA) | Fry, 11 | 672 | 4,246 | 748 | YES | 167,370 | $215.07 | 214,360 | $219.35 | 2.0% |
| Miami, FL (MIA) | McCarthy, 14 | 673 | 3,845 | 1,055 | YES | 31,410 | $240.86 | 32,290 | $245.17 | 1.8% |
| Seattle, WA (SEA) | Rubinsohn, 22 | 674 | 3,965 | 324 | YES | 213,030 | $267.70 | 256,480 | $272.39 | 1.8% |
| Fort Myers, FL (RSW) | McCarthy, 14 | 676 | 3,843 | 420 | YES | 17,250 | $224.67 | 17,570 | $228.53 | 1.7% |
| Tucson, AZ (TUS) | Fry, 10; Garavanian, 7; Talewsky, 15, 17 | 679 | 4,205 | 986 | YES | 43,000 | $275.14 | 51,290 | $279.43 | 1.6% |
| St. Louis, MO (STL) | McCarthy, 14 | 680 | 4,180 | 852 | YES | 253,170 | $181.97 | 275,990 | $184.78 | 1.5% |
| Tucson, AZ (TUS) | Fry, 10 | 684 | 3,955 | 1,001 | YES | 9,340 | $388.81 | 13,720 | $394.27 | 1.4% |
| St. Thomas, VI (STT) | Fry, 11 | 711 | 5,702 | 2,203 | YES | 4,280 | $369.48 | 3,660 | $370.41 | 0.3% |
| Washington, DC (WAS) | McCarthy, 14 | 729 | 2,993 | 763 | YES | 1,983,830 | $137.52 | 2,435,220 | $136.87 | -0.5% |
| Dallas, TX (DFW) | Russell, 10 | 732 | 6,189 | 3,086 | YES | 14,120 | $222.37 | 18,990 | $221.02 | -0.6% |
| San Jose, CA (SJC) | Rubinsohn, 22 | 739 | 3,539 | 1,090 | YES | 37,260 | $279.27 | 54,200 | $277.10 | -0.8% |
| Baton Rouge, LA (BTR) | Garavanian, 7 | 746 | 3,894 | 215 | YES | 12,910 | $247.56 | 10,610 | $244.79 | -1.1% |
| Sacramento, CA (SMF) | Russell, 10 | 751 | 5,376 | 972 | YES | 150,820 | $242.98 | 208,830 | $239.34 | -1.5% |
| Tucson, AZ (TUS) | Fry, 10 | 757 | 3,602 | 1,132 | YES | 21,170 | $248.76 | 25,090 | $244.52 | -1.7% |
| Washington, DC (WAS) | Fry, 11 | 771 | 3,581 | 518 | YES | 548,950 | $267.79 | 691,080 | $261.55 | -2.3% |
| Fayetteville, AR (XNA) | McCarthy, 14 | 783 | 5,188 | 1,511 | YES | 3,920 | $283.60 | 5,590 | $275.78 | -2.8% |
| Reno, NV (RNO) | Brito, 20; Garavanian, 6, 7; Stansbury, 13 | 785 | 2,676 | 523 | YES | 31,310 | $274.73 | 42,850 | $266.94 | -2.8% |
| Miami, FL (MIA) | McCarthy, 14 | 789 | 3,450 | 261 | YES | 34,020 | $229.96 | 38,810 | $223.07 | -3.0% |
| Tucson, AZ (TUS) | Fry, 10 | 792 | 6,370 | 3,165 | YES | 8,840 | $213.93 | 10,120 | $207.46 | -3.0% |
| Pittsburgh, PA (PIT) | Fry, 11 | 798 | 4,436 | 939 | YES | 159,290 | $219.68 | 184,550 | $212.43 | -3.3% |
| Phoenix, AZ (PHX) | Fry, 11 | 799 | 7,313 | 1,944 | YES | 134,030 | $281.57 | 206,810 | $272.27 | -3.3% |
| Miami, FL (MIA) | McCarthy, 14 | 803 | 3,474 | 612 | YES | 212,220 | $165.39 | 243,790 | $159.78 | -3.4% |
| Lexington, KY (LEX) | Garavanian, 7 | 808 | 4,044 | 228 | YES | 10,010 | $294.93 | 14,350 | $283.78 | -3.8% |
| Richmond, VA (RIC) | McCarthy, 14 | 811 | 3,343 | 805 | YES | 131,380 | $163.14 | 184,730 | $156.59 | -4.0% |
| Dallas, TX (DFW) | Jolly, 27 | 820 | 5,563 | 2,002 | YES | 66,670 | $215.71 | 119,480 | $205.95 | -4.5% |
| Huntsville, AL (HSV) | Russell, 10 | 825 | 7,305 | 507 | YES | 31,700 | $332.68 | 39,420 | $317.11 | -4.7% |
| Tucson, AZ (TUS) | Fry, 10 | 828 | 3,709 | 1,080 | YES | 25,240 | $240.67 | 27,150 | $229.19 | -4.8% |
| Tucson, AZ (TUS) | Fry, 10 | 830 | 3,653 | 1,275 | YES | 30,740 | $251.04 | 37,090 | $238.99 | -4.8% |
| Tucson, AZ (TUS) | Fry, 10 | 840 | 4,775 | 1,488 | YES | 24,290 | $211.16 | 28,240 | $199.90 | -5.3% |
| Westchester County, NY (HPN) | Jolly, 7; Russell, 10 | 851 | 4,933 | 2,093 | YES | 24,430 | $249.70 | 10,950 | $233.88 | -6.3% |
| Dallas, TX (DFW) | Davis, 2; Jolly, 6, 22; Russell, 10 | 855 | 7,589 | 3,163 | YES | 261,020 | $265.81 | 452,090 | $248.48 | -6.5% |
| Tucson, AZ (TUS) | Fry, 10 | 863 | 3,518 | 1,207 | YES | 17,260 | $214.69 | 18,090 | $200.21 | -6.7% |

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Tucson, AZ (TUS) | Fry, 10; McCarthy, 14 | 864 | 4,772 | 1,468 | YES | 31,480 | $274.38 | 35,790 | $255.44 | -6.9% |
| Fort Myers, FL (RSW) | McCarthy, 14 | 875 | 4,216 | 1,364 | YES | 70,830 | $173.57 | 84,770 | $160.36 | -7.6% |
| Reno, NV (RNO) | Brito, 20; Garavanaian, 6; Stansbury, 13, 15 | 880 | 2,640 | 397 | YES | 69,090 | $267.80 | 116,240 | $246.47 | -8.0% |
| Tucson, AZ (TUS) | Fry, 10 | 881 | 4,957 | 1,869 | YES | 25,810 | $211.92 | 29,100 | $195.03 | -8.0% |
| Phoenix, AZ (PHX) | Fry, 11 | 884 | 3,903 | 381 | YES | 250,590 | $211.85 | 373,850 | $194.67 | -8.1% |
| Phoenix, AZ (PHX) | Fry, 11 | 887 | 4,598 | 291 | YES | 7,320 | $272.30 | 15,330 | $249.86 | -8.2% |
| Raleigh-Durham, NC (RDU) | Jolly, 7; Russell, 10 | 891 | 5,442 | 354 | YES | 207,450 | $241.34 | 321,390 | $220.86 | -8.5% |
| Phoenix, AZ (PHX) | Fry, 11 | 898 | 5,665 | 1,730 | YES | 88,530 | $202.82 | 129,350 | $183.53 | -9.5% |
| Salt Lake City, UT (SLC) | McCarthy, 14 | 902 | 3,194 | 481 | YES | 115,460 | $246.48 | 205,670 | $222.87 | -9.6% |
| West Palm Beach (PBI) | Kosach, 3 | 912 | 5,333 | 777 | YES | 158,750 | $202.87 | 196,700 | $181.72 | -10.4% |
| Fort Myers, FL (RSW) | McCarthy, 14 | 914 | 2,933 | 452 | YES | 14,030 | $253.82 | 28,810 | $226.97 | -10.6% |
| Philadelphia, PA (PHL) | Rubinsohn, 22 | 928 | 4,442 | 915 | YES | 188,960 | $209.44 | 261,960 | $183.59 | -12.3% |
| Portland, OR (PDX) | Jolly, 7; Russell, 10 | 938 | 3,452 | 290 | YES | 208,380 | $223.15 | 325,430 | $193.17 | -13.4% |
| Ontario, CA (ONT) | Jolly, 6; Russell, 10 | 941 | 5,978 | 1,181 | YES | 132,400 | $228.16 | 242,590 | $195.62 | -14.3% |
| Louisville, KY (SDF) | McCarthy, 14 | 943 | 3,042 | 511 | YES | 77,410 | $215.92 | 115,490 | $183.71 | -14.9% |
| Knoxville, TN (TYS) | McCarthy, 14 | 946 | 3,522 | 622 | YES | 61,070 | $164.39 | 94,830 | $139.43 | -15.2% |
| Miami, FL (MIA) | McCarthy, 14 | 947 | 3,052 | 309 | YES | 208,150 | $187.51 | 318,930 | $158.67 | -15.4% |
| Phoenix, AZ (PHX) | Fry, 11; Garavanian, 6; Russell, 10 | 950 | 4,959 | 1,357 | YES | 524,280 | $199.43 | 949,480 | $167.74 | -15.9% |
| Salt Lake City, UT (SLC) | Jolly, 6, 22, 27; McCarthy, 12; Russell, 10 | 951 | 3,964 | 651 | YES | 233,940 | $232.82 | 415,780 | $195.78 | -15.9% |
| Phoenix, AZ (PHX) | Fry, 11; Garavanian, 6 | 954 | 3,339 | 695 | YES | 959,550 | $198.63 | 1,586,200 | $166.84 | -16.0% |
| Philadelphia, PA (PHL) | Jolly, 27; Rubinsohn, 6, 7, 19, 20, 22; Russell, 10 | 955 | 6,967 | 2,970 | YES | 438,700 | $244.85 | 659,940 | $205.47 | -16.1% |
| Louisville, KY (SDF) | Garavnian, 7 | 958 | 2,988 | 293 | YES | 45,990 | $254.78 | 56,280 | $212.59 | -16.6% |
| San Diego, CA (SAN) | McCarthy, 14 | 961 | 3,357 | 1,116 | YES | 142,660 | $264.04 | 275,650 | $220.00 | -16.7% |
| Seattle, WA (SEA) | Jolly, 7, 27; Russell, 8, 9, 10 | 969 | 3,968 | 280 | YES | 442,290 | $234.06 | 679,420 | $191.86 | -18.0% |
| San Diego, CA (SAN) | Jolly, 7; Russell, 10 | 970 | 4,847 | 532 | YES | 407,810 | $208.34 | 668,910 | $170.49 | -18.2% |
| Philadelphia, PA (PHL) | Garavnian, 5, 6; McCarthy, 14; Rubinsohn, 6, 7, 19, 22 | 974 | 5,177 | 1,283 | YES | 732,160 | $174.73 | 1,123,140 | $142.20 | -18.6% |

**Table B - Average Fare Growth on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/ 2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|
| Dallas, TX (DFW) | Russell, 10 | 980 | 5,198 | 1,976 | YES | 183,150 | $258.97 | 259,400 | $206.60 | -20.2% |
| Miami, FL (MIA) | McCarthy, 14 | 983 | 3,155 | 273 | YES | 465,880 | $230.51 | 712,210 | $180.63 | -21.6% |
| Miami, FL (MIA) | McCarthy, 14 | 1000 | 4,248 | 996 | YES | 41,570 | $224.84 | 119,500 | $156.86 | -30.2% |
| Boston, MA (BOS) | Garavnian, 7; Talewsky, 17 | 1005 | 3,234 | 409 | YES | 127,410 | $221.59 | 465,110 | $147.63 | -33.4% |

TABLE C

**Table C - Passenger Traffic Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | Passenger Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|
| Philadelphia, PA (PHL) | St. Thomas, VI (STT) | Rubinsohn, 22 | 268 | 8,138 | 1,857 | YES | 33,560 | 9,750 | -70.9% |
| Dallas, TX (DFW) | Westchester County, NY (HPN) | Jolly, 7; Russell, 10 | 851 | 4,933 | 2,093 | YES | 24,430 | 10,950 | -55.2% |
| Dallas, TX (DFW) | Harrisburg, PA (MDT) | Russell, 10 | 6 | 5,306 | 2,747 | YES | 45,260 | 21,810 | -51.8% |
| Harrisburg, PA (MDT) | Miami, FL (MIA) | McCarthy, 14 | 154 | 5,436 | 915 | YES | 25,080 | 15,030 | -40.1% |
| Greensboro, NC (GSO) | Phoenix, AZ (PHX) | Fry, 11 | 9 | 4,819 | 944 | YES | 27,730 | 17,080 | -38.4% |
| Fort Myers, FL (RSW) | St. Thomas, VI (STT) | McCarthy, 14 | 153 | 9,311 | 4,778 | YES | 550 | 370 | -32.7% |
| Harrisburg, PA (MDT) | Phoenix, AZ (PHX) | Fry, 11 | 12 | 5,644 | 2,318 | YES | 25,610 | 18,250 | -28.7% |
| Boston, MA (BOS) | Huntsville, AL (HSV) | Garavnian, 7 | 65 | 4,660 | 1,245 | YES | 27,840 | 20,020 | -28.1% |
| Albuquerque, NM (ABQ) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 53 | 3,518 | 1,125 | YES | 57,470 | 41,470 | -27.8% |
| Jackson, MS (JAN) | Miami, FL (MIA) | McCarthy, 14 | 143 | 6,299 | 2,609 | YES | 20,090 | 14,650 | -27.1% |
| Detroit, MI (DTW) | Tucson, AZ (TUS) | Fry, 10 | 237 | 2,989 | 771 | YES | 42,430 | 31,360 | -26.1% |
| Charleston, WV (CRW) | #REF! | Russell, 10 | 11 | 4,275 | 376 | YES | 15,050 | 11,140 | -26.0% |
| Dallas, TX (DFW) | St. Thomas, VI (STT) | Jolly, 7 27 | 395 | 6,378 | 961 | YES | 24,950 | 18,500 | -25.9% |
| Dallas, TX (DFW) | Montgomery, AL (MGM) | Russell, 10 | 151 | 7,964 | 511 | YES | 23,610 | 17,800 | -24.6% |
| Boston, MA (BOS) | Monterey, CA (MRY) | Garavnian, 7 | 296 | 4,979 | 641 | YES | 6,440 | 4,920 | -23.6% |
| Pittsburgh, PA (PIT) | Tucson, AZ (TUS) | Fry, 10 | 176 | 3,944 | 1,541 | YES | 23,620 | 18,200 | -22.9% |
| Dallas, TX (DFW) | Greensboro, NC (GSO) | Russell, 10 | 81 | 7,286 | 2,790 | YES | 57,770 | 44,670 | -22.7% |
| Boston, MA (BOS) | Ontario, CA (ONT) | Garavnian, 7 | 229 | 3,489 | 1,275 | YES | 31,350 | 24,250 | -22.6% |
| Jackson, MS (JAN) | Phoenix, AZ (PHX) | Fry, 11 | 83 | 4,247 | 1,771 | YES | 14,710 | 11,510 | -21.8% |
| Santa Barbara, CA (SBA) | Tucson, AZ (TUS) | Fry, 10 | 33 | 8,116 | 2,618 | YES | 6,190 | 4,900 | -20.8% |
| Tucson, AZ (TUS) | Washington, DC (WAS) | Fry, 10 | 201 | 3,785 | 731 | YES | 156,060 | 125,600 | -19.5% |
| Boston, MA (BOS) | Orange County, CA (SNA) | Garavnian, 7 | 284 | 3,245 | 805 | YES | 66,740 | 53,970 | -19.1% |
| Monterey, CA (MRY) | Tucson, AZ (TUS) | Fry, 10 | 276 | 7,816 | 2,413 | YES | 3,890 | 3,160 | -18.8% |
| Montgomery, AL (MGM) | Phoenix, AZ (PHX) | Fry, 11 | 180 | 5,045 | 733 | YES | 4,840 | 3,950 | -18.4% |
| Boston, MA (BOS) | Baton Rouge, LA (BTR) | Garavnian, 7 | 746 | 3,894 | 215 | YES | 12,910 | 10,610 | -17.8% |
| Columbia, SC (CAE) | Dallas, TX (DFW) | Russell, 10 | 302 | 7,118 | 1,750 | YES | 46,560 | 38,360 | -17.6% |
| Philadelphia, PA (PHL) | Orange County, CA (SNA) | Rubinsohn, 22 | 99 | 3,930 | 1,748 | YES | 88,100 | 72,660 | -17.5% |
| Kansas City, MO (MCI) | Tucson, AZ (TUS) | Fry, 10 | 288 | 3,964 | 1,212 | YES | 37,200 | 30,840 | -17.1% |
| Phoenix, AZ (PHX) | Knoxville, TN (TYS) | Fry, 11 | 21 | 3,665 | 958 | YES | 25,640 | 21,780 | -15.1% |
| Phoenix, AZ (PHX) | St. Thomas, VI (STT) | Fry, 11 | 711 | 5,702 | 2,203 | YES | 4,280 | 3,660 | -14.5% |
| Westchester County, NY (HPN) | Phoenix, AZ (PHX) | Fry, 11 | 179 | 4,524 | 1,707 | YES | 10,380 | 8,880 | -14.5% |
| Indianapolis, IN (IND) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 200 | 7,710 | 1,413 | YES | 160,630 | 137,650 | -14.3% |
| Boston, MA (BOS) | Jackson, MS (JAN) | Garavnian, 7 | 233 | 5,138 | 1,381 | YES | 15,130 | 13,050 | -13.7% |
| Dallas, TX (DFW) | Monterey, CA (MRY) | Russell, 10 | 274 | 7,329 | 2,861 | YES | 9,700 | 8,370 | -13.7% |
| Philadelphia, PA (PHL) | St. Louis, MO (STL) | Rubinsohn, 6, 7 | 70 | 4,756 | 466 | YES | 222,140 | 195,920 | -11.8% |
| Chicago, IL (CHI) | Tucson, AZ (TUS) | Fry,5, 10 | 370 | 4,711 | 703 | YES | 154,600 | 136,480 | -11.7% |
| Boston, MA (BOS) | Fresno, CA (FAT) | Garavnian, 7 | 124 | 4,431 | 1,130 | YES | 14,880 | 13,170 | -11.5% |
| Boston, MA (BOS) | Tallahassee, FL (TLH) | Garavnian, 7 | 190 | 5,274 | 585 | YES | 15,290 | 13,670 | -10.6% |
| Dallas, TX (DFW) | Tucson, AZ (TUS) | Fry, 10; Jolly, 7; Russell, 10; Talewsky, 15 | 104 | 8,521 | 1,949 | YES | 102,940 | 92,300 | -10.3% |
| Phoenix, AZ (PHX) | Syracuse, NY (SYR) | Fry, 11 | 79 | 3,937 | 1,133 | YES | 32,040 | 28,980 | -9.6% |
| Greensboro, NC (GSO) | Miami, FL (MIA) | McCarthy, 14 | 168 | 5,105 | 1,677 | YES | 62,940 | 56,950 | -9.5% |

**Table C - Passenger Traffic Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | Passenger Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|
| Charlotte, NC (CLT) | Tucson, AZ (TUS) | Fry, 10 | 308 | 5,734 | 2,741 | YES | 22,730 | 20,720 | -8.8% |
| New York, NY (NYC) | Tucson, AZ (TUS) | Fry, 5, 10 | 98 | 3,980 | 1,053 | YES | 112,700 | 102,800 | -8.8% |
| Boston, MA (BOS) | Gainesville, FL (GNV) | Garavnian, 7 | 223 | 5,020 | 575 | YES | 13,090 | 12,130 | -7.3% |
| Miami, FL (MIA) | Ontario, CA (ONT) | McCarthy, 14 | 321 | 4,857 | 2,477 | YES | 30,310 | 28,090 | -7.3% |
| Hartford, CT (BDL) | Dallas, TX (DFW) | Russell, 10 | 543 | 6,344 | 646 | YES | 128,390 | 119,220 | -7.1% |
| Houston, TX (HOU) | Tucson, AZ (TUS) | Fry, 10 | 463 | 4,409 | 458 | YES | 46,310 | 43,140 | -6.8% |
| Boston, MA (BOS) | Santa Barbara, CA (SBA) | Garavnian, 7 | 145 | 4,875 | 1,085 | YES | 17,670 | 16,480 | -6.7% |
| Dallas, TX (DFW) | Louisville, KY (SDF) | Russell, 10; Stansbury, 16 | 84 | 6,929 | 967 | YES | 114,800 | 107,320 | -6.5% |
| Miami, FL (MIA) | Orange County, CA (SNA) | McCarthy, 14 | 140 | 3,205 | 549 | YES | 63,380 | 59,750 | -5.7% |
| Boston, MA (BOS) | Pensacola, FL (PNS) | Garavnian, 7 | 294 | 3,895 | 899 | YES | 26,500 | 25,270 | -4.6% |
| West Palm Beach (PBI) | Phoenix, AZ (PHX) | Fry, 11; Talewsky, 17 | 43 | 4,121 | 1,781 | YES | 35,930 | 34,560 | -3.8% |
| Dallas, TX (DFW) | Kapaa, HI (LIH) | Russell, 10 | 38 | 7,072 | 947 | YES | 22,400 | 21,650 | -3.3% |
| Buffalo, NY (BUF) | Dallas, TX (DFW) | Russell, 10 | 443 | 2,846 | 399 | YES | 90,840 | 88,010 | -3.1% |
| Greenville, SC (GSP) | Phoenix, AZ (PHX) | Fry, 11 | 118 | 3,226 | 681 | YES | 30,000 | 29,080 | -3.1% |
| Huntsville, AL (HSV) | Phoenix, AZ (PHX) | Fry, 11 | 150 | 3,619 | 690 | YES | 19,860 | 19,570 | -1.5% |
| Phoenix, AZ (PHX) | Savannah, GA (SAV) | Fry, 11 | 47 | 4,294 | 620 | YES | 21,360 | 21,050 | -1.5% |
| Fort Myers, FL (RSW) | San Francisco, CA (SFO) | McCarthy, 12, 13, 14, 20 | 339 | 2,661 | 528 | YES | 48,230 | 47,930 | -0.6% |
| Fresno, CA (FAT) | Tucson, AZ (TUS) | Fry, 10 | 399 | 7,922 | 2,445 | YES | 7,150 | 7,140 | -0.1% |
| Philadelphia, PA (PHL) | Tucson, AZ (TUS) | Fry, 10; Rubinsohn, 7, 22 | 438 | 5,160 | 2,532 | YES | 37,160 | 37,460 | 0.8% |
| St. Louis, MO (STL) | Tucson, AZ (TUS) | Fry, 10 | 640 | 4,249 | 1,311 | YES | 27,680 | 28,180 | 1.8% |
| Des Moines, IA (DSM) | Fort Myers, FL (RSW) | McCarthy, 14 | 676 | 3,843 | 420 | YES | 17,250 | 17,570 | 1.9% |
| Milwaukee, WI (MKE) | Tucson, AZ (TUS) | Fry, 10 | 437 | 3,441 | 1,527 | YES | 26,950 | 27,510 | 2.1% |
| Chicago, IL (CHI) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 317 | 3,958 | 1,289 | YES | 911,360 | 930,380 | 2.1% |
| Little Rock, AR (LIT) | Miami, FL (MIA) | McCarthy, 14 | 673 | 3,845 | 1,055 | YES | 31,410 | 32,290 | 2.8% |
| Los Angeles, CA (LAX) | Fort Myers, FL (RSW) | McCarthy, 14 | 424 | 2,734 | 311 | YES | 55,460 | 57,640 | 3.9% |
| Mobile, AL (MOB) | Phoenix, AZ (PHX) | Fry, 11 | 219 | 3,471 | 505 | YES | 6,470 | 6,730 | 4.0% |
| Columbus, OH (CMH) | Tucson, AZ (TUS) | Fry, 10 | 510 | 3,410 | 909 | YES | 17,400 | 18,110 | 4.1% |
| Dallas, TX (DFW) | West Palm Beach (PBI) | Jolly, 6, 27; Russell, 10 | 247 | 7,300 | 551 | YES | 84,390 | 87,890 | 4.1% |
| Omaha, NE (OMA) | Tucson, AZ (TUS) | Fry, 10 | 863 | 3,518 | 1,207 | YES | 17,260 | 18,090 | 4.8% |
| Dallas, TX (DFW) | Syracuse, NY (SYR) | Jolly, 27; Russell, 10 | 205 | 4,525 | 1,957 | YES | 37,730 | 39,730 | 5.3% |
| Key West, FL (EYW) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 439 | 7,227 | 4,878 | YES | 27,980 | 29,470 | 5.3% |
| Dallas, TX (DFW) | Fresno, CA (FAT) | Russell, 10 | 214 | 8,591 | 3,029 | YES | 41,580 | 44,030 | 5.9% |
| Miami, FL (MIA) | Pensacola, FL (PNS) | McCarthy, 14 | 436 | 6,078 | 1,329 | YES | 51,710 | 55,240 | 6.8% |
| Phoenix, AZ (PHX) | San Juan, PR (SJU) | Fry, 11 | 527 | 3,843 | 1,171 | YES | 33,530 | 35,930 | 7.2% |
| Indianapolis, IN (IND) | Tucson, AZ (TUS) | Fry, 10 | 828 | 3,709 | 1,080 | YES | 25,240 | 27,150 | 7.6% |
| Hartford, CT (BDL) | Phoenix, AZ (PHX) | Fry, 11 | 392 | 3,090 | 869 | YES | 84,730 | 92,130 | 8.7% |
| Phoenix, AZ (PHX) | Fort Myers, FL (RSW) | Fry, 11; McCarthy, 14 | 152 | 2,894 | 889 | YES | 44,310 | 48,210 | 8.8% |
| Norfolk-Virginia Beach, VA (ORF) | Phoenix, AZ (PHX) | Fry, 11 | 235 | 3,183 | 635 | YES | 43,790 | 47,710 | 9.0% |
| Miami, FL (MIA) | St. Louis, MO (STL) | McCarthy, 14 | 680 | 4,180 | 852 | YES | 253,170 | 275,990 | 9.0% |

**Table C - Passenger Traffic Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | Passenger Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|
| Sacramento, CA (SMF) | St. Louis, MO (STL) | Fjord, 2, 3 | 627 | 4,113 | 1,432 | YES | 62,200 | 68,050 | 9.4% |
| Boston, MA (BOS) | Fort Walton Beach, FL (VPS) | Garavnian, 7 | 412 | 5,113 | 460 | YES | 13,430 | 14,760 | 9.9% |
| Detroit, MI (DTW) | Palm Springs, CA (PSP) | Freeland, 2 | 77 | 3,452 | 755 | YES | 16,920 | 18,610 | 10.0% |
| Phoenix, AZ (PHX) | Richmond, VA (RIC) | Fry, 11 | 189 | 3,655 | 1,228 | YES | 49,590 | 54,640 | 10.2% |
| Dallas, TX (DFW) | Knoxville, TN (TYS) | Russell, 10 | 236 | 7,575 | 1,533 | YES | 56,290 | 62,100 | 10.3% |
| Dallas, TX (DFW) | Jacksonville, FL (JAX) | Jolly, 7; Russell, 10 | 429 | 5,863 | 503 | YES | 160,910 | 178,000 | 10.6% |
| Dallas, TX (DFW) | Santa Barbara, CA (SBA) | Russell, 10 | 52 | 8,507 | 4,578 | YES | 23,990 | 26,570 | 10.8% |
| Phoenix, AZ (PHX) | Fort Walton Beach, FL (VPS) | Fry, 11 | 601 | 4,054 | 1,145 | YES | 10,620 | 11,780 | 10.9% |
| Phoenix, AZ (PHX) | Tallahassee, FL (TLH) | Fry, 11 | 249 | 5,060 | 558 | YES | 6,610 | 7,350 | 11.2% |
| Atlanta, GA (ATL) | Tucson, AZ (TUS) | Fry, 10 | 589 | 6,046 | 1,401 | YES | 49,870 | 55,730 | 11.8% |
| Dallas, TX (DFW) | Honolulu, HI (HNL) | Jolly, 7; Russell, 8, 9 | 194 | 6,210 | 604 | YES | 105,330 | 117,710 | 11.8% |
| Dallas, TX (DFW) | Richmond, VA (RIC) | Russell, 10 | 647 | 5,669 | 446 | YES | 107,930 | 120,830 | 12.0% |
| Charlotte, NC (CLT) | Miami, FL (MIA) | Garavnian, 6; McCarthy, 14 | 407 | 8,740 | 3,600 | YES | 277,170 | 310,530 | 12.0% |
| Dallas, TX (DFW) | Lexington, KY (LEX) | Jolly, 27; Russell, 10 | 352 | 6,870 | 490 | YES | 31,260 | 35,060 | 12.2% |
| San Antonio, TX (SAT) | Tucson, AZ (TUS) | Fry, 10 | 881 | 4,957 | 1,869 | YES | 25,810 | 29,100 | 12.7% |
| Dallas, TX (DFW) | Greenville, SC (GSP) | Jolly, 22, 26; Russell, 10 | 456 | 5,173 | 891 | YES | 69,040 | 78,050 | 13.1% |
| Miami, FL (MIA) | Tucson, AZ (TUS) | Fry, 10; McCarthy, 14 | 864 | 4,772 | 1,468 | YES | 31,480 | 35,790 | 13.7% |
| Philadelphia, PA (PHL) | San Diego, CA (SAN) | Rubinsohn, 6, 7 | 490 | 5,861 | 2,211 | YES | 230,920 | 262,830 | 13.8% |
| Dallas, TX (DFW) | Rochester, NY (ROC) | Russell, 10 | 346 | 3,438 | 673 | YES | 41,890 | 47,720 | 13.9% |
| Jacksonville, FL (JAX) | Phoenix, AZ (PHX) | Fry, 11 | 216 | 2,939 | 621 | YES | 56,310 | 64,190 | 14.0% |
| Des Moines, IA (DSM) | Miami, FL (MIA) | McCarthy, 14 | 789 | 3,450 | 261 | YES | 34,020 | 38,810 | 14.1% |
| Reno, NV (RNO) | Washington, DC (WAS) | Stansbury, 13, 14 | 671 | 2,826 | 478 | YES | 76,330 | 87,260 | 14.3% |
| Boston, MA (BOS) | Des Moines, IA (DSM) | Garavnian, 7 | 631 | 2,755 | 689 | YES | 32,600 | 37,290 | 14.4% |
| Phoenix, AZ (PHX) | Raleigh-Durham, NC (RDU) | Fry, 11 | 203 | 3,355 | 335 | YES | 121,520 | 139,070 | 14.4% |
| Des Moines, IA (DSM) | Tucson, AZ (TUS) | Fry, 10 | 792 | 6,370 | 3,165 | YES | 8,840 | 10,120 | 14.5% |
| Columbus, OH (CMH) | Miami, FL (MIA) | McCarthy, 14 | 803 | 3,474 | 612 | YES | 212,220 | 243,790 | 14.9% |
| Hilo, HI (KOA) | Phoenix, AZ (PHX) | Fry, 11 | 266 | 4,430 | 851 | YES | 36,200 | 41,600 | 14.9% |
| Miami, FL (MIA) | San Jose, CA (SJC) | McCarthy, 14 | 625 | 3,026 | 492 | YES | 35,470 | 40,960 | 15.5% |
| Phoenix, AZ (PHX) | Pittsburgh, PA (PIT) | Fry, 11 | 798 | 4,436 | 939 | YES | 159,290 | 184,550 | 15.9% |
| Austin, TX (AUS) | Tucson, AZ (TUS) | Fry, 10 | 840 | 4,775 | 1,488 | YES | 24,290 | 28,240 | 16.3% |
| Kapaa, HI (LIH) | Phoenix, AZ (PHX) | Fry, 11 | 556 | 4,522 | 1,046 | YES | 46,800 | 54,700 | 16.9% |
| Grand Junction, CO (GJT) | Miami, FL (MIA) | McCarthy, 14 | 416 | 7,506 | 2,755 | YES | 3,580 | 4,200 | 17.3% |
| Boston, MA (BOS) | Phoenix, AZ (PHX) | Brito, 6; Fry, 11; Garavanian, 6,7; Talewsky, 11 | 263 | 5,207 | 2,207 | YES | 368,400 | 432,550 | 17.4% |
| Tampa, FL (TPA) | Tucson, AZ (TUS) | Fry, 10 | 757 | 3,602 | 1,132 | YES | 21,170 | 25,090 | 18.5% |
| Fort Myers, FL (RSW) | San Diego, CA (SAN) | McCarthy, 13, 14 | 500 | 2,912 | 492 | YES | 25,400 | 30,170 | 18.8% |
| Dallas, TX (DFW) | Tallahassee, FL (TLH) | Russell, 10 | 241 | 7,565 | 3,220 | YES | 19,020 | 22,600 | 18.8% |

**Table C - Passenger Traffic Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | Passenger Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|
| Dallas, TX (DFW) | Palm Springs, CA (PSP) | Rubinsohn, 19, 20; Russell, 10 | 271 | 9,319 | 2,846 | YES | 34,020 | 40,520 | 19.1% |
| Little Rock, AR (LIT) | Fort Myers, FL (RSW) | McCarthy, 14 | 348 | 5,454 | 1,559 | YES | 6,400 | 7,630 | 19.2% |
| Boston, MA (BOS) | Tucson, AZ (TUS) | Fry, 10; Garavanian, 7; Talewsky, 15, 17 | 679 | 4,205 | 986 | YES | 43,000 | 51,290 | 19.3% |
| Columbus, OH (CMH) | Reno, NV (RNO) | Stansbury, 12, 13, 14 | 487 | 4,058 | 454 | YES | 12,960 | 15,480 | 19.4% |
| Fort Myers, FL (RSW) | Seattle, WA (SEA) | McCarthy, 13, 14 | 621 | 2,982 | 454 | YES | 33,280 | 39,810 | 19.6% |
| Kansas City, MO (MCI) | Fort Myers, FL (RSW) | McCarthy, 14 | 875 | 4,216 | 1,364 | YES | 70,830 | 84,770 | 19.7% |
| Kahului, HI (OGG) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 368 | 5,674 | 1,734 | YES | 14,930 | 17,880 | 19.8% |
| Philadelphia, PA (PHL) | San Antonio, TX (SAT) | Rubinsohn, 22 | 553 | 3,233 | 1,168 | YES | 111,790 | 134,540 | 20.4% |
| Philadelphia, PA (PHL) | Seattle, WA (SEA) | Rubinsohn, 22 | 674 | 3,965 | 324 | YES | 213,030 | 256,480 | 20.4% |
| Philadelphia, PA (PHL) | Phoenix, AZ (PHX) | Fry, 11; Rubinsohn, 6, 7, 19, 20 | 474 | 6,535 | 1,375 | YES | 323,350 | 389,370 | 20.4% |
| Los Angeles, CA (LAX) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7, 22 | 668 | 5,350 | 1,779 | YES | 662,540 | 798,820 | 20.6% |
| Orlando, FL (MCO) | Tucson, AZ (TUS) | Fry, 10 | 830 | 3,653 | 1,275 | YES | 30,740 | 37,090 | 20.7% |
| Miami, FL (MIA) | Norfolk-Virginia Beach, VA (ORF) | McCarthy, 14 | 670 | 4,055 | 1,616 | YES | 96,270 | 116,430 | 20.9% |
| Lexington, KY (LEX) | Phoenix, AZ (PHX) | Fry, 11 | 573 | 4,167 | 849 | YES | 8,730 | 10,580 | 21.2% |
| Boston, MA (BOS) | Louisville, KY (SDF) | Garavnian, 7 | 958 | 2,988 | 293 | YES | 45,990 | 56,280 | 22.4% |
| Boston, MA (BOS) | Little Rock, AR (LIT) | Garavnian, 7 | 649 | 3,089 | 735 | YES | 22,150 | 27,120 | 22.4% |
| Miami, FL (MIA) | Washington, DC (WAS) | McCarthy, 14 | 729 | 2,993 | 763 | YES | 1,983,830 | 2,435,220 | 22.8% |
| Key West, FL (EYW) | Phoenix, AZ (PHX) | Fry, 11 | 44 | 6,183 | 2,359 | YES | 2,480 | 3,050 | 23.0% |
| Philadelphia, PA (PHL) | St. Croix, VI (STX) | Rubinsohn, 22 | 68 | 9,230 | 1,466 | YES | 3,900 | 4,820 | 23.6% |
| Dallas, TX (DFW) | Norfolk-Virginia Beach, VA (ORF) | Russell, 10 | 609 | 5,979 | 2,144 | YES | 83,740 | 103,520 | 23.6% |
| Dallas, TX (DFW) | Grand Junction, CO (GJT) | Russell, 10 | 313 | 9,195 | 3,034 | YES | 16,340 | 20,210 | 23.7% |
| Miami, FL (MIA) | Sacramento, CA (SMF) | McCarthy, 14 | 515 | 2,775 | 546 | YES | 58,860 | 72,910 | 23.9% |
| Chicago, IL (CHI) | West Palm Beach (PBI) | Kosach, 3 | 912 | 5,333 | 777 | YES | 158,750 | 196,700 | 23.9% |
| Fresno, CA (FAT) | Miami, FL (MIA) | McCarthy, 14 | 172 | 6,745 | 1,089 | YES | 8,870 | 11,000 | 24.0% |
| Dallas, TX (DFW) | Huntsville, AL (HSV) | Russell, 10 | 825 | 7,305 | 507 | YES | 31,700 | 39,420 | 24.4% |
| Dallas, TX (DFW) | Fort Walton Beach, FL (VPS) | Jolly, 7, 27; Russell, 10 | 582 | 8,717 | 314 | YES | 64,720 | 80,620 | 24.6% |
| Dallas, TX (DFW) | Reno, NV (RNO) | Brito, 6; Jolly, 7, 27; Russell, 10; Stansbury 13 | 331 | 6,267 | 1,112 | YES | 79,820 | 100,390 | 25.8% |
| Phoenix, AZ (PHX) | Washington, DC (WAS) | Fry, 11 | 771 | 3,581 | 518 | YES | 548,950 | 691,080 | 25.9% |
| Dallas, TX (DFW) | Fort Myers, FL (RSW) | McCarthy, 12, 13, 14; Russell, 10 | 252 | 6,841 | 739 | YES | 83,010 | 105,030 | 26.5% |
| Fresno, CA (FAT) | Phoenix, AZ (PHX) | Fry, 11 | 286 | 9,493 | 558 | YES | 54,680 | 69,250 | 26.6% |
| Dallas, TX (DFW) | Savannah, GA (SAV) | Russell, 10 | 628 | 7,055 | 2,077 | YES | 47,700 | 60,730 | 27.3% |
| Atlanta, GA (ATL) | Reno, NV (RNO) | McCarthy, 13; Kosach, 3; Stansbury, 13 | 435 | 2,980 | 280 | YES | 34,840 | 44,480 | 27.7% |
| Phoenix, AZ (PHX) | Tampa, FL (TPA) | Fry, 11 | 672 | 4,246 | 748 | YES | 167,370 | 214,360 | 28.1% |

**Table C - Passenger Traffic Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | Passenger Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|
| Miami, FL (MIA) | Palm Springs, CA (PSP) | McCarthy, 14; Talewsky, 17 | 264 | 5,530 | 771 | YES | 12,070 | 15,500 | 28.4% |
| Kahului, HI (OGG) | Phoenix, AZ (PHX) | Fry, 11; Stansbury, 16 | 421 | 4,621 | 1,115 | YES | 78,830 | 101,850 | 29.2% |
| Kapaa, HI (LIH) | Tucson, AZ (TUS) | Fry, 10 | 379 | 5,581 | 1,949 | YES | 2,830 | 3,670 | 29.7% |
| Dallas, TX (DFW) | Hilo, HI (KOA) | Russell, 10 | 59 | 5,914 | 1,126 | YES | 14,980 | 19,450 | 29.8% |
| Miami, FL (MIA) | Reno, NV (RNO) | McCarthy, 14; Stansbury, 13 | 612 | 3,813 | 925 | YES | 25,590 | 33,320 | 30.2% |
| Durango, CO (DRO) | Miami, FL (MIA) | McCarthy, 14 | 166 | 6,946 | 3,197 | YES | 2,650 | 3,500 | 32.1% |
| Charlottesville, VA (CHO) | Phoenix, AZ (PHX) | Fry, 11 | 386 | 6,368 | 1,237 | YES | 7,990 | 10,580 | 32.4% |
| Dallas, TX (DFW) | Durango, CO (DRO) | Russell, 10 | 82 | 9,381 | 5,693 | YES | 22,300 | 29,650 | 33.0% |
| Charlottesville, VA (CHO) | Dallas, TX (DFW) | Russell, 10 | 732 | 6,189 | 3,086 | YES | 14,120 | 18,990 | 34.5% |
| Miami, FL (MIA) | Phoenix, AZ (PHX) | Brito, 6; Fry, 11; McCarthy 14; Talewsky, 17 | 645 | 4,184 | 1,518 | YES | 237,460 | 319,770 | 34.7% |
| Miami, FL (MIA) | Raleigh-Durham, NC (RDU) | McCarthy, 14 | 570 | 2,978 | 460 | YES | 329,350 | 446,860 | 35.7% |
| Boston, MA (BOS) | Fayetteville, AR (XNA) | Garavnian, 7 | 406 | 4,567 | 1,521 | YES | 15,280 | 20,770 | 35.9% |
| Boston, MA (BOS) | Reno, NV (RNO) | Brito, 20; Garavanian, 6, 7; Stansbury, 13 | 785 | 2,676 | 523 | YES | 31,310 | 42,850 | 36.9% |
| Boston, MA (BOS) | Palm Springs, CA (PSP) | Garavnian, 7; Talewsky, 17 | 275 | 3,538 | 580 | YES | 19,970 | 27,460 | 37.5% |
| Dallas, TX (DFW) | Sacramento, CA (SMF) | Russell, 10 | 751 | 5,376 | 972 | YES | 150,820 | 208,830 | 38.5% |
| New Orleans, LA (MSY) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 928 | 4,442 | 915 | YES | 188,960 | 261,960 | 38.6% |
| Miami, FL (MIA) | Richmond, VA (RIC) | McCarthy, 14 | 811 | 3,343 | 805 | YES | 131,380 | 184,730 | 40.6% |
| Cleveland, OH (CLE) | Dallas, TX (DFW) | Russell, 10 | 980 | 5,198 | 1,976 | YES | 183,150 | 259,400 | 41.6% |
| Fort Myers, FL (RSW) | Fayetteville, AR (XNA) | McCarthy, 14 | 783 | 5,188 | 1,511 | YES | 3,920 | 5,590 | 42.6% |
| Boston, MA (BOS) | Lexington, KY (LEX) | Garavnian, 7 | 808 | 4,044 | 228 | YES | 10,010 | 14,350 | 43.4% |
| Kapaa, HI (LIH) | Miami, FL (MIA) | McCarthy, 14 | 427 | 6,176 | 1,878 | YES | 1,600 | 2,320 | 45.0% |
| Philadelphia, PA (PHL) | San Jose, CA (SJC) | Rubinsohn, 22 | 739 | 3,539 | 1,090 | YES | 37,260 | 54,200 | 45.5% |
| Des Moines, IA (DSM) | Phoenix, AZ (PHX) | Fry, 11 | 898 | 5,665 | 1,730 | YES | 88,530 | 129,350 | 46.1% |
| Honolulu, HI (HNL) | Tucson, AZ (TUS) | Fry, 10 | 684 | 3,955 | 1,001 | YES | 9,340 | 13,720 | 46.9% |
| Orlando, FL (MCO) | Phoenix, AZ (PHX) | Fry, 11 | 884 | 3,903 | 381 | YES | 250,590 | 373,850 | 49.2% |
| Miami, FL (MIA) | Louisville, KY (SDF) | McCarthy, 14 | 943 | 3,042 | 511 | YES | 77,410 | 115,490 | 49.2% |
| Dallas, TX (DFW) | Philadelphia, PA (PHL) | Jolly, 27; Rubinsohn, 6, 7, 19, 20, 22; Russell, 10 | 955 | 6,967 | 2,970 | YES | 438,700 | 659,940 | 50.4% |
| Kahului, HI (OGG) | Tucson, AZ (TUS) | Fry, 10 | 403 | 4,543 | 1,205 | YES | 4,030 | 6,080 | 50.9% |
| Monterey, CA (MRY) | Phoenix, AZ (PHX) | Fry, 11 | 588 | 9,635 | 1,148 | YES | 26,760 | 40,660 | 51.9% |
| Las Vegas, NV (LAS) | Miami, FL (MIA) | McCarthy, 14 | 983 | 3,155 | 273 | YES | 465,880 | 712,210 | 52.9% |
| Indianapolis, IN (IND) | Miami, FL (MIA) | McCarthy, 14 | 947 | 3,052 | 309 | YES | 208,150 | 318,930 | 53.2% |

**Table C - Passenger Traffic Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (03/2019) | Lundgren Report - Row # (12/2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | Passenger Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|
| Miami, FL (MIA) | Philadelphia, PA (PHL) | Garavnian, 5, 6; McCarthy, 14; Rubinsohn, 6, 7, 19, 22 | 974 | 5,177 | 1,283 | YES | 732,160 | 1,123,140 | 53.4% |
| Dallas, TX (DFW) | Seattle, WA (SEA) | Jolly, 7, 27; Russell, 8, 9, 10 | 969 | 3,968 | 280 | YES | 442,290 | 679,420 | 53.6% |
| Charlotte, NC (CLT) | Phoenix, AZ (PHX) | Fry, 11 | 799 | 7,313 | 1,944 | YES | 134,030 | 206,810 | 54.3% |
| Dallas, TX (DFW) | Raleigh-Durham, NC (RDU) | Jolly, 7; Russell, 10 | 891 | 5,442 | 354 | YES | 207,450 | 321,390 | 54.9% |
| Miami, FL (MIA) | Knoxville, TN (TYS) | McCarthy, 14 | 946 | 3,522 | 622 | YES | 61,070 | 94,830 | 55.3% |
| Dallas, TX (DFW) | Portland, OR (PDX) | Jolly, 7; Russell, 10 | 938 | 3,452 | 290 | YES | 208,380 | 325,430 | 56.2% |
| Austin, TX (AUS) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 390 | 4,944 | 2,905 | YES | 120,980 | 193,800 | 60.2% |
| Honolulu, HI (HNL) | Miami, FL (MIA) | McCarthy, 14 | 502 | 3,802 | 263 | YES | 21,020 | 33,760 | 60.6% |
| Dallas, TX (DFW) | San Diego, CA (SAN) | Jolly, 7; Russell, 10 | 970 | 4,847 | 532 | YES | 407,810 | 668,910 | 64.0% |
| Chicago, IL (CHI) | Phoenix, AZ (PHX) | Fry, 11; Garavanian, 6 | 954 | 3,339 | 695 | YES | 959,550 | 1,586,200 | 65.3% |
| New York, NY (NYC) | Reno, NV (RNO) | Brito, 20; Garavanaian, 6; Stansbury, 13, 15 | 880 | 2,640 | 397 | YES | 69,090 | 116,240 | 68.2% |
| Hilo, HI (KOA) | Tucson, AZ (TUS) | Fry, 10 | 178 | 3,991 | 578 | YES | 2,070 | 3,570 | 72.5% |
| Charlotte, NC (CLT) | Dallas, TX (DFW) | Davis, 2; Jolly, 6, 22; Russell, 10 | 855 | 7,589 | 3,163 | YES | 261,020 | 452,090 | 73.2% |
| Dallas, TX (DFW) | Salt Lake City, UT (SLC) | Jolly, 6, 22, 27; McCarthy, 12; Russell, 10 | 951 | 3,964 | 651 | YES | 233,940 | 415,780 | 77.7% |
| Miami, FL (MIA) | Salt Lake City, UT (SLC) | McCarthy, 14 | 902 | 3,194 | 481 | YES | 115,460 | 205,670 | 78.1% |
| Charleston, SC (CHS) | Dallas, TX (DFW) | Jolly, 27 | 820 | 5,563 | 2,002 | YES | 66,670 | 119,480 | 79.2% |
| Dallas, TX (DFW) | Phoenix, AZ (PHX) | Fry, 11; Garavanian, 6; Russell, 10 | 950 | 4,959 | 1,357 | YES | 524,280 | 949,480 | 81.1% |
| Dallas, TX (DFW) | Ontario, CA (ONT) | Jolly, 6; Russell, 10 | 941 | 5,978 | 1,181 | YES | 132,400 | 242,590 | 83.2% |
| Miami, FL (MIA) | San Diego, CA (SAN) | McCarthy, 14 | 961 | 3,357 | 1,116 | YES | 142,660 | 275,650 | 93.2% |
| Austin, TX (AUS) | Fort Myers, FL (RSW) | McCarthy, 14 | 914 | 2,933 | 452 | YES | 14,030 | 28,810 | 105.3% |
| Chattanooga, TN (CHA) | Phoenix, AZ (PHX) | Fry, 11 | 887 | 4,598 | 291 | YES | 7,320 | 15,330 | 109.4% |
| Hilo, HI (KOA) | Miami, FL (MIA) | McCarthy, 14 | 454 | 5,788 | 2,084 | YES | 2,040 | 4,440 | 117.6% |
| Charleston, SC (CHS) | Miami, FL (MIA) | McCarthy, 14 | 1000 | 4,248 | 996 | YES | 41,570 | 119,500 | 187.5% |
| Nashville, TN (BNA) | Boston, MA (BOS) | Garavnian, 7; Talewsky, 17 | 1005 | 3,234 | 409 | YES | 127,410 | 465,110 | 265.0% |

# TABLE D

**Table D - Average Fare Growth and Passenger Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (March 2019) | Lundgren Report - Row # (Dec. 2018) | TK4 Actual EY 2018 HHI | TK4 Actual Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Passenger Growth (2012 - EY2018) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Philadelphia, PA (PHL) | St. Thomas, VI (STT) | Rubinsohn, 22 | 268 | 8,138 | 1,857 | YES | 33,560 | $339.02 | 9,750 | $395.00 | -70.9% | 16.5% |
| Dallas, TX (DFW) | Harrisburg, PA (MDT) | Russell, 10 | 6 | 5,306 | 2,747 | YES | 45,260 | $211.90 | 21,810 | $367.83 | -51.8% | 73.6% |
| Harrisburg, PA (MDT) | Miami, FL (MIA) | McCarthy, 14 | 154 | 5,436 | 915 | YES | 25,080 | $217.93 | 15,030 | $269.42 | -40.1% | 23.6% |
| Greensboro, NC (GSO) | Phoenix, AZ (PHX) | Fry, 11 | 9 | 4,819 | 944 | YES | 27,730 | $227.82 | 17,080 | $345.57 | -38.4% | 51.7% |
| Fort Myers, FL (RSW) | St. Thomas, VI (STT) | McCarthy, 14 | 153 | 9,311 | 4,778 | YES | 550 | $312.80 | 370 | $387.34 | -32.7% | 23.8% |
| Harrisburg, PA (MDT) | Phoenix, AZ (PHX) | Fry, 11 | 12 | 5,644 | 2,318 | YES | 25,610 | $223.05 | 18,250 | $329.79 | -28.7% | 47.8% |
| Boston, MA (BOS) | Huntsville, AL (HSV) | Garavnian, 7 | 65 | 4,660 | 1,245 | YES | 27,840 | $246.52 | 20,020 | $324.46 | -28.1% | 31.6% |
| Albuquerque, NM (ABQ) | Philadelphia, PA (PHL) | Rubinsohn, 22 | 53 | 3,518 | 1,125 | YES | 57,470 | $195.08 | 41,470 | $258.93 | -27.8% | 32.7% |
| Jackson, MS (JAN) | Miami, FL (MIA) | McCarthy, 14 | 143 | 6,299 | 2,609 | YES | 20,090 | $241.07 | 14,650 | $300.99 | -27.1% | 24.9% |
| Detroit, MI (DTW) | Tucson, AZ (TUS) | Fry, 10 | 237 | 2,989 | 771 | YES | 42,430 | $216.11 | 31,360 | $254.48 | -26.1% | 17.8% |
| Charleston, WV (CRW) | #REF! | Russell, 10 | 11 | 4,275 | 376 | YES | 15,050 | $238.04 | 11,140 | $355.43 | -26.0% | 49.3% |
| Dallas, TX (DFW) | St. Thomas, VI (STT) | Jolly, 7 27 | 395 | 6,378 | 961 | YES | 24,950 | $295.19 | 18,500 | $328.70 | -25.9% | 11.4% |
| Dallas, TX (DFW) | Montgomery, AL (MGM) | Russell, 10 | 151 | 7,964 | 511 | YES | 23,610 | $213.43 | 17,800 | $264.71 | -24.6% | 24.0% |
| Boston, MA (BOS) | Monterey, CA (MRY) | Garavnian, 7 | 296 | 4,979 | 641 | YES | 6,440 | $311.15 | 4,920 | $358.93 | -23.6% | 15.4% |
| Pittsburgh, PA (PIT) | Tucson, AZ (TUS) | Fry, 10 | 176 | 3,944 | 1,541 | YES | 23,620 | $211.76 | 18,200 | $258.35 | -22.9% | 22.0% |
| Dallas, TX (DFW) | Greensboro, NC (GSO) | Russell, 10 | 81 | 7,286 | 2,790 | YES | 57,770 | $249.61 | 44,670 | $323.69 | -22.7% | 29.7% |
| Boston, MA (BOS) | Ontario, CA (ONT) | Garavnian, 7 | 229 | 3,489 | 1,275 | YES | 31,350 | $250.45 | 24,250 | $297.94 | -22.6% | 19.0% |
| Jackson, MS (JAN) | Phoenix, AZ (PHX) | Fry, 11 | 83 | 4,247 | 1,771 | YES | 14,710 | $258.61 | 11,510 | $335.10 | -21.8% | 29.6% |
| Santa Barbara, CA (SBA) | Tucson, AZ (TUS) | Fry, 10 | 33 | 8,116 | 2,618 | YES | 6,190 | $203.87 | 4,900 | $281.70 | -20.8% | 38.2% |
| Tucson, AZ (TUS) | Washington, DC (WAS) | Fry, 10 | 201 | 3,785 | 731 | YES | 156,060 | $242.07 | 125,600 | $291.41 | -19.5% | 20.4% |
| Boston, MA (BOS) | Orange County, CA (SNA) | Garavnian, 7 | 284 | 3,245 | 805 | YES | 66,740 | $264.69 | 53,970 | $306.50 | -19.1% | 15.8% |
| Monterey, CA (MRY) | Tucson, AZ (TUS) | Fry, 10 | 276 | 7,816 | 2,413 | YES | 3,890 | $211.27 | 3,160 | $245.40 | -18.8% | 16.2% |
| Montgomery, AL (MGM) | Phoenix, AZ (PHX) | Fry, 11 | 180 | 5,045 | 733 | YES | 4,840 | $288.72 | 3,950 | $351.46 | -18.4% | 21.7% |
| Columbia, SC (CAE) | Dallas, TX (DFW) | Russell, 10 | 302 | 7,118 | 1,750 | YES | 46,560 | $243.91 | 38,360 | $280.94 | -17.6% | 15.2% |
| Philadelphia, PA (PHL) | Orange County, CA (SNA) | Rubinsohn, 22 | 99 | 3,930 | 1,748 | YES | 88,100 | $236.54 | 72,660 | $303.64 | -17.5% | 28.4% |
| Kansas City, MO (MCI) | Tucson, AZ (TUS) | Fry, 10 | 288 | 3,964 | 1,212 | YES | 37,200 | $172.18 | 30,840 | $198.97 | -17.1% | 15.6% |
| Phoenix, AZ (PHX) | Knoxville, TN (TYS) | Fry, 11 | 21 | 3,665 | 958 | YES | 25,640 | $229.20 | 21,780 | $326.90 | -15.1% | 42.6% |
| Phoenix, AZ (PHX) | St. Thomas, VI (STT) | Fry, 11 | 711 | 5,702 | 2,203 | YES | 4,280 | $369.48 | 3,660 | $370.41 | -14.5% | 0.3% |
| Westchester County, NY (HPN) | Phoenix, AZ (PHX) | Fry, 11 | 179 | 4,524 | 1,707 | YES | 10,380 | $229.66 | 8,880 | $279.93 | -14.5% | 21.9% |
| Indianapolis, IN (IND) | Philadelphia, PA (PHL) | Rubinsohn, 6, 7 | 200 | 7,710 | 1,413 | YES | 160,630 | $234.07 | 137,650 | $281.81 | -14.3% | 20.4% |
| Boston, MA (BOS) | Jackson, MS (JAN) | Garavnian, 7 | 233 | 5,138 | 1,381 | YES | 15,130 | $270.86 | 13,050 | $320.62 | -13.7% | 18.4% |
| Dallas, TX (DFW) | Monterey, CA (MRY) | Russell, 10 | 274 | 7,329 | 2,861 | YES | 9,700 | $237.07 | 8,370 | $275.53 | -13.7% | 16.2% |
| Philadelphia, PA (PHL) | St. Louis, MO (STL) | Rubinsohn, 6, 7 | 70 | 4,756 | 466 | YES | 222,140 | $182.83 | 195,920 | $239.19 | -11.8% | 30.8% |
| Chicago, IL (CHI) | Tucson, AZ (TUS) | Fry,5, 10 | 370 | 4,711 | 703 | YES | 154,600 | $209.19 | 136,480 | $235.15 | -11.7% | 12.4% |
| Boston, MA (BOS) | Fresno, CA (FAT) | Garavnian, 7 | 124 | 4,431 | 1,130 | YES | 14,880 | $256.82 | 13,170 | $324.12 | -11.5% | 26.2% |
| Boston, MA (BOS) | Tallahassee, FL (TLH) | Garavnian, 7 | 190 | 5,274 | 585 | YES | 15,290 | $240.66 | 13,670 | $291.80 | -10.6% | 21.2% |
| Dallas, TX (DFW) | Tucson, AZ (TUS) | Fry, 10; Jolly, 7; Russell, 10; Talewsky, 15 | 104 | 8,521 | 1,949 | YES | 102,940 | $196.78 | 92,300 | $252.02 | -10.3% | 28.1% |
| Phoenix, AZ (PHX) | Syracuse, NY (SYR) | Fry, 11 | 79 | 3,937 | 1,133 | YES | 32,040 | $239.19 | 28,980 | $310.41 | -9.6% | 29.8% |
| Greensboro, NC (GSO) | Miami, FL (MIA) | McCarthy, 14 | 168 | 5,105 | 1,677 | YES | 62,940 | $167.45 | 56,950 | $205.73 | -9.5% | 22.9% |
| Charlotte, NC (CLT) | Tucson, AZ (TUS) | Fry, 10 | 308 | 5,734 | 2,741 | YES | 22,730 | $221.60 | 20,720 | $254.19 | -8.8% | 14.7% |
| New York, NY (NYC) | Tucson, AZ (TUS) | Fry, 5, 10 | 98 | 3,980 | 1,053 | YES | 112,700 | $211.67 | 102,800 | $271.80 | -8.8% | 28.4% |
| Boston, MA (BOS) | Gainesville, FL (GNV) | Garavnian, 7 | 223 | 5,020 | 575 | YES | 13,090 | $194.72 | 12,130 | $232.57 | -7.3% | 19.4% |
| Miami, FL (MIA) | Ontario, CA (ONT) | McCarthy, 14 | 321 | 4,857 | 2,477 | YES | 30,310 | $232.97 | 28,090 | $266.35 | -7.3% | 14.3% |
| Hartford, CT (BDL) | Dallas, TX (DFW) | Russell, 10 | 543 | 6,344 | 646 | YES | 128,390 | $276.67 | 119,220 | $295.87 | -7.1% | 6.9% |
| Houston, TX (HOU) | Tucson, AZ (TUS) | Fry, 10 | 463 | 4,409 | 458 | YES | 46,310 | $241.17 | 43,140 | $263.56 | -6.8% | 9.3% |
| Boston, MA (BOS) | Santa Barbara, CA (SBA) | Garavnian, 7 | 145 | 4,875 | 1,085 | YES | 17,670 | $290.04 | 16,480 | $361.68 | -6.7% | 24.7% |
| Dallas, TX (DFW) | Louisville, KY (SDF) | Russell, 10; Stansbury, 16 | 84 | 6,929 | 967 | YES | 114,800 | $209.05 | 107,320 | $270.72 | -6.5% | 29.5% |
| Miami, FL (MIA) | Orange County, CA (SNA) | McCarthy, 14 | 140 | 3,205 | 549 | YES | 63,380 | $238.57 | 59,750 | $298.01 | -5.7% | 24.9% |
| Boston, MA (BOS) | Pensacola, FL (PNS) | Garavnian, 7 | 294 | 3,895 | 899 | YES | 26,500 | $220.42 | 25,270 | $254.36 | -4.6% | 15.4% |

**Table D - Average Fare Growth and Passenger Decline on Presumptively Illegal City Pairs and Plaintiffs' Travel**

| DOJ City Market 1 | DOJ City Market 2 | Written Direct Exam (Plaintiff, ¶) (March 2019) | Lundgren Report - Row # (Dec. 2018) | TK4 Actual EY 2018 HHI | TK4 Actual EY Δ HHI (2012 - EY2018) | EY 2018 HHI > 2500 & Actual Δ HHI > 200? | 2012 Passengers (0 or 1 stops) | 2012 Average Fare (0 or 1 stops) | EY 2018 Passengers (0 or 1 stops) | EY 2018 Average Fare (0 or 1 stops) | Passenger Growth (2012 - EY2018) | Average Fare Growth (2012 - EY2018) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| West Palm Beach (PBI) | Phoenix, AZ (PHX) | Fry, 11; Talewsky, 17 | 43 | 4,121 | 1,781 | YES | 35,930 | $213.26 | 34,560 | $287.46 | -3.8% | 34.8% |
| Dallas, TX (DFW) | Kapaa, HI (LIH) | Russell, 10 | 38 | 7,072 | 947 | YES | 22,400 | $366.37 | 21,650 | $503.17 | -3.3% | 37.3% |
| Buffalo, NY (BUF) | Dallas, TX (DFW) | Russell, 10 | 443 | 2,846 | 399 | YES | 90,840 | $192.06 | 88,010 | $210.95 | -3.1% | 9.8% |
| Greenville, SC (GSP) | Phoenix, AZ (PHX) | Fry, 11 | 118 | 3,226 | 681 | YES | 30,000 | $202.45 | 29,080 | $256.34 | -3.1% | 26.6% |
| Huntsville, AL (HSV) | Phoenix, AZ (PHX) | Fry, 11 | 150 | 3,619 | 690 | YES | 19,860 | $271.38 | 19,570 | $336.65 | -1.5% | 24.0% |
| Phoenix, AZ (PHX) | Savannah, GA (SAV) | Fry, 11 | 47 | 4,294 | 620 | YES | 21,360 | $237.71 | 21,050 | $318.91 | -1.5% | 34.2% |
| Fort Myers, FL (RSW) | San Francisco, CA (SFO) | McCarthy, 12, 13, 14, 20 | 339 | 2,661 | 528 | YES | 48,230 | $267.70 | 47,930 | $303.87 | -0.6% | 13.5% |
| Fresno, CA (FAT) | Tucson, AZ (TUS) | Fry, 10 | 399 | 7,922 | 2,445 | YES | 7,150 | $196.10 | 7,140 | $217.90 | -0.1% | 11.1% |